Stark et al v. Seattle Seahawks et al
Case 2:06-cv-01719-JLR    Document 1    Filed 11/29/2006    Page 1 of 11
Doc. 1

___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

NOV 29 2006   DJ

AT SEATTLE
CLERK U.S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FRED and KATHLEEN STARK, a married couple,

    Plaintiffs,

vs.

THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a Washington limited liability company, FIRST & GOAL, INC., a Washington corporation, THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington municipal corporation, and LORRAINE HINE, in her capacity as chair of the Washington State Public Stadium Authority board of directors,

    Defendants

Case No. **CV6 1719JLR**

COMPLAINT

06-CV-01719-CMP

## I. NATURE OF THE ACTION

1. This action is brought to bring a halt to unconstitutional mass warrantless and suspicionless "pat-down" searches of Seattle Seahawks ticket holders as a condition of their entry to Seattle's public football stadium, Qwest Field.

COMPLAINT - 1

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700  FAX. (206) 623-8717

ORIGINAL

## II. PARTIES

2. Plaintiffs Fred and Kathleen Stark are citizens of the United States, residents of the State of Washington, and Seattle Seahawks season-ticket holders.

3. Defendant Seattle Seahawks ("Seahawks") is a professional football team located in Seattle. The Seahawks are owned by Defendant Football Northwest, LLC ("FNW").

4. Defendant Washington State Public Stadium Authority (the "PSA") is a municipal corporation, and is the public owner/operator of Qwest Field, the Seahawks' home field.

5. Defendant Lorraine Hine is believed to be a resident of the State of Washington and is named in her official capacity as the chair of the PSA board of directors only.

6. Defendant First & Goal, Inc. ("FGI") is a corporation organized under the laws of the State of Washington. FGI operates the Stadium pursuant to a lease agreement with the PSA.

## III. JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331 and § 1367.

8. Venue is proper under 28 U.S.C. § 1391.

## IV. FACTS

**Financing, Development, Ownership, and Management of Qwest Field, Seattle's Public Football Stadium**

9. The PSA is a municipal corporation created in 1997 for the development, ownership, and operation of a new public football stadium in Seattle to replace the aging Kingdome. The new stadium was later christened "Qwest Field" (the "Stadium"). The Stadium was financed primarily with public funds. FGI, a private entity, assisted in the Stadium's financing and development and, pursuant to a long-term master lease agreement with the PSA, is authorized to operate the Stadium and related facilities on behalf of the PSA.

COMPLAINT - 2

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

**Origins of the Public Stadium Authority: The Stadium Financing Act**

10. In 1997, Football Northwest, Inc. ("FNW") had an option to purchase the Seahawks from its then owner, Ken Behring, who planned to move the team to California. FNW indicated that it would not exercise its option, keeping the Seahawks in Seattle, unless a new football stadium was built. In response, the State Legislature enacted the Stadium and Exhibition Center Financing Act, Laws of 1997, ch. 220 (the "Stadium Act"), which set forth a comprehensive financing plan for a new stadium and exhibition center.

11. Before the Stadium Act became effective, its key provisions were referred to the voters as Referendum Bill 48. The Referendum was approved on June 17, 1997.

12. The Stadium Act provided for the creation of the PSA to develop, own and operate the Stadium. The PSA is governed by a seven-member board, appointed by the governor. Defendant Lorraine Hine is the current chair of the board. An advisory committee also was established, consisting of the director of the state Office of Financial Management and four members selected by the Legislature.

13. The PSA was granted the authority to "acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a stadium and exhibition center". In carrying out these functions, the PSA was required to consult with the Seahawks' designated "team affiliate" (FGI) about the site, scope, and design of the project.

14. The Stadium Act also required the PSA to consult with the team affiliate about the budget for the project and make recommendations to the state finance committee about the structure of financing for the stadium. Additionally, although the PSA had the authority to build the stadium, it was authorized "to enter into a development agreement with a team affiliate whereby the team affiliate may control the development of the stadium and exhibition center project".

COMPLAINT - 3

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

### Stadium Act Financing Requirements

15. The stadium was to be financed primarily through the sale of bonds, with public contributions capped at $300 million. Before bonds could be sold, the PSA was required to obtain binding commitments that the Seahawks would play all home games at the stadium and that the "team affiliate" would provide $100 million for project development and assume all cost overruns.

16. The Stadium Act also required that the State be granted an equity stake in the Seahawks entitling it "to receive ten percent of the gross selling price" upon sale of the team. The team affiliate also was required to make a commitment to work with the "surrounding areas to mitigate the impact of the construction and operation of the stadium . . . with a budget of at least ten million dollars dedicated to area mitigation." Furthermore, "[20%] of the net profit from the operation of the exhibition facility of the stadium and exhibition center" was to be "deposited into the permanent common school fund."

17. There also were statutorily required commitments regarding the operation of the stadium. For example, at least 10% of the seats in the Stadium for home games had to be sold "at an affordable price" and an executive suite had to be made available, on a lottery basis, as a free upgrade to ticket purchasers. The team affiliate also was required to provide the PSA with reasonable office space at no cost.

### The Master Lease: FGI Becomes the "Team Affiliate" and the PSA's Surrogate Stadium Manager

18. The Stadium Act authorized the PSA to vest the team affiliate with responsibility for the Stadium's operation and management.

19. The Stadium Act authorized the PSA to vest the team affiliate with responsibility for the Stadium's management:

COMPLAINT - 4

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700  FAX, (206) 623-8717

enter into a long-term lease agreement with a team affiliate whereby, in consideration of the payment of fair rent and <u>assumption of operating and maintenance responsibilities</u>, risk, legal liability, and costs associated with the stadium and exhibition center, the team affiliate becomes the sole master tenant of the stadium and exhibition center.

20.  Consistent with the PSA's statutory rights and obligations, on November 24, 1998, the PSA entered into a master lease agreement (the "Master Lease") with FGI, with FGI satisfying the Stadium Act criteria for "team affiliate."

21.  The Master Lease recites that "FGI is the sole master tenant" of the Stadium, and "has the exclusive power and authority to possess, operate, use, sublease" the Stadium. The Master Lease imposes certain conditions on FGI's operation of the Stadium, including the requirement that "FGI shall at all times, use, manage, possess, and operate [the Stadium] in compliance with all applicable Laws, including Laws with respect to discrimination."

22.  The Master Lease also includes recitations regarding the PSA's authority and role as a governmental agency:

> By entering into this Lease…, PSA is binding itself to the covenants in this Lease…, but PSA is not otherwise limiting its governmental authority under the Act; provided PSA shall not exercise its governmental authority (as opposed to its contractual authority under this Lease or any Related Agreement which is not considered PSA's "governmental" authority for purposes of this Section) so as to impose any economic or operational burdens or impacts on FGI or the Project, either directly or indirectly, not provided in this Lease[.]

### The NFL-Mandated "Pat-Down" Policy

23.  In August 2005, the National Football League ("NFL") adopted a policy requiring pat-down searches of all ticket holders at NFL games, at venues throughout the country. The pat-down policy was adopted for the ostensible purpose of identifying explosive devices and preventing suicide bombings at NFL games.

24.  The pat-down policy requires that all ticket holders seeking admittance to an NFL game be subjected to an upper body pat-down search. The policy requires that security

COMPLAINT - 5

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

officers use open hands to pat-down the torso, arms, and back of every ticket holder. The pat-down policy was not adopted in response to any specific and credible threat, but was a broad prophylactic measure in response to a general threat that terrorists might attack any venue where a large number of Americans gather.

25. The NFL mandated that each local NFL franchise, including the Seattle Seahawks, comply with its pat-down policy. Upon information and belief, local NFL franchises, including the Seahawks, are believed to be contractually obligated to enforce the pat-down policy – whether they agree with the policy or not.

26. Upon information and belief, at the beginning of the 2005 NFL season, pat-down searches were instituted at all NFL games, including Seahawks home games at the Stadium.

**The Starks Have Been Subjected to Pat-down Searches at the Stadium**

27. Prior to the 2005 season, the Starks had never been subjected to a pat-down search at a Seahawks game, or any other NFL game.

28. On or about August 22, 2005, the Starks attended a Seahawks pre-season home game against the Dallas Cowboys. Upon arriving at the Stadium, the Starks were surprised to learn that, as a condition of their entry to the game, they were required to submit to a pat-down search. The Starks verbally objected, but ultimately submitted to the pat-down as their only option to attend the game. Upon inquiry, the Starks were informed that the pat-down searches were required under a new NFL policy; the security personnel suggested that the policy appeared to be aimed at preventing terrorist suicide bombers from detonating a hidden vest bomb. This was the first NFL game at which the Starks were subjected to a pat-down search.

COMPLAINT - 6

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

29. On or about September 2, 2005, the Starks attended the second Seahawks pre-season home game against the Minnesota Vikings. The Starks again lodged their objection, but ultimately submitted to a pat-down as a condition of their entry to the Stadium.

30. On September 18, 2005, the Starks attended their first Seahawks home game for the 2005 regular season. Upon arriving at the Stadium, the Starks discovered that the NFL's pat-down policy was to be enforced during the regular season as well. Apparently, Stadium security personnel had been directed by FGI and/or other Defendants to conduct pat-downs of every ticket holder seeking entry to the Stadium.

31. At the entrance to the Stadium, the Starks were stopped by a security officer and informed that they were required to submit to a pat-down as a condition of their entry to the Stadium. The Starks verbally objected, but ultimately submitted to a pat-down as their only option to gain admittance to the game.

32. The Starks attended Seahawks 2005 regular season and post-season home games at the Stadium on September 25, October 16, October 23, November 13, January 14 and January 22. During the 2006 pre-season and current regular season, the Starks attended home games at the Stadium on August 12, August 31, September 17, September 24, and October 22, November 6, November 12, and November 27.

33. Pat-downs of the Starks at these home games have ranged from the non-existent, to a highly intrusive, offensive, and humiliating full-body frisking.

34. No pat-downs (of the Starks or any other ticket holders) were conducted during a heavy downpour at one Seahawks home game on October 13, 2005. Many people were wearing ponchos or other bulky wet-weather protection. Had the stadium security officers conducted the pat-down searches under these conditions, large crowds would have been forced to stand in the rain before being permitted entry to the Stadium. Rather than cause this delay and discomfort to ticket holders, Defendants selectively abandoned the pat-down policy and

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

allowed the Starks and all other ticket holders observed by the Starks to enter the Stadium and attend the Seahawks game without any search.

35. At another Seahawks home game on July 31, 2006, Mr. Stark verbally objected to being patted-down and asked to speak with the security officer's supervisor. Two supervisors were called to discuss the situation. Rather than submitting to yet another pat-down, Mr. Stark removed his shirt in an effort to establish that he was concealing nothing that the pat-down would reveal. The original security officer waved him through the entrance without any further search.

36. At the other end of the spectrum, at a home game on October 16, 2005, Mr. Stark was subjected to a highly intrusive, offensive and humiliating full-body frisking. A security officer ran his hands down Mr. Stark's sides, reached around Mr. Stark and grasped his buttocks. He then felt both arms and across his chest. Then, he moved his hands towards Mr. Stark's groin area, where he found and handled an Albuterol inhaler in Mr. Stark's pant pocket (for his asthma). The security officer then placed both of his hands around Mr. Stark's left thigh, running them down to his sneaker top, which he also felt thoroughly. After this episode and other pat-downs, Mr. Stark was left feeling physically ill and emotionally unsettled for roughly 24 hours afterwards.

37. Except as described above, the Starks were subjected to upper body pat-downs at every Seahawks home game they attended in 2005 and 2006. The Starks verbally objected each time, but ultimately submitted to the searches in order to gain admittance to the Stadium and attend the game. The Starks were not singled out of the crowd based on any suspicion that they might be concealing an explosive device, but were patted-down simply because they were members of a large public gathering.

COMPLAINT - 8

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700  FAX, (206) 623-8717

38. Upon information and belief, the pat-down policy, as implemented at the Stadium was adopted in the absence of any specific and credible threat to the security of the Stadium or Seahawks ticket holders.

39. Implementation of the pat-down policy at the Stadium has lacked uniformity and consistency, with much inappropriate discretion apparently left to individual security officers. The policy, and the security officers' implementation thereof, neither effectively achieves its purported goals, nor attempts to achieve those goals in a constitutionally acceptable manner.

40. The pat-down searches do not effectively achieve the ostensible goal of making attendees at Seahawks games safe from terrorist attacks, but provide the mere illusion of security. A would-be terrorist could easily circumvent the half-measures of Stadium security by concealing an explosive device below the waist or smuggling a device on a rainy game-day where no searches – or only the most cursory pat-downs – take place.

41. When not hosting a Seahawks home game, the Stadium is frequently used for other sporting events and large gatherings, including Seattle Sounders soccer games, live concerts, and motocross events. Upon information and belief, pat-down searches at the Stadium are not conducted at these events and are only conducted at Seahawks games.

42. The mass, warrantless, suspicionless searches to which the Starks and other Seahawks ticket holders are subjected at the Stadium violate both the Federal and State Constitutions. At no time did the Starks voluntarily or effectively consent to waive their constitutional rights. The Starks' submission to the pat-down searches is not voluntary since their only option to attend Seahawks games, for which they have purchased tickets, at the public Stadium is to submit to the unconstitutional searches.

43. As they have done for the past 15 seasons, the Starks have purchased Seahawks season tickets for the 2006 season. The Starks plan to attend Seahawks home games for the

COMPLAINT - 9

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700  FAX, (206) 623-8717

remainder of the 2006 season, and intend to purchase season tickets and attend home games in future seasons.

44. Defendants should be enjoined from performing pat-down searches at the Stadium.

### First Cause of Action: Violation of Fourth Amendment Rights

45. Plaintiffs reallege and incorporate by reference the foregoing paragraphs 1 - 44 as if fully set forth below.

46. Defendants and/or their agents are conducting, authorizing, and/or otherwise facilitating mass warrantless, suspicionless, pat-down searches of ticket holders at Seahawks home games at the Stadium in violation of the Fourth Amendment.

47. Defendants' actions, and/or the actions of their agents, are unreasonable, and violate the Starks' Fourth Amendment right to be free from unreasonable searches.

48. Individually and collectively, Defendants' conduct constitutes "state action" for purposes of the Starks' constitutional claims.

49. Defendants' course of conduct, and/or the conduct of their agents, unless enjoined, threatens continued violation of the Starks' Fourth Amendment rights for the duration of the 2006 season and into the future.

### Second Cause of Action: Violation of Civil Rights under 42 U.S.C. § 1983

50. Plaintiffs reallege and incorporate by reference the foregoing paragraphs 1 - 49 as if fully set forth below.

51. Defendants' actions, and/or the actions of their agents, have caused the Starks to be subjected to a deprivation of their constitutional rights, in violation of 42 U.S.C. § 1983.

52. Defendants' course of conduct, and/or the conduct of their agents, unless enjoined, threatens continued violation of § 1983 for the duration of the 2006 season and into the future.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**Third Cause of Action: Violation of Washington State Constitution**

53. Plaintiffs reallege and incorporate by reference the foregoing paragraphs 1 - 52 as if fully set forth below.

54. Defendants and/or their agents are conducting, authorizing, and/or otherwise facilitating warrantless, suspicionless mass pat-down searches of ticket holders at Seahawks home games at the Stadium in violation of Article 1, § 7 of the Washington State Constitution.

55. Defendants' actions, and/or the actions of their agents, are unreasonable, and violate the Starks' right under the State Constitution to be free from unreasonable searches.

**Relief Requested**

Having stated their causes of action against Defendants, the Starks respectfully request the following relief:

a. An order enjoining defendants from conducting, authorizing, or otherwise permitting warrantless and suspicionless mass pat-down searches of Seahawks ticket holders as a condition of their admittance to Qwest Field on game days;

b. An award of damages in an amount to be determined at trial;

c. An award of attorneys' fees and costs as provided for by 42 U.S.C. § 1988 or other applicable law; and

d. For such other and further relief that the Court deems just and reasonable under the circumstances.

DATED this 29th day of November, 2006.

DANIELSON HARRIGAN LEYH & TOLLEFSON LLP

By _____
Timothy G. Leyh, WSBA #14853
Christopher T. Wion, WSBA #33207
Attorneys for Plaintiffs Fred and Kathleen Stark

COMPLAINT - 11

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717