Stark et al v. Seattle Seahawks et al
Case 2:06-cv-01719-JLR    Document 3    Filed 11/29/2006    Page 1 of 90
Doc. 3

_____FILED _____ENTERED
_____LODGED_ _ _RECEIVED

NOV 2 9 2006   DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FRED and KATHLEEN STARK, a married couple,

                            Plaintiffs,

        vs.

THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a Washington limited liability company, FIRST & GOAL, INC., a Washington corporation, THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington municipal corporation, and LORRAINE HINE, in her capacity as chair of the Washington State Public Stadium Authority board of directors,

                            Defendants

Case No. **CV6  1719** JLR

DECLARATION OF CHRISTOPHER WION

06-CV-01719-DECL

I, Christopher Wion, swear under penalty of perjury under the laws of the State of Washington, to the following:

DECLARATION OF CHRISTOPHER WION - 1

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL., (206) 623-1700   FAX, (206) 623-8717

ORIGINAL

1     1.     I am one of the attorneys representing Plaintiffs Fred and Kathleen Stark in the

2   above-captioned matter. I am over the age of 21 and competent to testify regarding the

3   following matters.

4     2.     Attached hereto as Exhibit A is a true and correct copy of the Master Lease

5   between the Washington State Public Stadium Authority and First & Goal, Inc., dated

6   November 24, 1998.

7          DATED this 29th day of November, 2006 in Seattle, Washington.

8

9

10                                          CHRISTOPHER WION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF CHRISTOPHER WION - 2

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

# EXHIBIT A

**MASTER LEASE**

between

**WASHINGTON STATE PUBLIC STADIUM AUTHORITY,**

a public corporation of the State of Washington

and

**FIRST & GOAL INC.,**

a Washington corporation

Dated: November 24, 1998

# TABLE OF CONTENTS

*Page*

SECTION 1 DEFINED TERMS ..................................................................................2

SECTION 2 AGREEMENT TO LEASE ......................................................................3
2.1   Sole Master Tenant ...........................................................................3
2.2   Condition Precedent...........................................................................3

SECTION 3 PREMISES ..............................................................................................3
3.1   Phase I................................................................................................3
3.2   Phase II...............................................................................................4
3.3   Reduction of Premises In Connection With Development; Purchase
        Option ................................................................................................4
3.4   Personal Property ...............................................................................4
3.5   Acceptance of Premises, Project Improvements................................4

SECTION 4 TERM.......................................................................................................5
4.1   Initial Term ........................................................................................5
4.2   Right to Extend. .................................................................................5
4.3   End of Term; Holdover ......................................................................6
4.4   Transition at End of Term..................................................................6
4.5   Turnover at End of Term ...................................................................7

SECTION 5 RENT ......................................................................................................7
5.1   Rent During the Term ........................................................................7
        5.1.1   Rent Prior to Completion Date .............................................7
        5.1.2   Rent From and After the Completion Date............................7
        5.1.3   PSA Operating Expenses ......................................................8
5.2   Proration of Rent..............................................................................10
5.3   Timing of Rent Payments ................................................................10
5.4   Past Due Rent...................................................................................11
5.5   Net Rent ...........................................................................................11
5.6   Rent During Any Holdover Period ..................................................11
5.7   Operating Reserve............................................................................11

SECTION 6 OTHER STATUTORILY MANDATED PAYMENT OBLIGATIONS OF
FGI ...........................................................................................................14
6.1   Share of Profits from Operation of Exhibition Hall.......................14
6.2   Share of Revenues from Other Sources ..........................................18
6.3   Net Profits from Olympic Games and/or World Cup Soccer ..........19

SECTION 7 USE OF THE PREMISES .....................................................................19
7.1   Permitted Use of Premises...............................................................19
7.2   Standard of Operations, Continuous Operations .............................20

*Page*

7.3    Hazardous Substances ...............................................................................20

SECTION 8 REQUIREMENTS TO PROVIDE PUBLIC BENEFITS ......................22
8.1    Special Team Covenants ...............................................................22
    8.1.1    Playing of All Home Games ................................................23
    8.1.2    Affordable Priced Seats .....................................................23
    8.1.3    Suite Lottery ......................................................................25
8.2    Coordination in Scheduling Events .............................................25
8.3    Cooperation with Obtaining Super Bowl Event ...........................26
8.4    Lottery Promotion .......................................................................26
8.5    Prevailing Wages ........................................................................27
8.6    Women and Minority Business Enterprise Goals .........................27
8.7    Hiring Local Residents ................................................................28
8.8    Mitigation of Impacts from Stadium Operations .........................28
8.9    Annual Reporting on Operations .................................................29
8.10   Major League Soccer ..................................................................29
8.11   Provision of PSA Office Space ...................................................29
8.12   Neighboring Community Meetings ..............................................31
8.13   Protection of Tax-Exempt Bonds ................................................32
8.14   Project Art ..................................................................................32
8.15   Compliance With Laws; No Discrimination ................................32

SECTION 9 MANAGEMENT OF THE PROJECT .................................................33
9.1    Standard of Operation .................................................................33
9.2    Signage, etc. ...............................................................................33
9.3    Project Revenues .........................................................................33

SECTION 10 FGI'S RESPONSIBILITY FOR ALL OPERATING EXPENSES .........34
10.1   Utilities .......................................................................................34
10.2   Payment and Contest of Impositions ...........................................34
10.3   Indemnification ...........................................................................35
10.4   Liens ...........................................................................................35
10.5   Weller Street Pedestrian Bridge Maintenance, etc. .....................36
10.6   Deferred Sales Tax ......................................................................36

SECTION 11 MAINTENANCE AND MODERNIZATION .....................................36
11.1   Maintenance ...............................................................................36
    11.1.1    Maintenance ......................................................................36
    11.1.2    Maintenance Standard of First Class Condition ................36
    11.1.3    Annual Maintenance Plan ..................................................38
    11.1.4    Five-Year Major Maintenance and Modernization Plan ....38
    11.1.5    Annual Maintenance Report ..............................................38
11.2   Normal Maintenance ...................................................................39
11.3   Major Maintenance .....................................................................39
11.4   Modernization .............................................................................40
11.5   FGI and PSA Funding Responsibilities ........................................40
11.6   Naming Rights Account ...............................................................41
11.7   Capital Improvements Account ....................................................41
11.8   Disbursement of Funds ................................................................41
11.9   Approval of Plans, Completion of Work ......................................42
11.10  Exemption From Public Works Requirements .............................43

SECTION 12 DAMAGE OR DESTRUCTION .......................................................43
12.1   Damage or Destruction ................................................................43

*Page*

12.2    Damage or Destruction at End of Term ................................................................ 45
12.3    No Rent Adjustment ........................................................................................... 46
12.4    Development Period ............................................................................................ 46

SECTION 13 INSURANCE ............................................................................................ 46
13.1    Securing of Insurance Coverage ........................................................................ 46
13.2    Types of Required Insurance ............................................................................. 47
13.3    Terms of Insurance ............................................................................................ 48
13.4    PSA's Acquisition of Insurance ........................................................................ 49
13.5    Waiver of Subrogation ....................................................................................... 49
13.6    Restoration Proceeds Held in Trust .................................................................. 49
13.7    Application of Restoration Proceeds ................................................................. 50
13.8    Powers and Duties of Trustee of Insurance ...................................................... 50
13.9    Self-Insurance ................................................................................................... 52

SECTION 14 CONDEMNATION ................................................................................... 53
14.1    Total Taking ...................................................................................................... 53
14.2    Substantial Taking ............................................................................................. 53
14.3    Partial Taking .................................................................................................... 54
14.4    Degree of Taking ............................................................................................... 54
14.5    Successive Takings ............................................................................................ 54
14.6    Temporary Taking ............................................................................................. 54
14.7    Insurance Trustee .............................................................................................. 55
14.8    Development Period ........................................................................................... 55

SECTION 15 INDEMNIFICATION ............................................................................... 55
15.1    FGI's Obligation ............................................................................................... 55
15.2    PSA's Obligation .............................................................................................. 56
15.3    Procedure ........................................................................................................... 56
15.4    Limitations on PSA Liability ............................................................................ 57

SECTION 16 INSPECTION OF PREMISES ................................................................. 57
16.1    PSA's Right to Inspect ...................................................................................... 57
16.2    Scope of Inspection ........................................................................................... 58
16.3    Right of Entry .................................................................................................... 58

SECTION 17 NAMING RIGHTS ................................................................................... 58
17.1    IP Rights ............................................................................................................ 58
17.2    FGI Rights ......................................................................................................... 59
17.3    PSA Limited Visual Image Rights .................................................................... 59
17.4    PSA Sale of Special Naming Rights .................................................................. 60

SECTION 18 TAX AND FEE COLLECTION OBLIGATION ....................................... 61
18.1    King County Taxes ............................................................................................ 61
18.2    PSA Surcharge .................................................................................................. 61
18.3    Audit Right ........................................................................................................ 61

SECTION 19 PSA COVENANTS .................................................................................. 62
19.1    Quiet Enjoyment ............................................................................................... 62
19.2    No Liens ............................................................................................................ 62
19.3    No Charges or Fees ........................................................................................... 62

SECTION 20 REPRESENTATIONS AND WARRANTIES ........................................... 63
20.1    By PSA .............................................................................................................. 63

*Page*

20.2    By FGI ................................................................................................63

SECTION 21 SUBLETTING AND ASSIGNMENT ...............................................64
21.1    Subletting..............................................................................................64
21.2    Limited Nondisturbance of Certain Sublessees .....................................64
21.3    Assignment............................................................................................66
21.4    FGI Liability ..........................................................................................67
21.5    Rent Letter of Credit..............................................................................67
21.6    Covenants Binding on Successors and Assigns.....................................68
21.7    Transfer.................................................................................................68
21.8    Change of Control..................................................................................68
21.9    Unauthorized Transfer ..........................................................................69
21.10   Stock Legends........................................................................................70

SECTION 22 DEFAULT ........................................................................................70
22.1    Event of Default.....................................................................................70
22.2    Termination of Lease .............................................................................72
22.3    Effect of Termination.............................................................................72
22.4    Damages and Remedies .........................................................................73
22.5    No Waivers ............................................................................................74
22.6    Performance by PSA of FGI's Defaulted Obligations ...........................74

SECTION 23 SURRENDER UPON TERMINATION ...........................................74
23.1    FGI's Obligation....................................................................................74
23.2    FGI's Personal Property.........................................................................75
23.3    No Rights to Accounts ...........................................................................75

SECTION 24 DISPUTE RESOLUTION .................................................................75
24.1    Applicability ..........................................................................................75
24.2    Designation of Arbitrator.......................................................................76
24.3    Scope of Dispute Resolution..................................................................76
24.4    Conduct of Dispute Resolution..............................................................76
24.5    Effect on Lease.......................................................................................77
24.6    Effect of Determination .........................................................................77
24.7    Equitable Proceedings............................................................................77
24.8    Specific Enforcement.............................................................................78
24.9    Further Disputes.....................................................................................79

SECTION 25 CONFIDENTIALITY; PUBLIC DISCLOSURE OF INFORMATION ...............79
25.1    Nondisclosure of Exempt Public Records .............................................79
25.2    Public Disclosure Requests....................................................................80
25.3    Ownership of FGI Documents ...............................................................80
25.4    PSA Use of FGI Documents ..................................................................81
25.5    Document Designation...........................................................................81
25.6    Term.......................................................................................................81

SECTION 26 GENERAL PROVISIONS ................................................................81
26.1    Overriding Legal Requirements.............................................................81
26.2    Compliance With Law; No Discrimination ............................................81
26.3    Estoppel Certificates .............................................................................82
26.4    Indexing ................................................................................................82
26.5    Good Faith Consideration ......................................................................83
26.6    No Partnership .......................................................................................83
26.7    Time of the Essence ...............................................................................83

*Page*

| | | |
|---|---|---|
| 26.8 | Captions | 83 |
| 26.9 | Meaning of Terms | 83 |
| 26.10 | Lease Construed as a Whole | 83 |
| 26.11 | Waivers | 83 |
| 26.12 | Severability | 84 |
| 26.13 | Survival | 84 |
| 26.14 | Memorandum of Lease | 84 |
| 26.15 | Amendment | 84 |
| 26.16 | Commissions | 84 |
| 26.17 | Notices | 84 |
| 26.18 | Consents and Approvals | 86 |
| 26.19 | Incorporation of Exhibits by Reference | 86 |
| 26.20 | Non-Waiver of Government Rights | 86 |
| 26.21 | Exclusive Remedies | 87 |
| 26.22 | No Third-Party Beneficiaries | 87 |
| 26.23 | Further Actions | 87 |
| 26.24 | Attorneys' Fees | 87 |
| 26.25 | Interest | 88 |
| 26.26 | Conflict of Interest | 88 |
| 26.27 | No PSA Personal Liability | 88 |
| 26.28 | Governing Law | 88 |
| 26.29 | Reference Date of Lease | 88 |
| 26.30 | Entire Agreement | 89 |

# MASTER LEASE

## With Exhibits



# MASTER LEASE EXHIBITS

A.       Project Site Description

1       Defined Terms

3.1       Phase I Parcel Legal Description

4.1       Form of Confirmation of Commencement Date and Completion Date

6.2       Possible Future Activities

8.11       Form of Confirmation of PSA Office Space Designation

11.1.2.       Comparable Stadium Facilities, Comparable Exhibition Facilities, and Comparable Parking Facilities

20.1.2       Permitted Exceptions

26.14       Form of Memorandum of Lease

1                              MASTER LEASE

2    EFFECTIVE DATE: November 24, 1998

3

4    BETWEEN:            **WASHINGTON STATE PUBLIC STADIUM AUTHORITY,**

5                        a Washington State public corporation

6                        401 Second Avenue South, Suite 520

7                        Seattle, WA 98104                    ("PSA")

8

9    AND:               **FIRST & GOAL INC.,**

10                        a Washington corporation

11                        110-110th Avenue N.E., Suite 550

12                        Bellevue, WA 98004                   ("FGI")

13

14          A.      On April 26, 1997, the Legislature of the State of Washington adopted

15   Chapter 220, Laws of 1997. That legislation referred certain sections, specifically Sections 101

16   through 604, to a vote of the people of the State as Referendum Bill Number 48. At a special

17   election held on June 17, 1997, the people of the State approved Referendum Bill Number 48

18   and, as a result, the legislation became law effective July 17, 1997. That legislation is the "Act."

19   Certain sections of the Act have since been codified at RCW Chapter 36.102.

20          B.      Pursuant to the Act, PSA was created and has acquired and owns the real

21   property described on attached Exhibit A (the "Project Site").

22          C.      Pursuant to the Act, PSA and FGI have simultaneously entered into that

23   certain Development Agreement of even date herewith ("Development Agreement") pursuant to

24   which PSA as owner of the Project Site has engaged FGI as developer to develop a new state-of-

25   the-art stadium designed for National Football League football, Olympic events and World Cup

26   soccer, with a seating capacity of at least 67,000 permanent seats with space for 5,000 additional

27   temporary or permanent seats (for NFL football) (the "Stadium"); a new state-of-the-art

28   exhibition hall of at least 325,000 gross square feet of space (the "Exhibition Hall"); a new

29   parking structure to serve the Stadium and the Exhibition Hall (the "Parking Facility"); and

30   related improvements (the "Other Improvements").

1          D.      Both the Stadium and the Parking Facility will contain space ("Swing

2    Space") which may be utilized either as part of the Stadium or the Parking Facility, respectively,

3    or as part of the Exhibition Hall.

4          E.      The Stadium, the Exhibition Hall, the Parking Facility and the Other

5    Improvements are collectively the "Project Improvements," and individually each a "Project

6    Element."

7          F.      The Project Site and the Project Improvements to be constructed thereon

8    are collectively the "Project."

9          G.      The Project will be fully furnished and equipped for its intended uses and

10   operation, and available to deliver to FGI under this Master Lease in "turn-key" condition.

11         H.      Football Northwest LLC ("FNW") owns the National Football League

12   team, the Seattle Seahawks ("Team"). FNW is under the control of Paul G. Allen ("Allen").

13   FGI is a corporation also under the control of Allen. Accordingly, FGI is a "team affiliate," as

14   that term is defined in Section 101(1) of the Act, because FGI and the Seattle Seahawks are

15   under common control.

16         I.      This Master Lease (the "Lease") is entered into pursuant to PSA's

17   authority under Section 106(8) of the Act.

18         NOW, THEREFORE, in consideration of the mutual promises of the Parties set

19   forth in this Lease, the Parties agree as follows:

20

21   SECTION 1    DEFINED TERMS

22         Defined terms are capitalized words which are not capitalized as the first word in a

23   sentence. A defined term has the meaning given to it by the text when it is first used, or by the

24   definition given it in Exhibit 1, or by the definition given it in the Development Agreement, or

25   by the definition given it in the Stadium Use Agreement. If a defined term used in this Lease has

26   a different definition in any of the other Related Leases, its definition is controlled by this Lease

27   when the defined term is used in reference to this Lease.

28

1    SECTION 2    AGREEMENT TO LEASE

2    PSA hereby leases the Premises to FGI and FGI hereby leases the Premises from PSA on

3    the following terms and conditions.

4    2.1    Sole Master Tenant

5    FGI is the sole master tenant of the Premises. Without limitation, as sole master

6    tenant, FGI has the exclusive power and authority to possess, operate, use, sublease and enter

7    into use, license, concession and other agreements with respect to the Premises.  Except to the

8    extent otherwise specifically provided for in this Lease, FGI shall have the right to retain all

9    revenues derived from the Premises, including without limitation revenues from (i) subleases and

10   use agreements, (ii) license and concession agreements, (iii) suite and seat licenses,

11   (iv) concessions, novelties, catering, parking, sponsorships, advertising, naming rights (subject to

12   Section 17.4 hereof), and (v) PSLs (except to the extent sold by PSA pursuant to the

13   Development Agreement).

14   2.2    Condition Precedent

15   This Lease shall not be effective until the Master Lease Guaranty has been

16   executed and delivered to PSA by a Person with a net worth in excess of one hundred million

17   dollars.

18

19   SECTION 3    PREMISES

20   3.1    Phase I

21   From the Substantial Completion of Phase I, as defined in the Development

22   Agreement, ("Commencement Date") through the Substantial Completion of Phase II, as defined

23   in the Development Agreement, ("Completion Date"), the Premises shall consist of that portion

24   of the Project Site described in Exhibit 3.1 (the "Phase I Parcel"), and any Project Improvements

25   constructed on the Phase I Parcel, which are to include the Exhibition Hall and the Parking

26   Facility. As additional Project Improvements are constructed or completed on the Phase I Parcel,

27   those Project Improvements shall be owned by PSA and automatically become part of the

28   Phase I Parcel.

1       3.2    Phase II

2           *From the Completion Date until the end of the Term, the Premises shall consist of*

3 *the Project, including the Project Site and the Project Improvements.*

4       3.3    Reduction of Premises In Connection With Development; Purchase Option

5           The Parties acknowledge that development may occur in the North Parking Lot,

6 and/or upon and/or adjacent to the Parking Facilities, pursuant to rights set forth in the

7 Development Agreement and/or pursuant to that certain Property Contribution Agreement and/or

8 1998 Letter of Intent. In addition, FGI has the option to purchase a portion of the North Parking

9 Lot pursuant to the Development Agreement. In the event of any such development or purchase

10 (subject to Section 27 of the Development Agreement), the Premises, but not any of the Project

11 Improvements (other than portions of the Parking Facilities which may be removed and/or

12 reconstructed as part of such development) shall be reduced (in the case of a purchase) or

13 modified, and such modification shall be reflected in a reasonable adjustment to the description

14 of the Premises, which shall be attached to this Lease as a substitute Exhibit A.

15       3.4    Personal Property

16           The "Personal Property" consists of movable items of property, used in

17 connection with the operation of the Premises, which were part of the Project Improvements as

18 FF&E and any items of property which replace any of such original items. The Personal

19 Property also includes items of movable property purchased by FGI as part of FGI's obligations

20 under Section 11. The Personal Property is included in the Premises. The Personal Property also

21 includes contract rights such as warranties on the Project Improvements and its various

22 components.

23       3.5    Acceptance of Premises, Project Improvements

24           3.5.1   Upon the Commencement Date, FGI will accept the Phase I Parcel and the

25 Project Improvements located thereon, and upon the Completion Date, FGI will accept the

26 Phase II Parcel and the Project Improvements located thereon, respectively, "AS IS, WITH ALL

27 FAULTS."

28           3.5.2   PSA makes no representation or warranty regarding the condition of the

29 Project Site other than PSA's representations set forth in the Development Agreement and this

1   *Lease. PSA shall have no liability to FGI on account of the condition of the Project Site other*
2   *than as may arise under the terms of the Development Agreement and this Lease.*

3                   3.5.3   *PSA makes no representation or warranty whatsoever regarding the design*
4   or construction of the Project, except to the extent Project improvements within the PSA Office
5   *Space are constructed or altered pursuant to Section 8.11.6.* FGI acknowledges that the Project
6   Improvements will be constructed by FGI (except to the extent Project improvements within the
7   PSA Office Space are constructed or altered pursuant to Section 8.11.6). FGI shall have no
8   *claim whatsoever against PSA on account of (x) the design or construction of the Project except*
9   to the extent Project improvements within the PSA Office Space are constructed or altered
10  pursuant to Section 8.11.6, or (y) the condition of the Project Improvements.

11

12  <u>SECTION 4</u>   <u>TERM</u>

13          The term of this Lease (the "Term") consists of the Initial Term, Extension Periods, if
14  any, and a Completion Term, if any.

15          4.1   <u>Initial Term</u>

16          The initial term ("Initial Term") of the Lease shall commence upon the
17  Commencement Date and, unless terminated pursuant to the provisions of this Lease, shall
18  terminate on the last day of the thirtieth (30th) complete Lease Year following the Completion
19  Date. The Commencement Date and the Completion Date shall each be confirmed by the Parties
20  in Exhibit 4.1, which shall be separately executed by the Parties. A "Lease Year" shall be the
21  calendar year.

22          4.2   <u>Right to Extend</u>. FGI shall have the right to extend the Initial Term for three (3)
23  successive periods of ten (10) years each (each an "Extension Period"), if exercised in
24  accordance with this section.

25          4.2.1   Each successive Extension Period shall be effective only if FGI gives
26  written notice of the exercise of the right to extend to PSA not later than eighteen (18) months
27  prior to the expiration of the Initial Term or the preceding Extension Period, as may be
28  applicable, and there does not exist an Event of Default under the Lease, either at the time the
29  notice to extend is given or at the commencement of the Extension Period in question. "Backup
30  *marketing" expenses incurred in connection with the marketing of the Project to third parties and*

1    finding new tenants and users shall only be considered Reasonable PSA Operating Expenses

2    during the last eighteen (18) months of the Term.

3                4.2.2    During each Extension Period, this Lease shall continue upon the same

4    terms and conditions as provided in this Lease, including the Rent as described in Section 5.1.2.

5                4.2.3    FGI may only exercise a right to extend if FNW has exercised its

6    comparable right to extend under the Stadium Use Agreement.

7        4.3    End of Term; Holdover

8                FGI may extend the Term for one Completion Term, if necessary, for the purpose

9    of enabling a professional sports team sublessee or user which uses the Stadium as its regular

10    home playing facility to complete a professional sports league season including playoffs.  FGI

11    shall not hold over for any other purpose.

12                4.3.1    The "Completion Term" shall mean a period of time not exceeding twelve

13    (12) months which shall commence immediately at the end of the Initial Term or then current

14    Extension Period and shall end not later than sixty (60) days after the completion of the

15    sublessee's or user's playing season including playoffs.  Any Completion Term shall be upon all

16    of the terms and conditions, including Rent, applicable under this Lease immediately prior to the

17    beginning of the Completion Term.

18                4.3.2    The Completion Term shall be effective only if:  FGI gives written notice

19    of the exercise of the right to extend to PSA not later than one (1) year prior to the expiration of

20    the Term, there does not exist an Event of Default under the Lease, at the time the notice to

21    extend is given, and there does not exist an Event of Default under the Lease at the

22    commencement of the Completion Term.

23        4.4    Transition at End of Term

24                During the last Lease Year prior to the end of the Term (i.e., for which there are

25    no longer any Extension Periods with respect to which FGI has exercised or may exercise its

26    option), PSA and FGI shall use Reasonable Efforts to effect an orderly and efficient transition of

27    operations of the Exhibition Hall, the Parking Facilities, the Stadium and any Other

28    Improvements to PSA or PSA's designee(s).  Within the last Lease Year of the Term, FGI may

29    not, without PSA's prior written consent, enter into any agreement which relates to the

30    operations of the Project which extends beyond the Term unless such agreement may be

1    terminated at the end of the Term without cost or obligation to PSA, including, but not limited to

2    advance booking agreements, agreements with athletic teams, agreements with concessionaires,

3    or agreements with suppliers or service providers. Costs incurred by PSA in connection with the

4    transition or the possession, renovation, improvement, demolition, use, operation, sale or leasing

5    of the Project after the Term are not Reasonable PSA Operating Expenses.

6        4.5    Turnover at End of Term

7            At the end of the Term, FGI will:

8            4.5.1    Turn over to PSA possession of the Premises, including all Project

9    Improvements and Personal Property used in the operations of the Premises in the condition

10   required by Section 11, normal wear and tear excepted;

11           4.5.2    Assign to PSA all agreements that exist and which are described in

12   Section 4.4;

13           4.5.3    Turn over to PSA originals or copies of all books and records which

14   pertain to the operations of the Premises during the immediately preceding five (5) years;

15           4.5.4    Assign to PSA any and all warranties that exist and which pertain to the

16   Project Improvements; and

17           4.5.5    Terminate, in accordance with applicable law, all employees of FGI

18   performing services exclusively in the operations of the Premises, and allow PSA to interview all

19   such employees with respect to possible future employment by PSA or PSA's designee.

20

21   SECTION 5    RENT

22       5.1    Rent During the Term

23           The following provisions for the payment of Rent apply during the Initial Term,

24   any Extension Periods, and any Completion Term. FGI shall pay rent ("Rent") as follows:

25           5.1.1    Rent Prior to Completion Date

26           From the Commencement Date until the Completion Date, FGI shall pay

27   Rent to PSA in the amount of $425,000 per year, Indexed from the Commencement Date.

28           5.1.2    Rent From and After the Completion Date

29           From and after the Completion Date, during each Lease Year FGI shall

30   pay Rent to PSA equal to the sum of:

1     5.1.2.1 Eight Hundred Fifty Thousand Dollars ($850,000) per year,

2 Indexed, ("Basic Rent"); plus

3     5.1.2.2 The amount, if any, by which the Reasonable PSA Operating

4 Expenses for that Lease Year exceed the Basic Rent (as provided in 5.1.3).

5   Basic Rent shall be Indexed as of the first day of the thirteenth complete calendar month

6 following the Completion Date, and on each anniversary thereafter during the Term. Indexing

7 may cause Basic Rent to increase or remain the same, but Basic Rent may not decrease.

8    5.1.3 <u>Reasonable PSA Operating Expenses</u>

9     5.1.3.1 PSA acknowledges that FGI has a legitimate interest in Reasonable

10 PSA Operating Expenses, but only to the extent Reasonable PSA Operating Expenses will cause

11 FGI to become obligated to pay Rent in excess of Basic Rent. "Reasonable PSA Operating

12 Expenses" mean those reasonable expenses associated with PSA operations, including the

13 employment of employees, ¬gents, attorneys, and other contractors, and the operation of its

14 office facilities. Reasonable PSA Operating Expenses include only those reasonable operating

15 expenses reasonably related to Project as it exists as of the Completion Date. Reasonable PSA

16 Operating Expenses do not include any (i) operating expenses which are not reasonably related to

17 the Project as it exists as of the Completion Date, (ii) operating expenses related to any

18 development rights or Development Areas including those described in Section 27 of the

19 Development Agreement (which should be reimbursed through other express agreements), (iii)

20 non-operating costs such as capital and capitalized costs (except capital costs for office

21 furnishings, equipment and software which are included as Reasonable PSA Operating

22 Expenses), or (iv) other expenses which would not be a reasonable operating expense if PSA's

23 activities were limited to activities (x) which are reasonably required by the Act, Laws, this

24 Lease, or the Development Agreement, or (y) which are reasonably related to the Project as it

25 exists as of the Completion Date. To the extent reasonably practicable, Reasonable PSA

26 Operating Expenses will be incurred and structured in such a manner (considering such matters

27 as timing, payment terms, etc.) so as to not require FGI to pay Rent pursuant to Section 5.1.2.2 in

28 any Lease Year. Reasonable PSA Operating Expenses include annual loan debt service of up to

29 $210,000 for up to fifteen (15) years ("Annual Loan Debt Service") as contemplated by the

30 Financing Plan between PSA and the State of Washington, provided that following Final

1   Completion the unexpended balance of PSA funds from the PSA Operating Account and the

2   PSA Project Account in excess of $500,000, to be utilized to initially fund the Cash Reserve

3   described below, shall be used to pay down the loan balance.

4          5.1.3.2   PSA shall use Reasonable Efforts to deliver to FGI an annual

5   budget of the anticipated Reasonable PSA Operating Expenses for a Lease Year, not later than

6   sixty (60) days prior to the commencement of such Lease Year. The budget shall be binding

7   upon PSA except for any mathematical errors. If, after the Completion Date, PSA fails to deliver

8   a budget for a Lease Year by the date on which such Lease Year commences, FGI shall

9   temporarily pay Rent to PSA in the amount required under 5.1.2 above for the prior Lease Year.

10   When PSA does deliver a budget for such Lease Year, if the budgeted Reasonable PSA

11   Operating Expenses are greater than the Rent paid by FGI for such Lease Year, FGI shall pay

12   PSA the amount of the excess within thirty (30) days of receipt of the budget for the monthly

13   installments paid to that date, and the corrected amount in monthly installments thereafter.

14   Alternatively, when PSA does deliver a budget for such Lease Year, if the budgeted Reasonable

15   PSA Operating Expenses are less than the monthly Rent paid by FGI for such Lease Year, PSA

16   shall refund to FGI within thirty (30) days the lesser of (x) the amount paid by FGI as Rent for

17   such Lease Year in excess of Basic Rent, or (y) the difference between the monthly Rent paid by

18   FGI for such Lease Year and budgeted Reasonable PSA Operating Expenses for the same period

19   of time, in either case together with interest at the highest rate of interest earned by PSA on its

20   various interest bearing accounts and investments.

21          5.1.3.3   PSA shall use Reasonable Efforts to provide FGI with a summary

22   of the actual Reasonable PSA Operating Expenses for a Lease Year within sixty (60) days after

23   the end of such Lease Year. If the actual Reasonable PSA Operating Expenses for such Lease

24   Year are more than the Rent paid by FGI for such Lease Year, and additional Rent is due, subject

25   to reduction pursuant to Section 5.7.2.2, FGI shall pay such additional amount to PSA within

26   thirty (30) days of FGI's receipt of the summary of actual Operating Expenses. If FGI has paid

27   Rent for such Lease Year pursuant to Section 5.1.2.2 above and the actual Reasonable PSA

28   Operating Expenses for such Lease Year are less than the Rent paid by FGI for that Lease Year,

29   PSA shall refund to FGI within thirty (30) days the lesser of (x) the amount paid by FGI as Rent

30   for such Lease Year pursuant to Section 5.1.2.2 above, or (y) the difference between the Rent

1    paid by FGI and the actual Reasonable PSA Operating Expenses, in either case together with

2    interest at the highest rate of interest earned by PSA on its various interest bearing accounts and

3    investments .

4                    5.1.3.4    At any time within thirty (30) days after FGI receives PSA's

5    statement of actual Reasonable PSA Operating Expenses, FGI may elect, by written notice to

6    PSA, to either review or audit PSA's books and records of the actual Reasonable PSA Operating

7    Expenses for that Lease Year. The review or audit shall occur at a mutually convenient time not

8    less than five (5) Business Days nor more than twenty (20) days after PSA's receipt of FGI's

9    notice. If the review or audit reveals a discrepancy in PSA's statement of actual Reasonable PSA

10    Operating Expenses, the Parties shall meet at a mutually convenient time within twenty (20) days

11    of FGI delivering the results of the review or audit to PSA. If the Parties are able to agree on the

12    actual Reasonable PSA Operating Expenses, the agreed amount shall become the "actual

13    Reasonable PSA Operating Expenses" for purposes of Section 5.1.3.3. If the Parties are unable

14    to agree on the actual Reasonable PSA Operating Expenses for that Lease Year, the matter will

15    be resolved pursuant to Dispute Resolution and the above payment adjustment provisions shall

16    apply, and such resolved amount shall become the "actual Reasonable PSA Operating Expenses"

17    for purposes of Section 5.1.3.3. In either case, if the actual Reasonable PSA Operating Expenses

18    is different than as provided to FGI pursuant to Section 5.1.3.3, then the Parties shall adjust the

19    Rent in accordance with Section 5.1.3.3.

20        5.2    Proration of Rent

21                    If the Term commences or ends on other than the first day of a Lease Year, or if a

22    Rent change occurs on other than the first day of a Lease Year, or if there is an abatement of Rent

23    that commences or ends on other than the first day of a Lease Year, then Rent shall be prorated

24    for that Lease Year on a daily basis.

25        5.3    Timing of Rent Payments

26                    Annual Rent shall be payable in twelve equal monthly installments. All payments

27    of Rent shall be due and payable, in advance, on the first day of each month during each Lease

28    Year during the Term.

1    5.4    Past Due Rent

2        5.4.1    Interest

3            Any Rent not paid when due shall bear interest as provided in

4    Section 26.25.

5        5.4.2    Late Charges

6            If FGI shall fail to make any payment of Rent when due as provided in this

7    Lease, then FGI shall pay a late charge of one percent (1%) of the amount past due, up to a

8    maximum late charge of $500, Indexed every five (5) years, for processing of late payments, as

9    additional Rent within ten (10) Business Days of notice that such late charge is due.

10    5.5    Net Rent

11            Rent and other sums to be paid by FGI shall be payable in lawful money of the

12    United States of America.  Rent payable by FGI shall be absolutely net to PSA, free from all

13    costs, expenses, charges and deductions to PSA and without any FGI claimed offset.  All costs,

14    expenses, and obligations of every kind and nature whatsoever relating to the use, maintenance,

15    operation, repair, restoration and replacement of the Premises as provided herein shall be paid for

16    and performed by FGI.

17    5.6    Rent During Any Holdover Period

18            If FGI holds over beyond the last day of the Term, the Rent due commencing with

19    the end of the Term and for each month thereafter, shall be the monthly Rent (the Lease Year

20    Rent divided by 12) for the last full calendar month of the Term multiplied by the number of

21    months from the end of the Term until FGI surrenders the Premises to PSA as required by

22    Section 23.  For example, if FGI holds over for three calendar months, the Rent for the first

23    holdover month shall be equal to the monthly Rent for the last calendar month of the Term,

24    multiplied by one (1), the Rent for the second holdover month shall be the monthly Rent for the

25    last calendar month of the Term multiplied by two (2), and the Rent for the third holdover month

26    shall be the monthly Rent for the last calendar month of the Term multiplied by three (3).

27    5.7    Operating Reserve

28        5.7.1    Operating Reserve

29            5.7.1.1    By January 1, 2003, PSA shall establish an operating reserve of $2

30    Million ("Operating Reserve"), which shall be comprised of a cash reserve component ("Cash

1    Reserve") and a letter of credit reserve component ("L/C Reserve").  Initially the Cash Reserve

2    shall be $500,000 and the L/C Reserve shall be $1.5 Million.

3            5.7.1.2   The Operating Reserve may be utilized only to pay Reasonable

4    PSA Operating Expenses incurred during any Lease Year as and when they come due to the

5    extent Rent paid during that Lease Year-to-date is insufficient.  To the extent the Operating

6    Reserve is utilized at all, PSA shall utilize and exhaust the Cash Reserve before utilizing the L/C

7    Reserve.

8            5.7.1.3   The Operating Reserve may not be utilized to fund any other

9    reserve, or to make any advance payments other than advance payments which are commercially

10   reasonable and customary.

11           5.7.1.4   Concurrently with PSA utilizing any part of the Cash Reserve or

12   L/C Reserve, but not as a condition precedent to such utilization, PSA shall present to FGI

13   documentation reasonably satisfactory to FGI in reasonable detail regarding the utilization of the

14   Operating Reserve, including without limitation the amount of funds utilized, the source of funds

15   utilized (i.e. Cash Reserve or L/C Reserve), the Reasonable PSA Operating Expenses for which

16   such funds were utilized, and an explanation that and why the Reasonable PSA Operating

17   Expenses for which such funds were utilized were not included or the amount was

18   underestimated in the annual budget described in Section 5.1.3.2.

19           5.7.1.5   At any time, FGI may object to the utilization of the Operating

20   Reserve based on a violation of this Section 5.7, for example by reason that funds were not

21   utilized entirely for Reasonable PSA Operating Expenses or that the Reasonable PSA Operating

22   Expenses for which the funds were utilized were contemplated in sufficient amount in the annual

23   budget described in Section 5.1.3.2.  If FGI so objects, the substance of such objection may be

24   subject to Dispute Resolution.  Any decision or award for FGI in Dispute Resolution on such

25   matter may be utilized by FGI as a credit against any Rent due under this Lease.

26        5.7.2   <u>Reserve Restoration</u>

27           If PSA has utilized the Operating Reserve during any Lease Year:

28           5.7.2.1   During that Lease Year, Rent payments in excess of Reasonable

29   PSA Operating Expenses shall be utilized first to repay to FGI the amount of any L/C Reserve

1    utilized during that Lease Year, and second to restore any amount of the Cash Reserve utilized

2    during that Lease Year; and

3              5.7.2.2   Following that Lease Year, if any Rent is payable to PSA pursuant

4    to Section 5.1.3.3, such Rent shall be reduced by the amount of the L/C Reserve utilized during

5    that Lease Year but not yet repaid to FGI pursuant to Section 5.7.2.1, and the net Rent paid

6    pursuant to Section 5.1.3.3 shall be utilized to fully restore the Cash Reserve utilized during that

7    Lease Year to the amount of its original level as of the beginning of the Lease Year, and any

8    excess shall be utilized to pay any then unpaid Reasonable PSA Operating Expenses for that

9    Lease Year.

10            5.7.3   Cash Reserve

11           Interest and other earnings on the Cash Reserve shall become part of and

12    increase the Cash Reserve and Operating Reserve.

13            5.7.4   L/C Reserve

14              5.7.4.1   FGI shall provide PSA with a standby letter of credit in the amount

15    of the L/C Reserve (the "Reserve Letter of Credit"). The Reserve Letter of Credit shall be issued

16    by a financial institution reasonably acceptable to PSA, and may be drawn upon by PSA upon

17    presentation of a "sight draft" in reasonable mutually agreed form.

18              5.7.4.2   The Reserve Letter of Credit shall be replaced annually by a new

19    Reserve Letter of Credit in the amount of the L/C Reserve so that at all times during the

20    remaining Term, PSA holds a Reserve Letter of Credit which is in full force and effect. To the

21    extent PSA draws against the Reserve Letter of Credit in any Lease Year, then the amount of

22    credit available to PSA under that Reserve Letter of Credit shall be reduced and not restored until

23    the Reserve Letter of Credit is replaced for the subsequent Lease Year. PSA may draw on the

24    Reserve Letter of Credit if FGI has not provided PSA with a replacement Reserve Letter of

25    Credit at least five (5) days prior to expiration of the then existing Reserve Letter of Credit.

26              5.7.4.3   All costs associated with the Reserve Letter of Credit, including

27    without limitation all service charges, shall be paid by FGI but shall be deemed a Reasonable

28    PSA Operating Expense and shall be a credit against any Rent payable hereunder by FGI.

29              5.7.4.4   The amount of the Rent Letter of Credit described in Section 21.5

30    shall not affect the amount of the Reserve Letter of Credit.

1        5.7.5   Adjustment of Amount of Cash Reserve and L/C Reserve

2               At the Option of PSA, the original amount of the Cash Reserve may be

3 increased and the amount of the L/C Reserve will be simultaneously decreased by the dollar

4 amount by which the Annual Loan Debt Service is less than $210,000 on the date the Operating

5 Reserve is established.

6   **SECTION 6**    **OTHER STATUTORILY MANDATED PAYMENT OBLIGATIONS OF FGI**

7     6.1   Share of Profits from Operation of Exhibition Hall

8         6.1.1   Definitions

9              For purposes of this Section 6.1, the following terms have the following

10 meanings.

11         6.1.1.1   "Exhibition Hall Net Profits" means Exhibition Hall Revenues less

12 Exhibition Hall Expenses, during each Lease Year during the Term.

13         6.1.1.2   "Exhibition Hall Revenues" means gross revenues received by FGI

14 or any Affiliate of FGI in connection with Exhibition Hall Events. Exhibition Hall revenues

15 include gross fees, rentals and payments of any kind or nature whatsoever (except as provided

16 herein) paid to FGI or any Affiliate of FGI in connection with the Exhibition Hall (including any

17 Swing Space utilized in connection with the Exhibition Hall) for Exhibition Hall Events,

18 including, without limitation: (i) space rental or occupancy fees; (ii) advertising fees; (iii) use

19 fees; (iv) license fees; (v) concession fees; (vi) signage fees; (vii) services charges; (viii) the sales

20 price of all merchandise (including food and beverage) sold in connection with Exhibition Hall

21 Events; (ix) charges to users of the Exhibition Hall for the right to use portions or all of the

22 Stadium, portions or all of the Parking Facilities for a non-parking use, or portions or all of the

23 North Parking Lot for a non-parking use, in connection with an Exhibition Hall Event;

24 (x) Exhibition Hall Parking Revenue; and (xi) the value of goods or services in lieu of cash for

25 any for the foregoing (i) through (x). Exhibition Hall Revenues do not include: (i) any revenues

26 associated with any events at the Project which are not Exhibition Hall Events; (ii) any sales

27 proceeds of Exhibition Hall Naming Rights or Parking Facilities Naming Rights; or (iii) any

28 admissions, parking, sales, gross receipts, compensating taxes or other retail excise taxes which

29 are imposed by any duly constituted Governmental Authority on sales and which are collected

30 and paid by FGI or any Affiliate of FGI to such Governmental Authority.

1          6.1.1.3  "Exhibition Hall Expenses" means those direct and indirect
2  expenses reasonably incurred by FGI in connection with the operation of the Exhibition Hall,
3  including Swing Spaces and other facilities used in connection with Exhibition Hall Events, and
4  the performance of each of FGI's obligations under this Lease as they relate to such facilities.
5  Exhibition Hall Expenses include, without limitation: (i) Rent payable pursuant to Section 5.1.1
6  through the Completion Date, and, after the Completion Date a percentage of the Rent payable
7  pursuant to Section 5.1.2 computed in accordance with Section 6.1.1.7; (ii) the cost of
8  Maintenance and Modernization of the Exhibition Hall (except to the extent paid from the
9  Capital Improvements Account or the Naming Rights Account), with the cost of Major
10  Maintenance and Modernization being amortized in accordance with reasonable accounting
11  principles; (iii) the cost of Utilities related to the Exhibition Hall; (iv) the cost of Insurance and
12  self-insurance (up to the amount of the premium charged by any third-party insurer for
13  equivalent coverage) related to the Exhibition Hall; (v) the cost of Impositions related to the
14  Exhibition Hall; (vi) Exhibition Hall Parking Expenses; (vii) the cost of goods and services
15  related to Exhibition Hall Revenues; and (viii) FGI's reasonably allocated reasonable direct and
16  indirect administrative and overhead expenses associated with the operation of the Exhibition
17  Hall.  Exhibition Hall Expenses do not include: (i) expenses that are reimbursed to FGI,
18  including, without limitation, expenses reimbursed by insurance proceeds, or expenses
19  reimbursed to FGI pursuant to any sublease, license agreement or occupancy agreement of any
20  kind or pursuant to any service agreement pertaining to the operation, maintenance or repair of
21  the Exhibition Hall, provided that such reimbursements are not accounted for as Exhibition Hall
22  Revenues; (ii) any Major Maintenance or Modernization to the extent paid from the Capital
23  Improvements Account or the Naming Rights Account; (iii) costs incurred because of the breach
24  of this Lease by FGI; (iv) amounts paid to persons or entities related to FGI in excess of the fair
25  market value of services or materials provided in exchange therefor; (v) amounts payable under
26  or in connection with any FGI mortgage, deed of trust, security agreement, or other financing or
27  refinancing arrangements; (vi) costs of sculpture, paintings, or other objects of art acquired and
28  owned by FGI, except to the extent FGI has obtained PSA's prior written approval of the cost
29  thereof; (vii) cost of repairing any defective construction work or latent defects in the Exhibition
30  Hall, or the repair or replacement of any materials or equipment in connection with such defects;

1   (viii) any damages resulting from the negligence of or violation of any Laws by any FGI
2   executive officer to the extent not covered by insurance or self-insurance; (ix) rental charges for
3   the use of portions of the Swing Space or the Stadium for Exhibition Hall Events; and (x) any
4   amortization of the initial capital cost of any Project Improvement incurred pursuant to the
5   Development Agreement.

6           6.1.1.4   "Exhibition Hall Events" means events which are primarily located
7   and centered in the Exhibition Hall, even if there is some ancillary use of other parts of the
8   Project, and includes "flat shows" such as the Home Show, Car Show and Boat Show.
9   Exhibition Hall Events do not include pre-, intermission- and post-functions related to primarily
10  Stadium events, or uses ancillary to primarily Stadium events. Stadium events include, without
11  limitation, football games, soccer games, concerts and other entertainment events held in the
12  Stadium bowl.

13          6.1.1.5   "Exhibition Hall Parking Revenues" are ninety-one percent (91%)
14  of the parking revenues generated in connection with Exhibition Hall Events (based on FGI's
15  good faith estimates, subject to the approval of PSA), computed exclusive of parking and other
16  taxes, for twenty (20) years from the Completion Date, and one hundred percent (100%) of the
17  parking revenues thereafter.

18          6.1.1.6   "Exhibition Hall Parking Expenses" are the expenses incurred in
19  connection with the operation of the Parking Facilities for Exhibition Hall Events, including for
20  any parking management contractor, and is calculated by multiplying the total operating cost of
21  the Parking Facilities, by a fraction, the numerator of which is the number of parkers estimated
22  for Exhibition Hall Events (and utilized in computation of Exhibition Hall Parking Revenues)
23  and the denominator of which is the total number of parkers in the Parking Facilities, during the
24  period of the computation.

25          6.1.1.7   The percentage of Rent paid pursuant to Section 5.1.2 which is an
26  Exhibition Hall Expense shall be a reasonable allocation of total Rent as determined by FGI,
27  subject to the approval of PSA.

28      6.1.2   Percentage Rent

29          From the Commencement Date and thereafter during the Term, FGI shall
30  pay PSA, as additional Rent, twenty percent (20%) of Exhibition Hall Net Profits ("Percentage

1    Rent"). FGI shall pay Percentage Rent to PSA annually in arrears on or before the one hundred

2    eightieth (180th) day of each Lease Year for the immediately preceding Lease Year. All funds

3    received by PSA pursuant to this Section 6.1. shall be deposited into the permanent common

4    school fund as required by Section 210(2)(b)(ix) of the Act.

5              6.1.3   Annual Exhibition Center Operating Expense Budget

6                   At least sixty (60) days prior to the beginning of each Lease Year, FGI

7    shall submit to PSA its budget for Exhibition Center operations for that Lease Year, for PSA's

8    review and comment.

9              6.1.4   Booking Policies

10               Prior to the Commencement Date, FGI shall provide to PSA, for its review

11    and comment, the "booking policies" which FGI proposes to follow in the booking of the

12    Exhibition Hall, and thereafter FGI shall provide to PSA, for its review and comment, any

13    changes or modifications to such booking policies which FGI proposes as they arise.

14              6.1.5   Reporting Period

15               FGI shall submit to PSA, on or before the forty-fifth (45th) day of each

16    calendar quarter for the immediately preceding calendar quarter, a written statement signed by

17    FGI, and certified by its chief financial officer to be true and correct, showing in detail the

18    amount of Exhibition Hall Revenues, Exhibition Hall Expenses, and Exhibition Hall Net Profits,

19    as of the end of the preceding calendar quarter. In addition to FGI's quarterly report of

20    Exhibition Hall Net Profits, FGI shall submit to PSA an annual audited report of Exhibition Hall

21    Revenues, Exhibition Hall Expenses, and Exhibition Hall Net Profits, not later than one hundred

22    eighty (180) days following the end of each Lease Year, showing Exhibition Hall Revenues,

23    Exhibition Hall Expenses, and Exhibition Hall Net Profits as of the end of such Lease Year.

24    Each such report shall be certified as accurate by the chief financial officer of FGI and each such

25    annual report and final report shall be accompanied by a certificate of an independent certified

26    public accountant reasonably satisfactory to PSA that such report has been prepared in

27    accordance with generally accepted accounting principles ("GAAP") consistently applied except

28    as so noted and accurately states the Exhibition Hall Revenues, Exhibition Hall Expenses, and

29    Exhibition Hall Net Profits for the period of such report. The format and detail of the above

30    reports shall be subject to the approval of PSA.

1        6.1.6    Books and Records

2           All Exhibition Hall Revenues and Exhibition Hall Expenses shall be

3 recorded on a daily basis in accordance with GAAP except as so noted and in a manner

4 reasonably satisfactory to PSA. FGI shall keep and maintain in the Premises, or in its home

5 office (provided PSA shall have been notified in writing of the address at which the books and

6 records are being maintained), full and accurate books of account and records from which

7 Exhibition Hall Revenues and Exhibition Hall Expenses can be determined. Such records shall

8 be preserved for at least thirty-six (36) months after the end of the period in question.

9        6.1.7    Inspection and Audit

10           For one hundred twenty (120) days after receipt of FGI's audited annual

11 Exhibition Hall Net Profits report, PSA shall have the right during regular business hours to

12 inspect and audit all books, electronic records, papers and files of FGI relating to Exhibition Hall

13 Net Profits and FGI shall make the same available to PSA upon at least five (5) Business Days

14 prior written request. If during that 120-day period, PSA contends that any error exists with

15 respect to FGI's annual Exhibition Hall Net Profits report, then FGI's books, electronic records,

16 papers, and files for such annual Exhibition Hall Net Profits report shall be kept and maintained

17 by FGI until PSA's contention has been finally determined, even if longer than the thirty-six (36)

18 month period provided for above. If any audit shows that the amount of annual Exhibition Hall

19 Net Profits on FGI's annual Exhibition Hall Net Profits report was understated by more than the

20 greater of (x) $10,000, or (y) two percent (2%), then FGI shall pay PSA the understated amount

21 of annual Percentage Rent within five (5) Business Days and the cost of the audit and

22 investigation as additional Rent. If the audit reveals that the amount of annual Exhibition Hall

23 Net Profits on FGI's annual Exhibition Hall Net Profits report was not understated by more than

24 the greater of (x) $10,000, or (y) two percent (2%), then PSA shall pay the cost of the audit,

25 which shall not be a Reasonable PSA Operating Expense. If any annual Exhibition Hall Net

26 Profits report understates the amount of Exhibition Hall Net Profits, FGI shall pay the amount of

27 the understatement together with Economic Interest from the date originally due.

28       6.2    Share of Revenues from Other Sources

29           If FGI derives gross revenue from the use of the Project from sources or activities

30 other than those described in this Lease and in Exhibit 6.2 hereof, then PSA reserves the right to

1    discuss with FGI profit sharing from such sources or activities, bearing in mind that there is

2    already profit sharing from Exhibition Hall Events pursuant to Section 6.1 above. Such

3    reservation does not imply that PSA has any right to share in such profits beyond the profit

4    sharing of Section 6.1 unless and until PSA and FGI mutually agree to a specific profit sharing

5    plan in their sole discretion.

6          6.3    Net Profits from Olympic Games and/or World Cup Soccer

7             To the extent any activities pertaining to the Olympic Games or World Cup

8    Soccer take place at the Project, all gross revenues derived from any such activities in excess of

9    FGI's actual cost of preparing, operating and restoring the Project in connection with such

10    activities shall be paid to PSA promptly following such activities. FGI shall provide reports to

11    PSA regarding the revenues received and the expenses incurred by FGI in connection with such

12    activities and shall maintain books and records with respect to such revenues and expenses and

13    PSA shall be entitled to inspect and audit such books and records, all in the same manner as FGI

14    is obligated to provide reports and to maintain books and records with respect to Percentage

15    Rent. All funds received by PSA pursuant to this Section 6.3 shall be deposited into a tourism

16    development and promotion account established pursuant to RCW 43.330, as such statute may be

17    from time-to-time amended, modified, supplemented, re-codified or replaced, as required by

18    Section 106(10) of the Act.

19

20    SECTION 7    USE OF THE PREMISES

21          7.1    Permitted Use of Premises

22             The Premises shall be used by FGI for the purpose of operating and maintaining

23    the Stadium, the Exhibition Hall, the Parking Facilities, and the Other Improvements. FGI may

24    use the Premises for any lawful purpose or event for which the Premises is (or can be reasonably

25    made) suitable, including without limitation sporting and other similar events, competitions,

26    ceremonies, conventions, meetings, assemblies, consumer shows, trade shows, concerts, plays,

27    musicals, recitals, performances, audience participation events, and similar types of

28    entertainment, social and business functions, music, movie and television production,

29    broadcasting or transmitting in television, radio, internet and other media, educational and

30    scientific activities, religious activities, political activities, concessions, restaurants and lounges,

1 parties and celebrations, circuses, carnivals, related concessions, ancillary office and retail uses,

2 parking and all ancillary uses necessary or convenient in connection with the above described

3 uses. FGI may use the Premises only for the uses and activities allowed in this Section 7.1 and

4 for no other uses or activities unless FGI obtains PSA's prior written consent. FGI shall not use

5 or allow the use of the Premises or any part thereof for any unlawful purpose or in violation of

6 any certificate of occupancy, any certificate of compliance or any Law. FGI shall not permit

7 waste of the Premises or permit any act to be done or any condition to exist on the Premises or

8 any part of the Premises which may be hazardous, which may constitute a nuisance, or which

9 may void or make voidable any policy of insurance in force with respect to the Premises.

10   7.2 Standard of Operations, Continuous Operations

11     7.2.1 Standard of Operations

12       From and after the Commencement Date and thereafter throughout the

13 Term, FGI shall occupy and continuously conduct business in the Exhibition Hall and the

14 Parking Facilities in a "First-Class Manner," which means a commercially reasonable manner

15 consistent with the average manner in which business is conducted in the Comparable Exhibition

16 Facilities and Comparable Parking Facilities identified in Section 11.1.2. From and after the

17 Completion Date and thereafter through the Term, FGI shall occupy and continuously conduct

18 business in the Stadium in a "First-Class Manner," which means in a commercially reasonable

19 manner consistent with the average manner in which business is conducted in the comparable

20 stadium facilities identified in Section 11.1.2.

21     7.2.2 Continuous Operations

22       FGI may interrupt the continuous operations of the Premises required by

23 this Section 7.2 only in the event FGI is forced to do so on account of a casualty loss, required

24 maintenance, or Force Majeure, and then only to the extent such an event actually requires an

25 interruption of continuous operations.

26   7.3 Hazardous Substances

27     7.3.1 FGI shall remediate any Hazardous Substances located on the Project Site

28 as of the Commencement Date to the extent required by applicable Governmental Authority, and

29 in accordance with the Development Agreement.

1        7.3.2   FGI shall not generate, release, store, or deposit on the Premises any

2   Hazardous Substances, except that FGI may use and store Hazardous Substances in compliance

3   with Laws and in such reasonable quantities as may be necessary for the operation of the

4   Premises. When such use or storage is reasonably necessary, FGI shall not allow any Hazardous

5   Substances to be released into or deposited on the Project Site, the Project Improvements, or the

6   ground water under the Project Site except to the extent permitted by Laws. In all events, usage

7   and storage of such Hazardous Substances shall be in full compliance with all Laws. If no such

8   Laws exist, FGI shall handle the Hazardous Substances in a manner reasonably calculated to

9   promote health and safety.

10        7.3.3   FGI shall defend, indemnify and hold harmless PSA and PSA Related

11   Persons from and against any and all claims, losses, liabilities, damages, response costs and

12   expenses of any nature whatsoever arising out of or in any way related to the generation, release,

13   storage, or deposit of Hazardous Substances on the Project Site or Project Improvements by FGI

14   at any time, or by any other Person during the Term, unless such Hazardous Substances are

15   generated, released, stored, or deposited by PSA or any PSA Related Person, including, but not

16   limited to: (i) claims of third parties, including Governmental Authorities, for damages, response

17   costs, injunctive or other relief; (ii) the cost, expense or loss to PSA of any injunctive relief,

18   including preliminary or temporary injunctive relief, applicable to PSA or the Premises; (iii) the

19   expense, including fees of attorneys, engineers, paralegals and experts for reporting the existence

20   of Hazardous Substances to any agency of the State of Washington or the United States as

21   required by applicable Laws; and (iv) any and all expenses or obligations, incurred before, during

22   and after any trial or appeal therefrom or any administrative proceeding or appeal therefrom

23   whether or not taxable as costs, including, without limitation, attorneys' and paralegal fees,

24   witness fees (expert and otherwise), deposition costs, copying and telephone charges and other

25   expenses, all of which shall be paid by FGI promptly after PSA incurs the obligation to pay such

26   amounts.   The indemnity obligations of FGI in this Section 7.3.3 shall survive any termination

27   of this Lease.

28        7.3.4   Subject to Section 15.4, PSA shall defend, indemnify and hold harmless

29   FGI from and against any and all claims, losses, liabilities, damages, response costs and expenses

30   of any nature whatsoever arising out of or in any way related to the generation, release, storage,

1    or deposit of Hazardous Substances on the Project Site by PSA or any PSA Related Person. Any

2    such indemnification is not a Reasonable PSA Operating Expense. The indemnity obligations of

3    PSA in this Section 7.3.4 shall survive any termination of this Lease.

4          7.3.5    FGI may obtain pollution legal liability and/or environmental remediation

5    cost overrun insurance.

6          7.3.6    Promptly upon written notice from PSA or from any Governmental

7    Authority, FGI shall remove from the Premises, or otherwise remediate in accordance with

8    applicable Laws, all Hazardous Substances (including, without limitation, the soil or water table

9    of the Premises), and shall restore the Premises, to a clean, safe, good, and usable condition.

10    Without limiting the foregoing, FGI may utilize any appropriate governmental appeal process in

11    those instances where, in its reasonable discretion, FGI determines the written notice to be

12    arbitrary and capricious or otherwise without grounds.

13          7.3.7    Nothing in Sections 7.3.3 through 7.3.6 shall preclude environmental

14    related claims for indemnification or contribution with respect to the Premises. If PSA believes

15    that it has an environmental-related claim for indemnification or contribution from a third-party

16    with respect to the Premises it shall so notify FGI. If FGI believes that PSA has such a claim,

17    either because of a notification in accordance with the preceding sentence or otherwise, FGI may

18    elect to timely pursue such claim. If FGI elects to pursue such claim, it shall so notify PSA and

19    PSA shall assign to FGI all of PSA's legal rights to pursue such claim (to the extent such

20    assignment can be lawfully made). If FGI does not elect to pursue such claim, then PSA may

21    elect to pursue it. PSA and FGI shall reasonably cooperate in the pursuit of any such claim.

22          7.3.8    FGI assumes and shall perform any obligations of PSA under Sections

23    7.7.3 and 7.7.4 of the Development Agreement.

24

25    SECTION 8    REQUIREMENTS TO PROVIDE PUBLIC BENEFITS

26          8.1    Special Team Covenants.

27          FGI shall require that the Stadium Use Agreement with Team contain the

28    following (but appropriately re-formatted) covenants set forth in this Section 8.1, and, subject to

29    temporary lapses caused by Force Majeure or damage or destruction to the Project, FGI shall

30    cause Team to comply with such covenants at all times during the Term following the

1    Completion Date.   For purposes of this Section 8.1, "Team" means not only the Seattle
2    Seahawks, but also any successor or replacement "major league" professional football team, and,
3    if professional football ceases to be considered a "major league" sport, then any other "major
4    league" team in any sport:

5            8.1.1   Playing of All Home Games.   Team shall play all of its Regular Season
6    Home Games and Playoff Home Games in the Stadium, other than Home Games scheduled
7    elsewhere by the League.

8            8.1.2   Affordable Priced Seats

9            8.1.2.1   Affordable Priced Seats.   Team shall offer to sell at least ten
10    percent (10%) of the spectator seats in the Stadium which are for sale to each Team Home Game
11    at an "affordable price," which seats shall be known as "Affordable Priced Seats." Affordable
12    Priced Seats may be offered for sale at a range of prices (not exceeding the affordable price) as
13    Team shall determine in its sole discretion. The number and locations of Affordable Priced Seats
14    may be determined for each Home Game, depending on the number and configuration of
15    spectator seats available.  Affordable Priced Seats may be offered and sold on a season-ticket,
16    multiple-games package, individual game, and/or on such other basis as Team shall determine in
17    its sole discretion; provided that at least fifty percent (50%) of the minimum required Affordable
18    Priced Seats (i.e. five percent (5%) of the total spectator seats in the Stadium) shall be offered on
19    an individual game basis.  "Affordable price" means a price which is not greater than the
20    "average" of the "lowest ticket prices" charged by all NFL teams other than Team during the
21    preceding NFL Season (based on information provided by the other NFL teams and/or by the
22    NFL), and affordable price is exclusive of any taxes, fees or other charges imposed on the sale of
23    the ticket by any Governmental Authority or any third-party.  "Lowest ticket price" means the
24    lowest priced paid-admissions ticket available for sale on a regular basis for a team's Pre-Season,
25    Regular Season and Playoff home games, respectively, and excludes complimentary tickets,
26    promotional tickets, and similarly offered tickets.  "Average" means the weighted average,
27    computed by multiplying for each NFL team other than Team the lowest ticket price for that
28    team's home games by the number of tickets sold at that price; adding the products of such
29    multiplication for all the NFL teams other than Team; and dividing that sum by the sum of
30    number of tickets sold at the lowest ticket prices for all the NFL teams other than Team.

1   "Affordable price" may be determined separately for Pre-Season Home Games, Regular Season
2   Home Games and/or Playoff Home Games.

3           8.1.2.2   Reporting.  By each May 31st following the end of each NFL
4   Season during the Term following the Completion Date, FGI shall file a report with PSA setting
5   forth the following information for the season just completed:  For each Home Game, the number
6   of spectator seats available for sale for the Home Game; the number of Affordable Priced Seats
7   available for the Home Game, the price or prices at which Affordable Priced Seats were offered
8   for sale (if unsold) or actually sold (if sold), or zero (if given away); and a schedule showing the
9   computation and backup information of the average of the lowest ticket prices charged by all
10  NFL teams other than Team during the preceding NFL Season.  If the ticket holder provides
11  goods or services as all or part of the consideration for a ticket, the reasonable market value of
12  such goods or services shall be included in the ticket price.  If the ticket entitles the holder to
13  goods or services in addition to the right to observe a game from a seat, the reasonable market
14  value of such other goods or services shall be deducted from the nominal ticket price.

15          8.1.2.3   Adjustment.  In the event that for any Home Game, fewer than
16  10% of the available seats qualified as Affordable Priced Seats, then an adjustment amount
17  ("Aggregate Adjustment Amount") shall be calculated which equals the minimum aggregate
18  amount which, if the offering price of a sufficient number of tickets which were not Affordable
19  Priced Seats had been reduced, then the requirement of Section 8.1.2.1 would have been
20  satisfied.   Team shall reflect the Aggregate Adjustment Amount at the first reasonable
21  opportunity in a one-time adjustment of the price of future Affordable Priced Seats, such that the
22  average price of the Affordable Priced Seats as calculated without regard to this adjustment
23  would be reduced by an amount equal to the Aggregate Adjustment Amount divided by the total
24  number of Affordable Priced Seats.  The "first reasonable opportunity" shall mean the next
25  Home Game during the then current NFL Season or the immediately following NFL Season at
26  which there are enough unsold Affordable Priced Seats to fully utilize the Aggregate Adjustment
27  Amount.

28          8.1.2.4   Audit Right.  PSA shall have the right to audit (generally as
29  provided in Section 6.1.7) the applicable records of FGI and Team to determine if FGI is in

1  compliance with its obligations under this Section 8.1.2. FGI shall fully cooperate with any such

2  audit, and FGI shall cause Team to fully cooperate with such audit.

3          8.1.3   Suite Lottery

4                  Subject to applicable legal restrictions, for each Team Home Game played

5  in the Stadium, Team shall designate and make available one Suite (which is not a field-level

6  suite i.e. a "bunker suite") with a minimum of twenty (20) seats on a "lottery basis," as a free

7  upgrade to purchasers of tickets (including for Affordable Priced Seats) other than tickets for

8  seats located in Suites or Club Seat areas ("Suite Lottery"). Team shall conduct the Suite Lottery

9  under the terms of a Suite Lottery Program setting forth the rules, terms and conditions of the

10 Suite Lottery, which Team shall determine from time-to-time, in its sole discretion, but subject to

11 applicable law.  The pool of eligible purchasers may include purchasers of season tickets,

12 multiple-game package tickets, individual game tickets, or any other basis (other than purchasers

13 of tickets located in Suites or Club Seat areas), and may include purchasers from the curr⎯: NFL

14 Season or the immediately prior NFL Season.  Team may set other reasonable eligibility

15 requirements, such as a minimum age.  The Suite Lottery Program shall provide for multiple

16 "winners" for each Team Home Game, and may allow winners to "win" multiple tickets to the

17 Suite. Winners may be the holder of a ticket and not literally the purchaser. So, for example, a

18 "winner" may be selected by random drawing of a seat number associated with a ticket held by

19 the "winner." The Suite Lottery may be conditioned upon each "winner's" agreement to such

20 conditions as:  (i) disclosure of his or her full name and social security number and granting

21 permission to Team to make any required Federal tax filings; (ii) payment of any taxes or other

22 regular charges due with respect to the Suite ticket; (iii) payment for food and beverages

23 available in the Suite; (iv) surrender of the ticket for which they became eligible for the Suite

24 Lottery and won; (v) payment to Team of dollar amounts required for withholding of any State or

25 Federal income taxes associated with such tickets; and (vi) agreement to any other reasonable

26 terms and conditions imposed by Team.

27      8.2    Coordination in Scheduling Events

28              8.2.1   PSA and/or FGI shall use Reasonable Efforts to meet with the Washington

29 State Major League Baseball Stadium Public Facilities District (the "PFD") which owns Safeco

30 Field, or The Baseball Club of Seattle, L.P. (the "Mariners"), which is the operator of Safeco

1    Field, and attempt to develop an agreement to coordinate scheduling of events at Safeco Field

2    and the Premises.  FGI shall cooperate with the PFD and the Mariners to coordinate FGI's

3    operational planning for dual time-specific events and back-to-back events occurring at these two

4    facilities on the same day.  Coordination of operational planning will include transportation

5    management, safety and security planning, and event clean up activities.  If FGI enters into an

6    agreement with the PFD or the Mariners with respect to scheduling of events, then FGI shall

7    comply with the terms of that agreement

8           8.2.2    The foregoing covenant is currently satisfied by that certain Agreement of

9    Event Scheduling Principles dated June 15, 1998, between FGI and the Mariners.

10          8.2.3    Within sixty (60) days after the last Home Game of Team, PSA and FGI

11   shall meet to review FGI's compliance with the requirements of Section 8.2.1 (the "Annual

12   Review").   The Annual Review shall include a report by FGI setting forth its efforts to

13   coordinate its operational planning with the operations of Safeco Field, shall include public and

14   neighborhood input, shall review whether FGI's operations conformed to the requirements of the

15   City of Seattle in permits or approvals issued with respect to the Project and shall set forth

16   recommendations, if any, for improved coordination.

17          8.3    <u>Cooperation with Obtaining Super Bowl Event</u>

18                 Pursuant to RCW 36.102.060(12), PSA, in consultation with FGI, is directed to

19   pursue hosting an NFL Super Bowl at the Stadium, but only in the event the rules of the National

20   Football League are changed to allow the Stadium to be the venue for a Super Bowl.  In such

21   event, FGI shall cooperate with PSA's efforts to host a Super Bowl at the Stadium.

22          8.4    <u>Lottery Promotion</u>

23          8.4.1    Pursuant to the Development Agreement, subject to Section 8.4.4, FGI

24   shall promote the Washington State Lottery games described in Section 205 of the Act with any

25   combination of in-kind advertising, sponsorships, or prize promotions, valued at $1 million

26   annually beginning in calendar year 1998, and increased by four percent (4%) each year

27   thereafter.  The content and value of the advertising, sponsorships and prize promotions are

28   subject to the reasonable advance approval of the State Lottery Commission.  FGI may enter into

29   an agreement with the State Lottery Commission setting forth the procedural aspects of

30   performance under this Section.

1          8.4.2   The purpose of this requirement is to increase lottery sales of games

2   described in Section 205 of the Act, and to comply with Section 208 of the Act.

3          8.4.3   This obligation shall terminate upon the earlier of:  (x) the date that

4   distributions end under RCW 67.70.240(5);  and (y) December 31, 2020.

5          8.4.4   Following the Completion Date, the Lottery promotion obligation under

6   the Development Agreement shall terminate, and the same obligation is assumed by FGI under

7   this Lease.

8       8.5   <u>Prevailing Wages</u>

9          FGI shall be subject to and comply with the prevailing wage requirements of

10   RCW 39.12, as such statute may be from time-to-time amended, modified, supplemented, re-

11   codified or replaced, with respect to any construction (but not operation or maintenance) work

12   conducted at the Premises, and FGI shall include this prevailing wage covenant in every

13   agreement FGI enters with any Person which will provide construction services at the Premises.

14       8.6   <u>Women and Minority Business Enterprise Goals</u>

15          FGI shall comply with applicable MBE and WBE goals established by King

16   County, Washington, in connection with the operation of the Premises and FGI shall include this

17   MBE/WBE goal covenant in every agreement and contract with respect thereto that FGI enters

18   with any Person which will provide services to the Premises.  "MBE" (Minority Business

19   Enterprise) means a for-profit business that is at least 51%-owned and controlled by one or more

20   minority persons or has been certified as such by the State Office of Minority and Women's

21   Business Enterprises or some other entity responsible for certifying such businesses.  "WBE"

22   (Women Business Enterprise) means a for-profit business that is at least 51%-owned and

23   controlled by one or more women or has been certified as such by the State Office of Minority

24   and Women's Business Enterprises or some other entity responsible for certifying such

25   businesses.  FGI shall use Reasonable-Efforts to cause-MBEs-and WBEs-to be utilized in the

26   operation of the Project and to cause the achievement of the goals in the aggregate.  FGI shall not

27   be required to establish or cause to be established MBE or WBE goals where no MBEs or WBEs

28   are available and capable of providing the desired services or goods, as reasonably determined by

29   FGI.  FGI shall provide to PSA an annual written report regarding compliance by FGI with the

30   requirements of this Section.

1    8.7    Hiring Local Residents

2        To the extent feasible, and subject to any conditions or requirements of any
3    Project Labor Agreement or Collective Bargaining Agreement related to the Project, with respect
4    to the operation of the Project FGI shall give preference in hiring, and shall cause its contractors
5    which will provide services related to operation of the Project to give preference in hiring, to
6    local residents and in particular residents from the areas immediately surrounding the Project.
7    However, neither FGI nor any of its contractors shall be required to hire any person who is not
8    fully capable or qualified to perform the duties of the particular job for which he or she is being
9    considered. If FGI or any of its contractors cannot satisfy its employment needs from persons
10    who reside within such areas, FGI and its contractors may hire such other employees as FGI or
11    its contractor deems appropriate. FGI shall include this covenant in every agreement FGI enters
12    with any contractor which will provide services related to operation of the Project. FGI shall
13    provide to PSA an annual written report regarding compliance by FGI with the requirements of
14    this Section.

15    8.8    Mitigation of Impacts from Stadium Operations

16        8.8.1    FGI shall work with PSA and those persons living or working in the
17    Pioneer Square, Chinatown/International District, and the Greater Duwamish Neighborhoods,
18    (the "Affected Area") to mitigate the adverse impacts on the Affected Area from the operations
19    of the Stadium. FGI and PSA acknowledge that the impacts of events at the Stadium can only be
20    estimated at the time of the execution of this Lease and can only be precisely determined over
21    time, and that mitigation requirements may need to be appropriately adjusted over time.

22        8.8.2    Within thirty (30) days prior to each Lease Year, FGI shall submit to PSA
23    for its review and comment a proposed Stadium Mitigation Report and Plan. A Stadium
24    Mitigation Report and Plan shall identify potential adverse impacts upon the persons living in the
25    Affected Area from FGI's operations, propose reasonable measures designed to diminish those
26    adverse impacts, provide an assessment of the effectiveness of FGI's prior mitigation activities,
27    and demonstrate how FGI will comply with the mitigation requirements of the Master Use
28    Permit issued by the City of Seattle authorizing the construction of the Premises.

1         8.9     <u>Annual Reporting on Operations</u>

2              FGI shall submit to PSA for public disclosure not later than one hundred eighty

3 (180) days following the end of each Lease Year an audited profit and loss financial statement

4 for FGI's operations of the Project.  This statement shall be certified as accurate by the chief

5 financial officer of FGI and shall be accompanied by a certificate of an independent certified

6 public accountant reasonably satisfactory to PSA that such statement has been prepared in

7 accordance with GAAP, except as so noted, and accurately states the profits and losses of FGI

8 for the period of such statement.  The format and detail of the statement of profits and losses

9 shall be subject to the approval of PSA.

10         8.10    <u>Major League Soccer</u>

11              FGI shall actively support efforts to bring a major league soccer team to play

12 soccer games in the Stadium, either as a home team based in Seattle or as a visiting team.  The

13 foregoing obligation shall not be construed to require FGI or any Affiliate to finance or acquire

14 any ownership interest of such a soccer team, or to provide economic terms for use of the

15 Stadium which are not commercially reasonable for FGI.  In scheduling events at the Stadium

16 FGI shall use Reasonable Efforts to accommodate the playing schedule of any Seattle major

17 league soccer team, but such Reasonable Efforts shall not require Team or any other Project user

18 to adjust the schedule of its Home Games or Project events.

19         8.11    <u>Provision of PSA Office Space</u>

20              8.11.1    PSA shall have exclusive use without charge of office space of

21 approximately 1,500 square feet, generally as shown in the Plans, (the "PSA Office Space") to be

22 located in the Stadium.  The exact location, configuration, dimensions, plans and specifications

23 of the PSA Office Space are to be determined pursuant to the Development Agreement, and

24 when so determined will be described in an Exhibit 8.11 to this Lease to be appended hereto.

25 The PSA Office Space is a "public area" as that term is contemplated by Section 202(14) and

26 (15) of the Act.

27              8.11.2    FGI shall, also without charge to PSA:

28              8.11.2.1    maintain the PSA Office Space, other than PSA's furniture,

29 fixtures, equipment and personal property, and provide , normal janitorial service, but only to the

30 extent incident to normal office use,

1       8.11.2.2    as part of the property insurance FGI maintains pursuant to
2    Section 13 of this Lease, maintain property insurance covering the PSA Office Space (but not
3    PSA's furniture, fixtures, equipment or personal property),

4       8.11.2.3    repair or reconstruct the PSA Office Space to the extent FGI is
5    otherwise required to repair or reconstruct the Premises under Sections 11 and 12 of this Lease,
6    except to the extent that the reason the PSA Office Space must be repaired or reconstructed was
7    due to the actions or omissions of PSA or PSA Related Persons, agents or invitees, or due to the
8    breach of this Lease by PSA,

9       8.11.2.4    pay the cost of electricity, water, sewer, and HVAC provided to the
10   PSA Office Space, but only to the extent incident to normal office use, and

11      8.11.2.5    ensure that at the time FGI tenders possession of the PSA Office
12   Space to the PSA, the PSA Office Space will be in compliance with all Laws applicable to the
13   PSA Office Space except to the extent such Laws relate solely to PSA's particular use of the
14   PSA Office Space (as opposed to the use of the PSA Office Space for general office use).

15      8.11.3    PSA, for itself, PSA Related Persons, and its agents, invitees and guests,
16   shall have the right of access to the PSA Office Space and nearby restrooms located in the
17   Stadium, at any time and from time-to-time, and to use any sidewalks, stairways, elevators,
18   escalators, parking areas and other similar or related public areas of the Stadium as may be
19   reasonably necessary or convenient for purposes of accessing the PSA Office Space and nearby
20   restrooms, to the same extent as FGI's employees. This Section 8.11.3 shall not be construed so
21   as to allow PSA to attend events at the Project without charge or to allow PSA to have access to
22   portions of the Project which are not necessary to access the PSA Office Space and nearby
23   restrooms; provided however that this shall not limit PSA's rights of access pursuant to Section
24   16.

25      8.11.4    FGI shall provide to PSA twelve (12) parking passes, without charge.
26   These passes shall allow parking in the North Parking Lot in any available parking stall
27   throughout the Term. PSA shall have the right to enter the North Parking Lot and use the
28   driveways and travel lanes of the North Parking Lot during the Term. The parking privileges
29   granted by the passes shall be subject to reasonable rules and terms established from time-to-time
30   by FGI which are generally applicable to all such parking passes.

1        8.11.5   FGI shall, subject to the imposition of reasonable rules, allow PSA to use

2    any appropriately-sized meeting room in the Project which is not previously scheduled for other

3    uses, for PSA's Board Meetings and other PSA public meetings, without charge except for the

4    reasonable cost of any services provided by FGI.

5        8.11.6   PSA may use the PSA Office Space only for the uses and activities

6    allowed in this Section 8.11 and for no other uses or activities without FGI's prior written

7    consent.  PSA shall not use or allow the use of the PSA Office Space or any part thereof for any

8    unlawful purpose or in violation of any certificate of occupancy, any certificate of compliance or

9    any Law.  PSA shall not permit waste of the PSA Office Space or permit any act to be done or

10   any condition to exist on the PSA Office Space or any part of the PSA Office Space which may

11   be hazardous, which may constitute a nuisance, or which may void or make voidable or which .

12   may increase the premium of any policy of insurance in force with respect to the PSA Office

13   Space.  Except for any minor non-structural alterations which do not affect the Project or its

14   operation, PSA shall not make any alterations to the PSA Office Space without FGI's prior

15   written consent.  In emergencies, and as part of its obligations for maintenance and repair of the

16   Stadium, FGI shall have the right to enter into the PSA Office Space as required.  FGI will use

17   Reasonable Efforts to avoid disrupting PSA's business operations and so long as FGI uses

18   Reasonable Efforts, FGI shall not be liable to PSA for any damage to PSA, its operations or

19   property resulting from such entry, maintenance or repair.  In the event of any casualty or

20   condemnation that make the PSA Office Space untenable, PSA, if requested by FGI, shall vacate

21   the PSA Office Space and FGI shall use Reasonable Efforts to provide PSA with alternative

22   space within the Project if reasonably practicable.

23        8.11.7   Notwithstanding the foregoing, if FGI has a reasonable basis, and subject

24   to PSA's reasonable consent, FGI may elect to provide to PSA without charge reasonable and

25   proximately located office space outside the Project which reasonably complies with Section

26   210(2)(b)(vii) of the Act, provided that FGI pays the reasonable moving expenses of PSA.

27      8.12   <u>Neighboring Community Meetings</u>

28        FGI shall, subject to the imposition of reasonable rules, allow the use of any

29   appropriately-sized meeting room in the Project which is not previously scheduled for other uses

1     for neighboring community public meetings, without charge except for the reasonable cost of any

2     services provided by FGI. "Neighboring communities" are the Affected Areas.

3           8.13    Protection of Tax-Exempt Bonds.

4               FGI acknowledges that the State of Washington may finance the construction of

5     the Project using tax-exempt bonds. If the State uses tax-exempt bonds, PSA and FGI shall

6     endeavor to structure and limit the amounts, sources, and uses of any payments received by the

7     State, the County, PSA, or any related governmental entity for the use or in respect to the Project

8     in such a manner as to permit the interest on those bonds to be tax exempt.

9           8.14    Project Art

10          8.14.1    The Project Improvements will include Project art pursuant to Section 15.1

11     of the Development Agreement ("Project Art"). FGI shall, pursuant to the Development

12     Agreement, allocate a total of $1.75 million for the acquisition and replacement of Project Art

13     (the "Project Art Fund"). The funds in the Project Art Fund, including the remaining balance of

14     the original $1.75 million, plus the proceeds from the sale of Project Art in the Premises

15     purchased from the Project Art Fund, plus interest earned, shall be used to purchase replacement

16     and additional Project Art. PSA and FGI shall, at least every five (5) years, confer to make

17     mutually acceptable decisions regarding Project Art to be sold and replacement Project Art to be

18     purchased.

19          8.14.2    Areas within the Premises have been or will be designed and designated as

20     "Project Art Spaces" intended to be utilized for the public display of Project Art. In consultation

21     with the Project Art Selection Committee, FGI shall, subject to PSA approval, determine what

22     Project Art may be displayed in the Project Art Spaces and the length of time the works of

23     Project Art may be displayed. FGI shall establish reasonable rules regarding display and

24     regarding public access to the Project Art Spaces, and shall use Reasonable Efforts to provide

25     security for the works of Project Art displayed.

26           8.15    Compliance With Laws; No Discrimination

27               FGI shall at all times, use, manage, possess, and operate the Project in compliance

28     with all applicable Laws, including Laws with respect to discrimination, and FGI shall include

29     this covenant in every agreement, contract, sublease, use agreement, concession agreement and

30     occupancy agreement FGI enters with any Person which will provide services to the Premises or

1    which will occupy space in the Premises. FGI may challenge the interpretation or application of

2    any Laws so long as such contest is in good faith, the contest does not jeopardize PSA's interest

3    in the Premises, and FGI indemnifies PSA from any cost, loss, or liability on account of the

4    contest

5

6    <u>SECTION 9</u>    <u>MANAGEMENT OF THE PROJECT</u>

7    9.1    <u>Standard of Operation</u>

8    FGI shall operate the Project in a First-Class Manner, as provided in Section 7.2.

9    9.2    <u>Signage, etc.</u>

10    Subject only to its compliance with Laws, FGI may design, construct, purchase,

11    install, move, remove, utilize and operate such interior and/or exterior structures, facilities,

12    devices and equipment for use as building marquees, signage, advertising displays, information

13    displays, sculptures, art works, or communication of commercial, non-commercial, public

14    service, entertainment or informational messages, including without limitation for purposes of

15    identifying the Project or any Project Element, without the consent or approval of PSA as to the

16    physical structure, facility, device or equipment or as to the content. Such structures, facilities,

17    devices and equipment may be either active or passive in nature, may be installed anywhere

18    within the Project, including in the interior or exterior of any of the Project Improvements, and

19    may be free-standing or permanently or temporarily attached to any such Project Improvement.

20    It is the intention of the Parties that this provision be construed broadly. No advertising of any

21    form at the Premises will contain a promotion of tobacco products, other than point of sale

22    advertising to the extent not prohibited by Laws.

23    9.3    <u>Project Revenues</u>

24    Except to the extent otherwise specifically provided for in this Lease, all revenues

25    from the operation of the Project during the Term, from every source whatsoever, shall be for the

26    benefit and account of FGI.

27

1    SECTION 10    FGI'S RESPONSIBILITY FOR ALL OPERATING EXPENSES

2        10.1    Utilities

3            Throughout the Term, FGI shall pay or cause to be paid when due, all charges for

4    Utilities provided to or used in connection with the Premises, other than utility charges for or

5    related to the PSA Office Space for which FGI is not responsible pursuant to Section 8.11.2.4.

6    Nothing in this Section shall affect the obligations of PSA and FGI with respect to Utilities under

7    the Development Agreement.

8        10.2    Payment and Contest of Impositions

9            10.2.1    Throughout the Term, FGI shall pay when due all Impositions levied or

10    assessed against the Premises.

11            10.2.2    If any Imposition may, under applicable law, at the option of FGI be paid

12    in installments, FGI may exercise that option, and shall pay all such installments (and interest, if

13    any) becoming due during the Term as they become due. At the end of the Term, FGI shall

14    deposit with PSA an amount sufficient to pay FGI's pro rata share of all Impositions for the

15    calendar year in which the Lease terminates. If Impositions have been paid in advance by FGI

16    for a period of time after the Term, PSA shall refund to FGI the portion of such payments

17    applicable to the period after the Term unless it would be illegal for PSA to pay the Impositions

18    after the end of the Term. If FGI has elected to pay  assessments in installments for

19    improvements made in connection with FGI's initial development of the Project, FGI shall pay

20    the full balance of the assessment at the end of the Term.

21            10.2.3    FGI will furnish to PSA at least annually official receipts of the

22    appropriate taxing authority or other proof satisfactory to PSA evidencing the payment of the

23    Imposition.

24            10.2.4    FGI may, by appropriate legal proceedings conducted in good faith and

25    with due diligence, contest the amount or validity or application, in whole or in part, of any

26    Imposition or lien therefor, or any other lien, encumbrance or charge against the Premises arising

27    from work done or materials provided to or for FGI, if:

28                10.2.4.1    The proceedings suspend the collection of the Imposition from

29    PSA, FGI and the Premises, as applicable;

1        10.2.4.2    FGI shall have furnished security as may be reasonably required by

2  PSA; and

3        10.2.4.3    FGI shall have given PSA reasonable notice of, information

4  pertaining to, and regular progress reports about the contest.

5        10.2.5    Pursuant to Section 202(15) of the Act, the "public or entertainment areas"

6  of the Project are exempt from taxes imposed pursuant to RCW 82.29A.030 and 82.29A.040.

7  PSA covenants that it will not initiate, support or cooperate with (except as required by Laws)

8  any effort to (i) revoke or modify that exemption, (ii) to make such an exemption not applicable

9  to the Project for any subsequent amendment or enactment of any other leasehold or similar type

10  Imposition, or (iii) interpret other than as broadly as possible the scope of "public or

11  entertainment areas" of the Project by any applicable agency.

12        10.3    Indemnification

13        FGI shall defend, indemnify and hold harmless PSA and PSA Related Persons

14  and the Premises from any lien, claim, cost, expense or liability with respect to any Imposition or

15  contest thereof, including all costs and expenses (including reasonable attorneys' fees) related

16  thereto.

17        10.4    Liens

18        FGI shall not permit or suffer any lien or encumbrance against the Premises other

19  than liens for Impositions not yet payable, liens and encumbrances granted by PSA and approved

20  by FGI and existing on the Completion Date, easements granted by PSA and approved by FGI

21  in connection with development of the Project, the Permitted Exceptions, and other liens and

22  encumbrances approved by PSA in its sole discretion.  If any unpermitted lien comes into

23  existence, FGI shall cause the lien to be discharged or bonded within thirty (30) days after FGI

24  receives notice of the existence of the lien.  If FGI fails to remove the lien as required in this

25  Section, PSA may, but shall not be obligated to, after prior written notice to FGI, discharge the

26  lien in any manner.  FGI shall repay PSA for any sums advanced to discharge the lien and for

27  PSA's reasonable costs and expenses (including attorneys' fees) in connection with discharging

28  the lien, within thirty (30) days after PSA requests repayment from FGI.  In addition, PSA shall

29  have all other rights and remedies against FGI under this Lease and under Law.

1      10.5    Weller Street Pedestrian Bridge Maintenance, etc.

2            Throughout the Term, FGI shall pay or cause to be paid when due, all of PSA's

3   liabilities related to the provision of maintenance, repair and security services for the Weller

4   Street Pedestrian Bridge pursuant to Section 4.3 of that certain Agreement among the City of

5   Seattle, King County, Central Puget Sound Regional Transit Authority, State of Washington

6   Department of Transportation, and PSA, in current form as of Closing.

7      10.6    _Deferred Sales Tax_

8            In accordance with Section 13.2.2 of the Development Agreement, if the Deferred

9   Sales Taxes exceed $37 million, FGI shall pay the amount of the excess to PSA when and as due,

10  which shall be in such proportion of each annual installment of the total Deferred Sales Taxes as

11  the portion of the Deferred Sales Taxes to be paid by FGI bears to the total Deferred Sales Taxes.

12

13  SECTION 11   MAINTENANCE AND MODERNIZATION

14      11.1   Maintenance

15         11.1.1   Maintenance

16            Maintenance consists of Normal Maintenance and Major Maintenance.

17         11.1.2   Maintenance Standard

18            11.1.2.1   FGI shall keep all aspects of the Premises, including its electrical,

19  mechanical, acoustical and other systems, in a "First-Class Condition" throughout the Term,

20  normal wear and tear excepted. With respect to the Stadium, First-Class Condition means that

21  the facilities, operational capabilities, systems, finishes, and amenities of the Stadium are

22  maintained at a level of at least the average quality of all stadiums in the United States that are

23  home stadiums for football teams in the National Football League (or its successor) which were

24  first placed in service after 1996 and before 2006 ("Comparable Stadium Facilities"). With

25  respect to the Exhibition Center, First-Class Condition means that the facilities, operational

26  capabilities, systems, finishes and amenities of the Exhibition Center are maintained at a level of

27  at least the average quality of comparable exhibition centers (i.e. of between 250,000 and

28  500,000 square feet) in major metropolitan cities west of the Mississippi River, and which were

29  first placed in service after 1996 and before 2003 ("Comparable Exhibition Facilities"). With

30  respect to the Parking Facilities, First-Class Condition means that the facilities, operational

1    capabilities, systems, finishes and amenities of the Parking Facilities are maintained at a level of
2    at least the average quality of other above-grade free-standing parking structures in Seattle,
3    which serve major sports facilities, convention facilities, retail, hotel or office uses and which
4    were first placed in service after 1996 and before 2003 ("Comparable Parking Facilities").
5    (Comparable Stadium Facilities, Comparable Exhibition Facilities, and Comparable Parking
6    Facilities are each "Comparable Facilities.") Exhibit 11.1.2.1 describes the Comparable Stadium
7    Facilities, Comparable Exhibition Facilities, and Comparable Parking Facilities as they exist on
8    the date of this Lease. Such Exhibit shall be updated by the parties on or before December 31,
9    2003 to include all additional Comparable Exhibition Facilities and Comparable Parking
10   Facilities, and on or before December 31, 2006 to include all additional Comparable Stadium
11   Facilities.

12           11.1.2.2    First-Class Condition shall require modifications to the Premises,
13   capital improvements and upgrading (all of which is included in "Modernization Improvements"
14   described in Section 11.4), but only to the extent the average of Comparable Facilities described
15   above have been modified, improved or upgraded using "internally generated financing."
16   "Internally generated financing" means financing to pay for the modifications, capital
17   improvements and upgrading either derived directly from operation of the Comparable Facility
18   (including from any facility parking or admissions taxes or surcharges) or borrowings (such as
19   through loans or issuance of bonds) to the extent repaid or retired from funds derived directly
20   from operation of the Comparable Facility.  Any modifications, capital improvements or
21   upgrading in any Comparable Facility which is not paid from internally generated financing shall
22   be ignored.  To the extent a Comparable Facility has been modified, improved or upgraded using
23   internally generated financing which is borrowed and intended to be repaid by funds derived
24   directly from operation of the Comparable Facility over a period of time which extends beyond
25   the expiration of the Term of this Lease, then the modifications, capital improvements or
26   upgrading so financed shall be ignored unless and until the Term of this Lease is extended
27   beyond the period of time in which that internally generated financing is expected to be fully
28   repaid or retired.  Notwithstanding the foregoing, FGI shall not be required to make any
29   modifications, capital improvements or upgrading which would have the effect of replacing any
30   structure, feature, finish, system, equipment or other part of the Project during its reasonably

1    anticipated useful life, unless such item is no longer functional and is necessary for the operation
2    of the Project. First-Class Condition shall not require keeping up with innovations or technology
3    or reconstructing portions of the Project.

4              11.1.3    Annual Maintenance Plan

5                        At least thirty (30) days prior to the Commencement Date and each Lease
6    Year thereafter, FGI shall submit to PSA, for PSA's review and approval, a plan for the Normal
7    Maintenance activities to be conducted at the Premises by FGI during that Lease Year (the
8    "Annual Maintenance Plan"). PSA shall have thirty (30) days from FGI's submission to approve
9    the Annual Maintenance Plan. Any subsequent changes in the Annual Maintenance Plan shall be
10   approved under the same procedure as for the initial approval of an Annual Maintenance Plan.
11   FGI shall perform Normal Maintenance substantially in accordance with the PSA approved
12   Annual Maintenance Plan unless FGI has a reasonable justification not to do so.

13             11.1.4    Five-Year Major Maintenance and Modernization Plan

14                       At least thirty (30) days prior to each Lease Year, FGI shall submit to
15   PSA, for PSA's review and approval, a new or updated plan of scheduled work to be performed
16   upon the Premises during the ensuing five-year period in order to meet FGI's obligations under
17   Section 11.3 for Major Maintenance and under Section 11.1.2.2 for certain modifications, capital
18   improvements and upgrading, as well as FGI's rights under Section 11.4 for Modernization
19   Improvements (a "Five-Year Plan"). A Five-Year Plan may be broken down into Major Repair
20   and Modernization Improvements sections. PSA shall have ninety (90) days from FGI's
21   submission to review and approve each Five-Year Plan. Any subsequent changes in a Five-Year
22   Plan shall be approved under the same procedure as for the initial Five-Year Plan. FGI shall
23   perform Major Maintenance and Modernization each year substantially in accordance with the
24   PSA approved Five-Year Plan, as that Five-Year Plan may be revised from year-to-year, unless
25   FGI has a reasonable justification not to do so.

26             11.1.5    Annual Maintenance Report

27                       Within one hundred twenty (120) days following each Lease Year, FGI
28   shall provide to PSA a report in reasonable detail on the prior year's Normal and Major
29   Maintenance. In addition, PSA shall have the opportunity to audit (generally pursuant to the
30   process described in Section 6.1.7) FGI's maintenance records.

1      11.2   Normal Maintenance

2          11.2.1   Normal Maintenance.   FGI shall be responsible for all Normal

3   Maintenance required to keep the Premises in a First-Class Condition, other than Normal

4   Maintenance of the PSA Office Space for which FGI is not responsible pursuant to Section 8.11.

5   "Normal Maintenance" consists of those routine and predictable actions, including curative and

6   preventive actions, which are necessary to keep the Premises in good order and repair,

7   functioning as designed, and clean and attractive.  Normal Maintenance shall include the repair

8   or replacement of parts or components which periodically need repair or replacement as a result

9   of normal wear and tear.  Examples of Normal Maintenance include, but are not limited to:

10   performing all preventive or routine maintenance, including those preventive or routine

11   maintenance activities called for by the commissioning consultant referred to in the Development

12   Agreement and those preventive or routine maintenance activities called for in any operations

13   manuals for any systems or equipment included in the Project; keeping all portions of the

14   Premises clean, free of graffiti and free of debris; periodic retouching of painted surfaces as

15   needed to maintain an aesthetically attractive appearance; repairing damage to finish surfaces;

16   replacing light bulbs; replacing damaged or worn out parts or components included in the

17   systems and equipment included in the Premises; keeping control systems functioning; re-

18   seeding or over-seeding the field and keeping the field properly mown, watered and fertilized;

19   keeping all landscaping properly watered, fertilized, and pruned; cleaning, lubricating, and

20   changing belts on all mechanical systems; periodically testing and, when needed, repairing all

21   mechanical and electrical systems; inspecting, cleaning, and patching roofs; repairing damaged

22   seats; cleaning storm and sanitary sewer drains; and testing and repairing all alarm systems, fire

23   sprinkler systems, and computerized building systems.

24      11.3   Major Maintenance

25          11.3.1   FGI shall be responsible for performing all Major Maintenance required to

26   keep the Premises in a First-Class Condition.  "Major Maintenance" consists of all Maintenance

27   other than Normal Maintenance, and includes without limitation major repairs, reconstruction

28   and replacement of Project systems and structural elements, equipment, and the like which are

29   required to maintain the Project in First-Class Condition.  Specific examples include without

1    limitation repainting or refinishing, equipment replacement, major repairs, replacing any

2    structural component, replacing any surface covering, and re-sodding the field.

3        11.4   Modernization

4            11.4.1   Modernization. FGI may, at its sole option except as required in Section

5    11.1.2.2, elect to undertake from time-to-time Modernization Improvements, for which it shall be

6    responsible for performing.    "Modernization Improvements" include major repairs,

7    reconstruction, replacement and additions of Project systems and structural elements, major

8    equipment, and the like which is intended to modernize the Project and make it more functional

9    and attractive for its then current and intended uses.

10        11.4.2   Modernization Improvements shall be performed only pursuant to a

11    "Modernization Plan" which has been prepared by FGI and submitted to PSA, for PSA's review

12    and approval, either as part of the Five-Year Plan or separately. If provided separately:

13            11.4.2.1   PSA shall have ninety (90) days to review the Modernization Plan

14    and to propose changes in the Modernization Plan, based upon PSA's reasonable judgment. If

15    PSA proposes changes in the Modernization Plan which are not acceptable to FGI, then either

16    party may submit the dispute to Dispute Resolution.

17            11.4.2.2   Any modifications in an approved Modernization Plan

18    subsequently proposed by FGI shall be approved under the same procedure as for the initial

19    approval of the Modernization Plan.

20        11.4.3   Permanent Seats. The Stadium will be built with approximately 67,000

21    permanent seats and with room to add approximately 5,000 more permanent seats. FGI may

22    from time-to-time add up to an aggregate of 5,000 permanent seats, which shall be considered a

23    "Modernization Improvement" subject to funding pursuant to Section 11.6 and 11.7, but so long

24    as the additional seats are generally consistent with the layout and quality of the original seating,

25    shall not require a Modernization Plan. FGI shall inform PSA of its plans, and PSA may review

26    and comment on such plans.

27        11.5   FGI and PSA Funding Responsibilities

28        PSA shall be responsible for funding all Major Maintenance and Modernization

29    Improvements to the extent of funds available in the Naming Rights Account and Capital

30    Improvements Account. FGI shall be responsible for funding all Normal Maintenance, and for

1    funding Major Maintenance and Modernization Improvements in excess of the funds available in

2    the Naming Rights Account and Capital Improvements Account, and to the extent that the cost of

3    complying with Section 11.3 and 11.4 exceeds the funds made available out of those Accounts,

4    the excess shall be paid by FGI (although subject to future reimbursement from the Naming

5    Rights Account to the extent funds subsequently become available).

6        11.6    Naming Rights Account

7            PSA shall create a fiduciary account entitled the "Naming Rights Account," to be

8    held in the custody of and administered by PSA.  Pursuant to Section 107 of the Act and

9    Section 17.4.6 of this Lease, net proceeds from the sales of Special Naming Rights shall be

10   collected by PSA and held in the Naming Rights Account.  The Naming Rights Account shall

11   consist of all such deposits, plus accumulated earnings and interest thereon.  The funds in the

12   Naming Rights Account will be utilized only for Major Maintenance and Modernization

13   Improvements, but not for work which is Normal Maintenance.

14       11.7    Capital Improvements Account

15           PSA shall create a fiduciary account entitled the "Capital Improvements

16   Account," to be held in the custody of and administered by PSA.  Pursuant to Sections 301 and

17   302 of the Act, certain tax proceeds will be paid into the Capital Improvements Account, after

18   the Bonds are retired.  The Capital Improvements Account shall consist of all such deposits, plus

19   accumulated earnings and interest thereon.  The funds in the Capital Improvements Account will

20   be utilized only for Major Maintenance and Modernization Improvements, but not for work

21   which is Normal Maintenance.

22       11.8    Disbursement of Funds

23           FGI may from time-to-time request a disbursement of funds from the Naming

24   Rights Account or the Capital Improvement Account to pay for work performed, or to reimburse

25   FGI for work performed and paid for by FGI, for Major Maintenance or Modernization

26   Improvements.  In order to obtain a disbursement, FGI must submit a written request for

27   disbursement, accompanied by a certification of the actual out-of-pocket costs owed or paid by

28   FGI, accompanied by conditional lien releases from all contractors, suppliers, materialmen and

29   others that performed the work.  PSA reserves the right to audit (generally pursuant to the

30   process described in Section 6.1.7) any of FGI's books and records reflecting the work for which

1    FGI is seeking payment or reimbursement. FGI's costs may include an administrative fee

2    payable to FGI not to exceed ten (10)% of the actual out-of-pocket costs paid or to be paid by

3    FGI for such work. Within fifteen (15) Business Days of FGI's request for disbursement, PSA

4    shall inspect the work to confirm that the work conforms to the plans approved by PSA if

5    required pursuant to Section 11.9. Upon PSA's confirmation that the costs claimed by FGI are

6    accurate and that the work conforms to the plans, PSA shall disburse the requested funds from

7    the requested account, or so much of them as has been confirmed.

8        11.9    Approval of Plans, Completion of Work

9            11.9.1    FGI may not make any Major Maintenance or Modernization

10    Improvement, the estimated cost of which would exceed $300,000, Indexed, without the prior

11    consent of PSA. For any such work that requires PSA's consent, FGI shall submit "design

12    development" level plans and specifications for the work to PSA. PSA shall have thirty (30)

13    days after receipt of all of the above to review and approve the documents submitted. As to

14    Modernization, the approval or disapproval of PSA shall be in its sole discretion, and shall not be

15    subject to Dispute Resolution.

16            11.9.2    FGI shall perform all work in a sound and workmanlike manner and in

17    accordance with all plans and specifications approved by PSA. FGI shall not authorize a change

18    order with respect to such work which would have the effect of changing the design development

19    approval without first obtaining PSA's approval of the proposed change order. FGI shall

20    complete all work authorized by PSA free of any liens or claims and shall defend, indemnify and

21    hold PSA harmless from any such liens or claims.

22            11.9.3    When the work is substantially complete, FGI shall notify PSA and the

23    Parties shall inspect the work to develop a "punch list" inspection report which shall include all

24    items of work that are not fully complete or items of work which are defective. FGI shall cause

25    all items on the "punchlist" to be completed or corrected and shall notify PSA when that work is

26    done. PSA and FGI shall then perform a reinspection of the work to determine if all "punchlist"

27    work has been completed. If any of the "punchlist" work is not completed, then FGI shall

28    promptly complete the "punchlist" work to PSA's reasonable satisfaction and notify PSA.

29            11.9.4    If work to be performed by FGI includes installing a new operating

30    system, or a major component of an operating system, PSA may require the use of a

1   commissioning consultant to review the installation, to start up the system, and to prescribe
2   operating and maintenance standards. The cost of the commissioning consultant shall be paid by
3   FGI.

4        11.10   Exemption From Public Works Requirements

5            All work (including without limitation work, construction, alteration,
6   maintenance, repair, replacement, and improvement) provided under this Lease by FGI or any
7   contractor of FGI or any direct or indirect subcontractor of any such contractor, and all supplies,
8   materials, equipment and other personal property provided by FGI or any contractor of FGI or
9   any direct or indirect subcontractor of any such contractor or any material supplier or leased
10  equipment supplier of FGI or any such contractor or subcontractor, is exempt from all public
11  contracting and related requirements, including without limitation requirements related to public
12  works, public bidding, or public procurement, to the fullest extent permitted by the Act or other
13  applicable Law.

14

15  SECTION 12   DAMAGE OR DESTRUCTION

16       12.1   Damage or Destruction

17            From and after the Completion Date, in the event of damage to or destruction of
18  the Project Improvements, FGI shall promptly give PSA notice of such damage or destruction
19  and, within thirty (30) days after the occurrence of such damage or destruction, commence
20  reasonable efforts to effect the repair and reconstruction of the Project Improvements to
21  substantially the same condition and form as prior to the damage or destruction. The repair or
22  reconstruction of any damage or destruction (collectively "Restoration") shall be made in
23  compliance with then existing Laws

24            12.1.1   In the event the Restoration is intended to restore the Premises to its
25  design immediately prior to the damage or destruction (with only non-material differences which
26  would not constitute a change to the design development level plans and specification) and the
27  cost of the Restoration exceeds $5,000,000, Indexed, then FGI shall first obtain PSA's approval
28  of design development level plans and specifications for the Restoration pursuant to Section 11.9
29  as if such Restoration were Major Maintenance. In the event the Restoration is intended to
30  restore the Premises to something materially different than its design immediately prior to the

1    damage or destruction (i.e. that would constitute a change to the design development level plans
2    and specification) and cost of the Restoration exceeds $300,000, Indexed, then FGI shall first
3    obtain PSA's approval of design development level plans and specifications for the Restoration
4    pursuant to Section 11.9 as if such Restoration were Modernization. Other than as provided in
5    the preceding two sentences, i.e. if the cost of the Restoration is $5,000,000 or less, or $300,000
6    or less, respectively, PSA's approval is not required.

7         12.1.2    Insurance proceeds up to $5,000,000, Indexed, shall be paid to FGI to
8    effect the Restoration of the Project Improvements. Insurance proceeds in excess of $5,000,000
9    shall be paid to the Trustee of Insurance to be disbursed in accordance with this Section 12. PSA
10   shall cooperate with FGI in FGI's filing of an insurance claim on account of any insured damage
11   or destruction to the Premises. Any settlement with the insurance carrier relating to damage in
12   excess of $5,000,000 shall require the reasonable approval of both PSA and FGI, and if they
13   cannot agree, then the dispute shall be submitted to Dispute Resolution.

14        12.1.3    If the available insurance proceeds plus the amounts then remaining in the
15   Capital Improvements Account and the Naming Rights Account are not sufficient, as reasonably
16   determined by FGI, to cover the cost of all labor, materials and other construction costs, direct
17   and indirect (including, but not limited to, overhead charges, contractors' fees, architects' fees,
18   payroll and social security charges and taxes) to complete the Restoration to a design condition
19   consistent with the design condition of the Project prior to the damage or destruction (except as
20   otherwise provided in Section 12.1.1), FGI shall either be responsible for payment of such
21   shortfall or, if applicable, deposit the amount of such shortfall with the Trustee of Insurance, if
22   one is required, prior to the commencement of any construction work. Any additional amounts
23   estimated to complete the Restoration, after taking into account the available insurance proceeds,
24   shall firstly be paid to FGI or deposited with the Trustee of Insurance, as applicable, by PSA
25   from the funds available in the Capital Improvements Account and secondly, be used by FGI or
26   deposited with the Trustee of Insurance, as applicable, from the funds then available in the
27   Naming Rights Account. FGI or the Trustee of Insurance, as applicable, shall be deemed to have
28   expended funds for Restoration in the following order: (i) available insurance proceeds, (ii)
29   funds from the Capital Improvements Account, (iii) and funds from the Naming Rights Account,
30   and (iv) funds deposited by FGI to cover any shortfall, (collectively "Restoration Proceeds"). In

1    the event that there are Restoration Proceeds that prove to be inadequate, FGI shall pay the

2    additional costs required to complete the Restoration. If the Restoration Proceeds are in excess

3    of the cost of the Restoration, the excess shall be repaid first to FGI until the amounts used from

4    (iv) above have been repaid in full, and secondly to PSA until the amounts used from (iii) and

5    (ii) above, in that order, have been repaid in full. If any insurance proceeds remain unspent, they

6    shall be deposited into the Naming Rights Account.

7    12.1.4   FGI shall diligently commence and continuously carry out the Restoration

8    to full completion as soon as possible, except to the extent of delays due to Force Majeure. FGI

9    shall obtain all permits and authorizations required by Governmental Authorities with respect to

10    any Restoration. The Restoration shall be performed by a duly licensed, bondable, and qualified

11    general contractor approved of by PSA. All construction work shall be carried on in accordance

12    with plans and specifications prepared by a licensed architect, engineer or other design

13    professional approved by PSA if such a professional is reasonably required, given the scope and

14    nature of the work.

15    12.1.5   The Restoration Proceeds with respect to damage or destruction in excess

16    of $5,000,000 shall be made available to FGI by the Trustee of Insurance as the work progresses.

17    The funds shall be made available by the Trustee of Insurance to pay for work and materials to

18    the extent completed and delivered (calculated on the basis of the percentage of the total work

19    and materials to be completed and delivered, and subject to a retention of five percent (5%) until

20    the work is finally complete). The Trustee of Insurance shall also require FGI to supply in form

21    satisfactory to the Trustee of Insurance evidence of application of funds and payment for all labor

22    and material relating to the construction. The Trustee of Insurance shall disburse the Restoration

23    Proceeds using procedures for the disbursement of construction loans followed by commercial

24    banks in Seattle, Washington.

25    12.2   Damage or Destruction at End of Term

26    If at any time after the first twenty-five (25) Lease Years, including any Extension

27    Periods, damage or destruction to the Project Improvements occurs and the cost of repairing,

28    restoring, replacing or rebuilding the damage or destruction exceeds twenty-five percent (25%)

29    of the original cost of the Project Improvements, Indexed, then FGI may elect to terminate this

30    Lease. In the event FGI so elects, FGI shall give notice to PSA of its election within ninety (90)

1    days after the date of such damage or destruction and the Lease shall terminate as of the date of

2    the notice.  In that event, all of the proceeds of any applicable insurance policies including the

3    deductibles shall be immediately distributed to PSA.  If the damage is of a lesser amount, such

4    that FGI does not have the right to terminate this Lease, or if FGI elects not to terminate this

5    Lease, then FGI shall be obligated to complete the Restoration as required by Section 12.1, and if

6    the Restoration cannot reasonably be completed during the remaining Term, then the Term shall

7    be extended for the lesser of:  the amount of time necessary to complete the Restoration or two

8    (2) Lease Years.

9        12.3    No Rent Adjustment

10            Except as provided in Section 12.2 above, this Lease and the Term shall not

11   terminate because of damage to or destruction of the Project Improvements.  The obligation to

12   pay Rent shall not be affected.

13       12.4    Development Period

14            Prior to the Completion Date, damage or destruction of the Project Improvements,

15   shall be governed by the Development Agreement.

16

17   SECTION 13    INSURANCE

18       13.1    Securing of Insurance Coverage

19            FGI shall procure and maintain, or cause to be procured and maintained, during

20   the entire Term the insurance described in this Section 13.  Policy limits and coverages (other

21   than the policies described in Sections 13.2.2 and 13.2.3) shall be reviewed every five (5) years

22   by PSA and FGI and shall be adjusted by PSA and FGI in their reasonable judgment to reflect

23   inflation or deflation, changes in coverage customarily obtained for properties comparable to the

24   Project, and other relevant factors, with any disputes being decided pursuant to Dispute

25   Resolution.  Policy limits and coverages on the policies described in Sections 13.2.2 and 13.2.3

26   shall be reviewed every five (5) years by PSA and FGI, or in the case of the policy described in

27   13.2.3, at any time that the amount of coverage is determined pursuant to Section 13.2.3(b), and

28   such policy limits and coverages shall be adjusted by PSA and FGI in their reasonable judgment

29   to reflect changes in coverage customarily obtained for properties comparable to the Project, and

30   other relevant factors, with any disputes being decided pursuant to Dispute Resolution.  By not

1    later than the date the policies are required to be in effect pursuant to Section 13.2, FGI shall

2    provide PSA certificates of insurance from the companies issuing policies providing the required

3    insurance stating that such coverage is in effect. Copies of required insurance policies procured

4    by FGI shall be provided to PSA upon request. To the extent allowed by applicable law, FGI

5    may provide some or all of the insurance required by Section 13 under blanket type policies

6    covering the Project and other property owned by FGI or an Affiliate of FGI. FGI's procurement

7    of the insurance required under this Section 13 shall in no manner affect or limit FGI's

8    indemnification obligations pursuant to Section 15.2. In the event of an insured loss, FGI shall

9    be responsible for paying all deductibles.

10        13.2    Types of Required Insurance

11            From the Commencement Date and throughout the Term, FGI shall secure and

12    maintain insurance covering the Exhibition Hall and Parking Facilities, and from the Completion

13    Date and throughout the remaining Term, FGI shall secure and maintain insurance covering the

14    Stadium as follows:

15            13.2.1    Commercial general liability insurance, in combination with umbrella or

16    excess liability policies, which together will provide limits of not less than $25,000,000 each

17    occurrence and annual aggregate including the following specific coverages relating to the

18    Premises:

19            13.2.1.1    Coverage A - Bodily injury and property damage for premises and

20    operations liability, including products and completed operations, and blanket contractual;

21            13.2.1.2    Coverage B - Personal and advertising injury liability;

22            13.2.1.3    Liquor liability endorsement for the serving and selling of

23    alcoholic beverages; and

24            13.2.1.4    Business auto coverage for owned, hired, leased and non-owned

25    vehicles, used by FGI in connection with the use, management and operation of the Premises,

26    which in combination with umbrella or excess liability policies provide limits of not less than

27    $25,000,000 each accident, combined bodily injury and property damage.

28            13.2.2    Commercial property insurance, special perils coverage (I.S.O., 1991

29    Edition, as amended) property insurance covering the Project Improvements against all risk of

30    direct physical loss (other than due to earthquake and flood, which shall be governed by

1   Section 13.2.3) during the Term in an amount not less than one hundred percent (100%) of the
2   replacement cost.

3        13.2.3   Earthquake and flood insurance covering the Project Improvements
4   against all direct physical loss due to earthquake and flood during the Term, in an amount equal
5   to the lesser of: (a) forty percent (40%) of the hard construction Project Costs, Indexed, or such
6   lesser amount as may be concluded in a "probable maximum loss" study prepared by a
7   consultant who is proposed by FGI and is reasonably acceptable to PSA (and in the event the
8   conclusion of the PML study is a range, then the mid-point of the range shall be used), or (b)
9   whatever amount of coverage which can be purchased with a premium of $200,000, Indexed, in
10   any Lease Year (assuming a 2% deductible).

11        13.2.4   After the Completion Date, during any period of construction or
12   renovation of any Project Improvements in excess of $5,000,000, Indexed, in addition to the
13   other coverages required under this Section 13, standard "all risk" builder's risk insurance
14   (including, without limitation, coverage against collapse), written on a completed value basis, in
15   an amount not less than the projected total cost of construction or renovation of such Project
16   Improvements as reasonably estimated by FGI's architect and as approved by PSA not more than
17   sixty (60) days prior to the commencement of construction or renovation.

18        13.2.5   Workers' compensation and employer's liability insurance covering all
19   Persons employed by FGI at or in connection with the Premises, in compliance with applicable
20   State and Federal Laws.

21       13.3   Terms of Insurance

22        Except to the extent Self-Insured as provided in Section 13.9, the policies required
23   under Section 13.2 shall:

24        13.3.1   Be written as primary policies not contributing with and not in excess of
25   coverage that PSA may carry.

26        13.3.2   Name PSA and PSA Related Persons as additional insureds.

27        13.3.3   Expressly provide that PSA shall not be required to give notice of
28   accidents or claims and that PSA shall have no liability for premiums.

29        13.3.4   Provide that such policies shall not be renewed, canceled, or materially
30   modified without thirty (30) days' prior written notice to PSA.

1    13.3.5   Be issued by an insurer of recognized standing, rated "A-VIII" or better as
2  established by Best's Rating Guide or an equivalent rating issued by such other publication of a
3  similar nature as shall be in current use, and licensed to do business in the State of Washington,
4  or be otherwise acceptable to PSA.

5    13.3.6   For Commercial general liability insurance, be written on an "occurrence"
6  basis, rather than on a "claims made" basis.

7    13.3.7   Provide that the insurer waives subrogation as to any rights to recovery
8  resulting from the PSA and PSA Related Persons.

9    13.4   PSA's Acquisition of Insurance

10    If at any time during the Term, FGI fails to procure or maintain insurance required
11  under this Lease, or to pay the premiums for such insurance, PSA shall have the right but not the
12  obligation after ten (10) Business Days' prior written notice to FGI to procure the insurance and
13  to pay any and all premiums for such insurance. Any amounts paid by PSA in connectic.. .vith
14  the acquisition of insurance shall be immediately due and payable as additional Rent, and FGI
15  shall pay to PSA upon demand the full amount paid by PSA, together with Economic Interest.
16  The ten-day notice requirement in this Section 13.4 shall satisfy the ten-day notice requirement
17  in Section 22.1.1 of this Lease.

18    13.5   Waiver of Subrogation

19    FGI and PSA and their respective Related Persons release and relieve each other from
20  any and all liability or responsibility and waive their entire right of recovery for any loss or
21  damage to the Premises or personal property on the Premises, caused by fire or any other insured
22  peril, even if the fire or other casualty was caused by the fault or negligence of either FGI or PSA
23  or their Related Persons. FGI and PSA shall have their respective insurers endorse the applicable
24  insurance policies to reflect the foregoing waiver of recovery and subrogation, provided,
25  however, that the endorsement shall not be required if the applicable policy of insurance permits
26  the named insured to waive rights of subrogation on a blanket basis, in which case the blanket
27  waiver shall be acceptable.

28    13.6   Restoration Proceeds Held in Trust

29    All Restoration Proceeds that are required to be delivered to the Trustee of
30  Insurance shall be held in trust and applied as follows:

1            13.6.1    First, for the purpose of defraying the cost of repairing, restoring,
2 replacing and/or rebuilding any Project Improvement as provided in Section 12 of this Lease; and
3            13.6.2    Second, if any funds remain, the funds shall be disposed of as provided in
4 Section 12.1.4.

5          13.7    Application of Restoration Proceeds

6            The Trustee of Insurance shall apply the Restoration Proceeds to the cost of the
7 work upon receipt of a certificate of progress and/or completion in form satisfactory to the
8 Trustee of Insurance issued by the architect in charge of the work. Upon completion of the
9 construction, and the full payment therefor (so no liens, encumbrances or claims with respect
10 thereto can be asserted against the Premises, this Lease, PSA or FGI), any Restoration Proceeds
11 held by the Trustee of Insurance with, and not used for Restoration, shall be distributed in
12 accordance with Section 12.1.4.

13          13.8    Powers and Duties of Trustee of Insurance

14            13.8.1    The Trustee of Insurance shall be an Institution with an office located in
15 Seattle, Washington with authority to hold escrowed funds. The Trustee of Insurance shall be
16 agreed upon by PSA and FGI, but if they are unable to agree, the Trustee of Insurance shall be
17 designated by the Presiding Judge of the Superior Court of the State of Washington for King
18 County. Upon occurrence of loss covered by insurance, FGI shall deliver the applicable
19 insurance policy to the Trustee of Insurance. The Trustee of Insurance shall receive in trust the
20 proceeds of physical property damage insurance and make disbursements thereof as provided in
21 Sections 12 and 13.6, as applicable. The Trustee of Insurance shall recognize that one of the
22 primary objectives of the Parties is to ensure that disbursements of funds held by the Trustee of
23 Insurance will be paid in a manner which will mitigate against the imposition of liens or
24 encumbrances upon the Premises. Receipt and disbursement of other types of insurance
25 proceeds shall be made in accordance with this Lease, or as otherwise approved by PSA and FGI,
26 and may be undertaken by the Trustee of Insurance upon the written agreement with PSA and
27 FGI.

28            13.8.2    The Trustee of Insurance shall not be responsible for the collection of any
29 proceeds or the failure or refusal of any insurance company or third Person from whom proceeds
30 may be due to pay the same. However, the Trustee of Insurance, in case of failure or refusal of

1    any insurance company or third person to pay any policies or money due, shall use all proper and

2    legal means in conjunction and cooperation with PSA and FGI to recover the sums due, but at

3    the expense of FGI, to be reimbursed from the insurance proceeds.

4          13.8.3    All the fees and charges of the Trustee of Insurance shall be shared equally

5    by PSA and FGI. The Trustee's fee shall be based on its then current annual minimum fee plus

6    out-of-pocket expenses. Administrative time is to be charged at the then prevailing hourly rate

7    for such service.

8          13.8.4    If the Trustee of Insurance should merge into any other Institution or

9    change its corporate name or should transfer its trust business to any other Institution, the

10    successor Institution shall succeed to all the powers, duties and authority given to Trustee of

11    Insurance hereunder.

12          13.8.5    The Trustee of Insurance may resign upon giving thirty (30) days' notice

13    in writing to PSA and FGI of its desire to resign. Upon receipt of written notice, or if the Trustee

14    of Insurance refuses to serve, PSA and FGI shall promptly mutually agree upon a successor or

15    alternate Trustee of Insurance and, in the event they are unable to agree upon a successor or

16    alternate trustee during the thirty (30) days, either PSA or FGI may apply to the Presiding Judge

17    of the Superior Court of the State of Washington for King County, to name a successor Trustee

18    of Insurance, which shall be an Institution.    The appointment of the successor Trustee of

19    Insurance shall be binding upon both PSA and FGI. The successor Trustee of Insurance shall be

20    entitled to receive from the former Trustee of Insurance all securities or moneys or polices held

21    by it, and shall be vested with all the rights and powers conferred upon the original Trustee of

22    Insurance.

23          13.8.6    The Trustee of Insurance shall invest any insurance proceeds received as

24    directed in writing jointly by PSA and FGI. If PSA and FGI cannot agree to the investments to

25    be made, the Trustee of Insurance may invest the funds in one or more of the following types of

26    bonds and securities:

27          13.8.6.1    Bills, certificates, notes or bonds of the United States;

28          13.8.6.2    Other obligations of the United States or its agencies;

29          13.8.6.3    Obligations of any corporation wholly owned by the Government

30    of the United States;

1          13.8.6.4    Indebtedness of the Federal National Mortgage Association; or

2          13.8.6.5    Time deposits in commercial banks

3    In making investments in one or more types of bonds and securities, the Trustee of Insurance

4    shall be mindful of the probable necessity of payments from time-to-time of portions of the

5    insurance proceeds and shall select investments with appropriate maturities.  Income from the

6    investments shall be treated as part of the insurance proceeds held by Trustee of Insurance.

7          13.8.6.6    No Trustee of insurance shall be required if the total amount of

8    Restoration Proceeds payable in connection with any damage or destruction is $5,000,000 or

9    less, Indexed.  In such event, the insurance proceeds shall be paid directly to FGI, and shall be

10    held and disbursed by FGI for reconstruction in the manner required of the Trustee of Insurance.

11        13.9    Self-Insurance

12          FGI shall have the right to Self-Insure for any or all insurance required in this

13    Section 13.  In the event FGI elects to Self-Insure, FGI shall provide PSA with a Certificate of Self-

14    Insurance specifying the FGI Affiliate undertaking the Self-Insurance, and the coverage and extent

15    of Self-Insurance.

16          13.9.1    "Self-Insure" shall mean that FGI or an FGI Affiliate is itself acting as

17    though it were the insurance company providing the insurance required under the provisions

18    hereof and FGI or the FGI Affiliate shall pay any amounts due in lieu of insurance proceeds

19    because of Self-Insurance, which amounts shall be treated as insurance proceeds for all purposes

20    under this Lease.

21          13.9.2    All amounts which FGI or the FGI Affiliate pays or is required to pay and

22    all loss or damages resulting from risks for which FGI has elected to Self-Insure shall be subject

23    to the waiver of subrogation provisions of Section 13.5.

24          13.9.3    FGI's right to Self-Insure and to continue to Self-Insure is conditioned

25    upon and subject to FGI or the FGI Affiliate having a net worth of at least Five Hundred Million

26    Dollars ($500 million), Indexed every five years, and FGI providing an audited financial

27    statement, prepared in accordance with generally accepted accounting principles, to PSA by May

28    1 of every year in which FGI Self-Insures, which confirms that FGI or the FGI Affiliate has the

29    required net worth.

30

1  SECTION 14   CONDEMNATION

2     14.1   Total Taking

3        In the event of the taking or condemnation by any authority for any public use or
4  purpose (a "Taking") of the whole of the Premises at any time during the Term:

5        14.1.1   The Term shall end as of the date of possession by the condemning
6  authority, and all Rent and other payments shall be prorated as of the date of possession.

7        14.1.2   If the condemning authority is neither the State nor any State agency, then
8  the condemnation award shall be first applied to fully pay any damages, including any relocation
9  costs, of FGI, any sub-tenant of FGI, or any other user of the Project, second to retire any
10  outstanding original Bonds in full, third to repay a ratable proportion of PSL Proceeds, and
11  fourth to repay the FGI Contribution as defined in the Development Agreement.  "Ratable
12  proportion of PSL Proceeds" means the original PSL Proceeds collected by PSA pursuant to the
13  Development Agreement reduced by one-thirtieth (1/30th) per Lease Year from the Completion
14  Date.  If the condemning authority is the State or any agency of the State, then any outstanding
15  Bonds shall be retired only after all the other payments have been made. In either event after the
16  respective foregoing payments have been made, any remaining amounts from the condemnation
17  award shall be paid to the PSA, except that the award for attorneys' fees and other costs shall be
18  shared by the Parties in proportion to the reasonable attorneys' fees of both outside and inside
19  counsel paid by each party on account of the condemnation proceedings.

20        14.1.3   Any Taking which renders the Stadium functionally or economically
21  unusable shall be deemed a Total Taking.  However, if such a Taking does not also render the
22  Exhibition Hall or the Parking Facilities functionally or economically unusable, then only the
23  percentage of outstanding original Bonds equal to the percentage of the original Project Costs
24  allocated to the Project Improvements which are rendered functionally or economically unusable
25  shall be repaid ahead of the FGI Contribution.

26     14.2   Substantial Taking

27        As used in this Section, a Substantial Taking means a Taking of materially all of
28  the Premises where the remaining part of the Premises not so taken cannot be adequately
29  restored, repaired or reconstructed to a usable exhibition hall, parking facility and stadium.  In

1    the event of a Substantial Taking, then the condemnation shall be treated as a Total Taking under
2    Section 14.1.

3        14.3    <u>Partial Taking</u>

4        In the event of a Taking which is not a Total Taking or a Substantial Taking (a
5    "Partial Taking"):

6        14.3.1    The Term shall continue and Rent determined in accordance with
7    Section 5.1.2 (including specifically Section 5.1.2.1) may be equitably reduced to reflect reduced
8    Reasonable PSA Operating Expenses in light of any reduction in PSA responsibilities.  There
9    shall be no abatement of Rent if a portion of the Premises is taken but the income-generating
10    capacity of the Premises is not affected.

11        14.3.2    The award from a Partial Taking shall be distributed first to FGI for the
12    restoration and repair of the Improvements as provided in 14.3.3, then pursuant to Section 14.1.2
13    to the extent relevant.

14        14.3.3    As to the portion of the Premises not taken in the condemnation
15    proceeding, FGI shall proceed diligently to make an adequate restoration, repair or reconstruction
16    of the part of the Premises not taken.  FGI shall restore, repair or reconstruct the Premises, to the
17    extent practicable, to a functional unit of substantially the same usefulness, design, construction,
18    quality, and to a condition having the same income-generating capability of the Premises prior to
19    the Taking.  In connection with such restoration, repair, and reconstruction, FGI shall comply
20    with the provisions of Section 12 regarding Restoration as if occurring after an event of damage
21    or destruction.

22        14.4    <u>Degree of Taking</u>

23        If the Parties cannot agree on whether the Taking is a Partial Taking or a
24    Substantial Taking, the degree of the Taking shall be determined by Dispute Resolution.

25        14.5    <u>Successive Takings</u>

26        In case of any additional Partial Taking or Takings from time-to-time, the
27    provisions of Section 14.3 shall apply to each Partial Taking.

28        14.6    <u>Temporary Taking</u>

29        If the whole or any part of the Premises or of FGI's interest under this Lease be
30    taken or condemned by any competent authority for its temporary use or occupancy ("Temporary

1    Taking"), FGI shall continue to pay the full amounts of Rent, and all Impositions and other sums

2    payable by FGI under this Lease.  FGI shall maintain sufficient business interruption insurance,

3    or at its election Self-Insure, in order to cover Rent (including, without limitation, Percentage

4    Rent), Impositions and other sums payable by FGI under this Lease during the period of

5    Temporary Taking.  This Lease shall continue and, except only to the extent that FGI may be

6    prevented from so doing pursuant to the terms of the order of the condemning authority, FGI

7    shall perform and observe all of its other terms, covenants, conditions and obligations under this

8    Lease, as though the Taking had not occurred.  In the event of any Temporary Taking, FGI shall

9    be entitled to receive the entire amount of any award made for the Taking, whether paid by way

10   of damages, rent or otherwise, unless the period of temporary use or occupancy shall extend to or

11   beyond the expiration date of the Term of this Lease, in which case the award shall be prorated

12   between PSA and FGI as of the date of expiration of the Term.

13       14.7   Insurance Trustee

14       To the extent FGI is obligated to repair or restore under this Section, and the

15   condemnation proceeds awarded exceed $5,000,000, Indexed, such proceeds shall be deposited

16   with the Trustee of Insurance who shall act in accordance with the terms of Section 13.  If the

17   condemnation proceeds are less than $5,000,000, Indexed, no Trustee of Insurance shall be

18   required and all condemnation proceeds awarded shall be paid directly to FGI and shall be

19   disbursed by FGI in the manner required by the Trustee of Insurance.

20       14.8   Development Period

21       This Section shall apply to condemnation on or after the Completion Date.  Prior

22   to the Completion Date, condemnation will be governed by the Development Agreement.

23

24   SECTION 15    INDEMNIFICATION

25       15.1   FGI's Obligation

26       FGI shall defend, indemnify and hold harmless PSA and PSA Related Persons

27   from and against any and all liabilities, losses, obligations, penalties, fines, damages, claims,

28   suits, costs, remediation costs, and expenses including, without limitation, attorneys' fees

29   (collectively, "Damages") which may be imposed upon, incurred by, or asserted against PSA or

30   any PSA Related Person arising out of any negligent conduct, act, or omission, or willful

1  misconduct, of FGI or any FGI Related Person or any of their respective contractors,
2  subcontractors, concessionaires, licensees, or invitees, or FGI's breach of this Lease, the
3  Development Agreement or any of the other Related Agreements. Notwithstanding the
4  foregoing, the above indemnification shall apply to PSA only in its capacity as landlord under
5  this Lease. FGI shall not indemnify PSA for any items which PSA is required to indemnify FGI
6  against, including, without limitation, indemnities of PSA, if any, contained in this Lease or the
7  Development Agreement. The obligations of FGI under this Section 15.1 shall not in any way be
8  affected or limited by the absence in any case of insurance coverage or by the failure or refusal of
9  any insurance carrier to perform any obligation on its part to be performed under insurance
10  policies affecting the Premises.

11       15.2  PSA's Obligation

12       PSA shall defend, indemnify and hold harmless FGI and FGI Related Persons
13  from and against any and all liabilities, losses, obligations, penalties, fines, damages, claims,
14  suits, costs, remediation costs, and expenses including, without limitation, attorneys' fees
15  (collectively, "Damages") which may be imposed upon, incurred by, or asserted against FGI or
16  any FGI Related Person arising out of any negligent conduct, act, or omission, or willful
17  misconduct, of PSA or any PSA Related Person or any of their respective contractors,
18  subcontractors, concessionaires, licensees, or invitees, or PSA's breach of this Lease, the
19  Development Agreement or any of the other Related Agreements. Any such indemnification is
20  not a Reasonable PSA Operating Expense.  Notwithstanding the foregoing, the above
21  indemnification shall apply to FGI only in its capacity as tenant under this Lease. PSA shall not
22  indemnify FGI for any items which FGI is required to indemnify PSA against, including, without
23  limitation, indemnities of FGI, if any, contained in this Lease or the Development Agreement.
24  The obligations of PSA under this Section 15.2 shall not in any way be affected or limited by the
25  absence in any case of insurance coverage or by the failure or refusal of any insurance carrier to
26  perform any obligation on its part to be performed under insurance policies affecting the
27  Premises.

28       15.3  Procedure

29       If any claim, action, or proceeding is made or brought against a Party or any of
30  that Party's Related Persons (the "Indemnified Party") for the recovery of Damages for which the

1    other Party (the "Indemnifying Party") is obligated to indemnify, upon demand by the

2    Indemnified Party, the Indemnifying Party, at its cost and expense, shall defend such claim,

3    action, or proceeding in the name of the Indemnified Party by the attorneys for the Indemnifying

4    Party's insurance carrier (if such claim, action, or proceeding is covered by insurance), or by

5    such attorneys as the Indemnifying Party shall select subject to the reasonable approval of the

6    Indemnified Party.  Notwithstanding the foregoing, after notice to the Indemnifying Party, the

7    Indemnified Party shall have the right to appear, defend, or otherwise take part in such claim,

8    action, or proceeding, at the election the Indemnified Party, by counsel of the Indemnified

9    Party's own choosing, at its own expense

10        15.4   Limitations on PSA Liability

11            In the event that FGI recovers a money judgment against PSA on account of

12    PSA's conduct under the terms of this Agreement, the judgment will not attach to and FGI may

13    not recover from funds which are operating funds of PSA reasonably necessary for PSA's

14    operations and the judgment will attach to and be recoverable only from other funds of PSA,

15    including funds generated by transfers of PSA property rights and reserves for future operating

16    expenses.

17

18    SECTION 16   INSPECTION OF PREMISES

19        16.1   PSA's Right to Inspect.

20            The Parties acknowledge that PSA has an ongoing right to oversee FGI's

21    performance of its obligations under this Lease throughout the Term.  It will be necessary for

22    PSA to periodically inspect the Premises to be certain that it is being maintained in a manner

23    consistent with the requirements of this Lease.  PSA shall have the reasonable right to inspect the

24    Premises, as frequently as it deems necessary, at reasonable times, but in any case in a manner

25    which is not intrusive or disruptive of FGI's operations.  If any mutually convenient time cannot

26    be agreed to by the Parties, PSA shall be entitled to provide FGI with written notice of an

27    inspection date and not later than five (5) Business Days after receipt of such notice, FGI shall be

28    required to allow PSA to proceed with its inspection of the Premises, and cooperate with and

29    assist PSA during the course of the inspection.

1    16.2    Scope of Inspection.

2    PSA shall have the right to inspect the entire Premises and FGI's maintenance

3    books and records.  FGI shall provide PSA access to the Premises to conduct inspections and

4    shall cooperate fully with PSA in its conducting such inspections.  In the course of its

5    inspections, PSA may hire mechanical, structural or electrical engineers, or other experts to assist

6    in making a determination that the Premises is being maintained as required by this Lease.  The

7    reasonable costs of any inspection, including the cost of any engineers or experts retained by

8    PSA, shall be a Reasonable PSA Operating Expense.

9    16.3    Right of Entry.

10    In addition to the rights granted under Section 16.1 and 16.2, PSA and its agents

11    and representatives, with notice to FGI, during the Term, shall have rights of access and entry

12    into and upon the Premises, provided any such entry does not unreasonably interfere with FGI's

13    operations.  PSA shall comply with all security provisions regarding access to the Premises.  FGI

14    shall, as part of such security provisions, provide PSA access and shall cooperate fully with PSA

15    in its entry into and upon the Premises.  PSA shall assume no duty or liability with respect to the

16    Premises or its maintenance as a result of such inspection.  During the last two (2) years of the

17    Term or after an Event of Default, FGI shall permit the inspection of the Premises at reasonable

18    times and for reasonable periods by or on behalf of prospective tenants and prospective

19    purchasers.

20

21    SECTION 17    NAMING RIGHTS

22    17.1    IP Rights

23    "IP Rights" means all copyrights, trademarks, design patent rights and other

24    intellectual property rights and "naming rights" associated with the Project and its several Project

25    Elements for the period of the Term.  Such exclusive rights include without limitation the right

26    during the Term to use, exploit, assign, license, sublicense and/or sell any or all of such IP

27    Rights, as well as the right to obtain and hold all common law and statutory copyright,

28    trademark, and design patent protection for such IP Rights.  IP Rights include without limitation

29    the following:

1            17.1.1    The right to designate, and to change from time-to-time, a name which
2    will be the exclusive identifying name of:

3            17.1.1.1    The Project ("Project Naming Rights");

4            17.1.1.2    The Stadium ("Stadium Naming Rights");

5            17.1.1.3    The Exhibition Hall ("Exhibition Hall Naming Rights");

6            17.1.1.4    The Parking Facilities ("Parking Facilities Naming Rights"); and

7            17.1.1.5    Any part or component of any of the Stadium, Exhibition Hall, or
8    the Parking Facilities;

9            Project Naming Rights, Stadium Naming Rights, Exhibition Hall Naming Rights,
10    and Parking Facilities Naming Rights are each "Special Naming Rights"

11            17.1.2    Any "de facto" naming right through a program of advertising,
12    sponsorship, or any other contractual arrangement which results, for example, in the placement
13    of a company's name, logo, or product images in such a frequency and concentration in a given
14    area of the Premises that the average person is reasonably likely to identify that given area of the
15    Premises by the name of that company or by the name of its product.

16            17.1.3    The right to all visual images of the Project, and the right to create all such
17    visual images.  Visual images of the Project include, subject to any rights of any artists, rights to
18    the visual images in the Project Art.  Visual images include any representations or facsimiles
19    thereof and any graphic designs or logos based on any such visual image or images and any
20    derivative works therefrom.

21        17.2    FGI Rights

22            Throughout the Term, FGI shall have the exclusive right to and shall own (to the
23    exclusion of third parties, and, except as provided in Section 17.3, to the exclusion of PSA) all IP
24    Rights, and to retain for FGI all economic benefits therefrom, except for the right to sell Special
25    Naming Rights and enjoy any economic benefit therefrom;

26        17.3    PSA Limited Visual Image Rights

27            PSA reserves the right (although not to the exclusion of FGI) to utilize the visual
28    images of the Project described in Section 17.1.3 for non-commercial purposes (i.e., purposes for
29    which no revenue or other economic benefit is received by PSA, either directly or indirectly);

17.4     PSA Sale of Special Naming Rights

PSA reserves the exclusive right (to the exclusion of FGI) to sell Special Naming Rights, as follows:

17.4.1     Authority To Sell Naming Rights

While FGI is not in breach of this Lease, FGI shall, as the exclusive agent of PSA (to the exclusion of PSA), have the exclusive right to offer for sale all Special Naming Rights.

17.4.2     Special Naming Rights Agreement. Any sale of Special Naming Rights shall only occur only pursuant to a written agreement ("Special Naming Rights Agreement") setting forth the price, payment terms, and any other terms for the sale of a Special Naming Right.

17.4.3     Reasonable Approval by PSA. Any Special Naming Rights Agreement proposed by FGI is subject to the reasonable approval of PSA as provided in Section 107 of the Act, within thirty-five (35) days of the date when a proposed Special Naming Rights Agreement is presented to PSA. PSA shall cooperate with FGI if FGI seeks pre-approval of any potential Special Naming Rights Agreement or of any particular name or names or type or types or category or categories of names. It shall not be reasonable to disapprove a Special Naming Rights Agreement if the proposed name is similar to or consistent with the types of names of any then current NFL Football Stadium, Major League Baseball Stadium, NBA Basketball Arena or NHL Hockey Arena. In considering any Special Naming Rights Agreement, important emphasis shall be given to maximizing the sales price of the Special Naming Rights because Special Naming Rights Proceeds shall be used for Major Maintenance and Modernization of the Project, and therefore fulfills a major public goal of this Lease.

17.4.4     Review and Comment by PSA Advisory Committee. Section 104 of the Act provides that the PSA Advisory Committee shall review and comment on any proposed Special Naming Rights Agreement (as well as this Lease). In the event that FGI proposes a Special Naming Rights Agreement, then FGI must present that proposed Special Naming Rights Agreement to the PSA Advisory Committee for its prior review and comment. No proposed Special Naming Rights Agreement may be entered into unless the PSA Advisory Committee has given prior review of and comment on the proposed Special Naming Rights Agreement or has

1    failed to give its review and comment within thirty (30) days of the presentation of the proposed

2    Special Naming Rights Agreement.

3                     17.4.5    Use of Special Naming Rights Proceeds.  Proceeds realized from the sale

4    of the Special Naming Rights, less any applicable taxes and reasonable out-of-pocket expenses

5    incurred by FGI in both (x) marketing and selling Special Naming Rights, including but not

6    limited to, fees, commissions, other sales expenses, reasonable attorneys' fees, travel costs, and

7    similar costs, and (y) in fulfilling its obligations under the Special Naming Rights Agreement,

8    including but not limited to, designing, constructing and erecting any signage, shall be paid into

9    the Naming Rights Account described in Section 11.6.  To the extent that the sale of any Special

10   Naming Rights is part of a larger sponsorship package, FGI shall make a reasonable allocation of

11   the total consideration among its various components, and only that portion allocated to the sale

12   of Special Naming Rights will be subject to this Section 17.4.

13

14   SECTION 18    TAX AND FEE COLLECTION OBLIGATION

15        18.1    King County Taxes

16                     King County is authorized by RCW 36.38.010 to levy a tax of up to 10% on

17   tickets for admission to events at the Project (the "Admissions Tax"), and by RCW 36.38.040 to

18   levy a tax of up to 10% on parking at the Project(the "Parking Tax").  FGI shall collect and remit

19   such Admissions Tax and Parking Tax as provided by Law and by any agreement with King

20   County.  An uncured event of default under any Admissions Tax and Parking Tax collection

21   agreement with King County shall constitute an Event of Default under this Lease.

22        18.2    PSA Surcharge

23                     PSA is authorized to impose a surcharge on tickets for events at the Project

24   pursuant to Section 13.2.3 of the Development Agreement.  FGI shall collect and remit to PSA

25   such surcharge substantially in the manner which it collects and remits the Admissions Tax and

26   Parking Tax under Section 18.1.

27        18.3    Audit Right

28                     PSA shall have the right to audit (generally as provided in Section 6.1.7) the

29   applicable records of FGI and Team to determine if FGI is in compliance with its obligations

1    under this Section 18.3. FGI shall fully cooperate with any such audit, and FGI shall cause Team

2    to fully cooperate with such audit.

3

4    SECTION 19    PSA COVENANTS

5        19.1    Quiet Enjoyment

6            Except as otherwise provided in this Lease or in the Development Agreement,

7    during the Term, FGI shall have exclusive control and possession of the Premises and PSA shall

8    have no liabilities, obligations or responsibilities whatsoever with respect to the Premises.

9    Provided FGI is not in default under this Lease, FGI, at all times during the Term, shall have the

10    right to peacefully and quietly have, hold and enjoy the Premises, subject to the terms of this

11    Lease and PSA will defend its title to the Project Site against all persons who may claim the

12    same. If any claims are asserted against PSA's title that disturbs or, if successful, would disturb

13    FGI's quiet and peaceable possession of the Premises, upon demand by FGI, PSA shall seek to

14    enforce the covenants of title in the warranty deed from King County as provided for in Section

15    64.04.030 of the Revised Code of Washington, and if requested by FGI, to assign such claim to

16    FGI as may be necessary in order for FGI to prosecute an action against King County on such

17    covenants of title. PSA shall cooperate with FGI in FGI's prosecution of any such claim.

18        19.2    No Liens

19            PSA shall neither grant nor suffer any liens or encumbrances against the Premises

20    which would be superior to this Lease.

21        19.3    No Charges or Fees

22            PSA shall not impose any charges or fees for the use of the Project, (including any

23    charges or fees which, but for this covenant, it is empowered to impose pursuant to

24    Section 105(5) of the Act), without the prior written consent of FGI, which consent or denial of

25    consent by FGI shall be in its sole discretion, and shall not be subject to Dispute Resolution. FGI

26    consents to the imposition of a surcharge on tickets for events at the Project solely as provided

27    in, for the purpose of, and subject to all of the limitations of, Section 13.2.3 of the Development

28    Agreement.

29

1  SECTION 20   REPRESENTATIONS AND WARRANTIES

2       20.1   By PSA

3            20.1.1   Authority, Binding Effect

4                 PSA represents and warrants that PSA has full power and authority to

5  enter into this Lease and to perform all of its obligations under this Lease. PSA represents and

6  warrants that this Lease has been duly authorized by PSA and that the person(s) executing this

7  Lease on behalf of PSA have the power and authority to do so. PSA represents and warrants that

8  this Lease is binding on PSA and enforceable according to its terms.

9            20.1.2   Title

10                PSA represents and warrants that it owns the Premises in fee simple

11 subject only to the Permitted Exceptions described in attached Exhibit 20.1.2.

12           20.1.3   Limitation on Representations

13                Except for the representations and warranties set forth above, PSA makes

14 absolutely no other representation or warranties under this Lease or regarding the Premises. FGI

15 acknowledges that it is not relying on any representations or warranties of PSA other than those

16 set forth in this Section 20.1.

17      20.2   By FGI

18           20.2.1   Authority, Binding Effect

19                FGI represents and warrants that FGI has full power and authority to enter

20 into this Lease and to perform all of its obligations under this Lease. FGI represents and

21 warrants that this Lease has been duly authorized by FGI and that the person(s) executing this

22 Lease on behalf of FGI have the power and authority to do so. FGI represents and warrants that

23 this Lease is binding on FGI and enforceable according to its terms.

24           20.2.2   Limitation on Representations

25                Except for the representations and warranties set forth above, FGI makes

26 absolutely no other representations or warranties under this Lease. PSA acknowledges that in

27 executing this Lease, it is not relying on any representations or warranties of FGI other than

28 those set forth in this Section 18.2.

29

1    SECTION 21    SUBLETTING AND ASSIGNMENT

2        21.1    Subletting

3            FGI shall have the right to sublet all or any part of the Premises for any time or
4    times during the Term for terms not to exceed the Term of this Lease. However, the subletting of
5    all or substantially all of the Premises to a Person for substantially all of the remaining Term
6    shall be considered an assignment of this Lease which shall be restricted pursuant to the
7    provisions of Section 21.3. FGI shall not enter into a sublease other than a Qualified Sublease
8    which extends beyond the Term of this Lease (unless by its terms, on termination of this Lease
9    the sublease either terminates automatically or may be terminated without cost or penalty.) All
10    subleases shall be in writing and shall be expressly subject to the terms of this Lease.

11        21.2    Limited Nondisturbance of Certain Sublessees

12            21.2.1    A "Qualified Sublease" is a booking agreement or license to use the
13    Exhibition Hall or the Stadium which meets the following conditions:

14                21.2.1.1    The sublessee under the Qualified Sublease is not an Affiliate of
15    FGI;

16                21.2.1.2    The Qualified Sublease is on commercially reasonable terms and
17    conditions;

18                21.2.1.3    The event covered by the Qualified Sublease will occur within five
19    (5) years of the effective date of the Qualified Sublease or any extension or renewal thereof; and

20                21.2.1.4    No payment shall be made to FGI more than one (1) year in
21    advance of the event and, at FGI's option, (a) FGI shall provide to PSA a reasonable guaranty by
22    a third-party guarantor with a net worth of at least $10 million, or other readily realizable
23    security, in the aggregate amount of 300% of the average advance payments held at any one time
24    during the previous Lease Year, which shall be available to pay to PSA, in the event of a
25    termination of the Lease by reason of a default by FGI, the amount of all advance payments to
26    FGI for events not yet held at the time of the termination (to the extent such payments are not
27    otherwise recovered by PSA), to be paid to PSA at the time of the holding of the event; or (b)
28    any advance payment to FGI shall be promptly paid over to PSA to be returned to FGI upon the
29    commencement of the event together with interest earned by PSA.

1     21.2.2 PSA will give a Qualified Sublease Nondisturbance, in the event the Term

2 ends prior to the event referred to in the Qualified Sublease.  Upon the end of the Term all

3 Qualified Subleases shall be automatically assigned to PSA.

4     21.2.3 No sports team, party providing services at the Premises, no

5 concessionaire, and no advertiser, shall have any right to come upon or utilize the Premises or

6 any part of the Premises after the end of the Term (including but not limited to a termination

7 pursuant to Section 22), unless PSA elects, in its sole discretion, to give notice to the Team or

8 Allen authorizing one of the following:

9     21.2.3.1 The owner of the team which is a party to the Stadium Use

10 Agreement enters into an agreement with PSA, within ten (10) days after the end of the Term,

11 pursuant to which such owner or an Affiliate becomes the tenant under this Lease and accepts

12 and agrees to perform all of FGI's obligations under this Lease and agrees to maintain the

13 Stadium Use Agreement in effect; and in that event PSA will reinstate this Lease for the longer

14 of: the balance of the Term or the remaining term of the Stadium Use Agreement; or

15     21.2.3.2 Allen enters into a full guarantee of all of FGI's obligations under

16 this Lease, within thirty (30) days after the end of the Term, for a period of time designated by

17 Allen, and in that event, PSA will reinstate this Lease with an entity designated by Allen as

18 master tenant for the period of the guaranty.

19    21.2.4 In the event of termination of this Lease for any reason, (except

20 termination after damage, destruction or condemnation under Sections 12 and 14) any sublessee

21 under a Qualified Sublease shall be entitled to continued occupancy in the Premises

22 ("Nondisturbance") in accordance with its Qualified Sublease as long as:

23     21.2.4.1 The Qualified Sublease is not terminated in accordance with its

24 terms (including termination for default upon expiration of all applicable periods to cure), and

25     21.2.4.2 The sublessee agrees in writing to attorn to PSA under the

26 applicable Qualified Sublease, and to such other terms and conditions as are customarily required

27 by mortgage lenders in similar circumstances.

28    21.2.5 Upon the request of FGI, PSA shall within a reasonable time execute,

29 acknowledge and deliver a nondisturbance agreement with any sublessee under a Qualified

30 Sublease setting forth the above terms.

1      21.3   <u>Assignment</u>

2         21.3.1   FGI shall not Transfer this Lease, the leasehold estate this Lease creates,

3 any of FGI's rights or interests under this Lease or any of FGI's rights or interests in the

4 Premises, in whole or in part; nor shall FGI's rights or interests under or in this Lease be

5 Transferred or assigned by operation of law or otherwise, except as provided below.  The

6 assignee, purchaser or transferee of FGI's interest in this Lease is referred to as a "Transferee."

7 FGI shall have no right to make any Transfer of its rights under this Lease if FGI is then in

8 default under this Lease.

9         21.3.2   FGI may Transfer this Lease upon notice to PSA (without the consent of

10 PSA) to any Transferee which is an Affiliate of FGI, including any inter vivos or testamentary

11 trust or the estate or heirs of Allen, subject to Section 21.4.

12         21.3.3   FGI may Transfer this Lease upon notice to PSA (without the consent of

13 PSA) to any Transferee which, or an Affiliate of which, is also the transferee of at least the

14 controlling interest in Team, subject to Section 21.5.

15         21.3.4   Any other proposed Transfer requires the consent of PSA.  PSA shall

16 consent to a Transfer by FGI in the event that the Transferee meets all of the following criteria in

17 PSA's reasonable judgment:

18         21.3.4.1   The Transferee has a net worth at the time of Transfer of the lesser

19 of (x) at least $100,000,000, Indexed every five (5) years, or (y) sufficient net worth (as

20 determined by PSA in its sole discretion) to perform all of the obligations of FGI under the terms

21 of this Lease, and

22         21.3.4.2   The Transferee or its Management Company has Sufficient

23 Experience. "Sufficient Experience" means either:

24            (i)    The Transferee or its Management Company has entered

25 into employment contracts with the key management employees of FGI; or

26            (ii)    The Transferee or its Management Company or any of its

27 employees has managed or had substantial responsibility for management for at least five (5)

28 years in the aggregate (x) sports facilities used as the home venue for a Major League Baseball,

29 National Football League, National Basketball Association, or National Hockey League team (or

30 similar or successor major league franchise), and (y)  exhibition halls of at least similar size to

1    the Exhibition Hall; has never been convicted of a felony, has never been terminated under a

2    management agreement or lease of facilities by reason of its default; and has a demonstrated

3    record of reasonable business success.

4            21.3.4.3   FGI shall give PSA written notice of a proposed Transfer sixty (60)

5    days prior to the effective date of the Transfer together with a copy of the Transfer agreement

6    executed by FGI and the proposed Transferee, and documentation reasonably sufficient to show

7    that the Transferee meets the criteria in Section 21.3.4.1 and 21.3.4.2.

8            21.3.5   Any Transferee must also assume in writing the obligations of FGI under

9    this Lease and the Person which executed the Master Lease Guaranty must execute a

10    reaffirmation of the Master Lease Guaranty or a Person with a net worth of not less than

11    $100,000,000 must execute a replacement Master Lease Guaranty in identical form.

12            21.3.6   Without limiting the generality of the foregoing, no Transfer shall be

13    effective if any Event of Default exists under this Lease or unless and until the Transferee

14    assumes all the obligations of FGI hereunder accruing on and after the effective date of the

15    Transfer.

16            21.3.7   Without Transferring this Lease, FGI may hire an agent (a "Management

17    Company") to manage the Exhibition Hall and/or Parking Facilities and/or the Stadium provided

18    the Management Company satisfies the criteria specified in Section 21.3.4.2.

19        21.4   FGI Liability

20            Upon any Transfer pursuant to Section 21.3.2, but not 21.3.3 or 21.3.4, FGI shall

21    continue to be liable under the terms of this Lease, as a guarantor of the Transferee's

22    performance of its obligation under this Lease.

23        21.5   Rent Letter of Credit

24            21.5.1   Upon any Transfer pursuant to Section 21.3.3 or 21.3.4, Transferee shall

25    provide PSA with a standby letter of credit in the amount of at least the amount of the Rent paid

26    by FGI for the most recently completed Lease Year (the "Rent Letter of Credit"). The Rent

27    Letter of Credit shall be issued by a financial institution reasonably acceptable to PSA. The Rent

28    Letter of Credit shall be replaced annually by a new Rent Letter of Credit in the amount of at

29    least the amount of the Rent paid for the then most recently completed Lease Year so that at all

1    times during the remaining Term, PSA holds a Rent Letter of Credit which is in full force and

2    effect.

3         21.5.2    PSA may draw upon the Rent Letter of Credit at any time that there is a

4    Event of Default related to payment of Rent which Transferee has not cured within the time

5    period allowed under this Lease. PSA may also draw on the Rent Letter of Credit if Transferee

6    has not provided PSA with a replacement Rent Letter of Credit at least five (5) days prior to

7    expiration of the then existing Rent Letter of Credit. The Rent Letter of Credit will be payable

8    against PSA's presentation of a sight draft. If PSA draws against the Rent Letter of Credit, then

9    the amount of credit available to PSA under the Rent Letter of Credit shall be immediately

10    restored to the amount available prior to the draw.

11        21.6    <u>Covenants Binding on Successors and Assigns</u>

12         All of the terms, conditions and covenants of this Lease shall inure to the benefit

13    of and be binding upon the successors of the respective Parties.

14        21.7    <u>Transfer</u>

15         For purposes of this Lease, a "Transfer" shall include any sale, assignment,

16    pledge, conveyance, encumbrance, subcontract, delegation, or other disposition, whether direct

17    or indirect, voluntary or involuntary, of FGI's interest in this Lease. A Transfer shall also include

18    a Change of Control.

19        21.8    <u>Change of Control</u>

20         For purposes of this Lease, "Control" shall mean the power, directly or indirectly,

21    to direct or cause the direction of the management or policies of the tenant under this Lease, by

22    virtue of ownership of voting securities or otherwise. A "Change of Control" shall refer to a

23    change in the control of the tenant under this Lease, which shall be deemed to have occurred if:

24        21.8.1    <u>Change of Control of FNW</u>

25         "Change of Control of FNW" means a change in the Control of FNW,

26    whether through a single transaction or series of transactions, which shall be deemed to have

27    occurred if:

28        21.8.1.1    The Allen Ownership Group ceases to have Control of FNW;

1          21.8.1.2    FNW merges or consolidates with another entity, unless following

2    the consummation of such transaction the Allen Ownership Group Controls the surviving entity;

3    or

4          21.8.1.3    FNW sells or otherwise disposes of all or substantially all of the

5    Team Assets to one or more persons or entities other than entities with respect to which the Allen

6    Ownership Group has Control.

7          For purposes of this Section 21.8.1, the "Allen Ownership Group" means Allen, or any

8    direct or indirect Affiliate of Allen, or any family member, heir, or trust of Allen, or any

9    combination of Allen, any such Affiliates, family members, heirs and/or trusts;

10          21.8.2    Change of Control of Other Transferee

11          "Change of Control of Other Tenant" means a change in the Control of

12    any Transferee other than a member of the Allen Ownership Group ("Other Transferee"),

13    whether through a single transaction or series of transactions, which shall be deemed to have

14    occurred if:

15          21.8.2.1    Affiliates of the Other Transferee at the time the Other

16    Transferee became the Transferee under this Lease ("Other Transferee Affiliates") cease to have

17    Control of the Other Transferee;

18          21.8.2.2    Other Transferee merges or consolidates with another

19    entity, unless following the consummation of such transaction Other Transferee Affiliates

20    Control the surviving entity; or

21          21.8.2.3    Other Transferee sells or otherwise disposes of all or

22    substantially all of the business or assets of Other Transferee to one or more Persons other than

23    Persons with respect to which the Other Transferee Affiliates have Control.

24    21.9    Unauthorized Transfer

25          If any right, title, or interest of FGI in this Lease, or Control of FGI, is Transferred

26    in violation of the provisions of this Section 21, such Transfer shall be null and void and of no

27    force or effect.  Notwithstanding the foregoing, PSA shall have the right to collect from any such

Transferee an amount equal to the amounts payable to PSA under this Lease.

1        21.10   Stock Legends

2                FGI shall cause all certificates of stock in FGI to be surrendered to FGI and shall

3   place on each such certificate a legend in the following form:

4        THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE ARE

5        SUBJECT TO RESTRICTIONS SET FORTH IN THAT CERTAIN MASTER

6        LEASE DATED NOVEMBER 24, 1998 BETWEEN THE WASHINGTON

7        STATE PUBLIC STADIUM AUTHORITY AND THE CORPORATION AND

8        NONE OF SUCH SHARES, OR ANY INTEREST THEREIN, SHALL BE

9        TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT AS PROVIDED

10      IN SUCH MASTER LEASE. A COPY OF THE MASTER LEASE IS

11      AVAILABLE FOR INSPECTION WITHOUT CHARGE IN THE OFFICE OF

12      THE CORPORATION.

13

14  **SECTION 22   DEFAULT**

15      22.1   Event of Default

16              *The occurrence of any of the following shall constitute an "Event of Default":*

17         22.1.1   Failure of FGI to pay when due any payment owed to PSA, or to pay any

18  Imposition or any other payment required under this Lease when due (except as and to the extent

19  permitted under Section 10.2 of this Lease), or the failure to maintain any of the insurance

20  coverage required and the occurrence or failure continues for a period of ten (10) Business Days

21  after written notice of such failure or occurrence is given to FGI by PSA;

22         22.1.2   FGI being in breach of, or FGI failing to perform, comply with, or observe

23  any other term, covenant, warranty, condition, agreement or undertaking contained in or arising

24  under this Lease other than those referred to above in Section 22.1.1 and FGI fails to cure the

25  default within thirty (30) days after written notice thereof is given by PSA to FGI. However, if

26  the default is one which can be cured, but cannot be cured (without regard to the availability of

27  funds or the financial condition of FGI) within such 30-day period, and FGI proceeds promptly

28  and thereafter prosecutes with due diligence the curing of the default, then the time for curing of

29  the default shall be extended for the period of time necessary to complete the cure so long as

1    PSA's interest in the Premises will not be adversely affected by the delay in FGI's cure of such
2    default.

3            22.1.3    FGI being in breach of, or FGI failing to perform, comply with, or observe
4    any material term, covenant, warranty, condition, agreement or undertaking contained in or
5    arising under the Stadium Use Agreement and FGI fails to cure the default within thirty (30) days
6    after written notice thereof is given by Team to FGI.  However, if the default is one which can be
7    cured, but cannot be cured (without regard to the availability of funds or the financial condition
8    of FGI) within such 30-day period, and FGI proceeds promptly and thereafter prosecutes with
9    due diligence the curing of the default, then the time for curing of the default shall be extended
10   for the period of time necessary to complete the cure so long as FGI's interest in the Stadium use
11   Agreement will not be adversely affected by the delay in FGI's cure of such default.

12           22.1.4    FGI making an assignment for the benefit of creditors, filing a petition in
13   bankruptcy, petitioning or applying to any tribunal for the appointment of a custodian, receiver or
14   any trustee for it or a substantial part of its assets, or commencing any proceedings under any
15   bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or
16   statute of any jurisdiction, whether now or hereafter in effect; or if there shall have been filed any
17   petition or application, or any proceeding shall have been commenced against FGI, in which an
18   order for relief is entered or which remains undismissed for a period of ninety (90) days or more;
19   or FGI by any act or omission indicating its consent to, approval of or acquiescence in any such
20   petition, application or proceeding or order for relief or the appointment of a custodian, receiver
21   or any trustee for it or any substantial part of any of its properties, or suffering any such
22   custodianship, receivership or trusteeship to continue undischarged for a period of ninety (90)
23   days or more;

24           22.1.5    FGI being generally unable to pay its debts as such debts become due;

25           22.1.6    FGI having concealed, removed, or permitted to be concealed or removed,
26   any part of its property, with intent to hinder, delay or defraud its creditors or any of them, or
27   making or suffering a transfer of any of its property which may be fraudulent under any
28   bankruptcy, fraudulent conveyance or similar law; or suffering or permitting, while insolvent,
29   any creditor to obtain a lien upon any of its property through legal proceedings or distraint which
30   is not vacated within thirty (30) days from the date thereof; or

1      22.1.7   PSA being in breach of, or PSA failing to perform, comply with, or
2   observe any term, covenant, warranty, condition, agreement or undertaking contained in or
3   arising under this Lease and PSA fails to cure the default within ten (10) Business Days as to any
4   monetary default and thirty (30) days as to any other default, after written notice thereof is given
5   by FGI to PSA.  However, if any nonmonetary default is one which can be cured, but cannot be
6   cured (without regard to the availability of funds or the financial condition of PSA) within such
7   30-day period, and PSA proceeds promptly and thereafter prosecutes with due diligence the
8   curing of the default, then the time for curing of the default shall be extended for the period of
9   time necessary to complete the cure so long as FGI's interest in the Premises will not be
10   adversely affected by the delay in PSA's cure of such default.

11      22.1.8   A default under the Development Agreement by FGI, but only if the
12   Guarantor under the Completion and Payment Guaranty has also failed to perform under the
13   Completion and Payment Guaranty.

14      22.2   Termination of Lease

15      In addition to all other rights and remedies available to PSA by law or equity,
16   PSA may, at any time after the occurrence of any Event of Default by FGI, terminate this Lease
17   by notice to FGI, and PSA may reenter upon and take possession of the Premises by self-help or
18   other means.  If either Party disputes whether an Event of Default has occurred, such dispute
19   shall be resolved by Dispute Resolution.  If a default asserted under Section 22.1 is contested by
20   the Party asserted to be in default, the time for curing the default shall commence upon the
21   rendering of the Dispute Resolution decision, or other resolution of the dispute.  However, if part
22   of the matter subject to Dispute Resolution is capable of performance to the extent not in dispute
23   (e.g., the undisputed portion of monies owing), performance to the extent not in dispute shall be
24   a condition precedent to the effectiveness of this Section 22.2.

25      22.3   Effect of Termination

26      Subject to the provisions of Section 21 (relating to Sublessees), upon termination
27   of this Lease under Section 22.2, all rights and privileges of FGI and all duties and obligations of
28   PSA hereunder shall terminate.  Immediately upon the termination of the Lease, and without
29   further notice to any other party, PSA shall have the right to assert, perfect, establish and confirm
30   all rights to the Premises reverting to PSA by reason of the termination by any means permitted

1    by law, including the right to take possession of the Premises and to remove all personal property

2    from the Premises and all persons occupying them except Sublessees with Nondisturbance as

3    permitted under this Lease.  PSA may in all respects take the actual, full and exclusive

4    possession of the Premises, thereby wholly terminating any right, title, interest or claim of or

5    through FGI as to the Premises, the Project Improvements, and all Personal Property located on

6    the Premises, excepting therefrom FGI's Personal Property as defined in Section 23.1.

7        22.4    Damages and Remedies

8        22.4.1    For a breach during the Term, the exercise by either Party of any remedy

9    arising by virtue of an Event of Default shall not be considered exclusive, but either Party may

10    exercise any and all other rights or remedies provided by this Lease or by law or equity.  In

11    pursuing remedies, PSA or FGI may elect to sue the other with or without terminating this Lease.

12    The termination of the Term pursuant to this Section 22 shall not extinguish the right of either

13    Party to collect damages including without limitation direct and consequential damages arising

14    from the breach of this Lease by the other Party.

15        22.4.2    FGI shall be liable for the continued payment of Rent under this Lease

16    accruing up to the end of the Term specified in this Lease notwithstanding the early termination

17    of the Term due to an Event of Default and the reentry of PSA before the normal expiration of

18    the Term.  PSA may at any time after termination of this Lease, recover from FGI the worth at

19    that time (discounted to present value at the time of termination) of the excess, if any, of the

20    amount of the Rent reserved in this Lease for the balance of the Term (had such termination not

21    occurred) over the then reasonable rental value of the Premises for the same period.  The

22    "reasonable rental value" shall be the amount of rental which PSA can reasonably be expected to

23    obtain as rent for the remaining balance of the Term (to its normal expiration date, excluding

24    unexercised Extension Periods and the Completion Term), had such termination and default not

25    occurred.  In addition, FGI shall be liable for and PSA may recover the estimated value of the

26    lost Percentage Rent during the period from the date of early termination of the Term due to an

27    Event of Default to the date of the first Exhibition Hall Event held after such termination which

28    is not held pursuant to an agreement originally between FGI and the holder of that Exhibition

29    Hall Event; provided that FGI shall get credit for all Exhibition Hall Events held during such

30    period, and PSA shall use Reasonable Efforts to mitigate its damages.

1          22.4.3   *PSA shall credit against sums owed by FGI the net proceeds, if any, of any*
2      *reletting or operation of the Premises after deducting PSA's reasonable expenses in connection*
3      *with the reletting and operation of the Premises. Reasonable expenses shall include but not be*
4      *limited to repossession costs, brokerage commissions, legal expenses, employee expenses,*
5      *alteration costs reasonably incurred and other reletting expenses.*

6          22.4.4   Nothing in this Section 22 shall relieve PSA of its duty to use Reasonable
7      Efforts to mitigate its damages as required by law.

8          22.5   No Waivers

9              No failure by any Party to insist upon the strict performance of any provision of
10     *this Lease or to exercise any right, power or remedy consequent to any breach thereof, and no*
11     *waiver of any breach, or the acceptance of full or partial Rent during the continuance thereof,*
12     *shall constitute a waiver of any such breach or of any provision. No waiver of any breach shall*
13     *affect or alter this Lease, which shall continue in full force and effect, or the rights of any Party*
14     *hereto with respect to any other then existing or subsequent breach. A waiver must be in writing*
15     *and signed by the Party to be bound by such waiver.*

16         22.6   Performance by PSA of FGI's Defaulted Obligations

17             In case of failure on the part of FGI to pay any money, or do any act to satisfy any
18     of the obligations or covenants which it is required to pay, do, or satisfy under the provisions of
19     this Lease, PSA may, at its option, after ten (10) Business Days' prior written notice to FGI, pay
20     any or all of the sums, or do any or all such acts which require the payment of money, or incur
21     any reasonable expense to remedy the failure of FGI to perform any one or more of the covenants
22     contained in this Lease. *FGI shall repay to PSA the sums advanced by PSA on demand together*
23     with Default Interest from the date payment is made by PSA. PSA shall not be obligated to so
24     cure any of FGI's defaults; and such right to cure shall be in addition to and not in lieu of any
25     other right or remedy.

26

27     SECTION 23   SURRENDER UPON TERMINATION

28         23.1   FGI's Obligation

29             Upon any termination of this Lease, FGI shall surrender possession of the
30     Premises and Personal Property included in the Premises to PSA in First-Class Condition, except

1   for normal wear and tear, as provided in Section 11.1.2.  With respect to personal property of

2   FGI that is not included in the Personal Property but is located at the Premises, PSA and FGI,

3   within five (5) days preceding the date of termination of this Lease, shall conduct an inventory of

4   all personal property claimed by FGI to be FGI's personal property and not included in the

5   Personal Property ("FGI's Personal Property").  In the event that PSA and FGI disagree about

6   what is included in FGI's Personal Property, that matter shall be resolved by Dispute Resolution.

7        23.2   <u>FGI's Personal Property</u>

8               Within five (5) Business Days of the completion of the inventory of FGI's

9   Personal Property, FGI shall identify those items of FGI's Personal Property which FGI is

10   willing to sell to PSA, for cash based by those items then fair market value.  PSA shall have five

11   (5) Business Days to give FGI notice of the items of FGI's Personal Property, which PSA is

12   willing to purchase.  Within five (5) Business Days after PSA's notice to FGI, FGI shall remove

13   from the Premises all of the items of FGI's Personal Property which are not being purchased by

14   PSA.  Any dispute as the fair market value of FGI's Personal Property shall be resolved by

15   Dispute Resolution.

16        23.3   <u>No Rights to Accounts</u>

17               Upon any termination of this Lease, FGI shall have no rights to any funds in the

18   Naming Rights Account or Capital Improvements Account other than its rights pursuant to

19   Section 11.5 provided that FGI makes claim within three (3) months of termination of the Lease.

20

21   <u>SECTION 24</u>   <u>DISPUTE RESOLUTION</u>

22        24.1   <u>Applicability</u>

23               Any dispute (a "Dispute") shall be resolved by dispute resolution in accordance

24   with this Section 24, to the extent permitted by Laws, except where a Party is expressly

25   permitted or required to resort to judicial, administrative, or other legal proceedings or other

26   rights or remedies at law or in equity ("Dispute Resolution").  In the event either Party believes a

27   Dispute exists, it shall give notice to the other specifying in reasonable detail the nature of such

28   Dispute.  The Parties shall seek in good faith to negotiate a settlement of the Dispute, including,

29   without limitation, by agreeing to reasonable requests of the other to hold a meeting to discuss

30   such Dispute.

1       24.2   Designation of Arbitrator

2       If within fifteen (15) days after the effective date of any notice given pursuant to

3 Section 24.1 (a "Dispute Notice") the Parties have been unable to reach a resolution of the

4 Dispute, the Parties shall jointly appoint an arbitrator who is an attorney with at least ten (10)

5 years' substantial experience relevant to the subject matter of the Dispute. If the Parties fail to

6 agree upon an arbitrator within twenty (20) days after the effective date of the Dispute Notice,

7 the Parties shall each designate, by written notice to the other given not later than twenty-five

8 (25) days after the effective date of the Dispute Notice, a representative, who need not be neutral

9 and who is an attorney with at least ten (10) years' substantial experience relevant to the subject

10 matter of the Dispute. If either Party fails to designate a representative within this period, the

11 representative of the Party who met the deadline shall act as arbitrator. If both Parties meet the

12 deadline, the two representatives shall, within ten (10) Business Days after the last of the two

13 representatives is designated, select an arbitrator who is an attorney with at least ten (10) years'

14 substantial experience relevant to the subject matter of the Dispute. If the representatives cannot

15 agree on an arbitrator, the Presiding Judge of the Superior Court for King County, Washington

16 shall, upon application by either Party, select an arbitrator having such qualification.   The

17 arbitrator chosen pursuant to this Section 24.2 shall be the sole arbitrator.

18       24.3   Scope of Dispute Resolution

19       In connection with any Dispute Resolution issue (of which there may be more

20 than one in any Dispute Resolution proceeding), each Party may, but need not, submit in writing

21 the specific requested action or decision it wishes to take or make with respect to the Dispute;

22 however, the arbitrator may, but need not, choose one or the other Party's specific requested

23 actions or decisions, or may order any compromise position.

24       24.4   Conduct of Dispute Resolution

25       Except to the extent provided in this Lease, or as the Parties may otherwise agree

26 in writing, any Dispute Resolution proceeding shall be conducted in accordance with the

27 Commercial Arbitration Rules and the Expedited Procedures of the American Arbitration

28 Association ("AAA") then in force. Although the Commercial Arbitration Rules of the AAA

29 shall be used to govern the conduct of the Dispute Resolution, the arbitrator shall be chosen by

30 the procedure described in Section 24.2 and the Dispute Resolution shall not be conducted

1    through the AAA, unless the Parties otherwise agree. For purposes of a Dispute Resolution
2    conducted under this Section 24, whenever the AAA Commercial Arbitration Rules refer to the
3    "tribunal administrator," such reference shall be deemed to be the arbitrator chosen under
4    Section 24.2. The Parties expressly agree that any Dispute Resolution proceeding may proceed
5    in the absence of any Party who, after due notice, fails to be present at such Dispute Resolution
6    or to obtain an adjournment, and that, in such event, an award may be made based solely upon
7    the evidence submitted by the Party who is present. All Dispute Resolution proceedings shall be
8    conducted in Seattle, Washington or in such other location as the Parties may agree. In making
9    any determination, the arbitrator shall apply the pertinent provisions of this Lease without
10   modification or qualification in any respect. The arbitrator shall furnish the Parties with a written
11   decision within thirty (30) days after the date the arbitrator is selected.

12        24.5    Effect on Lease

13             Unless otherwise agreed in writing, during the period that any Dispute Resolution
14   is pending under this Section 24, the Parties shall continue to comply with all terms and
15   provisions of this Lease which are not the subject of the Dispute.

16        24.6    Effect of Determination

17             The decision or award rendered by the arbitrator shall be final, nonappealable, and
18   binding upon the Parties, and judgment may be entered upon it in accordance with applicable law
19   in a court of competent jurisdiction. If the arbitrator determines that an Event of Default has
20   occurred, the provisions of Section 22.4 shall govern the damages and/or other remedies which
21   may be ordered by the arbitrator. Neither the requirement to utilize the procedures set forth in
22   this Section 24, nor the pendency of any Dispute Resolution proceeding, shall in any way
23   invalidate any notices or extend any cure periods provided for in this Lease.

24        24.7    Equitable Proceedings

25             In the event a Party desires to seek interim relief, whether affirmative or
26   prohibitive, in the form of a temporary restraining order, preliminary injunction, or other interim
27   equitable relief with respect to a Dispute, either before or after the initiation of an Dispute
28   Resolution proceeding, that Party may initiate the judicial proceeding necessary to obtain such
29   relief ("Equitable Proceeding"). Nothing in this Section 24.7 shall be construed to suspend or
30   terminate the obligation of the Parties to comply with the procedures set forth in this Section 24

1    with respect to the *Dispute* that is the subject of such *Equitable Proceeding* during the pendency

2    of any such Equitable Proceeding, including any appeal or review. Any interim or appellate

3    relief granted in such Equitable Proceeding shall remain in effect until, and only until, the

4    procedures set forth in this Section 24 result in a settlement agreement or a determination by an

5    arbitrator with respect to the Dispute. Such settlement agreement or determination shall be the

6    binding and final determination on the merits of the Dispute (including, without limitation, any

7    equitable relief and monetary damages, but excluding any award of attorneys' fees or costs

8    rendered in the Equitable Proceeding), shall supersede and nullify any decision in the Equitable

9    *Proceeding on the merits of the dispute that is the subject of such Equitable Proceeding* as

10   between FGI and PSA, and shall preclude any subsequent litigation on such merits,

11   notwithstanding any determination to the contrary in connection with any Equitable Proceeding

12   granting or denying *interim relief.*

13           24.8    Specific Enforcement

14                   24.8.1    FGI acknowledges that the covenants set forth in Sections 7.2, 8.1, 8.5,

15   8.6, 8.7, 8.8 and 8.9 are material and essential elements of the transactions contemplated by this

16   Lease, and that in the event of a FGI default under any of those Sections, PSA may not have an

17   appropriate remedy at law. Accordingly, in addition to its other remedies available at law or in

18   equity, in the event of a breach or threatened breach of any of Sections 7.2, 8.1, 8.5, 8.6, 8.7, 8.8

19   and 8.9, PSA shall be entitled to obtain injunctive relief including specific enforcement from a

20   *court of competent jurisdiction, and may elect to bypass Dispute Resolution.*

21                   24.8.2    PSA acknowledges that the covenants set forth in Sections 19.3 and 25 are

22   material and essential elements of the transactions contemplated by this Lease, and that in the

23   event of a PSA default under any of those Sections, FGI may not have an appropriate remedy at

24   law. Accordingly, in addition to its other remedies available at law or in equity, in the event of a

25   breach or threatened breach of any of Sections 19.3 and 25, FGI shall be entitled to obtain

26   injunctive relief including specific enforcement from a court of competent jurisdiction, and may

27   elect to bypass Dispute Resolution.