1

2

3

4

5

—— FILED ——ENTERED
—— LODGED —— RECEIVED

NOV 29 2006    DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
BY    WESTERN DISTRICT OF WASHINGTON
                                              DEPUTY

6

7

8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

9  FRED and KATHLEEN STARK, a married
   couple,

10                          Plaintiffs,

11        vs.

12  THE SEATTLE SEAHAWKS,
    FOOTBALL NORTHWEST, LLC, a
13  Washington limited liability company,
    FIRST & GOAL, INC., a Washington
14  corporation, THE WASHINGTON STATE
    PUBLIC STADIUM AUTHORITY, a
15  Washington municipal corporation, and
    LORRAINE HINE, in her capacity as chair
16  of the Washington State Public Stadium
    Authority board of directors,
17

18                          Defendants

Case No. **CV6    1719 JLR**

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

Noted: Friday, December 15, 2006

06-CV-01719-M

19

20

### I. RELIEF REQUESTED

21    Plaintiffs Fred and Kathleen Stark respectfully move the Court for an order enjoining

22  Defendants from conducting mass warrantless and suspicionless "pat-down" searches of ticket

23  holders as a condition of their entry to Qwest Field (the "Stadium") at Seattle Seahawks home

24  football games.  The Starks plan to attend the upcoming Seahawks home game on December

25  24, 2006 and request issuance of a preliminary injunction prior to that time.

MOTION FOR PRELIMINARY INJUNCTION - 1

**ORIGINAL**

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

Dockets.Justia.com

## II. INTRODUCTION

**A.    The Parties**

Plaintiffs Fred and Kathleen Stark are citizens of the United States, residents of the State of Washington, and have been Seattle Seahawks season-ticket holders since 1991.

Defendant Seattle Seahawks is a professional football team located in Seattle and owned by Defendant Football Northwest, LLC ("FNW"). Defendant First & Goal, Inc. ("FGI") is a corporation organized under the laws of the State of Washington and operates the Stadium pursuant to a long-term master lease agreement with Defendant Washington State Public Stadium Authority (the "PSA"). The PSA is a municipal corporation, and is the public owner/operator of the Stadium, which was financed primarily with public funds. Defendant Lorraine Hine is believed to be a resident of the State of Washington and is named in her official capacity as the chair of the PSA board of directors.

**B.    The Problem**

The Starks, along with other ticket holders seeking admittance to Seahawks home games, have been subjected to unconstitutional pat-down searches at the Stadium as a condition to entry. The searches constitute unreasonable, mass, warrantless and suspicionless searches prohibited by both the State and Federal Constitution. Because these pat-downs were adopted as part of an ongoing, nationwide NFL-mandated policy, the Starks have reason to believe these searches, and the resulting violation of their constitutional rights, will continue unabated unless enjoined.

It is unknown whether Defendants would have an interest in maintaining the pat-down policy in the absence of any contractual obligations to enforce the NFL policy. To the extent

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

that any Defendants privately object to the policy, they likely lack standing to contest the resulting constitutional violations themselves.[1]

### III.  STATEMENT OF FACTS

**A.    Financing, Development, Ownership, and Management of Qwest Field, Seattle's Public Football Stadium**

The PSA is a municipal corporation created in 1997 for the development, ownership, and operation of a new public football stadium in Seattle to replace the aging Kingdome.  The new stadium was later christened "Qwest Field" (the "Stadium").  The Stadium was financed primarily with public funds.  FGI, a private entity, assisted in the Stadium's financing and development and, pursuant to a long-term master lease agreement with the PSA, is authorized to operate the Stadium and related facilities on behalf of the PSA.

1.    Origins of the Public Stadium Authority:  The Stadium Financing Act

In 1997, FNW had an option to purchase the Seahawks from its then owner, Ken Behring, who planned to move the team to California.  *See Brower v. State*, 137 Wn.2d 44, 49 (1998).  FNW indicated that it would not exercise its option, keeping the Seahawks in Seattle, unless a new football stadium was built.  In response, the State Legislature enacted the Stadium and Exhibition Center Financing Act, Laws of 1997, ch. 220 (the "Stadium Act"), which set forth a comprehensive financing plan for a new stadium and exhibition center.  *Brower*, 137 Wn.2d at 49.  The Stadium Act is codified, in pertinent part, at RCW 36 ch. 102.[2]

The Stadium Act provided for the creation of the PSA to develop, own and operate the Stadium.  RCW 36.102.020(1).  The PSA is governed by a seven-member board, appointed by the governor.  RCW 36.102.030.  Defendant Lorraine Hine is the current chair of the board.

---

[1] *See, e.g., Chicago Park Dist. v. Chicago Bears Football Club, Inc.*, 2006 U.S. Dist. LEXIS 58621 (N.D. Ill. Aug. 8, 2006) (public owner of stadium lacked standing to vicariously contest constitutional violations).
[2] Before the Stadium Act became effective, its key provisions were referred to the voters as Referendum Bill 48. RCW 36.102.803(1).  The Referendum was approved on June 17, 1997.  *Brower*, at 52.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX. (206) 623-8717

1   An advisory committee also was established, consisting of the director of the state Office of

2   Financial Management and four members selected by the Legislature. RCW 36.102.040(1).

3       The PSA was granted the authority to "acquire, construct, own, remodel, maintain,

4   equip, reequip, repair, and operate a stadium and exhibition center". RCW 36.102.050(1). In

5   carrying out these functions, the PSA was required to consult with the Seahawks' designated

6   "team affiliate" [3] about the site, scope, and design of the project. RCW 36.102.060(1)–(3).

7       The Stadium Act also required the PSA to consult with the team affiliate about the

8   budget for the project and make recommendations to the state finance committee about the

9   structure of financing for the stadium. RCW 36.120.060(5)–(6). Additionally, although the

10  PSA had the authority to build the stadium, it was authorized "to enter into a development

11  agreement with a team affiliate whereby the team affiliate may control the development of the

12  stadium and exhibition center project". RCW 36.102.060(7).

13          2.    Stadium Act Financing Requirements

14      The stadium was to be financed primarily through the sale of bonds, with public

15  contributions capped at $300 million. Stadium Act, § 210(1), § 218. Before bonds could be

16  sold, the PSA was required to obtain binding commitments that the Seahawks would play all

17  home games at the stadium (*id.*, § 210(2)(a)) and that the "team affiliate" would provide $100

18  million for project development and assume all cost overruns (*id.*, § 210(2)(b)).

19      The Stadium Act also required that the State be granted an equity stake in the Seahawks

20  entitling it "to receive ten percent of the gross selling price" upon sale of the team. *Id.* The

21  team affiliate also was required to make a commitment to work with the "surrounding areas to

22  mitigate the impact of the construction and operation of the stadium . . . with a budget of at

23  least ten million dollars dedicated to area mitigation." *Id.* Furthermore, "[20%] of the net

24

---

25  [3] As explained below, FGI was later to become the "team affiliate" and assume all associated rights and
    obligations.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX. (206) 623-8717

1  profit from the operation of the exhibition facility of the stadium and exhibition center" was to

2  be "deposited into the permanent common school fund." *Id.*

3      There also were statutorily required commitments regarding the operation of the

4  stadium. For example, at least 10% of the seats in the Stadium for home games had to be sold

5  "at an affordable price" and an executive suite had to be made available, on a lottery basis, as a

6  free upgrade to ticket purchasers. *Id.* The team affiliate also was required to provide the PSA

7  with reasonable office space at no cost. *Id.*

8          3.      The Master Lease: FGI Becomes the "Team Affiliate" and the PSA's Surrogate
9                  Stadium Manager

10      The Stadium Act authorized the PSA to vest the team affiliate with responsibility for

11  the Stadium's management by entering:

12          into a long-term lease agreement with a team affiliate whereby, in consideration
            of the payment of fair rent and <u>assumption of operating and maintenance</u>
13          <u>responsibilities</u>, risk, legal liability, and costs associated with the stadium and
            exhibition center, the team affiliate becomes the sole master tenant of the
14          stadium and exhibition center.

15  RCW 36.102.060(8) (emphasis added).

16      Consistent with the PSA's statutory rights and obligations, on November 24, 1998, the

17  PSA entered into a master lease agreement (the "Master Lease") with FGI, a copy of which is

18  attached to the Declaration of Christopher Wion as Exhibit A. Because FGI and the Seahawks

19  were under common control, FGI satisfied the Stadium Act criteria for "team affiliate."[4]

20      The Master Lease recites that "FGI is the sole master tenant" of the Stadium, and "has

21  the exclusive power and authority to possess, operate, use, sublease" the Stadium. *Id.*, ¶ 2.1, at

22

23  ────────────────
    [4] The term "team affiliate" was defined in the Stadium Act to mean:
24          a professional football team that will use the stadium and exhibition center, and any affiliate of
            the team designated by the team. An "affiliate of the team" means any person or entity that
            controls, is controlled by, or is under common control with the team.
25  RCW 36.102.010(10).

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX, (206) 623-8717

1  3. The Master Lease imposes certain conditions on FGI's operation of the Stadium, including

2  the requirement that "FGI shall at all times, use, manage, possess, and operate [the Stadium] in

3  compliance with all applicable Laws, including Laws with respect to discrimination." *Id.*, ¶

4  8.15, at 32. The Master Lease also includes recitations regarding the PSA's authority and role

5  as a governmental agency:

> By entering into this Lease…, PSA is binding itself to the covenants in this
> Lease…, but PSA is not otherwise limiting its governmental authority under the
> Act; provided PSA shall not exercise its governmental authority (as opposed to
> its contractual authority under this Lease or any Related Agreement which is not
> considered PSA's "governmental" authority for purposes of this Section) so as
> to impose any economic or operational burdens or impacts on FGI or the
> Project, either directly or indirectly, not provided in this Lease[.]

*Id.*, ¶ 26.20, at 86.

## B.    The NFL-Mandated "Pat-down" Policy

In August 2005, the National Football League ("NFL") adopted a policy requiring pat-

down searches of all ticket holders at NFL games, at venues throughout the country. *See*

*Johnston v. Tampa Sports Authority*, 442 F.Supp.2d 1257, 1260 (M.D. Fla. 2006). The pat-

down policy was adopted for the ostensible purpose of identifying explosive devices and

preventing suicide bombings inside stadiums where NFL games are being played. *Id.*

The pat-down policy requires that all ticket holders seeking admittance to an NFL game

be subjected to an upper-body pat-down search. The policy requires that security officers use

open hands to pat-down the torso, arms, and back of every ticket holder. *Id.* The pat-down

policy was not adopted in response to any specific and credible threat. *Id.* at 1268 ("the

evidence establishes that the NFL implemented a pat-down policy as a broad prophylactic

measure in response to a general threat that terrorists might attack any venue where a large

number of Americans gather").

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

The NFL mandated that each local NFL franchise, including the Seattle Seahawks, comply with its pat-down policy. *Id.* at 1260. Local NFL franchises, including the Seahawks, are believed to be contractually obligated to enforce the pat-down policy – whether they agree with the policy or not.

At the beginning of the 2005 NFL season, pat-down searches were instituted at all NFL games, including Seahawks home games at the Stadium.

## C. The Starks Have Been Subjected to Unconstitutional Pat-down Searches at the Stadium

Prior to the 2005 season, the Starks had never been subjected to a pat-down search at a Seahawks game, or any other NFL game. Declaration of Fred Stark, dated November 27, 2006 ("Stark Decl."), at ¶ 2.

On or about August 22, 2005, the Starks attended a Seahawks pre-season home game against the Dallas Cowboys. Stark Decl. ¶ 3. Upon arriving at the Stadium, the Starks were surprised to learn that, as a condition of their entry to the game, they were required to submit to a pat-down search. *Id.* The Starks verbally objected, but ultimately submitted to the pat-down as their only option to attend the game. *Id.* Upon inquiry, the Starks were informed that the pat-down searches were required under a new NFL policy instituted to prevent terrorist suicide bombers from detonating a hidden vest bomb. *Id.* This was the first NFL game at which the Starks were subjected to a pat-down search. *Id.*

On or about September 2, 2005, the Starks attended the second Seahawks pre-season home game against the Minnesota Vikings. Stark Decl. ¶ 4. The Starks again lodged their objection, but ultimately submitted to a pat-down as a condition of their entry to the stadium. *Id.*

On September 18, 2005, the Starks attended their first Seahawks home game for the 2005 regular season. Stark Decl. ¶ 5. Upon arriving at the Stadium, the Starks discovered that

MOTION FOR PRELIMINARY INJUNCTION - 7

1    the NFL's pat-down policy was also being enforced at Seahawks regular season home games.

2    *Id.* Apparently, Stadium security officers had been directed by Defendants to conduct pat-

3    downs of every ticket holder seeking entry to the Stadium.

4          At the entrance to the Stadium, the Starks were stopped by a security officer and

5    informed that they were required to submit to a pat-down as a condition of their entry to the

6    Stadium. Stark Decl. ¶ 6. The Starks verbally objected, but ultimately submitted to a pat-

7    down as their only option to gain admittance to the game. *Id.*

8          The Starks attended Seahawks 2005 regular season and post-season home games at the

9    Stadium on September 25, October 16, October 23, November 13, January 14 and January 22.

10   Stark Decl. ¶ 7. During the 2006 pre-season and current regular season, the Starks attended

11   home games at the Stadium on August 12, August 31, September 17, September 24, October

12   22, November 6, November 12 and November 27. Stark Decl. ¶ 9.

13         Pat-downs of the Starks at these home games have ranged from the non-existent, to a

14   highly intrusive, offensive, and humiliating full-body frisking. Stark Decl. ¶¶ 11-14.

15         No pat-downs (of the Starks or any other ticket holders the Starks observed) were

16   conducted during a heavy downpour at one Seahawks home game November 13, 2005. Stark

17   Decl. ¶ 11. Many people were wearing ponchos or other bulky wet-weather protection. *Id.*

18   Had the stadium security officers conducted the pat-down searches under these conditions,

19   large crowds would have been forced to stand in the rain before being permitted entry to the

20   Stadium. *Id.* Rather than cause this delay and discomfort to ticket holders, Defendants

21   selectively abandoned the pat-down policy and allowed the Starks, and all other ticket holders

22   the Starks observed, to enter the Stadium and attend the Seahawks game without any search.

23         At another Seahawks home game on July 13, 2006, Mr. Stark verbally objected to

24   being patted-down and asked to speak with the security officer's supervisor. Stark Decl. ¶ 12.

25   Two supervisors were called to discuss the situation. *Id.* Rather than submitting to yet another

MOTION FOR PRELIMINARY INJUNCTION - 8

1  pat-down, Mr. Stark removed his shirt in an effort to establish that he was concealing nothing

2  that the pat-down would reveal. *Id.* The original security officer waved him through the

3  entrance without any further search. *Id.*

4      At the other end of the spectrum, at a home game on October 16, 2005, Mr. Stark was

5  subjected to a highly intrusive, offensive and humiliating full-body frisking. Stark Decl. ¶ 13.

6  A security officer ran his hands down Mr. Stark's sides, reached around Mr. Stark and grasped

7  his buttocks. *Id.* He then felt both arms and across his chest. *Id.* Then, he moved his hands

8  towards Mr. Stark's groin area, where he found and handled an Albuterol inhaler in Mr. Stark's

9  pant pocket (for his asthma). *Id.* The security officer then placed both of his hands around

10  Mr. Stark's left thigh, running them down to his sneaker top, which he also felt thoroughly. *Id.*

11      Except as described above, the Starks were subjected to upper body pat-downs at every

12  Seahawks home game they attended in 2005 and 2006. Stark Decl. ¶ 13. The Starks verbally

13  objected each time, but ultimately submitted to the searches in order to gain admittance to the

14  Stadium. *Id.* The Starks were not singled out of the crowd based on any suspicion that they

15  might be concealing an explosive device, but simply because they were members of a large

16  public gathering.

17  ## IV. ARGUMENT AND AUTHORITY

18      This case is virtually indistinguishable from *Johnston v. Tampa Sports Authority*, 442

19  F. Supp. 2d 1257 (M.D. Fla. 2006), a case in which the court approved a preliminary injunction

20  under nearly identical facts. *Tampa Sports Authority* involved a claim by a Tampa Bay

21  Buccaneers season ticket holder that the Tampa Sports Authority – the public owner of

22  Raymond James Stadium – violated his state and federal constitutional rights through its

23  implementation of the NFL-mandated pat-down policy at Buccaneers home games. The

24  *Tampa Sports Authority* opinion is attached as Appendix A and, by itself, provides a sufficient,

25  and well-reasoned, basis for this Court to grant the Starks' motion for injunctive relief.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

## A.    Ninth Circuit Standards for Preliminary Injunctions.

The Ninth Circuit recently restated the standards for permitting preliminary injunctive relief in *Earth Island Institute v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) ("*Earth Island II*"). There, the court described the "proper legal standard governing preliminary injunctive relief" for courts in the Ninth Circuit:

> Under the "traditional" criteria, a court may grant a preliminary injunction if a plaintiff shows "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." Alternatively, a court may grant a preliminary injunction if a plaintiff "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable harm *or* that serious questions are raised and the balance of hardships tips sharply in his favor."

*Id.* at 1158-59 (internal citations omitted, emphasis in original), quoting *Earth Island Institute v. U.S. Forest Serv.*, 351 F.3d 1291, 1296 (9th Cir. 2003) ("*Earth Island I*").

Under the "balancing of hardships" test, a moving party need not demonstrate that he risks irreparable injury, but he must show that he will suffer a degree of hardship that outweighs the hardship facing the opposing party if the injunction is not issued. Similarly, a moving party need not demonstrate that he will succeed on the merits, but must show that his cause presents serious questions of law worthy of litigation. *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993). However, neither element of the "alternative" test described in the *Earth Island* decisions is applied rigidly. The two elements are treated as related flexible parts of a "sliding scale." As noted by the court in *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987), these are not separate tests, but rather "opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Id.* (quotation and citation omitted). Each of these two prongs:

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX, (206) 623-8717

requires an examination of both the potential merits of the asserted claims and
the harm or hardships faced by the parties.  We have held that these two
formulations represent two points on a sliding scale in which the required
degree of irreparable harm increases as the probability of success decreases.

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) (internal quotation

marks and citation omitted).

## B.    The Starks Are Entitled to a Preliminary Injunction

As in *Tampa Sports Authority*, the Starks are likely to succeed on the merits of their

constitutional claims, and the balance of harm to the parties weighs overwhelmingly in favor of

the Starks, who will suffer irreparable harm unless the pat-down searches are enjoined.

### 1.    The Starks Are Likely to Succeed on the Merits

Both the Washington State and United States Constitution ensure citizens' right to

privacy by prohibiting unreasonable searches.  The Fourth Amendment of the United States

Constitution provides that:

The right of the people to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures, shall not be violated, and no
warrants shall issue, but upon probable cause, supported by oath or affirmation,
and particularly describing the place to be searched, and the persons or things to
be seized.

United States Constitution, Amend. IV.  For its part, Article 1, § 7 of the Washington State

Constitution provides that:

No person shall be disturbed in his private affairs, or his home invaded, without
authority of law.

The Washington State Constitution has been held to provide greater protection to individual

privacy interests than the Fourth Amendment.  *City of Seattle v. Mesiani*, 110 Wn.2d 454, 457

(1988).

As a general rule, warrantless and suspicionless searches are *per se* unreasonable under

both the State and Federal Constitution:

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX. (206) 623-8717

1

2

> The most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specially established and well-delineated exceptions.

3   *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (citations and internal quotations

4   omitted). *See also City of Indianapolis v. Edmond*, 531 U.S. 32, 37 ("A search or seizure is

5   ordinarily unreasonable in the absence of [at least some] individualized suspicion of

6   wrongdoing"); *State v. Houser*, 95 Wn.2d 143, 149 (1980) (citing *Coolidge*).

7        In limited situations, a suspicionless search may be justified by "special needs" that go

8   beyond crime detection. *Chandler*, 520 U.S. at 313. Where such "special needs" are invoked,

9   "courts must undertake a context-specific inquiry, examining closely the competing private and

10  public interests advanced by the parties." *Id.* at 314 (citations omitted). Every such case must

11  be based on a "concrete danger demanding departure from the Fourth Amendment's main

12  rule." *Id.* at 319.

13       Exceptions to the general rule are jealously guarded. *Bourgeois v. Peters*, 387 F.3d

14  1303, 1313 (11th Cir. 2004); *Indianapolis*, 531 U.S. at 37 ("While suspicion is not an

15  'irreducible' component of reasonableness, we have recognized only limited circumstances in

16  which the usual rule does not apply."). Recognized exceptions include: (1) consensual

17  searches; (2) stop and frisk searches (*i.e., Terry* stops); (3) hot pursuit; (4) border searches; and

18  (5) airport and courthouse searches. *Jacobsen v. The City of Seattle*, 98 Wn.2d 668, 672

19  (1983). As stated by the Washington Supreme Court:

20

21

> The general search is anathema to Fourth Amendment and Const. art. 1, § 7 protections, and except for the most compelling situations, should not be countenanced.

22  *Kuehn v. Renton School District No. 403*, 103 Wn.2d 594, 601-02 (1985).

23

24

25

MOTION FOR PRELIMINARY INJUNCTION - 12

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL., (206) 623-1700   FAX, (206) 623-8717

a.    No Exception Applies: The Pat-Down Searches Are *Per Se* Unreasonable

The pat-down policy implemented by Defendants is an unreasonable mass warrantless and suspicionless search, not subject to any applicable exception to the state and federal constitutional guarantees of privacy. The Washington Supreme Court has held that, "No special exemption from constitutional protections should be made for rock concerts or other gatherings in public arenas." *Jacobsen*, 98 Wn.2d at 674. Although Defendants may attempt to justify the policy on the basis of "special need" or implied consent, both arguments should be rejected for the reasons articulated below.

i.    Defendants Cannot Establish a "Special Need"

The NFL's pat-down policy, as implemented at the Stadium, was not adopted in response to a specific and credible terrorist threat, nor would it be effective in protecting against such a threat. As stated in *Chandler*, 520 U.S. at 319, "[n]otably lacking… is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule."

Defendants may argue, as others have before them, that the upper body pat-downs are now a necessary precaution, a lamentable feature of life in a post-September 11 world. In rejecting this argument, the Eleventh Circuit has stated:

> This argument is troubling. While the threat of terrorism is omnipresent, we cannot use it as the basis for restricting the scope of the Fourth Amendment's protections in any large gathering of people.
> ***
> [T]he Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on evidence— rather than potentially effective, broad, prophylactic dragnets—as the constitutional norm.
> ***
> September 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1  *Bourgeois*, 387 F.3d at 1311-12.

2  Addressing essentially identical circumstances as presented here, the court in *Tampa*

3  *Sports Authority* rejected the purported "special need" for NFL game pat-downs, stating:

4  A finding of "special needs" based on evidence that supports only a general fear
   of terrorist attacks would essentially condone mass suspicionless searches of
5  every person attending any large event, including, for example, virtually all
   professional sporting events, high school graduations, indoor and outdoor
6  concerts, and parades.

7  *Tampa Sports Authority*, 442 F.Supp.2d at 1269.

8  The pat-down searches do not make the public perceptibly more secure from terrorist

9  attacks. Even if they did, increased public safety by itself does not justify an otherwise

10  unconstitutional search. *Bourgeois*, 387 F.3d at 1311-12. The security half-measures could be

11  circumvented by concealing an explosive device below the waist or smuggling the device on a

12  rainy game-day where Defendants have chosen to abandon the policy for the ticket-holders'

13  convenience. The pat-downs provide the mere illusion of security. Moreover, it appears that

14  no pat-downs are conducted at other large gatherings at the Stadium, such as professional

15  soccer games, motocross rallies, and live concerts.

16  Defendants cannot establish that there is a "special need" to intrude upon the Starks', or

17  other ticket holders', right to privacy at Seahawks home games.

18            ii.    The Starks Did Not Voluntarily Consent to the Pat-Downs

19  Validity of consent turns upon the voluntariness with which it was given. *Schneckloth*

20  *v. Bustamonte*, 412 U.S. 218, 227 (1973) ("the question whether a consent to a search was in

21  fact "voluntary" or was the product of duress or coercion, express or implied, is a question of

22  fact to be determined from the totality of all the circumstances").

23  Preannouncement of a search policy cannot sanitize an otherwise unconstitutional

24  search. Any argument to the contrary is based on the false premise that, if a person is aware

25

MOTION FOR PRELIMINARY INJUNCTION -
14

1    that the search will take place, submission to the search is "voluntary." As the Washington

2    Supreme Court has held, "neither the voluntary nature of the activity nor the preannouncement

3    of the search, standing alone, make the search constitutional." *Kuehn v. Renton School District*

4    *No. 403*, 103 Wn.2d 594, 600 (1985). Any other rule would eviscerate the constitutional right

5    to be free from unreasonable searches.

6        A number of courts have refused to apply the consent exception in stadium search

7    cases, where attendance at a rock concert or sporting event was conditioned on submission to a

8    search. *See, e.g., Tampa Sports Authority*, 442 F.Supp.2d at 1271 ("[t]his type of implied

9    consent, where the government conditions the receipt of a benefit... on the waiver of a

10   constitutional right... has been deemed invalid as an unconstitutional condition"); *Nakamoto v.*

11   *Fasi*, 635 P.2d 946, 951 (Haw. 1981) ("Once having extended... an invitation to the public to

12   use its arena upon paying the price of admission, [defendant] could not further condition the

13   exercise of this privilege upon compliance with an unconstitutional requirement."); *Jacobsen*,

14   98 Wn.2d 668; *Wheaton v. Hagan*, 435 F. Supp 1134 (M.D. N.C. 1977); *Stroeber v. Comm.*

15   *Veterans Auditorium*, 453 F. Supp. 926, 933 (S.D. Iowa 1997); *Gaioni v. Folmar*, 460 F.Supp.

16   10, 14 (M.D. Ala. 1978); *Collier v. Miller*, 414 F. Supp. 1357, 1366 (S.D. Tex. 1976); *State v.*

17   *Carter*, 267 NW2d 385 (Iowa 1978). *See also Bourgeois*, 387 F.3d at 1324 (rejecting

18   argument that demonstration participants consented to search because they could choose not to

19   participate in the protest).

20       The Starks verbally objected to each pat-down search, and their submission to the

21   searches as their only avenue of attending Seahawks home games at the public Stadium does

22   not amount to voluntary consent.

23

24

25

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

b.    Defendants' Implementation of the Pat-Down Policy Constitutes "State Action"

A necessary predicate of the Starks' constitutional claims is that the pat-downs constituted "state action." Defendants may argue that the non-PSA Defendants' role in implementing the pat-down policy prevents constitutional scrutiny. However, there can be little doubt that the interdependent relationship among the public and private Defendants concerning the financing, development, use and operation of the public Stadium satisfies the "state action" requirement.

In determining whether action is attributable to the State, a two-part test is applied:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

A private party may be deemed to be a state actor where it could not engage in the objectionable behavior but for State authorization, complicity, or inaction:

> A person may become a state actor by conspiring with a state official, or by engaging in joint activity with state officials. A person may also become a state actor by becoming so closely related to the State that the person's actions can be said to be those of the State itself. That might be found because the nexus is so close as to cause the relationship to be symbiotic. It might also be for such other reasons as performing public functions or being regulated to the point that the conduct in question is practically compelled by the State.

*Price v. State of Hawaii*, 939 F.2d 702, 708-09 (9th Cir. 1991) (citations omitted, emphasis added).

As an example of the type of "symbiotic" public-private relationship that transforms a private party into a state actor, the *Price* court cited *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). *Price*, at 708.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

In *Burton*, the United States Supreme Court found that a private restaurant's racial discrimination constituted "state action" for purposes of the Equal Protection Clause of the Fourteenth Amendment since the restaurant leased space within a publicly financed multi-use parking facility. The parking facility was developed, owned and operated by the Wilmington Parking Authority ("WPA"), a public agency. Construction was funded primarily through the issuance of public bonds. To secure additional capital and make bond financing practicable, the WPA entered into long-term leases with various businesses. Approximately 60% of the facility was leased to private parties for commercial purposes. Approximately 2/3 of the facility's revenue came from these leases, with the remainder coming from parking fees.

The restaurant, Eagle Coffee Shoppe ("Eagle"), entered into a 20-year lease with the WPA. In return for its annual lease fee, Eagle received tax benefits, as well as free structural and cosmetic improvements and utilities. Although Eagle lacked direct access from the parking garage and had a separate street entrance, the restaurant was housed within the facility's exterior walls. Eagle's patrons benefited from convenient parking while the WPA benefited from their parking fees. Thus, Eagle "constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit." *Id.* at 723-24.

Due to its interdependent relationship with the WPA, Eagle both forfeited its status as a purely private actor and tarred the State with its discriminatory actions:

> [T]he benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn.
>                              ***
> [I]n its lease with Eagle the Authority could have affirmatively required Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. But no State may effectively abdicate its responsibilities by either ignoring them or by

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

> merely failing to discharge them whatever the motive may be.... By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity[.]

*Id.* at 724-25 (emphasis added).  Accordingly, the court held:

> [W]hen a State leases public property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself.

*Id.* at 726.

The PSA and FGI have a symbiotic relationship closely analogous to that between Eagle and the WPA, as described in *Burton*. The PSA, as a public agency, is a "state actor." In accordance with the authority vested in the PSA by the Stadium Act and pursuant to the Master Lease, FGI operates the public Stadium and stands in the PSA's shoes for that purpose. A private party, acting on behalf of an agency of the state, is a "state actor" for constitutional purposes:

> the school principal, the band director, and the parent booster club members were clothed with the authority of state law when they announced their policy of requiring students' submissions of luggage for search prior to departure.

*Kuehn v. Renton School District No. 403*, 103 Wn.2d 594, 602 (1985).

The PSA cannot simply contract away the public's constitutional right to be free from unreasonable searches, abdicating its duty to observe those rights. The Stadium is a public facility, and neither FGI, as operator, nor any other private party is entitled to erect barriers to the public's entry that the State could not itself impose. Individually, and collectively, Defendants' acts and/or omissions have facilitated the unreasonable pat-down searches, and constitute state action.

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

**2.    The Relative Harm to the Parties Overwhelmingly Supports Injunctive Relief**

The balance of harm tips overwhelmingly in favor of injunctive relief; the Starks have suffered, and will continue to suffer, irreparable injury while Defendants will suffer no harm.

a.    The Starks Will Suffer Irreparable Injury unless Defendants' Implementation of the NFL Pat-Down Policy Is Enjoined

The deprivation of constitutional rights is presumed to constitute irreparable injury. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993) (even brief loss of First Amendment rights may constitute irreparable injury); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (given fundamental Fourth Amendment right "to be free from unreasonable searches… Covino has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights"); *Ramirez v. Webb*, 787 F.2d 592 (6th Cir. 1986) (loss of Fourth Amendment rights constitutes irreparable injury); *Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 974 (3d Cir. 1980) (holding that "an [OSHA] inspection violating the Fourth Amendment would constitute irreparable injury for which injunctive relief would be appropriate"); *Able v. United States*, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994) ("possible violation of constitutional rights [under Fifth and First Amendments] constitutes irreparable harm").

Consistent with these authorities, the Ninth Circuit has previously upheld injunctions prohibiting further violations of the Fourth Amendment. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) (citing cases).

In the absence of injunctive relief, the pat-down searches will continue unabated at remaining Seahawks home games for the 2006 season, and subsequent seasons. The Starks have paid for their 2006 season tickets, plan to use those tickets, and intend to buy season

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX, (206) 623-8717

1  tickets for the 2007 and subsequent seasons. Accordingly, unless the pat-down searches are

2  enjoined, the Starks will continue to be subjected to violations of their constitutional right to

3  privacy, causing irreparable injury.

4                          b.      Defendants Will Suffer No Harm

5          If the Court grants the requested relief, ticket holders will be allowed to attend

6  Seahawks home games at the Stadium in the same manner as they had been prior to the 2005

7  season. In addition, Defendants' selective abandonment of the pat-down policy (*e.g.*, at the

8  rainy home game on November 13, 2005), suggests that Defendants themselves perceive the

9  value of the pat-downs to be minimal – outweighed where ticket holders would be required to

10 stand in long lines in the rain. Moreover, to the extent that an injunction would translate into a

11 reduction in necessary security personnel at the Stadium, an injunction could actually *save*

12 defendants money. Defendants will suffer little harm, if any, from an injunction, and the

13 balance of hardships weighs overwhelmingly in the Starks' favor.

14         Under the circumstances, no security is necessary or appropriate. Fed. R. Civ. P. 65(c)

15 requires a successful applicant for an injunction to post security "in such sum as the court

16 deems proper, for the payment of such costs and damages as may be incurred or suffered by

17 any party who is found to have been wrongfully enjoined or restrained." Courts have

18 substantial discretion to waive the security requirement, particularly where anything other than

19 a nominal bond would erect practical barriers to the private enforcement of constitutional

20 rights for the public's benefit or where a strong likelihood of success on the merits is shown.

21 *See, e.g., Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *California ex*

22 *rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir.

23 1985).

24         In vacating the bond imposed by the state court prior to removal, the court in *Tampa*

25 *Sports Authority* reasoned as follows:

MOTION FOR PRELIMINARY INJUNCTION -
20

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

[I]n a case where, as here, Plaintiff's fundamental constitutional rights are at issue, imposing a financial burden on a plaintiff as a condition to protecting fundamental constitutional rights would create an unfair hardship on that plaintiff. Moreover, Defendants' argument that Plaintiff should be required to post a bond to secure Defendants from costs they allege they could be subjected to, "damages and losses which might flow from [a terrorist] attack", is unpersuasive. Even if the injunction is determined to have been wrongfully entered, it is unlikely that the Defendants would be liable in tort for the [potential] damages and losses they assert.

*Johnston v. Tampa Sports Authority*, 2006 U.S. Dist. LEXIS 77614, *3-4 (M.D. Fla. Oct. 16, 2006) (order vacating bond).

## V. CONCLUSION

For the foregoing reasons, the Starks respectfully request that their motion for injunctive relief be granted.

DATED this 29th day of November, 2006.

DANIELSON HARRIGAN LEYH & TOLLEFSON LLP

By _____

Timothy G. Leyh, WSBA #14853
Christopher T. Wion, WSBA #33207
Attorneys for Plaintiffs Fred and Kathleen Stark

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

# APPENDIX A

Motion

LEXSEE 442 F. SUPP. 2D 1257

**GORDON JOHNSTON, Plaintiff, vs. TAMPA SPORTS AUTHORITY and HENRY
G. SAAVEDRA, in his official capacity as Executive Director of the TAMPA
SPORTS AUTHORITY, Defendants.**

**Case No. 8:05-CV-2191-T-27MAP**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
FLORIDA, TAMPA DIVISION**

*442 F. Supp. 2d 1257; 2006 U.S. Dist. LEXIS 52173; 19 Fla. L. Weekly Fed. D 825*

**July 28, 2006, Decided
July 28, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion granted by *Johnston v. Tampa Sports Auth., 2006 U.S. Dist. LEXIS 77614
(M.D. Fla., Oct. 13, 2006)*

**PRIOR HISTORY:** *Johnston v. Tampa Sports Auth.,
410 F. Supp. 2d 1143, 2005 U.S. Dist. LEXIS 40046
(M.D. Fla., 2005)*

**COUNSEL:** [**1] For Gordon Johnston, Plaintiff:
Amy Lea Drushal, John D. Goldsmith, Trenam, Kemker,
Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL;
Randall C. Marshall, American Civil Liberties Union
Foundation of Florida, Inc., Miami, FL; Rebecca H.
Steele, ACLU Foundation of Florida, Inc., Tampa, FL.

For Tampa Sports Authority, Henry G. Saavedra, in his
official capacity as Executive Director of the Tampa
Sports Authority, Defendants: John Irving Van Voris,
Richard Michael Zabak, Gray Robinson, P.A., Tampa,
FL.

**JUDGES:** JAMES D. WHITTEMORE, United States
District Judge.

**OPINION BY:** JAMES D. WHITTEMORE

**OPINION:**

[*1258] **ORDER**

**BEFORE THE COURT** is Defendants' Motion to
Reconsider, Vacate, and Dissolve the Preliminary In-
junction (Dkt. 7) and Plaintiff's Response in Opposition
(Dkt. 23). Argument on Defendant's motion was heard
on July 13, 2006. After careful consideration of the par-
ties' briefs and the record before the state court, Defen-
dants' Motion to Reconsider, Vacate and Dissolve the

Preliminary Injunction is **DENIED**. The mass suspi-
cionless pat-downs implemented by the Tampa Sports
[*1259] Authority ("TSA") for NFL games at Raymond
James Stadium ("Stadium") constitute unreasonable
searches under [**2] the Florida Constitution and the
*Fourth Amendment to the United States Constitution.* n1

> n1 *Article I, Section 12 of the Florida Con-
> stitution* affords the same protections against un-
> reasonable searches and seizures as the *Fourth
> Amendment to the United States Constitution. See
> State v. Peterson, 739 So. 2d 561, 564 (Fla.
> 1999).*

The TSA has not established that its concern for
public safety is based on a substantial and real risk which
would justify a "special needs" exception to the well-
established rule that suspicionless searches of one's per-
son are *per se* unreasonable. Moreover, the TSA has not
demonstrated that this case presents one of the very lim-
ited instances where the Plaintiff's privacy interest is
minimal and the TSA's public safety interest would be
jeopardized by prohibiting mass suspicionless pat-downs
at the Stadium.

Before embarking upon a complex constitutional
analysis, it is important to emphasize what this case is
*not* about. It is not about the wisdom of the pat-down
[**3] policy, whether the average Buccaneers fan sup-
ports or objects to the pat-down searches, or whether a
judge believes the pat-downs are wise. n2 The Eleventh
Circuit has cautioned that "[c]onducting an *ad hoc* analy-
sis of the reasonableness of the search based on the
judge's personal opinions about the governmental and
privacy interests at stake, instead of applying the Su-
preme Court's well-established *per se* rules regarding

Case 2:06-cv-01719-JLR    Document 10    Filed 11/29/2006    Page 24 of 34
Page 2

442 F. Supp. 2d 1257, *; 2006 U.S. Dist. LEXIS 52173, **;
19 Fla. L. Weekly Fed. D 825

warrants, prior judicial scrutiny of proposed searches, probable cause, and individualized suspicion ignores [] crucial *Fourth Amendment* principles." *Bourgeois v. Peters, 387 F.3d 1303, 1314 (11th Cir. 2004)* (citations omitted).

> n2 The TSA implemented pat-downs after the NFL and the Buccaneers "mandated" them. The NFL's concern over potential terrorist attacks at its stadiums was the reason for the NFL's mandate. The NFL's concern for the safety and well being of its patrons and the good intentions behind the pat-down policy cannot reasonably be criticized. The *Fourth Amendment*, however, requires a constitutional analysis that may or may not be consistent with the NFL's rationale for mandating pat-downs. Moreover, and most importantly from a constitutional perspective, it is the action of the TSA, a public agency created by Florida law that is subject to *Fourth Amendment* scrutiny, not that of the NFL.

[**4]

"The *Fourth Amendment* embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on *evidence-rather* than potentially effective, broad prophylactic dragnets-as the constitutional norm." *Bourgeois, 387 F.3d at 1312* (emphasis added). The constitutionality of the pat-down searches is determined by a careful and considered analysis of the evidence presented in justification of the pat-downs, specifically an analysis of whether that evidence demonstrates a "substantial and real" risk of a terrorist attack on an NFL stadium. *Chandler v. Miller, 520 U.S. 305, 323, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997)*. Only under this very limited circumstance has the Supreme Court authorized an exception to the general rule that suspicionless searches, such as the pat-down searches implemented by the TSA, are *per se* unconstitutional. *See id.*

### Procedural and Factual Background

This case was originally filed in the Circuit Court of Hillsborough County, Florida by Plaintiff, a Tampa Bay Buccaneers season ticket holder, against the TSA and its Executive Director, [**5] Henry G. Saavedra. In his initial lawsuit, Plaintiff sought declaratory [*1260] and injunctive relief, contending that the mass suspicionless pat-downs of patrons attending Buccaneers games at the Stadium implemented by the TSA violate his constitutional rights under *Article 1, Section 12 of the Florida Constitution*. The state court conducted an evidentiary hearing on Plaintiff's emergency motion for preliminary

injunction and thereafter granted an injunction prohibiting the pat-downs. n3 (App. 7, 8).

> n3 Record citations are to the Appendix filed in the TSA's interlocutory appeal of the preliminary injunction order.

The Tampa Bay Buccaneers, a NFL franchise, plays its home football games at the Stadium pursuant to the Buccaneers' Stadium Agreement with the TSA. (App. 7, p. 32). The Stadium hosts other events as well, including University of South Florida Bulls football games, high school events and "monster truck pulls." (App. 7, p. 25). In August 2005, the NFL declared that all persons attending NFL games be physically [**6] searched before entering NFL stadiums. (App. 4, Hast Aff., P 9; App. 8, p. 44). The pat-downs were implemented to address the perceived risk of detonation of an "improvised explosive device" ("IED"). n4 (App. 4, Hast Aff., P 9).

> n4 Examples of IEDs include "suicide bomber" belts and vests. (App. 4, Hast Aff., P 8).

The TSA is a public entity created by the Florida legislature. Pursuant to that authority, the TSA operates the publicly-owned Stadium. (App. 7, pp. 21-22). During its September 13, 2005 board meeting, at the request of representatives of the NFL and Buccaneers, the TSA authorized pat-down searches of every person who enters the Stadium to attend Buccaneers games. (App. 8, pp. 111-12). Recognizing the constitutional implications of mass suspicionless searches, on advice of counsel, the TSA also voted to recommend that the Buccaneers refund ticket prices to any fan who objected to the pat-downs. (App. 17, pp. 10-11, 26)

At the TSA's expense, private "screeners" were hired to physically pat down each [**7] patron as he or she enters the gate. (App. 7, p. 34; App. 8, pp. 60-61, 126-27, 131). Generally, the pat-down is performed above the patron's waist. If the security personnel observe suspicious bulges, the screener may pat the pockets and instruct the patron to empty them. (App. 8, pp. 60-61; App. 4, PP 11-14). The screener "conducts a visual inspection of the person by asking the person to extend his arms sideward and upward, parallel to the ground, with palms facing up, and then visually inspect[s] the person's wrists and arms for switches, wires, or push-button devices." The screener then conducts a "physical inspection by touching, patting, or lightly rubbing the person's torso, around his waist, along the belt line" and "touches, pats, or lightly rubs the person's back along the spine from the belt line to the collar line." (App. 4, Hast Aff., PP 11-13).

Case 2:06-cv-01719-JLR   Document 10   Filed 11/29/2006   Page 25 of 34

Page 3

442 F. Supp. 2d 1257, *; 2006 U.S. Dist. LEXIS 52173, **;
19 Fla. L. Weekly Fed. D 825

Anyone found to be carrying contraband is detained while the police are summoned. (App. 7, p. 99; App. 8, pp. 89-92, 129-30). Anyone who refuses to be patted down is denied entry into the Stadium.

Plaintiff has been a Buccaneers season ticket holder since the 2001-2002 season. (App. 7, p. 54). To become a season ticket holder, [**8] he was required to pay a seat deposit in addition to the annual price of his tickets. (App. 7, pp. 54-55). Plaintiff renewed his season tickets for the 2005-2006 season. At that time, he was not given notice that he would be subjected to a pat-down search before entering the Stadium. n5 (App. 7, pp. 56-58). After the TSA [*1261] adopted the pat-down policy, Plaintiff contacted the Buccaneers to complain. He was told that the Buccaneers would not refund his season ticket price. (App. 7, pp. 62, 77-78). Even if Plaintiff were permitted to return his 2005-2006 tickets for a refund, he would lose the remainder of his seat deposit and would be relegated to the bottom of a long waiting list in the event he desired to purchase season tickets in the future. (App. 7, pp. 77-78). During the 2005-2006 season, Plaintiff attended several Buccaneers games. (App. 7, pp. 55, 63). Prior to being patted down, he stated that he "do[es] not consent to the search." (App. 7, pp. 63-64).

> n5 During the hearing on July 13, 2006, counsel represented that Plaintiff renewed his season tickets for the 2006-2007 season. According to counsel, at the time Plaintiff renewed his tickets, he was not certain that the pat-down searches would be implemented because the preliminary injunction was in effect.

[**9]

In granting Plaintiff's motion for an emergency temporary injunction, the state court concluded that Plaintiff was likely to succeed on his constitutional claim. (App. 12). The court issued a preliminary injunction enjoining Defendants from conducting "mass suspicionless pat-down searches of every person attending Bucs games at [the Stadium]." n6 (App. 12). In November 2005, Plaintiff amended his complaint, adding claims that the pat-down searches violate the *Fourth Amendment to the United States Constitution* and *42 U.S.C. § 1983*. On November 30, 2005, Defendants removed the case to federal court, asserting federal question jurisdiction. (Dkt. 1). Pursuant to *Fed. R. Civ. P. 59(e)*, Defendants request that this Court reconsider, vacate and dissolve the preliminary injunction issued by the state court. (Dkt. 8).

> n6 Defendants appealed the state court's decision to the Florida Second District Court of Appeal. Pursuant to *Fla. R. App. P. 9.310(b)(2)*, the preliminary injunction was automatically stayed pending appeal. On Plaintiff's motion, the appellate court vacated the automatic stay. *Tampa Sports Authority v. Johnston, 914 So. 2d 1076, 1084 (Fla. 2d DCA 2005)*. The injunction, therefore, remains in effect. *Id.*

[**10]

**Applicable Standards**

After removal, orders issued by the state court are considered orders of the district court. *See Jackson v. Am. Sav. Mortgage Corp., 924 F.2d 195, 198 (11th Cir. 1991)* ("[a]fter removal, state court proceedings are treated as those of the district court and the district court naturally is able to reexamine its own proceedings") (citations omitted). "A federal district court may dissolve or modify injunctions, orders, and all other proceedings which have taken place in state court prior to removal." *Id.* Reconsideration ensures that any alleged errors brought to the federal appeals court "*are in fact* as well as in theory *the considered products of a district judge.*" *Resolution Trust Corporation v. Bakker, 51 F.3d 242, 244-45 (11th Cir. 1995)* (citations omitted).

*Rule 59(e)*, which permits motions to alter or amend a judgment, is the proper procedural vehicle by which the district court may entertain a motion to reconsider an order entered by the state court prior to removal. *Id.* The district court "should evaluate and resolve a *Rule 59* motion in these circumstances just as it would a motion to vacate a judgment [**11] originating in federal court . . ." *Bakker, 51 F.3d at 245. Rule 59(e)* gives the court broad discretion to reconsider an order. *See O'Neal v. Kennamer, 958 F.2d 1044, 1047 (11th Cir. 1992)* ("[t]he decision to alter or amend a judgment is committed to the sound discretion of the district court").

The purpose of a preliminary injunction is to protect against irreparable injury and [*1262] preserve the *status quo* until the district court renders a meaningful decision on the merits. *See Canal Auth. of State of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974)*. n7 A district court may grant a preliminary injunction only if the moving party shows that: (1) he has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004)*.

Case 2:06-cv-01719-JLR   Document 10   Filed 11/29/2006   Page 26 of 34

Page 4

442 F. Supp. 2d 1257, *; 2006 U.S. Dist. LEXIS 52173, **;
19 Fla. L. Weekly Fed. D 825

N7 The Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit made prior to October 1, 1981. *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)*.

[**12]

### Discussion

Defendants seek reconsideration of the preliminary injunction, arguing Plaintiff failed to establish that he is likely to succeed on the merits of his constitutional claims. Defendants contend Plaintiff is not likely to prevail because: (1) the TSA's role in implementing the pat-down policy does not constitute "state action"; (2) the pat-down searches are not unreasonable because the TSA demonstrated a "special need" and because the Plaintiff has no reasonable expectation of privacy at the NFL games; (3) Plaintiff impliedly consented to the pat-down search; and (4) the equities weigh in favor of public safety and against issuance of an injunction.

### 1. State Action

The *Fourth Amendment to the United States Constitution* and *Article 1, Section 12 of the Florida Constitution* guarantee the right to be free from "unreasonable searches and seizures. . . ." *State v. Iaccarino, 767 So. 2d 470, 475 (Fla. 2d DCA 2000); United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)*. "Implicit in that guarantee is the requirement that an agent of the government perform those searches and seizures." *Iaccarino, 767 So. 2d at 475* [**13] (citing *Burdeau v. McDowell, 256 U.S. 465, 475, 41 S. Ct. 574, 65 L. Ed. 1048 (1921))*. A variety of tests have been employed to determine whether conduct constitutes state action. At the heart of each test is the requirement that "the conduct allegedly causing the deprivation of a federal right" be "fairly attributable to the State." *Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995)* (quoting *Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982))*. A plaintiff must demonstrate that the alleged deprivation of constitutional rights was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." n8 *Id.*

> N8 Conduct that constitutes "state action" under the *Fourth Amendment* necessarily constitutes conduct "under color of law" for purposes of determining *§ 1983* liability. *Gallagher, 49 F.3d at 1447* (citing *Lugar, 457 U.S. at 935)*. Accordingly, cases analyzing whether a party acted "under color of law" pursuant to *§ 1983* are instructive.

[**14]

Defendants contend the pat-downs were not performed by state actors because the TSA was not "acting in a governmental capacity" and was "not performing a governmental function" when it voted to implement the pat-down searches. According to Defendants, the TSA was acting as a "managing agent" pursuant to the Stadium Agreement it executed with the Buccaneers. Defendants maintain the TSA instituted [*1263] the pat-downs because the Buccaneers requested that it do so, pointing out that the policy was "reasonably consistent" with rules for similar NFL stadiums" and therefore, the TSA was contractually obligated to implement the policy. Defendants' arguments are unpersuasive.

The TSA is a public agency created by the Florida legislature "for the purpose of planning, developing, and maintaining a comprehensive complex of sports and recreation facilities for the use and enjoyment of the citizens of Tampa and Hillsborough County, as a public purpose." *State v. Tampa Sports Authority, 188 So. 2d 795, 796 (Fla. 1966)* (citing Ch. 65-2307, Laws of Fla., Acts of 1965). The TSA cannot transform its actions as a public agency into that of a private actor simply because it has a contractual [**15] obligation to provide security for the Buccaneers games under the terms of the Stadium Agreement. When the TSA decided to implement the pat-down searches, it acted in its capacity as a public agency entrusted with the responsibility of maintaining the Stadium. Simply put, the TSA cannot contract away its public status. Likewise, it cannot contractually obligate itself to perform its responsibility to maintain the Stadium in an unconstitutional manner. n9

> n9 The TSA provides no authority to support its argument that its contract with a private entity or its contractual obligation to provide security absolves it from traditional constitutional limitations and restraints placed on state actors. TSA's reliance on cases involving preemption, tax exemption, the market-participant doctrine, and the dormant *commerce clause* are simply misplaced and unpersuasive.

Similarly, that the pat-downs are conducted by a private security company does not insulate the searches from state action status. Contrary to the TSA's contention, [**16] the evidence demonstrates that the screeners who performed the searches were acting as instruments of the TSA for purposes of a state action analysis. The TSA voted to implement the pat-down policy, hired the security company to perform the pat-down searches, dictated the security company's duties, and paid the secu-

rity company with taxpayer dollars. The alleged constitutional deprivation was caused by the exercise of a policy created and imposed by the TSA and implemented by people for whom the TSA was responsible. There is, therefore, a sufficiently close nexus between the TSA and the challenged conduct such that the conduct may be fairly treated as that of the TSA itself. *See Gallagher, 49 F.3d at 1450* (recognizing that if appellants "could demonstrate that the pat-down searches directly resulted from the University's policies then the required nexus" and in turn, state action, "would be established"); *Iaccarino, 767 So. 2d at 475* (off-duty police officers, hired by private concert promoter to provide security, are state actors where sheriff's office had discretion to assign officers and officers had "complete discretion" as to how to conduct the [**17] searches). n10

n10 The cases Defendants rely on in support of their argument that the TSA's actions in connection with the pat-down searches do not constitute state action are inapposite. *See Gallagher, 49 F.3d 1442; National Broadcasting Co. v. Communications Workers of America, AFL-CIO, 860 F.2d 1022 (11th Cir. 1988)*. In both *Gallagher* and *NBC*, a private entity either made the decision that allegedly deprived the plaintiffs of their constitutional rights or exercised control over the conduct that allegedly deprived the plaintiffs of their constitutional rights. *See Gallagher, 49 F.3d at 1445* (no state action where private concert promoter made decision to hire security company that performed pat-down searches and discussed procedures for pat-down searches with security personnel); *National Broadcasting Co., 860 F.2d at 1027-28* (no state action where private entity renting City of Miami Convention Center made decision to exclude plaintiff from event; City of Miami did not dictate, control or participate in alleged unconstitutional conduct).

[**18]

[*1264] Finally, Defendants contend the pat-down searches are not state action because they were conducted for the purpose of maintaining security and not for law enforcement purposes. Defendants point out that the "mere fact that police are able to observe the screeners conduct the pat-down searches does not render the searches 'state action.'" (Dkt. 8, p. 10). n11

n11 The evidence presented at the preliminary injunction indicates that the police officers were prepared to do more than just observe the pat-down searches. Robert Hast, the NFL's Direc-

tor of Event Security, testified that "[w]e requested that stadiums place a law-enforcement officer at each of the gates to support the private security because they don't have authority to make arrests. . . ." (App. 8, p. 91). According to Hast, the screeners were trained to call law enforcement over to detain or arrest any individual found to have contraband. (App. 8 pp. 90-94, 129-31).

Similarly, Mickey Farrell, TSA's Director of Operations, testified that police officers are strategically positioned near the screeners and have discretion to conduct "extended searches," if necessary. At the September 15, 2005 TSA board meeting, Farrell testified:

> [F]or every eight lines we have out there, there will be three officers behind, and there will be two sentry supervisors behind. So you will have five people between basically the entrance gate and the actual person conducting the pat-down. . . . if you find something or you want to do an extended search, I guess, for lack of a better term, we will bring you over to the side and bring you over to the police officer, if we suspect something. Say you come up and you've got these big baggy pants and you have this big thing sticking out and you don't want to take it out of your pocket, we will bring you over to the side and we will have a wand there and the officer can decide what to do with you next.

(App. 17, p. 17).

[**19]

Whether and to what extent law enforcement participated in the pat-down searches and whether TSA's public safety and security interests are independent of a general interest in law enforcement is not determinative to the state action analysis, however. As discussed, the pat-down searches constitute state action because the TSA, acting as a public entity fulfilling its public purpose, implemented the pat-down policy, hired and supervised the security personnel and paid for the searches with public funds. Under such circumstances, the pat-down searches constitute state action for purposes of a

Case 2:06-cv-01719-JLR   Document 10   Filed 11/29/2006   Page 28 of 34

Page 6

442 F. Supp. 2d 1257, *; 2006 U.S. Dist. LEXIS 52173, **;
19 Fla. L. Weekly Fed. D 825

*Fourth Amendment* search and seizure analysis. *See e.g., Stroeher v. Commission Veteran's Auditorium, 453 F. Supp. 926, 931 (S.D. Iowa 1977)* (state action where Commissioners "purported to act in a capacity made possible by virtue of state statutes and were acting to provide security for a public facility financed by public monies").

## 2. The Reasonableness of the Pat-Down Searches

"The *Fourth Amendment* requires government to respect the right of the people to be secure in their persons . . . against unreasonable searches and seizures. This restraint on government conduct [**20] generally bars officials from undertaking a search or seizure absent individualized suspicion." *Chandler, 520 U.S. at 308* (citations and quotations omitted). The sanctity of one's person is, therefore, the starting point for the requisite *Fourth Amendment* analysis.

The Supreme Court, in scrutinizing a stop and frisk of an individual suspected of being involved in criminal activity, found the frisk to be a "serious intrusion upon the sanctity of the person . . . not to be undertaken lightly." *See Terry v. Ohio, 392 U.S. 1, 17, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*. The Court rejected the argument, one that might be made here, that a frisk was a mere "petty indignity." *Id.* [*1265] While the frisk in *Terry* was arguably more intrusive than the pat-downs conducted by the TSA at the Stadium, the Court's analysis in *Terry* is instructive, as the Court reasoned that "the sounder course is to recognize that the *Fourth Amendment* governs all intrusions by agents of the public upon personal security" and that "the scope of the particular intrusion, in light of all the exigencies of the case" is the "central element in the analysis of reasonableness." *Id. at 19. Terry* [**21] requires, therefore, that a search of an individual must be premised on "specific and articulable facts which, taken together with rationale inferences from those facts, reasonably warrant that intrusion." *Id. at 21.* "[A]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulable hunches, a result this Court has consistently refused to sanction." *Id. at 22.* Consistent with the Court's analysis in *Terry*, mass suspicionless searches have been uniformly prohibited, absent certain narrow exceptions.

### The "Special Needs" Exception

Recognizing that there are circumstances in which a compelling governmental interest will outweigh an individual's right to be free from suspicionless searches, the Supreme Court has carved out a narrow exception in instances where suspicionless searches are implemented "to further 'special needs' beyond the normal need for law enforcement." *Bourgeois, 387 F.3d at 1312* (citations omitted). In order to justify the "special needs" ex-

ception, however, the risk to public safety must be "substantial and real." *Chandler, 520 U.S. at 323.* [**22] Accordingly, the "proffered special need . . . must be *substantial* — important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the *Fourth Amendment's* normal requirement of individualized suspicion." *Id. at 318* (emphasis added). There must also be a "*concrete danger* demanding departure from the *Fourth Amendment's* main rule," such that the hazard or threat is "*real and not simply hypothetical.*" *Id. at 318-19* (emphasis added). A "special need" cannot be demonstrated by the "gravity of the threat" alone or the "severe and intractable nature of the problem." *See City of Indianapolis v. Edmond, 531 U.S. 32, 42-43, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000)*. In cases applying the "special needs" exception, some evidentiary justification for the suspicionless searches has been demonstrated. n12

> n12 *See Bd. of Educ. v. Earls, 536 U.S. 822, 835-36, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002)* (suspicionless drug testing program for students engaged in extracurricular activities upheld where Government presented specific evidence of drug use at particular school, including teachers' testimony of witnessing students under the influence and where police found drugs or drug paraphernalia in vehicle driven by extracurricular club member); *Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 650, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995)* (suspicionless drug testing program for high school students engaged in interscholastic athletic competitions upheld where the district court's findings included an "immediate crisis" caused by "a sharp increase in drug use" and that student athletes were not only "among the drug users" but also "leaders of the drug culture"); *Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 447, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990)* (sobriety checkpoint upheld where court found "[d]runk drivers cause an annual death toll of over 25,000 and in the same span cause nearly one million personal injuries and more than five billion dollars in property damage"); *Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 607-08, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989)* (upholding Federal Railroad Administration's adoption of drug testing of employees involved in train accidents and employees who committed certain safety rules where testing was adopted in response to evidence of drug and alcohol abuse by some railroad employees, the obvious safety hazards posed by such abuse, and the documented link between drug and

alcohol impaired employees and the incidence of train accidents); *National Treasury Employees Union v. Von Raab, 489 U.S. 656, 669, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989)* (drug testing for Customs employees seeking promotion upheld even though Government did not demonstrate an existing problem of drug abuse but where it was demonstrated that Customs' officers "ha[d] been the targets of bribery by drug smugglers on numerous occasions" and several had succumbed to the temptation).

[**23]

[*1266] "When such 'special needs' . . . are alleged in justification of a *Fourth Amendment* intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler, 520 U.S. at 314.* In doing so, "the Court must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue." *Edmond, 531 U.S. at 43-44.*

Defendants contend the "special needs" exception justifies mass suspicionless pat-downs of NFL patrons because of the need to protect patrons against potential terrorist attacks. One cannot seriously dispute the magnitude of the threat of terrorism to this country or the Government's interest in eradicating it. In this regard, the TSA's "special need" to prevent terrorist attacks is "substantial," as that requirement is defined in *Chandler.* Likewise, any reasonable person appreciates the potential harm that would result from a terrorist attack at the Stadium. However, the gravity of the threat cannot alone justify the intrusiveness of a suspicionless search of Plaintiff's person. *See Edmond, 531 U.S. at 42-43* [**24] (gravity of drug problem alone insufficient to justify canine and visual inspections of vehicles). To warrant the intrusion on Plaintiff's fundamental right to be free from suspicionless pat-down searches, the specific threat that the TSA seeks to prevent, that of a terrorist attack on the Stadium, must be a "concrete danger," "real," and "not hypothetical." A generalized threat of a terrorist attack will not suffice. *Bourgeois, 387 F.3d at 1311* (rejecting general evidence of a threat of terrorism, such as the Department of Homeland Security's elevated threat advisory level, as insufficient to justify a "special needs" exception to a suspicionless search). Although the record demonstrates a generalized threat of terrorism to large gatherings, the TSA has not met its burden of establishing a "substantial and real" risk of a terrorist attack at an NFL stadium.

During the preliminary injunction hearing, Roland Manteiga, a TSA board member, testified that prior to the TSA vote adopting the NFL's pat-down policy, there was no testimony or evidence of a particularized threat to NFL games or to the Stadium. (App. 7, pp. 24-25). The minutes of the September 13, 2005 board [**25] meeting confirm that although concerns of an attack were discussed, no evidence of a threat to NFL stadiums was presented. Moreover, in the aftermath of September 11, 2001, the TSA rejected pat-downs on two separate occasions, finding them unnecessary. n13 (App. 7, pp. 22-23). According to Manteiga, the "biggest difference" between the two votes against the pat-downs and the third vote to implement the pat-downs was that the NFL "mandated" implementation of the pat-downs prior to [*1267] the third vote. (App. 7, pp. 31-32). Likewise, Mickey Farrell, TSA's Director of Operations, testified that the pat-downs were "mandated" by the NFL and the Buccaneers. (App. 8, p. 112). The minutes of the September 13, 2005 board meeting confirm that the TSA adopted the pat-down policy solely because of the NFL's mandate. (App. 17).

> n13 Mickey Farrell, TSA's Director of Operations, testified that the TSA had received a telephone threat two years prior to its vote to implement the pat-down policy. The telephone threat was investigated and determined to be a false alarm. (App. 8, pp. 128-129). The TSA choose not to implement pat-down searches in response to the threat. *Id.*

[**26]

During the preliminary injunction hearing, the TSA presented testimony describing what the NFL relied on in mandating pat-downs at all NFL games. The information dealt primarily with threats to the transportation industry rather than sports or stadium events. Robert Hast, the NFL's Director of Event Security, testified that the NFL decided to implement the pat-down policy after the alert to the "transportation industry" was heightened. (App. 8, p. 44).

While Hast testified that the NFL relied on information from "government agencies, the State Department, the FBI, the Secret Service, the New York Police Department, as well as the joint terrorist task force," he identified only two specific reports of terrorist threats. n14 The first and most troubling report was a CBS news report from July 2002 that persons associated with terrorist groups had downloaded images from the internet of NFL stadiums in Indianapolis and St. Louis. (App. 8, pp. 52-53; App. 24). However, according to the report, the FBI investigated that incident and determined that it presented no threat, "not even a perceived or implied threat." (App. 8, pp. 84-85; App. 24). The FBI field director was quoted as saying [**27] there was no need to

442 F. Supp. 2d 1257, *; 2006 U.S. Dist. LEXIS 52173, **;
19 Fla. L. Weekly Fed. D 825

alter attendance policies at NFL games. (App. 8, pp. 84; App. 24). n15

> n14 Hast testified that "a great deal of [the] information [the NFL relied on] . . . is public information," but that "some of it is law-enforcement sensitive." (App. 8, p. 46). If that statement suggests that the NFL relied on sensitive law enforcement evidence demonstrating a "substantial and real" threat to NFL games in addition to what was presented, it was incumbent upon the TSA to present that evidence, perhaps *in camera*.

> n15 Notwithstanding the age of the report and the FBI's determination that the incident did not require any change in attendance policies at NFL games, Hast intimated in his testimony that he was privy to sensitive law enforcement intelligence that provided more specific information about the individuals involved and their alleged ties to Al Qaeda. If that information exists, it was likewise incumbent upon the TSA to present it, particularly given the inference Hast draws from the information, that "[i]t tells you that people in Al Qaeda were interested in our stadiums."

[**28]

The second report relied on by the NFL was issued in April 2005 by the U.S. Department of State in its "Country Reports on Terrorism 2004." (App. 23). The Report included a summary of terrorist threats in Spain, which included an incident in March 2004 when a bomb was detonated on a commuter train and the arrest in November 2004 of individuals linked to a radical Islamic organization. (App. 8, p. 53; App. 23, p. 52). The arrest reportedly disrupted "apparent plans" to bomb Spain's High court, Madrid's largest soccer stadium, office buildings and other public landmarks. (App. 8, p. 55; App. 23, p. 52).

The TSA also submitted a Joint Information Bulletin issued by the Department of Homeland Security (DHS) on October 4, 2005 identifying "tourist facilities" as "potentially attractive [terrorist targets.]" (App. 3, Ex. B, p. 2). Notably, the Bulletin was issued after the TSA voted to implement the pat-down policy. In the Bulletin, tourist attractions such as the Washington Monument, Statue of Liberty, Empire State Building, and Golden Gate Bridge, among others, were listed as potential targets. [*1268] (App. 3, Ex. B, p. 2). The TSA contends the Bulletin is relevant despite its focus on tourist [**29] attractions because within the Bulletin, the DHS acknowledged that the list of facilities provided was not exhaustive and did

not preclude "other facilities where people gather for leisure, entertainment, or vacation -- such as sporting events or shopping destinations -- as potential targets for terrorist attack." Significantly, however, the DHS expressly stated that "there is currently no credible or specific intelligence regarding the possibility of such attack in the United States." (App. 3, Ex. B, p. 1). Notably absent from the DHS's "suggestive protective measures" was a recommendation that suspicionless pat-down searches be conducted on patrons visiting any of the identified tourist facilities. (App. 3, Ex. B, pp. 3-7)

The only additional evidence presented by the TSA was evidence of a general concern that public events at which large crowds gather could be potential targets of terrorism. Christopher Ronay, President of the Institute of Makers of Explosives (a safety and security association representing the commercial explosives industry) testified that in his opinion NFL games "could be a very attractive target for terrorists, *as could any large venue or venue where people* [**30] *gather in great numbers* . . .," which in his opinion would include "churches, transportation venues, stadiums" and "shopping malls." (App. 7, pp. 153, 166-67) (emphasis added). Ronay testified that he was not aware of any specific threat to an NFL stadium. n16 (App. 7, p. 153).

> n16 Defendants also contend that the "Federal Government, including Congress, considers sports stadiums at risk of terrorist attack" because the Federal Aviation Administration issued a no-fly zone over "any major professional or collegiate sporting event or any other major open air assembly of people unless authorized by [air traffic control]." (Dkt. 8, pp. 2-3, 12); *see also Cleveland Nat'l Air Show, Inc. v. U.S. Dep't of Transp., 430 F.3d 757, 758 (6th Cir. 2005)* (recognizing the no-fly zone as an enhanced security restriction issued after the air attacks on the Pentagon and World Trade Center)).

> One cannot question, particularly in the aftermath of September 11, 2001, the wisdom of implementing a no-fly zone over NFL stadiums. All of the experts agree that NFL stadiums and large public venues are attractive targets. That is not to say, however, that Congress' recognition of NFL stadiums as potential terrorist targets demonstrates a "special need" to conduct mass suspicionless pat-downs of NFL patrons. As discussed, general evidence of a threat of terrorism does not satisfy the requisite need for a "substantial and real" risk justifying relinquishment of fundamental *Fourth Amendment* protections based on "special needs."

Case 2:06-cv-01719-JLR    Document 10    Filed 11/29/2006    Page 31 of 34

Page 9

442 F. Supp. 2d 1257, *; 2006 U.S. Dist. LEXIS 52173, **;
19 Fla. L. Weekly Fed. D 825

[**31]

In summary, the evidence establishes that the NFL implemented a pat-down policy as a broad prophylactic measure in response to a general threat that terrorists might attack any venue where a large number of Americans gather. The TSA adopted that policy because it was "mandated" by the NFL and the Buccaneers and because the TSA believed it had a contractual obligation to do so. While the intentions underlying the pat-down policy are commendable, the evidence the TSA presented in support of a "special needs" exception is not sufficient to demonstrate the requisite "real" and "concrete danger" to public safety at the Stadium. *See Chandler, 520 U.S. at 323.*

The relatively dated and largely non-specific evidence presented by the TSA stands in contrast to the quantity and quality of evidence which has been found sufficient to justify mass suspicionless container searches, a search unquestionably less intrusive than the pat-downs. *See Downing v. Kunzig, 454 F.2d 1230, 1231-32 (6th Cir. 1972)* (mass suspicionless [*1269] searches of packages and briefcases in federal building held constitutional where "threat to federal property as well as to the safety of federal [**32] personnel . . . was *direct and immediate* and likely to materialize into acts of violence and destruction in any part of the nation"; search was implemented only after "an outburst of acts of violence, bombings of federal buildings and hundreds of bomb threats, resulting in massive evacuations of federal property and direct financial loss to the Government") (emphasis added); *MacWade v. Kelly, 2005 U.S. Dist. LEXIS 39695, 2005 WL 3338573 (S.D.N.Y. Dec. 7, 2005)* (random subway container search held constitutional under "special needs" exception where Commissioner testified that 40 to 50 percent of terrorist attacks around the world are directed against transportation systems, NYC's mass transit system, including the subway system, had been targeted by terrorists in the past, and within the last year terrorists had bombed commuter trains in Madrid, the subway system in Moscow and had attempted to bomb the London subway system). n17

> n17 *Compare Wilkinson v. Forst, 832 F.2d 1330, 1340 (2d Cir. 1987), cert. denied, 485 U.S. 1034, 108 S. Ct. 1593, 99 L. Ed. 2d 907 (1988)* (upholding magnetometer searches at KKK rally as constitutional, but finding pat-down searches excessive and unconstitutional even though evidence demonstrated a history of violence at KKK rallies, including reliable information from undercover agent that some attendees would be armed and ready to attack).

[**33]

A finding of "special needs" based on evidence that supports only a general fear of terrorist attacks would essentially condone mass suspicionless searches of every person attending any large event, including, for example, virtually all professional sporting events, high school graduations, indoor and outdoor concerts, and parades. While a generalized threat of terrorism in this country and around the world is well documented, on this record, the TSA has not presented evidence that the threat of a terrorist attack on an NFL stadium is "concrete" or "real." n18

> n18 As it has been applied, *Chandler's* "substantial and real" standard does not require that the TSA establish that an attack on an NFL stadium is certain or imminent.

*Plaintiff's Privacy Interest*

Putting aside that the TSA failed to demonstrate a "substantial and real" threat to NFL stadiums, the TSA has likewise not established that Plaintiff enjoys only a diminished expectation of privacy when attending an NFL game or that the TSA's interest [**34] in protecting patrons against terrorist attacks would be placed in jeopardy by a requirement of individualized suspicion. The Supreme Court has cautioned that only "[i]n limited circumstances, *where the privacy interests implicated by the search are minimal*, and where an important governmental interest furthered by the intrusion *would be placed in jeopardy by a requirement of individualized suspicion*, may a search be reasonable despite the absence of such suspicion." *Chandler, 520 U.S. at 314* (citations omitted) (emphasis added).

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry, 392 U.S. at 9* (citations omitted). "[T]he *Fourth Amendment* protects people, not places . . . and wherever an individual may harbor a reasonable 'expectation of privacy' . . . he is entitled to be free from unreasonable governmental intrusion." *Id.* (internal citations and quotations omitted). "In their persons and property . . . [*1270] individuals [**35] are not shorn of all *Fourth Amendment* protection when they step from their homes onto the public sidewalks." *Bourgeois, 387 F.3d at 1315* (citations and quotations omitted).

Defendants have presented no persuasive authority establishing that Plaintiff had a minimal expectation of

Case 2:06-cv-01719-JLR   Document 10   Filed 11/29/2006   Page 32 of 34
Page 10

442 F. Supp. 2d 1257, *; 2006 U.S. Dist. LEXIS 52173, **;
19 Fla. L. Weekly Fed. D 825

privacy simply because he attends NFL games. To the contrary, the Eleventh Circuit has held that "[t]he text of the *Fourth Amendment* contains no exception for large gatherings of people." *Bourgeois, 387 F.3d at 1311.* "The need to apply [the Supreme Court's well-established *per se* rules regarding warrants, probable cause and individualized suspicion] reaches all searches, whether of the home, office, person, or other location." *Id. at 1314.* Defendants' assertion that Plaintiff enjoyed a diminished or minimal expectation of privacy because he attended a Buccaneers game is contrary to Eleventh Circuit precedent and otherwise unpersuasive.

Also important to a comprehensive *Fourth Amendment* analysis is consideration of the degree of the intrusion imposed by the pat-down search on Plaintiff's privacy right. "[A] frisk is considered a gross invasion of [**36] one's privacy." *United States v. Albarado, 495 F.2d 799, 807 (2d Cir. 1974)* (recognizing that airport "frisks" of individuals who set off a magnetometer "may be more in the nature of a 'pat-down'"). Pat-downs or searches of an individual's person have been regarded as far more intrusive than container searches, sniff searches performed by canines, and magnetometer searches applied to the public at large. *See e.g., Wilkinson, 832 F.2d at 1337-38, 1340* (holding mass suspicionless pat-downs searches unconstitutional despite reliable evidence that violence at rally was likely, but upholding magnetometer searches as reasonable and less intrusive); *Jensen v. Pontiac, 113 Mich. App. 341, 317 N.W.2d 619, 624 (Mich. Ct. App. 1981)* (recognizing that a "physical pat-down search by a guard is more intrusive than a limited visual search"); *United States v. Cintron-Segarra, 1993 U.S. Dist. LEXIS 6244, 1993 WL 150307, at * 3 (D. PR. 1993)* (recognizing that "hand held magnetometer [] is much less intrusive [] than a pat-down or frisk"). Moreover, airport searches conducted with magnetometers and courtroom searches that generally employ a brief stop and visual examination of packages, [**37] are far less intrusive than the pat-down searches the TSA seeks to implement. *See Jacobsen v. City of Seattle, 98 Wn.2d 668, 658 P.2d 653, 656-57 (Wash. 1983)* (citing *Downing, 454 F.2d at 1233; Edwards, 498 F.2d at 496*); *see also Wilkinson, 832 F.2d at 1339* (recognizing that "the airport and courtroom cases have sanctioned only magnetometer searches" despite unprecedented evidence of the potential harm to hundreds of persons posed by airplane hijackings and bombings).

Finally, relevant but not determinative to the constitutionality of the pat-downs is the TSA's failure to present convincing evidence that prohibiting the pat-down searches would preclude the TSA from averting the danger it seeks to prevent or that security measures already in place do not adequately protect the patrons. While the reasonableness of the search does not turn on an evalua-

tion of the effectiveness of the search or the existence of less intrusive means, consideration of the evidence presented in this regard is one factor to consider in the *Fourth Amendment* analysis. *See Wilkinson, 832 F.2d at 1340 n. 13* (recognizing that reasonableness [**38] of search does not invariably turn on existence of alternative, less intrusive means but finding that consideration of alternative means remains a legitimate factor in *Fourth Amendment* analysis).

While the TSA presented expert testimony that the pat-down searches are the [*1271] most effective means of detecting IEDs, the TSA did not institute pat-down searches until two years after it received the only specific threat to the Stadium, a telephone call later determined to be a false alarm. The evidence suggests that the TSA decided to implement the policy in large part, if not exclusively, because of its perceived contractual obligation to do so. When the TSA finally voted to implement the pat-down procedure, it chose to apply the policy only to Buccaneers games. These circumstances undermine the TSA's argument that the pat-down searches are an essential aspect of terrorism protection. In conclusion, the TSA has not demonstrated that this case presents one of the very limited instances where the Plaintiff's privacy interest is "minimal" and the TSA's public safety interest "would be placed in jeopardy by a requirement of [individualized] suspicion." *See Chandler, 520 U.S. at 314.* [**39] Simply put, the intrusiveness of the pat-downs cannot be constitutionally justified under these circumstances.

### 3. Implied Consent

Defendants contend the pat-down search is constitutional because Plaintiff consented to the search by repeatedly attending NFL games knowing in advance that he would either be subjected to a pat-down search or denied entry to the Stadium. (Dkt. 8, p. 18). In other words, Defendants contend that Plaintiff was not compelled to submit to the pat-down search, but rather consented to the search by choosing to attend the Buccaneers games.

This type of implied consent, where the government conditions receipt of a benefit (attending the Stadium event) on the waiver of a constitutional right (the right to be free from suspicionless searches), has been deemed invalid as an unconstitutional condition. *See Bourgeois, 387 F.3d at 1324* (rejecting city's argument that participants at a demonstration consented to search because they were not compelled to submit to search, but rather choose to participate in the protest) (citing *Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986)* ("[t]he doctrine of unconstitutional conditions [**40] prohibits terminating benefits, though not classified as entitle-

ments, if the termination is based on motivations that other constitutional provisions proscribe").

Plaintiff's property interest in his season tickets and his right to attend the games and assemble with other Buccaneers fans constitute benefits or privileges that cannot be conditioned on relinquishment of his *Fourth Amendment* rights. *See Bourgeois, 387 F.3d at 1324* (citing *Boykins v. Fairfield, 399 F.2d 11, 13 (5th Cir. 1968)*); *see also Nakamoto v. Fasi, 64 Haw. 17, 635 P.2d 946, 951-52 (Haw. 1981)* (search of patron's personal effects as condition to entry of the City arena for a rock concert held unconstitutional; a citizen should not be "required to relinquish his constitutional right to be free from unreasonable searches and seizures, in order to be allowed to exercise a privilege for which, incidentally . . . he has paid for").

Regardless of the unconstitutional condition imposed on Plaintiff's admission to the Stadium, Plaintiff's conduct does not constitute implied consent because it was not voluntarily given, free from constraint. A"[v]alid consent legitimizes an otherwise [**41] unconstitutional search." *See Lenz v. Winburn, 51 F.3d 1540, 1548 (11th Cir. 1995)*. "Searches conducted by means of consent are valid so long as the consent is voluntary." *United States v. Chrispin, 181 Fed. Appx. 935, 2006 U.S. App. LEXIS 13199, 2006 WL 1457689, at * 3 (11th Cir. May 26, 2006)* (citations omitted). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Id.* [*1272] (citations omitted); *see also Shapiro v. State of Florida, 390 So. 2d 344, 348 (Fla. 1980)* ("consent must be free and unconstrained, and the question of voluntariness is a question of fact to be determined from the totality of the circumstances"). The following factors are relevant in determining the issue of implied consent: (1) whether the individual was aware that his conduct would subject him to a search (2) whether a vital interest supports the search; (3) the apparent authority of the officer to conduct the search; (4) whether the individual was advised of his right to refuse; and (5) whether refusal would result in a deprivation of a benefit or right. *Iaccarino, 767 So. 2d at 476* (internal citations and quotations [**42] omitted).

The evidence at the preliminary injunction hearing establishes that Plaintiff was not notified of the pat-down policy prior to purchasing his 2005-06 season tickets. After the TSA adopted the pat-down policy, Plaintiff was informed that the Buccaneers would not refund the cost of his season tickets. Plaintiff was faced with the choice of either subjecting himself to the pat-down searches or losing the value of his tickets, parking pass, seat deposit and the opportunity to attend the Buccaneers games. Moreover, if he was refunded his ticket price and relinquished his tickets, he would have been placed at the bottom of a long waiting list if he desired to purchase season tickets in the future. It is undisputed that at each game he attended, Plaintiff clearly expressed his objection to submitting to the pat-down. Therefore, in view of the totality of the circumstances and the factors delineated in *Iaccarino*, this Court cannot conclude that Plaintiff's consent to the searches was voluntarily given, free of constraint. *See Iaccarino, 767 So. 2d at 479* (finding no implied consent where the "failure to acquiesce in a search would result in a deprivation of [**43] a patron's right to attend the concert, if not their ticket cost as well").

**4. The Equities**

Defendants contend the state court erred in issuing the injunction because the equities weigh against a preliminary injunction and in favor of public safety. (Dkt. 8, p. 19). While there is unquestionably a compelling public interest in preventing terrorist attacks, the public likewise has a compelling interest in preserving the constitutional right to be free from unreasonable governmental intrusion. This principled and cherished *Fourth Amendment* right has long been recognized as fundamental to the maintenance of a free society. *See Camara v. Municipal Ct. of City and County of San Francisco, 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)*.

Public policy does not and cannot justify mass suspicionless searches of those who choose to attend an NFL game at the Stadium. Utilizing mass suspicionless pat-downs simply goes too far. Moreover, enforcing the injunction leaves the TSA in the same posture it chose to maintain in the years before the pat-downs were implemented. The TSA will continue to utilize the same effective security measures to protect its patrons as it did before the NFL directed [**44] the use of pat-down searches. Those same procedures have been and continue to be used for non-Buccaneer events at the Stadium. While this Court recognizes a compelling public interest in preventing terrorism, the TSA has not justified the intrusion on Plaintiff's fundamental *Fourth Amendment* rights it seeks to impose.

**Conclusion**

Particularly after September 11, 2001, Americans are justifiably more sensitive to the need to protect against acts of terrorism. Many Americans have become more [*1273] tolerant of protective measures such as magnetometers, container searches and pat-downs, rationalizing that the inconvenience is worth the added protection. In fact, pat-downs may not bother the average Buccaneers fan. However, the constitutionality of mass suspicionless searches does not turn on popular opinion. A generalized fear of terrorism should not diminish the fundamental *Fourth Amendment* protections envisioned

by our Founding Fathers. Our Constitution requires more.

> While the threat of terrorism is omnipresent, we cannot use it as the basis for restricting the scope of the *Fourth Amendment's* protections in any large gathering of people. In the absence of some reason to believe [**45] that international terrorists would target or infiltrate this protest, there is no basis for using September 11 as an excuse for searching the protestors. . . . We cannot simply suspend or restrict civil liberties until the War on Terror is over, because the War on Terror is unlikely ever to be truly over. September 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country.

*Bourgeois, 387 F.3d at 1311-12.*

Defendants have failed to demonstrate that the preliminary injunction was issued in error. Specifically, Plaintiff has met his burden of establishing entitlement to a preliminary injunction, including a substantial likelihood of success on the merits of his constitutional claim. The purpose of the injunction is to preserve the *status quo* until this Court can render a meaningful decision on

the merits of Plaintiff's constitutional claims. n19 *See Callaway, 489 F.2d at 572.* Accordingly, it is

> n19 This determination may change, however, should evidence demonstrating a "substantial and real" threat to the Stadium materialize. In that event, it would be incumbent upon the TSA to present that evidence to the Court immediately and move to dissolve the injunction.

[**46]

**ORDERED AND ADJUDGED:**

1. Defendants' Motion to Vacate and Dissolve the Preliminary Injunction (Dkt. 7) is **DENIED.**

2. The TSA is enjoined from conducting mass, suspicionless pat-down searches of every person attending Buccaneers games at Raymond James Stadium. n20

> n20 The $ 21,000 bond required by the state court's preliminary injunction order has not been challenged.

**DONE AND ORDERED** in chambers this 28th day of July, 2006.

**JAMES D. WHITTEMORE**

**United States District Judge**