Ainsworth Declaration Exhibit B

Dockets.Justia.com

The Honorable James L. Robart

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STARK *et al*,                              )
                                            )
                          Plaintiffs,       )
                                            )
        v.                                  )   No. CV06-1719 JLR
                                            )
THE SEATTLE SEAHAWKS, FOOTBALL              )   DECLARATION OF MILTON E.
NORTHWEST LLC, *et al.*,                    )   AHLERICH
                                            )
                          Defendants.       )
                                            )

## DECLARATION OF MILTON E. AHLERICH

### I.    Background

      1.    My name is Milton E. Ahlerich.  I am over the age of eighteen years and competent to testify about the matters set forth herein.

      2.    I am Vice President of Security for the National Football League.  I have been responsible for League security since January 1996.

      3.    I graduated from Kansas State University in 1968 with a degree in psychology.  From January 1973 through December 1975, I attended courses in advanced studies in criminal justice at Long Island's C.W. Post University.  From 1971 until January 1996, I was employed by the FBI in several senior executive positions, including Chief of the Bureau's

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

Office of Congressional and Public Affairs, Chief Spokesman for the Bureau, and Director of the Bureau's Forensic Laboratory.

4.    During my 25 years with the FBI, I had extensive experience with counter terrorism. For example, while I was Assistant Special Agent-in-Charge in Chicago, I oversaw the investigation of Fuerzas Armadas de Liberación Nacional ("FALN"), a Puerto Rican terrorist group. I had similar responsibilities for terrorist investigations while I was the Special Agent-in-Charge in Connecticut. The bombing of the Alfred P. Murrah Federal Building in Oklahoma City occurred during my tenure as Director of the Bureau's Forensic Laboratory; I oversaw the Forensic Laboratory's role in that investigation.

5.    As Vice President of Security for the NFL, my responsibilities include supervision of all NFL security programs, including stadium security and security for special events such as the Super Bowl. I am also responsible for all NFL internal investigative matters, including fraud, pre-employment reviews, player misconduct, and transactional due diligence. I supervise a staff of ten security professionals and thirty-four security consultants, all of whom are licensed private investigators.

## II.    The Development of the NFL's Best Practices for Stadium Security

6.    After the events of September 11, 2001, NFL Commissioner Paul Tagliabue made clear that the NFL's first priority going forward would be to ensure the safety of its fans, employees, and facilities. In response to the Commissioner's directive, the NFL formed a task force of security experts, stadium operators, and Club owners to evaluate stadium security operations, identify our vulnerabilities, assess the risks, and develop a strategy for responding to the changing security environment.

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

Exhibits to Ainsworth Decl.
Page 60

7. The Task Force consulted with and relied on information received from various federal government sources including the Federal Bureau of Investigation, the Department of Homeland Security, and the Joint Terrorism Task Force, as well as various state and local law enforcement agencies. (I am in regular contact with these sources in order to remaining aware of and alert to emerging threats to our stadiums, as well as state-of-the-art steps that we can and should take in response.)

8. The task force concluded, and I believe, that the NFL's most significant vulnerabilities to terrorism include suicide bombers, aerial attack, car bombs, and biological or chemical attack.

9. The task force's assessment of our vulnerabilities is consistent with more recent assessments by federal agencies responsible for counter terrorism efforts. *See* U.S. Department of Homeland Security, Risk Management Division, Office of Infrastructure Protection, *Stadiums and Arenas*, at 1 (April 28, 2006) (attached hereto as Exhibit A) ("Specific threats of most concern to stadiums and arenas include: explosives (e.g., car bomb, suicide bomber; arson (e.g., firebombing, using accelerants); biological/chemical/radiological agents introduced into the facility; hostage-taking; indiscriminate shooting of patrons.")

10. The task force's work led to a comprehensive strategy for stadium security known as our "Best Practices," an updated copy of which is attached hereto as Exhibit B. The Best Practices establish a layered, multi-dimensional approach to security. To the extent possible, each NFL stadium is expected to have a 100-foot hardened perimeter to guard against car and truck bombs. Deliveries of game day necessities, such as food and beverages, are closely monitored; drivers' credentials are checked; and access by vehicle is tightly restricted. Stadium

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

Exhibits to Ainsworth Decl.
Page 61

1   operators are required to secure and monitor stadium HVAC and water systems in order to deter

2   and detect possible chemical or biological attacks.  On game days, stadium security sweeps,

3   including sweeps by canine units trained to detect explosives, are conducted before fans are

4   admitted to the stadium.  And all parcels brought into the stadium by fans on game day are

5   inspected.  (All purses and bags have been inspected at Qwest Field since 2001.)  The Best

6   Practices are consistent with recent recommendations from the Department of Homeland

7   Security specifically addressing stadiums and arenas.  *See* Exhibit A, *Stadiums and Arenas,* at 2.

8

9          11.    In January 2002, we implemented a pat-down inspection procedure for all

10  Super Bowl games.  The pat-downs augmented our existing security practice of inspecting all

11  bags at Super Bowl games and limited, random inspections using hand-held magnetometer

12  wands.  (The attractiveness of Super Bowl games for terrorist attack has led the Federal

13  Government to designate recent Super Bowl games being as National Special Security Event or

14  Level-One National Security Events, which allows numerous federal counter-terrorism agencies

15  and their experts a substantial role in security designing, planning, and implementation.)  The

16  pat-down procedure was adopted in response to the risk that terrorists seeking to attack the Super

17  Bowl would do so through improvised explosive devices ("IEDs," which I discuss further below)

18  concealed on the person.

19

20         12.    In 2004, after observing a rise in incidents of suicide bombings, the NFL

21  considered requiring pat-downs for all games in addition to the Super Bowl and championship

22  games.  We concluded that all stadiums should prepare and train for pat-downs in the event that

23  the security environment deteriorated further.

24

25

26

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

Exhibits to Ainsworth Decl.
Page 62

13. In August 2005, after numerous additional high-profile suicide bombing attacks, the NFL adopted a policy of mandatory limited pat-down inspections of all persons entering NFL stadiums on the day of an NFL event. Upon my recommendation to the NFL Commissioner and in consultation with members of the task force, the mandatory pat-down policy was adopted unanimously by the owners of the 32 Clubs. The policy, as adopted, is reflected in a memorandum I sent to the Clubs in August 2005 (attached hereto as Exhibit B).

## III. The Risk Addressed By The Pat-Down Procedure

14. The specific threat addressed by the pat-downs is the use of an IED, especially by a suicide bomber. An IED is any kind of device, placed or fabricated in an improvised manner, that incorporates destructive, lethal, noxious, pyrotechnic, or incendiary chemicals and is designed to destroy, incapacitate, harass, or distract. Common examples of IEDs are suicide bomber vests or belts, as well as car bombs. The bombs detonated in Oklahoma City in 1995, in Atlanta at the Centennial Olympic Park in 1996, and more recently at the University of Oklahoma football stadium in 2005, are also examples of IEDs. Because of the relative ease with which an IED can be constructed, nearly anyone can build such a device with the capacity for devastating effects.

15. While bag inspections are of some use in detecting IEDs, terrorists have shown increasing willingness in the last few years to strike with suicide bombs carried on the person, often concealed under clothing. Terrorists have also adapted their techniques to create IEDs with non-metallic materials, resulting in bombs not susceptible to detection by magnetometers.

16. The NFL is concerned not only with suicide bombings by international terrorists, but also with attacks by home-grown terrorists and the mentally unstable. For

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

- 5 -

1  example, in the absence of appropriate stadium security, the 2005 detonation of an IED by a

2  University of Okalahoma student outside a university football stadium could have just as easily

3  happened inside an NFL stadium.  In that case, a student had constructed a home-made peroxide-

4  based bomb that apparently exploded prematurely near the stadium during a football game.

5          17.    Our terrorist risk assessment is based in part on our conclusion that

6  indicators applicable to mass transit systems are also applicable to NFL games.  NFL stadia share

7  many common characteristics with mass transit systems; both are soft targets with a high degree

8  of accessibility, multiple and parallel targets, a predictable schedule, and large crowds.

9

10          18.    The London Subway bombings in July 2005 and the attempted copy-cat

11  bombings a few weeks later are good examples of these similarities; both sets of incidents

12  increased our concerns about the security of NFL games.  Among other things, they

13  demonstrated the ease, willingness, and ability of terrorists to execute simultaneous coordinated

14  suicide bomb attacks in western nations.

15

16          19.    Our terrorist risk assessment also takes into account terrorist threats and

17  attacks on sporting events at home and abroad.  We are well aware, for example, of incidents at

18  Madrid's Santiago Bernabéu, which hosts one of Europe's premiere "football" teams, and of

19  terrorist literature recommending sports stadiums as fertile targets for terrorist attack.  We also

20  understand that terrorists have downloaded information about the design and architecture of two

21  NFL stadia.

22

23          20.    In 2006 alone, there were two publicized terrorist threats relating to U.S.

24  sporting events, one of which involved Qwest Field.  This spring, the FBI issued an alert

25  reporting that an extremist message board had advocated suicide attacks against sporting events

26

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

Exhibits to Ainsworth Decl.
Page 64

as a cost-effective means of killing thousands of Americans. According to the FBI, the posting suggested a coordinated attack, using three to five blond or black American Muslim suicide bombers, inside the stadium and outside the gates as crowds fled from the initial explosions. The posting also reportedly observed that the resulting crowd panic would kill more spectators then the explosion itself. *See* Federal Bureau of Investigation, Office of Intelligence and Analysis, *Background on Potential Terrorist Targeting of Public Facilities* (March 10, 2006) (attached hereto as Exhibit C.)

21.    In October 2006, the FBI reported receiving information indicating that terrorists were planning a coordinated attack using radiological agents on seven NFL stadiums. The FBI quickly investigated this threat and concluded it to be a hoax. In addition to these publicized incidents, I have recently received non-public information relating to potential terrorist activity that supports our assessment that NFL stadiums are attractive terrorist targets.

22.    We also recognize that NFL games are especially attractive targets for terrorists because all NFL games, including those at Qwest Field, are broadcast throughout the nation and abroad, presenting terrorists with a world-wide, real time stage for their efforts.

**IV.    The NFL Pat-Down Procedure is Brief, Limited, and Focused**

23.    The limited pat-down inspection protocol recommended by the NFL consists of a visual and physical inspection of each person seeking entry to the stadium by trained private stadium security personnel, sometimes called "screeners." Each of these inspections takes approximately five to ten seconds.

24.    A screener conducts a visual inspection of the person by asking the person to extend his arms sideward and upward, parallel to the ground, with palms facing up, and then visually inspecting the person's wrists and arms for switches, wires, or push-button devices.

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

- 7 -

25.    A screener next conducts a limited physical inspection of the person by touching, patting, or lightly rubbing specified clothed portions of the subject's body. The inspection is performed by a screener of the same gender as the person being inspected. Security personnel are directed to touch only clothed areas and to avoid skin-to-skin contact with the subject.

26.    A screener begins the physical inspection by touching, patting, or lightly rubbing the person's torso, around his waist, along the beltline. This part of the inspection is limited to the area extending from the area immediately below the belt line to a few inches above the belt line. The screener then touches, pats, or lightly rubs the person's back along the spine from the belt line to the collar line.

27.    Screeners are trained to adapt their physical inspections to the clothing worn by the particular person. If the person is wearing trousers with large pockets, such as cargo pants, the screener will pat the pockets; if an object is detected, the screener may lightly squeeze the pockets; and if the screener detects a sizeable object, the screener may require the person show the object. Similarly, if a person is wearing a jacket, the screener may require the person to open the jacket to facilitate the physical inspection. But if parts of a person's torso are unclothed -- for example, if a person is wearing only a halter-top -- the screener will tailor the physical inspection to avoid contact with the person's skin.

28.    Limited pat-downs, as described above, coupled with visual inspections are the most effective method for detecting IEDs carried by suicide bombers in venues like stadiums. This protocol is not designed to detect contraband such as drugs but rather to detect IEDs. It is a

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

Exhibits to Ainsworth Decl.
Page 66

substantially more limited inspection than the type of search that a police officer would employ when conducting a protective search.

29.    Beyond actual detection of IEDs, pat-downs also have a substantial deterrent effect.  It is well known that terrorists conduct surveillance of their targets and are less likely to strike at events or venues with visible security measures in place.  Visible security measures are therefore recommended to deter against suicide bombings.

30.    I have reviewed Mr. Stark's declaration and his assertion that pat-downs were not performed at the February 5, 2006 Super Bowl in Detroit.  As the person responsible for overseeing security at the Super Bowl in Detroit, I can state unequivocally that that assertion is incorrect.  Pat-downs were conducted for all persons attending the Super Bowl in Detroit.

31.    Plaintiff's allegation that the pat-down procedures are ineffective is similarly unfounded.  One of the hallmarks of an effective counter terrorism measure is that it *deters* potential terrorist incidents; we simply do not know how many incidents have been avoided by the pat-down procedures.  But terrorists, and suicide terrorists in particular, are unlikely to target a location where they perceive a substantial risk of detection before they can accomplish their objective; the pat-down procedure increases this risk in a very visible way that is likely to have a deterrent effect.  Suicide bombings are much less likely to occur at NFL games with the pat-downs in place than if they were not conducted.

32.    Moreover, the pat-downs are highly likely to be effective in *detecting* suicide bombs.  The pat-downs are tailored to detect the kinds of explosive devices that terrorists are most likely to use.  While a suicide terrorist could, in theory, conceal a device below the waist, the possibility of such an attack is remote; I am unaware of a single reported incident in which a

DECLARATION OF MILTON E. AHLERICH
Case No. CV06-1719 JLR

COVINGTON & BURLING LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
Tel: 202.662.6000 FAX: 202.662.6291

Exhibits to Ainsworth Decl.
Page 67

1    terrorist concealed such a device below his or her waist (except when the target was an airplane,

2    on which an explosion of very small magnitude could have a devastating effect).

3        33.   I also understand that plaintiffs have complained that the pat-down

4    procedures are not always implemented in a manner consistent with the guidelines set forth by

5    the NFL, FGI, and the Seahawks.  Human error is inherent in any security design that relies on

6    individuals to conduct screenings.  The best strategy for reducing human error is to emphasize

7    proper training and supervision of the security screeners, and we have done that.  For example,

8    the NFL has produced a training video that provides an overview of the pat-down procedure, its

9    objectives, and common errors; that video has been shown to screeners at Qwest Field as part of

10   their initial and continuing training.  In addition, NFL representatives work with the Clubs,

11   stadium operators, and security managers to ensure that the pat-downs are implemented in

12   accordance with our protocols.  I am confident that the departures from those protocols represent

13   a very tiny percentage of the total number of pat-downs conducted at each NFL stadium,

14   including at Qwest Field.

15       I declare under penalty of perjury that that foregoing is true and correct.

16

17

18

19   January 3 , 2007

20                                        Milton E. Ahlerich

21

22

23

24

25

26

DECLARATION OF MILTON E. AHLERICH          COVINGTON & BURLING LLP
Case No. CV06-1719 JLR                     1201 Pennsylvania Ave, NW
                                           Washington, DC 20004
                                           Tel: 202.662.6000 FAX: 202.662.6291

- 10 -

# Exhibit A

*FOR OFFICIAL USE ONLY*



# U.S. Department of Homeland Security
### Risk Management Division
### Office of Infrastructure Protection

# Stadiums and Arenas

There are more than 1,300 stadiums and arenas in the United States. They are located in every region and state; in most, if not all, major municipalities; in many smaller localities; and often on university and high school campuses. Arenas and stadiums range in size from on-campus field houses and high school football stadiums that can accommodate a few hundred people to downtown sports arenas, large indoor/outdoor stadiums, and automobile racetracks that can accommodate over 100,000 spectators. They host many types of events, including sporting events, concerts, religious gatherings, university/high school graduations, political conventions, and circuses.



## Potential Indicators of Terrorist Activity

Terrorists have a wide variety of weapons and tactics available to achieve their objectives. Specific threats of most concern to stadiums and arenas include:

- Explosives (e.g., car bomb, suicide bomber)
- Arson (e.g., firebombing, using accelerants)
- Biological/chemical/radiological agents introduced into the facility
- Hostage-taking
- Indiscriminate shooting of patrons

Terrorist activity indicators are observable anomalies or incidents that may precede a terrorist attack. Indicators of an imminent attack requiring immediate action may include the following:

- Persons in crowded areas (e.g., facility common areas, food courts) wearing unusually bulky clothing that might conceal suicide explosives or automatic weapons

- Vehicles (e.g., cars, motorcycles, trucks, boats, or aircraft) illegally parked near facility buildings or near places where large numbers of people gather (the larger the vehicle, the greater the quantity of explosives that might be loaded into it)

- Vehicles approaching the facility at unusually high speeds and/or steering around barriers and traffic controls

- Unattended packages (e.g., backpacks, briefcases, boxes) that might contain explosives (packages may be left in open areas or may be hidden in trash receptacles, lockers, or similar containers)

Indicators of potential surveillance by terrorists include:

- Persons discovered with facility maps, photos, or diagrams with critical assets highlighted or notes regarding infrastructure or listing of personnel

- Persons questioning facility employees off site about practices pertaining to the facility and its operations, or an increase in personal e-mails, telephone calls, faxes, or postal mail requesting information about the facility or one of its key assets

- Facility employees using video/camera/observation equipment that is not job-related

- An increase in threats from unidentified sources by telephone, postal mail, or the e-mail system and/or an increase in reports of threats from outside known, reliable sources

- Unfamiliar cleaning crews or other contract workers with passable credentials, or crews or contract workers attempting to access unauthorized areas

## Common Vulnerabilities

The following are key common vulnerabilities of stadiums and arenas:

- Large number of people entering facility for events with varying levels of inspection of the items carried in

- Little or no control or inspection of vehicles entering parking areas adjacent to the facility

- Little or no inspection of items carried in by event participants, vendors, contractors, and maintenance and janitorial personnel

- Limited security of facility (e.g., lock downs, patrols, inspections) between events

- Large number of people present at scheduled and publicly announced events, providing easy targets

FOR OFFICIAL USE ONLY

# Protective Measures

Protective measures include equipment, personnel, and procedures designed to protect a facility against threats and to mitigate the effects of an attack. Protective measures for stadiums and arenas include:

- **Planning and Preparedness**
  - Develop a comprehensive security plan and emergency response plan for the facility
  - Establish liaison and regular communication with local law enforcement and emergency responders
  - Conduct regular exercises with facility employees
  - Review available threat information and determine whether events should be cancelled on the basis of this information

- **Personnel**
  - Conduct background checks on all employees (more detailed checks should be conducted on those who will have access to critical assets)
  - Maintain an adequately sized, equipped, and trained security force for all events
  - Conduct continuous roving security patrols during special events; expand roving/motorized patrols to outer perimeter

- **Access Control**
  - Establish a process for controlling access and egress to the facility; including designated, monitored points of entry
  - Establish a buffer zone and perimeter around the facility and a process for controlling access
  - Define and secure controlled areas that require extra security
  - Control employee and concessionaire identification and access through use of photo identification badges
  - Formally identify gathering areas for tail-gate parties and other such gatherings in locations with natural surveillance and access; make informal areas off-limits and subject to automatic scrutiny

- **Barriers**
  - Increase the number of temporary venue barriers and place them to guide the flow of vehicles
  - Offset vehicle entrances from the direction of a vehicle's approach to force a reduction in speed

- **Communication and Notification**
  - Maintain contact numbers and checklists to follow in the event of a security-related incident
  - During events, maintain instantaneous communication capability with local, state, or federal law enforcement and emergency responders

- **Monitoring, Surveillance, Inspection**
  - Ensure that the venue has an intrusion detection system
  - Provide video surveillance systems on venue grounds
  - At the beginning and end of each event, inspect interior/exterior of facility
  - Require screening of all patrons before they are allowed to enter the facility's perimeter
  - Require screening of all employees, concessionaires, event participants, and delivery and emergency service personnel before they are allowed to enter the facility's perimeter for special events
  - Check outdoor air intakes of heating, ventilation, and air conditioning (HVAC) systems to ensure that they are protected

- **Infrastructure Interdependencies**
  - Provide 24/7 guard at utility supply points starting 24 hours before a special event until its conclusion
  - Ensure that an emergency power source is provided for critical systems
  - Ensure that dumpsters are secured and enclosed

- **Cyber Security**
  - Minimize the number of people with authorized access to computer systems
  - Increase computer security levels to maximum, if not already in place

- **Incident Response**
  - Ensure that multiple evacuation routes and rallying points are available
  - Inspect all available emergency equipment prior to any event to ensure that it will operate during crisis situations
  - Assign specific staff members the responsibility of turning off the gas, electricity, water, and alarm systems in the event of an emergency

More detailed information on stadiums and arenas is contained in the document, *Stadiums and Arenas: Potential Indicators of Terrorist Activity, Common Vulnerabilities, and Protective Measures.* Information on issues relevant to a wide range of critical infrastructures and key resources is available in the document, *Overview of Potential Indicators of Terrorist Activity, Common Vulnerabilities, and Protective Measures for Critical Infrastructures and Key Resources.* Both are available from the contacts listed below.

**WARNING**

This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

At a minimum when unattended, this document is to be stored in a locked container such as a file cabinet, desk drawer, overhead compartment, credenza or locked area offering sufficient protection against theft, compromise, inadvertent access and unauthorized disclosure.

*For more information about this document contact:*
*David Dickinson (703-235-5714*
*David.Dickinson1@dhs.gov)*
*or Wade Townsend (703-235-5748*
*Wade.Townsend@dhs.gov)*

FOR OFFICIAL USE ONLY

# Exhibit B

<u>**MEMORANDUM**</u>

**TO:**          Club Presidents
                 General Managers
                 Security Points of Contact

**FROM:**       Milt Ahlerich

**DATE:**       August 24, 2005

**SUBJECT:**    Stadium Security
                 Pat Downs Guidelines


      Per the Commissioner's memo to the Chief Executives and Club Presidents of August 18, pat down screening will be mandatory for fans attending our games by no later than the week three of the regular season (September 25-26). This will follow up on the Commissioner's memo and provide detailed guidelines for implementing this screening procedure. Over the past few seasons a growing number of clubs have employed pat downs and we have benefited a great deal from the experience of these clubs and have a much better understanding of how to use the technique with minimal inconvenience to fans while accomplishing a much higher level of security effectiveness.

      We want to emphasize that the objective of this procedure is straightforward:  <u>to keep our fans as safe as reasonably possible while enjoying games</u>. We believe pat downs further this objective in two important respects:

- <u>By locating and excluding</u> improvised explosive devices and other large weapons from our games.
- <u>By deterring terrorists or others who would seek </u>to introduce improvised explosive devices and other large weapons into our games. We are repeatedly told by the intelligence community that strong visible security deters terrorists away from their intended targets.

### Some guidelines to keep in mind as Pat Downs are implemented

- Training and close supervision is critical to using pat downs successfully. We strongly recommend that no security personnel conduct pat downs without thorough training. If any club needs assistance in securing trainers or other resources please contact the Security Department

- Physical inspections which involve touching or patting patrons, employees and others should only be conducted on a consensual basis. We suggest that clear signage be posted or audio loop announcements be made as fans approach the gates informing the patrons that entering the gate screening area constitutes their consent to the pat down screening. Patrons who do not wish to give their consent should not be given access to the game and their money refunded.

- Physical pat down inspections should be conducted by like gender security screening personnel.

- In the instance of a patron wearing a zippered or buttoned outer garment, it should be opened by the patron and held away from the body by the patron. Inspect the clothing by touching, patting or squeezing the garment sufficiently to locate large or suspect foreign objects. Inspect blankets being carried in by squeezing thoroughly.

- Ask the person to be inspected to extend his or her arms to the side, parallel to the ground, with palms facing up. Visually inspect the wrists and palms for switches, wires or push button devices. Gloves should be removed.

- Security screeners should inspect the person by touching, patting or lightly rubbing the torso of the inspected person, confining the area to the belt line and a few inches above the belt. Following inspection of the complete circumference of the torso at the belt line, pat, touch or lightly rub the center of the patron's back from the belt line to collar line. Large trouser pockets should be inspected by patting or lightly squeezing. Large items discovered in the pockets should be displayed to the screener for visual inspection. The screener's hands remain fully open during the pat down screening and no skin-on-skin contact should occur during the pat down.

- Consistency is important and screening should be uniformly applied. On a very limited basis – and for a clearly defined and limited group of people, such as visiting teams and their coaches, staffs, etc. – alternative security screening can be employed. But this should be a limited exception, and not replace pat downs to any meaningful degree. Common sense must apply in certain instances where a pat down accomplishes nothing to advance our security objectives.

- To be consistent, we suggest all game day employees (security, food service and other event staff) undergo pat downs. The pat downs should be applied at suite and media gates as well.

- As a reminder, security screeners are urged to make full use of visual inspections. A great deal can be ascertained by careful visual inspections when screeners are vigilant, carefully trained, closely supervised and given regular breaks.

Pat down security screening now becomes an important part of the *Best Practices for Stadium Security.* There are other elements of gate screening and management that continue to be very important. These areas are: prohibiting certain items including any large containers, large backpacks and packages, consistent inspection of interior of all bags and purses and the posting of uniform police officers at all gates to support the security screening process and as a deterrent. In respect of the last point, we strongly recommend that clear lines of immediate communication be established between the uniformed police officers and the screening personnel in the event that prohibited items are discovered by screeners.

Security managers are encouraged to call the Security Department if we can be of any assistance in the implementation of pat downs security screening.

f:\2004\guardsmark&sectaskforce\limitedpatdownguidelines12-28.doc

PT:gd
f:\2005\guardsmark&taskforce\memos\ceos,pres,gms-patdowns8-17(fromjp).doc

Exhibit C

UNCLASSIFIED//FOR OFFICIAL USE ONLY



Joint Special Assessment

# (U//FOUO)  Background Information on Potential Terrorist Targeting of Public Facilities

## 10 March 2006

*(U) Attention: Federal Departments and Agencies, State Homeland Security Advisors, Emergency Managers, Tribal Governments, Security Managers, State and Local Law Enforcement, Information Sharing and Analysis Centers, and International Partners.*

*(U) Distribution Notice: Secondary release, dissemination or sharing of this product is authorized by Federal Departments and Agencies within their respective departments and agencies, and by State Homeland Security Advisors within their state and local jurisdictions to authorized homeland security partners, that have an official valid need-to-know.  Any further release, dissemination or sharing of this product, or any information contained herein, (beyond that indicated above) is not authorized without further approval from the Department of Homeland Security (DHS), Office of Intelligence & Analysis (I&A) –Production Management Division (PM) at IA.PM@dhs.gov.*

## (U)  Key Findings

(U//FOUO)  A recent posting on a jihadist message board advocated targeting American sporting venues and other public facilities.  DHS and the FBI do not believe this posting constitutes an imminent threat.  However, the posting has received broad distribution among jihadist websites and contains detailed information regarding potential tactics.   The emergence of this posting provides an opportunity to remind readers of terrorist interest in open, public facilities.

(U//FOUO)  The posting, "How You Can Kill Thousands of Americans with a Few Hundred Dollars and Three Men," proposed that suicide bombers attack a sporting event at various locations throughout a stadium to incite panic and create a stampede.  We have no information to suggest the individual or group posting this statement is connected to al-Qa'ida or other affiliated Sunni extremist groups.  In addition, DHS and the FBI are unaware of any specific or credible plans regarding an imminent threat to any sporting event or public facility within the Homeland.

(U) Warning:  This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO).  It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## (U)  Poster Claims Attacks Against Sporting Venues Efficient and Justified

(U//FOUO)  The posting on an extremist message board advocated suicide attacks against sporting events as a cost-effective means of killing thousands of Americans.  According to the posting, attacks on civilians are increasingly justified because the American people purportedly refused a truce offered by Usama Bin Ladin.  DHS and the FBI assess that the posting is likely referring to Usama Bin Ladin's 19 January 2006 taped statement in which he offered a "truce" to the United States.  Bin Ladin also issued ultimatums directly to the American people on 18 October 2003 and 29 October 2004.  DHS cannot confirm whether the poster of this message is affiliated with al-Qa'ida or other Sunni extremist organizations; the overwhelming majority of the Internet-based activity regarding alleged al-Qa'ida threats or plots to U.S. interests are associated with individuals with unknown or undetermined credibility.

## (U)  Poster Recommends the Use of Suicide Bombers and Secondary Attacks

(U//FOUO)  The author of the posting recommended an attack on a sporting venue using three to five "blond or black" American Muslim suicide bombers. The bombers would employ handmade explosive belts hidden under their clothing.  In order to avoid detection, the author suggested the bombing take place in winter when bombers could wear heavy clothing to conceal the explosives without arousing suspicion.  According to the posting, one suicide bomber would detonate explosives inside the stadium to create an initial panic. The other bombers would subsequently detonate their belts at the exit gates when spectators are fleeing.  Citing past stampeding incidents, the author of the posting believed that the combined explosions would create a panic that would kill far more spectators than the bombing alone.  Islamic extremists in previous operations have used secondary attacks to amplify the casualties, destruction, and disruption of an initial attack.

## (U)  Implications

(U//FOUO)  DHS and the FBI are unaware of any specific or credible plans regarding an imminent threat to any sporting event or public facility.  International and domestic extremists have targeted sporting events in the past, including terrorist attacks at the 1972 Munich and 1996 Atlanta Olympic Games.  Al-Qa'ida and affiliated terrorist groups have mounted attacks against "soft" or symbolic targets around the world, including hotels, restaurants, nightclubs, housing compounds, schools, and places of worship.  These open access facilities allow terrorists to avoid the extensive security measures at "hardened" facilities while providing the opportunity to achieve objectives such as mass casualties and mass disruption.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Exhibits to Ainsworth Decl.
Page 78

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## (U)  Protective Measures for Stadiums and Public Assembly Facilities

(U//FOUO)  Members of the Public Assembly and Sports Leagues Sub-Sectors, owners/operators of stadiums, arenas, or public facilities, and owners/operators of critical infrastructures or key resources within close proximity of a stadium or arena should review and coordinate their security best practices and emergency response procedures to address this potential threat.  FBI and DHS suggest routine coordination with local law enforcement, first responders, and Joint Terrorism Task Forces as a best practice.

### (U)  Reporting Notice:

(U//FOUO)  For additional information regarding indicators of suicide bomber activity refer to FBI-DHS Bulletin # 185, "Update: Tactics and Techniques of Suicide Bombers," 19 October 2005.

(U) DHS and FBI encourage recipients of this document to report information concerning suspicious or criminal activity to the local FBI Joint Terrorism Task Force (JTTF) and the Homeland Security Operations Center (HSOC).  The FBI regional phone numbers can be found online at http://www.fbi.gov/contact/fo/fo.htm, and the HSOC can be reached by telephone at 202-282-8101 or by email at HSOC.Common@dhs.gov.  For information affecting the private sector and critical infrastructure, contact the National Infrastructure Coordinating Center (NICC), a sub-element of the HSOC.  The NICC can be reached by telephone at 202-282-9201 or by email at NICC@dhs.gov.  When available, each report submitted should include the date, time, location, type of activity, number of people and type of equipment used for the activity, the name of the submitting company or organization, and a designated point of contact.

(U) For comments or questions related to the content or dissemination of this document, please contact the DHS/I&A Production Management staff at IA.PM@dhs.gov.

### (U)  Tracked by:

(U) HSEC-020000-02-05
(U) HSEC-021500-01-05
(U) HSEC-022000-01-05
(U) HSEC-030000-01-05
(U) HSEC-040000-01-05
(U) TERR-010000-01-05
(U) TERR-010200-01-05
(U) TERR-051500-01-05
(U) TERR-052000-01-05

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Exhibits to Ainsworth Decl.
Page 79