1    under this Section 18.3. FGI shall fully cooperate with any such audit, and FGI shall cause Team

2    to fully cooperate with such audit.

3

4    SECTION 19    PSA COVENANTS

5        19.1    Quiet Enjoyment

6            Except as otherwise provided in this Lease or in the Development Agreement,

7    during the Term, FGI shall have exclusive control and possession of the Premises and PSA shall

8    have no liabilities, obligations or responsibilities whatsoever with respect to the Premises.

9    Provided FGI is not in default under this Lease, FGI, at all times during the Term, shall have the

10   right to peacefully and quietly have, hold and enjoy the Premises, subject to the terms of this

11   Lease and PSA will defend its title to the Project Site against all persons who may claim the

12   same. If any claims are asserted against PSA's title that disturbs or, if successful, would disturb

13   FGI's quiet and peaceable possession of the Premises, upon demand by FGI, PSA shall seek to

14   enforce the covenants of title in the warranty deed from King County as provided for in Section

15   64.04.030 of the Revised Code of Washington, and if requested by FGI, to assign such claim to

16   FGI as may be necessary in order for FGI to prosecute an action against King County on such

17   covenants of title. PSA shall cooperate with FGI in FGI's prosecution of any such claim.

18       19.2    No Liens

19           PSA shall neither grant nor suffer any liens or encumbrances against the Premises

20   which would be superior to this Lease.

21       19.3    No Charges or Fees

22           PSA shall not impose any charges or fees for the use of the Project, (including any

23   charges or fees which, but for this covenant, it is empowered to impose pursuant to

24   Section 105(5) of the Act), without the prior written consent of FGI, which consent or denial of

25   consent by FGI shall be in its sole discretion, and shall not be subject to Dispute Resolution. FGI

26   consents to the imposition of a surcharge on tickets for events at the Project solely as provided

27   in, for the purpose of, and subject to all of the limitations of, Section 13.2.3 of the Development

28   Agreement.

29

<center>EXHIBIT 4
Page 70 of 179</center>                                    PSA 000109

Exhibits to Ainsworth Decl.
Dockets.Justia.com    Page 240

1  <u>SECTION 20    REPRESENTATIONS AND WARRANTIES</u>

2      20.1    <u>By PSA</u>

3          20.1.1    <u>Authority, Binding Effect</u>

4              PSA represents and warrants that PSA has full power and authority to

5  enter into this Lease and to perform all of its obligations under this Lease.  PSA represents and

6  warrants that this Lease has been duly authorized by PSA and that the person(s) executing this

7  Lease on behalf of PSA have the power and authority to do so.  PSA represents and warrants that

8  this Lease is binding on PSA and enforceable according to its terms.

9          20.1.2    <u>Title</u>

10             PSA represents and warrants that it owns the Premises in fee simple

11  subject only to the Permitted Exceptions described in attached Exhibit 20.1.2.

12         20.1.3    <u>Limitation on Representations</u>

13             Except for the representations and warranties set forth above, PSA makes

14  absolutely no other representation or warranties under this Lease or regarding the Premises.  FGI

15  acknowledges that it is not relying on any representations or warranties of PSA other than those

16  set forth in this Section 20.1.

17     20.2    <u>By FGI</u>

18         20.2.1    <u>Authority, Binding Effect</u>

19             FGI represents and warrants that FGI has full power and authority to enter

20  into this Lease and to perform all of its obligations under this Lease.  FGI represents and

21  warrants that this Lease has been duly authorized by FGI and that the person(s) executing this

22  Lease on behalf of FGI have the power and authority to do so.  FGI represents and warrants that

23  this Lease is binding on FGI and enforceable according to its terms.

24         20.2.2    <u>Limitation on Representations</u>

25             Except for the representations and warranties set forth above, FGI makes

26  absolutely no other representations or warranties under this Lease.  PSA acknowledges that in

27  executing this Lease, it is not relying on any representations or warranties of FGI other than

28  those set forth in this Section 18.2.

29

<div align="center">
**EXHIBIT 4**
**Page 71 of 179**

-63-
</div>

PSA 000110

Exhibits to Ainsworth Decl.
Page241

1    SECTION 21    SUBLETTING AND ASSIGNMENT

2         21.1    Subletting

3              FGI shall have the right to sublet all or any part of the Premises for any time or

4    times during the Term for terms not to exceed the Term of this Lease. However, the subletting of

5    all or substantially all of the Premises to a Person for substantially all of the remaining Term

6    shall be considered an assignment of this Lease which shall be restricted pursuant to the

7    provisions of Section 21.3. FGI shall not enter into a sublease other than a Qualified Sublease

8    which extends beyond the Term of this Lease (unless by its terms, on termination of this Lease

9    the sublease either terminates automatically or may be terminated without cost or penalty.) All

10    subleases shall be in writing and shall be expressly subject to the terms of this Lease.

11         21.2    Limited Nondisturbance of Certain Sublessees

12              21.2.1    A "Qualified Sublease" is a booking agreement or license to use the

13    Exhibition Hall or the Stadium which meets the following conditions:

14                   21.2.1.1    The sublessee under the Qualified Sublease is not an Affiliate of

15    FGI;

16                   21.2.1.2    The Qualified Sublease is on commercially reasonable terms and

17    conditions;

18                   21.2.1.3    The event covered by the Qualified Sublease will occur within five

19    (5) years of the effective date of the Qualified Sublease or any extension or renewal thereof; and

20                   21.2.1.4    No payment shall be made to FGI more than one (1) year in

21    advance of the event and, at FGI's option, (a) FGI shall provide to PSA a reasonable guaranty by

22    a third-party guarantor with a net worth of at least $10 million, or other readily realizable

23    security, in the aggregate amount of 300% of the average advance payments held at any one time

24    during the previous Lease Year, which shall be available to pay to PSA, in the event of a

25    termination of the Lease by reason of a default by FGI, the amount of all advance payments to

26    FGI for events not yet held at the time of the termination (to the extent such payments are not

27    otherwise recovered by PSA), to be paid to PSA at the time of the holding of the event; or (b)

28    any advance payment to FGI shall be promptly paid over to PSA to be returned to FGI upon the

29    commencement of the event together with interest earned by PSA.

**EXHIBIT 4**
Page 72 of 179

PSA 000111

*50034209 13* – STADIUM MASTER LEASE
11/23/98                              -64-

Exhibits to Ainsworth Decl.
Page242

1      21.2.2  PSA will give a Qualified Sublease Nondisturbance, in the event the Term

2  ends prior to the event referred to in the Qualified Sublease.  Upon the end of the Term all

3  Qualified Subleases shall be automatically assigned to PSA.

4      21.2.3  No sports team, party providing services at the Premises, no

5  concessionaire, and no advertiser, shall have any right to come upon or utilize the Premises or

6  any part of the Premises after the end of the Term (including but not limited to a termination

7  pursuant to Section 22), unless PSA elects, in its sole discretion, to give notice to the Team or

8  Allen authorizing one of the following:

9      21.2.3.1  The owner of the team which is a party to the Stadium Use

10  Agreement enters into an agreement with PSA, within ten (10) days after the end of the Term,

11  pursuant to which such owner or an Affiliate becomes the tenant under this Lease and accepts

12  and agrees to perform all of FGI's obligations under this Lease and agrees to maintain the

13  Stadium Use Agreement in effect; and in that event PSA will reinstate this Lease for the longer

14  of: the balance of the Term or the remaining term of the Stadium Use Agreement; or

15      21.2.3.2  Allen enters into a full guarantee of all of FGI's obligations under

16  this Lease, within thirty (30) days after the end of the Term, for a period of time designated by

17  Allen, and in that event, PSA will reinstate this Lease with an entity designated by Allen as

18  master tenant for the period of the guaranty.

19      21.2.4  In the event of termination of this Lease for any reason, (except

20  termination after damage, destruction or condemnation under Sections 12 and 14) any sublessee

21  under a Qualified Sublease shall be entitled to continued occupancy in the Premises

22  ("Nondisturbance") in accordance with its Qualified Sublease as long as:

23      21.2.4.1  The Qualified Sublease is not terminated in accordance with its

24  terms (including termination for default upon expiration of all applicable periods to cure), and

25      21.2.4.2  The sublessee agrees in writing to attorn to PSA under the

26  applicable Qualified Sublease, and to such other terms and conditions as are customarily required

27  by mortgage lenders in similar circumstances.

28      21.2.5  Upon the request of FGI, PSA shall within a reasonable time execute,

29  acknowledge and deliver a nondisturbance agreement with any sublessee under a Qualified

30  Sublease setting forth the above terms.

**EXHIBIT 4**
**Page 73 of 179**
-65-

PSA 000112

Exhibits to Ainsworth Decl.
Page243

21.3    Assignment

21.3.1    FGI shall not Transfer this Lease, the leasehold estate this Lease creates, any of FGI's rights or interests under this Lease or any of FGI's rights or interests in the Premises, in whole or in part; nor shall FGI's rights or interests under or in this Lease be Transferred or assigned by operation of law or otherwise, except as provided below. The assignee, purchaser or transferee of FGI's interest in this Lease is referred to as a "Transferee." FGI shall have no right to make any Transfer of its rights under this Lease if FGI is then in default under this Lease.

21.3.2    FGI may Transfer this Lease upon notice to PSA (without the consent of PSA) to any Transferee which is an Affiliate of FGI, including any inter vivos or testamentary trust or the estate or heirs of Allen, subject to Section 21.4.

21.3.3    FGI may Transfer this Lease upon notice to PSA (without the consent of PSA) to any Transferee which, or an Affiliate of which, is also the transferee of at least the controlling interest in Team, subject to Section 21.5.

21.3.4    Any other proposed Transfer requires the consent of PSA. PSA shall consent to a Transfer by FGI in the event that the Transferee meets all of the following criteria in PSA's reasonable judgment:

21.3.4.1    The Transferee has a net worth at the time of Transfer of the lesser of (x) at least $100,000,000, Indexed every five (5) years, or (y) sufficient net worth (as determined by PSA in its sole discretion) to perform all of the obligations of FGI under the terms of this Lease, and

21.3.4.2    The Transferee or its Management Company has Sufficient Experience. "Sufficient Experience" means either:

(i)    The Transferee or its Management Company has entered into employment contracts with the key management employees of FGI; or

(ii)    The Transferee or its Management Company or any of its employees has managed or had substantial responsibility for management for at least five (5) years in the aggregate (x) sports facilities used as the home venue for a Major League Baseball, National Football League, National Basketball Association, or National Hockey League team (or similar or successor major league franchise), and (y) exhibition halls of at least similar size to

Exhibits to Ainsworth Decl.
Page244

1    the Exhibition Hall; has never been convicted of a felony, has never been terminated under a
2    management agreement or lease of facilities by reason of its default; and has a demonstrated
3    record of reasonable business success.

4            21.3.4.3    FGI shall give PSA written notice of a proposed Transfer sixty (60)
5    days prior to the effective date of the Transfer together with a copy of the Transfer agreement
6    executed by FGI and the proposed Transferee, and documentation reasonably sufficient to show
7    that the Transferee meets the criteria in Section 21.3.4.1 and 21.3.4.2.

8            21.3.5    Any Transferee must also assume in writing the obligations of FGI under
9    this Lease and the Person which executed the Master Lease Guaranty must execute a
10   reaffirmation of the Master Lease Guaranty or a Person with a net worth of not less than
11   $100,000,000 must execute a replacement Master Lease Guaranty in identical form.

12           21.3.6    Without limiting the generality of the foregoing, no Transfer shall be
13   effective if any Event of Default exists under this Lease or unless and until the Transferee
14   assumes all the obligations of FGI hereunder accruing on and after the effective date of the
15   Transfer.

16           21.3.7    Without Transferring this Lease, FGI may hire an agent (a "Management
17   Company") to manage the Exhibition Hall and/or Parking Facilities and/or the Stadium provided
18   the Management Company satisfies the criteria specified in Section 21.3.4.2.

19       21.4    FGI Liability

20           Upon any Transfer pursuant to Section 21.3.2, but not 21.3.3 or 21.3.4, FGI shall
21   continue to be liable under the terms of this Lease, as a guarantor of the Transferee's
22   performance of its obligation under this Lease.

23       21.5    Rent Letter of Credit

24           21.5.1    Upon any Transfer pursuant to Section 21.3.3 or 21.3.4, Transferee shall
25   provide PSA with a standby letter of credit in the amount of at least the amount of the Rent paid
26   by FGI for the most recently completed Lease Year (the "Rent Letter of Credit"). The Rent
27   Letter of Credit shall be issued by a financial institution reasonably acceptable to PSA. The Rent
28   Letter of Credit shall be replaced annually by a new Rent Letter of Credit in the amount of at
29   least the amount of the Rent paid for the then most recently completed Lease Year so that at all

<div align="center">

**EXHIBIT 4**
**Page 75 of 179**

</div>

PSA 000114

Exhibits to Ainsworth Decl.
Page245

1   times during the remaining Term, PSA holds a Rent Letter of Credit which is in full force and

2   effect.

3        21.5.2   PSA may draw upon the Rent Letter of Credit at any time that there is a

4   Event of Default related to payment of Rent which Transferee has not cured within the time

5   period allowed under this Lease. PSA may also draw on the Rent Letter of Credit if Transferee

6   has not provided PSA with a replacement Rent Letter of Credit at least five (5) days prior to

7   expiration of the then existing Rent Letter of Credit. The Rent Letter of Credit will be payable

8   against PSA's presentation of a sight draft. If PSA draws against the Rent Letter of Credit, then

9   the amount of credit available to PSA under the Rent Letter of Credit shall be immediately

10  restored to the amount available prior to the draw.

11       21.6   Covenants Binding on Successors and Assigns

12           All of the terms, conditions and covenants of this Lease shall inure to the benefit

13  of and be binding upon the successors of the respective Parties.

14       21.7   Transfer

15           For purposes of this Lease, a "Transfer" shall include any sale, assignment,

16  pledge, conveyance, encumbrance, subcontract, delegation, or other disposition, whether direct

17  or indirect, voluntary or involuntary, of FGI's interest in this Lease. A Transfer shall also include

18  a Change of Control.

19       21.8   Change of Control

20           For purposes of this Lease, "Control" shall mean the power, directly or indirectly,

21  to direct or cause the direction of the management or policies of the tenant under this Lease, by

22  virtue of ownership of voting securities or otherwise. A "Change of Control" shall refer to a

23  change in the control of the tenant under this Lease, which shall be deemed to have occurred if:

24       21.8.1   Change of Control of FNW

25           "Change of Control of FNW" means a change in the Control of FNW,

26  whether through a single transaction or series of transactions, which shall be deemed to have

27  occurred if:

28           21.8.1.1   The Allen Ownership Group ceases to have Control of FNW;

**EXHIBIT 4**
**Page 76 of 179**

PSA 000115

50034209 13 -- STADIUM MASTER LEASE
11/23/98                                    -68-

Exhibits to Ainsworth Decl.
Page246

1        21.8.1.2   FNW merges or consolidates with another entity, unless following
2 the consummation of such transaction the Allen Ownership Group Controls the surviving entity;
3 or

4        21.8.1.3   FNW sells or otherwise disposes of all or substantially all of the
5 Team Assets to one or more persons or entities other than entities with respect to which the Allen
6 Ownership Group has Control.

7       For purposes of this Section 21.8.1, the "Allen Ownership Group" means Allen, or any
8 direct or indirect Affiliate of Allen, or any family member, heir, or trust of Allen, or any
9 combination of Allen, any such Affiliates, family members, heirs and/or trusts;

10     21.8.2   Change of Control of Other Transferee

11       "Change of Control of Other Tenant" means a change in the Control of
12 any Transferee other than a member of the Allen Ownership Group ("Other Transferee"),
13 whether through a single transaction or series of transactions, which shall be deemed to have
14 occurred if:

15        21.8.2.1   Affiliates of the Other Transferee at the time the Other
16 Transferee became the Transferee under this Lease ("Other Transferee Affiliates") cease to have
17 Control of the Other Transferee;

18        21.8.2.2   Other Transferee merges or consolidates with another
19 entity, unless following the consummation of such transaction Other Transferee Affiliates
20 Control the surviving entity; or

21        21.8.2.3   Other Transferee sells or otherwise disposes of all or
22 substantially all of the business or assets of Other Transferee to one or more Persons other than
23 Persons with respect to which the Other Transferee Affiliates have Control.

24    21.9   Unauthorized Transfer

25       If any right, title, or interest of FGI in this Lease, or Control of FGI, is Transferred
26 in violation of the provisions of this Section 21, such Transfer shall be null and void and of no
27 force or effect. Notwithstanding the foregoing, PSA shall have the right to collect from any such
28 Transferee an amount equal to the amounts payable to PSA under this Lease.

50084209 13 – STADIUM MASTER LEASE         **EXHIBIT 4**         PSA 000116
11/23/98                   Page 77 of 179
                          -69-

Exhibits to Ainsworth Decl.
Page247

1        21.10   Stock Legends

2            FGI shall cause all certificates of stock in FGI to be surrendered to FGI and shall

3    place on each such certificate a legend in the following form:

4        THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE ARE

5        SUBJECT TO RESTRICTIONS SET FORTH IN THAT CERTAIN MASTER

6        LEASE DATED NOVEMBER 24, 1998 BETWEEN THE WASHINGTON

7        STATE PUBLIC STADIUM AUTHORITY AND THE CORPORATION AND

8        NONE OF SUCH SHARES, OR ANY INTEREST THEREIN, SHALL BE

9        TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT AS PROVIDED

10       IN SUCH MASTER LEASE.  A COPY OF THE MASTER LEASE IS

11       AVAILABLE FOR INSPECTION WITHOUT CHARGE IN THE OFFICE OF

12       THE CORPORATION.

13

14   SECTION 22    DEFAULT

15       22.1    Event of Default

16            The occurrence of any of the following shall constitute an "Event of Default":

17            22.1.1    Failure of FGI to pay when due any payment owed to PSA, or to pay any

18   Imposition or any other payment required under this Lease when due (except as and to the extent

19   permitted under Section 10.2 of this Lease), or the failure to maintain any of the insurance

20   coverage required and the occurrence or failure continues for a period of ten (10) Business Days

21   after written notice of such failure or occurrence is given to FGI by PSA;

22            22.1.2    FGI being in breach of, or FGI failing to perform, comply with, or observe

23   any other term, covenant, warranty, condition, agreement or undertaking contained in or arising

24   under this Lease other than those referred to above in Section 22.1.1 and FGI fails to cure the

25   default within thirty (30) days after written notice thereof is given by PSA to FGI.  However, if

26   the default is one which can be cured, but cannot be cured (without regard to the availability of

27   funds or the financial condition of FGI) within such 30-day period, and FGI proceeds promptly

28   and thereafter prosecutes with due diligence the curing of the default, then the time for curing of

29   the default shall be extended for the period of time necessary to complete the cure so long as

**EXHIBIT 4**
**Page 78 of 179**

Exhibits to Ainsworth Decl.
Page248

1    PSA's interest in the Premises will not be adversely affected by the delay in FGI's cure of such

2    default.

3              22.1.3    FGI being in breach of, or FGI failing to perform, comply with, or observe

4    any material term, covenant, warranty, condition, agreement or undertaking contained in or

5    arising under the Stadium Use Agreement and FGI fails to cure the default within thirty (30) days

6    after written notice thereof is given by Team to FGI. However, if the default is one which can be

7    cured, but cannot be cured (without regard to the availability of funds or the financial condition

8    of FGI) within such 30-day period, and FGI proceeds promptly and thereafter prosecutes with

9    due diligence the curing of the default, then the time for curing of the default shall be extended

10   for the period of time necessary to complete the cure so long as FGI's interest in the Stadium use

11   Agreement will not be adversely affected by the delay in FGI's cure of such default.

12             22.1.4    FGI making an assignment for the benefit of creditors, filing a petition in

13   bankruptcy, petitioning or applying to any tribunal for the appointment of a custodian, receiver or

14   any trustee for it or a substantial part of its assets, or commencing any proceedings under any

15   bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or

16   statute of any jurisdiction, whether now or hereafter in effect; or if there shall have been filed any

17   petition or application, or any proceeding shall have been commenced against FGI, in which an

18   order for relief is entered or which remains undismissed for a period of ninety (90) days or more;

19   or FGI by any act or omission indicating its consent to, approval of or acquiescence in any such

20   petition, application or proceeding or order for relief or the appointment of a custodian, receiver

21   or any trustee for it or any substantial part of any of its properties, or suffering any such

22   custodianship, receivership or trusteeship to continue undischarged for a period of ninety (90)

23   days or more;

24             22.1.5    FGI being generally unable to pay its debts as such debts become due;

25             22.1.6    EGI having concealed, removed, or permitted to be concealed or removed,

26   any part of its property, with intent to hinder, delay or defraud its creditors or any of them, or

27   making or suffering a transfer of any of its property which may be fraudulent under any

28   bankruptcy, fraudulent conveyance or similar law; or suffering or permitting, while insolvent,

29   any creditor to obtain a lien upon any of its property through legal proceedings or distraint which

30   is not vacated within thirty (30) days from the date thereof; or

**EXHIBIT 4**
**Page 79 of 179**                    PSA 000118

Exhibits to Ainsworth Decl.
Page249

1           22.1.7   PSA being in breach of, or PSA failing to perform, comply with, or

2   observe any term, covenant, warranty, condition, agreement or undertaking contained in or

3   arising under this Lease and PSA fails to cure the default within ten (10) Business Days as to any

4   monetary default and thirty (30) days as to any other default, after written notice thereof is given

5   by FGI to PSA.  However, if any nonmonetary default is one which can be cured, but cannot be

6   cured (without regard to the availability of funds or the financial condition of PSA) within such

7   30-day period, and PSA proceeds promptly and thereafter prosecutes with due diligence the

8   curing of the default, then the time for curing of the default shall be extended for the period of

9   time necessary to complete the cure so long as FGI's interest in the Premises will not be

10   adversely affected by the delay in PSA's cure of such default.

11           22.1.8   A default under the Development Agreement by FGI, but only if the

12   Guarantor under the Completion and Payment Guaranty has also failed to perform under the

13   Completion and Payment Guaranty.

14        22.2   Termination of Lease

15           In addition to all other rights and remedies available to PSA by law or equity,

16   PSA may, at any time after the occurrence of any Event of Default by FGI, terminate this Lease

17   by notice to FGI, and PSA may reenter upon and take possession of the Premises by self-help or

18   other means.  If either Party disputes whether an Event of Default has occurred, such dispute

19   shall be resolved by Dispute Resolution.  If a default asserted under Section 22.1 is contested by

20   the Party asserted to be in default, the time for curing the default shall commence upon the

21   rendering of the Dispute Resolution decision, or other resolution of the dispute.  However, if part

22   of the matter subject to Dispute Resolution is capable of performance to the extent not in dispute

23   (e.g., the undisputed portion of monies owing), performance to the extent not in dispute shall be

24   a condition precedent to the effectiveness of this Section 22.2.

25        22.3   Effect of Termination

26           Subject to the provisions of Section 21 (relating to Sublessees), upon termination

27   of this Lease under Section 22.2, all rights and privileges of FGI and all duties and obligations of

28   PSA hereunder shall terminate.  Immediately upon the termination of the Lease, and without

29   further notice to any other party, PSA shall have the right to assert, perfect, establish and confirm

30   all rights to the Premises reverting to PSA by reason of the termination by any means permitted

Exhibits to Ainsworth Decl.
Page250

1   by law, including the right to take possession of the Premises and to remove all personal property

2   from the Premises and all persons occupying them except Sublessees with Nondisturbance as

3   permitted under this Lease.   PSA may in all respects take the actual, full and exclusive

4   possession of the Premises, thereby wholly terminating any right, title, interest or claim of or

5   through FGI as to the Premises, the Project Improvements, and all Personal Property located on

6   the Premises, excepting therefrom FGI's Personal Property as defined in Section 23.1.

7       22.4   <u>Damages and Remedies</u>

8          22.4.1   For a breach during the Term, the exercise by either Party of any remedy

9   arising by virtue of an Event of Default shall not be considered exclusive, but either Party may

10   exercise any and all other rights or remedies provided by this Lease or by law or equity.   In

11   pursuing remedies, PSA or FGI may elect to sue the other with or without terminating this Lease.

12   The termination of the Term pursuant to this Section 22 shall not extinguish the right of either

13   Party to collect damages including without limitation direct and consequential damages arising

14   from the breach of this Lease by the other Party.

15          22.4.2   FGI shall be liable for the continued payment of Rent under this Lease

16   accruing up to the end of the Term specified in this Lease notwithstanding the early termination

17   of the Term due to an Event of Default and the reentry of PSA before the normal expiration of

18   the Term.  PSA may at any time after termination of this Lease, recover from FGI the worth at

19   that time (discounted to present value at the time of termination) of the excess, if any, of the

20   amount of the Rent reserved in this Lease for the balance of the Term (had such termination not

21   occurred) over the then reasonable rental value of the Premises for the same period.   The

22   "reasonable rental value" shall be the amount of rental which PSA can reasonably be expected to

23   obtain as rent for the remaining balance of the Term (to its normal expiration date, excluding

24   unexercised Extension Periods and the Completion Term), had such termination and default not

25   occurred.  In addition, FGI shall be liable for and PSA may recover the estimated value of the

26   lost Percentage Rent during the period from the date of early termination of the Term due to an

27   Event of Default to the date of the first Exhibition Hall Event held after such termination which

28   is not held pursuant to an agreement originally between FGI and the holder of that Exhibition

29   Hall Event; provided that FGI shall get credit for all Exhibition Hall Events held during such

30   period, and PSA shall use Reasonable Efforts to mitigate its damages.

Exhibits to Ainsworth Decl.
Page251

1    22.4.3    PSA shall credit against sums owed by FGI the net proceeds, if any, of any
2    reletting or operation of the Premises after deducting PSA's reasonable expenses in connection
3    with the reletting and operation of the Premises.  Reasonable expenses shall include but not be
4    limited to repossession costs, brokerage commissions, legal expenses, employee expenses,
5    alteration costs reasonably incurred and other reletting expenses.

6    22.4.4    Nothing in this Section 22 shall relieve PSA of its duty to use Reasonable
7    Efforts to mitigate its damages as required by law.

8    22.5    No Waivers

9    No failure by any Party to insist upon the strict performance of any provision of
10    this Lease or to exercise any right, power or remedy consequent to any breach thereof, and no
11    waiver of any breach, or the acceptance of full or partial Rent during the continuance thereof,
12    shall constitute a waiver of any such breach or of any provision.  No waiver of any breach shall
13    affect or alter this Lease, which shall continue in full force and effect, or the rights of any Party
14    hereto with respect to any other then existing or subsequent breach.  A waiver must be in writing
15    and signed by the Party to be bound by such waiver.

16    22.6    Performance by PSA of FGI's Defaulted Obligations

17    In case of failure on the part of FGI to pay any money, or do any act to satisfy any
18    of the obligations or covenants which it is required to pay, do, or satisfy under the provisions of
19    this Lease, PSA may, at its option, after ten (10) Business Days' prior written notice to FGI, pay
20    any or all of the sums, or do any or all such acts which require the payment of money, or incur
21    any reasonable expense to remedy the failure of FGI to perform any one or more of the covenants
22    contained in this Lease.  FGI shall repay to PSA the sums advanced by PSA on demand together
23    with Default Interest from the date payment is made by PSA.  PSA shall not be obligated to so
24    cure any of FGI's defaults; and such right to cure shall be in addition to and not in lieu of any
25    other right or remedy.

26

27    SECTION 23    SURRENDER UPON TERMINATION

28    23.1    FGI's Obligation

29    Upon any termination of this Lease, FGI shall surrender possession of the
30    Premises and Personal Property included in the Premises to PSA in First-Class Condition, except

Exhibits to Ainsworth Decl.
Page252

1    for normal wear and tear, as provided in Section 11.1.2.  With respect to personal property of

2    FGI that is not included in the Personal Property but is located at the Premises, PSA and FGI,

3    within five (5) days preceding the date of termination of this Lease, shall conduct an inventory of

4    all personal property claimed by FGI to be FGI's personal property and not included in the

5    Personal Property ("FGI's Personal Property").  In the event that PSA and FGI disagree about

6    what is included in FGI's Personal Property, that matter shall be resolved by Dispute Resolution.

7        23.2    <u>FGI's Personal Property</u>

8            Within five (5) Business Days of the completion of the inventory of FGI's

9    Personal Property, FGI shall identify those items of FGI's Personal Property which FGI is

10   willing to sell to PSA, for cash based by those items then fair market value.  PSA shall have five

11   (5) Business Days to give FGI notice of the items of FGI's Personal Property, which PSA is

12   willing to purchase.  Within five (5) Business Days after PSA's notice to FGI, FGI shall remove

13   from the Premises all of the items of FGI's Personal Property which are not being purchased by

14   PSA.  Any dispute as the fair market value of FGI's Personal Property shall be resolved by

15   Dispute Resolution.

16       23.3    <u>No Rights to Accounts</u>

17           Upon any termination of this Lease, FGI shall have no rights to any funds in the

18   Naming Rights Account or Capital Improvements Account other than its rights pursuant to

19   Section 11.5 provided that FGI makes claim within three (3) months of termination of the Lease.

20

21   <u>SECTION 24</u>    <u>DISPUTE RESOLUTION</u>

22       24.1    <u>Applicability</u>

23           Any dispute (a "Dispute") shall be resolved by dispute resolution in accordance

24   with this Section 24, to the extent permitted by Laws, except where a Party is expressly

25   permitted or required to resort to judicial, administrative, or other legal proceedings or other

26   rights or remedies at law or in equity ("Dispute Resolution").  In the event either Party believes a

27   Dispute exists, it shall give notice to the other specifying in reasonable detail the nature of such

28   Dispute.  The Parties shall seek in good faith to negotiate a settlement of the Dispute, including,

29   without limitation, by agreeing to reasonable requests of the other to hold a meeting to discuss

30   such Dispute.

**EXHIBIT 4**
**Page 83 of 179**

*PSA 000122*

50024209 13 – STADIUM MASTER LEASE
11/23/98                    -75-

Exhibits to Ainsworth Decl.
Page253

1       24.2   Designation of Arbitrator

2            If within fifteen (15) days after the effective date of any notice given pursuant to

3  Section 24.1 (a "Dispute Notice") the Parties have been unable to reach a resolution of the

4  Dispute, the Parties shall jointly appoint an arbitrator who is an attorney with at least ten (10)

5  years' substantial experience relevant to the subject matter of the Dispute.  If the Parties fail to

6  agree upon an arbitrator within twenty (20) days after the effective date of the Dispute Notice,

7  the Parties shall each designate, by written notice to the other given not later than twenty-five

8  (25) days after the effective date of the Dispute Notice, a representative, who need not be neutral

9  and who is an attorney with at least ten (10) years' substantial experience relevant to the subject

10  matter of the Dispute.  If either Party fails to designate a representative within this period, the

11  representative of the Party who met the deadline shall act as arbitrator.  If both Parties meet the

12  deadline, the two representatives shall, within ten (10) Business Days after the last of the two

13  representatives is designated, select an arbitrator who is an attorney with at least ten (10) years'

14  substantial experience relevant to the subject matter of the Dispute.  If the representatives cannot

15  agree on an arbitrator, the Presiding Judge of the Superior Court for King County, Washington

16  shall, upon application by either Party, select an arbitrator having such qualification.  The

17  arbitrator chosen pursuant to this Section 24.2 shall be the sole arbitrator.

18       24.3   Scope of Dispute Resolution

19            In connection with any Dispute Resolution issue (of which there may be more

20  than one in any Dispute Resolution proceeding), each Party may, but need not, submit in writing

21  the specific requested action or decision it wishes to take or make with respect to the Dispute;

22  however, the arbitrator may, but need not, choose one or the other Party's specific requested

23  actions or decisions, or may order any compromise position.

24       24.4   Conduct of Dispute Resolution

25            Except to the extent provided in this Lease, or as the Parties may otherwise agree

26  in writing, any Dispute Resolution proceeding shall be conducted in accordance with the

27  Commercial Arbitration Rules and the Expedited Procedures of the American Arbitration

28  Association ("AAA") then in force.  Although the Commercial Arbitration Rules of the AAA

29  shall be used to govern the conduct of the Dispute Resolution, the arbitrator shall be chosen by

30  the procedure described in Section 24.2 and the Dispute Resolution shall not be conducted

Exhibits to Ainsworth Decl.
Page254

1    through the AAA, unless the Parties otherwise agree.  For purposes of a Dispute Resolution

2    conducted under this Section 24, whenever the AAA Commercial Arbitration Rules refer to the

3    "tribunal administrator," such reference shall be deemed to be the arbitrator chosen under

4    Section 24.2.  The Parties expressly agree that any Dispute Resolution proceeding may proceed

5    in the absence of any Party who, after due notice, fails to be present at such Dispute Resolution

6    or to obtain an adjournment, and that, in such event, an award may be made based solely upon

7    the evidence submitted by the Party who is present.  All Dispute Resolution proceedings shall be

8    conducted in Seattle, Washington or in such other location as the Parties may agree.  In making

9    any determination, the arbitrator shall apply the pertinent provisions of this Lease without

10   modification or qualification in any respect.  The arbitrator shall furnish the Parties with a written

11   decision within thirty (30) days after the date the arbitrator is selected.

12       24.5    Effect on Lease

13           Unless otherwise agreed in writing, during the period that any Dispute Resolution

14   is pending under this Section 24, the Parties shall continue to comply with all terms and

15   provisions of this Lease which are not the subject of the Dispute.

16       24.6    Effect of Determination

17           The decision or award rendered by the arbitrator shall be final, nonappealable, and

18   binding upon the Parties, and judgment may be entered upon it in accordance with applicable law

19   in a court of competent jurisdiction.  If the arbitrator determines that an Event of Default has

20   occurred, the provisions of Section 22.4 shall govern the damages and/or other remedies which

21   may be ordered by the arbitrator.  Neither the requirement to utilize the procedures set forth in

22   this Section 24, nor the pendency of any Dispute Resolution proceeding, shall in any way

23   invalidate any notices or extend any cure periods provided for in this Lease.

24       24.7    Equitable Proceedings

25           In the event a Party desires to seek interim relief, whether affirmative or

26   prohibitive, in the form of a temporary restraining order, preliminary injunction, or other interim

27   equitable relief with respect to a Dispute, either before or after the initiation of an Dispute

28   Resolution proceeding, that Party may initiate the judicial proceeding necessary to obtain such

29   relief ("Equitable Proceeding").  Nothing in this Section 24.7 shall be construed to suspend or

30   terminate the obligation of the Parties to comply with the procedures set forth in this Section 24

**EXHIBIT 4**
**Page 85 of 179**

PSA 000124

Exhibits to Ainsworth Decl.
Page255

1    with respect to the Dispute that is the subject of such Equitable Proceeding during the pendency

2    of any such Equitable Proceeding, including any appeal or review.  Any interim or appellate

3    relief granted in such Equitable Proceeding shall remain in effect until, and only until, the

4    procedures set forth in this Section 24 result in a settlement agreement or a determination by an

5    arbitrator with respect to the Dispute.  Such settlement agreement or determination shall be the

6    binding and final determination on the merits of the Dispute (including, without limitation, any

7    equitable relief and monetary damages, but excluding any award of attorneys' fees or costs

8    rendered in the Equitable Proceeding), shall supersede and nullify any decision in the Equitable

9    Proceeding on the merits of the dispute that is the subject of such Equitable Proceeding as

10   between FGI and PSA, and shall preclude any subsequent litigation on such merits,

11   notwithstanding any determination to the contrary in connection with any Equitable Proceeding

12   granting or denying interim relief.

13        24.8    Specific Enforcement

14            24.8.1    FGI acknowledges that the covenants set forth in Sections 7.2, 8.1, 8.5,

15   8.6, 8.7, 8.8 and 8.9 are material and essential elements of the transactions contemplated by this

16   Lease, and that in the event of a FGI default under any of those Sections, PSA may not have an

17   appropriate remedy at law.  Accordingly, in addition to its other remedies available at law or in

18   equity, in the event of a breach or threatened breach of any of Sections 7.2, 8.1, 8.5, 8.6, 8.7, 8.8

19   and 8.9, PSA shall be entitled to obtain injunctive relief including specific enforcement from a

20   court of competent jurisdiction, and may elect to bypass Dispute Resolution.

21            24.8.2    PSA acknowledges that the covenants set forth in Sections 19.3 and 25 are

22   material and essential elements of the transactions contemplated by this Lease, and that in the

23   event of a PSA default under any of those Sections, FGI may not have an appropriate remedy at

24   law.  Accordingly, in addition to its other remedies available at law or in equity, in the event of a

25   breach or threatened breach of any of Sections 19.3 and 25, FGI shall be entitled to obtain

26   injunctive relief including specific enforcement from a court of competent jurisdiction, and may

27   elect to bypass Dispute Resolution.

Exhibits to Ainsworth Decl.
Page256

1     24.9   Further Disputes

2         The Parties agree that any Disputes which arise during the Term out of a

3   settlement agreement or arbitrator's determination shall be resolved exclusively by the

4   procedures set forth in this Section 24.

5

6   **SECTION 25**   CONFIDENTIALITY; PUBLIC DISCLOSURE OF INFORMATION

7         PSA shall keep confidential those matters which are exempt from public

8   disclosure under the Act, other applicable Laws, and this Section.

9     25.1   Nondisclosure of Exempt Public Records

10        PSA acknowledges that certain FGI Documents may be exempt from public

11   disclosure under RCW Chapter 42.17, RCW Chapter 19.108 or other applicable law.  Section

12   119 of the Act provides that PSA may refuse to disclose financial information on FGI, the Team,

13   concessionaires and sublessees.  In addition, Section 120(1)(jj) of the Act provides that financial

14   and commercial information requested by PSA from any Person that leases or uses the Project is

15   exempt from public inspection and copying.

16     25.1.1   Before providing PSA with any documents or other materials or

17   information of its own or of any other Person ("FGI Documents"), FGI shall determine based on

18   the good faith advice of its legal counsel whether FGI believes particular FGI Documents are

19   exempt or are permitted to be exempt from public disclosure ("Exempt Information").  FGI shall

20   endeavor to mark Exempt Information as "confidential" or with another mark of similar import

21   before transmitting Exempt Information to PSA.

22     25.1.2   PSA and its PSA Related Parties and their respective agents, contractors

23   and consultants shall refuse to disclose Exempt Information to any person, agency, or entity other

24   than its board members, employees, agents, or consultants without the prior consent of FGI and

25   shall at all times maintain the confidentiality of Exempt Information.  PSA shall inform each of

26   its board members, employees, agents, and consultants of the existence of this Agreement and

27   shall require them to comply fully with its provisions prior to disclosing to any such board

28   member, employee, agent, or consultant any Exempt Information.  FGI shall not unreasonably

29   withhold its consent to a PSA request to disclose Exempt Information, and FGI shall base its

30   decision with respect to consent on the good faith advice of its legal counsel.

**EXHIBIT 4**
**Page 87 of 179**
-79-

50034269 13 — STADIUM MASTER LEASE
11/23/98

PSA 000126

Exhibits to Ainsworth Decl.
Page257

1         25.1.3   Except for the information provided by FGI pursuant to Section 8.9,

2  financial and commercial information provided to PSA by FGI and any user of the Project is

3  exempt from public inspection and copying, and PSA shall enforce such exemption.

4       25.2   Public Disclosure Requests

5          If any FGI Documents become the subject of a request for public disclosure, PSA

6  shall promptly notify FGI of such request and how PSA intends to respond with respect to

7  particular FGI Documents. Unless compelled by law or consented to by FGI, PSA shall not

8  disclose any FGI Documents until ten (10) Business Days after the date PSA notifies FGI of the

9  disclosure request. During that time, FGI may determine (based on the good faith advice of

10  FGI's legal counsel) whether FGI believes any of the FGI Documents requested are Exempt

11  Information (in addition to FGI Documents previously determined to be Exempt Information).

12  PSA shall not disclose Exempt Information, and FGI shall defend, indemnify and hold harmless

13  PSA from all damages, penalties, attorneys fees and costs PSA actually incurs related to denying

14  the request for public disclosure of Exempt Information.

15       25.2.1   Remedies

16          FGI is entitled to seek injunctive relief to prevent PSA from disclosing

17  Exempt Information, but shall not be entitled to damages.

18       25.2.2   Disclosure of Non-Exempt Information Expressly Permitted

19          Nothing in this Agreement is intended, nor shall it be construed, to prevent

20  PSA from disclosing information that State law requires PSA to disclose, that is required to be

21  disclosed by a court or other public authority or agency, that was public at the time it was

22  furnished to PSA, or that became public through any means other than the act of PSA or its board

23  members, employees, agents, or consultants.

24       25.3   Ownership of FGI Documents

25          Except to the extent, if any, that FGI Documents and any copies thereof made by

26  or for PSA are "public records" subject to applicable document retention requirements under

27  State law, all such documents shall be and remain the sole and exclusive property of PSA. At the

28  end of any applicable records retention period, upon the request of FGI, PSA shall, to the extent

29  permitted by law and at FGI's expense, return or destroy (at FGI's option) all FGI Documents

Exhibits to Ainsworth Decl.
Page258

1    and any copies of those FGI Documents in PSA's possession, except for copies of FGI

2    Documents that would be reasonably necessary for PSA to use if the Term ended.

3        25.4    <u>PSA Use of FGI Documents</u>

4            Nothing in this Agreement is intended to prohibit PSA from excerpting Exempt

5    Information from FGI Documents to develop its own documents analyzing particular issues,

6    provided however, that such PSA documents shall not identify FGI as the source of particular

7    Exempt Information without FGI's prior consent, and the particular Exempt Information shall

8    not be identified in any such PSA documents as relating to FGI.

9        25.5    <u>Document Designation</u>

10           The fact that an FGI Document is not marked as "confidential" or with other

11   words of similar import shall not relieve any Party of their obligations hereunder.

12       25.6    <u>Term</u>

13           For valuable consideration, including the execution of this Agreement, the

14   provisions of this Section 25 shall be retroactive to January 30, 1998, and shall continue through

15   the Term.

16

17   <u>SECTION 26    GENERAL PROVISIONS</u>

18       26.1    <u>Overriding Legal Requirements</u>

19           It is the intention of the Parties that this Lease be fully consistent with and, to the

20   extent applicable, give effect to the Act. Anything herein seemingly inconsistent with the Act

21   shall be interpreted in a manner which is consistent with the Act, and which most closely gives

22   effect to the provisions of this Lease.

23       26.2    <u>Compliance With Law; No Discrimination</u>

24           FGI shall at all times conduct its activities with respect to the Project in

25   compliance with all applicable Laws, including Laws with respect to discrimination; and FGI

26   shall include this covenant in every agreement or contract with any Person used by FGI in its

27   activities with respect to the Project. FGI may challenge the interpretation or application of any

28   Laws, so long as such contest is in good faith and does not jeopardize PSA's interest in the

29   Project, and so long as FGI indemnifies PSA from any cost, loss, or liability on account of the

30   contest.

<div style="text-align:center">

**EXHIBIT 4**
**Page 89 of 179**

</div>

1      26.3  <u>Estoppel Certificates</u>

2      Each Party shall at any reasonable time, and from time to time, within ten (10)

3  Business Days after written request by the other Party, execute, acknowledge and deliver to the

4  requesting Party or to any assignee or subtenant designated by the requesting Party, a certificate

5  stating that (a) this Lease is in full force and effect and has not been modified, supplemented or

6  amended in any way, or if there have been modifications, this Lease is in full force and effect as

7  modified, identifying such modification agreement; and if this Lease is not in force and effect,

8  the certificate shall so state; (b) the dates on which the term of this Lease commenced;

9  (c) whether all conditions under this Lease to be performed by a designated Party, to the

10  knowledge of the other Party, have been satisfied and, as of the date of such certificate, whether

11  there are any existing defenses or offsets which one Party has against the enforcement of this

12  Lease by another Party, or, if such conditions have not been satisfied or if there are any defenses

13  or offsets, the certificate shall so state. The party to whom any such certificate shall be issued

14  may rely on the matters therein set forth and thereafter the Party issuing the same shall be

15  estopped from denying the veracity or accuracy of the same.

16      26.4  <u>Indexing</u>

17      "Indexed" means adjusting a dollar value by the percentage change in the Index

18  from the December 31 immediately preceding a "reference date" to the December 31

19  immediately preceding the Lease Year in which the "adjustment date" occurs. Unless another

20  reference date is identified when the term "Indexed" is used (e.g., "Indexed as of the

21  Commencement Date"), the reference date is the Completion Date. Unless another "adjustment

22  date" is indicated, adjustment dates are anniversaries of the reference date. Unless another period

23  is identified when the term "Indexed" is used (e.g., "Indexed every five (5) years"), the dollar

24  value is Indexed annually.     "Index" means the Consumer Price Index for All Urban Consumers

25  (CPI-U), Seattle-Tacoma, All Items (1982-1984=100) issued by the Bureau of Labor Statistics of

26  the United States Department of Labor. If the CPI-U ceases to use the 1982-1984 average

27  equaling 100 as the basis of calculation, or if a change is made in the term or number of items

28  contained in the CPI-U, or the CPI-U is altered, modified, converted or revised in any other way,

29  then the determination of the CPI Change shall be made with the use of such conversion factor,

30  formula or table for converting such index as may be published by the Bureau of Labor Statistics.

Exhibits to Ainsworth Decl.
Page260

1   If the CPI-U is no longer published by the Bureau of Labor Statistics, than any substitute or

2   successor index published by said Bureau or other governmental agency of the United States will

3   be used, as shall be agreed upon by FGI and PSA and, if agreement cannot be reached the matter

4   shall be subject to Dispute Resolution.

5       26.5   <u>Good Faith Consideration</u>

6          Whenever PSA is permitted the opportunity to review and comment under this

7   Lease, FGI shall give its good faith consideration to PSA's comments, although it shall not be

8   otherwise obligated with respect to such comments.

9       26.6   <u>No Partnership</u>

10         Nothing in this Lease or in any instrument relating to this Lease shall be construed

11   as creating a partnership or joint venture between PSA and FGI, or cause PSA to be responsible

12   in any way for debts or obligations of FGI or any other Party.

13       26.7   <u>Time of the Essence</u>

14         Time is of the essence of this Lease and of each and every term, covenant,

15   agreement, condition and provision of this Lease.

16       26.8   <u>Captions</u>

17         The captions of this Lease and the table of contents preceding this Lease are for

18   convenience and reference only, and are not a part of this Lease, and in no way amplify, define,

19   limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

20       26.9   <u>Meaning of Terms</u>

21         Words of any gender in this Lease shall be held to include any other gender and

22   words in the singular number shall be held to include the plural when the sense requires.

23       26.10  <u>Lease Construed as a Whole</u>

24         The language in all parts of this Lease shall in all cases be construed as a whole

25   according to its fair meaning and neither strictly for nor against PSA or FGI.

26       26.11  <u>Waivers</u>

27         No waiver made by any Party with respect to the performance, or manner or time

28   thereof, of any obligation of any other Party or any condition of a Party's own obligation under

29   this Lease shall be considered a waiver of any rights of the other Party or condition of such other

30   Party's obligation beyond those expressly waived and to the extent thereof, or a waiver in any

50034209 13 – STADIUM MASTER LEASE
11/23/98                   -83-         **EXHIBIT 4**
Page 91 of 179             PSA 000130

Exhibits to Ainsworth Decl.
Page261

1    respect in regard to any other rights of the Party making the waiver or any other obligations of

2    the Party.  No waiver by any Party of any provision of this Lease or any breach thereof, shall be

3    of any force and effect unless in writing; and no such waiver shall be construed to be a

4    continuing waiver.

5        26.12  Severability

6            If any provision of this Lease or the application thereof to any person or

7    circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the

8    application of that provision to persons or circumstances other than those as to which it is invalid

9    or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid

10   and be enforced to the fullest extent permitted by law.

11       26.13  Survival

12           Each provision of this Lease, the full performance of which is not required prior

13   to the expiration of the Term hereof or its earlier termination shall survive expiration or earlier

14   termination, and be fully enforceable thereafter, including, without limitation, all indemnity

15   obligation hereunder.

16       26.14  Memorandum of Lease

17           The Parties shall execute and acknowledge a Memorandum of this Lease in the

18   form attached as Exhibit 26.14 for public recordation purposes, so that public notice of the Term

19   of the Lease be given.  However, this Lease shall not be recorded.

20       26.15  Amendment

21           This Lease may be amended only in writing, signed by both PSA and FGL

22       26.16  Commissions

23           PSA and FGI shall defend, indemnify and hold harmless the other from any and

24   all claims or demands, requests by real estate brokers, agents or finders with whom such

25   indemnifying Party may have dealt in connection with this Lease.

26       26.17  Notices

27           A notice or communication under this Lease by a Party to the other Party shall be

28   in writing and sufficiently given upon personal delivery or upon sending of a confirmed facsimile

29   copy (either by automatic electronic confirmation or by declaration of the sender) directed to the

30   Fax Number of the Party set forth below, or if dispatched by registered or certified mail, postage

Exhibits to Ainsworth Decl.
Page262

1    prepaid, return receipt requested or by a delivery service or "overnight delivery" service that

2    provides a written confirmation of delivery, and addressed to a Party as follows:

3

4              If to PSA:         WASHINGTON STATE PUBLIC STADIUM
5                                AUTHORITY
6                                401 Second Avenue South, Suite 520
7                                Seattle, WA 98104
8                                Attn: Mr. Phillip K. Kushlan
9                                Fax No.: 206-205-8604
10                               Confirmation No.: 206-205-8600

11             with a copy to:     BALL JANIK LLP
12                               101 SW Main Street, Suite 1100
13                               Portland, OR 97204
14                               Attn: Stephen T. Janik
15                               Fax No.: 503-295-1058
16                               Confirmation No.: 503-228-2525

17             If to FGI:         FIRST & GOAL INC.
18                               110 - 110th Ave. N.E., Suite 550
19                               Bellevue, WA 98004
20                               Attn: Robert J. Whitsitt, President
21                               Fax No.: 425-453-1985
22                               Confirmation No.: 425-453-1940
23

24             with a copy to:     FIRST & GOAL INC.
25                               110 - 110th Ave. N.E., Suite 550
26                               Bellevue, WA 98004
27                               Attn:  Mr. Richard E. Leigh, Jr.
28                                       Vice President and General Counsel
29                               Fax No.: 425-453-1985
30                               Confirmation No.: 425-453-1940
31

32             and:            Foster Pepper & Shefelman PLLC
33                               1111 Third Avenue, Suite 3400
34                               Seattle, Washington 98101
35                               Attn: Allen D. Israel
36                               Fax No.: 206-447-9700
37                               Confirmation No.: 206-447-4400
38

39         Each Party may by notice to all other Parties, specify a different address or Fax or

40   Confirmation number for subsequent notice purposes.  Notice shall be deemed effective on the

41   date of actual receipt or three days after the date of mailing, whichever is earlier.

Exhibits to Ainsworth Decl.
Page263

1        26.18  <u>Consents and Approvals</u>

2        Whenever the consent, approval, authorization or similar response of a Party is

3  required, or whenever a Party has the right to approve or give its consent, unless a different

4  standard is explicitly stated, that Party's consent, approval, authorization or similar response

5  shall neither be unreasonably withheld, conditioned nor delayed.  Any refusal to consent,

6  disapproval or similar negative response by that Party shall be in writing and must include a

7  detailed explanation for the refusal to consent, disapproval or similar negative response.  Unless

8  a different standard is explicitly stated, if the Party makes no response within a definite time

9  period provided for response, an affirmative response (i.e. consent, approval, authorization or

10  similar affirmative response) shall be deemed.  The statement of a definite period for giving a

11  response shall entitle the responding Party to give its response at any time within such period;

12  provided, however, that neither Party shall purposefully delay considering or giving any

13  requested response, and each Party will proceed in good faith to give such response in a timely

14  manner.

15        26.19  <u>Incorporation of Exhibits by Reference</u>

16        The Exhibits to this Lease are incorporated by reference as part of this Lease as

17  though set forth in full in this Lease.

18        26.20  <u>Non-Waiver of Government Rights</u>

19        By entering into this Lease and the Related Agreements, PSA is specifically not

20  obligating any other governmental agency with respect to any discretionary or regulatory action

21  relating to operation of the Project.  By entering into this Lease and the Related Agreements,

22  PSA is binding itself to the covenants in this Lease and the Related Agreements and such other

23  covenants as may be implied from this Lease and the Related Agreements, but PSA is not

24  otherwise limiting its governmental authority under the Act; provided PSA shall not exercise its

25  governmental authority (as-opposed to its contractual authority under this Lease or any Related

26  Agreement which is not considered PSA's "governmental" authority for purposes of this Section)

27  so as to impose any economic or operational burdens or impacts on FGI or the Project, either

28  directly or indirectly, not provided in this Lease or the Related Agreements.

**EXHIBIT 4**
**Page 94 of 179**

Exhibits to Ainsworth Decl.
Page264

1        26.21  <u>Exclusive Remedies</u>

2              The rights and remedies expressly set forth in this Lease shall be deemed

3  exclusive, except where otherwise indicated.

4        26.22  <u>No Third-Party Beneficiaries</u>

5              The Parties intend that the rights, obligations and covenants in this Lease shall be

6  exclusively enforceable by the Parties.  Except as expressly provided herein, there are no third-

7  party beneficiaries to this Lease.

8        26.23  <u>Further Actions</u>

9              At the request of either Party, the other Party shall, without further consideration,

10  promptly execute and deliver such other instruments and take such further actions as may be

11  necessary or appropriate to confer upon the requesting Party the benefits contemplated by this

12  Lease, and which are not contrary to the provisions of this Lease.

13        26.24  <u>Attorneys' Fees</u>

14              In the event a suit, action, Dispute Resolution, or other proceeding of any nature

15  whatsoever, including without limitation any proceeding under the U.S. Bankruptcy Code, is

16  instituted, or the services of an attorney are retained, to interpret or enforce any provision of this

17  Lease or with respect to any dispute relating to this Lease, the prevailing or non-defaulting Party

18  shall be entitled to recover from the losing or defaulting Party its attorneys', paralegals',

19  accountants', and other experts' fees and all other fees, costs, and expenses actually incurred and

20  reasonably necessary in connection therewith.  In the event of suit, action, Dispute Resolution, or

21  other proceeding, the amount thereof shall be determined by the judge or arbitrator, shall include

22  fees and expenses incurred on any appeal or review, and shall be in addition to all other amounts

23  provided by law.  In any suit, action, Dispute Resolution, or other proceeding in which FGI is the

24  substantially prevailing party, then PSA's attorneys', paralegals', accountants', and other experts'

25  fees and all other fees, costs, and expenses actually incurred, and the amount, if any, which PSA

26  must pay toward FGI's attorneys', paralegals', accountants', and other experts' fees and all other

27  fees, costs, and expenses actually incurred, shall not be considered Reasonable PSA Operating

28  Expenses and if PSA is the substantially prevailing party then the unrecovered amounts of PSA

29  costs as set forth above shall be Reasonable PSA Operating Expenses.

**EXHIBIT 4**
**Page 95 of 179**

PSA 000134

Exhibits to Ainsworth Decl.
Page265

1    26.25   Interest

2            Whenever any sums are due and payable, from one Party to another Party under

3    this Lease they shall bear interest from the date originally due until paid in full at the Prime Rate

4    plus four percentage points ("Default Interest"), if it is determined as a result of Dispute

5    Resolution, that the Party failing to make the payment when due did not have a good faith and

6    reasonable basis not to make the payment when due.  If it is determined, as a result of Dispute

7    Resolution, that the Party failing to make the payment when due did have a good faith and

8    reasonable basis not to make the payment when due, such sums shall bear interest from the date

9    due until paid in full at the Prime Rate plus two percentage Points ("Economic Interest").  The

10   "Prime Rate" shall mean the prime rate of interest as quoted from time-to-time in The Wall

11   Street Journal, or any successor publication.  In no event shall the interest rate exceed the highest

12   rate of interest that may be charged under applicable law.

13   26.26   Conflict of Interest

14           No member, director, officer, or employee of PSA shall have any personal

15   interest, direct or indirect, in this Lease, nor shall any such member, director, officer, or

16   employee participate in any decision relating to this Lease which affects his/her personal interest

17   or the interest of any Person in which he/she is, directly or indirectly, interested.

18   26.27   No PSA Personal Liability

19           No member, director, officer, or employee of PSA shall be personally liable to

20   FGI or any successor in interest to FGI in the event of any default or breach by PSA or for any

21   amount which may become due to FGI or such successor with respect to any obligations under

22   the terms of this Lease.

23   26.28   Governing Law

24           This Lease shall be construed according to and governed by the laws of the State

25   of Washington.

26   26.29   Reference Date of Lease

27           For reference purposes, the date of this Lease shall be the date on the first page,

28   irrespective of the date PSA or FGI actually executes this Lease.

**EXHIBIT 4**
**Page 96 of 179**

PSA 000135

Exhibits to Ainsworth Decl.
Page266

1     26.30  <u>Entire Agreement</u>

2            This Lease and the Related Agreements constitute the entire agreement between

3  the Parties as of the date of execution of this Lease. No prior agreements or understanding

4  pertaining to the same shall be valid or of any force or effect and the covenants and agreements

5  of this Lease shall not be altered, modified or added to except in writing signed by PSA and FGI.

6           IN WITNESS WHEREOF, this Lease has been executed by the Parties as of the

7  dates set forth below.

8

9     PSA:               WASHINGTON STATE PUBLIC STADIUM

10                     AUTHORITY, a public corporation of the State of

11                     Washington

12

13

14                     By: _Lorraine Hine_____

15                       Lorraine Hine, Chair of the Board

16

17     FGI:               FIRST & GOAL INC., a Washington corporation

18

19

20                     By: _Robert Whitsitt_____

21                       Robert J. Whitsitt, President

22

Exhibits to Ainsworth Decl.
Page267

1   STATE OF WASHINGTON   )

2                           ) ss.

3   COUNTY OF KING       )

4

5

6        I certify that I know or have satisfactory evidence that **LORRAINE HINE** is the person

7   who appeared before me, and said person acknowledged that said person signed this instrument,

8   on oath stated that said person was authorized to execute the instrument and acknowledged it as

9   the Chair of the Board of the **WASHINGTON STATE PUBLIC STADIUM AUTHORITY**, a

10  public corporation of the State of Washington, to be the free and voluntary act of such

11  corporation for the uses and purposes mentioned in the instrument.

12

13

14  Dated this 24ᵗʰ day of November, 1998.



(Signature of Notary)

ALLEN D. ISRAEL

(Legibly Print or Stamp Name of Notary)

Notary public in and for the State of Washington, residing at Seattle

My appointment expires 6/15/02

26  STATE OF WASHINGTON   )

27                          ) ss.

28  COUNTY OF KING       )

29

30

31        I certify that I know or have satisfactory evidence that **ROBERT J. WHITSITT** is the

32  person who appeared before me, and said person acknowledged that said person signed this

33  instrument, on oath stated that said person was authorized to execute the instrument and

34  acknowledged it as the President of **FIRST & GOAL INC.**, a Washington corporation, to be the

35  free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

36

37  Dated this 24ᵗʰ day of November, 1998.

(Signature of Notary)

ALLEN D. ISRAEL

(Legibly Print or Stamp Name of Notary)

Notary public in and for the State of Washington, residing at Seattle

My appointment expires 6/15/0

5084209.13 — STADIUM MASTER LEASE
11/23/98                        -90-           **EXHIBIT 4**
Page 98 of 179        PSA 000137

Exhibits to Ainsworth Decl.
Page268

# MASTER LEASE
## EXHIBIT A

## PROJECT SITE DESCRIPTION

THE "PROJECT SITE" CONSISTS OF: All of Lots 1 through 35, inclusive, of Block 325 and that portion of Lots 1 through 35, inclusive, of Block 285 of the Seattle Tide Lands as shown on the official maps of the Seattle Tide Lands in volume 2, pages 29, 30, 31 and 32 in King County, Washington, and vacated 3rd Avenue South, per City of Seattle Ordinance No. 10552, described as follows:

Beginning at the Southwest corner of said Block 325, said corner being the intersection of the North margin of South Connecticut Street with the East margin of Occidental Avenue South;

Thence north along said East margin of Occidental Avenue South and West boundary of said Block 325 a distance of 2060.28 feet to the Northwest corner of said Block 325, said corner being the intersection of the East margin of Occidental Avenue South with the South margin of South King Street;

Thence South 89°54'20" East along said South margin of South King Street and North boundary of said Blocks 325 and 285 a distance of 673.47 feet;

Thence South 0°05'40" West a distance of 60.00 feet;

Thence South 89°54'20" East a distance of 112.18 feet;

Thence South 1°06'04" West a distance of 1192.89 feet;

Thence South 10°36'22" West a distance of 820.21 feet to an intersection with the North margin of South Connecticut Street and the South boundary of said Block 285;

Thence South 89°59'21" West along said North margin of South Connecticut Street and the South boundary of said Blocks 285 and 325 a distance of 611.66 feet TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THE FOLLOWING PROPERTY (the "North Half Lot"):

That portion of Lots 1 through 5, of Block 325, and that portion of Lots 1 through 5, of Block 285 of the Seattle Tide Lands, and vacated 3rd Avenue South, per City of Seattle Ordinance No. 10552, all in the Northwest ¼ of Section 5, Township 24 North, Range 4 East, West Meridian, King County Washington, described as follows:

Beginning at the Northwest corner of said Block 325, said corner being the intersection of the East margin of Occidental Avenue South with the South margin of South King Street, thence South 88°46'43" East along said south margin of South King Street and the North boundary of said Blocks 325 and 285, a distance of 673.45 feet; thence South 1°11'39" West 60.00 feet; thence South 88°48'21" East 112.18 feet; thence South 2°12'15" West 181.02 feet to a line 30.00 feet South of and parallel to the centerline of the proposed Weller Street Pedestrian overpass; thence North 88°44'49" West along said

**EXHIBIT 4**
**Page 99 of 179**

Exhibit A   Page 1

S0055440 03

PSA 000138

Exhibits to Ainsworth Decl.
Page269

parallel line 782.19 feet to said East margin of Occidental Street; thence North 1°08'01" East along said margin 240.51 feet to THE POINT OF BEGINNING.

THE PROJECT SITE ALSO INCLUDES: all rights of use and other rights of the Washington State Public Stadium Authority ("PSA") with respect to the Project Site and the North Half Lot, as set forth in the certain Agreement and Letter of Intent dated June 25, 1998 among King County, Washington, the City of Seattle, the Washington State Public Stadium Authority, First & Goal Inc., Football Northwest Inc. and the Washington State Department of Transportation, (the "1998 Letter of Intent"); that certain Agreement, Stadium and Exhibition Center, Property Contributions and Reservation of Possessory Rights between King County, Washington and the Washington State Public Stadium Authority dated as of September 30, 1998 (the "Property Contribution Agreement"); and the Special Use Permit described in the Property Contribution Agreement. If the North Half Lot is acquired by the PSA pursuant to Section 5.3 of the Property Contribution Agreement or otherwise, the North Half Lot shall, upon such acquisition, become part of the Project Site and subject to the Master Lease.

**EXHIBIT 4**
**Page 100 of 179**

PSA 000139

50055440.03

Exhibit A    Page 2

MASTER LEASE
EXHIBIT 1

DEFINED TERMS

The following defined terms have the following defined meanings when used in this Master Lease Agreement. Some definitions are taken from the Development Agreement or Stadium Use Agreement.

Defined terms may be used together, and when so used will have the combined meaning of the two defined terms.

| TERM | FIRST USED | DEFINED |
|------|-----------|---------|
| 1998 Letter of Intent | 3.3 | Development Agreement |
| AAA | 24.4 | 24.4 |
| Act | Recital A | Recital A |
| actual Reasonable PSA Operating Expenses | 5.1.3.4 | 5.1.3.4 |
| adjustment date | 26.2 | 26.2 |
| Admissions Tax | 18 | 18 |
| Affected Area | 8.8.1 | 8.8.1 |
| Affiliate | 6.1.1.2 | |
| affordable price | 8.1.2.1 | 8.1.2.1 |
| Affordable Priced Seats | 8.1.2.1 | 8.1.2.1 |
| Aggregate Adjustment Amount | 8.1.2.3 | 8.1.2.3 |
| Agreement of Event Scheduling Principles | 8.2.2 | 8.2.2 |
| Allen | Recital H | Recital H |
| Allen Ownership Group | 21.8.1.1 | 21.8.1 |
| Annual Loan Debt Service | 5.1.3.1 | 5.1.3.1 |
| Annual Maintenance Plan | 11.1.3 | 11.1.3 |
| Annual Review | 8.2.3 | 8.2.3 |
| average | 8.1.2.1 | 8.1.2.1 |
| Backup marketing expenses | 4.2.1 | Trade meaning |
| Basic Rent | 5.1.2.1 | 5.1.2.1 |
| Bonds | 14.1.2 | Development Agreement |
| booking policies | 6.1.4 | 6.1.4 |
| bunker suite | 8.1.3 | 8.1.3 |
| Business Days | 5.1.3.4 | Development Agreement |
| Capital Improvements Account | 6.1.1.3 | 11.7 |
| Cash Reserve | 5.7.1.1 | 5.7.1.1 |
| Change of Control of FNW | 21.8.1 | 21.8.1 |
| Change of Control of Other Tenant | 21.8.2 | 21.8.2 |
| Club Seat | 8.1.3 | Stadium Use Agreement |
| Collective Bargaining Agreement | 8.7 | Common meaning |
| Commencement Date | 3.1 | 3.1 |
| Comparable Exhibition Facilities | 7.2.1 | 11.1.2.1 |
| Comparable Facilities | 11.1.2.1 | 11.1.2.1 |

#50038657 v2 - Defined Terms
11/23/982:38 PM

Exhibit 1, Page 1

| | | |
|---|---|---|
| Comparable Parking Facilities | 7.2.1 | 11.1.2.1 |
| Comparable Stadium Facilities | 11.1.2.1 | 11.1.2.1 |
| Completion Date | 3.1 | 3.1 |
| Completion Term | 4 | 4.3.1 |
| Control | 21.8 | 21.8 |
| Damages | 15.1 | 15.1 |
| de facto naming right | 17.1.2 | 17.1.2 |
| Default Interest | 26.17 | 26.17 |
| design development | 11.9.1 | Trade meaning |
| Development Agreement | Recital C | Recital C |
| Development Areas | 5.1.3.1 | Development Agreement |
| Dispute | 24.1 | 24.1 |
| Dispute Notice | 24.2 | 24.2 |
| Dispute Resolution | 5.1.3.4 | 24.1 |
| Economic Interest | 22.6 | 26.17 |
| Equitable Proceeding | 24.7 | 24.7 |
| Event of Default | 4.2.1 | 22.1 |
| Exempt Information | 25.1.1 | 25.1.1 |
| Exhibition Center | 6.1.3 | Development Agreement |
| Exhibition Hall | Recital C | Recital C |
| Exhibition Hall Events | 6.1.1.2 | 6.1.1.4 |
| Exhibition Hall Expenses | 6.1.1.3 | 6.1.1.3 |
| Exhibition Hall Naming Rights | 6.1.1.2 | 17.1.1.3 |
| Exhibition Hall Naming Rights | 17.1.1.3 | 17.1.1.3 |
| Exhibition Hall Net Profits | 6.1.1.1 | 6.1.1.1 |
| Exhibition Hall Parking Expenses | 6.1.1.6 | 6.1.1.6 |
| Exhibition Hall Parking Revenue | 6.1.1.2 | 6.1.1.5 |
| Exhibition Hall Revenues | 6.1.1.2 | 6.1.1.2 |
| Extension Period | 4 | 4.2 |
| Fax Number | 26.14 | 26.14 |
| FGI | Introduction | Introduction |
| FGI Contribution | 14.1.2 | Development Agreement |
| FGI Documents | 25.1 | 25.1.1 |
| FGI's Personal Property | 23.1 | 23.1 |
| first reasonable opportunity | 8.1.2.3 | 8.1.2.3 |
| First-Class Condition | 11.1.2.1 | 11.1.2.1 |
| First-Class Manner | 7.2.1 | 7.2.1 |
| Five-Year Plan | 11.1.4 | 11.1.4 |
| flat shows | 6.1.1.4 | Common meaning |
| FNW | Recital H | Recital H |
| Force Majeure | 12.1.5 | Follows in this Exhibit |
| GAAP | 6.1.5 | 6.1.5 |
| Governmental Authority | 6.1.1.2 | Follows in this Exhibit |
| Hazardous Substances | 7.3.1 | Development Agreement |
| Home Game | 8.1.2.1 | Stadium Use Agreement |
| Impositions | 6.1.1.3 | Follows in this Exhibit |

#50038657 v2 – Defined Terms
11/23/982:38 PM

Exhibit 1, Page 2

**EXHIBIT 4**
**Page 102 of 179**

PSA 000141

Exhibits to Ainsworth Decl.
Page272

| | | |
|---|---|---|
| Indemnified Party | 15.3 | 15.3 |
| Indemnifying Party | 15.3 | 15.3 |
| Indexed | 5.1.1 | 26.2 |
| Initial Term | 4 | 4.1 |
| Institution | 13.8.1 | Follows in this Exhibit |
| Insurance | 6.1.1.3 | 13 |
| internally generated financing | 11.1.2.2 | 11.1.2.2 |
| IP Rights | 17.1 | 17.1 |
| L/C Reserve | 5.7.1.1 | 5.7.1.1 |
| Laws | 5.1.3.1 | Development Agreement |
| League | 8.1.1 | Stadium Use Agreement |
| Lease | Recital I | Recital I |
| Lease Year | 4.1 | 4.1 |
| lottery basis | 8.1.3 | Common meaning |
| Lottery Promotion obligation | 8.4.4 | Development Agreement |
| lowest ticket prices | 8.1.2.1 | 8.1.2.1 |
| Maintenance | 6.1.1.3 | 11.1.1 |
| Major Maintenance | 11.1.1 | 11.3.1 |
| Management Company | 21.3.4.2 | 21.3.7 |
| Mariners | 8.2.1 | 8.2.1 |
| Master Lease Guaranty | 2.2 | Development Agreement |
| Master Use Permit | 8.8.2 | 8.8.2 |
| MBE | 8.6 | 8.6 |
| Memorandum of Lease | 26.11 | Exhibit 25.10 |
| Modernization | 6.1.1.3 | 11.4 |
| Modernization Improvements | 11.1.2.2 | 11.4.1 |
| Modernization Plan | 11.4.2 | 11.4.2 |
| naming rights | 17.1 | Trade Meaning |
| Naming Rights Account | 6.1.1.3 | 11.6 |
| Neighboring communities | 8.12 | 8.12 |
| NFL Season | 8.1.2.2 | Stadium Use Agreement |
| Nondisturbance | 21.2.2 | 21.2.4 |
| Normal Maintenance | 11.1.1 | 11.2.1 |
| North Parking Lot | 3.3 | Development Agreement |
| occurrence basis | 13.3.6 | Trade meaning |
| Operating Reserve | 5.7.1.1 | 5.7.1.1 |
| Other Improvements | Recital C | Recital C |
| Other Transferee | 21.8.2 | 21.8.2 |
| Other Transferee Affiliate | 21.8.2.1 | 21.8.2.1 |
| Parking Facilities Naming Rights | 6.1.1.2 | 17.1.1.4 |
| Parking Facility | Recital C | Recital C |
| Parking Facility Naming Rights | 17.1.1.5 | 17.1.1.5 |
| Parking Tax | 18 | 18 |
| Partial Taking | 14.3 | 14.3 |
| Parties | 4.1 | Development Agreement |
| Percentage Rent | 6.1.2 | 6.1.2 |

Exhibits to Ainsworth Decl.
Page273

| | | |
|---|---|---|
| Permitted Exceptions | 20.1.2 | Exhibit 20.1.2 |
| Person | 2.2 | Development Agreement |
| Personal Property | 3.4 | 3.4 |
| PFD | 8.2.1 | 8.2.1 |
| Phase I | 3.1 | Development Agreement |
| Phase I Parcel | 3.1 | Exhibit 3.1, Development Agreement |
| Phase II | 3.1 | Development Agreement |
| Playoff Home Games | 8.1.1 | Stadium Use Agreement |
| Premises | 2 | 3.1; 3.2 |
| Prime Rate | 26.17 | 26.17 |
| Project | Recital F | Recital F |
| Project Art | 8.14.1 | 8.14.1 |
| Project Art Fund | 8.14.1 | 8.14.1 |
| Project Art Selection Committee | 8.14.2 | |
| Project Art Spaces | 8.14.2 | 8.14.2 |
| Project Element | Recital E | Recital E |
| Project Improvements | Recital E | Recital E |
| Project Labor Agreement | 8.7 | Development Agreement |
| Project Naming Rights | 17.1.1.1 | 17.1.1.1 |
| Project Site | Recital B | Recital B |
| Property Contribution Agreement | 3.3 | Development Agreement |
| PSA | Introduction | Introduction |
| PSA Advisory Committee | 17.4.4 | Development Agreement |
| PSA Office Space | 3.5.3 | 8.11.1 |
| PSA Possession Date | 21.2.1 | 21.2.1 |
| PSA's Board Meetings | 8.11.5 | 8.11.5 |
| PSLs | 2.1 | Development Agreement |
| public area | 8.11.1 | 8.11.1, Act |
| public or entertainment areas | 10.2.5 | Act |
| public records | 25.3 | Common meaning |
| punch list | 11.9.3 | Trade meaning |
| Qualified Sublease | 21.1 | 21.2.1 |
| Ratable proportion of PSL Proceeds | 14.1.2 | 14.1.2 |
| Reasonable Efforts | 4.4 | Development Agreement |
| reasonable expenses | 22.4.3 | 22.4.3 |
| Reasonable PSA Operating Expenses | 4.2.1 | 5.1.3.1 |
| reasonable rental value | 22.4.2 | 22.4.2 |
| reference date | 26.2 | 26.2 |
| Regular Season Home Games | 8.1.1 | Stadium Use Agreement |
| Related Agreements | 15.2 | Development Agreement |
| Related Person | 7.3.3 | Development Agreement |
| Rent | 4.2.2 | 5.1 |
| Rent Letter of Credit | 21.5.1 | 21.5.1 |
| Reserve Letter of Credit | 5.7.3.1 | 5.7.3.1 |
| Restoration | 12.1 | 12.1 |

#50038657 v2 - Defined Terms
11/23/982:38 PM

**EXHIBIT 4**
Page 104 of 179

PSA 000143

Exhibit 1, Page 4

Exhibits to Ainsworth Decl.
Page274

| Restoration Proceeds | 12.1.4 | 12.1.4 |
|---|---|---|
| Seattle metropolitan area | 8.7 | Common meaning |
| sight draft | 5.7.3.1 | Trade meaning |
| Special Naming Rights | 17.1.1 | 17.1.1 |
| Special Naming Rights Agreement | 17.4.2 | 17.4.2 |
| Stadium | Recital C | Recital C |
| Stadium | 6.1.1.4 | Development Agreement |
| Stadium Mitigation Report and Plan | 8.8.2 | 8.8.2 |
| Stadium Naming Rights | 17.1.1.2 | 17.1.1.2 |
| Substantial Completion | 3.1 | Development Agreement |
| Substantial Taking | 14.2 | 14.2 |
| Sufficient Experience | 21.3.4.2 | 21.3.4.2 |
| Suite | 8.1.3 | Stadium Use Agreement |
| Suite Lottery | 8.1.3 | 8.1.3 |
| Suite Lottery Program | 8.1.3 | 8.1.3 |
| Swing Space | Recital D | Recital D |
| Tax Collection and Disbursement Agreement | 18 | 18 |
| Team | Recital H | Recital H |
| team affiliate | Recital H | Act |
| Temporary Taking | 14.6 | 14.6 |
| Term | 3.2 | 4 |
| Total Taking | 14.1 | 14.1 |
| Transfer | 21.3.1 | 21.7 |
| Transferee | 21.3.1 | 21.3.1 |
| Trustee of Insurance | 12.1.2 | 13.8.1 |
| turn-key | Recital G | Trade meaning |
| Utilities | 6.1.1.3 | Follows in this Exhibit |
| WBE | 8.6 | 8.6 |

Force Majeure. "Force Majeure" means any matter beyond the reasonable control of a party (financial inability excepted), including, without limitation, weather, strikes, labor unrest, labor disputes, lockouts, picketing, labor shortages, failure of Utilities, materials shortages, transportation shortages, energy shortages, governmental action or inaction, rationing, inability to obtain permits or third-party approvals, war, acts of terrorism, acts of vandalism, civil commotion, insurrection, riots, local or national emergency, acts of God, natural disasters, or fire or other casualty.

Governmental Authority. "Governmental Authority" means any federal, state, regional, local or municipal government, corporation, department, agency, district, court, tribunal, or other instrumentality having jurisdiction over the matter(s) in question.

Impositions. "Impositions" means all taxes, including without limitation admissions taxes, parking taxes, sales taxes, gross receipts taxes, compensating or other retail excise taxes, special and general assessments, use and occupancy taxes, rent taxes, possessory interest taxes, excises, levies, license and sales and permit fees and taxes of general application and all other charges of

#50038657 v2 - Defined Terms
11/23/982:38 PM
Exhibit 1, Page 5
EXHIBIT 4
Page 105 of 179
PSA 000144

Exhibits to Ainsworth Decl.
Page275

general application which shall during the Term of the Lease be assessed, levied, charged, confirmed or imposed by any Governmental Authority, or which accrue or become due or payable on account of or become a lien on or against the Premises or Project Improvements or any portion thereof, or any interest in the Premises.

Institution.    "Institution" shall mean a bank, insurance company, pension fund, major financial institution, or other entity actively engaged in a business related to the business for which "Institution" is contemplated by the particular context of this Lease, with total assets of at least $100,000,000, Indexed.

Utilities.  "Utilities" means all services and utilities delivered to, provided for, or consumed on the Premises, including, without limitation, such services as janitorial and garbage pick-up, and such utilities as gas, water, sewer, storm water drainage, electricity, cable, microwave, television, and telecommunications services.

**EXHIBIT 4**
**Page 106 of 179**

Exhibit 1, Page 6

PSA 000145

#50038657 v2 - Defined Terms
11/23/982:38 PM

Exhibits to Ainsworth Decl.
Page276

MASTER LEASE

EXHIBIT 3.1

PHASE I PARCEL DESCRIPTION

**General description of Phase I of the Project Site (not an official legal description):**

That portion of the Project Site (described in Exhibit A) lying south of the following described line:

Beginning at a point on the eastern margin of Occidental Street, located 780 feet north of the northeast intersection of S. Royal Brougham Way and Occidental Ave. So.; thence easterly to a point that intersects a line that is an arc which is concentric with the existing Kingdome building and which runs 20 feet south of the existing Kingdome Gate "A"; thence leaving such concentric arc and running easterly to the ending point located on the easterly margin of a roadway known as "Street of Dreams" which ending point is located on a line that runs 740 feet north from the northerly margin of S. Royal Brougham Way.

EXHIBIT 4
Page 107 of 179

Exhibit 3.1

30003063 03/1

PSA 000146

Exhibits to Ainsworth Decl.
Page277

MASTER LEASE
EXHIBIT 4.1

## CONFIRMATION OF COMMENCEMENT DATE AND COMPLETION DATE

### CONFIRMATION OF COMMENCEMENT DATE

Pursuant to Section 4.1 of the Master Lease dated November 24, 1998, between PSA and FGI ("Master Lease"), the parties hereby confirm that:

The Commencement Date as defined in the Master Lease is

_____October 28, 1999_____.

Dated: _October 29, 1999_____

WASHINGTON STATE PUBLIC STADIUM
AUTHORITY

By: _____
     Ann M. Kawasaki, Executive Director

FIRST & GOAL INC.

By: _____
     Robert J. Whitsitt, President



19991102000895
PAGE 002 OF 002
11/02/1999 12:31
KING COUNTY, WA

PUBLIC STADIUM MISC      9 00

EXHIBIT 4
Page 108 of 179

Exhibit 4.1 Page 1                              PSA 000147

Exhibits to Ainsworth Decl.
Page278

RETURN ADDRESS



PUBLIC STADIUM MISC      9.00

19991102000895
PAGE 001 OF 002
11/02/1999 12:31
KING COUNTY, WA

After recording return to:
Robin Wohlhueter
Public Stadium Authority
401 2nd Avenue South, Suite 520
Seattle, WA  98104

Please print neatly or type information
## Document Title(s)

*Confirmation of Commencement Date – Phase I*

## Reference Numbers(s) of related documents

Additional Reference #'s on page ____

## Grantor(s) (Last, First and Middle Initial)

*Washington State Public Stadium Authority*

Additional grantors on page ____

## Grantee(s) (Last, First and Middle Initial)

*First @ Goal Inc.*

Additional grantees on page ____

## Legal Description (abbreviated form: i.e. lot, block, plat or section, township, range, quarter/quarter)

Additional legal is on page ____

## Assessor's Property Tax Parcel/Account Number

Additional parcel #'s on page ____

The Auditor/Recorder will rely on the information provided on this form.  The staff will not read the document to verify the
accuracy or completeness of the indexing information provided herein.

**EXHIBIT 4**
**Page 109 of 179**

PSA 000148

LL 014-087
F 829
D 134925

Return Address:
*Seahawks Stadium & Ev. Center*
*800 Occidental Av S #700*
*Seattle WA 98134*

20020807001911
WA STATE PUBLI N          21.00
PAGE 001 OF 003
08/07/2002 12:08
KING COUNTY, WA

Please print or type information **WASHINGTON STATE RECORDER'S** Cover Sheet (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)
1. Notice of Confirmation of Completion Date
3. _____  4. _____

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page _____ of document    2 0000522000751

**Grantor(s)** (Last name, first name, initials)
1. Public Stadium Authority _____
2. _____

Additional names on page _____ of document.

**Grantee(s)** (Last name first, then first name and initials)
1. First & Goal Inc. _____
2. _____

Additional names on page _____ of document.

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)
_____
_____
Additional legal is on page _____ of document.

**Assessor's Property Tax Parcel/Account Number**          ☐ Assessor Tax # not yet assigned
_____

The Auditor/Recorder will rely on the information provided on the form. The staff will not read the document to verify the accuracy or completeness of the indexing information provided herein.

I am requesting an emergency nonstandard recording for an additional fee as provided in RCW 36.18.010. I understand that the recording processing requirements may cover up or otherwise obscure some part of the text of the original document.

_____ Signature of Requesting Party

**EXHIBIT 4**
**Page 110 of 179**                    PSA 000149

Exhibits to Ainsworth Decl.
Page280

## NOTICE OF CONFIRMATION OF COMPLETION DATE

This Notice of Confirmation is executed by WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington public corporation ("PSA") and FIRST & GOAL INC., a Washington Corporation ("FGI").

This relates to Section 4.1 of the Master Lease dated November 24, 1998, between PSA and FGI ("Master Lease"), a Memorandum of which is recorded in King County, Washington on May 22, 2000 as Document Number 20000522000751.   The parties hereby confirm that:

1.     The Completion Date as used in the Master Lease is June 27, 2002.


Dated this 26th of July, 2002.

PSA:                          WASHINGTON STATE PUBLIC STADIUM
                              AUTHORITY

                              By: _____
                                  Ann M. Kawasaki


FGI:                          FIRST & GOAL INC.

                              By: _____
                                  Robert J. Whitsitt, President


[ACKNOWLEDGEMENTS FOLLOW]


**EXHIBIT 4**
**Page 111 of 179**

1

PSA 000150

Exhibits to Ainsworth Decl.
Page281

STATE OF WASHINGTON )
                     )
COUNTY OF KING       )

I certify that I know or have satisfactory evidence that **ANN M. KAWASAKI** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the Executive Director of the **WASHINGTON STATE PUBLIC STADIUM AUTHORITY**, a Washington public corporation, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this 26ᵗʰ day of ___July___, 2002.



_J. E. Todd_
(Signature of Notary)

_J. E. Todd_
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington,
residing at _Bothell, WA_

My appointment expires _6/9/05_

STATE OF WASHINGTON )
                     )
COUNTY OF KING       )

I certify that I know or have satisfactory evidence that **ROBERT J. WHITSITT** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the President of the **FIRST & GOAL INC.**, a Washington corporation, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this 31st day of _July_, 2002.

_(signature)_
(Signature of Notary)

_KIM LINDBECK_
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington,
residing at _EDMONDS, WA_.

My appointment expires _3/15/04_

2

**EXHIBIT 4**
**Page 112 of 179**

PSA 000151

Exhibits to Ainsworth Decl.
Page282

MASTER LEASE
EXHIBIT 6.2
POSSIBLE FUTURE PROJECT ACTIVITIES

NOTHING HEREIN SHALL BE CONSTRUED AS ENTITLING FGI TO USE THE PREMISES
OTHER THAN IN ACCORDANCE WITH SECTION 7.1.

Adult Shows
Advertising and Sponsorship
Aircraft Events or Activities/ Shows/ Races/
    Demonstrations/ Sales/ Auctions/ etc. (e.g.,
    lighter than air, heavier than air, powered,
    unpowered, current, futuristic, vintage, etc.)
Antique/ Collectibles Fairs/ Events or Activities
Arcades/ Games/ Gaming
Art Events or Activities/ Demonstrations/ ·
    Shows/ Sales/ Auctions/ etc.
Arts, Crafts and/or Hobby Events or Activities/
    Demonstrations/ Shows/ Sales/ Auctions/
    etc.
Automobile and /or Vehicle (e.g. motorcycles,
    off-road, tractor, powered, un-powered)
    Events or Activities/ Shows/ Races/
    Demonstrations/ Sales/ Auctions/ etc. (e.g.
    current, futuristic, vintage, etc.)
Bartering, Exchanging or Trading Events or
    Activities
Bazaars (Holiday etc.)
Beer, Wine and/or Food Events or Activities /
    Festivals/ etc.
Bicycle and other Human Powered and
    Unpowered Vehicle Events or Activities/
    Shows/ Races/ Demonstrations/ Sales/
    Auctions/ etc.
Boat and other Watercraft Events or Activities/
    Shows/ Races/ Demonstrations/ Sales/
    Auctions/ etc. (e.g., motor powered, sail,
    unpowered, current, futuristic, vintage, etc.)
Bridal or Wedding Shows/ Events or Activities
"Bumbershoot" type Events or Activities
Carnivals
Charity Events or Activities/ Runs/ Walks/
    Auctions/ Rallies/ etc.
Children Shows/ Events or Activities
Circuses
Civic Events or Activities
Classes
Combination Events or Activities
Commercial Events or Activities

Commercial Equipment Shows (e.g. office
    equipment)
Commercial Seminars (e.g. self-improvement
    such as Anthony Robbins)
Competitions (e.g. Band/ Cheerleader/ Dance/
    Food (e.g. Chili Cook Off)/ Chess/ Athletic/
    Academic/ etc.)
Computers and Technology Events or Activities
Concerts
Concessions/ Catering/ Novelties/ Visitor
    Services
Conventions
Corporate and Business Meetings (e.g. annual
    meetings)/ Parties/ Events or Activities
Demonstrations
Direct Marketing Events or Activities (e.g.
    Amway, Herbalife)
Disabled/Special Needs Persons Events or
    Activities
Distribution
"Double Dare" type Events or Activities
Educational Events or Activities
Emergency Events or Activities / Training/
    Housing/ Medical/ Detention/ etc.
Entertainment Events or Activities
Exhibitions
"Extreme Sports" Events or Activities
Fairs
Family Shows/ Events or Activities
Farmers Markets
Fashion Shows/ Events or Activities
Festivals (e.g. Ethnic/ Food (e.g. Bite of Seattle)/
    Music (e.g. Bumbershoot)/ etc.)
Film, Video, and Photography Events or
    Activities
Fireworks Shows
Flea Markets
Frisbee/ Frisbee Golf/ etc. Tournaments/ Events
    or Activities
Games and Related Events or Activities
Gatherings: (e.g. Million Man March, Promise
    Keepers)
Goodwill Games

EXHIBIT 4
Page 113 of 179
Exhibit 6.2 Page 1

PSA 000152

Exhibits to Ainsworth Decl.
Page283

Government Events or Activities

"Haunted House" type Events or Activities

Highland Games/ Events or Activities

Holiday Events or Activities/ Festivals/ Shows/
etc., (e.g. New Years, New Millennium,
Fourth of July, Christmas, Easter, etc.)

Home/ Yard/ Garden Shows/ Events or
Activities

"Hoop it Up" type Events or Activities

Hot Air Balloon Events or Activities

Hot Rod Car Shows/ Events or Activities

Industry Events or Activities/ Games/ etc., (e.g.
log rolling, bus rodeo)

Junior Olympics

Labor/ Union Events or Activities

Laser Shows

Laser Tag

Manufacturing/ Assembly

Martial Arts Competitions/ Events or Activities

Mazes

Meetings

Meets

Model and/or Hobby Shows/ Demonstrations/
Competitions/ Sales (e.g. aircraft, trains
boats, cars)

Motivational Speakers

Motorcycle/ Bicycle / Motocross Competitions/
Events or Activities

Movie Theater

Museums

Music Events or Activities/ Performances/
Festivals (e.g. Bumbershoot/ Jazz/ "Lillith
Fair"/ "Lollapalooza"/ Blues/ etc.)/
Concerts/ Recitals/ etc.

"Major League Baseball Experience" type
Events or Activities

"Major Soccer League Experience" type Events
or Activities

Neighborhood Events or Activities

Noncommercial Seminars

Nonprofit Events or Activities

"NFL Experience" type Events or Activities t

Office

Olympic Games Events or Activities

Outdoor/ Sportsman Shows/ Events or Activities

Paintball

Parachuting/ Air Sports Events or Activities

Parades

Parties and Celebrations e.g. Weddings, Bar
Mitzvahs, Confirmations, Birthdays, New
Years, Millennium, etc.

Patriotic Events or Activities

Performance Theater

Pet, Livestock and other animal Shows/ Events
or Activities

Plant Shows/ Events or Activities

Police Station

Political Conventions/ Events or Activities

Polo

Pope/ President/ Dignitary/ Celebrity Events or
Activities

Private Events or Activities

Public Events or Activities

Public Service Events or Activities

Rallies

Races

Recreational Equipment Shows/ Events or
Activities

Recreational Vehicle Shows/ Events or
Activities

Religious Events or Activities / Revivals/
Services/ Prayer Meetings/ Convocations/
etc.

Religious Group or Organization Events or
Activities / etc.

Retail Sales/ Showroom

Retreats

Rifle/ Gun/ Weapons/ Ammo Shows/ Sales/
Events or Activities/ etc.

Rock Climbing and related Events or Activities

Rodeo

Runs

Sales

Science or Scientific Fairs/ Events or Activities

"Saturday Market" type Events or Activities

Scouting/Campfire/and Other Youth Group
Events or Activities

"Seafair" Events or Activities

"Seahawk Experience" type Events or Activities

Seasonal Events or Activities (e.g. Octoberfest/
Spring Time Celebration)

Seminars

Shakespearean type Festivals/ Events or
Activities

Shows

Skating Events or Activities (including in-line
and skateboards).

Ski Jump Events or Activities

Ski Shows/ Events or Activities

Social Events or Activities

Special Interest Group Events or Activities

Special Olympics Events or Activities

Speeches

Sports and/or Athletic Events or Activities,
including without limitation school, college,
amateur, semi-pro, professional, seniors,
international, disabled, and charitable events

**EXHIBIT 4**
**Page 114 of 179**

50036220.02

PSA 000153

Exhibit 6.2 Page 2

Exhibits to Ainsworth Decl.
Page284

or activities and activities, including without
limitation competitions, tryouts, training,
practices and exhibition, regular season,
preliminary, qualifying, post-season,
championship, tournament, and "all-star"
games for any sport, including without
limitation: football, soccer, tennis, softball,
baseball, lacrosse, track and field,
gymnastics, field hockey, bicycle, rugby,
fencing, Olympic-type events or activities,
decathlon, triathlon, biathlon, fencing,
shooting, boxing, wrestling, archery, golf,
cricket, croquet, lawn bowling, ice and
roller/in-line skating, skateboard, ice
skating, swimming, diving, skiing, etc.; and
including without limitation any
organizational, promotional, ceremonial,
celebratory, historical, fan participation, fan
recognition, community outreach, or other
or similar type event ancillary or otherwise
related to any such sporting or athletic
events or activities (or series or season of
such Events or Activities) or to any player
or coach or other participant, team, league
or other organization involved in such
events or activities.

Superbowl and Related Events or Activities
Swap Meets
Television Shows (e.g. Wheel of Fortune)
Theater
Theme Park
Tournaments
Tractor Pulls
Trade Shows/ Events or Activities
Training
Virtual Reality/Holograms
Walks
Warehouse
Water Park
Wholesale Sales/ Showroom
World Championships and Preliminaries
World Cup Soccer
World Masters Games

**EXHIBIT 4**
**Page 115 of 179**

PSA 000154

Exhibits to Ainsworth Decl.
Page285

MASTER LEASE
EXHIBIT 8.11

FORM OF CONFIRMATION OF PSA OFFICE SPACE DESIGNATION
ARCHITECT OF RECORD DRAWING
A111 H - PSA OFFICES



Exhibit 8.11          **EXHIBIT 4**          PSA 000155
                      **Page 116 of 179**

Exhibits to Ainsworth Decl.
Page286

## U.S. EXHIBIT HALLS & TOTAL SQUARE FEET
### OF CURRENT EXHIBIT SPACE*

1. McCormick Place
   Chicago, IL
   2,200,000

2. Las Vegas Convention Center
   Las Vegas, NV
   1,300,000

3. Georgia World Congress
   Center
   Atlanta, GA
   1,180,000

4. Astrodome U*S*A (includes
   Astrohall, Astroarena,
   Astrodome)
   Houston, TX
   1,130,000

5. Orange County Convention
   Center
   Orlando, FL
   1,103,538

6. Kentucky Exposition Center
   Louisville, KY
   1,068,050

7. Sands Expo & Convention
   Center
   Las Vegas, NV
   1,006,396

8. International Exposition (I-X)
   Center
   Cleveland, OH
   902,000

9. Los Angeles Convention &
   Exhibition Center
   Los Angeles, CA
   865,000

10. Convention Center
    Dallas, TX
    850,000

11. Cobo Conference/
    Exhibition Center
    Detroit, MI
    800,000

12. Jacob K. Javits Convention
    Center of New York
    New York City, NY
    760,000

13. Anaheim Convention Center
    Anaheim, CA
    720,000

14. Ernest N. Morial
    Convention Center – New
    Orleans
    New Orleans, LA
    700,000

15. National Western Complex
    Denver, CO
    601,500

16. Rosemount Convention
    Center
    Rosemount, IL
    600,000

17. San Diego Convention
    Center
    San Diego, CA
    571,981

18. Indiana State Fairgrounds
    Event Center
    Indianapolis, IN
    559,000

19. Miami Beach Convention
    Center
    Miami Beach, FL
    502,717

20. America's Center/Cervantes
    Convention Center
    St. Louis, MO
    502,000

21. New Atlantic City Convention
    Center
    Atlantic City, NJ
    500,000

22. Kansas City Convention
    Center (includes H. Roe Bartle
    Hall)
    Kansas City, MO
    498,600

23. George R. Brown Convention
    Center
    Houston, TX
    451,500

24. Tulsa Exposition Center
    Tulsa, OK
    448,000

25. Moscone Convention Center
    San Francisco, CA
    442,000

26. Phoenix Civic Plaza
    Phoenix, AZ
    438,000

27. Pennsylvania Convention
    Center
    Philadelphia, PA
    435,000

28. New Charlotte Convention
    Center
    Charlotte, NC
    412,500

29. Cleveland Convention Center
    Cleveland, OH
    409,000

30. Long Beach Convention &
    Entertainment Center
    Long Beach, CA
    390,382

**EXHIBIT 4**
**Page 117 of 179**

PSA 000156

*Tradeshow Week's Major Exhibit Hall Directory, 1997

Exhibits to Ainsworth Decl.
Page287

31. Washington Convention
Center
Washington, D.C.
381,000

32. Indiana Convention Center
& RCA Dome
Indianapolis, IN
377,452

33. Palmetto Expo Center
Greenville, SC
375,000

34. American Royal Center
Kansas City, MO
372,000

35. Reno Convention Center
Reno, NV
370,000

36. Fairplex
Pomona, CA
348,920

37. Portland Metropolitan
Exposition Center
Portland, OR
341,200

38. Minneapolis Convention
Center
Minneapolis, MN
319,000

39. Eastern States Exposition
West Springfield, MA
317,000

40. Greater Columbia
Convention Center
Columbus, OH
306,000

41. Baltimore Convention Center
Baltimore, MD
300,000

42. Colorado Convention Center
of the Denver Convention
Complex
Denver, CO
300,000

43. Cow Palace
San Francisco
300,000

44. Atlanta Market Center
(Merchandise Mart, Apparel
Mart, Gift Mart, INFORUM)
Atlanta, GA
296,000

45. Henry B. Gonzalez
Convention Center
San Antonio, TX
291,600

46. King County Stadium/"The
Kingdome"
Seattle, WA
281,147

47. CAL EXPO/California
Exposition & State Fair
Sacramento, CA
263,600

48. Fort Washington Expo
Center
Fort Washington, PA
260,000

49. Salt Palace Convention
Center
Salt Lake City, UT
256,000

50. Wisconsin Center
Milwaukee, WI
256,000

51. Arizona State Fair Park
&Exposition
Phoenix, AZ
255,880

52. Bayside Expo Center
Boston, MA
250,000

53. Dane County Expo Center
Madison, WI
250,000

54. San Mateo County Expo
Center
San Mateo, CA
245,000

55. Louisiana Superdome
New Orleans, LA
240,030

56. Dr. Albert B. Sabin
Convention Center
Cincinnati, OH
240,000

57. Tampa Convention Center
Tampa, FL
236,000

58. Charlotte Merchandise Mart
Charlotte, NC
224,000

**EXHIBIT 4**
**Page 118 of 179**

PSA 000157

*Tradeshow Week's Major Exhibit Hall Directory, 1997

Exhibits to Ainsworth Decl.
Page288

Here is the Stadia information that you requested. Some do have names (naming rights), some do not.

NFL Stadia Opened Since 1996:

1.   ALLTEL Stadium - Jacksonville Jaguars
2.   Ericcson Stadium - Carolina Panthers
3.   Jack Kent Cooke Stadium - Washington Redskins
4    Baltimore Ravens Stadium

NFL Stadia Proposed by 2006 (to date)

1.   Tampa Bay Stadium - Tampa Bay Buccaneers
2.   Tennessee Oliers Stadium
3.   Cleveland Browns Stadium
4.   Cincinnati Bengals Stadium
5.   Detroit Lions Stadium
6.   San Francisco 49ers Stadium (on hold)
7.   Washington State Football/Soccer Stadium and Exhibition Center - Seattle Seahawks
8.   Denver Broncos Stadium
9.   Pittsburgh Steelers Stadium

MLB Stadia Opened Since 1996:

1.   Turner Field - Atlanta Braves
2.   BankOne Ballpark - Arizona Diamondbacks

MLB Stadia Proposed by 2006 (to date):

1.   Miller Field - Milwaukee Brewers
2.   Safeco Field - Seattle Mariners
3.   Houston Astros Stadium
4.   Detroit Tigers Stadium
5.   Minnesota Twins Ballpark (on hold)
6.   New York Mets Ballpark
7.   Cincinnati Reds Ballpark

**EXHIBIT 4**
**Page 119 of 179**

PSA 000158

| Free-Standing Parking Garages | | | |
|---|---|---|---|
| Garage | Location | Owner/Operator | Stalls |
| 6th & Cherry Garage | 6th & Cherry | Republic Parking | 770 |
| Post Office | 4th & Lander | Post Office | 980 |
| "Sinking Ship" | 2nd & Yesler | AMPCO | 250 |
| King County Administration Garage | 5th & Jefferson | King County | 740 |
| Bon Marche Garage | 3rd & Stewart | Bon Marche | 840 |
| Market & Western Garage | Western & Virginia | Pike Place Market PDA | 530 |
| Seattle Central Community College | Bolyston & Pine | SCCC | 527 |
| Swedish Hospital | Boren & James | Sweedish Hopital | 110 |
| Seattle University | Broadway & Marion | Sweedish Hopital | 100 (approx) |
| Providence Hospital | 15th & Jefferson | Providence Hospital | 724 |
| Mercer Garage | Mercer & 3rd | Seattle Center | 1500 |
| Key Arena Garage | Thomas & Warren | Seattle Center | 400-500 |

**EXHIBIT 4**
**Page 120 of 179**

PSA 000159

9723\DESIGN\GARGES

MASTER LEASE
EXHIBIT 20.1.2

PERMITTED EXCEPTIONS

1.  Reservation of Possessory Rights by King County, Washington as set forth in that certain Warranty Deed executed by King County, Washington, as grantor, in favor of the Washington State Public Stadium Authority, as grantee, dated _____, 1998 recorded with King County Records, No. _____ (to be recorded).

2.  Assessment by Metro Tunnel filed February 13, 1991 with King County Records, No. 0440-766620-4876-09, provided that PSA shall be responsible for causing King County to pay all amounts owing as provided for in the Agreement and Letter of Intent referenced in Permitted Exception #21.

3.  An unrecorded lease between King County, as lessor, and Donald B. Murphy Contractors, Inc. & Associated, a joint venture, as lessee, dated December 1, 1973 relating to the stadium energy plant, as disclosed by an assignment for security purposes recorded under Recording No. 7402150375, which lease was subsequently assigned to Citicorp, as lessee, as disclosed by Recording No. 8612120582, and a bill of sale conveying the stadium plant to The Bank of California, N.A., by assignment recorded under Recording No. 7402150374.

4.  Financing Statement executed by King County, State of Washington Department of Stadium Administration ("King County"), as debtor, in favor of Citicorp Leasing, Inc. ("Citicorp") recorded on December 12, 1986 with King County Records, No. 8612120582, as continued by instruments recorded under Recording Nos. 9107030441, 9107250418 and 9609171167. PSA shall be responsible for causing King County to pay all amounts owing under such Financing Statement as provided for in the Agreement and Letter of Intent referenced in Permitted Exception #21 below.

5.  Liability, if any, for the pro-rated portion of current year's general taxes for the Property which is currently being carried on the tax rolls as exempt from taxation.

6.  Release of Damages executed by Northern Pacific Railway Company in favor of the City of Seattle in connection with the construction of a side sewer, dated April 23, 1949, recorded on April 29, 1949 with King County Records, No. 3897380.

7.  Release of Damages executed by Northern Pacific Railway Company in favor of the City of Seattle in connection with the construction of a side sewer, dated April 26, 1964, recorded on May 3, 1964 with King County Records, No. 5874002.

8.  Release of Damages executed by Great Northern Railway Co. in favor of the City of Seattle in connection with the construction of a side sewer dated October 11, 1967, recorded on November 15, 1967 with King County Records, No. 6265537.

Exhibit 20.1.2
Page 1

EXHIBIT 4
Page 121 of 179

PSA 000160

30002803 04

Exhibits to Ainsworth Decl.
Page291

9.      Ordinance No. 98852 creating the Pioneer Square Historic District.

10.     Easement for fire hydrants executed by King County, as grantor, in favor of the City of Seattle, as grantee, dated May 2, 1995, recorded May 2, 1995 with King County Records, No. 9505021077.

11.     Easement for utilities, hot water flows and returns, air conditioning water flows and returns, 10,000 gallon underground fuel tank with supply and return lines recorded February 15, 1974 with King County Records, No. 7402150375.

12.     Easement for one electric substation in favor of Burlington Northern Inc recorded March 8, 1979 with King County Records, No. 7903080743.

13.     Easement for underground electric distribution facilities in favor of the City of Seattle recorded February 26, 1997 with King County Records, No. 9702261536.

14.     City of Seattle Ordinance No. 118857 pertaining to amended land use and zoning affecting a westerly portion of the Project Site recorded with King County Records, No. 9801209276.

15.     Covenants for off-site parking from Merrill Place LLC recorded June 16, 1998 with King County Records, No. 9806160880.

16.     Covenants for off-site parking from Union Station Associates LLC recorded June 16, 1998 with King County Records, No. 9806160881.

17.     Covenant for off-site parking from Union Station Associates LLC recorded June 16, 1998 with King County Records, No. 9806160882.

18      Covenant for off-site parking from Washington State Major League Baseball recorded June 18, 1998 with King County Records, No. 9806181828.

19.     Covenant for off-site parking from Washington State Public Stadium Authority recorded July 20, 1998 with King County Records, No. 9807301034.

20.     Covenant for geologic hazard area from King County recorded July 31, 1998 with King County Records, No. 9807311097.

21.     Agreement and Letter of Intent among King County, Washington, City of Seattle, Washington State Public Stadium Authority, First & Goal Inc., Football Northwest Inc. and Washington State Department of Transportation dated June 25, 1998 and recorded with King County Records, No. 9807012001.

22.     Agreement, Stadium and Exhibition Center Property Contributions and Reservation of Possessory Rights between King County, Washington and The Washington State Public Stadium Authority dated September 30, 1998 and recorded with King County Records, No. _____ (to be recorded).

Exhibit 20.1.2                    EXHIBIT 4                    PSA 000161
Page 2                      Page 122 of 179

30002803.04

23.    Existing utility and electrical power easements.

24.    A prospective electrical power easement in favor of Seattle City Light for purposes of improving electrical services on and near the area of the current north lot of the Kingdome (to be recorded).

25.    A prospective public and private transportation easement in favor of the County's Transportation Department ("Metro") as described in the Agreement and Letter of Intent referenced in Permitted Exception #21 (to be recorded).

26.    A prospective easement in favor of the RTA in connection with a proposed Weller Street public access pedestrian bridge as such easement extends onto the Kingdome Parcel as described in the Agreement and Letter of Intent referenced in Permitted Exception #21 (to be recorded).

**EXHIBIT 4**
**Page 123 of 179**

Exhibit 20.1.2
Page 3

PSA 000162

30002801 04

Exhibits to Ainsworth Decl.
Page293

MASTER LEASE
EXHIBIT 26.14

After Recording Return To:

Allen D. Israel
Foster Pepper & Shefelman PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101

## MEMORANDUM OF MASTER LEASE

GRANTOR:     WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a
             Washington public corporation ("PSA")

GRANTEE:     FIRST & GOAL INC., a Washington corporation ("FGI")

PREMISES LEGAL DESCRIPTION:

1.    Abbreviated Form:  Lots 1–35, Block 325 and Lots 1–35, Block 285,
      Seattle Tidelands

2.    Additional legal description is on Exhibit A attached hereto.

ASSESSOR'S PROPERTY TAX PARCEL ACCOUNT NUMBER(S):

Assessor's Property Tax Parcel Account Number(s) is(are) on Exhibit B attached
hereto.

1.    PSA has leased to FGI upon the terms and conditions of the Master Lease
between the parties dated November 24, 1998 (the "Master Lease"), certain real property
described in attached Exhibit A incorporated herein by reference (the "Premises"), together with
certain improvement to be constructed thereon pursuant to a Development Agreement between
the parties dated November 24, 1998 (the "Development Agreement").

2.    The Master Lease shall be for an initial term commencing on the Commencement
Date as defined therein and shall end on the last day of the thirtieth (30th) complete Lease Year
following the Completion Date, as defined therein, plus one completion term of up to 12 months,

30004695 02

Exhibit 26.14  Page 1

EXHIBIT 4
Page 124 of 179                                    PSA 000163

Exhibits to Ainsworth Decl.
Page294

```
20000522000750
FIRST AMERICAN LE      13.00
PAGE 001 OF 005
05/22/2000 11:27
KING COUNTY, WA
```

## AFTER RECORDING MAIL TO:

Name  **Foster Pepper & Shefelman**

Address  **1111 Third Ave., Suite 3400**

City/State  **Seattle, WA 98101**

**attn: Allen D. Israel**

Document Title(s): (or transactions contained therein)
1. Memorandum of Master Lease
2.
3.
4.



First American Title
Insurance Company

353940·C3
1ST AM-S (4)

(this space for title company use only)

Reference Number(s) of Documents assigned or released:

☐ Additional numbers on page _____ of document

Grantor(s): (Last name first, then first name and initials)
1.
   WashingtonnState Public Stadium Authority
2.
3.
4.
5. ☐ Additional names on page _____ of document

Grantee(s): (Last name first, then first name and initials)
1.  First & Goal Inc.
2.
3.
4.
5. ☐ Additional names on page _____ of document

Abbreviated Legal Description as follows: (i.e. lot/block/plat or section/township/range/quarter/quarter)

Por. Blocks 285 & 325 Seattle Tidelands

☐ Complete legal description is on page _____ of document

Assessor's Property Tax Parcel / Account Number(s):

766620-4876 & 766620-4880

WA-1

NOTE: *The auditor/recorder will rely on the information on the form. The staff will not read the document to verify the accuracy or completeness of the indexing information provided herein.*

EXHIBIT 4
Page 125 of 179                                    PSA 000164

Exhibits to Ainsworth Decl.
Page295

Filed for Record at Request of
After Recording Return to:

Allen D. Israel
Foster Pepper & Shefelman PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101

## MEMORANDUM OF MASTER LEASE

| | |
|---|---|
| Grantor: | WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington public corporation ("PSA") |
| Grantee: | FIRST & GOAL INC., a Washington corporation ("FGI") |
| Legal: | POR. Block 285 & 325, SEATTLE TIDELANDS, additional legal description is on Exhibit A attached hereto |
| Tax Number: | POR. 76620-4876; and 766620-4880 |

1.    PSA has leased to FGI upon the terms and conditions of the Master Lease between the parties dated November 24, 1998 as amended by First Amendment to Master Lease dated July 22, 1999 (the "Master Lease"), certain real property described in attached Exhibit A incorporated herein by reference (the "Premises"), together with certain improvement to be constructed thereon pursuant to a Development Agreement between the parties dated November 24, 1998 as amended by First Amendment to Development Agreement dated November 1, 1999 (the "Development Agreement").

2.    The Master Lease shall be for an initial term commencing on the Commencement Date as defined therein and shall end on the last day of the thirtieth (30th) complete Lease Year following the Completion Date, as defined therein, plus one completion term of up to 12 months, in accordance with the terms of the Master Lease. The term may be extended for up to three extension periods of ten (10) years each, plus one completion term of up to twelve months in accordance with the terms of the Master Lease. The Completion Date is expected to occur in late 2002.

3.    If the North Half Lot, as defined in the Property Contribution Agreement which is described in the Development Agreement, is acquired by PSA, then upon such acquisition that property shall become part of the Premises and subject to the Master Lease and the modified description of the Premises shall be recorded as an amendment to this Memorandum.

30004695.03

EXHIBIT 4
Page 126 of 179                                                    PSA 000165

Exhibits to Ainsworth Decl.
Page296

Section 27 of the Development Agreement contemplates the possibility of further development of certain portions of the Premises. In such event, the Premises shall be appropriately modified, if required, and the modified description of the Premises shall be recorded as an amendment to this Memorandum.

5.    In the event of a conflict between the provisions of this Memorandum and the Master Lease, the provisions of the Master Lease shall control.

Dated this ____ day of May 2000.

PSA:                                  WASHINGTON   STATE   PUBLIC   STADIUM
                                      AUTHORITY

                                      By: _____
                                          Frederick Mendoza, Vice-Chair of the Board

FGI:                                  FIRST & GOAL INC.

                                      By: _____
                                          Robert L. Collier, Vice-President


            [ACKNOWLEDGEMENTS FOLLOW]

30004695.03

EXHIBIT 4
Page 127 of 179

PSA 000166

Exhibits to Ainsworth Decl.
Page297

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that **FREDERICK MENDOZA** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the Vice-Chair of the Board of the **WASHINGTON STATE PUBLIC STADIUM AUTHORITY**, a public corporation of the State of Washington, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this *15* day of May 2000.



BONNIE GILLEN BARNEY
NOTARY PUBLIC
STATE OF WASHINGTON
MISSION EXPIRES
MAY 9, 2004

*Bonnie Gillen Barney*
(Signature of Notary)
*Bonnie Gillen Barney*
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington, residing at *Kent*

My appointment expires *5/9/04*

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that **ROBERT L. COLLIER** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the Vice-President of **FIRST & GOAL INC.**, a Washington corporation, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this *16th* day of May 2000.

Notary Public
State of Washington
LESLEE A. BUSH
My Appointment Expires Feb. 07, 2003

*Leslee A. Bush*
(Signature of Notary)
*Leslee A. Bush*
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington, residing at *Bellevue*

My appointment expires *February 07, 2003*

30004695 03

**EXHIBIT 4**
**Page 128 of 179**

PSA 000167

Exhibits to Ainsworth Decl.
Page298

EXHIBIT A

Legal Description

Lots 5 through 35, Block 285, Lots 5 through 35, Block 325, the Seattle Tide Lands as shown on the official maps of the Seattle Tide Lands in Volume 2, pages 29, 30, 31 and 32 in King County, Washington, and that portion of 3rd Avenue South, vacated per City of Seattle Ordinance No. 10552, conveyed to King County by Burlington Northern, Inc. by Warranty Deed recorded under King County Auditor's File No. 7112140537.

EXCEPT that portion of Lot 5 said Block 325, lying North of the adjusted line per City of Seattle Lot Boundary Adjustment Number 9806721.

And EXCEPT that portion of Lot 5 said Block 285 and said vacated 3rd Avenue South lying North of the adjusted line per City of Seattle Lot Boundary Adjustment Number 9806720.

And EXCEPT any portion of said Block 285 not conveyed to King County by said Warranty Deed recorded under King County Auditor's File No. 7112140537.

TOGETHER WITH an access and egress easement for vehicles and pedestrians of all types and kinds 90 feet in width (60 foot wide roadway plus sidewalks), being a southerly extension of 2nd Ave. So to the northerly boundary of Lot 5, Block 325 described above.

SUBJECT TO an easement by reservation for a portion of the footprint of the Weller Street pedestrian bridge touchdown together with related maintenance and access rights to and for the Weller Street pedestrian bridge on, over and through that portion of the following described property which is located within the unexcepted portions of Lot 5, Block 325 and vacated 3rd Avenue South described above:

A portion of the Southwest quarter of the Northwest quarter of Section 5, Township 24 North, Range 4 East, W.M.; King County, Washington being a portion of Block 285, Seattle Tidelands as recorded in Volume 2, pages 29 and 30 of Plats, Records of King County, Washington and also vacated 3rd Avenue South as vacated by City of Seattle Vacation Ordinance No. 10552. More particularly described as follows:

Commencing at the intersection of Occidental Avenue South and South King Street; thence South 89°53'29" East (Seattle Tidelands), 703.55 feet along the centerline of South King Street; thence South 00°06'31" West, 40.00 feet perpendicular to the centerline of South King Street to a point on the South margin of South King Street said point being described as 673.47 feet distant from the intersection of the East margin of Occidental Avenue South and the South margin of South King Street in a Warranty Deed filed under Auditor's File No. 7112140537 records of King County, Washington; thence continuing South 00°06'31" West, 60 feet along a property line per said Deed; thence South 89°53'29" East, 15.10 feet along a property line per said Deed; thence South 00°40'42" East, 100.10 feet; said point being the TRUE POINT OF

EXHIBIT A - 1

EXHIBIT 4
Page 129 of 179

3000469503

PSA 000168

Exhibits to Ainsworth Decl.
Page299

BEGINNING; thence South 88°53'57" East, 93.95 feet to a property line per said Deed; thence South 01°06'03" West, 110.00 feet along said property line; thence North 88°53'57" West, 102.55 feet; thence North 00°40'42" West, 110.06 feet; thence South 88°53'57" East, 11.41 feet to the TRUE POINT OF BEGINNING.

SUBJECT TO a 10 foot wide water line easement by reservation across a portion of Lot 4, Block 285, Seattle Tidelands, located 5 feet on each side of the following described centerline:

Commencing at the intersection of Occidental Avenue South and South King Street; thence South 89°53'29" East (Seattle Tidelands), 703.55 feet along the centerline of South King Street; thence South 00°06'31" West, 40.00 feet perpendicular to the centerline of South King Street to a point on the South margin of South King Street said point being described as 673.47 feet distant from the intersection of the East margin of Occidental Avenue South and the South margin of South King Street in a Warranty Deed filed under Auditor's File No. 7112140537 records of King County, Washington; thence continuing South 00°06'31" West, 60 feet along a property line per said Deed; thence South 89°53'29" East, 15.10 feet along a property line per said Deed; thence South 00°40'42" East, 100.10 feet; thence South 88°53'57" West, 11.41 feet; thence South 00°40'42" West, 14.68; said point being the TRUE POINT OF BEGINNING; thence North 89°38'57" West 19.19 feet, more or less, to the existing 6 inch water line running approximately north and south, and the termination of the herein described centerline.

SUBJECT TO an easement by reservation for extensions of 2nd Ave. So. (approximately 90 feet), 3rd Ave. So. (approximately 72 feet), and South Lane St. (approximately 72 feet) for the purpose of providing bus ingress, egress and through travel for the benefit of King County's Transportation Department. Grantee has the right to establish the exact location of this reserved easement so long as its configuration provides reasonable bus ingress and egress and through travel to the Washington State Department of Transportation's adjacent multi-modal facility. Improvements for this reserved easement are subject to the provisions of Section 1.5.4 of the Property Contribution Agreement and Paragraph 12a, third bullet of Exhibit C thereto (Agreement and Letter of Intent) which Property Contribution Agreement is more particularly identified in Exhibit B to this Statutory Warranty Deed as Exception to Title No. 15. This reserved easement shall be extinguished upon dedication of the area comprising the reserved easement as a public street right of way meeting the same specifications as this easement reservation.

20020529 002700150

30004695 03

EXHIBIT A - 2

**EXHIBIT 4**
**Page 130 of 179**

PSA 000169

Exhibits to Ainsworth Decl.
Page300

FIRST AMENDMENT

to

MASTER LEASE

Dated November 24, 1998

between

WASHINGTON STATE PUBLIC STADIUM AUTHORITY,

a public corporation of the State of Washington

and

FIRST & GOAL INC.,

a Washington corporation

Dated: July 22, 1999

EXHIBIT 4
Page 131 of 179

PSA 000170

Exhibits to Ainsworth Decl.
Page301

1    FIRST AMENDMENT TO MASTER LEASE

2

3    EFFECTIVE DATE: July __, 1999

4

5    BETWEEN:        **WASHINGTON STATE PUBLIC STADIUM AUTHORITY,**

6                    a Washington State public corporation

7                    401 Second Avenue South, Suite 520

8                    Seattle, WA 98104                        ("PSA")

9

10   AND:            **FIRST & GOAL INC.,**

11                   a Washington corporation

12                   110-110th Avenue N.E., Suite 550

13                   Bellevue, WA 98004                       ("FGI")

14

15       This is the First Amendment to the Master Lease dated November 24, 1998, between the

16   parties hereto (the "Lease"). All defined terms used herein shall have the same meaning as in the

17   Lease unless otherwise defined herein.

18       1.   <u>Maintenance Plans</u>.   Sections 11.1.3 and 11.1.4 of the Lease are modified as

19   follows. FGI shall submit to PSA the first Annual Maintenance Plan and the first Five-Year Plan

20   for the Exhibition Center and Parking Facility after the RV show in March, 2000, but before June

21   30, 2000. Subsequent Annual Maintenance Plans and updates of Five-Year Plans shall be

22   submitted by FGI to PSA at least thirty (30) days prior to each Lease Year, except that FGI shall

23   submit to PSA the first Annual Maintenance Plan and the first Five-Year Plan for the Stadium

24   and Other Improvements on or before October 31, 2003.   PSA shall have 60 days from FGI's

25   submission to review and approve the first Annual Maintenance Plans for the Exhibition

26   Center/Parking Facility and Stadium/Other Improvements, respectively.   Subsequent Annual

27   Maintenance Plans shall be subject to the thirty (30) day review and approval period provided in

28   Section 11.1.3.

29       2.   <u>Other Terms Ratified</u>.

30       All other terms and conditions of the Lease are hereby ratified and affirmed.

FIRST AMENDMENT TO MASTER LEASE                    **EXHIBIT 4**        Res. 89 Exhibit A.DOC
08/23/99                              -1-          **Page 132 of 179**

                                                                       PSA 000171

1

2          IN WITNESS WHEREOF, this First Amendment has been executed by the

3   Parties as of the dates set forth below.

4

5          PSA:                          WASHINGTON STATE PUBLIC STADIUM

6                                         AUTHORITY, a public corporation of the State of

7                                         Washington

8

9

10         By: _Lorraine Hine_____

11                                         Lorraine Hine, Chair of the Board

12

13         FGI:                          FIRST & GOAL INC., a Washington corporation

14

15

16         By: _Robert J. Whitsitt_____

17                                         Robert J. Whitsitt, President

18


PSA 000172

EXHIBIT 4
Page 133 of 179

FIRST AMENDMENT TO MASTER LEASE
08/23/99                              -2-                    Res. 89 Exhibit A.DOC

Exhibits to Ainsworth Decl.
Page303

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that **LORRAINE HINE** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the Chair of the Board of the **WASHINGTON STATE PUBLIC STADIUM AUTHORITY**, a public corporation of the State of Washington, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this 22 day of July, 1999.

_Robin M Wohlhueter_
(Signature of Notary)

_____
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington,
residing at _King County_

My appointment expires _4-14-01_

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that **ROBERT J. WHITSITT** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the President of **FIRST & GOAL INC.**, a Washington corporation, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this 22 day of July, 1999.

_Cynthia L Kelley_
(Signature of Notary)

_Cynthia L. Kelley_
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington,
residing at _Kirkland, WA_

My appointment expires _9-28-01_

PSA 000173

Exhibits to Ainsworth Decl.
Page304