MASTER LEASE

between

WASHINGTON STATE PUBLIC STADIUM AUTHORITY,

a public corporation of the State of Washington

and

FIRST & GOAL INC.,

a Washington corporation

Dated: November 24, 1998

EXHIBIT A
Page 1 of 179

PSA 000040

Dockets.Justia.com

# TABLE OF CONTENTS

*Page*

SECTION 1 DEFINED TERMS ...................................................................................2

SECTION 2 AGREEMENT TO LEASE ......................................................................3
    2.1    Sole Master Tenant ..................................................................................3
    2.2    Condition Precedent.................................................................................3

SECTION 3 PREMISES ...............................................................................................3
    3.1    Phase I .....................................................................................................3
    3.2    Phase II....................................................................................................4
    3.3    Reduction of Premises In Connection With Development; Purchase
            Option .....................................................................................................4
    3.4    Personal Property ....................................................................................4
    3.5    Acceptance of Premises, Project Improvements......................................4

SECTION 4 TERM........................................................................................................5
    4.1    Initial Term ..............................................................................................5
    4.2    Right to Extend. .......................................................................................5
    4.3    End of Term; Holdover.............................................................................6
    4.4    Transition at End of Term ........................................................................6
    4.5    Turnover at End of Term ..........................................................................7

SECTION 5 RENT ........................................................................................................7
    5.1    Rent During the Term ..............................................................................7
            5.1.1   Rent Prior to Completion Date ...................................................7
            5.1.2   Rent From and After the Completion Date..................................7
            5.1.3   PSA Operating Expenses...........................................................8
    5.2    Proration of Rent......................................................................................10
    5.3    Timing of Rent Payments ........................................................................10
    5.4    Past Due Rent...........................................................................................11
    5.5    Net Rent ...................................................................................................11
    5.6    Rent During Any Holdover Period ...........................................................11
    5.7    Operating Reserve....................................................................................11

SECTION 6 OTHER STATUTORILY MANDATED PAYMENT OBLIGATIONS OF
FGI ...............................................................................................................................14
    6.1    Share of Profits from Operation of Exhibition Hall..................................14
    6.2    Share of Revenues from Other Sources ...................................................18
    6.3    Net Profits from Olympic Games and/or World Cup Soccer .....................19

SECTION 7 USE OF THE PREMISES .........................................................................19
    7.1    Permitted Use of Premises .......................................................................19
    7.2    Standard of Operations, Continuous Operations .....................................20

**EXHIBIT A**
**Page 2 of 179**

PSA 000041

*Page*

7.3    Hazardous Substances.....................................................................................20

SECTION 8 REQUIREMENTS TO PROVIDE PUBLIC BENEFITS .........................22
8.1    Special Team Covenants.........................................................................22
        8.1.1    Playing of All Home Games ..............................................23
        8.1.2    Affordable Priced Seats ......................................................23
        8.1.3    Suite Lottery ..........................................................................25
8.2    Coordination in Scheduling Events ...................................................25
8.3    Cooperation with Obtaining Super Bowl Event ...............................26
8.4    Lottery Promotion.................................................................................26
8.5    Prevailing Wages ..................................................................................27
8.6    Women and Minority Business Enterprise Goals ............................27
8.7    Hiring Local Residents ........................................................................28
8.8    Mitigation of Impacts from Stadium Operations ............................28
8.9    Annual Reporting on Operations .......................................................29
8.10   Major League Soccer ............................................................................29
8.11   Provision of PSA Office Space ...........................................................29
8.12   Neighboring Community Meetings ....................................................31
8.13   Protection of Tax-Exempt Bonds.......................................................32
8.14   Project Art..............................................................................................32
8.15   Compliance With Laws; No Discrimination......................................32

SECTION 9 MANAGEMENT OF THE PROJECT .........................................................33
9.1    Standard of Operation .........................................................................33
9.2    Signage, etc............................................................................................33
9.3    Project Revenues...................................................................................33

SECTION 10 FGI'S RESPONSIBILITY FOR ALL OPERATING EXPENSES.....................34
10.1   Utilities...................................................................................................34
10.2   Payment and Contest of Impositions ...............................................34
10.3   Indemnification.....................................................................................35
10.4   Liens.......................................................................................................35
10.5   Weller Street Pedestrian Bridge Maintenance, etc.........................36
10.6   Deferred Sales Tax ...............................................................................36

SECTION 11 MAINTENANCE AND MODERNIZATION ...........................................36
11.1   Maintenance...........................................................................................36
        11.1.1    Maintenance...........................................................................36
        11.1.2    Maintenance Standard of First Class Condition ............36
        11.1.3    Annual Maintenance Plan ...................................................38
        11.1.4    Five-Year Major Maintenance and Modernization Plan....38
        11.1.5    Annual Maintenance Report ................................................38
11.2   Normal Maintenance.............................................................................39
11.3   Major Maintenance ...............................................................................39
11.4   Modernization .......................................................................................40
11.5   FGI and PSA Funding Responsibilities .............................................40
11.6   Naming Rights Account........................................................................41
11.7   Capital Improvements Account ...........................................................41
11.8   Disbursement of Funds ........................................................................41
11.9   Approval of Plans, Completion of Work ............................................42
11.10  Exemption From Public Works Requirements .................................43

SECTION 12 DAMAGE OR DESTRUCTION...............................................................43
12.1   Damage or Destruction ........................................................................43

*Page*

12.2    Damage or Destruction at End of Term .......................................................45
12.3    No Rent Adjustment .......................................................................................46
12.4    Development Period ........................................................................................46

SECTION 13 INSURANCE .........................................................................................46
13.1    Securing of Insurance Coverage ...................................................................46
13.2    Types of Required Insurance .........................................................................47
13.3    Terms of Insurance ........................................................................................48
13.4    PSA's Acquisition of Insurance ....................................................................49
13.5    Waiver of Subrogation ...................................................................................49
13.6    Restoration Proceeds Held in Trust ..............................................................49
13.7    Application of Restoration Proceeds .............................................................50
13.8    Powers and Duties of Trustee of Insurance ..................................................50
13.9    Self-Insurance ...............................................................................................52

SECTION 14 CONDEMNATION .................................................................................53
14.1    Total Taking ...................................................................................................53
14.2    Substantial Taking .........................................................................................53
14.3    Partial Taking .................................................................................................54
14.4    Degree of Taking ...........................................................................................54
14.5    Successive Takings ........................................................................................54
14.6    Temporary Taking ..........................................................................................54
14.7    Insurance Trustee ..........................................................................................55
14.8    Development Period .......................................................................................55

SECTION 15 INDEMNIFICATION ............................................................................55
15.1    FGI's Obligation ............................................................................................55
15.2    PSA's Obligation ...........................................................................................56
15.3    Procedure .......................................................................................................56
15.4    Limitations on PSA Liability .........................................................................57

SECTION 16 INSPECTION OF PREMISES ..............................................................57
16.1    PSA's Right to Inspect ...................................................................................57
16.2    Scope of Inspection .......................................................................................58
16.3    Right of Entry ................................................................................................58

SECTION 17 NAMING RIGHTS .................................................................................58
17.1    IP Rights ........................................................................................................58
17.2    FGI Rights .....................................................................................................59
17.3    PSA Limited Visual Image Rights ................................................................59
17.4    PSA Sale of Special Naming Rights .............................................................60

SECTION 18 TAX AND FEE COLLECTION OBLIGATION ..................................61
18.1    King County Taxes ........................................................................................61
18.2    PSA Surcharge ...............................................................................................61
18.3    Audit Right ....................................................................................................61

SECTION 19 PSA COVENANTS .................................................................................62
19.1    Quiet Enjoyment ............................................................................................62
19.2    No Liens .........................................................................................................62
19.3    No Charges or Fees .......................................................................................62

SECTION 20 REPRESENTATIONS AND WARRANTIES .......................................63
20.1    By PSA ...........................................................................................................63

50034209 13 -- STADIUM MASTER LEASE
11/23/98
-iii-

**EXHIBIT A**
**Page 4 of 179**

PSA 000043

*Page*

20.2   By FGI ....................................................................................................63

SECTION 21 SUBLETTING AND ASSIGNMENT..................................................64
21.1   Subletting ................................................................................................64
21.2   Limited Nondisturbance of Certain Sublessees .....................................64
21.3   Assignment ..............................................................................................66
21.4   FGI Liability ...........................................................................................67
21.5   Rent Letter of Credit ..............................................................................67
21.6   Covenants Binding on Successors and Assigns......................................68
21.7   Transfer....................................................................................................68
21.8   Change of Control....................................................................................68
21.9   Unauthorized Transfer ............................................................................69
21.10  Stock Legends .........................................................................................70

SECTION 22 DEFAULT ...........................................................................................70
22.1   Event of Default......................................................................................70
22.2   Termination of Lease ..............................................................................72
22.3   Effect of Termination..............................................................................72
22.4   Damages and Remedies ..........................................................................73
22.5   No Waivers ..............................................................................................74
22.6   Performance by PSA of FGI's Defaulted Obligations ...........................74

SECTION 23 SURRENDER UPON TERMINATION ...............................................74
23.1   FGI's Obligation .....................................................................................74
23.2   FGI's Personal Property..........................................................................75
23.3   No Rights to Accounts ............................................................................75

SECTION 24 DISPUTE RESOLUTION ....................................................................75
24.1   Applicability ...........................................................................................75
24.2   Designation of Arbitrator........................................................................76
24.3   Scope of Dispute Resolution...................................................................76
24.4   Conduct of Dispute Resolution...............................................................76
24.5   Effect on Lease........................................................................................77
24.6   Effect of Determination ..........................................................................77
24.7   Equitable Proceedings.............................................................................77
24.8   Specific Enforcement..............................................................................78
24.9   Further Disputes......................................................................................79

SECTION 25 CONFIDENTIALITY; PUBLIC DISCLOSURE OF INFORMATION..............79
25.1   Nondisclosure of Exempt Public Records ..............................................79
25.2   Public Disclosure Requests.....................................................................80
25.3   Ownership of FGI Documents ................................................................80
25.4   PSA Use of FGI Documents ...................................................................81
25.5   Document Designation.............................................................................81
25.6   Term.........................................................................................................81

SECTION 26 GENERAL PROVISIONS ....................................................................81
26.1   Overriding Legal Requirements..............................................................81
26.2   Compliance With Law; No Discrimination .............................................81
26.3   Estoppel Certificates ...............................................................................82
26.4   Indexing ..................................................................................................82
26.5   Good Faith Consideration .......................................................................83
26.6   No Partnership .........................................................................................83
26.7   Time of the Essence .................................................................................83

*Page*

26.8    Captions ...................................................................................................83
26.9    Meaning of Terms........................................................................................83
26.10   Lease Construed as a Whole ...........................................................................83
26.11   Waivers ....................................................................................................83
26.12   Severability ..............................................................................................84
26.13   Survival....................................................................................................84
26.14   Memorandum of Lease .................................................................................84
26.15   Amendment................................................................................................84
26.16   Commissions ..............................................................................................84
26.17   Notices .....................................................................................................84
26.18   Consents and Approvals ................................................................................86
26.19   Incorporation of Exhibits by Reference..............................................................86
26.20   Non-Waiver of Government Rights.....................................................................86
26.21   Exclusive Remedies .....................................................................................87
26.22   No Third-Party Beneficiaries...........................................................................87
26.23   Further Actions ..........................................................................................87
26.24   Attorneys' Fees...........................................................................................87
26.25   Interest.....................................................................................................88
26.26   Conflict of Interest ......................................................................................88
26.27   No PSA Personal Liability...............................................................................88
26.28   Governing Law ...........................................................................................88
26.29   Reference Date of Lease ................................................................................88
26.30   Entire Agreement ........................................................................................89

# MASTER LEASE

## With Exhibits

EXHIBIT A
Page 7 of 179

PSA 000046

MASTER LEASE EXHIBITS

A.        Project Site Description

1         Defined Terms

3.1       Phase I Parcel Legal Description

4.1       Form of Confirmation of Commencement Date and Completion Date

6.2       Possible Future Activities

8.11      Form of Confirmation of PSA Office Space Designation

11.1.2.   Comparable Stadium Facilities, Comparable Exhibition Facilities, and Comparable
          Parking Facilities

20.1.2    Permitted Exceptions

26.14     Form of Memorandum of Lease

1                                    MASTER LEASE

2    EFFECTIVE DATE: November 24, 1998

3

4    BETWEEN:          WASHINGTON STATE PUBLIC STADIUM AUTHORITY,

5                            a Washington State public corporation

6                            401 Second Avenue South, Suite 520

7                            Seattle, WA  98104                              ("PSA")

8

9    AND:                FIRST & GOAL INC.,

10                          a Washington corporation

11                          110-110th Avenue N.E., Suite 550

12                          Bellevue, WA  98004                          ("FGI")

13

14           A.      On April 26, 1997, the Legislature of the State of Washington adopted

15   Chapter 220, Laws of 1997. That legislation referred certain sections, specifically Sections 101

16   through 604, to a vote of the people of the State as Referendum Bill Number 48. At a special

17   election held on June 17, 1997, the people of the State approved Referendum Bill Number 48

18   and, as a result, the legislation became law effective July 17, 1997. That legislation is the "Act."

19   Certain sections of the Act have since been codified at RCW Chapter 36.102.

20           B.      Pursuant to the Act, PSA was created and has acquired and owns the real

21   property described on attached Exhibit A (the "Project Site").

22           C.      Pursuant to the Act, PSA and FGI have simultaneously entered into that

23   certain Development Agreement of even date herewith ("Development Agreement") pursuant to

24   which PSA as owner of the Project Site has engaged FGI as developer to develop a new state-of-

25   the-art stadium designed for National Football League football, Olympic events and World Cup

26   soccer, with a seating capacity of at least 67,000 permanent seats with space for 5,000 additional

27   temporary or permanent seats (for NFL football) (the "Stadium"); a new state-of-the-art

28   exhibition hall of at least 325,000 gross square feet of space (the "Exhibition Hall"); a new

29   parking structure to serve the Stadium and the Exhibition Hall (the "Parking Facility"); and

30   related improvements (the "Other Improvements").

1       D.     Both the Stadium and the Parking Facility will contain space ("Swing

2 Space") which may be utilized either as part of the Stadium or the Parking Facility, respectively,

3 or as part of the Exhibition Hall.

4       E.     The Stadium, the Exhibition Hall, the Parking Facility and the Other

5 Improvements are collectively the "Project Improvements," and individually each a "Project

6 Element."

7       F.     The Project Site and the Project Improvements to be constructed thereon

8 are collectively the "Project."

9       G.     The Project will be fully furnished and equipped for its intended uses and

10 operation, and available to deliver to FGI under this Master Lease in "turn-key" condition.

11       H.     Football Northwest LLC ("FNW") owns the National Football League

12 team, the Seattle Seahawks ("Team"). FNW is under the control of Paul G. Allen ("Allen").

13 FGI is a corporation also under the control of Allen. Accordingly, FGI is a "team affiliate," as

14 that term is defined in Section 101(1) of the Act, because FGI and the Seattle Seahawks are

15 under common control.

16       I.     This Master Lease (the "Lease") is entered into pursuant to PSA's

17 authority under Section 106(8) of the Act.

18       NOW, THEREFORE, in consideration of the mutual promises of the Parties set

19 forth in this Lease, the Parties agree as follows:

20

21 SECTION 1     DEFINED TERMS

22     Defined terms are capitalized words which are not capitalized as the first word in a

23 sentence. A defined term has the meaning given to it by the text when it is first used, or by the

24 definition given it in Exhibit 1, or by the definition given it in the Development Agreement, or

25 by the definition given it in the Stadium Use Agreement. If a defined term used in this Lease has

26 a different definition in any of the other Related Leases, its definition is controlled by this Lease

27 when the defined term is used in reference to this Lease.

28

1    SECTION 2    AGREEMENT TO LEASE

2        PSA hereby leases the Premises to FGI and FGI hereby leases the Premises from PSA on

3    the following terms and conditions.

4        2.1    Sole Master Tenant

5            FGI is the sole master tenant of the Premises. Without limitation, as sole master

6    tenant, FGI has the exclusive power and authority to possess, operate, use, sublease and enter

7    into use, license, concession and other agreements with respect to the Premises. Except to the

8    extent otherwise specifically provided for in this Lease, FGI shall have the right to retain all

9    revenues derived from the Premises, including without limitation revenues from (i) subleases and

10   use agreements, (ii) license and concession agreements, (iii) suite and seat licenses,

11   (iv) concessions, novelties, catering, parking, sponsorships, advertising, naming rights (subject to

12   Section 17.4 hereof), and (v) PSLs (except to the extent sold by PSA pursuant to the

13   Development Agreement).

14       2.2    Condition Precedent

15           This Lease shall not be effective until the Master Lease Guaranty has been

16   executed and delivered to PSA by a Person with a net worth in excess of one hundred million

17   dollars.

18

19   SECTION 3    PREMISES

20       3.1    Phase I

21           From the Substantial Completion of Phase I, as defined in the Development

22   Agreement, ("Commencement Date") through the Substantial Completion of Phase II, as defined

23   in the Development Agreement, ("Completion Date"), the Premises shall consist of that portion

24   of the Project Site described in Exhibit 3.1 (the "Phase I Parcel"), and any Project Improvements

25   constructed on the Phase I Parcel, which are to include the Exhibition Hall and the Parking

26   Facility. As additional Project Improvements are constructed or completed on the Phase I Parcel,

27   those Project Improvements shall be owned by PSA and automatically become part of the

28   Phase I Parcel.

**EXHIBIT A**
**Page 11 of 179**

PSA 000050

1    3.2    Phase II

2            From the Completion Date until the end of the Term, the Premises shall consist of

3    the Project, including the Project Site and the Project Improvements.

4    3.3    Reduction of Premises In Connection With Development; Purchase Option

5            The Parties acknowledge that development may occur in the North Parking Lot,

6    and/or upon and/or adjacent to the Parking Facilities, pursuant to rights set forth in the

7    Development Agreement and/or pursuant to that certain Property Contribution Agreement and/or

8    1998 Letter of Intent. In addition, FGI has the option to purchase a portion of the North Parking

9    Lot pursuant to the Development Agreement. In the event of any such development or purchase

10   (subject to Section 27 of the Development Agreement), the Premises, but not any of the Project

11   Improvements (other than portions of the Parking Facilities which may be removed and/or

12   reconstructed as part of such development) shall be reduced (in the case of a purchase) or

13   modified, and such modification shall be reflected in a reasonable adjustment to the description

14   of the Premises, which shall be attached to this Lease as a substitute Exhibit A.

15   3.4    Personal Property

16           The "Personal Property" consists of movable items of property, used in

17   connection with the operation of the Premises, which were part of the Project Improvements as

18   FF&E and any items of property which replace any of such original items. The Personal

19   Property also includes items of movable property purchased by FGI as part of FGI's obligations

20   under Section 11. The Personal Property is included in the Premises. The Personal Property also

21   includes contract rights such as warranties on the Project Improvements and its various

22   components.

23   3.5    Acceptance of Premises, Project Improvements

24           3.5.1    Upon the Commencement Date, FGI will accept the Phase I Parcel and the

25   Project Improvements located thereon, and upon the Completion Date, FGI will accept the

26   Phase II Parcel and the Project Improvements located thereon, respectively, "AS IS, WITH ALL

27   FAULTS."

28           3.5.2    PSA makes no representation or warranty regarding the condition of the

29   Project Site other than PSA's representations set forth in the Development Agreement and this

1    Lease. PSA shall have no liability to FGI on account of the condition of the Project Site other

2    than as may arise under the terms of the Development Agreement and this Lease.

3        3.5.3    PSA makes no representation or warranty whatsoever regarding the design

4    or construction of the Project, except to the extent Project improvements within the PSA Office

5    Space are constructed or altered pursuant to Section 8.11.6. FGI acknowledges that the Project

6    Improvements will be constructed by FGI (except to the extent Project improvements within the

7    PSA Office Space are constructed or altered pursuant to Section 8.11.6). FGI shall have no

8    claim whatsoever against PSA on account of (x) the design or construction of the Project except

9    to the extent Project improvements within the PSA Office Space are constructed or altered

10    pursuant to Section 8.11.6, or (y) the condition of the Project Improvements.

11

12    SECTION 4    TERM

13        The term of this Lease (the "Term") consists of the Initial Term, Extension Periods, if

14    any, and a Completion Term, if any.

15        4.1    Initial Term

16        The initial term ("Initial Term") of the Lease shall commence upon the

17    Commencement Date and, unless terminated pursuant to the provisions of this Lease, shall

18    terminate on the last day of the thirtieth (30th) complete Lease Year following the Completion

19    Date. The Commencement Date and the Completion Date shall each be confirmed by the Parties

20    in Exhibit 4.1, which shall be separately executed by the Parties. A "Lease Year" shall be the

21    calendar year.

22        4.2    Right to Extend. FGI shall have the right to extend the Initial Term for three (3)

23    successive periods of ten (10) years each (each an "Extension Period"), if exercised in

24    accordance with this section.

25        4.2.1    Each successive Extension Period shall be effective only if FGI gives

26    written notice of the exercise of the right to extend to PSA not later than eighteen (18) months

27    prior to the expiration of the Initial Term or the preceding Extension Period, as may be

28    applicable, and there does not exist an Event of Default under the Lease, either at the time the

29    notice to extend is given or at the commencement of the Extension Period in question. "Backup

30    marketing" expenses incurred in connection with the marketing of the Project to third parties and

1   finding new tenants and users shall only be considered Reasonable PSA Operating Expenses
2   during the last eighteen (18) months of the Term.

3       4.2.2   During each Extension Period, this Lease shall continue upon the same
4   terms and conditions as provided in this Lease, including the Rent as described in Section 5.1.2.

5       4.2.3   FGI may only exercise a right to extend if FNW has exercised its
6   comparable right to extend under the Stadium Use Agreement.

7   4.3   End of Term; Holdover

8       FGI may extend the Term for one Completion Term, if necessary, for the purpose
9   of enabling a professional sports team sublessee or user which uses the Stadium as its regular
10  home playing facility to complete a professional sports league season including playoffs. FGI
11  shall not hold over for any other purpose.

12      4.3.1   The "Completion Term" shall mean a period of time not exceeding twelve
13  (12) months which shall commence immediately at the end of the Initial Term or then current
14  Extension Period and shall end not later than sixty (60) days after the completion of the
15  sublessee's or user's playing season including playoffs. Any Completion Term shall be upon all
16  of the terms and conditions, including Rent, applicable under this Lease immediately prior to the
17  beginning of the Completion Term.

18      4.3.2   The Completion Term shall be effective only if: FGI gives written notice
19  of the exercise of the right to extend to PSA not later than one (1) year prior to the expiration of
20  the Term, there does not exist an Event of Default under the Lease, at the time the notice to
21  extend is given, and there does not exist an Event of Default under the Lease at the
22  commencement of the Completion Term.

23  4.4   Transition at End of Term

24      During the last Lease Year prior to the end of the Term (i.e., for which there are
25  no longer any Extension Periods with respect to which FGI has exercised or may exercise its
26  option), PSA and FGI shall use Reasonable Efforts to effect an orderly and efficient transition of
27  operations of the Exhibition Hall, the Parking Facilities, the Stadium and any Other
28  Improvements to PSA or PSA's designee(s). Within the last Lease Year of the Term, FGI may
29  not, without PSA's prior written consent, enter into any agreement which relates to the
30  operations of the Project which extends beyond the Term unless such agreement may be

1   terminated at the end of the Term without cost or obligation to PSA, including, but not limited to

2   advance booking agreements, agreements with athletic teams, agreements with concessionaires,

3   or agreements with suppliers or service providers. Costs incurred by PSA in connection with the

4   transition or the possession, renovation, improvement, demolition, use, operation, sale or leasing

5   of the Project after the Term are not Reasonable PSA Operating Expenses.

6       4.5    <u>Turnover at End of Term</u>

7          At the end of the Term, FGI will:

8          4.5.1   Turn over to PSA possession of the Premises, including all Project

9   Improvements and Personal Property used in the operations of the Premises in the condition

10   required by Section 11, normal wear and tear excepted;

11         4.5.2   Assign to PSA all agreements that exist and which are described in

12   Section 4.4;

13         4.5.3   Turn over to PSA originals or copies of all books and records which

14   pertain to the operations of the Premises during the immediately preceding five (5) years;

15         4.5.4   Assign to PSA any and all warranties that exist and which pertain to the

16   Project Improvements; and

17         4.5.5   Terminate, in accordance with applicable law, all employees of FGI

18   performing services exclusively in the operations of the Premises, and allow PSA to interview all

19   such employees with respect to possible future employment by PSA or PSA's designee.

20

21   <u>SECTION 5</u>   <u>RENT</u>

22       5.1    <u>Rent During the Term</u>

23          The following provisions for the payment of Rent apply during the Initial Term,

24   any Extension Periods, and any Completion Term. FGI shall pay rent ("Rent") as follows:

25         5.1.1   <u>Rent Prior to Completion Date</u>

26          From the Commencement Date until the Completion Date, FGI shall pay

27   Rent to PSA in the amount of $425,000 per year, Indexed from the Commencement Date.

28         5.1.2   <u>Rent From and After the Completion Date</u>

29          From and after the Completion Date, during each Lease Year FGI shall

30   pay Rent to PSA equal to the sum of:

50034209 13 – STADIUM MASTER LEASE
11/23/98          -7-         **EXHIBIT A**
**Page 15 of 179**      **PSA 000054**

1             5.1.2.1   Eight Hundred Fifty Thousand Dollars ($850,000) per year,

2 Indexed, ("Basic Rent"); plus

3             5.1.2.2   The amount, if any, by which the Reasonable PSA Operating

4 Expenses for that Lease Year exceed the Basic Rent (as provided in 5.1.3).

5       Basic Rent shall be Indexed as of the first day of the thirteenth complete calendar month

6 following the Completion Date, and on each anniversary thereafter during the Term. Indexing

7 may cause Basic Rent to increase or remain the same, but Basic Rent may not decrease.

8          5.1.3   <u>Reasonable PSA Operating Expenses</u>

9             5.1.3.1   PSA acknowledges that FGI has a legitimate interest in Reasonable

10 PSA Operating Expenses, but only to the extent Reasonable PSA Operating Expenses will cause

11 FGI to become obligated to pay Rent in excess of Basic Rent. "Reasonable PSA Operating

12 Expenses" mean those reasonable expenses associated with PSA operations, including the

13 employment of employees, agents, attorneys, and other contractors, and the operation of its

14 office facilities. Reasonable PSA Operating Expenses include only those reasonable operating

15 expenses reasonably related to Project as it exists as of the Completion Date. Reasonable PSA

16 Operating Expenses do not include any (i) operating expenses which are not reasonably related to

17 the Project as it exists as of the Completion Date, (ii) operating expenses related to any

18 development rights or Development Areas including those described in Section 27 of the

19 Development Agreement (which should be reimbursed through other express agreements), (iii)

20 non-operating costs such as capital and capitalized costs (except capital costs for office

21 furnishings, equipment and software which are included as Reasonable PSA Operating

22 Expenses), or (iv) other expenses which would not be a reasonable operating expense if PSA's

23 activities were limited to activities (x) which are reasonably required by the Act, Laws, this

24 Lease, or the Development Agreement, or (y) which are reasonably related to the Project as it

25 exists as of the Completion Date. To the extent reasonably practicable, Reasonable PSA

26 Operating Expenses will be incurred and structured in such a manner (considering such matters

27 as timing, payment terms, etc.) so as to not require FGI to pay Rent pursuant to Section 5.1.2.2 in

28 any Lease Year. Reasonable PSA Operating Expenses include annual loan debt service of up to

29 $210,000 for up to fifteen (15) years ("Annual Loan Debt Service") as contemplated by the

30 Financing Plan between PSA and the State of Washington, provided that following Final

1    Completion the unexpended balance of PSA funds from the PSA Operating Account and the

2    PSA Project Account in excess of $500,000, to be utilized to initially fund the Cash Reserve

3    described below, shall be used to pay down the loan balance.

4        5.1.3.2   PSA shall use Reasonable Efforts to deliver to FGI an annual

5    budget of the anticipated Reasonable PSA Operating Expenses for a Lease Year, not later than

6    sixty (60) days prior to the commencement of such Lease Year.  The budget shall be binding

7    upon PSA except for any mathematical errors.  If, after the Completion Date, PSA fails to deliver

8    a budget for a Lease Year by the date on which such Lease Year commences, FGI shall

9    temporarily pay Rent to PSA in the amount required under 5.1.2 above for the prior Lease Year.

10   When PSA does deliver a budget for such Lease Year, if the budgeted Reasonable PSA

11   Operating Expenses are greater than the Rent paid by FGI for such Lease Year, FGI shall pay

12   PSA the amount of the excess within thirty (30) days of receipt of the budget for the monthly

13   installments paid to that date, and the corrected amount in monthly installments thereafter.

14   Alternatively, when PSA does deliver a budget for such Lease Year, if the budgeted Reasonable

15   PSA Operating Expenses are less than the monthly Rent paid by FGI for such Lease Year, PSA

16   shall refund to FGI within thirty (30) days the lesser of (x) the amount paid by FGI as Rent for

17   such Lease Year in excess of Basic Rent, or (y) the difference between the monthly Rent paid by

18   FGI for such Lease Year and budgeted Reasonable PSA Operating Expenses for the same period

19   of time, in either case together with interest at the highest rate of interest earned by PSA on its

20   various interest bearing accounts and investments.

21       5.1.3.3   PSA shall use Reasonable Efforts to provide FGI with a summary

22   of the actual Reasonable PSA Operating Expenses for a Lease Year within sixty (60) days after

23   the end of such Lease Year.  If the actual Reasonable PSA Operating Expenses for such Lease

24   Year are more than the Rent paid by FGI for such Lease Year, and additional Rent is due, subject

25   to reduction pursuant to Section 5.7.2.2; FGI shall pay such additional amount to PSA within

26   thirty (30) days of FGI's receipt of the summary of actual Operating Expenses.  If FGI has paid

27   Rent for such Lease Year pursuant to Section 5.1.2.2 above and the actual Reasonable PSA

28   Operating Expenses for such Lease Year are less than the Rent paid by FGI for that Lease Year,

29   PSA shall refund to FGI within thirty (30) days the lesser of (x) the amount paid by FGI as Rent

30   for such Lease Year pursuant to Section 5.1.2.2 above, or (y) the difference between the Rent

1  paid by FGI and the actual Reasonable PSA Operating Expenses, in either case together with

2  interest at the highest rate of interest earned by PSA on its various interest bearing accounts and

3  investments .

4          5.1.3.4    At any time within thirty (30) days after FGI receives PSA's

5  statement of actual Reasonable PSA Operating Expenses, FGI may elect, by written notice to

6  PSA, to either review or audit PSA's books and records of the actual Reasonable PSA Operating

7  Expenses for that Lease Year. The review or audit shall occur at a mutually convenient time not

8  less than five (5) Business Days nor more than twenty (20) days after PSA's receipt of FGI's

9  notice. If the review or audit reveals a discrepancy in PSA's statement of actual Reasonable PSA

10  Operating Expenses, the Parties shall meet at a mutually convenient time within twenty (20) days

11  of FGI delivering the results of the review or audit to PSA.  If the Parties are able to agree on the

12  actual Reasonable PSA Operating Expenses, the agreed amount shall become the "actual

13  Reasonable PSA Operating Expenses" for purposes of Section 5.1.3.3.  If the Parties are unable

14  to agree on the actual Reasonable PSA Operating Expenses for that Lease Year, the matter will

15  be resolved pursuant to Dispute Resolution and the above payment adjustment provisions shall

16  apply, and such resolved amount shall become the "actual Reasonable PSA Operating Expenses"

17  for purposes of Section 5.1.3.3.  In either case, if the actual Reasonable PSA Operating Expenses

18  is different than as provided to FGI pursuant to Section 5.1.3.3, then the Parties shall adjust the

19  Rent in accordance with Section 5.1.3.3.

20      5.2    Proration of Rent

21          If the Term commences or ends on other than the first day of a Lease Year, or if a

22  Rent change occurs on other than the first day of a Lease Year, or if there is an abatement of Rent

23  that commences or ends on other than the first day of a Lease Year, then Rent shall be prorated

24  for that Lease Year on a daily basis.

25      5.3    Timing of Rent Payments

26          Annual Rent shall be payable in twelve equal monthly installments.  All payments

27  of Rent shall be due and payable, in advance, on the first day of each month during each Lease

28  Year during the Term.

EXHIBIT A
Page 18 of 179

PSA 000057

5.4  Past Due Rent

5.4.1  Interest

Any Rent not paid when due shall bear interest as provided in Section 26.25.

5.4.2  Late Charges

If FGI shall fail to make any payment of Rent when due as provided in this Lease, then FGI shall pay a late charge of one percent (1%) of the amount past due, up to a maximum late charge of $500, Indexed every five (5) years, for processing of late payments, as additional Rent within ten (10) Business Days of notice that such late charge is due.

5.5  Net Rent

Rent and other sums to be paid by FGI shall be payable in lawful money of the United States of America. Rent payable by FGI shall be absolutely net to PSA, free from all costs, expenses, charges and deductions to PSA and without any FGI claimed offset. All costs, expenses, and obligations of every kind and nature whatsoever relating to the use, maintenance, operation, repair, restoration and replacement of the Premises as provided herein shall be paid for and performed by FGI.

5.6  Rent During Any Holdover Period

If FGI holds over beyond the last day of the Term, the Rent due commencing with the end of the Term and for each month thereafter, shall be the monthly Rent (the Lease Year Rent divided by 12) for the last full calendar month of the Term multiplied by the number of months from the end of the Term until FGI surrenders the Premises to PSA as required by Section 23. For example, if FGI holds over for three calendar months, the Rent for the first holdover month shall be equal to the monthly Rent for the last calendar month of the Term, multiplied by one (1), the Rent for the second holdover month shall be the monthly Rent for the last calendar month of the Term multiplied by two (2), and the Rent for the third holdover month shall be the monthly Rent for the last calendar month of the Term multiplied by three (3).

5.7  Operating Reserve

5.7.1  Operating Reserve

5.7.1.1  By January 1, 2003, PSA shall establish an operating reserve of $2 Million ("Operating Reserve"), which shall be comprised of a cash reserve component ("Cash

EXHIBIT A
Page 19 of 179

PSA 000058

1    Reserve") and a letter of credit reserve component ("L/C Reserve"). Initially the Cash Reserve
2    shall be $500,000 and the L/C Reserve shall be $1.5 Million.

3            5.7.1.2    The Operating Reserve may be utilized only to pay Reasonable
4    PSA Operating Expenses incurred during any Lease Year as and when they come due to the
5    extent Rent paid during that Lease Year-to-date is insufficient.  To the extent the Operating
6    Reserve is utilized at all, PSA shall utilize and exhaust the Cash Reserve before utilizing the L/C
7    Reserve.

8            5.7.1.3    The Operating Reserve may not be utilized to fund any other
9    reserve, or to make any advance payments other than advance payments which are commercially
10   reasonable and customary.

11           5.7.1.4    Concurrently with PSA utilizing any part of the Cash Reserve or
12   L/C Reserve, but not as a condition precedent to such utilization, PSA shall present to FGI
13   documentation reasonably satisfactory to FGI in reasonable detail regarding the utilization of the
14   Operating Reserve, including without limitation the amount of funds utilized, the source of funds
15   utilized (i.e. Cash Reserve or L/C Reserve), the Reasonable PSA Operating Expenses for which
16   such funds were utilized, and an explanation that and why the Reasonable PSA Operating
17   Expenses for which such funds were utilized were not included or the amount was
18   underestimated in the annual budget described in Section 5.1.3.2.

19           5.7.1.5    At any time, FGI may object to the utilization of the Operating
20   Reserve based on a violation of this Section 5.7, for example by reason that funds were not
21   utilized entirely for Reasonable PSA Operating Expenses or that the Reasonable PSA Operating
22   Expenses for which the funds were utilized were contemplated in sufficient amount in the annual
23   budget described in Section 5.1.3.2.  If FGI so objects, the substance of such objection may be
24   subject to Dispute Resolution.  Any decision or award for FGI in Dispute Resolution on such
25   matter may be utilized by FGI as a credit against any Rent due under this Lease.

26         5.7.2    Reserve Restoration

27           If PSA has utilized the Operating Reserve during any Lease Year:

28           5.7.2.1    During that Lease Year, Rent payments in excess of Reasonable
29   PSA Operating Expenses shall be utilized first to repay to FGI the amount of any L/C Reserve

1    utilized during that Lease Year, and second to restore any amount of the Cash Reserve utilized

2    during that Lease Year; and

3        5.7.2.2    Following that Lease Year, if any Rent is payable to PSA pursuant

4    to Section 5.1.3.3, such Rent shall be reduced by the amount of the L/C Reserve utilized during

5    that Lease Year but not yet repaid to FGI pursuant to Section 5.7.2.1, and the net Rent paid

6    pursuant to Section 5.1.3.3 shall be utilized to fully restore the Cash Reserve utilized during that

7    Lease Year to the amount of its original level as of the beginning of the Lease Year, and any

8    excess shall be utilized to pay any then unpaid Reasonable PSA Operating Expenses for that

9    Lease Year.

10        5.7.3    <u>Cash Reserve</u>

11        Interest and other earnings on the Cash Reserve shall become part of and

12    increase the Cash Reserve and Operating Reserve.

13        5.7.4    <u>L/C Reserve</u>

14        5.7.4.1    FGI shall provide PSA with a standby letter of credit in the amount

15    of the L/C Reserve (the "Reserve Letter of Credit"). The Reserve Letter of Credit shall be issued

16    by a financial institution reasonably acceptable to PSA, and may be drawn upon by PSA upon

17    presentation of a "sight draft" in reasonable mutually agreed form.

18        5.7.4.2    The Reserve Letter of Credit shall be replaced annually by a new

19    Reserve Letter of Credit in the amount of the L/C Reserve so that at all times during the

20    remaining Term, PSA holds a Reserve Letter of Credit which is in full force and effect. To the

21    extent PSA draws against the Reserve Letter of Credit in any Lease Year, then the amount of

22    credit available to PSA under that Reserve Letter of Credit shall be reduced and not restored until

23    the Reserve Letter of Credit is replaced for the subsequent Lease Year. PSA may draw on the

24    Reserve Letter of Credit if FGI has not provided PSA with a replacement Reserve Letter of

25    Credit at least five (5) days prior to expiration of the then existing Reserve Letter of Credit.

26        5.7.4.3    All costs associated with the Reserve Letter of Credit, including

27    without limitation all service charges, shall be paid by FGI but shall be deemed a Reasonable

28    PSA Operating Expense and shall be a credit against any Rent payable hereunder by FGI.

29        5.7.4.4    The amount of the Rent Letter of Credit described in Section 21.5

30    shall not affect the amount of the Reserve Letter of Credit.

1           5.7.5   Adjustment of Amount of Cash Reserve and L/C Reserve

2                 At the Option of PSA, the original amount of the Cash Reserve may be

3  increased and the amount of the L/C Reserve will be simultaneously decreased by the dollar

4  amount by which the Annual Loan Debt Service is less than $210,000 on the date the Operating

5  Reserve is established.

6  SECTION 6    OTHER STATUTORILY MANDATED PAYMENT OBLIGATIONS OF FGI

7      6.1    Share of Profits from Operation of Exhibition Hall

8          6.1.1   Definitions

9                 For purposes of this Section 6.1, the following terms have the following

10  meanings.

11               6.1.1.1  "Exhibition Hall Net Profits" means Exhibition Hall Revenues less

12  Exhibition Hall Expenses, during each Lease Year during the Term.

13               6.1.1.2  "Exhibition Hall Revenues" means gross revenues received by FGI

14  or any Affiliate of FGI in connection with Exhibition Hall Events.  Exhibition Hall revenues

15  include gross fees, rentals and payments of any kind or nature whatsoever (except as provided

16  herein) paid to FGI or any Affiliate of FGI in connection with the Exhibition Hall (including any

17  Swing Space utilized in connection with the Exhibition Hall) for Exhibition Hall Events,

18  including, without limitation:  (i) space rental or occupancy fees; (ii) advertising fees; (iii) use

19  fees; (iv) license fees; (v) concession fees; (vi) signage fees; (vii) services charges; (viii) the sales

20  price of all merchandise (including food and beverage) sold in connection with Exhibition Hall

21  Events; (ix) charges to users of the Exhibition Hall for the right to use portions or all of the

22  Stadium, portions or all of the Parking Facilities for a non-parking use, or portions or all of the

23  North Parking Lot for a non-parking use, in connection with an Exhibition Hall Event;

24  (x) Exhibition Hall Parking Revenue; and (xi) the value of goods or services in lieu of cash for

25  any for the foregoing (i) through (x).  Exhibition Hall Revenues do not include: (i) any revenues

26  associated with any events at the Project which are not Exhibition Hall Events; (ii) any sales

27  proceeds of Exhibition Hall Naming Rights or Parking Facilities Naming Rights; or (iii) any

28  admissions, parking, sales, gross receipts, compensating taxes or other retail excise taxes which

29  are imposed by any duly constituted Governmental Authority on sales and which are collected

30  and paid by FGI or any Affiliate of FGI to such Governmental Authority.

PSA 000061

1              6.1.1.3 "Exhibition Hall Expenses" means those direct and indirect

2    expenses reasonably incurred by FGI in connection with the operation of the Exhibition Hall,

3    including Swing Spaces and other facilities used in connection with Exhibition Hall Events, and

4    the performance of each of FGI's obligations under this Lease as they relate to such facilities.

5    Exhibition Hall Expenses include, without limitation: (i) Rent payable pursuant to Section 5.1.1

6    through the Completion Date, and, after the Completion Date a percentage of the Rent payable

7    pursuant to Section 5.1.2 computed in accordance with Section 6.1.1.7; (ii) the cost of

8    Maintenance and Modernization of the Exhibition Hall (except to the extent paid from the

9    Capital Improvements Account or the Naming Rights Account), with the cost of Major

10    Maintenance and Modernization being amortized in accordance with reasonable accounting

11    principles; (iii) the cost of Utilities related to the Exhibition Hall; (iv) the cost of Insurance and

12    self-insurance (up to the amount of the premium charged by any third-party insurer for

13    equivalent coverage) related to the Exhibition Hall; (v) the cost of Impositions related to the

14    Exhibition Hall; (vi) Exhibition Hall Parking Expenses; (vii) the cost of goods and services

15    related to Exhibition Hall Revenues; and (viii) FGI's reasonably allocated reasonable direct and

16    indirect administrative and overhead expenses associated with the operation of the Exhibition

17    Hall. Exhibition Hall Expenses do not include: (i) expenses that are reimbursed to FGI,

18    including, without limitation, expenses reimbursed by insurance proceeds, or expenses

19    reimbursed to FGI pursuant to any sublease, license agreement or occupancy agreement of any

20    kind or pursuant to any service agreement pertaining to the operation, maintenance or repair of

21    the Exhibition Hall, provided that such reimbursements are not accounted for as Exhibition Hall

22    Revenues; (ii) any Major Maintenance or Modernization to the extent paid from the Capital

23    Improvements Account or the Naming Rights Account; (iii) costs incurred because of the breach

24    of this Lease by FGI; (iv) amounts paid to persons or entities related to FGI in excess of the fair

25    market value of services or materials provided in exchange therefor; (v) amounts payable under

26    or in connection with any FGI mortgage, deed of trust, security agreement, or other financing or

27    refinancing arrangements; (vi) costs of sculpture, paintings, or other objects of art acquired and

28    owned by FGI, except to the extent FGI has obtained PSA's prior written approval of the cost

29    thereof; (vii) cost of repairing any defective construction work or latent defects in the Exhibition

30    Hall, or the repair or replacement of any materials or equipment in connection with such defects;

50034209 13 -- STADIUM MASTER LEASE
11/23/98           -15-          **EXHIBIT A**
Page 23 of 179        PSA 000062

1   (viii) any damages resulting from the negligence of or violation of any Laws by any FGI

2   executive officer to the extent not covered by insurance or self-insurance; (ix) rental charges for

3   the use of portions of the Swing Space or the Stadium for Exhibition Hall Events; and (x) any

4   amortization of the initial capital cost of any Project Improvement incurred pursuant to the

5   Development Agreement.

6          6.1.1.4   "Exhibition Hall Events" means events which are primarily located

7   and centered in the Exhibition Hall, even if there is some ancillary use of other parts of the

8   Project, and includes "flat shows" such as the Home Show, Car Show and Boat Show.

9   Exhibition Hall Events do not include pre-, intermission- and post-functions related to primarily

10  Stadium events, or uses ancillary to primarily Stadium events. Stadium events include, without

11  limitation, football games, soccer games, concerts and other entertainment events held in the

12  Stadium bowl.

13         6.1.1.5   "Exhibition Hall Parking Revenues" are ninety-one percent (91%)

14  of the parking revenues generated in connection with Exhibition Hall Events (based on FGI's

15  good faith estimates, subject to the approval of PSA), computed exclusive of parking and other

16  taxes, for twenty (20) years from the Completion Date, and one hundred percent (100%) of the

17  parking revenues thereafter.

18         6.1.1.6   "Exhibition Hall Parking Expenses" are the expenses incurred in

19  connection with the operation of the Parking Facilities for Exhibition Hall Events, including for

20  any parking management contractor, and is calculated by multiplying the total operating cost of

21  the Parking Facilities, by a fraction, the numerator of which is the number of parkers estimated

22  for Exhibition Hall Events (and utilized in computation of Exhibition Hall Parking Revenues)

23  and the denominator of which is the total number of parkers in the Parking Facilities, during the

24  period of the computation.

25         6.1.1.7   The percentage of Rent paid pursuant to Section 5.1.2 which is an

26  Exhibition Hall Expense shall be a reasonable allocation of total Rent as determined by FGI,

27  subject to the approval of PSA.

28     6.1.2   Percentage Rent

29         From the Commencement Date and thereafter during the Term, FGI shall

30  pay PSA, as additional Rent, twenty percent (20%) of Exhibition Hall Net Profits ("Percentage

1   Rent"). FGI shall pay Percentage Rent to PSA annually in arrears on or before the one hundred

2   eightieth (180th) day of each Lease Year for the immediately preceding Lease Year. All funds

3   received by PSA pursuant to this Section 6.1. shall be deposited into the permanent common

4   school fund as required by Section 210(2)(b)(ix) of the Act.

5               6.1.3    Annual Exhibition Center Operating Expense Budget

6                       At least sixty (60) days prior to the beginning of each Lease Year, FGI

7   shall submit to PSA its budget for Exhibition Center operations for that Lease Year, for PSA's

8   review and comment.

9               6.1.4    Booking Policies

10                      Prior to the Commencement Date, FGI shall provide to PSA, for its review

11  and comment, the "booking policies" which FGI proposes to follow in the booking of the

12  Exhibition Hall, and thereafter FGI shall provide to PSA, for its review and comment, any

13  changes or modifications to such booking policies which FGI proposes as they arise.

14              6.1.5    Reporting Period

15                      FGI shall submit to PSA, on or before the forty-fifth (45th) day of each

16  calendar quarter for the immediately preceding calendar quarter, a written statement signed by

17  FGI, and certified by its chief financial officer to be true and correct, showing in detail the

18  amount of Exhibition Hall Revenues, Exhibition Hall Expenses, and Exhibition Hall Net Profits,

19  as of the end of the preceding calendar quarter. In addition to FGI's quarterly report of

20  Exhibition Hall Net Profits, FGI shall submit to PSA an annual audited report of Exhibition Hall

21  Revenues, Exhibition Hall Expenses, and Exhibition Hall Net Profits, not later than one hundred

22  eighty (180) days following the end of each Lease Year, showing Exhibition Hall Revenues,

23  Exhibition Hall Expenses, and Exhibition Hall Net Profits as of the end of such Lease Year.

24  Each such report shall be certified as accurate by the chief financial officer of FGI and each such

25  annual report and final report shall be accompanied by a certificate of an independent certified

26  public accountant reasonably satisfactory to PSA that such report has been prepared in

27  accordance with generally accepted accounting principles ("GAAP") consistently applied except

28  as so noted and accurately states the Exhibition Hall Revenues, Exhibition Hall Expenses, and

29  Exhibition Hall Net Profits for the period of such report. The format and detail of the above

30  reports shall be subject to the approval of PSA.

**EXHIBIT A**
**Page 25 of 179**

1     6.1.6   Books and Records

2          All Exhibition Hall Revenues and Exhibition Hall Expenses shall be

3   recorded on a daily basis in accordance with GAAP except as so noted and in a manner

4   reasonably satisfactory to PSA. FGI shall keep and maintain in the Premises, or in its home

5   office (provided PSA shall have been notified in writing of the address at which the books and

6   records are being maintained), full and accurate books of account and records from which

7   Exhibition Hall Revenues and Exhibition Hall Expenses can be determined. Such records shall

8   be preserved for at least thirty-six (36) months after the end of the period in question.

9     6.1.7   Inspection and Audit

10          For one hundred twenty (120) days after receipt of FGI's audited annual

11  Exhibition Hall Net Profits report, PSA shall have the right during regular business hours to

12  inspect and audit all books, electronic records, papers and files of FGI relating to Exhibition Hall

13  Net Profits and FGI shall make the same available to PSA upon at least five (5) Business Days

14  prior written request. If during that 120-day period, PSA contends that any error exists with

15  respect to FGI's annual Exhibition Hall Net Profits report, then FGI's books, electronic records,

16  papers, and files for such annual Exhibition Hall Net Profits report shall be kept and maintained

17  by FGI until PSA's contention has been finally determined, even if longer than the thirty-six (36)

18  month period provided for above. If any audit shows that the amount of annual Exhibition Hall

19  Net Profits on FGI's annual Exhibition Hall Net Profits report was understated by more than the

20  greater of (x) $10,000, or (y) two percent (2%), then FGI shall pay PSA the understated amount

21  of annual Percentage Rent within five (5) Business Days and the cost of the audit and

22  investigation as additional Rent. If the audit reveals that the amount of annual Exhibition Hall

23  Net Profits on FGI's annual Exhibition Hall Net Profits report was not understated by more than

24  the greater of (x) $10,000, or (y) two percent (2%), then PSA shall pay the cost of the audit,

25  which shall not be a Reasonable PSA Operating Expense. If any annual Exhibition Hall Net

26  Profits report understates the amount of Exhibition Hall Net Profits, FGI shall pay the amount of

27  the understatement together with Economic Interest from the date originally due.

28     6.2   Share of Revenues from Other Sources

29          If FGI derives gross revenue from the use of the Project from sources or activities

30  other than those described in this Lease and in Exhibit 6.2 hereof, then PSA reserves the right to

1  discuss with FGI profit sharing from such sources or activities, bearing in mind that there is

2  already profit sharing from Exhibition Hall Events pursuant to Section 6.1 above.  Such

3  reservation does not imply that PSA has any right to share in such profits beyond the profit

4  sharing of Section 6.1 unless and until PSA and FGI mutually agree to a specific profit sharing

5  plan in their sole discretion.

6       6.3    Net Profits from Olympic Games and/or World Cup Soccer

7            To the extent any activities pertaining to the Olympic Games or World Cup

8  Soccer take place at the Project, all gross revenues derived from any such activities in excess of

9  FGI's actual cost of preparing, operating and restoring the Project in connection with such

10  activities shall be paid to PSA promptly following such activities.  FGI shall provide reports to

11  PSA regarding the revenues received and the expenses incurred by FGI in connection with such

12  activities and shall maintain books and records with respect to such revenues and expenses and

13  PSA shall be entitled to inspect and audit such books and records, all in the same manner as FGI

14  is obligated to provide reports and to maintain books and records with respect to Percentage

15  Rent.  All funds received by PSA pursuant to this Section 6.3 shall be deposited into a tourism

16  development and promotion account established pursuant to RCW 43.330, as such statute may be

17  from time-to-time amended, modified, supplemented, re-codified or replaced, as required by

18  Section 106(10) of the Act.

19

20  SECTION 7    USE OF THE PREMISES

21       7.1    Permitted Use of Premises

22            The Premises shall be used by FGI for the purpose of operating and maintaining

23  the Stadium, the Exhibition Hall, the Parking Facilities, and the Other Improvements.  FGI may

24  use the Premises for any lawful purpose or event for which the Premises is (or can be reasonably

25  made) suitable, including without limitation sporting and other similar events, competitions,

26  ceremonies, conventions, meetings, assemblies, consumer shows, trade shows, concerts, plays,

27  musicals, recitals, performances, audience participation events, and similar types of

28  entertainment, social and business functions, music, movie and television production,

29  broadcasting or transmitting in television, radio, internet and other media, educational and

30  scientific activities, religious activities, political activities, concessions, restaurants and lounges,

1    parties and celebrations, circuses, carnivals, related concessions, ancillary office and retail uses,

2    parking and all ancillary uses necessary or convenient in connection with the above described

3    uses. FGI may use the Premises only for the uses and activities allowed in this Section 7.1 and

4    for no other uses or activities unless FGI obtains PSA's prior written consent. FGI shall not use

5    or allow the use of the Premises or any part thereof for any unlawful purpose or in violation of

6    any certificate of occupancy, any certificate of compliance or any Law. FGI shall not permit

7    waste of the Premises or permit any act to be done or any condition to exist on the Premises or

8    any part of the Premises which may be hazardous, which may constitute a nuisance, or which

9    may void or make voidable any policy of insurance in force with respect to the Premises.

10         7.2   Standard of Operations, Continuous Operations

11              7.2.1   Standard of Operations

12                  From and after the Commencement Date and thereafter throughout the

13    Term, FGI shall occupy and continuously conduct business in the Exhibition Hall and the

14    Parking Facilities in a "First-Class Manner," which means a commercially reasonable manner

15    consistent with the average manner in which business is conducted in the Comparable Exhibition

16    Facilities and Comparable Parking Facilities identified in Section 11.1.2. From and after the

17    Completion Date and thereafter through the Term, FGI shall occupy and continuously conduct

18    business in the Stadium in a "First-Class Manner," which means in a commercially reasonable

19    manner consistent with the average manner in which business is conducted in the comparable

20    stadium facilities identified in Section 11.1.2.

21              7.2.2   Continuous Operations

22                  FGI may interrupt the continuous operations of the Premises required by

23    this Section 7.2 only in the event FGI is forced to do so on account of a casualty loss, required

24    maintenance, or Force Majeure, and then only to the extent such an event actually requires an

25    interruption of continuous operations.

26         7.3   Hazardous Substances

27              7.3.1   FGI shall remediate any Hazardous Substances located on the Project Site

28    as of the Commencement Date to the extent required by applicable Governmental Authority, and

29    in accordance with the Development Agreement.

**EXHIBIT A**<br>**Page 28 of 179**

1    7.3.2  FGI shall not generate, release, store, or deposit on the Premises any
2  Hazardous Substances, except that FGI may use and store Hazardous Substances in compliance
3  with Laws and in such reasonable quantities as may be necessary for the operation of the
4  Premises.  When such use or storage is reasonably necessary, FGI shall not allow any Hazardous
5  Substances to be released into or deposited on the Project Site, the Project Improvements, or the
6  ground water under the Project Site except to the extent permitted by Laws.  In all events, usage
7  and storage of such Hazardous Substances shall be in full compliance with all Laws.  If no such
8  Laws exist, FGI shall handle the Hazardous Substances in a manner reasonably calculated to
9  promote health and safety.

10    7.3.3  FGI shall defend, indemnify and hold harmless PSA and PSA Related
11  Persons from and against any and all claims, losses, liabilities, damages, response costs and
12  expenses of any nature whatsoever arising out of or in any way related to the generation, release,
13  storage, or deposit of Hazardous Substances on the Project Site or Project Improvements by FGI
14  at any time, or by any other Person during the Term, unless such Hazardous Substances are
15  generated, released, stored, or deposited by PSA or any PSA Related Person, including, but not
16  limited to: (i) claims of third parties, including Governmental Authorities, for damages, response
17  costs, injunctive or other relief; (ii) the cost, expense or loss to PSA of any injunctive relief,
18  including preliminary or temporary injunctive relief, applicable to PSA or the Premises; (iii) the
19  expense, including fees of attorneys, engineers, paralegals and experts for reporting the existence
20  of Hazardous Substances to any agency of the State of Washington or the United States as
21  required by applicable Laws; and (iv) any and all expenses or obligations, incurred before, during
22  and after any trial or appeal therefrom or any administrative proceeding or appeal therefrom
23  whether or not taxable as costs, including, without limitation, attorneys' and paralegal fees,
24  witness fees (expert and otherwise), deposition costs, copying and telephone charges and other
25  expenses, all of which shall be paid by FGI promptly after PSA incurs the obligation to pay such
26  amounts.   The indemnity obligations of FGI in this Section 7.3.3 shall survive any termination
27  of this Lease.

28    7.3.4  Subject to Section 15.4, PSA shall defend, indemnify and hold harmless
29  FGI from and against any and all claims, losses, liabilities, damages, response costs and expenses
30  of any nature whatsoever arising out of or in any way related to the generation, release, storage,

**EXHIBIT A**
**Page 29 of 179**

PSA 000068

1    or deposit of Hazardous Substances on the Project Site by PSA or any PSA Related Person. Any

2    such indemnification is not a Reasonable PSA Operating Expense. The indemnity obligations of

3    PSA in this Section 7.3.4 shall survive any termination of this Lease.

4            7.3.5    FGI may obtain pollution legal liability and/or environmental remediation

5    cost overrun insurance.

6            7.3.6    Promptly upon written notice from PSA or from any Governmental

7    Authority, FGI shall remove from the Premises, or otherwise remediate in accordance with

8    applicable Laws, all Hazardous Substances (including, without limitation, the soil or water table

9    of the Premises), and shall restore the Premises, to a clean, safe, good, and usable condition.

10   Without limiting the foregoing, FGI may utilize any appropriate governmental appeal process in

11   those instances where, in its reasonable discretion, FGI determines the written notice to be

12   arbitrary and capricious or otherwise without grounds.

13           7.3.7    Nothing in Sections 7.3.3 through 7.3.6 shall preclude environmental

14   related claims for indemnification or contribution with respect to the Premises. If PSA believes

15   that it has an environmental-related claim for indemnification or contribution from a third-party

16   with respect to the Premises it shall so notify FGI. If FGI believes that PSA has such a claim,

17   either because of a notification in accordance with the preceding sentence or otherwise, FGI may

18   elect to timely pursue such claim. If FGI elects to pursue such claim, it shall so notify PSA and

19   PSA shall assign to FGI all of PSA's legal rights to pursue such claim (to the extent such

20   assignment can be lawfully made). If FGI does not elect to pursue such claim, then PSA may

21   elect to pursue it. PSA and FGI shall reasonably cooperate in the pursuit of any such claim.

22           7.3.8    FGI assumes and shall perform any obligations of PSA under Sections

23   7.7.3 and 7.7.4 of the Development Agreement.

24

25   SECTION 8    REQUIREMENTS TO PROVIDE PUBLIC BENEFITS

26       8.1    Special Team Covenants.

27           FGI shall require that the Stadium Use Agreement with Team contain the

28   following (but appropriately re-formatted) covenants set forth in this Section 8.1, and, subject to

29   temporary lapses caused by Force Majeure or damage or destruction to the Project, FGI shall

30   cause Team to comply with such covenants at all times during the Term following the

1    Completion Date.    For purposes of this Section 8.1, "Team" means not only the Seattle

2    Seahawks, but also any successor or replacement "major league" professional football team, and,

3    if professional football ceases to be considered a "major league" sport, then any other "major

4    league" team in any sport:

5            8.1.1    Playing of All Home Games.  Team shall play all of its Regular Season

6    Home Games and Playoff Home Games in the Stadium, other than Home Games scheduled

7    elsewhere by the League.

8            8.1.2    Affordable Priced Seats

9                    8.1.2.1    Affordable Priced Seats.    Team shall offer to sell at least ten

10    percent (10%) of the spectator seats in the Stadium which are for sale to each Team Home Game

11    at an "affordable price," which seats shall be known as "Affordable Priced Seats."  Affordable

12    Priced Seats may be offered for sale at a range of prices (not exceeding the affordable price) as

13    Team shall determine in its sole discretion.  The number and locations of Affordable Priced Seats

14    may be determined for each Home Game, depending on the number and configuration of

15    spectator seats available.  Affordable Priced Seats may be offered and sold on a season-ticket,

16    multiple-games package, individual game, and/or on such other basis as Team shall determine in

17    its sole discretion; provided that at least fifty percent (50%) of the minimum required Affordable

18    Priced Seats (i.e. five percent (5%) of the total spectator seats in the Stadium) shall be offered on

19    an individual game basis.  "Affordable price" means a price which is not greater than the

20    "average" of the "lowest ticket prices" charged by all NFL teams other than Team during the

21    preceding NFL Season (based on information provided by the other NFL teams and/or by the

22    NFL), and affordable price is exclusive of any taxes, fees or other charges imposed on the sale of

23    the ticket by any Governmental Authority or any third-party.  "Lowest ticket price" means the

24    lowest priced paid-admissions ticket available for sale on a regular basis for a team's Pre-Season,

25    Regular Season and Playoff home games, respectively; and excludes complimentary tickets,

26    promotional tickets, and similarly offered tickets.  "Average" means the weighted average,

27    computed by multiplying for each NFL team other than Team the lowest ticket price for that

28    team's home games by the number of tickets sold at that price; adding the products of such

29    multiplication for all the NFL teams other than Team; and dividing that sum by the sum of

30    number of tickets sold at the lowest ticket prices for all the NFL teams other than Team.

1    "Affordable price" may be determined separately for Pre-Season Home Games, Regular Season

2    Home Games and/or Playoff Home Games.

3    8.1.2.2    Reporting.    By each May 31st following the end of each NFL

4    Season during the Term following the Completion Date, FGI shall file a report with PSA setting

5    forth the following information for the season just completed: For each Home Game, the number

6    of spectator seats available for sale for the Home Game; the number of Affordable Priced Seats

7    available for the Home Game, the price or prices at which Affordable Priced Seats were offered

8    for sale (if unsold) or actually sold (if sold), or zero (if given away); and a schedule showing the

9    computation and backup information of the average of the lowest ticket prices charged by all

10    NFL teams other than Team during the preceding NFL Season.  If the ticket holder provides

11    goods or services as all or part of the consideration for a ticket, the reasonable market value of

12    such goods or services shall be included in the ticket price.  If the ticket entitles the holder to

13    goods or services in addition to the right to observe a game from a seat, the reasonable market

14    value of such other goods or services shall be deducted from the nominal ticket price.

15    8.1.2.3    Adjustment.    In the event that for any Home Game, fewer than

16    10% of the available seats qualified as Affordable Priced Seats, then an adjustment amount

17    ("Aggregate Adjustment Amount") shall be calculated which equals the minimum aggregate

18    amount which, if the offering price of a sufficient number of tickets which were not Affordable

19    Priced Seats had been reduced, then the requirement of Section 8.1.2.1 would have been

20    satisfied.    Team shall reflect the Aggregate Adjustment Amount at the first reasonable

21    opportunity in a one-time adjustment of the price of future Affordable Priced Seats, such that the

22    average price of the Affordable Priced Seats as calculated without regard to this adjustment

23    would be reduced by an amount equal to the Aggregate Adjustment Amount divided by the total

24    number of Affordable Priced Seats.  The "first reasonable opportunity" shall mean the next

25    Home Game during the then current NFL Season or the immediately following NFL Season at

26    which there are enough unsold Affordable Priced Seats to fully utilize the Aggregate Adjustment

27    Amount.

28    8.1.2.4    Audit Right.    PSA shall have the right to audit (generally as

29    provided in Section 6.1.7) the applicable records of FGI and Team to determine if FGI is in

EXHIBIT A
Page 32 of 179

PSA 000071

1     compliance with its obligations under this Section 8.1.2. FGI shall fully cooperate with any such

2     audit, and FGI shall cause Team to fully cooperate with such audit.

3                 8.1.3    Suite Lottery

4                    Subject to applicable legal restrictions, for each Team Home Game played

5     in the Stadium, Team shall designate and make available one Suite (which is not a field-level

6     suite i.e. a "bunker suite") with a minimum of twenty (20) seats on a "lottery basis," as a free

7     upgrade to purchasers of tickets (including for Affordable Priced Seats) other than tickets for

8     seats located in Suites or Club Seat areas ("Suite Lottery"). Team shall conduct the Suite Lottery

9     under the terms of a Suite Lottery Program setting forth the rules, terms and conditions of the

10    Suite Lottery, which Team shall determine from time-to-time, in its sole discretion, but subject to

11    applicable law. The pool of eligible purchasers may include purchasers of season tickets,

12    multiple-game package tickets, individual game tickets, or any other basis (other than purchasers

13    of tickets located in Suites or Club Seat areas), and may include purchasers from the curr___: NFL

14    Season or the immediately prior NFL Season. Team may set other reasonable eligibility

15    requirements, such as a minimum age. The Suite Lottery Program shall provide for multiple

16    "winners" for each Team Home Game, and may allow winners to "win" multiple tickets to the

17    Suite. Winners may be the holder of a ticket and not literally the purchaser. So, for example, a

18    "winner" may be selected by random drawing of a seat number associated with a ticket held by

19    the "winner." The Suite Lottery may be conditioned upon each "winner's" agreement to such

20    conditions as: (i) disclosure of his or her full name and social security number and granting

21    permission to Team to make any required Federal tax filings; (ii) payment of any taxes or other

22    regular charges due with respect to the Suite ticket; (iii) payment for food and beverages

23    available in the Suite; (iv) surrender of the ticket for which they became eligible for the Suite

24    Lottery and won; (v) payment to Team of dollar amounts required for withholding of any State or

25    Federal income taxes associated with such tickets; and (vi) agreement to any other reasonable

26    terms and conditions imposed by Team.

27         8.2    Coordination in Scheduling Events

28                 8.2.1    PSA and/or FGI shall use Reasonable Efforts to meet with the Washington

29    State Major League Baseball Stadium Public Facilities District (the "PFD") which owns Safeco

30    Field, or The Baseball Club of Seattle, L.P. (the "Mariners"), which is the operator of Safeco

1    Field, and attempt to develop an agreement to coordinate scheduling of events at Safeco Field

2    and the Premises. FGI shall cooperate with the PFD and the Mariners to coordinate FGI's

3    operational planning for dual time-specific events and back-to-back events occurring at these two

4    facilities on the same day. Coordination of operational planning will include transportation

5    management, safety and security planning, and event clean up activities. If FGI enters into an

6    agreement with the PFD or the Mariners with respect to scheduling of events, then FGI shall

7    comply with the terms of that agreement

8             8.2.2    The foregoing covenant is currently satisfied by that certain Agreement of

9    Event Scheduling Principles dated June 15, 1998, between FGI and the Mariners.

10            8.2.3    Within sixty (60) days after the last Home Game of Team, PSA and FGI

11    shall meet to review FGI's compliance with the requirements of Section 8.2.1 (the "Annual

12    Review"). The Annual Review shall include a report by FGI setting forth its efforts to

13    coordinate its operational planning with the operations of Safeco Field, shall include public and

14    neighborhood input, shall review whether FGI's operations conformed to the requirements of the

15    City of Seattle in permits or approvals issued with respect to the Project and shall set forth

16    recommendations, if any, for improved coordination.

17       8.3    Cooperation with Obtaining Super Bowl Event

18            Pursuant to RCW 36.102.060(12), PSA, in consultation with FGI, is directed to

19    pursue hosting an NFL Super Bowl at the Stadium, but only in the event the rules of the National

20    Football League are changed to allow the Stadium to be the venue for a Super Bowl. In such

21    event, FGI shall cooperate with PSA's efforts to host a Super Bowl at the Stadium.

22       8.4    Lottery Promotion

23            8.4.1    Pursuant to the Development Agreement, subject to Section 8.4.4, FGI

24    shall promote the Washington State Lottery games described in Section 205 of the Act with any

25    combination of in-kind advertising, sponsorships, or prize promotions, valued at $1 million

26    annually beginning in calendar year 1998, and increased by four percent (4%) each year

27    thereafter. The content and value of the advertising, sponsorships and prize promotions are

28    subject to the reasonable advance approval of the State Lottery Commission. FGI may enter into

29    an agreement with the State Lottery Commission setting forth the procedural aspects of

30    performance under this Section.

**EXHIBIT A**
**Page 34 of 179**

PSA 000073

1        8.4.2   The purpose of this requirement is to increase lottery sales of games

2   described in Section 205 of the Act, and to comply with Section 208 of the Act.

3        8.4.3   This obligation shall terminate upon the earlier of:  (x) the date that

4   distributions end under RCW 67.70.240(5); and (y) December 31, 2020.

5        8.4.4   Following the Completion Date, the Lottery promotion obligation under

6   the Development Agreement shall terminate, and the same obligation is assumed by FGI under

7   this Lease.

8      8.5   <u>Prevailing Wages</u>

9        FGI shall be subject to and comply with the prevailing wage requirements of

10  RCW 39.12, as such statute may be from time-to-time amended, modified, supplemented, re-

11  codified or replaced, with respect to any construction (but not operation or maintenance) work

12  conducted at the Premises, and FGI shall include this prevailing wage covenant in every

13  agreement FGI enters with any Person which will provide construction services at the Premises.

14     8.6   <u>Women and Minority Business Enterprise Goals</u>

15        FGI shall comply with applicable MBE and WBE goals established by King

16  County, Washington, in connection with the operation of the Premises and FGI shall include this

17  MBE/WBE goal covenant in every agreement and contract with respect thereto that FGI enters

18  with any Person which will provide services to the Premises.  "MBE" (Minority Business

19  Enterprise) means a for-profit business that is at least 51%-owned and controlled by one or more

20  minority persons or has been certified as such by the State Office of Minority and Women's

21  Business Enterprises or some other entity responsible for certifying such businesses.  "WBE"

22  (Women Business Enterprise) means a for-profit business that is at least 51%-owned and

23  controlled by one or more women or has been certified as such by the State Office of Minority

24  and Women's Business Enterprises or some other entity responsible for certifying such

25  businesses. FGI shall use Reasonable Efforts to cause MBEs and WBEs to be utilized in the

26  operation of the Project and to cause the achievement of the goals in the aggregate. FGI shall not

27  be required to establish or cause to be established MBE or WBE goals where no MBEs or WBEs

28  are available and capable of providing the desired services or goods, as reasonably determined by

29  FGI. FGI shall provide to PSA an annual written report regarding compliance by FGI with the

30  requirements of this Section.

1    8.7    Hiring Local Residents

2            To the extent feasible, and subject to any conditions or requirements of any

3    Project Labor Agreement or Collective Bargaining Agreement related to the Project, with respect

4    to the operation of the Project FGI shall give preference in hiring, and shall cause its contractors

5    which will provide services related to operation of the Project to give preference in hiring, to

6    local residents and in particular residents from the areas immediately surrounding the Project.

7    However, neither FGI nor any of its contractors shall be required to hire any person who is not

8    fully capable or qualified to perform the duties of the particular job for which he or she is being

9    considered. If FGI or any of its contractors cannot satisfy its employment needs from persons

10   who reside within such areas, FGI and its contractors may hire such other employees as FGI or

11   its contractor deems appropriate. FGI shall include this covenant in every agreement FGI enters

12   with any contractor which will provide services related to operation of the Project. FGI shall

13   provide to PSA an annual written report regarding compliance by FGI with the requirements of

14   this Section.

15   8.8    Mitigation of Impacts from Stadium Operations

16           8.8.1    FGI shall work with PSA and those persons living or working in the

17   Pioneer Square, Chinatown/International District, and the Greater Duwamish Neighborhoods,

18   (the "Affected Area") to mitigate the adverse impacts on the Affected Area from the operations

19   of the Stadium. FGI and PSA acknowledge that the impacts of events at the Stadium can only be

20   estimated at the time of the execution of this Lease and can only be precisely determined over

21   time, and that mitigation requirements may need to be appropriately adjusted over time.

22           8.8.2    Within thirty (30) days prior to each Lease Year, FGI shall submit to PSA

23   for its review and comment a proposed Stadium Mitigation Report and Plan. A Stadium

24   Mitigation Report and Plan shall identify potential adverse impacts upon the persons living in the

25   Affected Area from FGI's operations, propose reasonable measures designed to diminish those

26   adverse impacts, provide an assessment of the effectiveness of FGI's prior mitigation activities,

27   and demonstrate how FGI will comply with the mitigation requirements of the Master Use

28   Permit issued by the City of Seattle authorizing the construction of the Premises.

1    8.9    Annual Reporting on Operations

2    FGI shall submit to PSA for public disclosure not later than one hundred eighty

3    (180) days following the end of each Lease Year an audited profit and loss financial statement

4    for FGI's operations of the Project. This statement shall be certified as accurate by the chief

5    financial officer of FGI and shall be accompanied by a certificate of an independent certified

6    public accountant reasonably satisfactory to PSA that such statement has been prepared in

7    accordance with GAAP, except as so noted, and accurately states the profits and losses of FGI

8    for the period of such statement. The format and detail of the statement of profits and losses

9    shall be subject to the approval of PSA.

10    8.10    Major League Soccer

11    FGI shall actively support efforts to bring a major league soccer team to play

12    soccer games in the Stadium, either as a home team based in Seattle or as a visiting team. The

13    foregoing obligation shall not be construed to require FGI or any Affiliate to finance or acquire

14    any ownership interest of such a soccer team, or to provide economic terms for use of the

15    Stadium which are not commercially reasonable for FGI. In scheduling events at the Stadium

16    FGI shall use Reasonable Efforts to accommodate the playing schedule of any Seattle major

17    league soccer team, but such Reasonable Efforts shall not require Team or any other Project user

18    to adjust the schedule of its Home Games or Project events.

19    8.11    Provision of PSA Office Space

20    8.11.1    PSA shall have exclusive use without charge of office space of

21    approximately 1,500 square feet, generally as shown in the Plans, (the "PSA Office Space") to be

22    located in the Stadium. The exact location, configuration, dimensions, plans and specifications

23    of the PSA Office Space are to be determined pursuant to the Development Agreement, and

24    when so determined will be described in an Exhibit 8.11 to this Lease to be appended hereto.

25    The PSA Office Space is a "public area" as that term is contemplated by Section 202(14) and

26    (15) of the Act.

27    8.11.2    FGI shall, also without charge to PSA:

28    8.11.2.1    maintain the PSA Office Space, other than PSA's furniture,

29    fixtures, equipment and personal property, and provide , normal janitorial service, but only to the

30    extent incident to normal office use,

1          8.11.2.2    as part of the property insurance FGI maintains pursuant to
2    Section 13 of this Lease, maintain property insurance covering the PSA Office Space (but not
3    PSA's furniture, fixtures, equipment or personal property),

4          8.11.2.3    repair or reconstruct the PSA Office Space to the extent FGI is
5    otherwise required to repair or reconstruct the Premises under Sections 11 and 12 of this Lease,
6    except to the extent that the reason the PSA Office Space must be repaired or reconstructed was
7    due to the actions or omissions of PSA or PSA Related Persons, agents or invitees, or due to the
8    breach of this Lease by PSA,

9          8.11.2.4    pay the cost of electricity, water, sewer, and HVAC provided to the
10    PSA Office Space, but only to the extent incident to normal office use, and

11          8.11.2.5    ensure that at the time FGI tenders possession of the PSA Office
12    Space to the PSA, the PSA Office Space will be in compliance with all Laws applicable to the
13    PSA Office Space except to the extent such Laws relate solely to PSA's particular use of the
14    PSA Office Space (as opposed to the use of the PSA Office Space for general office use).

15          8.11.3    PSA, for itself, PSA Related Persons, and its agents, invitees and guests,
16    shall have the right of access to the PSA Office Space and nearby restrooms located in the
17    Stadium, at any time and from time-to-time, and to use any sidewalks, stairways, elevators,
18    escalators, parking areas and other similar or related public areas of the Stadium as may be
19    reasonably necessary or convenient for purposes of accessing the PSA Office Space and nearby
20    restrooms, to the same extent as FGI's employees. This Section 8.11.3 shall not be construed so
21    as to allow PSA to attend events at the Project without charge or to allow PSA to have access to
22    portions of the Project which are not necessary to access the PSA Office Space and nearby
23    restrooms; provided however that this shall not limit PSA's rights of access pursuant to Section
24    16.

25          8.11.4    FGI shall provide to PSA twelve (12) parking passes, without charge.
26    These passes shall allow parking in the North Parking Lot in any available parking stall
27    throughout the Term. PSA shall have the right to enter the North Parking Lot and use the
28    driveways and travel lanes of the North Parking Lot during the Term. The parking privileges
29    granted by the passes shall be subject to reasonable rules and terms established from time-to-time
30    by FGI which are generally applicable to all such parking passes.

1    8.11.5   FGI shall, subject to the imposition of reasonable rules, allow PSA to use
2    any appropriately-sized meeting room in the Project which is not previously scheduled for other
3    uses, for PSA's Board Meetings and other PSA public meetings, without charge except for the
4    reasonable cost of any services provided by FGI.

5    8.11.6   PSA may use the PSA Office Space only for the uses and activities
6    allowed in this Section 8.11 and for no other uses or activities without FGI's prior written
7    consent. PSA shall not use or allow the use of the PSA Office Space or any part thereof for any
8    unlawful purpose or in violation of any certificate of occupancy, any certificate of compliance or
9    any Law. PSA shall not permit waste of the PSA Office Space or permit any act to be done or
10   any condition to exist on the PSA Office Space or any part of the PSA Office Space which may
11   be hazardous, which may constitute a nuisance, or which may void or make voidable or which
12   may increase the premium of any policy of insurance in force with respect to the PSA Office
13   Space. Except for any minor non-structural alterations which do not affect the Project or its
14   operation, PSA shall not make any alterations to the PSA Office Space without FGI's prior
15   written consent. In emergencies, and as part of its obligations for maintenance and repair of the
16   Stadium, FGI shall have the right to enter into the PSA Office Space as required. FGI will use
17   Reasonable Efforts to avoid disrupting PSA's business operations and so long as FGI uses
18   Reasonable Efforts, FGI shall not be liable to PSA for any damage to PSA, its operations or
19   property resulting from such entry, maintenance or repair. In the event of any casualty or
20   condemnation that make the PSA Office Space untenable, PSA, if requested by FGI, shall vacate
21   the PSA Office Space and FGI shall use Reasonable Efforts to provide PSA with alternative
22   space within the Project if reasonably practicable.

23   8.11.7   Notwithstanding the foregoing, if FGI has a reasonable basis, and subject
24   to PSA's reasonable consent, FGI may elect to provide to PSA without charge reasonable and
25   proximately located office space outside the Project which reasonably complies with Section
26   210(2)(b)(vii) of the Act, provided that FGI pays the reasonable moving expenses of PSA.

27   8.12   Neighboring Community Meetings

28   FGI shall, subject to the imposition of reasonable rules, allow the use of any
29   appropriately-sized meeting room in the Project which is not previously scheduled for other uses

**EXHIBIT A**
Page 39 of 179

**PSA 000078**

1    for neighboring community public meetings, without charge except for the reasonable cost of any

2    services provided by FGI. "Neighboring communities" are the Affected Areas.

3          8.13   Protection of Tax-Exempt Bonds

4             FGI acknowledges that the State of Washington may finance the construction of

5    the Project using tax-exempt bonds.  If the State uses tax-exempt bonds, PSA and FGI shall

6    endeavor to structure and limit the amounts, sources, and uses of any payments received by the

7    State, the County, PSA, or any related governmental entity for the use or in respect to the Project

8    in such a manner as to permit the interest on those bonds to be tax exempt.

9          8.14   Project Art

10          8.14.1   The Project Improvements will include Project art pursuant to Section 15.1

11    of the Development Agreement ("Project Art").  FGI shall, pursuant to the Development

12    Agreement, allocate a total of $1.75 million for the acquisition and replacement of Project Art

13    (the "Project Art Fund").  The funds in the Project Art Fund, including the remaining balance of

14    the original $1.75 million, plus the proceeds from the sale of Project Art in the Premises

15    purchased from the Project Art Fund, plus interest earned, shall be used to purchase replacement

16    and additional Project Art.  PSA and FGI shall, at least every five (5) years, confer to make

17    mutually acceptable decisions regarding Project Art to be sold and replacement Project Art to be

18    purchased.

19          8.14.2   Areas within the Premises have been or will be designed and designated as

20    "Project Art Spaces" intended to be utilized for the public display of Project Art.  In consultation

21    with the Project Art Selection Committee, FGI shall, subject to PSA approval, determine what

22    Project Art may be displayed in the Project Art Spaces and the length of time the works of

23    Project Art may be displayed.  FGI shall establish reasonable rules regarding display and

24    regarding public access to the Project Art Spaces, and shall use Reasonable Efforts to provide

25    security for the works of Project Art displayed.

26          8.15   Compliance With Laws; No Discrimination

27             FGI shall at all times, use, manage, possess, and operate the Project in compliance

28    with all applicable Laws, including Laws with respect to discrimination, and FGI shall include

29    this covenant in every agreement, contract, sublease, use agreement, concession agreement and

30    occupancy agreement FGI enters with any Person which will provide services to the Premises or

50034209 13 – STADIUM MASTER LEASE
11/23/98                     -32-            **EXHIBIT A**     **PSA 000079**
                                              Page 40 of 179

1    which will occupy space in the Premises.  FGI may challenge the interpretation or application of

2    any Laws so long as such contest is in good faith, the contest does not jeopardize PSA's interest

3    in the Premises, and FGI indemnifies PSA from any cost, loss, or liability on account of the

4    contest

5

6    SECTION 9    MANAGEMENT OF THE PROJECT

7          9.1    Standard of Operation

8             FGI shall operate the Project in a First-Class Manner, as provided in Section 7.2.

9          9.2    Signage, etc.

10           Subject only to its compliance with Laws, FGI may design, construct, purchase,

11    install, move, remove, utilize and operate such interior and/or exterior structures, facilities,

12    devices and equipment for use as building marquees, signage, advertising displays, information

13    displays, sculptures, art works, or communication of commercial, non-commercial, public

14    service, entertainment or informational messages, including without limitation for purposes of

15    identifying the Project or any Project Element, without the consent or approval of PSA as to the

16    physical structure, facility, device or equipment or as to the content.  Such structures, facilities,

17    devices and equipment may be either active or passive in nature, may be installed anywhere

18    within the Project, including in the interior or exterior of any of the Project Improvements, and

19    may be free-standing or permanently or temporarily attached to any such Project Improvement.

20    It is the intention of the Parties that this provision be construed broadly. No advertising of any

21    form at the Premises will contain a promotion of tobacco products, other than point of sale

22    advertising to the extent not prohibited by Laws.

23          9.3    Project Revenues

24           Except to the extent otherwise specifically provided for in this Lease, all revenues

25    from the operation of the Project during the Term, from every source whatsoever, shall be for the

26    benefit and account of FGI.

27

1  SECTION 10   FGI'S RESPONSIBILITY FOR ALL OPERATING EXPENSES

2      10.1   Utilities

3          Throughout the Term, FGI shall pay or cause to be paid when due, all charges for

4  Utilities provided to or used in connection with the Premises, other than utility charges for or

5  related to the PSA Office Space for which FGI is not responsible pursuant to Section 8.11.2.4.

6  Nothing in this Section shall affect the obligations of PSA and FGI with respect to Utilities under

7  the Development Agreement.

8      10.2   Payment and Contest of Impositions

9          10.2.1   Throughout the Term, FGI shall pay when due all Impositions levied or

10  assessed against the Premises.

11          10.2.2   If any Imposition may, under applicable law, at the option of FGI be paid

12  in installments, FGI may exercise that option, and shall pay all such installments (and interest, if

13  any) becoming due during the Term as they become due.  At the end of the Term, FGI shall

14  deposit with PSA an amount sufficient to pay FGI's pro rata share of all Impositions for the

15  calendar year in which the Lease terminates.  If Impositions have been paid in advance by FGI

16  for a period of time after the Term, PSA shall refund to FGI the portion of such payments

17  applicable to the period after the Term unless it would be illegal for PSA to pay the Impositions

18  after the end of the Term. If FGI has elected to pay   assessments in installments for

19  improvements made in connection with FGI's initial development of the Project, FGI shall pay

20  the full balance of the assessment at the end of the Term.

21          10.2.3   FGI will furnish to PSA at least annually official receipts of the

22  appropriate taxing authority or other proof satisfactory to PSA evidencing the payment of the

23  Imposition.

24          10.2.4   FGI may, by appropriate legal proceedings conducted in good faith and

25  with due diligence, contest the amount or validity or application, in whole or in part, of any

26  Imposition or lien therefor, or any other lien, encumbrance or charge against the Premises arising

27  from work done or materials provided to or for FGI, if:

28          10.2.4.1   The proceedings suspend the collection of the Imposition from

29  PSA, FGI and the Premises, as applicable;

1          10.2.4.2   FGI shall have furnished security as may be reasonably required by

2    PSA; and

3          10.2.4.3   FGI shall have given PSA reasonable notice of, information

4    pertaining to, and regular progress reports about the contest.

5          10.2.5   Pursuant to Section 202(15) of the Act, the "public or entertainment areas"

6    of the Project are exempt from taxes imposed pursuant to RCW 82.29A.030 and 82.29A.040.

7    PSA covenants that it will not initiate, support or cooperate with (except as required by Laws)

8    any effort to (i) revoke or modify that exemption, (ii) to make such an exemption not applicable

9    to the Project for any subsequent amendment or enactment of any other leasehold or similar type

10   Imposition, or (iii) interpret other than as broadly as possible the scope of "public or

11   entertainment areas" of the Project by any applicable agency.

12        10.3   Indemnification

13          FGI shall defend, indemnify and hold harmless PSA and PSA Related Persons

14   and the Premises from any lien, claim, cost, expense or liability with respect to any Imposition or

15   contest thereof, including all costs and expenses (including reasonable attorneys' fees) related

16   thereto.

17        10.4   Liens

18          FGI shall not permit or suffer any lien or encumbrance against the Premises other

19   than liens for Impositions not yet payable, liens and encumbrances granted by PSA and approved

20   by FGI and existing on the Completion Date, easements granted by PSA and approved by FGI

21   in connection with development of the Project, the Permitted Exceptions, and other liens and

22   encumbrances approved by PSA in its sole discretion.  If any unpermitted lien comes into

23   existence, FGI shall cause the lien to be discharged or bonded within thirty (30) days after FGI

24   receives notice of the existence of the lien.  If FGI fails to remove the lien as required in this

25   Section, PSA may, but shall not be obligated to, after prior written notice to FGI, discharge the

26   lien in any manner.  FGI shall repay PSA for any sums advanced to discharge the lien and for

27   PSA's reasonable costs and expenses (including attorneys' fees) in connection with discharging

28   the lien, within thirty (30) days after PSA requests repayment from FGI.  In addition, PSA shall

29   have all other rights and remedies against FGI under this Lease and under Law.

EXHIBIT A
Page 43 of 179

PSA 000082

1    10.5    Weller Street Pedestrian Bridge Maintenance, etc.

2    Throughout the Term, FGI shall pay or cause to be paid when due, all of PSA's

3    liabilities related to the provision of maintenance, repair and security services for the Weller

4    Street Pedestrian Bridge pursuant to Section 4.3 of that certain Agreement among the City of

5    Seattle, King County, Central Puget Sound Regional Transit Authority, State of Washington

6    Department of Transportation, and PSA, in current form as of Closing.

7    10.6    Deferred Sales Tax

8    In accordance with Section 13.2.2 of the Development Agreement, if the Deferred

9    Sales Taxes exceed $37 million, FGI shall pay the amount of the excess to PSA when and as due,

10    which shall be in such proportion of each annual installment of the total Deferred Sales Taxes as

11    the portion of the Deferred Sales Taxes to be paid by FGI bears to the total Deferred Sales Taxes.

12

13    SECTION 11    MAINTENANCE AND MODERNIZATION

14    11.1    Maintenance

15    11.1.1    Maintenance

16    Maintenance consists of Normal Maintenance and Major Maintenance.

17    11.1.2    Maintenance Standard

18    11.1.2.1    FGI shall keep all aspects of the Premises, including its electrical,

19    mechanical, acoustical and other systems, in a "First-Class Condition" throughout the Term,

20    normal wear and tear excepted. With respect to the Stadium, First-Class Condition means that

21    the facilities, operational capabilities, systems, finishes, and amenities of the Stadium are

22    maintained at a level of at least the average quality of all stadiums in the United States that are

23    home stadiums for football teams in the National Football League (or its successor) which were

24    first placed in service after 1996 and before 2006 ("Comparable Stadium Facilities"). With

25    respect to the Exhibition Center, First-Class Condition means that the facilities, operational

26    capabilities, systems, finishes and amenities of the Exhibition Center are maintained at a level of

27    at least the average quality of comparable exhibition centers (i.e. of between 250,000 and

28    500,000 square feet) in major metropolitan cities west of the Mississippi River, and which were

29    first placed in service after 1996 and before 2003 ("Comparable Exhibition Facilities"). With

30    respect to the Parking Facilities, First-Class Condition means that the facilities, operational

1    capabilities, systems, finishes and amenities of the Parking Facilities are maintained at a level of
2    at least the average quality of other above-grade free-standing parking structures in Seattle,
3    which serve major sports facilities, convention facilities, retail, hotel or office uses and which
4    were first placed in service after 1996 and before 2003 ("Comparable Parking Facilities").
5    (Comparable Stadium Facilities, Comparable Exhibition Facilities, and Comparable Parking
6    Facilities are each "Comparable Facilities.") Exhibit 11.1.2.1 describes the Comparable Stadium
7    Facilities, Comparable Exhibition Facilities, and Comparable Parking Facilities as they exist on
8    the date of this Lease. Such Exhibit shall be updated by the parties on or before December 31,
9    2003 to include all additional Comparable Exhibition Facilities and Comparable Parking
10   Facilities, and on or before December 31, 2006 to include all additional Comparable Stadium
11   Facilities.
12           11.1.2.2   First-Class Condition shall require modifications to the Premises,
13   capital improvements and upgrading (all of which is included in "Modernization Improvements"
14   described in Section 11.4), but only to the extent the average of Comparable Facilities described
15   above have been modified, improved or upgraded using "internally generated financing."
16   "Internally generated financing" means financing to pay for the modifications, capital
17   improvements and upgrading either derived directly from operation of the Comparable Facility
18   (including from any facility parking or admissions taxes or surcharges) or borrowings (such as
19   through loans or issuance of bonds) to the extent repaid or retired from funds derived directly
20   from operation of the Comparable Facility.   Any modifications, capital improvements or
21   upgrading in any Comparable Facility which is not paid from internally generated financing shall
22   be ignored. To the extent a Comparable Facility has been modified, improved or upgraded using
23   internally generated financing which is borrowed and intended to be repaid by funds derived
24   directly from operation of the Comparable Facility over a period of time which extends beyond
25   the expiration of the Term of this Lease, then the modifications, capital improvements or
26   upgrading so financed shall be ignored unless and until the Term of this Lease is extended
27   beyond the period of time in which that internally generated financing is expected to be fully
28   repaid or retired.   Notwithstanding the foregoing, FGI shall not be required to make any
29   modifications, capital improvements or upgrading which would have the effect of replacing any
30   structure, feature, finish, system, equipment or other part of the Project during its reasonably

**EXHIBIT A**
**Page 45 of 179**

PSA 000084

1    anticipated useful life, unless such item is no longer functional and is necessary for the operation

2    of the Project. First-Class Condition shall not require keeping up with innovations or technology

3    or reconstructing portions of the Project.

4           11.1.3    Annual Maintenance Plan

5           At least thirty (30) days prior to the Commencement Date and each Lease

6    Year thereafter, FGI shall submit to PSA, for PSA's review and approval, a plan for the Normal

7    Maintenance activities to be conducted at the Premises by FGI during that Lease Year (the

8    "Annual Maintenance Plan"). PSA shall have thirty (30) days from FGI's submission to approve

9    the Annual Maintenance Plan. Any subsequent changes in the Annual Maintenance Plan shall be

10   approved under the same procedure as for the initial approval of an Annual Maintenance Plan.

11   FGI shall perform Normal Maintenance substantially in accordance with the PSA approved

12   Annual Maintenance Plan unless FGI has a reasonable justification not to do so.

13          11.1.4    Five-Year Major Maintenance and Modernization Plan

14          At least thirty (30) days prior to each Lease Year, FGI shall submit to

15   PSA, for PSA's review and approval, a new or updated plan of scheduled work to be performed

16   upon the Premises during the ensuing five-year period in order to meet FGI's obligations under

17   Section 11.3 for Major Maintenance and under Section 11.1.2.2 for certain modifications, capital

18   improvements and upgrading, as well as FGI's rights under Section 11.4 for Modernization

19   Improvements (a "Five-Year Plan"). A Five-Year Plan may be broken down into Major Repair

20   and Modernization Improvements sections. PSA shall have ninety (90) days from FGI's

21   submission to review and approve each Five-Year Plan. Any subsequent changes in a Five-Year

22   Plan shall be approved under the same procedure as for the initial Five-Year Plan. FGI shall

23   perform Major Maintenance and Modernization each year substantially in accordance with the

24   PSA approved Five-Year Plan, as that Five-Year Plan may be revised from year-to-year, unless

25   FGI has a reasonable justification not to do so.

26          11.1.5    Annual Maintenance Report

27          Within one hundred twenty (120) days following each Lease Year, FGI

28   shall provide to PSA a report in reasonable detail on the prior year's Normal and Major

29   Maintenance. In addition, PSA shall have the opportunity to audit (generally pursuant to the

30   process described in Section 6.1.7) FGI's maintenance records.

1    11.2    Normal Maintenance

2        11.2.1    Normal Maintenance.    FGI shall be responsible for all Normal

3    Maintenance required to keep the Premises in a First-Class Condition, other than Normal

4    Maintenance of the PSA Office Space for which FGI is not responsible pursuant to Section 8.11.

5    "Normal Maintenance" consists of those routine and predictable actions, including curative and

6    preventive actions, which are necessary to keep the Premises in good order and repair,

7    functioning as designed, and clean and attractive.  Normal Maintenance shall include the repair

8    or replacement of parts or components which periodically need repair or replacement as a result

9    of normal wear and tear.  Examples of Normal Maintenance include, but are not limited to:

10    performing all preventive or routine maintenance, including those preventive or routine

11    maintenance activities called for by the commissioning consultant referred to in the Development

12    Agreement and those preventive or routine maintenance activities called for in any operations

13    manuals for any systems or equipment included in the Project; keeping all portions of the

14    Premises clean, free of graffiti and free of debris; periodic retouching of painted surfaces as

15    needed to maintain an aesthetically attractive appearance; repairing damage to finish surfaces;

16    replacing light bulbs; replacing damaged or worn out parts or components included in the

17    systems and equipment included in the Premises; keeping control systems functioning; re-

18    seeding or over-seeding the field and keeping the field properly mown, watered and fertilized;

19    keeping all landscaping properly watered, fertilized, and pruned; cleaning, lubricating, and

20    changing belts on all mechanical systems; periodically testing and, when needed, repairing all

21    mechanical and electrical systems; inspecting, cleaning, and patching roofs; repairing damaged

22    seats; cleaning storm and sanitary sewer drains; and testing and repairing all alarm systems, fire

23    sprinkler systems, and computerized building systems.

24    11.3    Major Maintenance

25        11.3.1    FGI shall be responsible for performing all Major Maintenance required to

26    keep the Premises in a First-Class Condition.  "Major Maintenance" consists of all Maintenance

27    other than Normal Maintenance, and includes without limitation major repairs, reconstruction

28    and replacement of Project systems and structural elements, equipment, and the like which are

29    required to maintain the Project in First-Class Condition.  Specific examples include without

1    limitation repainting or refinishing, equipment replacement, major repairs, replacing any

2    structural component, replacing any surface covering, and re-sodding the field.

3        11.4    Modernization

4            11.4.1    Modernization.  FGI may, at its sole option except as required in Section

5    11.1.2.2, elect to undertake from time-to-time Modernization Improvements, for which it shall be

6    responsible for performing.    "Modernization Improvements" include major repairs,

7    reconstruction, replacement and additions of Project systems and structural elements, major

8    equipment, and the like which is intended to modernize the Project and make it more functional

9    and attractive for its then current and intended uses.

10            11.4.2    Modernization Improvements shall be performed only pursuant to a

11    "Modernization Plan" which has been prepared by FGI and submitted to PSA, for PSA's review

12    and approval, either as part of the Five-Year Plan or separately.  If provided separately:

13               11.4.2.1    PSA shall have ninety (90) days to review the Modernization Plan

14    and to propose changes in the Modernization Plan, based upon PSA's reasonable judgment.  If

15    PSA proposes changes in the Modernization Plan which are not acceptable to FGI, then either

16    party may submit the dispute to Dispute Resolution.

17               11.4.2.2    Any modifications in an approved Modernization Plan

18    subsequently proposed by FGI shall be approved under the same procedure as for the initial

19    approval of the Modernization Plan.

20            11.4.3    Permanent Seats.  The Stadium will be built with approximately 67,000

21    permanent seats and with room to add approximately 5,000 more permanent seats.  FGI may

22    from time-to-time add up to an aggregate of 5,000 permanent seats, which shall be considered a

23    "Modernization Improvement" subject to funding pursuant to Section 11.6 and 11.7, but so long

24    as the additional seats are generally consistent with the layout and quality of the original seating,

25    shall not require a Modernization Plan.  FGI shall inform PSA of its plans, and PSA may review

26    and comment on such plans.

27        11.5    FGI and PSA Funding Responsibilities

28            PSA shall be responsible for funding all Major Maintenance and Modernization

29    Improvements to the extent of funds available in the Naming Rights Account and Capital

30    Improvements Account.  FGI shall be responsible for funding all Normal Maintenance. and for

1    funding Major Maintenance and Modernization Improvements in excess of the funds available in

2    the Naming Rights Account and Capital Improvements Account, and to the extent that the cost of

3    complying with Section 11.3 and 11.4 exceeds the funds made available out of those Accounts,

4    the excess shall be paid by FGI (although subject to future reimbursement from the Naming

5    Rights Account to the extent funds subsequently become available).

6        11.6    Naming Rights Account

7            PSA shall create a fiduciary account entitled the "Naming Rights Account," to be

8    held in the custody of and administered by PSA.  Pursuant to Section 107 of the Act and

9    Section 17.4.6 of this Lease, net proceeds from the sales of Special Naming Rights shall be

10   collected by PSA and held in the Naming Rights Account.  The Naming Rights Account shall

11   consist of all such deposits, plus accumulated earnings and interest thereon.  The funds in the

12   Naming Rights Account will be utilized only for Major Maintenance and Modernization

13   Improvements, but not for work which is Normal Maintenance.

14       11.7    Capital Improvements Account

15           PSA shall create a fiduciary account entitled the "Capital Improvements

16   Account," to be held in the custody of and administered by PSA.  Pursuant to Sections 301 and

17   302 of the Act, certain tax proceeds will be paid into the Capital Improvements Account, after

18   the Bonds are retired.  The Capital Improvements Account shall consist of all such deposits, plus

19   accumulated earnings and interest thereon.  The funds in the Capital Improvements Account will

20   be utilized only for Major Maintenance and Modernization Improvements, but not for work

21   which is Normal Maintenance.

22       11.8    Disbursement of Funds

23           FGI may from time-to-time request a disbursement of funds from the Naming

24   Rights Account or the Capital Improvement Account to pay for work performed, or to reimburse

25   FGI for work performed and paid for by FGI, for Major Maintenance or Modernization

26   Improvements.  In order to obtain a disbursement, FGI must submit a written request for

27   disbursement, accompanied by a certification of the actual out-of-pocket costs owed or paid by

28   FGI, accompanied by conditional lien releases from all contractors, suppliers, materialmen and

29   others that performed the work.  PSA reserves the right to audit (generally pursuant to the

30   process described in Section 6.1.7) any of FGI's books and records reflecting the work for which

1   FGI is seeking payment or reimbursement. FGI's costs may include an administrative fee
2   payable to FGI not to exceed ten (10)% of the actual out-of-pocket costs paid or to be paid by
3   FGI for such work. Within fifteen (15) Business Days of FGI's request for disbursement, PSA
4   shall inspect the work to confirm that the work conforms to the plans approved by PSA if
5   required pursuant to Section 11.9. Upon PSA's confirmation that the costs claimed by FGI are
6   accurate and that the work conforms to the plans, PSA shall disburse the requested funds from
7   the requested account, or so much of them as has been confirmed.

8       11.9   Approval of Plans, Completion of Work

9       11.9.1   FGI may not make any Major Maintenance or Modernization
10  Improvement, the estimated cost of which would exceed $300,000, Indexed, without the prior
11  consent of PSA. For any such work that requires PSA's consent, FGI shall submit "design
12  development" level plans and specifications for the work to PSA. PSA shall have thirty (30)
13  days after receipt of all of the above to review and approve the documents submitted. As to
14  Modernization, the approval or disapproval of PSA shall be in its sole discretion, and shall not be
15  subject to Dispute Resolution.

16      11.9.2   FGI shall perform all work in a sound and workmanlike manner and in
17  accordance with all plans and specifications approved by PSA. FGI shall not authorize a change
18  order with respect to such work which would have the effect of changing the design development
19  approval without first obtaining PSA's approval of the proposed change order. FGI shall
20  complete all work authorized by PSA free of any liens or claims and shall defend, indemnify and
21  hold PSA harmless from any such liens or claims.

22      11.9.3   When the work is substantially complete, FGI shall notify PSA and the
23  Parties shall inspect the work to develop a "punch list" inspection report which shall include all
24  items of work that are not fully complete or items of work which are defective. FGI shall cause
25  all items on the "punchlist" to be completed or corrected and shall notify PSA when that work is
26  done. PSA and FGI shall then perform a reinspection of the work to determine if all "punchlist"
27  work has been completed. If any of the "punchlist" work is not completed, then FGI shall
28  promptly complete the "punchlist" work to PSA's reasonable satisfaction and notify PSA.

29      11.9.4   If work to be performed by FGI includes installing a new operating
30  system, or a major component of an operating system, PSA may require the use of a