1    commissioning consultant to review the installation, to start up the system, and to prescribe

2    operating and maintenance standards. The cost of the commissioning consultant shall be paid by

3    FGI.

4         11.10   Exemption From Public Works Requirements

5              All work (including without limitation work, construction, alteration,

6    maintenance, repair, replacement, and improvement) provided under this Lease by FGI or any

7    contractor of FGI or any direct or indirect subcontractor of any such contractor, and all supplies,

8    materials, equipment and other personal property provided by FGI or any contractor of FGI or

9    any direct or indirect subcontractor of any such contractor or any material supplier or leased

10   equipment supplier of FGI or any such contractor or subcontractor, is exempt from all public

11   contracting and related requirements, including without limitation requirements related to public

12   works, public bidding, or public procurement, to the fullest extent permitted by the Act or other

13   applicable Law.

14

15   SECTION 12    DAMAGE OR DESTRUCTION

16        12.1    Damage or Destruction

17              From and after the Completion Date, in the event of damage to or destruction of

18   the Project Improvements, FGI shall promptly give PSA notice of such damage or destruction

19   and, within thirty (30) days after the occurrence of such damage or destruction, commence

20   reasonable efforts to effect the repair and reconstruction of the Project Improvements to

21   substantially the same condition and form as prior to the damage or destruction. The repair or

22   reconstruction of any damage or destruction (collectively "Restoration") shall be made in

23   compliance with then existing Laws

24        12.1.1    In the event the Restoration is intended to restore the Premises to its

25   design immediately prior to the damage or destruction (with only non-material differences which

26   would not constitute a change to the design development level plans and specification) and the

27   cost of the Restoration exceeds $5,000,000, Indexed, then FGI shall first obtain PSA's approval

28   of design development level plans and specifications for the Restoration pursuant to Section 11.9

29   as if such Restoration were Major Maintenance. In the event the Restoration is intended to

30   restore the Premises to something materially different than its design immediately prior to the

1   damage or destruction (i.e. that would constitute a change to the design development level plans
2   and specification) and cost of the Restoration exceeds $300,000, Indexed, then FGI shall first
3   obtain PSA's approval of design development level plans and specifications for the Restoration
4   pursuant to Section 11.9 as if such Restoration were Modernization. Other than as provided in
5   the preceding two sentences, i.e. if the cost of the Restoration is $5,000,000 or less, or $300,000
6   or less, respectively, PSA's approval is not required.

7          12.1.2    Insurance proceeds up to $5,000,000, Indexed, shall be paid to FGI to
8   effect the Restoration of the Project Improvements. Insurance proceeds in excess of $5,000,000
9   shall be paid to the Trustee of Insurance to be disbursed in accordance with this Section 12. PSA
10  shall cooperate with FGI in FGI's filing of an insurance claim on account of any insured damage
11  or destruction to the Premises. Any settlement with the insurance carrier relating to damage in
12  excess of $5,000,000 shall require the reasonable approval of both PSA and FGI, and if they
13  cannot agree, then the dispute shall be submitted to Dispute Resolution.

14         12.1.3    If the available insurance proceeds plus the amounts then remaining in the
15  Capital Improvements Account and the Naming Rights Account are not sufficient, as reasonably
16  determined by FGI, to cover the cost of all labor, materials and other construction costs, direct
17  and indirect (including, but not limited to, overhead charges, contractors' fees, architects' fees,
18  payroll and social security charges and taxes) to complete the Restoration to a design condition
19  consistent with the design condition of the Project prior to the damage or destruction (except as
20  otherwise provided in Section 12.1.1), FGI shall either be responsible for payment of such
21  shortfall or, if applicable, deposit the amount of such shortfall with the Trustee of Insurance, if
22  one is required, prior to the commencement of any construction work. Any additional amounts
23  estimated to complete the Restoration, after taking into account the available insurance proceeds,
24  shall firstly be paid to FGI or deposited with the Trustee of Insurance, as applicable, by PSA
25  from the funds available in the Capital Improvements Account and secondly be used by FGI or
26  deposited with the Trustee of Insurance, as applicable, from the funds then available in the
27  Naming Rights Account. FGI or the Trustee of Insurance, as applicable, shall be deemed to have
28  expended funds for Restoration in the following order: (i) available insurance proceeds, (ii)
29  funds from the Capital Improvements Account, (iii) and funds from the Naming Rights Account,
30  and (iv) funds deposited by FGI to cover any shortfall, (collectively "Restoration Proceeds"). In

1    the event that there are Restoration Proceeds that prove to be inadequate, FGI shall pay the

2    additional costs required to complete the Restoration. If the Restoration Proceeds are in excess

3    of the cost of the Restoration, the excess shall be repaid first to FGI until the amounts used from

4    (iv) above have been repaid in full, and secondly to PSA until the amounts used from (iii) and

5    (ii) above, in that order, have been repaid in full. If any insurance proceeds remain unspent, they

6    shall be deposited into the Naming Rights Account.

7         12.1.4   FGI shall diligently commence and continuously carry out the Restoration

8    to full completion as soon as possible, except to the extent of delays due to Force Majeure. FGI

9    shall obtain all permits and authorizations required by Governmental Authorities with respect to

10   any Restoration. The Restoration shall be performed by a duly licensed, bondable, and qualified

11   general contractor approved of by PSA. All construction work shall be carried on in accordance

12   with plans and specifications prepared by a licensed architect, engineer or other design

13   professional approved by PSA if such a professional is reasonably required, given the scope and

14   nature of the work.

15        12.1.5   The Restoration Proceeds with respect to damage or destruction in excess

16   of $5,000,000 shall be made available to FGI by the Trustee of Insurance as the work progresses.

17   The funds shall be made available by the Trustee of Insurance to pay for work and materials to

18   the extent completed and delivered (calculated on the basis of the percentage of the total work

19   and materials to be completed and delivered, and subject to a retention of five percent (5%) until

20   the work is finally complete). The Trustee of Insurance shall also require FGI to supply in form

21   satisfactory to the Trustee of Insurance evidence of application of funds and payment for all labor

22   and material relating to the construction. The Trustee of Insurance shall disburse the Restoration

23   Proceeds using procedures for the disbursement of construction loans followed by commercial

24   banks in Seattle, Washington.

25        12.2   Damage or Destruction at End of Term

26        If at any time after the first twenty-five (25) Lease Years, including any Extension

27   Periods, damage or destruction to the Project Improvements occurs and the cost of repairing,

28   restoring, replacing or rebuilding the damage or destruction exceeds twenty-five percent (25%)

29   of the original cost of the Project Improvements, Indexed, then FGI may elect to terminate this

30   Lease. In the event FGI so elects, FGI shall give notice to PSA of its election within ninety (90)

1    days after the date of such damage or destruction and the Lease shall terminate as of the date of

2    the notice.  In that event, all of the proceeds of any applicable insurance policies including the

3    deductibles shall be immediately distributed to PSA.  If the damage is of a lesser amount, such

4    that FGI does not have the right to terminate this Lease, or if FGI elects not to terminate this

5    Lease, then FGI shall be obligated to complete the Restoration as required by Section 12.1, and if

6    the Restoration cannot reasonably be completed during the remaining Term, then the Term shall

7    be extended for the lesser of:  the amount of time necessary to complete the Restoration or two

8    (2) Lease Years.

9        12.3    No Rent Adjustment

10       Except as provided in Section 12.2 above, this Lease and the Term shall not

11   terminate because of damage to or destruction of the Project Improvements.  The obligation to

12   pay Rent shall not be affected.

13       12.4    Development Period

14       Prior to the Completion Date, damage or destruction of the Project Improvements,

15   shall be governed by the Development Agreement.

16

17   SECTION 13    INSURANCE

18       13.1    Securing of Insurance Coverage

19       FGI shall procure and maintain, or cause to be procured and maintained, during

20   the entire Term the insurance described in this Section 13.  Policy limits and coverages (other

21   than the policies described in Sections 13.2.2 and 13.2.3) shall be reviewed every five (5) years

22   by PSA and FGI and shall be adjusted by PSA and FGI in their reasonable judgment to reflect

23   inflation or deflation, changes in coverage customarily obtained for properties comparable to the

24   Project, and other relevant factors, with any disputes being decided pursuant to Dispute

25   Resolution.  Policy limits and coverages on the policies described in Sections 13.2.2 and 13.2.3

26   shall be reviewed every five (5) years by PSA and FGI, or in the case of the policy described in

27   13.2.3, at any time that the amount of coverage is determined pursuant to Section 13.2.3(b), and

28   such policy limits and coverages shall be adjusted by PSA and FGI in their reasonable judgment

29   to reflect changes in coverage customarily obtained for properties comparable to the Project, and

30   other relevant factors, with any disputes being decided pursuant to Dispute Resolution.  By not

1   later than the date the policies are required to be in effect pursuant to Section 13.2, FGI shall

2   provide PSA certificates of insurance from the companies issuing policies providing the required

3   insurance stating that such coverage is in effect. Copies of required insurance policies procured

4   by FGI shall be provided to PSA upon request. To the extent allowed by applicable law, FGI

5   may provide some or all of the insurance required by Section 13 under blanket type policies

6   covering the Project and other property owned by FGI or an Affiliate of FGI. FGI's procurement

7   of the insurance required under this Section 13 shall in no manner affect or limit FGI's

8   indemnification obligations pursuant to Section 15.2. In the event of an insured loss, FGI shall

9   be responsible for paying all deductibles.

10       13.2   <u>Types of Required Insurance</u>

11       From the Commencement Date and throughout the Term, FGI shall secure and

12   maintain insurance covering the Exhibition Hall and Parking Facilities, and from the Completion

13   Date and throughout the remaining Term, FGI shall secure and maintain insurance covering the

14   Stadium as follows:

15       13.2.1   Commercial general liability insurance, in combination with umbrella or

16   excess liability policies, which together will provide limits of not less than $25,000,000 each

17   occurrence and annual aggregate including the following specific coverages relating to the

18   Premises:

19       13.2.1.1   Coverage A - Bodily injury and property damage for premises and

20   operations liability, including products and completed operations, and blanket contractual;

21       13.2.1.2   Coverage B - Personal and advertising injury liability;

22       13.2.1.3   Liquor liability endorsement for the serving and selling of

23   alcoholic beverages; and

24       13.2.1.4   Business auto coverage for owned, hired, leased and non-owned

25   vehicles, used by FGI in connection with the use, management and operation of the Premises,

26   which in combination with umbrella or excess liability policies provide limits of not less than

27   $25,000,000 each accident, combined bodily injury and property damage.

28       13.2.2   Commercial property insurance, special perils coverage (I.S.O., 1991

29   Edition, as amended) property insurance covering the Project Improvements against all risk of

30   direct physical loss (other than due to earthquake and flood, which shall be governed by

**EXHIBIT A**
**Page 55 of 179**

PSA 000094

1    Section 13.2.3) during the Term in an amount not less than one hundred percent (100%) of the

2    replacement cost.

3         13.2.3    Earthquake and flood insurance covering the Project Improvements

4    against all direct physical loss due to earthquake and flood during the Term, in an amount equal

5    to the lesser of: (a) forty percent (40%) of the hard construction Project Costs, Indexed, or such

6    lesser amount as may be concluded in a "probable maximum loss" study prepared by a

7    consultant who is proposed by FGI and is reasonably acceptable to PSA (and in the event the

8    conclusion of the PML study is a range, then the mid-point of the range shall be used), or (b)

9    whatever amount of coverage which can be purchased with a premium of $200,000, Indexed, in

10   any Lease Year (assuming a 2% deductible).

11        13.2.4    After the Completion Date, during any period of construction or

12   renovation of any Project Improvements in excess of $5,000,000, Indexed, in addition to the

13   other coverages required under this Section 13, standard "all risk" builder's risk insurance

14   (including, without limitation, coverage against collapse), written on a completed value basis, in

15   an amount not less than the projected total cost of construction or renovation of such Project

16   Improvements as reasonably estimated by FGI's architect and as approved by PSA not more than

17   sixty (60) days prior to the commencement of construction or renovation.

18        13.2.5    Workers' compensation and employer's liability insurance covering all

19   Persons employed by FGI at or in connection with the Premises, in compliance with applicable

20   State and Federal Laws.

21      13.3    Terms of Insurance

22        Except to the extent Self-Insured as provided in Section 13.9, the policies required

23   under Section 13.2 shall:

24        13.3.1    Be written as primary policies not contributing with and not in excess of

25   coverage that PSA may carry.

26        13.3.2    Name PSA and PSA Related Persons as additional insureds.

27        13.3.3    Expressly provide that PSA shall not be required to give notice of

28   accidents or claims and that PSA shall have no liability for premiums.

29        13.3.4    Provide that such policies shall not be renewed, canceled, or materially

30   modified without thirty (30) days' prior written notice to PSA.

PSA 000095

1        13.3.5   Be issued by an insurer of recognized standing, rated "A-VIII" or better as

2   established by Best's Rating Guide or an equivalent rating issued by such other publication of a

3   similar nature as shall be in current use, and licensed to do business in the State of Washington,

4   or be otherwise acceptable to PSA.

5        13.3.6   For Commercial general liability insurance, be written on an "occurrence"

6   basis, rather than on a "claims made" basis.

7        13.3.7   Provide that the insurer waives subrogation as to any rights to recovery

8   resulting from the PSA and PSA Related Persons.

9      13.4   <u>PSA's Acquisition of Insurance</u>

10        If at any time during the Term, FGI fails to procure or maintain insurance required

11   under this Lease, or to pay the premiums for such insurance, PSA shall have the right but not the

12   obligation after ten (10) Business Days' prior written notice to FGI to procure the insurance and

13   to pay any and all premiums for such insurance. Any amounts paid by PSA in connectio.. .vith

14   the acquisition of insurance shall be immediately due and payable as additional Rent, and FGI

15   shall pay to PSA upon demand the full amount paid by PSA, together with Economic Interest.

16   The ten-day notice requirement in this Section 13.4 shall satisfy the ten-day notice requirement

17   in Section 22.1.1 of this Lease.

18      13.5   <u>Waiver of Subrogation</u>

19     FGI and PSA and their respective Related Persons release and relieve each other from

20   any and all liability or responsibility and waive their entire right of recovery for any loss or

21   damage to the Premises or personal property on the Premises, caused by fire or any other insured

22   peril, even if the fire or other casualty was caused by the fault or negligence of either FGI or PSA

23   or their Related Persons. FGI and PSA shall have their respective insurers endorse the applicable

24   insurance policies to reflect the foregoing waiver of recovery and subrogation, provided,

25   however, that the endorsement shall not be required if the applicable policy of insurance permits

26   the named insured to waive rights of subrogation on a blanket basis, in which case the blanket

27   waiver shall be acceptable.

28      13.6   <u>Restoration Proceeds Held in Trust</u>

29        All Restoration Proceeds that are required to be delivered to the Trustee of

30   Insurance shall be held in trust and applied as follows:

EXHIBIT A
Page 57 of 179

PSA 000096

1        13.6.1    First, for the purpose of defraying the cost of repairing, restoring,

2    replacing and/or rebuilding any Project Improvement as provided in Section 12 of this Lease; and

3        13.6.2    Second, if any funds remain, the funds shall be disposed of as provided in

4    Section 12.1.4.

5        13.7    <u>Application of Restoration Proceeds</u>

6        The Trustee of Insurance shall apply the Restoration Proceeds to the cost of the

7    work upon receipt of a certificate of progress and/or completion in form satisfactory to the

8    Trustee of Insurance issued by the architect in charge of the work.  Upon completion of the

9    construction, and the full payment therefor (so no liens, encumbrances or claims with respect

10   thereto can be asserted against the Premises, this Lease, PSA or FGI), any Restoration Proceeds

11   held by the Trustee of Insurance with, and not used for Restoration, shall be distributed in

12   accordance with Section 12.1.4.

13       13.8    <u>Powers and Duties of Trustee of Insurance</u>

14       13.8.1    The Trustee of Insurance shall be an Institution with an office located in

15   Seattle, Washington with authority to hold escrowed funds.  The Trustee of Insurance shall be

16   agreed upon by PSA and FGI, but if they are unable to agree, the Trustee of Insurance shall be

17   designated by the Presiding Judge of the Superior Court of the State of Washington for King

18   County.  Upon occurrence of loss covered by insurance, FGI shall deliver the applicable

19   insurance policy to the Trustee of Insurance.  The Trustee of Insurance shall receive in trust the

20   proceeds of physical property damage insurance and make disbursements thereof as provided in

21   Sections 12 and 13.6, as applicable.  The Trustee of Insurance shall recognize that one of the

22   primary objectives of the Parties is to ensure that disbursements of funds held by the Trustee of

23   Insurance will be paid in a manner which will mitigate against the imposition of liens or

24   encumbrances upon the Premises.  Receipt and disbursement of other types of insurance

25   proceeds shall be made in accordance with this Lease, or as otherwise approved by PSA and FGI,

26   and may be undertaken by the Trustee of Insurance upon the written agreement with PSA and

27   FGI.

28       13.8.2    The Trustee of Insurance shall not be responsible for the collection of any

29   proceeds or the failure or refusal of any insurance company or third Person from whom proceeds

30   may be due to pay the same.  However, the Trustee of Insurance, in case of failure or refusal of

50034209 13 – STADIUM MASTER LEASE
11/23/98          -50-          **EXHIBIT A**        PSA 000097
                                              **Page 58 of 179**

1  any insurance company or third person to pay any policies or money due, shall use all proper and

2  legal means in conjunction and cooperation with PSA and FGI to recover the sums due, but at

3  the expense of FGI, to be reimbursed from the insurance proceeds.

4     13.8.3    All the fees and charges of the Trustee of Insurance shall be shared equally

5  by PSA and FGI. The Trustee's fee shall be based on its then current annual minimum fee plus

6  out-of-pocket expenses. Administrative time is to be charged at the then prevailing hourly rate

7  for such service.

8     13.8.4    If the Trustee of Insurance should merge into any other Institution or

9  change its corporate name or should transfer its trust business to any other Institution, the

10  successor Institution shall succeed to all the powers, duties and authority given to Trustee of

11  Insurance hereunder.

12     13.8.5    The Trustee of Insurance may resign upon giving thirty (30) days' notice

13  in writing to PSA and FGI of its desire to ι.ьign. Upon receipt of written notice, or if the Trustee

14  of Insurance refuses to serve, PSA and FGI shall promptly mutually agree upon a successor or

15  alternate Trustee of Insurance and, in the event they are unable to agree upon a successor or

16  alternate trustee during the thirty (30) days, either PSA or FGI may apply to the Presiding Judge

17  of the Superior Court of the State of Washington for King County, to name a successor Trustee

18  of Insurance, which shall be an Institution. The appointment of the successor Trustee of

19  Insurance shall be binding upon both PSA and FGI. The successor Trustee of Insurance shall be

20  entitled to receive from the former Trustee of Insurance all securities or moneys or polices held

21  by it, and shall be vested with all the rights and powers conferred upon the original Trustee of

22  Insurance.

23     13.8.6    The Trustee of Insurance shall invest any insurance proceeds received as

24  directed in writing jointly by PSA and FGI. If PSA and FGI cannot agree to the investments to

25  be made, the Trustee of Insurance may invest the funds in one or more of the following types of

26  bonds and securities:

27     13.8.6.1    Bills, certificates, notes or bonds of the United States;

28     13.8.6.2    Other obligations of the United States or its agencies;

29     13.8.6.3    Obligations of any corporation wholly owned by the Government

30  of the United States;

**EXHIBIT A**
Page 59 of 179

*PSA 000098*

1                        13.8.6.4    Indebtedness of the Federal National Mortgage Association; or

2                        13.8.6.5    Time deposits in commercial banks

3    In making investments in one or more types of bonds and securities, the Trustee of Insurance

4 shall be mindful of the probable necessity of payments from time-to-time of portions of the

5 insurance proceeds and shall select investments with appropriate maturities. Income from the

6 investments shall be treated as part of the insurance proceeds held by Trustee of Insurance.

7                        13.8.6.6   No Trustee of insurance shall be required if the total amount of

8 Restoration Proceeds payable in connection with any damage or destruction is $5,000,000 or

9 less, Indexed. In such event, the insurance proceeds shall be paid directly to FGI, and shall be

10 held and disbursed by FGI for reconstruction in the manner required of the Trustee of Insurance.

11     13.9    <u>Self-Insurance</u>

12           FGI shall have the right to Self-Insure for any or all insurance required in this

13 Section 13. In the event FGI elects to Self-Insure, FGI shall provide PSA with a Certificate of Self-

14 Insurance specifying the FGI Affiliate undertaking the Self-Insurance, and the coverage and extent

15 of Self-Insurance.

16           13.9.1   "Self-Insure" shall mean that FGI or an FGI Affiliate is itself acting as

17 though it were the insurance company providing the insurance required under the provisions

18 hereof and FGI or the FGI Affiliate shall pay any amounts due in lieu of insurance proceeds

19 because of Self-Insurance, which amounts shall be treated as insurance proceeds for all purposes

20 under this Lease.

21           13.9.2    All amounts which FGI or the FGI Affiliate pays or is required to pay and

22 all loss or damages resulting from risks for which FGI has elected to Self-Insure shall be subject

23 to the waiver of subrogation provisions of Section 13.5.

24           13.9.3    FGI's right to Self-Insure and to continue to Self-Insure is conditioned

25 upon and subject to FGI or the FGI Affiliate having a net worth of at least Five Hundred Million

26 Dollars ($500 million), Indexed every five years, and FGI providing an audited financial

27 statement, prepared in accordance with generally accepted accounting principles, to PSA by May

28 1 of every year in which FGI Self-Insures, which confirms that FGI or the FGI Affiliate has the

29 required net worth.

30

**EXHIBIT A**
Page 60 of 179

PSA 000099

1  SECTION 14    CONDEMNATION

2      14.1    Total Taking

3          In the event of the taking or condemnation by any authority for any public use or

4  purpose (a "Taking") of the whole of the Premises at any time during the Term:

5          14.1.1    The Term shall end as of the date of possession by the condemning

6  authority, and all Rent and other payments shall be prorated as of the date of possession.

7          14.1.2    If the condemning authority is neither the State nor any State agency, then

8  the condemnation award shall be first applied to fully pay any damages, including any relocation

9  costs, of FGI, any sub-tenant of FGI, or any other user of the Project, second to retire any

10  outstanding original Bonds in full, third to repay a ratable proportion of PSL Proceeds, and

11  fourth to repay the FGI Contribution as defined in the Development Agreement.    "Ratable

12  proportion of PSL Proceeds" means the original PSL Proceeds collected by PSA pursuant to the

13  Development Agreement reduced by one-thirtieth (1/30th) per Lease Year from the Completion

14  Date. If the condemning authority is the State or any agency of the State, then any outstanding

15  Bonds shall be retired only after all the other payments have been made. In either event after the

16  respective foregoing payments have been made, any remaining amounts from the condemnation

17  award shall be paid to the PSA, except that the award for attorneys' fees and other costs shall be

18  shared by the Parties in proportion to the reasonable attorneys' fees of both outside and inside

19  counsel paid by each party on account of the condemnation proceedings.

20          14.1.3    Any Taking which renders the Stadium functionally or economically

21  unusable shall be deemed a Total Taking.  However, if such a Taking does not also render the

22  Exhibition Hall or the Parking Facilities functionally or economically unusable, then only the

23  percentage of outstanding original Bonds equal to the percentage of the original Project Costs

24  allocated to the Project Improvements which are rendered functionally or economically unusable

25  shall be repaid ahead of the FGI Contribution.

26      14.2    Substantial Taking

27          As used in this Section, a Substantial Taking means a Taking of materially all of

28  the Premises where the remaining part of the Premises not so taken cannot be adequately

29  restored, repaired or reconstructed to a usable exhibition hall, parking facility and stadium.  In

**EXHIBIT A**
**Page 61 of 179**

PSA 000100

1    the event of a Substantial Taking, then the condemnation shall be treated as a Total Taking under

2    Section 14.1.

3        14.3    Partial Taking

4            In the event of a Taking which is not a Total Taking or a Substantial Taking (a

5    "Partial Taking"):

6            14.3.1    The Term shall continue and Rent determined in accordance with

7    Section 5.1.2 (including specifically Section 5.1.2.1) may be equitably reduced to reflect reduced

8    Reasonable PSA Operating Expenses in light of any reduction in PSA responsibilities.    There

9    shall be no abatement of Rent if a portion of the Premises is taken but the income-generating

10   capacity of the Premises is not affected.

11           14.3.2    The award from a Partial Taking shall be distributed first to FGI for the

12   restoration and repair of the Improvements as provided in 14.3.3, then pursuant to Section 14.1.2

13   to the extent relevant.

14           14.3.3    As to the portion of the Premises not taken in the condemnation

15   proceeding, FGI shall proceed diligently to make an adequate restoration, repair or reconstruction

16   of the part of the Premises not taken.  FGI shall restore, repair or reconstruct the Premises, to the

17   extent practicable, to a functional unit of substantially the same usefulness, design, construction,

18   quality, and to a condition having the same income-generating capability of the Premises prior to

19   the Taking.  In connection with such restoration, repair, and reconstruction, FGI shall comply

20   with the provisions of Section 12 regarding Restoration as if occurring after an event of damage

21   or destruction.

22       14.4    Degree of Taking

23            If the Parties cannot agree on whether the Taking is a Partial Taking or a

24   Substantial Taking, the degree of the Taking shall be determined by Dispute Resolution.

25       14.5    Successive Takings

26            In case of any additional Partial Taking or Takings from time-to-time, the

27   provisions of Section 14.3 shall apply to each Partial Taking.

28       14.6    Temporary Taking

29            If the whole or any part of the Premises or of FGI's interest under this Lease be

30   taken or condemned by any competent authority for its temporary use or occupancy ("Temporary

**EXHIBIT A**
**Page 62 of 179**

PSA 000101

1   Taking"), FGI shall continue to pay the full amounts of Rent, and all Impositions and other sums
2   payable by FGI under this Lease. FGI shall maintain sufficient business interruption insurance,
3   or at its election Self-Insure, in order to cover Rent (including, without limitation, Percentage
4   Rent), Impositions and other sums payable by FGI under this Lease during the period of
5   Temporary Taking. This Lease shall continue and, except only to the extent that FGI may be
6   prevented from so doing pursuant to the terms of the order of the condemning authority, FGI
7   shall perform and observe all of its other terms, covenants, conditions and obligations under this
8   Lease, as though the Taking had not occurred. In the event of any Temporary Taking, FGI shall
9   be entitled to receive the entire amount of any award made for the Taking, whether paid by way
10  of damages, rent or otherwise, unless the period of temporary use or occupancy shall extend to or
11  beyond the expiration date of the Term of this Lease, in which case the award shall be prorated
12  between PSA and FGI as of the date of expiration of the Term.

13          14.7    Insurance Trustee

14          To the extent FGI is obligated to repair or restore under this Section, and the
15  condemnation proceeds awarded exceed $5,000,000, Indexed, such proceeds shall be deposited
16  with the Trustee of Insurance who shall act in accordance with the terms of Section 13. If the
17  condemnation proceeds are less than $5,000,000, Indexed, no Trustee of Insurance shall be
18  required and all condemnation proceeds awarded shall be paid directly to FGI and shall be
19  disbursed by FGI in the manner required by the Trustee of Insurance.

20          14.8    Development Period

21          This Section shall apply to condemnation on or after the Completion Date. Prior
22  to the Completion Date, condemnation will be governed by the Development Agreement.

23

24  SECTION 15    INDEMNIFICATION

25          15.1    FGI's Obligation

26          FGI shall defend, indemnify and hold harmless PSA and PSA Related Persons
27  from and against any and all liabilities, losses, obligations, penalties, fines, damages, claims,
28  suits, costs, remediation costs, and expenses including, without limitation, attorneys' fees
29  (collectively, "Damages") which may be imposed upon, incurred by, or asserted against PSA or
30  any PSA Related Person arising out of any negligent conduct, act, or omission, or willful

1    misconduct, of FGI or any FGI Related Person or any of their respective contractors,
2    subcontractors, concessionaires, licensees, or invitees, or FGI's breach of this Lease, the
3    Development Agreement or any of the other Related Agreements. Notwithstanding the
4    foregoing, the above indemnification shall apply to PSA only in its capacity as landlord under
5    this Lease. FGI shall not indemnify PSA for any items which PSA is required to indemnify FGI
6    against, including, without limitation, indemnities of PSA, if any, contained in this Lease or the
7    Development Agreement. The obligations of FGI under this Section 15.1 shall not in any way be
8    affected or limited by the absence in any case of insurance coverage or by the failure or refusal of
9    any insurance carrier to perform any obligation on its part to be performed under insurance
10   policies affecting the Premises.

11        15.2   PSA's Obligation

12           PSA shall defend, indemnify and hold harmless FGI and FGI Related Persons
13   from and against any and all liabilities, losses, obligations, penalties, fines, damages, claims,
14   suits, costs, remediation costs, and expenses including, without limitation, attorneys' fees
15   (collectively, "Damages") which may be imposed upon, incurred by, or asserted against FGI or
16   any FGI Related Person arising out of any negligent conduct, act, or omission, or willful
17   misconduct, of PSA or any PSA Related Person or any of their respective contractors,
18   subcontractors, concessionaires, licensees, or invitees, or PSA's breach of this Lease, the
19   Development Agreement or any of the other Related Agreements. Any such indemnification is
20   not a Reasonable PSA Operating Expense. Notwithstanding the foregoing, the above
21   indemnification shall apply to FGI only in its capacity as tenant under this Lease. PSA shall not
22   indemnify FGI for any items which FGI is required to indemnify PSA against, including, without
23   limitation, indemnities of FGI, if any, contained in this Lease or the Development Agreement.
24   The obligations of PSA under this Section 15.2 shall not in any way be affected or limited by the
25   absence in any case of insurance coverage or by the failure or refusal of any insurance carrier to
26   perform any obligation on its part to be performed under insurance policies affecting the
27   Premises.

28        15.3   Procedure

29           If any claim, action, or proceeding is made or brought against a Party or any of
30   that Party's Related Persons (the "Indemnified Party") for the recovery of Damages for which the

1    other Party (the "Indemnifying Party") is obligated to indemnify, upon demand by the

2    Indemnified Party, the Indemnifying Party, at its cost and expense, shall defend such claim,

3    action, or proceeding in the name of the Indemnified Party by the attorneys for the Indemnifying

4    Party's insurance carrier (if such claim, action, or proceeding is covered by insurance), or by

5    such attorneys as the Indemnifying Party shall select subject to the reasonable approval of the

6    Indemnified Party. Notwithstanding the foregoing, after notice to the Indemnifying Party, the

7    Indemnified Party shall have the right to appear, defend, or otherwise take part in such claim,

8    action, or proceeding, at the election the Indemnified Party, by counsel of the Indemnified

9    Party's own choosing, at its own expense

10        15.4    Limitations on PSA Liability

11            In the event that FGI recovers a money judgment against PSA on account of

12   PSA's conduct under the terms of this Agreement, the judgment will not attach to and FGI may

13   not recover from funds which are operating funds of PSA reasonably necessary for PSA's

14   operations and the judgment will attach to and be recoverable only from other funds of PSA,

15   including funds generated by transfers of PSA property rights and reserves for future operating

16   expenses.

17

18   SECTION 16    INSPECTION OF PREMISES

19        16.1    PSA's Right to Inspect.

20            The Parties acknowledge that PSA has an ongoing right to oversee FGI's

21   performance of its obligations under this Lease throughout the Term. It will be necessary for

22   PSA to periodically inspect the Premises to be certain that it is being maintained in a manner

23   consistent with the requirements of this Lease. PSA shall have the reasonable right to inspect the

24   Premises, as frequently as it deems necessary, at reasonable times, but in any case in a manner

25   which is not intrusive or disruptive of FGI's operations. If any mutually convenient time cannot

26   be agreed to by the Parties, PSA shall be entitled to provide FGI with written notice of an

27   inspection date and not later than five (5) Business Days after receipt of such notice, FGI shall be

28   required to allow PSA to proceed with its inspection of the Premises, and cooperate with and

29   assist PSA during the course of the inspection.

1    16.2    Scope of Inspection.

2    PSA shall have the right to inspect the entire Premises and FGI's maintenance

3    books and records. FGI shall provide PSA access to the Premises to conduct inspections and

4    shall cooperate fully with PSA in its conducting such inspections. In the course of its

5    inspections, PSA may hire mechanical, structural or electrical engineers, or other experts to assist

6    in making a determination that the Premises is being maintained as required by this Lease. The

7    reasonable costs of any inspection, including the cost of any engineers or experts retained by

8    PSA, shall be a Reasonable PSA Operating Expense.

9    16.3    Right of Entry.

10    In addition to the rights granted under Section 16.1 and 16.2, PSA and its agents

11    and representatives, with notice to FGI, during the Term, shall have rights of access and entry

12    into and upon the Premises, provided any such entry does not unreasonably interfere with FGI's

13    operations. PSA shall comply with all security provisions regarding access to the Premises. FGI

14    shall, as part of such security provisions, provide PSA access and shall cooperate fully with PSA

15    in its entry into and upon the Premises. PSA shall assume no duty or liability with respect to the

16    Premises or its maintenance as a result of such inspection. During the last two (2) years of the

17    Term or after an Event of Default, FGI shall permit the inspection of the Premises at reasonable

18    times and for reasonable periods by or on behalf of prospective tenants and prospective

19    purchasers.

20

21    SECTION 17    NAMING RIGHTS

22    17.1    IP Rights

23    "IP Rights" means all copyrights, trademarks, design patent rights and other

24    intellectual property rights and "naming rights" associated with the Project and its several Project

25    Elements for the period of the Term. Such exclusive rights include without limitation the right

26    during the Term to use, exploit, assign, license, sublicense and/or sell any or all of such IP

27    Rights, as well as the right to obtain and hold all common law and statutory copyright,

28    trademark, and design patent protection for such IP Rights. IP Rights include without limitation

29    the following:

1       17.1.1   The right to designate, and to change from time-to-time, a name which

2  will be the exclusive identifying name of:

3         17.1.1.1   The Project ("Project Naming Rights");

4         17.1.1.2   The Stadium ("Stadium Naming Rights");

5         17.1.1.3   The Exhibition Hall ("Exhibition Hall Naming Rights");

6         17.1.1.4   The Parking Facilities ("Parking Facilities Naming Rights"); and

7         17.1.1.5   Any part or component of any of the Stadium, Exhibition Hall, or

8  the Parking Facilities;

9       Project Naming Rights, Stadium Naming Rights, Exhibition Hall Naming Rights,

10  and Parking Facilities Naming Rights are each "Special Naming Rights"

11       17.1.2   Any "de facto" naming right through a program of advertising,

12  sponsorship, or any other contractual arrangement which results, for example, in the placement

13  of a company's name, logo, or product images in such a frequency and concentration in a given

14  area of the Premises that the average person is reasonably likely to identify that given area of the

15  Premises by the name of that company or by the name of its product.

16       17.1.3   The right to all visual images of the Project, and the right to create all such

17  visual images. Visual images of the Project include, subject to any rights of any artists, rights to

18  the visual images in the Project Art. Visual images include any representations or facsimiles

19  thereof and any graphic designs or logos based on any such visual image or images and any

20  derivative works therefrom.

21    17.2   FGI Rights

22       Throughout the Term, FGI shall have the exclusive right to and shall own (to the

23  exclusion of third parties, and, except as provided in Section 17.3, to the exclusion of PSA) all IP

24  Rights, and to retain for FGI all economic benefits therefrom, except for the right to sell Special

25  Naming Rights and enjoy any economic benefit therefrom:

26    17.3   PSA Limited Visual Image Rights

27       PSA reserves the right (although not to the exclusion of FGI) to utilize the visual

28  images of the Project described in Section 17.1.3 for non-commercial purposes (i.e., purposes for

29  which no revenue or other economic benefit is received by PSA, either directly or indirectly);

1        17.4   <u>PSA Sale of Special Naming Rights</u>

2            PSA reserves the exclusive right (to the exclusion of FGI) to sell Special Naming

3    Rights, as follows:

4        17.4.1   <u>Authority To Sell Naming Rights</u>

5            While FGI is not in breach of this Lease, FGI shall, as the exclusive agent

6    of PSA (to the exclusion of PSA), have the exclusive right to offer for sale all Special Naming

7    Rights.

8        17.4.2   <u>Special Naming Rights Agreement</u>.  Any sale of Special Naming Rights

9    shall only occur only pursuant to a written agreement ("Special Naming Rights Agreement")

10   setting forth the price, payment terms, and any other terms for the sale of a Special Naming

11   Right.

12       17.4.3   <u>Reasonable Approval by PSA</u>.  Any Special Naming Rights Agreement

13   proposed by FGI is subject to the reasonable approval of PSA as provided in Section 107 of the

14   Act, within thirty-five (35) days of the date when a proposed Special Naming Rights Agreement

15   is presented to PSA.  PSA shall cooperate with FGI if FGI seeks pre-approval of any potential

16   Special Naming Rights Agreement or of any particular name or names or type or types or

17   category or categories of names.  It shall not be reasonable to disapprove a Special Naming

18   Rights Agreement if the proposed name is similar to or consistent with the types of names of any

19   then current NFL Football Stadium, Major League Baseball Stadium, NBA Basketball Arena or

20   NHL Hockey Arena.  In considering any Special Naming Rights Agreement, important emphasis

21   shall be given to maximizing the sales price of the Special Naming Rights because Special

22   Naming Rights Proceeds shall be used for Major Maintenance and Modernization of the Project,

23   and therefore fulfills a major public goal of this Lease.

24       17.4.4   <u>Review and Comment by PSA Advisory Committee</u>.  Section 104 of the

25   Act provides that the PSA Advisory Committee shall review and comment on any proposed

26   Special Naming Rights Agreement (as well as this Lease).  In the event that FGI proposes a

27   Special Naming Rights Agreement, then FGI must present that proposed Special Naming Rights

28   Agreement to the PSA Advisory Committee for its prior review and comment.  No proposed

29   Special Naming Rights Agreement may be entered into unless the PSA Advisory Committee has

30   given prior review of and comment on the proposed Special Naming Rights Agreement or has

**EXHIBIT A**
**Page 68 of 179**

PSA 000107

1    failed to give its review and comment within thirty (30) days of the presentation of the proposed

2    Special Naming Rights Agreement.

3           17.4.5   Use of Special Naming Rights Proceeds.  Proceeds realized from the sale

4    of the Special Naming Rights, less any applicable taxes and reasonable out-of-pocket expenses

5    incurred by FGI in both (x) marketing and selling Special Naming Rights, including but not

6    limited to, fees, commissions, other sales expenses, reasonable attorneys' fees, travel costs, and

7    similar costs, and (y) in fulfilling its obligations under the Special Naming Rights Agreement,

8    including but not limited to, designing, constructing and erecting any signage, shall be paid into

9    the Naming Rights Account described in Section 11.6.  To the extent that the sale of any Special

10    Naming Rights is part of a larger sponsorship package, FGI shall make a reasonable allocation of

11    the total consideration among its various components, and only that portion allocated to the sale

12    of Special Naming Rights will be subject to this Section 17.4.

13

14    SECTION 18   TAX AND FEE COLLECTION OBLIGATION

15        18.1   King County Taxes

16           King County is authorized by RCW 36.38.010 to levy a tax of up to 10% on

17    tickets for admission to events at the Project (the "Admissions Tax"), and by RCW 36.38.040 to

18    levy a tax of up to 10% on parking at the Project(the "Parking Tax").  FGI shall collect and remit

19    such Admissions Tax and Parking Tax as provided by Law and by any agreement with King

20    County.  An uncured event of default under any Admissions Tax and Parking Tax collection

21    agreement with King County shall constitute an Event of Default under this Lease.

22        18.2   PSA Surcharge

23           PSA is authorized to impose a surcharge on tickets for events at the Project

24    pursuant to Section 13.2.3 of the Development Agreement.  FGI shall collect and remit to PSA

25    such surcharge substantially in the manner which it collects and remits the Admissions Tax and

26    Parking Tax under Section 18.1.

27        18.3   Audit Right

28           PSA shall have the right to audit (generally as provided in Section 6.1.7) the

29    applicable records of FGI and Team to determine if FGI is in compliance with its obligations

1    under this Section 18.3. FGI shall fully cooperate with any such audit, and FGI shall cause Team

2    to fully cooperate with such audit.

3

4    SECTION 19    PSA COVENANTS

5        19.1    Quiet Enjoyment

6            Except as otherwise provided in this Lease or in the Development Agreement,

7    during the Term, FGI shall have exclusive control and possession of the Premises and PSA shall

8    have no liabilities, obligations or responsibilities whatsoever with respect to the Premises.

9    Provided FGI is not in default under this Lease, FGI, at all times during the Term, shall have the

10    right to peacefully and quietly have, hold and enjoy the Premises, subject to the terms of this

11    Lease and PSA will defend its title to the Project Site against all persons who may claim the

12    same. If any claims are asserted against PSA's title that disturbs or, if successful, would disturb

13    FGI's quiet and peaceable possession of the Premises, upon demand by FGI, PSA shall seek to

14    enforce the covenants of title in the warranty deed from King County as provided for in Section

15    64.04.030 of the Revised Code of Washington, and if requested by FGI, to assign such claim to

16    FGI as may be necessary in order for FGI to prosecute an action against King County on such

17    covenants of title. PSA shall cooperate with FGI in FGI's prosecution of any such claim.

18        19.2    No Liens

19            PSA shall neither grant nor suffer any liens or encumbrances against the Premises

20    which would be superior to this Lease.

21        19.3    No Charges or Fees

22            PSA shall not impose any charges or fees for the use of the Project, (including any

23    charges or fees which, but for this covenant, it is empowered to impose pursuant to

24    Section 105(5) of the Act), without the prior written consent of FGI, which consent or denial of

25    consent by FGI shall be in its sole discretion, and shall not be subject to Dispute Resolution. FGI

26    consents to the imposition of a surcharge on tickets for events at the Project solely as provided

27    in, for the purpose of, and subject to all of the limitations of, Section 13.2.3 of the Development

28    Agreement.

29

EXHIBIT A
Page 70 of 179

PSA 000109

1  SECTION 20    REPRESENTATIONS AND WARRANTIES

2      20.1    By PSA

3          20.1.1    Authority, Binding Effect

4              PSA represents and warrants that PSA has full power and authority to

5  enter into this Lease and to perform all of its obligations under this Lease.  PSA represents and

6  warrants that this Lease has been duly authorized by PSA and that the person(s) executing this

7  Lease on behalf of PSA have the power and authority to do so.  PSA represents and warrants that

8  this Lease is binding on PSA and enforceable according to its terms.

9          20.1.2    Title

10              PSA represents and warrants that it owns the Premises in fee simple

11  subject only to the Permitted Exceptions described in attached Exhibit 20.1.2.

12          20.1.3    Limitation on Representations

13              Except for the representations and warranties set forth above, PSA makes

14  absolutely no other representation or warranties under this Lease or regarding the Premises.  FGI

15  acknowledges that it is not relying on any representations or warranties of PSA other than those

16  set forth in this Section 20.1.

17      20.2    By FGI

18          20.2.1    Authority, Binding Effect

19              FGI represents and warrants that FGI has full power and authority to enter

20  into this Lease and to perform all of its obligations under this Lease.  FGI represents and

21  warrants that this Lease has been duly authorized by FGI and that the person(s) executing this

22  Lease on behalf of FGI have the power and authority to do so.  FGI represents and warrants that

23  this Lease is binding on FGI and enforceable according to its terms.

24          20.2.2    Limitation on Representations

25              Except for the representations and warranties set forth above, FGI makes

26  absolutely no other representations or warranties under this Lease.  PSA acknowledges that in

27  executing this Lease, it is not relying on any representations or warranties of FGI other than

28  those set forth in this Section 18.2.

29

**EXHIBIT A**
**Page 71 of 179**

1    SECTION 21    SUBLETTING AND ASSIGNMENT

2        21.1    Subletting

3            FGI shall have the right to sublet all or any part of the Premises for any time or

4    times during the Term for terms not to exceed the Term of this Lease. However, the subletting of

5    all or substantially all of the Premises to a Person for substantially all of the remaining Term

6    shall be considered an assignment of this Lease which shall be restricted pursuant to the

7    provisions of Section 21.3. FGI shall not enter into a sublease other than a Qualified Sublease

8    which extends beyond the Term of this Lease (unless by its terms, on termination of this Lease

9    the sublease either terminates automatically or may be terminated without cost or penalty.) All

10    subleases shall be in writing and shall be expressly subject to the terms of this Lease.

11        21.2    Limited Nondisturbance of Certain Sublessees

12            21.2.1    A "Qualified Sublease" is a booking agreement or license to use the

13    Exhibition Hall or the Stadium which meets the following conditions:

14                21.2.1.1    The sublessee under the Qualified Sublease is not an Affiliate of

15    FGI;

16                21.2.1.2    The Qualified Sublease is on commercially reasonable terms and

17    conditions;

18                21.2.1.3    The event covered by the Qualified Sublease will occur within five

19    (5) years of the effective date of the Qualified Sublease or any extension or renewal thereof; and

20                21.2.1.4    No payment shall be made to FGI more than one (1) year in

21    advance of the event and, at FGI's option, (a) FGI shall provide to PSA a reasonable guaranty by

22    a third-party guarantor with a net worth of at least $10 million, or other readily realizable

23    security, in the aggregate amount of 300% of the average advance payments held at any one time

24    during the previous Lease Year, which shall be available to pay to PSA, in the event of a

25    termination of the Lease by reason of a default by FGI, the amount of all advance payments to

26    FGI for events not yet held at the time of the termination (to the extent such payments are not

27    otherwise recovered by PSA), to be paid to PSA at the time of the holding of the event; or (b)

28    any advance payment to FGI shall be promptly paid over to PSA to be returned to FGI upon the

29    commencement of the event together with interest earned by PSA.

1        21.2.2    PSA will give a Qualified Sublease Nondisturbance, in the event the Term
2    ends prior to the event referred to in the Qualified Sublease.  Upon the end of the Term all
3    Qualified Subleases shall be automatically assigned to PSA.

4        21.2.3    No sports team, party providing services at the Premises, no
5    concessionaire, and no advertiser, shall have any right to come upon or utilize the Premises or
6    any part of the Premises after the end of the Term (including but not limited to a termination
7    pursuant to Section 22), unless PSA elects, in its sole discretion, to give notice to the Team or
8    Allen authorizing one of the following:

9        21.2.3.1    The owner of the team which is a party to the Stadium Use
10   Agreement enters into an agreement with PSA, within ten (10) days after the end of the Term,
11   pursuant to which such owner or an Affiliate becomes the tenant under this Lease and accepts
12   and agrees to perform all of FGI's obligations under this Lease and agrees to maintain the
13   Stadium Use Agreement in effect; and in that event PSA will reinstate this Lease for the longer
14   of: the balance of the Term or the remaining term of the Stadium Use Agreement; or

15       21.2.3.2    Allen enters into a full guarantee of all of FGI's obligations under
16   this Lease, within thirty (30) days after the end of the Term, for a period of time designated by
17   Allen, and in that event, PSA will reinstate this Lease with an entity designated by Allen as
18   master tenant for the period of the guaranty.

19       21.2.4    In the event of termination of this Lease for any reason, (except
20   termination after damage, destruction or condemnation under Sections 12 and 14) any sublessee
21   under a Qualified Sublease shall be entitled to continued occupancy in the Premises
22   ("Nondisturbance") in accordance with its Qualified Sublease as long as:

23       21.2.4.1    The Qualified Sublease is not terminated in accordance with its
24   terms (including termination for default upon expiration of all applicable periods to cure), and

25       21.2.4.2    The .sublessee agrees in writing to attorn to PSA under the
26   applicable Qualified Sublease, and to such other terms and conditions as are customarily required
27   by mortgage lenders in similar circumstances.

28       21.2.5    Upon the request of FGI, PSA shall within a reasonable time execute,
29   acknowledge and deliver a nondisturbance agreement with any sublessee under a Qualified
30   Sublease setting forth the above terms.

EXHIBIT A
Page 73 of 179

PSA 000112

1      21.3   <u>Assignment</u>

2            21.3.1   FGI shall not Transfer this Lease, the leasehold estate this Lease creates,

3      any of FGI's rights or interests under this Lease or any of FGI's rights or interests in the

4      Premises, in whole or in part; nor shall FGI's rights or interests under or in this Lease be

5      Transferred or assigned by operation of law or otherwise, except as provided below.   The

6      assignee, purchaser or transferee of FGI's interest in this Lease is referred to as a "Transferee."

7      FGI shall have no right to make any Transfer of its rights under this Lease if FGI is then in

8      default under this Lease.

9            21.3.2   FGI may Transfer this Lease upon notice to PSA (without the consent of

10     PSA) to any Transferee which is an Affiliate of FGI, including any inter vivos or testamentary

11     trust or the estate or heirs of Allen, subject to Section 21.4.

12           21.3.3   FGI may Transfer this Lease upon notice to PSA (without the consent of

13     PSA) to any Transferee which, or an Affiliate of which, is also the transferee of at least the

14     controlling interest in Team, subject to Section 21.5.

15           21.3.4   Any other proposed Transfer requires the consent of PSA.   PSA shall

16     consent to a Transfer by FGI in the event that the Transferee meets all of the following criteria in

17     PSA's reasonable judgment:

18                  21.3.4.1   The Transferee has a net worth at the time of Transfer of the lesser

19     of (x) at least $100,000,000, Indexed every five (5) years, or (y) sufficient net worth (as

20     determined by PSA in its sole discretion) to perform all of the obligations of FGI under the terms

21     of this Lease, and

22                  21.3.4.2   The Transferee or its Management Company has Sufficient

23     Experience. "Sufficient Experience" means either:

24                         (i)     The Transferee or its Management Company has entered

25     into employment contracts with the key management employees of FGI; or

26                         (ii)    The Transferee or its Management Company or any of its

27     employees has managed or had substantial responsibility for management for at least five (5)

28     years in the aggregate (x) sports facilities used as the home venue for a Major League Baseball,

29     National Football League, National Basketball Association, or National Hockey League team (or

30     similar or successor major league franchise), and (y)  exhibition halls of at least similar size to

1    the Exhibition Hall; has never been convicted of a felony, has never been terminated under a

2    management agreement or lease of facilities by reason of its default; and has a demonstrated

3    record of reasonable business success.

4           21.3.4.3   FGI shall give PSA written notice of a proposed Transfer sixty (60)

5    days prior to the effective date of the Transfer together with a copy of the Transfer agreement

6    executed by FGI and the proposed Transferee, and documentation reasonably sufficient to show

7    that the Transferee meets the criteria in Section 21.3.4.1 and 21.3.4.2.

8           21.3.5   Any Transferee must also assume in writing the obligations of FGI under

9    this Lease and the Person which executed the Master Lease Guaranty must execute a

10   reaffirmation of the Master Lease Guaranty or a Person with a net worth of not less than

11   $100,000,000 must execute a replacement Master Lease Guaranty in identical form.

12          21.3.6   Without limiting the generality of the foregoing, no Transfer shall be

13   effective if any Event of Default exists under this Lease or unless and until the Transferee

14   assumes all the obligations of FGI hereunder accruing on and after the effective date of the

15   Transfer.

16          21.3.7   Without Transferring this Lease, FGI may hire an agent (a "Management

17   Company") to manage the Exhibition Hall and/or Parking Facilities and/or the Stadium provided

18   the Management Company satisfies the criteria specified in Section 21.3.4.2.

19      21.4   FGI Liability

20          Upon any Transfer pursuant to Section 21.3.2, but not 21.3.3 or 21.3.4, FGI shall

21   continue to be liable under the terms of this Lease, as a guarantor of the Transferee's

22   performance of its obligation under this Lease.

23      21.5   Rent Letter of Credit

24          21.5.1   Upon any Transfer pursuant to Section 21.3.3 or 21.3.4, Transferee shall

25   provide PSA with a standby letter of credit in the amount of at least the amount of the Rent paid

26   by FGI for the most recently completed Lease Year (the "Rent Letter of Credit").   The Rent

27   Letter of Credit shall be issued by a financial institution reasonably acceptable to PSA.  The Rent

28   Letter of Credit shall be replaced annually by a new Rent Letter of Credit in the amount of at

29   least the amount of the Rent paid for the then most recently completed Lease Year so that at all

**EXHIBIT A**
**Page 75 of 179**

PSA 000114

1   times during the remaining Term, PSA holds a Rent Letter of Credit which is in full force and

2   effect.

3       21.5.2    PSA may draw upon the Rent Letter of Credit at any time that there is a

4   Event of Default related to payment of Rent which Transferee has not cured within the time

5   period allowed under this Lease.  PSA may also draw on the Rent Letter of Credit if Transferee

6   has not provided PSA with a replacement Rent Letter of Credit at least five (5) days prior to

7   expiration of the then existing Rent Letter of Credit.  The Rent Letter of Credit will be payable

8   against PSA's presentation of a sight draft.  If PSA draws against the Rent Letter of Credit, then

9   the amount of credit available to PSA under the Rent Letter of Credit shall be immediately

10  restored to the amount available prior to the draw.

11      21.6    <u>Covenants Binding on Successors and Assigns</u>

12          All of the terms, conditions and covenants of this Lease shall inure to the benefit

13  of and be binding upon the successors of the respective Parties.

14      21.7    <u>Transfer</u>

15          For purposes of this Lease, a "Transfer" shall include any sale, assignment,

16  pledge, conveyance, encumbrance, subcontract, delegation, or other disposition, whether direct

17  or indirect, voluntary or involuntary, of FGI's interest in this Lease.  A Transfer shall also include

18  a Change of Control.

19      21.8    <u>Change of Control</u>

20          For purposes of this Lease, "Control" shall mean the power, directly or indirectly,

21  to direct or cause the direction of the management or policies of the tenant under this Lease, by

22  virtue of ownership of voting securities or otherwise.  A "Change of Control" shall refer to a

23  change in the control of the tenant under this Lease, which shall be deemed to have occurred if:

24      21.8.1    <u>Change of Control of FNW</u>

25          "Change of Control of FNW" means a change in the Control of FNW,

26  whether through a single transaction or series of transactions, which shall be deemed to have

27  occurred if:

28          21.8.1.1    The Allen Ownership Group ceases to have Control of FNW;

**EXHIBIT A**
**Page 76 of 179**

PSA 000115

1    21.8.1.2  FNW merges or consolidates with another entity, unless following

2  the consummation of such transaction the Allen Ownership Group Controls the surviving entity;

3  or

4    21.8.1.3  FNW sells or otherwise disposes of all or substantially all of the

5  Team Assets to one or more persons or entities other than entities with respect to which the Allen

6  Ownership Group has Control.

7    For purposes of this Section 21.8.1, the "Allen Ownership Group" means Allen, or any

8  direct or indirect Affiliate of Allen, or any family member, heir, or trust of Allen, or any

9  combination of Allen, any such Affiliates, family members, heirs and/or trusts;

10    21.8.2  _Change of Control of Other Transferee_

11    "Change of Control of Other Tenant" means a change in the Control of

12  any Transferee other than a member of the Allen Ownership Group ("Other Transferee"),

13  whether through a single transaction or series of transactions, which shall be deemed to have

14  occurred if:

15    21.8.2.1  Affiliates of the Other Transferee at the time the Other

16  Transferee became the Transferee under this Lease ("Other Transferee Affiliates") cease to have

17  Control of the Other Transferee;

18    21.8.2.2  Other Transferee merges or consolidates with another

19  entity, unless following the consummation of such transaction Other Transferee Affiliates

20  Control the surviving entity; or

21    21.8.2.3  Other Transferee sells or otherwise disposes of all or

22  substantially all of the business or assets of Other Transferee to one or more Persons other than

23  Persons with respect to which the Other Transferee Affiliates have Control.

24    21.9  _Unauthorized Transfer_

25    If any right, title, or interest of FGI in this Lease, or Control of FGI, is Transferred

26  in violation of the provisions of this Section 21, such Transfer shall be null and void and of no

27  force or effect. Notwithstanding the foregoing, PSA shall have the right to collect from any such

28  Transferee an amount equal to the amounts payable to PSA under this Lease.

1    21.10  Stock Legends

2         FGI shall cause all certificates of stock in FGI to be surrendered to FGI and shall

3    place on each such certificate a legend in the following form:

4         THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE ARE

5         SUBJECT TO RESTRICTIONS SET FORTH IN THAT CERTAIN MASTER

6         LEASE DATED NOVEMBER 24, 1998 BETWEEN THE WASHINGTON

7         STATE PUBLIC STADIUM AUTHORITY AND THE CORPORATION AND

8         NONE OF SUCH SHARES, OR ANY INTEREST THEREIN, SHALL BE

9         TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT AS PROVIDED

10        IN SUCH MASTER LEASE.  A COPY OF THE MASTER LEASE IS

11        AVAILABLE FOR INSPECTION WITHOUT CHARGE IN THE OFFICE OF

12        THE CORPORATION.

13

14   SECTION 22   DEFAULT

15        22.1   Event of Default

16         The occurrence of any of the following shall constitute an "Event of Default":

17        22.1.1   Failure of FGI to pay when due any payment owed to PSA, or to pay any

18   Imposition or any other payment required under this Lease when due (except as and to the extent

19   permitted under Section 10.2 of this Lease), or the failure to maintain any of the insurance

20   coverage required and the occurrence or failure continues for a period of ten (10) Business Days

21   after written notice of such failure or occurrence is given to FGI by PSA;

22        22.1.2   FGI being in breach of, or FGI failing to perform, comply with, or observe

23   any other term, covenant, warranty, condition, agreement or undertaking contained in or arising

24   under this Lease other than those referred to above in Section 22.1.1 and FGI fails to cure the

25   default within thirty (30) days after written notice thereof is given by PSA to FGI.  However, if

26   the default is one which can be cured, but cannot be cured (without regard to the availability of

27   funds or the financial condition of FGI) within such 30-day period, and FGI proceeds promptly

28   and thereafter prosecutes with due diligence the curing of the default, then the time for curing of

29   the default shall be extended for the period of time necessary to complete the cure so long as

1   PSA's interest in the Premises will not be adversely affected by the delay in FGI's cure of such

2   default.

3        22.1.3   FGI being in breach of, or FGI failing to perform, comply with, or observe

4   any material term, covenant, warranty, condition, agreement or undertaking contained in or

5   arising under the Stadium Use Agreement and FGI fails to cure the default within thirty (30) days

6   after written notice thereof is given by Team to FGI. However, if the default is one which can be

7   cured, but cannot be cured (without regard to the availability of funds or the financial condition

8   of FGI) within such 30-day period, and FGI proceeds promptly and thereafter prosecutes with

9   due diligence the curing of the default, then the time for curing of the default shall be extended

10  for the period of time necessary to complete the cure so long as FGI's interest in the Stadium use

11  Agreement will not be adversely affected by the delay in FGI's cure of such default.

12       22.1.4   FGI making an assignment for the benefit of creditors, filing a petition in

13  bankruptcy, petitioning or applying to any tribunal for the appointment of a custodian, receiver or

14  any trustee for it or a substantial part of its assets, or commencing any proceedings under any

15  bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or

16  statute of any jurisdiction, whether now or hereafter in effect; or if there shall have been filed any

17  petition or application, or any proceeding shall have been commenced against FGI, in which an

18  order for relief is entered or which remains undismissed for a period of ninety (90) days or more;

19  or FGI by any act or omission indicating its consent to, approval of or acquiescence in any such

20  petition, application or proceeding or order for relief or the appointment of a custodian, receiver

21  or any trustee for it or any substantial part of any of its properties, or suffering any such

22  custodianship, receivership or trusteeship to continue undischarged for a period of ninety (90)

23  days or more;

24       22.1.5   FGI being generally unable to pay its debts as such debts become due;

25       22.1.6   FGI having concealed, removed, or permitted to be concealed or removed,

26  any part of its property, with intent to hinder, delay or defraud its creditors or any of them, or

27  making or suffering a transfer of any of its property which may be fraudulent under any

28  bankruptcy, fraudulent conveyance or similar law; or suffering or permitting, while insolvent,

29  any creditor to obtain a lien upon any of its property through legal proceedings or distraint which

30  is not vacated within thirty (30) days from the date thereof; or

**EXHIBIT A**
**Page 79 of 179**       PSA 000118

1            22.1.7   PSA being in breach of, or PSA failing to perform, comply with, or

2    observe any term, covenant, warranty, condition, agreement or undertaking contained in or

3    arising under this Lease and PSA fails to cure the default within ten (10) Business Days as to any

4    monetary default and thirty (30) days as to any other default, after written notice thereof is given

5    by FGI to PSA.  However, if any nonmonetary default is one which can be cured, but cannot be

6    cured (without regard to the availability of funds or the financial condition of PSA) within such

7    30-day period, and PSA proceeds promptly and thereafter prosecutes with due diligence the

8    curing of the default, then the time for curing of the default shall be extended for the period of

9    time necessary to complete the cure so long as FGI's interest in the Premises will not be

10   adversely affected by the delay in PSA's cure of such default.

11          22.1.8   A default under the Development Agreement by FGI, but only if the

12   Guarantor under the Completion and Payment Guaranty has also failed to perform under the

13   Completion and Payment Guaranty.

14         22.2    Termination of Lease

15          In addition to all other rights and remedies available to PSA by law or equity,

16   PSA may, at any time after the occurrence of any Event of Default by FGI, terminate this Lease

17   by notice to FGI, and PSA may reenter upon and take possession of the Premises by self-help or

18   other means.  If either Party disputes whether an Event of Default has occurred, such dispute

19   shall be resolved by Dispute Resolution.  If a default asserted under Section 22.1 is contested by

20   the Party asserted to be in default, the time for curing the default shall commence upon the

21   rendering of the Dispute Resolution decision, or other resolution of the dispute.  However, if part

22   of the matter subject to Dispute Resolution is capable of performance to the extent not in dispute

23   (e.g., the undisputed portion of monies owing), performance to the extent not in dispute shall be

24   a condition precedent to the effectiveness of this Section 22.2.

25         22.3    Effect of Termination

26          Subject to the provisions of Section 21 (relating to Sublessees), upon termination

27   of this Lease under Section 22.2, all rights and privileges of FGI and all duties and obligations of

28   PSA hereunder shall terminate.  Immediately upon the termination of the Lease, and without

29   further notice to any other party, PSA shall have the right to assert, perfect, establish and confirm

30   all rights to the Premises reverting to PSA by reason of the termination by any means permitted

1    by law, including the right to take possession of the Premises and to remove all personal property

2    from the Premises and all persons occupying them except Sublessees with Nondisturbance as

3    permitted under this Lease.  PSA may in all respects take the actual, full and exclusive

4    possession of the Premises, thereby wholly terminating any right, title, interest or claim of or

5    through FGI as to the Premises, the Project Improvements, and all Personal Property located on

6    the Premises, excepting therefrom FGI's Personal Property as defined in Section 23.1.

7        22.4    Damages and Remedies

8            22.4.1    For a breach during the Term, the exercise by either Party of any remedy

9    arising by virtue of an Event of Default shall not be considered exclusive, but either Party may

10    exercise any and all other rights or remedies provided by this Lease or by law or equity.  In

11    pursuing remedies, PSA or FGI may elect to sue the other with or without terminating this Lease.

12    The termination of the Term pursuant to this Section 22 shall not extinguish the right of either

13    Party to collect damages including without limitation direct and consequential damages arising

14    from the breach of this Lease by the other Party.

15            22.4.2    FGI shall be liable for the continued payment of Rent under this Lease

16    accruing up to the end of the Term specified in this Lease notwithstanding the early termination

17    of the Term due to an Event of Default and the reentry of PSA before the normal expiration of

18    the Term.  PSA may at any time after termination of this Lease, recover from FGI the worth at

19    that time (discounted to present value at the time of termination) of the excess, if any, of the

20    amount of the Rent reserved in this Lease for the balance of the Term (had such termination not

21    occurred) over the then reasonable rental value of the Premises for the same period.  The

22    "reasonable rental value" shall be the amount of rental which PSA can reasonably be expected to

23    obtain as rent for the remaining balance of the Term (to its normal expiration date, excluding

24    unexercised Extension Periods and the Completion Term), had such termination and default not

25    occurred.  In addition, FGI shall be liable for and PSA may recover the estimated value of the

26    lost Percentage Rent during the period from the date of early termination of the Term due to an

27    Event of Default to the date of the first Exhibition Hall Event held after such termination which

28    is not held pursuant to an agreement originally between FGI and the holder of that Exhibition

29    Hall Event; provided that FGI shall get credit for all Exhibition Hall Events held during such

30    period, and PSA shall use Reasonable Efforts to mitigate its damages.

**EXHIBIT A**
**Page 81 of 179**

PSA 000120

1          22.4.3   PSA shall credit against sums owed by FGI the net proceeds, if any, of any

2    reletting or operation of the Premises after deducting PSA's reasonable expenses in connection

3    with the reletting and operation of the Premises.  Reasonable expenses shall include but not be

4    limited to repossession costs, brokerage commissions, legal expenses, employee expenses,

5    alteration costs reasonably incurred and other reletting expenses.

6          22.4.4   Nothing in this Section 22 shall relieve PSA of its duty to use Reasonable

7    Efforts to mitigate its damages as required by law.

8       22.5   No Waivers

9          No failure by any Party to insist upon the strict performance of any provision of

10   this Lease or to exercise any right, power or remedy consequent to any breach thereof, and no

11   waiver of any breach, or the acceptance of full or partial Rent during the continuance thereof,

12   shall constitute a waiver of any such breach or of any provision.  No waiver of any breach shall

13   affect or alter this Lease, which shall continue in full force and effect, or the rights of any Party

14   hereto with respect to any other then existing or subsequent breach.  A waiver must be in writing

15   and signed by the Party to be bound by such waiver.

16      22.6   Performance by PSA of FGI's Defaulted Obligations

17         In case of failure on the part of FGI to pay any money, or do any act to satisfy any

18   of the obligations or covenants which it is required to pay, do, or satisfy under the provisions of

19   this Lease, PSA may, at its option, after ten (10) Business Days' prior written notice to FGI, pay

20   any or all of the sums, or do any or all such acts which require the payment of money, or incur

21   any reasonable expense to remedy the failure of FGI to perform any one or more of the covenants

22   contained in this Lease.  FGI shall repay to PSA the sums advanced by PSA on demand together

23   with Default Interest from the date payment is made by PSA.  PSA shall not be obligated to so

24   cure any of FGI's defaults; and such right to cure shall be in addition to and not in lieu of any

25   other right or remedy.

26

27   SECTION 23   SURRENDER UPON TERMINATION

28      23.1   FGI's Obligation

29         Upon any termination of this Lease, FGI shall surrender possession of the

30   Premises and Personal Property included in the Premises to PSA in First-Class Condition, except

1    for normal wear and tear, as provided in Section 11.1.2. With respect to personal property of

2    FGI that is not included in the Personal Property but is located at the Premises, PSA and FGI,

3    within five (5) days preceding the date of termination of this Lease, shall conduct an inventory of

4    all personal property claimed by FGI to be FGI's personal property and not included in the

5    Personal Property ("FGI's Personal Property"). In the event that PSA and FGI disagree about

6    what is included in FGI's Personal Property, that matter shall be resolved by Dispute Resolution.

7        23.2    FGI's Personal Property

8            Within five (5) Business Days of the completion of the inventory of FGI's

9    Personal Property, FGI shall identify those items of FGI's Personal Property which FGI is

10   willing to sell to PSA, for cash based by those items then fair market value. PSA shall have five

11   (5) Business Days to give FGI notice of the items of FGI's Personal Property, which PSA is

12   willing to purchase. Within five (5) Business Days after PSA's notice to FGI, FGI shall remove

13   from the Premises all of the items of FGI's Personal Property which are not being purchased by

14   PSA. Any dispute as the fair market value of FGI's Personal Property shall be resolved by

15   Dispute Resolution.

16       23.3    No Rights to Accounts

17           Upon any termination of this Lease, FGI shall have no rights to any funds in the

18   Naming Rights Account or Capital Improvements Account other than its rights pursuant to

19   Section 11.5 provided that FGI makes claim within three (3) months of termination of the Lease.

20

21   SECTION 24    DISPUTE RESOLUTION

22       24.1    Applicability

23           Any dispute (a "Dispute") shall be resolved by dispute resolution in accordance

24   with this Section 24, to the extent permitted by Laws, except where a Party is expressly

25   permitted or required to resort to judicial, administrative, or other legal proceedings or other

26   rights or remedies at law or in equity ("Dispute Resolution"). In the event either Party believes a

27   Dispute exists, it shall give notice to the other specifying in reasonable detail the nature of such

28   Dispute. The Parties shall seek in good faith to negotiate a settlement of the Dispute, including,

29   without limitation, by agreeing to reasonable requests of the other to hold a meeting to discuss

30   such Dispute.

1    24.2    Designation of Arbitrator

2            If within fifteen (15) days after the effective date of any notice given pursuant to

3    Section 24.1 (a "Dispute Notice") the Parties have been unable to reach a resolution of the

4    Dispute, the Parties shall jointly appoint an arbitrator who is an attorney with at least ten (10)

5    years' substantial experience relevant to the subject matter of the Dispute. If the Parties fail to

6    agree upon an arbitrator within twenty (20) days after the effective date of the Dispute Notice,

7    the Parties shall each designate, by written notice to the other given not later than twenty-five

8    (25) days after the effective date of the Dispute Notice, a representative, who need not be neutral

9    and who is an attorney with at least ten (10) years' substantial experience relevant to the subject

10   matter of the Dispute. If either Party fails to designate a representative within this period, the

11   representative of the Party who met the deadline shall act as arbitrator. If both Parties meet the

12   deadline, the two representatives shall, within ten (10) Business Days after the last of the two

13   representatives is designated, select an arbitrator who is an attorney with at least ten (10) years'

14   substantial experience relevant to the subject matter of the Dispute. If the representatives cannot

15   agree on an arbitrator, the Presiding Judge of the Superior Court for King County, Washington

16   shall, upon application by either Party, select an arbitrator having such qualification. The

17   arbitrator chosen pursuant to this Section 24.2 shall be the sole arbitrator.

18   24.3    Scope of Dispute Resolution

19           In connection with any Dispute Resolution issue (of which there may be more

20   than one in any Dispute Resolution proceeding), each Party may, but need not, submit in writing

21   the specific requested action or decision it wishes to take or make with respect to the Dispute;

22   however, the arbitrator may, but need not, choose one or the other Party's specific requested

23   actions or decisions, or may order any compromise position.

24   24.4    Conduct of Dispute Resolution

25           Except to the extent provided in this Lease, or as the Parties may otherwise agree

26   in writing, any Dispute Resolution proceeding shall be conducted in accordance with the

27   Commercial Arbitration Rules and the Expedited Procedures of the American Arbitration

28   Association ("AAA") then in force. Although the Commercial Arbitration Rules of the AAA

29   shall be used to govern the conduct of the Dispute Resolution, the arbitrator shall be chosen by

30   the procedure described in Section 24.2 and the Dispute Resolution shall not be conducted

EXHIBIT A
Page 84 of 179                    PSA 000123

1    through the AAA, unless the Parties otherwise agree. For purposes of a Dispute Resolution

2    conducted under this Section 24, whenever the AAA Commercial Arbitration Rules refer to the

3    "tribunal administrator," such reference shall be deemed to be the arbitrator chosen under

4    Section 24.2. The Parties expressly agree that any Dispute Resolution proceeding may proceed

5    in the absence of any Party who, after due notice, fails to be present at such Dispute Resolution

6    or to obtain an adjournment, and that, in such event, an award may be made based solely upon

7    the evidence submitted by the Party who is present. All Dispute Resolution proceedings shall be

8    conducted in Seattle, Washington or in such other location as the Parties may agree. In making

9    any determination, the arbitrator shall apply the pertinent provisions of this Lease without

10    modification or qualification in any respect. The arbitrator shall furnish the Parties with a written

11    decision within thirty (30) days after the date the arbitrator is selected.

12    24.5   Effect on Lease

13    Unless otherwise agreed in writing, during the period that any Dispute Resolution

14    is pending under this Section 24, the Parties shall continue to comply with all terms and

15    provisions of this Lease which are not the subject of the Dispute.

16    24.6   Effect of Determination

17    The decision or award rendered by the arbitrator shall be final, nonappealable, and

18    binding upon the Parties, and judgment may be entered upon it in accordance with applicable law

19    in a court of competent jurisdiction. If the arbitrator determines that an Event of Default has

20    occurred, the provisions of Section 22.4 shall govern the damages and/or other remedies which

21    may be ordered by the arbitrator. Neither the requirement to utilize the procedures set forth in

22    this Section 24, nor the pendency of any Dispute Resolution proceeding, shall in any way

23    invalidate any notices or extend any cure periods provided for in this Lease.

24    24.7   Equitable Proceedings

25    In the event a Party desires to seek interim relief, whether affirmative or

26    prohibitive, in the form of a temporary restraining order, preliminary injunction, or other interim

27    equitable relief with respect to a Dispute, either before or after the initiation of an Dispute

28    Resolution proceeding, that Party may initiate the judicial proceeding necessary to obtain such

29    relief ("Equitable Proceeding"). Nothing in this Section 24.7 shall be construed to suspend or

30    terminate the obligation of the Parties to comply with the procedures set forth in this Section 24

1    with respect to the Dispute that is the subject of such Equitable Proceeding during the pendency

2    of any such Equitable Proceeding, including any appeal or review.  Any interim or appellate

3    relief granted in such Equitable Proceeding shall remain in effect until, and only until, the

4    procedures set forth in this Section 24 result in a settlement agreement or a determination by an

5    arbitrator with respect to the Dispute.  Such settlement agreement or determination shall be the

6    binding and final determination on the merits of the Dispute (including, without limitation, any

7    equitable relief and monetary damages, but excluding any award of attorneys' fees or costs

8    rendered in the Equitable Proceeding), shall supersede and nullify any decision in the Equitable

9    Proceeding on the merits of the dispute that is the subject of such Equitable Proceeding as

10    between FGI and PSA, and shall preclude any subsequent litigation on such merits,

11    notwithstanding any determination to the contrary in connection with any Equitable Proceeding

12    granting or denying interim relief.

13        24.8    Specific Enforcement

14            24.8.1    FGI acknowledges that the covenants set forth in Sections 7.2, 8.1, 8.5,

15    8.6, 8.7, 8.8 and 8.9 are material and essential elements of the transactions contemplated by this

16    Lease, and that in the event of a FGI default under any of those Sections, PSA may not have an

17    appropriate remedy at law.  Accordingly, in addition to its other remedies available at law or in

18    equity, in the event of a breach or threatened breach of any of Sections 7.2, 8.1, 8.5, 8.6, 8.7, 8.8

19    and 8.9, PSA shall be entitled to obtain injunctive relief including specific enforcement from a

20    court of competent jurisdiction, and may elect to bypass Dispute Resolution.

21            24.8.2    PSA acknowledges that the covenants set forth in Sections 19.3 and 25 are

22    material and essential elements of the transactions contemplated by this Lease, and that in the

23    event of a PSA default under any of those Sections, FGI may not have an appropriate remedy at

24    law.  Accordingly, in addition to its other remedies available at law or in equity, in the event of a

25    breach or threatened breach of any of Sections 19.3 and 25, FGI shall be entitled to obtain

26    injunctive relief including specific enforcement from a court of competent jurisdiction, and may

27    elect to bypass Dispute Resolution.

PSA 000125

1  24.9 Further Disputes

2    The Parties agree that any Disputes which arise during the Term out of a

3 settlement agreement or arbitrator's determination shall be resolved exclusively by the

4 procedures set forth in this Section 24.

5

6 SECTION 25 CONFIDENTIALITY: PUBLIC DISCLOSURE OF INFORMATION

7    PSA shall keep confidential those matters which are exempt from public

8 disclosure under the Act, other applicable Laws, and this Section.

9  25.1 Nondisclosure of Exempt Public Records

10    PSA acknowledges that certain FGI Documents may be exempt from public

11 disclosure under RCW Chapter 42.17, RCW Chapter 19.108 or other applicable law. Section

12 119 of the Act provides that PSA may refuse to disclose financial information on FGI, the Team,

13 concessionaires and sublessees. In addition, Section 120(1)(jj) of the Act provides that financial

14 and commercial information requested by PSA from any Person that leases or uses the Project is

15 exempt from public inspection and copying.

16  25.1.1 Before providing PSA with any documents or other materials or

17 information of its own or of any other Person ("FGI Documents"), FGI shall determine based on

18 the good faith advice of its legal counsel whether FGI believes particular FGI Documents are

19 exempt or are permitted to be exempt from public disclosure ("Exempt Information"). FGI shall

20 endeavor to mark Exempt Information as "confidential" or with another mark of similar import

21 before transmitting Exempt Information to PSA.

22  25.1.2 PSA and its PSA Related Parties and their respective agents, contractors

23 and consultants shall refuse to disclose Exempt Information to any person, agency, or entity other

24 than its board members, employees, agents, or consultants without the prior consent of FGI and

25 shall at all times maintain the confidentiality of Exempt Information. PSA shall inform each of

26 its board members, employees, agents, and consultants of the existence of this Agreement and

27 shall require them to comply fully with its provisions prior to disclosing to any such board

28 member, employee, agent, or consultant any Exempt Information. FGI shall not unreasonably

29 withhold its consent to a PSA request to disclose Exempt Information, and FGI shall base its

30 decision with respect to consent on the good faith advice of its legal counsel.

1       25.1.3   Except for the information provided by FGI pursuant to Section 8.9,

2    financial and commercial information provided to PSA by FGI and any user of the Project is

3    exempt from public inspection and copying, and PSA shall enforce such exemption.

4       25.2   Public Disclosure Requests

5       If any FGI Documents become the subject of a request for public disclosure, PSA

6    shall promptly notify FGI of such request and how PSA intends to respond with respect to

7    particular FGI Documents.  Unless compelled by law or consented to by FGI, PSA shall not

8    disclose any FGI Documents until ten (10) Business Days after the date PSA notifies FGI of the

9    disclosure request.  During that time, FGI may determine (based on the good faith advice of

10    FGI's legal counsel) whether FGI believes any of the FGI Documents requested are Exempt

11    Information (in addition to FGI Documents previously determined to be Exempt Information).

12    PSA shall not disclose Exempt Information, and FGI shall defend, indemnify and hold harmless

13    PSA from all damages, penalties, attorneys fees and costs PSA actually incurs related to denying

14    the request for public disclosure of Exempt Information.

15       25.2.1   Remedies

16       FGI is entitled to seek injunctive relief to prevent PSA from disclosing

17    Exempt Information, but shall not be entitled to damages.

18       25.2.2   Disclosure of Non-Exempt Information Expressly Permitted

19       Nothing in this Agreement is intended, nor shall it be construed, to prevent

20    PSA from disclosing information that State law requires PSA to disclose, that is required to be

21    disclosed by a court or other public authority or agency, that was public at the time it was

22    furnished to PSA, or that became public through any means other than the act of PSA or its board

23    members, employees, agents, or consultants.

24       25.3   Ownership of FGI Documents

25       Except to the extent, if any, that FGI Documents and any copies thereof made by

26    or for PSA are "public records" subject to applicable document retention requirements under

27    State law, all such documents shall be and remain the sole and exclusive property of PSA.  At the

28    end of any applicable records retention period, upon the request of FGI, PSA shall, to the extent

29    permitted by law and at FGI's expense, return or destroy (at FGI's option) all FGI Documents

1    and any copies of those FGI Documents in PSA's possession, except for copies of FGI

2    Documents that would be reasonably necessary for PSA to use if the Term ended.

3        25.4    PSA Use of FGI Documents

4            Nothing in this Agreement is intended to prohibit PSA from excerpting Exempt

5    Information from FGI Documents to develop its own documents analyzing particular issues;

6    provided however, that such PSA documents shall not identify FGI as the source of particular

7    Exempt Information without FGI's prior consent, and the particular Exempt Information shall

8    not be identified in any such PSA documents as relating to FGI.

9        25.5    Document Designation

10           The fact that an FGI Document is not marked as "confidential" or with other

11   words of similar import shall not relieve any Party of their obligations hereunder.

12       25.6    Term

13           For valuable consideration, including the execution of this Agreement, the

14   provisions of this Section 25 shall be retroactive to January 30, 1998, and shall continue through

15   the Term.

16

17   SECTION 26    GENERAL PROVISIONS

18       26.1    Overriding Legal Requirements

19           It is the intention of the Parties that this Lease be fully consistent with and, to the

20   extent applicable, give effect to the Act. Anything herein seemingly inconsistent with the Act

21   shall be interpreted in a manner which is consistent with the Act, and which most closely gives

22   effect to the provisions of this Lease.

23       26.2    Compliance With Law; No Discrimination

24           FGI shall at all times conduct its activities with respect to the Project in

25   compliance with all applicable Laws, including Laws with respect to discrimination; and FGI

26   shall include this covenant in every agreement or contract with any Person used by FGI in its

27   activities with respect to the Project. FGI may challenge the interpretation or application of any

28   Laws, so long as such contest is in good faith and does not jeopardize PSA's interest in the

29   Project, and so long as FGI indemnifies PSA from any cost, loss, or liability on account of the

30   contest.

**EXHIBIT A**
**Page 89 of 179**

1    26.3    Estoppel Certificates

2    Each Party shall at any reasonable time, and from time to time, within ten (10)
3    Business Days after written request by the other Party, execute, acknowledge and deliver to the
4    requesting Party or to any assignee or subtenant designated by the requesting Party, a certificate
5    stating that (a) this Lease is in full force and effect and has not been modified, supplemented or
6    amended in any way, or if there have been modifications, this Lease is in full force and effect as
7    modified, identifying such modification agreement; and if this Lease is not in force and effect,
8    the certificate shall so state; (b) the dates on which the term of this Lease commenced;
9    (c) whether all conditions under this Lease to be performed by a designated Party, to the
10    knowledge of the other Party, have been satisfied and, as of the date of such certificate, whether
11    there are any existing defenses or offsets which one Party has against the enforcement of this
12    Lease by another Party, or, if such conditions have not been satisfied or if there are any defenses
13    or offsets, the certificate shall so state. The party to whom any such certificate shall be issued
14    may rely on the matters therein set forth and thereafter the Party issuing the same shall be
15    estopped from denying the veracity or accuracy of the same.

16    26.4    Indexing

17    "Indexed" means adjusting a dollar value by the percentage change in the Index
18    from the December 31 immediately preceding a "reference date" to the December 31
19    immediately preceding the Lease Year in which the "adjustment date" occurs. Unless another
20    reference date is identified when the term "Indexed" is used (e.g., "Indexed as of the
21    Commencement Date"), the reference date is the Completion Date. Unless another "adjustment
22    date" is indicated, adjustment dates are anniversaries of the reference date. Unless another period
23    is identified when the term "Indexed" is used (e.g., "Indexed every five (5) years"), the dollar
24    value is Indexed annually.    "Index" means the Consumer Price Index for All Urban Consumers
25    (CPI-U), Seattle-Tacoma, All Items (1982-1984=100) issued by the Bureau of Labor Statistics of
26    the United States Department of Labor. If the CPI-U ceases to use the 1982-1984 average
27    equaling 100 as the basis of calculation, or if a change is made in the term or number of items
28    contained in the CPI-U, or the CPI-U is altered, modified, converted or revised in any other way,
29    then the determination of the CPI Change shall be made with the use of such conversion factor,
30    formula or table for converting such index as may be published by the Bureau of Labor Statistics.

1  If the CPI-U is no longer published by the Bureau of Labor Statistics, than any substitute or

2  successor index published by said Bureau or other governmental agency of the United States will

3  be used, as shall be agreed upon by FGI and PSA and, if agreement cannot be reached the matter

4  shall be subject to Dispute Resolution.

5      26.5    Good Faith Consideration

6              Whenever PSA is permitted the opportunity to review and comment under this

7  Lease, FGI shall give its good faith consideration to PSA's comments, although it shall not be

8  otherwise obligated with respect to such comments.

9      26.6    No Partnership

10             Nothing in this Lease or in any instrument relating to this Lease shall be construed

11  as creating a partnership or joint venture between PSA and FGI, or cause PSA to be responsible

12  in any way for debts or obligations of FGI or any other Party.

13     26.7    Time of the Essence

14             Time is of the essence of this Lease and of each and every term, covenant,

15  agreement, condition and provision of this Lease.

16     26.8    Captions

17             The captions of this Lease and the table of contents preceding this Lease are for

18  convenience and reference only, and are not a part of this Lease, and in no way amplify, define,

19  limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

20     26.9    Meaning of Terms

21             Words of any gender in this Lease shall be held to include any other gender and

22  words in the singular number shall be held to include the plural when the sense requires.

23     26.10   Lease Construed as a Whole

24             The language in all parts of this Lease shall in all cases be construed as a whole

25  according to its fair meaning and neither strictly for nor against PSA or FGI.

26     26.11   Waivers

27             No waiver made by any Party with respect to the performance, or manner or time

28  thereof, of any obligation of any other Party or any condition of a Party's own obligation under

29  this Lease shall be considered a waiver of any rights of the other Party or condition of such other

30  Party's obligation beyond those expressly waived and to the extent thereof, or a waiver in any

1    respect in regard to any other rights of the Party making the waiver or any other obligations of
2    the Party. No waiver by any Party of any provision of this Lease or any breach thereof, shall be
3    of any force and effect unless in writing; and no such waiver shall be construed to be a
4    continuing waiver.

5         26.12  Severability

6              If any provision of this Lease or the application thereof to any person or
7    circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the
8    application of that provision to persons or circumstances other than those as to which it is invalid
9    or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid
10   and be enforced to the fullest extent permitted by law.

11        26.13  Survival

12             Each provision of this Lease, the full performance of which is not required prior
13   to the expiration of the Term hereof or its earlier termination shall survive expiration or earlier
14   termination, and be fully enforceable thereafter, including, without limitation, all indemnity
15   obligation hereunder.

16        26.14  Memorandum of Lease

17             The Parties shall execute and acknowledge a Memorandum of this Lease in the
18   form attached as Exhibit 26.14 for public recordation purposes, so that public notice of the Term
19   of the Lease be given. However, this Lease shall not be recorded.

20        26.15  Amendment

21             This Lease may be amended only in writing, signed by both PSA and FGI.

22        26.16  Commissions

23             PSA and FGI shall defend, indemnify and hold harmless the other from any and
24   all claims or demands, requests by real estate brokers, agents or finders with whom such
25   indemnifying Party may have dealt in connection with this Lease.

26        26.17  Notices

27             A notice or communication under this Lease by a Party to the other Party shall be
28   in writing and sufficiently given upon personal delivery or upon sending of a confirmed facsimile
29   copy (either by automatic electronic confirmation or by declaration of the sender) directed to the
30   Fax Number of the Party set forth below, or if dispatched by registered or certified mail, postage

**EXHIBIT A**
**Page 92 of 179**

PSA 000131

1    prepaid, return receipt requested or by a delivery service or "overnight delivery" service that

2    provides a written confirmation of delivery, and addressed to a Party as follows:

3

4    If to PSA:           WASHINGTON STATE PUBLIC STADIUM
5                         AUTHORITY
6                         401 Second Avenue South, Suite 520
7                         Seattle, WA 98104
8                         Attn: Mr. Phillip K. Kushlan
9                         Fax No.: 206-205-8604
10                        Confirmation No.: 206-205-8600

11   with a copy to:      BALL JANIK LLP
12                        101 SW Main Street, Suite 1100
13                        Portland, OR 97204
14                        Attn: Stephen T. Janik
15                        Fax No.: 503-295-1058
16                        Confirmation No.: 503-228-2525

17   If to FGI:           FIRST & GOAL INC.
18                        110 - 110th Ave. N.E., Suite 550
19                        Bellevue, WA 98004
20                        Attn: Robert J. Whitsitt, President
21                        Fax No.: 425-453-1985
22                        Confirmation No.: 425-453-1940
23

24   with a copy to:      FIRST & GOAL INC.
25                        110 - 110th Ave. N.E., Suite 550
26                        Bellevue, WA 98004
27                        Attn:   Mr. Richard E. Leigh, Jr.
28                                Vice President and General Counsel
29                        Fax No.: 425-453-1985
30                        Confirmation No.: 425-453-1940
31

32   and:                 Foster Pepper & Shefelman PLLC
33                        1111 Third Avenue, Suite 3400
34                        Seattle, Washington 98101
35                        Attn: Allen D. Israel
36                        Fax No.: 206-447-9700
37                        Confirmation No.: 206-447-4400
38

39        Each Party may by notice to all other Parties, specify a different address or Fax or

40   Confirmation number for subsequent notice purposes.  Notice shall be deemed effective on the

41   date of actual receipt or three days after the date of mailing, whichever is earlier.

1        26.18  <u>Consents and Approvals</u>

2            Whenever the consent, approval, authorization or similar response of a Party is

3  required, or whenever a Party has the right to approve or give its consent, unless a different

4  standard is explicitly stated, that Party's consent, approval, authorization or similar response

5  shall neither be unreasonably withheld, conditioned nor delayed.  Any refusal to consent,

6  disapproval or similar negative response by that Party shall be in writing and must include a

7  detailed explanation for the refusal to consent, disapproval or similar negative response.  Unless

8  a different standard is explicitly stated, if the Party makes no response within a definite time

9  period provided for response, an affirmative response (i.e. consent, approval, authorization or

10  similar affirmative response) shall be deemed.  The statement of a definite period for giving a

11  response shall entitle the responding Party to give its response at any time within such period;

12  provided, however, that neither Party shall purposefully delay considering or giving any

13  requested response, and each Party will proceed in good faith to give such response in a timely

14  manner.

15       26.19  <u>Incorporation of Exhibits by Reference</u>

16          The Exhibits to this Lease are incorporated by reference as part of this Lease as

17  though set forth in full in this Lease.

18       26.20  <u>Non-Waiver of Government Rights</u>

19          By entering into this Lease and the Related Agreements, PSA is specifically not

20  obligating any other governmental agency with respect to any discretionary or regulatory action

21  relating to operation of the Project.  By entering into this Lease and the Related Agreements,

22  PSA is binding itself to the covenants in this Lease and the Related Agreements and such other

23  covenants as may be implied from this Lease and the Related Agreements, but PSA is not

24  otherwise limiting its governmental authority under the Act; provided PSA shall not exercise its

25  governmental authority (as-opposed to its contractual authority under this Lease or any Related

26  Agreement which is not considered PSA's "governmental" authority for purposes of this Section)

27  so as to impose any economic or operational burdens or impacts on FGI or the Project, either

28  directly or indirectly, not provided in this Lease or the Related Agreements.

**EXHIBIT A**
**Page 94 of 179**

1    26.21  Exclusive Remedies

2        The rights and remedies expressly set forth in this Lease shall be deemed

3  exclusive, except where otherwise indicated.

4    26.22  No Third-Party Beneficiaries

5        The Parties intend that the rights, obligations and covenants in this Lease shall be

6  exclusively enforceable by the Parties.  Except as expressly provided herein, there are no third-

7  party beneficiaries to this Lease.

8    26.23  Further Actions

9        At the request of either Party, the other Party shall, without further consideration,

10  promptly execute and deliver such other instruments and take such further actions as may be

11  necessary or appropriate to confer upon the requesting Party the benefits contemplated by this

12  Lease, and which are not contrary to the provisions of this Lease.

13    26.24  Attorneys' Fees

14        In the event a suit, action, Dispute Resolution, or other proceeding of any nature

15  whatsoever, including without limitation any proceeding under the U.S. Bankruptcy Code, is

16  instituted, or the services of an attorney are retained, to interpret or enforce any provision of this

17  Lease or with respect to any dispute relating to this Lease, the prevailing or non-defaulting Party

18  shall be entitled to recover from the losing or defaulting Party its attorneys', paralegals',

19  accountants', and other experts' fees and all other fees, costs, and expenses actually incurred and

20  reasonably necessary in connection therewith.  In the event of suit, action, Dispute Resolution, or

21  other proceeding, the amount thereof shall be determined by the judge or arbitrator, shall include

22  fees and expenses incurred on any appeal or review, and shall be in addition to all other amounts

23  provided by law.  In any suit, action, Dispute Resolution, or other proceeding in which FGI is the

24  substantially prevailing party, then PSA's attorneys', paralegals', accountants', and other experts'

25  fees and all other fees, costs, and expenses actually incurred, and the amount, if any, which PSA

26  must pay toward FGI's attorneys', paralegals', accountants', and other experts' fees and all other

27  fees, costs, and expenses actually incurred, shall not be considered Reasonable PSA Operating

28  Expenses and if PSA is the substantially prevailing party then the unrecovered amounts of PSA

29  costs as set forth above shall be Reasonable PSA Operating Expenses.

50034209.13 -- STADIUM MASTER LEASE
11/23/98          -87-

PSA 000134

1    26.25  Interest

2          Whenever any sums are due and payable, from one Party to another Party under

3    this Lease they shall bear interest from the date originally due until paid in full at the Prime Rate

4    plus four percentage points ("Default Interest"), if it is determined as a result of Dispute

5    Resolution, that the Party failing to make the payment when due did not have a good faith and

6    reasonable basis not to make the payment when due.  If it is determined, as a result of Dispute

7    Resolution, that the Party failing to make the payment when due did have a good faith and

8    reasonable basis not to make the payment when due, such sums shall bear interest from the date

9    due until paid in full at the Prime Rate plus two percentage Points ("Economic Interest").  The

10   "Prime Rate" shall mean the prime rate of interest as quoted from time-to-time in The Wall

11   Street Journal, or any successor publication.  In no event shall the interest rate exceed the highest

12   rate of interest that may be charged under applicable law.

13   26.26  Conflict of Interest

14          No member, director, officer, or employee of PSA shall have any personal

15   interest, direct or indirect, in this Lease, nor shall any such member, director, officer, or

16   employee participate in any decision relating to this Lease which affects his/her personal interest

17   or the interest of any Person in which he/she is, directly or indirectly, interested.

18   26.27  No PSA Personal Liability

19          No member, director, officer, or employee of PSA shall be personally liable to

20   FGI or any successor in interest to FGI in the event of any default or breach by PSA or for any

21   amount which may become due to FGI or such successor with respect to any obligations under

22   the terms of this Lease.

23   26.28  Governing Law

24          This Lease shall be construed according to and governed by the laws of the State

25   of Washington.

26   26.29  Reference Date of Lease

27          For reference purposes, the date of this Lease shall be the date on the first page,

28   irrespective of the date PSA or FGI actually executes this Lease.

**EXHIBIT A**
**Page 96 of 179**

PSA 000135

S0034209.13 – STADIUM MASTER LEASE
11/23/98                              -88-

1    26.30  Entire Agreement

2         This Lease and the Related Agreements constitute the entire agreement between

3    the Parties as of the date of execution of this Lease.  No prior agreements or understanding

4    pertaining to the same shall be valid or of any force or effect and the covenants and agreements

5    of this Lease shall not be altered, modified or added to except in writing signed by PSA and FGI.

6         IN WITNESS WHEREOF, this Lease has been executed by the Parties as of the

7    dates set forth below.

8

9    PSA:                          WASHINGTON STATE PUBLIC STADIUM

10                                 AUTHORITY, a public corporation of the State of

11                                 Washington

12

13

14                             By: _Lorraine Hine_____

15                                 Lorraine Hine, Chair of the Board

16

17   FGI:                          FIRST & GOAL INC., a Washington corporation

18

19

20                             By: _Robert Whitsitt_____

21                                 Robert J. Whitsitt, President

22

50054209.13 — STADIUM MASTER LEASE
11/23/98                    -89-

1  STATE OF WASHINGTON    )
2                         ) ss.
3  COUNTY OF KING         )
4
5
6      I certify that I know or have satisfactory evidence that **LORRAINE HINE** is the person
7  who appeared before me, and said person acknowledged that said person signed this instrument,
8  on oath stated that said person was authorized to execute the instrument and acknowledged it as
9  the Chair of the Board of the **WASHINGTON STATE PUBLIC STADIUM AUTHORITY**, a
10 public corporation of the State of Washington, to be the free and voluntary act of such
11 corporation for the uses and purposes mentioned in the instrument.
12
13
14     Dated this 24 day of November, 1998.
15
16
17                                                    _____
18                                                    (Signature of Notary)
19                                                    **ALLEN D. ISRAEL**
20                                                    (Legibly Print or Stamp Name of Notary)
21                                                    Notary public in and for the State of Washington,
22                                                    residing at _SeaHP_____
23
24                                                    My appointment expires _6/15/02_____
25
26 STATE OF WASHINGTON    )
27                        ) ss.
28 COUNTY OF KING         )
29
30
31     I certify that I know or have satisfactory evidence that **ROBERT J. WHITSITT** is the
32 person who appeared before me, and said person acknowledged that said person signed this
33 instrument, on oath stated that said person was authorized to execute the instrument and
34 acknowledged it as the President of **FIRST & GOAL INC.**, a Washington corporation, to be the
35 free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.
36
37     Dated this 24 day of November, 1998.
38
39
40                                                    _____
41                                                    (Signature of Notary)
42                                                    **ALLEN D. ISRAEL**
43                                                    (Legibly Print or Stamp Name of Notary)
44                                                    Notary public in and for the State of Washington,
45                                                    residing at _SeaHP_____
46
                                                       My appointment expires _6/15/02_____



# MASTER LEASE
# EXHIBIT A

## PROJECT SITE DESCRIPTION

THE "PROJECT SITE" CONSISTS OF:  All of Lots 1 through 35, inclusive, of Block 325 and that portion of Lots 1 through 35, inclusive, of Block 285 of the Seattle Tide Lands as shown on the official maps of the Seattle Tide Lands in volume 2, pages 29, 30, 31 and 32 in King County, Washington, and vacated 3rd Avenue South, per City of Seattle Ordinance No. 10552, described as follows:

Beginning at the Southwest corner of said Block 325, said corner being the intersection of the North margin of South Connecticut Street with the East margin of Occidental Avenue South;

Thence north along said East margin of Occidental Avenue South and West boundary of said Block 325 a distance of 2060.28 feet to the Northwest corner of said Block 325, said corner being the intersection of the East margin of Occidental Avenue South with the South margin of South King Street;

Thence South 89°54'20" East along said South margin of South King Street and North boundary of said Blocks 325 and 285 a distance of 673.47 feet;

Thence South 0°05'40" West a distance of 60.00 feet;

Thence South 89°54'20" East a distance of 112.18 feet;

Thence South 1°06'04" West a distance of 1192.89 feet;

Thence South 10°36'22" West a distance of 820.21 feet to an intersection with the North margin of South Connecticut Street and the South boundary of said Block 285;

Thence South 89°59'21" West along said North margin of South Connecticut Street and the South boundary of said Blocks 285 and 325 a distance of 611.66 feet TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THE FOLLOWING PROPERTY (the "North Half Lot"):

That portion of Lots 1 through 5, of Block 325, and that portion of Lots 1 through 5, of Block 285 of the Seattle Tide Lands, and vacated 3rd Avenue South, per City of Seattle Ordinance No. 10552, all in the Northwest ¼ of Section 5, Township 24 North, Range 4 East, West Meridian, King County Washington, described as follows:

Beginning at the Northwest corner of said Block 325, said corner being the intersection of the East margin of Occidental Avenue South with the South margin of South King Street, thence South 88°46'43" East along said south margin of South King Street and the North boundary of said Blocks 325 and 285, a distance of 673.45 feet; thence South 1°11'39" West 60.00 feet; thence South 88°48'21" East 112.18 feet; thence South 2°12'15" West 181.02 feet to a line 30.00 feet South of and parallel to the centerline of the proposed Weller Street Pedestrian overpass; thence North 88°44'49" West along said

parallel line 782.19 feet to said East margin of Occidental Street; thence North 1°08'01" East along said margin 240.51 feet to THE POINT OF BEGINNING.

THE PROJECT SITE ALSO INCLUDES: all rights of use and other rights of the Washington State Public Stadium Authority ("PSA") with respect to the Project Site and the North Half Lot, as set forth in the certain Agreement and Letter of Intent dated June 25, 1998 among King County, Washington, the City of Seattle, the Washington State Public Stadium Authority, First & Goal Inc., Football Northwest Inc. and the Washington State Department of Transportation, (the "1998 Letter of Intent"); that certain Agreement, Stadium and Exhibition Center, Property Contributions and Reservation of Possessory Rights between King County, Washington and the Washington State Public Stadium Authority dated as of September 30, 1998 (the "Property Contribution Agreement"); and the Special Use Permit described in the Property Contribution Agreement. If the North Half Lot is acquired by the PSA pursuant to Section 5.3 of the Property Contribution Agreement or otherwise, the North Half Lot shall, upon such acquisition, become part of the Project Site and subject to the Master Lease.

**EXHIBIT A**
**Page 100 of 179**

PSA 000139