THE HONORABLE JAMES ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FRED and KATHLEEN STARK, a
married couple,

                    Plaintiffs,

    vs.

THE SEATTLE SEAHAWKS,
FOOTBALL NORTHWEST, LLC, a
Washington limited liability company,
FIRST & GOAL, INC., a Washington
corporation, THE WASHINGTON STATE
PUBLIC STADIUM AUTHORITY, a
Washington municipal corporation, and
LORRAINE HINE, in her capacity as chair
of the Washington State Public Stadium
Authority board of directors,

                 Defendants.

Case No. CV 06-1719 JLR

PLAINTIFFS' CONSOLIDATED
RESPONSE TO DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT

Noted for May 18, 2007

## I. INTRODUCTION

The fundamental constitutional and privacy rights of those attending public events at

public facilities cannot be ignored because of an amorphous fear of terrorism.

> While the threat of terrorism is omnipresent, we cannot use it as the basis for
> restricting the scope of the Fourth Amendment's protections in any large
> gathering of people.
> . . . .
> [T]he Fourth Amendment embodies a value judgment by the Framers that
> prevents us from gradually trading ever-increasing amounts of freedom and

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -1-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX, (206) 623-8717

Dockets.Justia.com

privacy for additional security. It establishes searches based on evidence—
rather than potentially effective, broad, prophylactic dragnets—as the
constitutional norm.

. . . .

September 11, 2001, already a day of immeasurable tragedy, cannot be the day
liberty perished in this country.

*Bourgeois v. Peters*, 387 F.3d 1303, 1311-12 (11th Cir. 2004).

Plaintiffs Fred and Kathleen Stark brought this action to halt the suspicionless,

warrantless mass pat-down searches of patrons entering Qwest Field to attend Seattle

Seahawks football games. The Starks contend that these searches constitute unreasonable

searches and seizures in violation of the Fourth Amendment to the United States Constitution;

Article 1, Section 7 of the Washington State Constitution; and 42 U.S.C § 1983.

Defendants in this lawsuit are the owners and operators of Qwest Field and related

facilities, including the Qwest Field Event Center (sometimes referred to as the Exhibition

Center) and parking facilities. Defendants together present Seahawks football games and other

public events via a self-described "model for public-private partnerships."[1]

Qwest Field was built mostly with public funds, and is owned by the Washington State

Public Stadium Authority ("PSA"), a state-chartered municipal corporation. Defendant

Lorraine Hine is the Chairperson of PSA's Board of Directors.[2] Defendant First & Goal, Inc.

("FGI") leases Qwest Field pursuant to a Master Lease Agreement ("Master Lease") with PSA.

Defendant Football Northwest, LLC ("FNW") owns the Seattle Seahawks,[3] who use Qwest

Field as the venue for their home football games.

Defendants have filed separate motions for summary judgment, asserting that the

warrantless, suspicionless searches of patrons entering Qwest Field cannot fairly be attributed

to "state action." Defendants' motions must be denied. Qwest Field is a public resource for

---

[1] Declaration of Garth Wojtanowicz ("Wojtanowicz Dec."), Ex. 1, pp. 31:6 – 33:25, Exhibit 30.
[2] The Washington State Public Stadium Authority and Ms. Hine shall be referred to collectively as the "PSA."
[3] Collectively, FGI, the Seattle Seahawks and Football Northwest, LLC shall be referred to as the "Seahawk Defendants."

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -2-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1  public use, built primarily with public funds.  PSA, a state-chartered municipal corporation,

2  owns Qwest Field and the related facilities; earns a share of Seahawks ticket revenues;

3  contributes Seahawks revenues to a fund supporting public schools; and has an ownership

4  interest in the Seahawks if the team is sold before the public bonds used to finance the stadium

5  are retired.  PSA is statutorily obligated to ensure that operation of the stadium provides

6  substantial public benefits.

7  The Master Lease between PSA and FGI contains multiple provisions designed to

8  provide public benefit.  The Master Lease requires, among other things, that FGI comply with

9  affirmative action hiring goals; provide affordable seating; provide complimentary upgrades on

10  a lottery basis to purchasers of less expensive Seahawks tickets; provide advertising for the

11  Washington State Lottery; comply with the prevailing wage requirements of RCW 39.12; pay

12  money into a fund for youth athletic facilities; and comply with "all applicable Laws, including

13  Laws with respect to discrimination."  These requirements -- certainly not standard commercial

14  lease provisions -- demonstrate the close relationship between PSI and FGI, and the extent to

15  which the Master Lease is used as a vehicle to protect the public's interest and investment in

16  this important and expensive public facility.  Indeed, the PSA website proclaims that:

17
18  The PSA's mission is to represent the public's interest in owning Qwest Field & Event Center and overseeing First & Goal Inc.'s operation of the facility for the benefit of all Washington state citizens.

19
20  In pursuit of this mission, the PSA will work to ensure that Qwest Field & Event Center:
   - Is accessible and of high quality.

21   - Provides economic and entertainment benefits to residents across the state of Washington.

22   - Attracts families of all incomes and interests.

23   - Is an asset and symbol of pride to its residential and business neighbors and to all Washington state residents.

24   - Remains a showcase that will attract national and international sports, entertainment and trade events and visitors for many decades to come.

25

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -3-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

- Serves as a national model for public-private partnerships.[4]

PSA receives virtually all of its revenues from FGI. In addition to annual rent payments, PSA receives a 20% share of the net profits from FGI's operation of the Qwest Field Event Center, and it profits directly from ticket sales at Qwest Field through the imposition of a 1.2% ticket surcharge. PSA also receives revenue from the sale of naming rights for the stadium – rights which were made more valuable by the fact that the Seahawks play there.[5] These revenues are used to satisfy PSA's deferred sales tax obligations, to fund major maintenance and capital improvements (which will ultimately benefit PSA when the property reverts to PSA control after the lease term), and to make payments to the State's permanent common school fund. PSA has a direct pecuniary interest in FGI's operation of the facilities and attendance levels at Seahawks games and other events.

The Master Lease also confers substantial benefits on FGI, as befits the close relationship between PSA and FGI. In exchange for the right to operate, sublease, and retain most of the profits from the operation of Qwest Field and Event Center and the related facilities (built at a cost to taxpayers of $300 million), FGI pays annual rent of $850,000 (plus the amount by which PSA's reasonable operating expenses exceed that amount).[6] Moreover, as part of the deal, FGI was awarded a valuable tax break: its leasehold interest was exempted from the 12% excise tax normally applicable to leases of public property to private parties.[7]

In short, PSA's operations and interests are closely entwined with those of the Seahawks Defendants in a "model public-private partnership." PSA uses this "partnership" to meet its public benefit obligations. Under these circumstances, the warrantless, suspicionless pat-down searches conducted by FGI are fairly attributable to its partner PSA as the owner, lessor, and public custodian of Qwest Field. On this motion, it must be presumed that PSA

---

[4] Wojtanowicz Dec., Ex.1, pp. 31:6 – 33:25, Ex. 30.
[5] Wojtanowicz Dec., Ex. 1, p. 35:4 – :17.
[6] To date, PSA's operating expenses have not exceeded $850,000. Wojtanowicz Dec., Ex. 2, pp. 39:23 – 40:6.
[7] Municipal public property normally is exempt from property taxes. *See* RCW 82.29A.010(1)(a).

PLAINTIFFS' CONSOLIDATED RESPONSE TO           CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -4-

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1  could not conduct the pat-down searches on its own, and that the searches are unconstitutional.

2  PSA should not be permitted to sidestep the protections afforded by the United States and

3  Washington Constitutions[8] by delegating its authority to its partner, a private entity.

## II. STATEMENT OF FACTS

**A.    The Creation of a Public Resource: Origins of Qwest Field**

6        PSA is a municipal corporation formed in 1997 for the development, ownership, and

7  operation of a new public football stadium in Seattle to replace the aging Kingdome. *See*

8  RCW 36.102.020 (authorizing the creation of PSA). Wojtanowicz Dec., Ex. 3 at ¶ 9. The

9  stadium, later named "Qwest Field," was financed primarily with public funds, over loud

10  public objection to this use of taxpayer money. Wojtanowicz Dec., Ex. 3 at ¶ 9. FGI is the

11  master tenant of Qwest Field and adjacent facilities pursuant to a Master Lease executed in

12  November 1998, before the stadium was even completed. *See* Declaration of Lorraine Hine in

13  Support of Motion for Summary Judgment by Defendants PSA and Hine ("Hine Dec."), Ex. A.

14        However, PSA's intertwinement with FGI began long before the Master Lease was

15  executed. A brief review of the origins of Qwest Field shows that PSA and FGI began

16  working together long before the stadium was built -- the Master Lease only cemented what

17  already were very close ties between PSA and FGI. That "public-private partnership"

18  continues to this day.

19        1.    Origins of the PSA and Qwest Field: The Stadium Financing Act

20        In 1997, FNW had an option to purchase the Seahawks from its then owner, Ken

21  Behring, who threatened to move the team to California. *See Brower v. State*, 137 Wn.2d 44,

22  49 (1998); Wojtanowicz Dec., Ex. 4, ¶ 10. FNW refused to exercise its option (and keep the

23

24  ─────────────────────

[8] Article I, section 7 of the Washington State Constitution provides broader protections than those afforded by the
25  fourth amendment to the U.S. Constitution. *State v. Ladson*, 138 Wn.2d 343, 348-49, 979 P.2d 833 (1999). For
purposes of state action, however, the analyses are the same. *See, e.g., Allied Sheet Metal Fabricators, Inc. v.
Peoples Nat'l Bank of Wash.*, 10 Wn.App. 530, 540, 518 P.2d 734 (1974)

1    Seahawks in Seattle) unless the public funded a new downtown football stadium. *Id.* There

2    was strong opposition to using public funds for this purpose, but the State Legislature enacted

3    the Stadium and Exhibition Center Financing Act, Laws of 1997, ch. 220 (the "Stadium Act").

4    The Stadium Act set forth a comprehensive financing plan for a new stadium and exhibition

5    center. *Brower*, 137 Wn.2d at 49. The Stadium Act is codified, in part, at RCW 36 ch. 102.[9]

6        The Stadium Act provided for the creation of PSA to develop, own and operate the

7    Stadium. RCW 36.102.020(1). PSA is governed by a seven-member board, appointed by the

8    governor. RCW 36.102.030. Defendant Lorraine Hine is the current chair of the board.

9        PSA was granted the authority to "acquire, construct, own, remodel, maintain, equip,

10    reequip, repair, and operate a stadium and exhibition center." RCW 36.102.050(1). In

11    carrying out these functions, PSA was required to consult with the Seahawks' designated

12    "team affiliate" [10] about the site, scope, and design of the project. RCW 36.102.060(1)–(3).

13        The Stadium Act also required PSA to consult with FGI about the budget for the

14    project and make recommendations to the state finance committee about how to pay for the

15    stadium. RCW 36.120.060(5)–(6). Additionally, although PSA had the authority to build the

16    stadium, it was authorized "to enter into a development agreement with a team affiliate

17    whereby the team affiliate may control the development of the stadium and exhibition center

18    project." RCW 36.102.060(7).

19        2.    Stadium Act Financing Requirements

20        The legislature's authorization of the stadium financing plan (as presented to the public

21    for a vote) was expressly conditioned on several requirements to ensure the public would

22    benefit from it. The stadium was to be financed primarily through the sale of bonds, with

23

24    [9] Before the Stadium Act became effective, its key provisions were referred to the voters as Referendum Bill 48.
RCW 36.102.803(1). The Referendum was approved on June 17, 1997. *Brower*, 137 Wn.2d at 52.

25    [10] The term "team affiliate" was defined by the Act to mean "a professional football team that will use the stadium
and exhibition center, and any affiliate of the team designated by the team."
RCW 36.102.010(10). FGI later became the "team affiliate" and assume all associated rights and obligations.

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -6-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700  FAX. (206) 623-8717

public contributions capped at $300 million. Stadium Act, § 210(1), § 218. However, before

the bonds could be sold, PSA was required to certify that FGI had made binding commitments

to a number of requirements for public benefit. Among other things, before the bonds were

issued, the Stadium Act required commitments from the team affiliate that it would:

1.  Ensure that the Seahawks would play all home games at the stadium (Stadium Act §§ 210(2)(a));
2.  Provide $100 million for project development and assume all cost overruns (*id.*, § 210(2)(b));
3.  "[D]eposit at least ten million dollars into the youth athletic facility grant account" (*Id.*, § 210(2)(b));
4.  Sell at least 10% of the seats in the stadium for Seahawks home games at an "affordable price" (*Id.*);
5.  Make an executive suite available on a lottery basis as a free upgrade to purchasers of tickets not in the executive suites or club seat areas (*Id.*);
6.  Grant an equity stake in the Seahawks to the State, entitling the State "to receive ten percent of the gross selling price" if the team was sold within 25 years of the date on which the bonds were issued (*Id.*);
7.  Provide reasonable office space to PSA without charge (*Id.*)
8.  Work with the "surrounding areas to mitigate the impact of the construction and operation of the stadium . . . with a budget of at least ten million dollars dedicated to area mitigation" (*Id.*); and
9.  Remit to PSA "[20%] of the net profit from the operation of the exhibition facility of the stadium and exhibition center," payable "into the permanent common school fund (*Id.*).

The Act also requires that the Master Tenant "shall meet goals, established by the county

where the stadium and exhibition center is located, for women and minority employment for

the operation of the stadium and exhibition center." *Id.* § 106(8). Taken together, these

requirements, all later incorporated into the Master Lease,[11] demonstrate the clear intention of

the State that operation of the stadium and exhibition center was to benefit the public that paid

the lion's share of their cost.

3.  The Stadium Act Provided Benefits to FGI.

---

[11] The PSA website contains a summary of the public benefits provided by Qwest Field and Event Center, and encourages citizens to "[r]ead our Public Benefits section to learn more about how public and private interests worked together to make the facility a sound investment in Washington's future." Wojtanowicz Dec., Ex. 1, pp. 23:24 – 25:17 (Ex. 29).

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -7-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    While the Stadium Act conditioned public funding of the stadium on providing public

2 benefits, it also conferred significant benefits on FGI, including a special tax break. Under

3 RCW 82.29 *et seq.*, private lessees of public property who pay no property taxes are required

4 to pay an excise tax on leasehold interests at a rate of 12% of the taxable rent. RCW

5 82.29A.030.[12] Under Section 202(15) of the Stadium Act, however, the legislature bestowed

6 upon FGI a blanket exemption from that tax obligation.

7    In addition, FGI was given a "sweetheart deal" on rent. In exchange for the right to

8 operate and retain those profits generated by the facilities and not shared with the State, FGI

9 was obligated to pay "fair rent," which is "solely intended to cover the reasonable operating

10 expenses of the public stadium authority and shall be not less than eight hundred fifty thousand

11 dollars per year." Stadium Act § 106 (8).[13]

12    4.    The Master Lease: FGI Becomes the "Team Affiliate" and PSA's Delegated
            Stadium Manager

13

14    The Stadium Act gave PSA the principal responsibility for developing and operating

15 the stadium, authorizing it to "acquire, construct, own, remodel, maintain, equip, reequip,

   repair, and <u>operate</u> a stadium and exhibition center . . . ." RCW 36.102.050(1) (emphasis
16

17 added). The Act authorized – but did not require – PSA to delegate some or all of its

   responsibilities. The Stadium Act provided that the
18

19        public stadium authority <u>may</u> enter into agreements . . . for the joint provision
          and operation of a stadium and exhibition center and may enter into contracts . .
20        . where any party to the contract provides and operates the stadium and
          exhibition center <u>for the other party</u> or parties to the contract.

21

22
   _____

23 [12] The legislature imposed the leasehold excise tax in recognition of the fact that "private lessees of such public
   properties receive substantial benefits from governmental services." RCW 82.29A.010(1)(a). The excise tax was
   intended "to fairly compensate governmental units for services rendered to such lessees of publicly owned
24 property." RCW 82.29A.010(1)(c).
   [13] Under the Master Lease, FGI also enjoys the benefit of Major Maintenance and Modernization Improvements
25 paid for by PSA out of the revenue the PSA receives for the sale of naming rights for the stadium. *See* Hine Dec.,
   Ex. A. at ¶ 11.6 (p. 41), ¶ 17.4.5 (p. 61). *See also* Wojtanowicz Dec., Ex. 1, pp. 36:2 – 37:8; Ex. 5, pp. 36:20 –
   37:16, Ex. 62.

RCW 36.102.050(2) (emphasis added).

The Act also provided that PSA could make

> a long-term lease agreement with a team affiliate whereby, in consideration of the payment of fair rent and <u>assumption of operating and maintenance responsibilities</u>, risk, legal liability, and costs associated with the stadium and exhibition center, the team affiliate becomes the sole master tenant of the stadium and exhibition center.

RCW 36.102.060(8) (emphasis added).[14]  These provisions make clear that PSA was responsible for the development and operation of the stadium in the first instance.  While it was authorized to delegate some of those responsibilities, it was not required to do so, and it could choose the extent to which that delegation would occur.

On November 24, 1998, PSA entered into the Master Lease with FGI.  Hine Dec., Ex. A.  The Master Lease recites that "FGI is the sole master tenant" of the Stadium, and "has the exclusive power and authority to possess, operate, use, sublease" the Stadium.  *Id.*, ¶ 2.1, at 3.  However, the Master Lease imposes certain "Requirements to Provide Public Benefits" on FGI's operation of the Stadium.  *Id.* ¶ 8, at 22.

In addition to adopting the statutorily-mandated benefits listed on page 7 above, the Master Lease provides (in two places) that "FGI shall at all times, use, manage, possess, and operate [the Stadium] in compliance with all applicable Laws, including Laws with respect to discrimination."  *Id.*, ¶ 8.15, at 32; ¶ 26.2, at 81.  It further requires that FGI meet the prevailing wage requirements of RCW 39.12 (which apply to contractors on public works in Washington) (*Id.*, ¶ 8.5, at 27) and hire local residents to the extent feasible (*Id.*, ¶ 8.7 at 28).

The Master Lease reserves PSA's authority and role as a governmental agency:

---

[14] Although the Act refers to the assumption of "legal liability" by the lessor, that provision does not address whether the team affiliate or PSA could be enjoined from committing constitutional violations.  Rather, the Act simply requires that, as a condition of assuming control over the facility, the team affiliate would also assume the financial responsibilities that might flow from its actions.  Thus, if FGI committed a constitutional violation resulting in the imposition of monetary liability, FGI, and not PSA, would be responsible for paying those damages.  Here, the Starks seek only injunctive relief and the payment of reasonable costs and attorney fees.

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -9-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

> By entering into this Lease…, PSA is binding itself to the covenants in this Lease…, but <u>PSA is not otherwise limiting its governmental authority under the Act</u>; provided PSA shall not exercise its governmental authority (as opposed to its contractual authority under this Lease or any Related Agreement which is not considered PSA's "governmental" authority for purposes of this Section) so as to impose any economic or operational burdens or impacts on FGI or the Project, either directly or indirectly, not provided in this Lease[.]

*Id.*, ¶ 26.20, at 86 (emphasis added).

Consistent with this reservation, the PSA touts its role as the overseer of FGI's operation of the stadium facilities and as the protector of the public's interest in its substantial investment. The PSA website states that "[w]ith construction complete, the chief role of the PSA is to ensure that the public's interests are represented and protected in the facility's operation." Wojtanowicz Dec., Ex. 1, pp. 34:19 – 35:15, Ex. 31. Ms. Kawasaki admitted in her deposition that "[i]t's my belief that the PSA is – yes, part of their responsibility is to ensure that public benefits are derived from the stadium pursuant to the Stadium Act." *Id.* at p. 23:10 - :15.[15] In addition, FGI participates in meetings of the PSA Board, and provides periodic updates on stadium operations, including policies and procedures regarding "recruitment and hiring, <u>security and game day operations</u>."[16]

The Master Lease and Stadium Act give PSA a direct share in the profits and revenues generated by events hosted by FGI at Qwest Field and Event Center, including Seahawks games. Under Section 6.1.2 of the Master Lease, PSA is entitled to receive 20% of the net profits from the operation of the Event Center. *Id.*, ¶ 6.1.2, at 16.[17] In the event that the Olympic Games and/or World Cup Soccer events are held at Qwest Field, PSA will be entitled to receive all net profits from those events. *Id.* ¶ 6.3, at 19. Proceeds from the sale of stadium

---

[15] Ms. Kawasaki Romero and others recognized the PSA's oversight role on numerous occasions and discussed the PSA's efforts to ensure that FGI was actually providing the requisite public benefits at length. *See* Wojtanowicz Dec., Ex. 1 at pp. 10:16 – 21:17, 23:10 – 27:25, 31:6 – 33:25, 34:19 – 35:15, Exs. 30, 31; Wojtanowicz Dec., Ex. 6 at pp. 9:13 – 10:23; Wojtanowicz Dec., Ex. 5 at pp. 9:6 – 9:17, 10:17 – 10:22, 15:4 – 16:19, 17:4 – 18:15, 21:15 – 22:8.
[16] Wojtanowicz Dec., Ex. 6 at p. 15:4 – 15:23, Ex. 58. *See also, Id.* at pp. 9:6 – :17, 10:17 – 22, 17:4 – 18:15, 21:15 – 22:8 (discussing other reports by FGI to PSA regarding security issues), and Exs. 59, 60 thereto.
[17] *See also* Wojtanowicz Dec., Ex. 1, pp. 26:17 – 27:6; Ex. 6, pp. 35:21 – :24, Ex. 62.

PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT -10-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX. (206) 623-8717

1   naming rights are collected by PSA and deposited into an account for Major Maintenance and

2   Modernization Improvements. *Id.* ¶¶ 11.6, 17.4.5.[18]  The Master Lease also permits PSA to

3   impose a surcharge on tickets for events – a right it has exercised since September 1999, when

4   PSA imposed a 1.2% surcharge on all tickets. *Id.*, Second Amendment to Master Lease, ¶

5   18.2.3 (PSA 000177).[19]  The Stadium Act also reserves to PSA "the authority, upon the

6   agreement of the team affiliate, to sell permanent seat licenses." Stadium Act, § 106(15).[20]

7        At the end of the lease term, Qwest Field and Event Center and the related facilities –

8   as improved and modernized through the use of naming rights proceeds – revert to PSA

9   control. Hine Dec., Ex. A, ¶ 4.5.1.

10  **B.    The NFL-Mandated "Pat-down" Policy**

11       In August 2005, the National Football League ("NFL") adopted a policy requiring pat-

12  down searches of all ticket holders at NFL games, held at venues throughout the country. *See*

13  *Johnston v. Tampa Sports Authority*, 442 F.Supp.2d 1257, 1260 (M.D. Fla. 2006). The pat-

14  down policy was adopted for the ostensible purpose of identifying explosive devices and

15  preventing suicide bombings inside stadiums where NFL games are being played. *Id.*

16       The pat-down policy requires that all ticket holders seeking admittance to an NFL game

17  be subjected to an upper-body pat-down search. The pat-down policy was not adopted in

18  response to any specific and credible threat. *Id.* at 1268 ("the evidence establishes that the

19  NFL implemented a pat-down policy as a broad prophylactic measure in response to a general

20  threat that terrorists might attack any venue where a large number of Americans gather").

21

22

---

23  [18] *See also* Wojtanowicz Dec., Ex. 1, pp. 36:4 – 37:8; Ex. 6, pp. 36:20 – 37:16.

24  [19] *See also* Wojtanowicz Dec., Ex. 1, pp. 41:2 – :6, 42:18 – 43:8; Ex. 5, pp. 34:18 – 35:4, Ex. 6, pp. 23:16 – 24:16, 26:3 - :9, 27:6 – 28:18, 36:17 - :19 (Ex. 62), 41:11 - :13.

25  [20] *See also* Declaration of Ann Kawasaki Romero in Support of Motion for Summary Judgment by Defendants PSA and Hine at ¶ 5 ("FGI also acts as PSA's sales agent for personal seat licenses. . . . . In lay terms, my general understanding is that a seat license gives the purchaser a right to purchase season tickets during specific years for specific seats"); Wojtanowicz Dec., Ex. 6, pp. 7:5 – 9:1, 36:2 – 37:3 (Ex. 62).

PLAINTIFFS' CONSOLIDATED RESPONSE TO     CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -11-

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    At the beginning of the 2005 NFL season, pat-down searches were instituted at all NFL

2 games, including Seahawks home games. The NFL mandated that each local NFL franchise,

3 including the Seattle Seahawks, comply with its pat-down policy. *Id.* at 1260. Prior to 2005,

4 the Starks had never been subjected to a pat-down search at a Seahawks game or any other

5 NFL game. Declaration of Fred Stark, dated November 27, 2006 ("Stark Dec."), at ¶ 2.

6 Beginning in August, 2005, however, the Starks were subjected to pat-down searches for

7 nearly every Seahawks game they attended at Qwest Field. Stark Dec. ¶¶ 14.[21] Each time, the

8 Starks verbally objected to the searches, but were required to submit to the pat-down in order

9 to gain entry to the game. Stark Dec. ¶¶ 3-4. Pat-downs of the Starks at these home games

10 included a highly intrusive, offensive, and humiliating full-body frisking. Stark Dec. ¶¶ 11-14.

11    The pat-down requirement has not been consistently applied. For example, no pat-

12 downs (of the Starks or any other ticket holders the Starks observed) were conducted during a

13 heavy downpour at one Seahawks home game November 13, 2005. Stark Dec. ¶ 11. At

14 another Seahawks home game on August 31, 2006, Mr. Stark verbally objected to being

15 patted-down and asked to speak with the security officer's supervisor. Stark Dec. ¶ 12.[22] Two

16 supervisors were called to discuss the situation. *Id.* Rather than submitting to yet another pat-

17 down, Mr. Stark removed his shirt in an effort to establish that he was concealing nothing that

18 the pat-down would reveal. *Id.* The original security officer waved him through the entrance

19 without any further search. *Id.*

20    At the other end of the spectrum, at a home game on October 16, 2005, Mr. Stark was

21 subjected to a highly intrusive, offensive and humiliating full-body frisking. Stark Decl. ¶ 13.

22 A security officer ran his hands down Mr. Stark's sides, reached around Mr. Stark and grasped

23 his buttocks. *Id.* He then felt both arms and across his chest. *Id.* Then, he moved his hands

24

25 [21] Wojtanowicz Dec., Ex. 7 at ¶ 14.
[22] As Mr. Stark clarified in his deposition p 34:7 - :11, his declaration contains a typo; the game was held on August 31, not July 31.

PLAINTIFFS' CONSOLIDATED RESPONSE TO    CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -12-

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX. (206) 623-8717

1  towards Mr. Stark's groin area, where he found and handled an Albuterol inhaler in Mr. Stark's

2  pant pocket (for his asthma). *Id.* The security officer then placed both of his hands around

3  Mr. Stark's left thigh, running them down to his sneaker top, which he also felt thoroughly. *Id.*

4        Each time the Starks attended a Seahawks home game and were confronted with the

5  pat-down search requirement, they verbally objected. Ultimately, however, they were required

6  to submit to the searches in order to gain admittance. *Id.* The Starks were not singled out of

7  the crowd based on any reasonable suspicion —they were stopped and searched simply

8  because they sought to attend a public gathering at a publicly-owned and financed facility.

9        **III. ARGUMENT AND AUTHORITY**

10  **A.    Summary Judgment Standards**

11        Summary judgment is proper only if there is no genuine issue as to any material fact

12  and the moving party is entitled to judgment as a matter of law. *Gunnier v. Yakima Heart Ctr.,*

13  *Inc.,* 134 Wn.2d 854, 858, 953 P.2d 1162 (1998). If reasonable minds can reach different

14  conclusions, summary judgment is improper. *Kalmas v. Wagner,* 133 Wn.2d 210, 215, 943

15  P.2d 1369 (1997). The court considers the facts submitted and all reasonable inferences from

16  those facts in the light most favorable to the nonmoving party. *Scott v. Pasadena Unified*

17  *School Dist.,* 306 F.3d 646 (9th Cir. 2002).

18        The Ninth Circuit has recognized that "[w]hether a private party engaged in state action

19  is a highly factual question." *Brunette v. Humane Society of Ventura County,* 294 F.3d 1205,

20  1209 (9th Cir. 2002), citing *Howerton v. Gabica,* 708 F.2d 380, 383 (9th Cir. 1983); citing in

21  turn *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45

22  (1961). Because the "crucial [inquiry] is the nature and extent of the relationship" between the

23  private and state actors involved, "'[o]nly by sifting facts and weighing circumstances' can [the

24  court] hope to ferret out obvious as well as non-obvious State involvement in private conduct."

25  *Brunette,* 708 F.2d at 1209 (citations omitted).

PLAINTIFFS' CONSOLIDATED RESPONSE TO    CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -13-

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    **B.    The Pat-Down Searches at Qwest Field are "Fairly Attributable" to PSA.**

2          The narrow question before the Court is whether the pat downs should be deemed

3    "state action."  It is assumed, for purposes of summary judgment, that the pat downs constitute

4    unreasonable and unconstitutional searches.

5          The Fourth Amendment to the United States Constitution guarantees the right to be free

6    from "unreasonable searches and seizures."  While normally private entities are not liable for

7    violations of the rights and protections afforded by the United States Constitution, "private"

8    actors – and public entities – may be held liable for such violations when the actions of the

9    private entities are "fairly attributable" to the government.[23]  *See Rendell-Baker v. Kohn*, 457

10   U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982); *Vincent v. Trend Western Tech.*

11   *Corp.*, 828 F.2d 5632, 567 (9th Cir. 1987).

12         Over the years, courts have settled on four basic factors for determining whether the

13   actions of a private actor are fairly attributable to the government, thus giving rise to the

14   possibility of liability under 42 U.S.C. § 1983 for constitutional violations.  Two of these are

15   relevant here:  the "symbiotic relationship" and "public function" analyses.

16         While these factors provide useful guidance in analyzing the "fact-intensive" question

17   of whether a private entity's actions are fairly attributable to the state, they are not rigid tests to

18   be applied mechanically.  *See Lee v. Katz*, 276 F.2d at 554 ("Because of the fact-intensive

19   nature of the inquiry, courts have developed a variety of approaches to the State actor issue");

20   *Burton v. Wilmington Parking Auth.*, 365 U.S. at 722 ("to fashion and apply a precise formula

21   for recognition of state responsibility . . . is an 'impossible task' which 'This Court has never

22

23

---

24   [23] 42 U.S.C. § 1983 requires action under color of state law.  This requirement has been held to be identical to the
     "state action" requirement of the Fourteenth Amendment.  *See Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1309 (9th
25   Cir. 1982) ("the under-color-of-state-law requirement of s. 1983 is equivalent to the state action requirement of
     the fourteenth amendment"); *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) ("Conduct that is actionable under the
     Fourteenth Amendment is also action under color of State law supporting a suit under § 1983").

PLAINTIFFS' CONSOLIDATED RESPONSE TO        CV 06-1719 JLR         LAW OFFICES
DEFENDANTS' MOTIONS FOR SUMMARY                        DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
JUDGMENT -14-                                                    999 THIRD AVENUE, SUITE 4400
                                                                SEATTLE, WASHINGTON 98104
                                                          TEL. (206) 623-1700   FAX. (206) 623-8717

attempted'"). Instead, the factors serve as guidelines, leaving room for the consideration of the totality of the circumstances.

> What is fairly attributable [as State action] is a matter of normative judgment, and the criteria lack rigid simplicity . . . .  [No] one fact can function as a necessary condition across the board . . . nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason . . . .

*Lee*, 276 F.2d at 554, *quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96, 121 S.Ct. 924, 148 L.Ed.2d 807 (alterations in original).

Private action may be attributed to the government under a "symbiotic relationship" analysis when "the government has so far insinuated itself into a position of interdependence with [a private entity] that it must be recognized as a joint participant in the challenged activity." *Burton*, 365 U.S. at 862. Under the "public function" test, "private" actions may be attributed to the government where the private actor performs functions traditionally and exclusively reserved to the government. *Lee,* 276 F.3d at 554-55 ("when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations") (citation omitted). The warrantless, suspicionless searches of patrons entering Qwest Field may be attributed to PSA under both the "symbiotic relationship" and "public function" tests.

1.    PSA is in a symbiotic relationship with the Seahawk Defendants.

The symbiotic relationship test finds its roots in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The relationship between the state and private actors in *Burton* bears a substantial similarity to the facts in this case.

In *Burton*, the issue was whether a private entity's ("Eagle") practices of racial discrimination in a restaurant could fairly be attributed to the Wilmington Parking Authority, a public entity which owned the facility (a public parking garage) in which the restaurant was located. *Burton*, 365 U.S. at 717. "The land and the building were publicly owned. As an

CV 06-1719 JLR

entity, the building was dedicated to 'public uses' in performance of the Authority's 'essential governmental functions.'" *Id.* at 723.

The Court noted that the Wilmington Parking Authority stood to gain revenue from Eagle's operation of the restaurant, as the presence of the restaurant could create additional demand for parking, which would generate revenue for the Authority. *Id.* at 724. Furthermore, Eagle claimed that its business would suffer if it did not discriminate – thus tying the Authority's financial incentive to the discriminatory conduct (*i.e.*, fewer restaurant patrons would mean lower parking revenues). *Id.* Considering these factors, the court noted that

> the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building . . . indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn. *Id.*

The integration and alignment of financial interests in *Burton* was the crucial factor in finding that the State action requirement was satisfied. As explained by the 9th Circuit in *Brunette v. Humane Soc. of Ventura County*, 294 F.3d 1205 (9th Cir. 2002),

> *Burton* teaches that substantial coordination and integration between the private entity and the government are the essence of a symbiotic relationship." . . . . For example, if a private entity, like the restaurant in *Burton*, confers significant financial benefits indispensable to the government's 'financial success,' then a symbiotic relationship may exist.

*Brunette*, 294 F.3d at 1213 (citations omitted).[24]

Although the Wilmington Parking Authority did not direct or otherwise require Eagle's discrimination, its lack of direct involvement was not sufficient to preclude a finding of state action. Rather, the Court focused on the Parking Authority's affirmative decision to delegate blindly its governmental authority to a private actor:

---

[24] *See also Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action"); *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (state action may be found in actions of a private entity where the private actor is "entwined with governmental policies") (*citing Evans, supra*).

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -16-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

> By its inaction, the Authority, and through it the State, has not only made itself
> a party to the refusal of service, but has elected to place its power, property and
> prestige behind the admitted discrimination. The state has so far insinuated
> itself into a position of interdependence with Eagle that it must be recognized as
> a joint participant in the challenged activity . . . .

*Burton*, 365 U.S. at 725.

Moreover, the court noted that to permit the Wilmington Parking Authority to insulate

itself from the discriminatory conduct of its tenant would be unjust.

> [I]n its lease with Eagle the Authority could have affirmatively required Eagle
> to discharge the responsibilities under the Fourteenth Amendment imposed
> upon the private enterprise as a consequence of state participation. But no state
> may effectively abdicate its responsibilities by either ignoring them or by
> merely failing to discharge them whatever the motive may be." *Id.*

In *Halet v. Wend Inv. Co.*, 672 F.2d 1305 (9th Cir. 1982), the court applied the

reasoning of *Burton* to find that the plaintiff had alleged sufficient facts to state a cause of

action under the Fourteenth Amendment. At issue in *Halet* was an adults-only rental policy in

an apartment complex on land owned by the state, and leased to a private party. In reversing

the District Court's decision not to allow leave to amend the complaint to include additional

allegations relating to the symbiotic relationship between the county and the private owner, the

court noted that plaintiff had alleged:

> (1) the County owns the land leased to Wend for the apartment complex; (2)
> the County acquired and prepared the land using federal and state funds and
> used federal services in dredging the harbor in the redevelopment area; (3) the
> purchase of land was part of a large redevelopment program; (4) the County
> leased the land to Wend for the benefit of the public in providing housing; (5)
> the lease prohibits race or religious discrimination; (6) the County oversees the
> development of the area and the design of the buildings and had final approval
> of all plans; (7) the County controls the use and purpose of the apartment and
> the rent charged; (8) Wend pays a percentage of the rentals to the County; and
> (9) Wend must abide by all the conditions of the lease.

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -17-

CV 06-1719 JLR

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1    *Halet*, 672 F.2d at 1310.  The court found that these allegations were sufficient to sustain

2    plaintiff's claim:  "[t]hese allegations, if proved, would place the County in a position of

3    interdependence such that it is a joint participant with Wend."  *Id.* (citing *Burton*).[25]

4        The level of entanglement between FGI and PSA certainly is no less than that found in

5    *Burton* and Halet, and may in fact be far greater.  As in *Burton*, Qwest Field and Event Center

6    are public facilities, developed and funded by a public agency of the State created to serve a

7    variety of public functions, as delineated in the Stadium Act.  And as in *Burton*, PSA has

8    reserved the right to profit from FGI's operation of the facilities, in the form of shared revenue

9    (for Event Center activities), surcharges placed on tickets to events in the stadium and event

10   center, and proceeds from the sale of naming rights.  Indeed, the State even has obtained an

11   equity stake in the Seahawks, and is entitled to recover 10% of the sales price if the team is

12   sold within 25 years of the issuance of the bonds used to finance stadium construction.[26]

13       Moreover, PSA's success as a governmental agency is entirely dependent on the

14   benefits and money provided by FGI – its office space and its entire operating budget are

15   provided by FGI.  FGI is required by the Master Lease to provide numerous public benefits not

16   normally associated with commercial leases, such as affordable tickets, compliance with

17   minority and woman-owned hiring goals, and payments into a fund for the development of

18   youth athletic facilities.  Indeed, PSA relies <u>entirely</u> on FGI to obtain funding, provide public

19

---

[25] *See also Geneva Towers Tenants Ass'n v. Federated Mortgate Investors*, 504 F.2d 483, 487-88 (9th Cir. 1974) (finding state action where there was a "joint undertaking with the federal government to provide housing for low and moderate income families"); *Male v. Crossroads Associates*, 469 F.2d 616, 620 (2nd Cir. 1972) (finding state action where state's involvement in an urban renewal project "dates to the very origins" of the project, where land was acquired by public domain, public funds were used in connection with the project, and the facility "owed its very existence to state action").

[26] *See* Stadium Act § 210(2)(vi) (requiring PSA certification prior to issuance of the stadium financing bonds that "[a] nonparticipatory interest in the [Seahawks] has been granted to the state beginning on the date on which bonds are issued under this section which only entitles the state to receive ten percent of the gross selling price in the team that is sold if a majority interest or more of the [Seahawks are] sold within twenty-five years of the date on which bonds are issued under the section."  This provision gives State the opportunity to reap the benefits of any increases in the value of the team (from increased attendance or otherwise) if the team is sold within 25 years of bond issuance.

1    benefits, and operate the stadium – it has essentially delegated to FGI its entire governmental

2    function, leaving only its obligation of oversight, and use of the proceeds it requires from the

3    Seahawks. PSA, no less than the Wilmington Parking Authority in *Burton*, has "so far

4    insinuated itself into a position of interdependence with [FGI] that it must be recognized as a

5    joint participant in the challenged activity . . . ." *Burton*, 365 U.S. at 725. Although it

6    disavows responsibility for FGI's actions, PSA has "placed its power, property, and prestige"

7    behind FGI's operation of the stadium and its conduct of suspicionless, warrantless pat-down

8    searches of patrons entering Qwest Field for Seahawks games.[27]

9          Defendants place significant emphasis on cases suggesting that "state action" requires a

10   connection between the government entity and the action taken by the private entity, and not

11   the relationship between the governmental entity and the private actor. *See, e.g.*, *Kabbani v.*

12   *Council House, Inc.*, 406 F.Supp.2d 1189, 1194 (W.D. Wash. 2005).[28] Defendants would have

13   this court apply that statement as a mechanical rule, ignoring the substantial evidence of

14   intertwinement between FGI and PSA – precisely the type of formalistic approach the Supreme

15   Court has cautioned against. *See Brentwood*, 531 U.S. at 295 ("What is fairly attributable [to

16   state action] is a matter of normative judgment, and the criteria lack rigid simplicity. From the

17

18

19   ---

20   [27] *Rendall-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), cited by Defendants, is
     inapposite. In *Rendall-Baker*, the issue was whether a private school receiving state funding could be charged
     with "state action" for personnel decisions. The Court found that it could not because "the school's fiscal

21   relationship with the State is not different from that of many contractors performing services for the government."
     *Id.* at 843. Here, PSA's relationship with FGI does not at all resemble a "normal" relationship between a private
     contractor and the government, as demonstrated by the litany of public benefit requirements placed on FGI and

22   the PSA's ability to profit from stadium operations and the sale of the Seahawks, among other things.
     [28] *Kabbani* is also distinguishable. There, the issue was whether a private landlord's participation in the federal

23   Section 8 housing program (which offers rent subsidies for low-income persons) was sufficient to transform the
     landlord's imposition of "house rules" into state action. *Kabbani*, 406 F.Supp.2d at 1193. Although the federal

24   government regulates landlords receiving Section 8 subsidies and provides money to them, there was no evidence
     of the pervasive entwinement found in either *Burton* or in the relationship between FGI and PSA. *Id.* at 1193-94.
     The relationship between the governmental and private entities in *Kabbani* bears no resemblance to the

25   relationship between FGI and PSA – the case cannot provide meaningful guidance for the case at bar.

PLAINTIFFS' CONSOLIDATED RESPONSE TO          CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -19-

1  range of circumstances that could point toward the state behind an individual face, no one fact

2  can function as a necessary condition across the board . . .").

3        Moreover, Defendants overstate the rule and conflate the nexus analysis with the

4  symbiotic relationship analysis. As *Burton* and its progeny demonstrate, when governmental

5  and private actors are sufficiently intertwined, a plaintiff need not demonstrate that the state

6  actor actually participated in, condoned, or otherwise directed the unconstitutional behavior.

7  In *Burton,* for example, there was no evidence that the Parking Authority directed, authorized

8  or participated in the discriminatory conduct, yet its close, symbiotic relationship sustained a

9  finding of state action. *See Burton*, 365 U.S. at 862. In *Richards v. Lowell*, 472 F.Supp.2d 51

10  (D. Mass 2007), the court noted the difference between the nexus and symbiotic relationship

11  analyses, stating that "in contrast to the nexus inquiry, this examination does not focus on the

12  specific conduct complained of, but concentrates instead on the nature of the overall

13  relationship between the State and private entity." *Id.* at 75.

14        Defendants have failed to appreciate this difference, and as a result, have placed undue

15  reliance on cases such as *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir.

16  1995). *Gallagher* was not a case involving a symbiotic relationship – the conduct at issue

17  there was simply the result of a one-time event whereby the University leased a performance

18  space to a private concert promoter. *Id.* at 1444 – 45. Under those circumstances, the nexus

19  analysis is the proper one: because the University and the promoter were not substantially

20  entwined, the relevant question is whether the University's conduct was sufficiently tied to the

21  wrongful conduct to warrant treating the private actors as agents of the State. In this case,

22  however, the evidence of entanglement and symbiosis between FGI and PSA is substantial and

23  demonstrates a longstanding, deep-rooted entanglement of interests. Under these

24

25

PLAINTIFFS' CONSOLIDATED RESPONSE TO       CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -20-

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX, (206) 623-8717

1    circumstances, the symbiotic relationship test is appropriate – and that test focuses not only on

2    the specific conduct at issue, but on the totality of the circumstances.[29]

3           The NFL's Vice President of Security Operations, Milton Ahlerich, has admitted that

4    one of the purposes of the pat-down policy was to ensure that patrons would "feel safe" and

5    continue to patronize NFL football games, including those at Qwest Field:

6           Q.    Now, you said that you – one of the purposes of the task force was to develop
                  procedures that would inform the public and the fans that they were secure; is
7                 that correct?

8           A.    To make – not exactly. Not exactly. Let me amplify on that.

9                 An important part of security is the perception of security, so that when fans
                  come into a stadium, that they feel comfortable. They know that measures are
10                in place that are keeping them safe, not only from being told that, but from
                  measures they can see in place. . . . .
11

12                People want to feel secure, and especially after 9/11, we were intent on A,
                  making them secure, and B, giving them the knowledge that they were secure so
13                that they would perceive that they were secure, so that they could then come in
                  and enjoy the game and not be frightened.
14

15          Q.    And the importance of that, in part – would you agree that the importance of
                  that is that if fans didn't feel secure, they might not, at NFL games, they might
16                not come in as great of numbers to NFL games, correct?

17          A.    Not exactly. That's part of the answer. It's part that certainly if they stayed
                  away, that would be a very bad thing for what we're trying to do.
18

19   Wojtanowicz Dec., Ex. 8. In other words, the NFL, which imposed the pat-down requirement,

20   has admitted that it instituted the policy in part because it feared that revenues would decrease

21   without the unconstitutional searches. FGI's security operations are part-and-parcel of its

22

23   _____

24   [29] These analyses are not exclusive; they are complementary. For example, a private entity may be a state actor
     under the nexus analysis if a governmental entity was closely involved in the constitutional deprivation, even if
     there were no prior or ongoing relationship between the state and private entities. Conversely, if the state and
25   private entities are sufficiently entangled in one another's affairs, the private entity may be a state actor under the
     symbiotic relationship test because the closeness of the relationship is sufficient to color the constitutional
     deprivation with the authority of the state, even if the state was not intimately involved in the violation.

1   operation of Qwest Field, and because PSA profits from the sale of event tickets (through the

2   imposition of a 1.2% surcharge), it profits from FGI's security procedures.

3          In sum, Plaintiffs believe that they have presented more than sufficient evidence to

4   establish that the warrantless, suspicionless searches conducted at Qwest Field are the product

5   of "state action." Indeed, the Starks believe the evidence is sufficient to permit the Court to

6   enter summary judgment in their favor on the "state action" issue, of its own accord.

7          However, as stated previously, the state action inquiry is highly factual in nature.

8   Because the "crucial [inquiry] is the nature and extent of the relationship" between the private

9   and state actors involved, "'[o]nly by sifting facts and weighing circumstances' can [the court]

10  hope to ferret out obvious as well as non-obvious State involvement in private conduct."

11  *Brunette*, 708 F.2d at 1209 (citations omitted). Although many of the material facts are

12  undisputed, one issue remains which, if the Court is not persuaded that *sua sponte* summary

13  judgment for the Starks on "state action" is appropriate, precludes a ruling on summary

14  judgment against them.

15         Defendants offer the conclusory allegation that the "PSA . . . does not profit – directly

16  or indirectly – from the pat-down inspections." Seahawks' Defendants' Motion at p. 3; PSA

17  Motion at p. 4. Conversely, the Starks have presented evidence that PSA reserved the right to

18  profit from FGI's operation of Qwest Field and Event Center and that the State obtained an

19  ownership interest in the Seahawks allowing the state to profit in the event the Seahawks are

20  sold within 25 years of the issuance of the construction bonds. Defendants' conclusory, self-

21  serving and unsupported statements regarding the PSA's lack of profit should not be merited,

22  and should not preclude a *sua sponte* grant of summary judgment to the Starks on the "state

23  action" issue. At the very least, though, the Starks have raised a genuine issue of material fact

24  that <u>does</u> preclude summary judgment in Defendants' favor.

25         2.      PSA has Delegated an Exclusively Public Function to FGI.

PLAINTIFFS' CONSOLIDATED RESPONSE TO    CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -22-

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX. (206) 623-8717

1    The warrantless, suspicionless pat-downs conducted by FGI may also be attributed to

2  "state action" if PSA has delegated its authority to provide a "public function" to FGI. Here, it

3  is clear that PSA has in fact delegated a public function: in fact, it has delegated nearly its

4  entire public function to FGI. Under these circumstances, FGI's actions are fairly attributable

5  to state action, and therefore are subject to constitutional protections and § 1983 liability.

6    In *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002), plaintiffs sued under 42 U.S.C. §1983,

7  alleging abridgments to their free speech rights. Plaintiffs, self-described 'street preachers,'

8  had been excluded from the Rose Quarter Commons, an outdoor area next to public facilities

9  owned by the City of Portland and leased to the Oregon Arena Corporation ("OAC"), a private

10  entity, along with other facilities including the Rose Garden Arena and Memorial Coliseum

11  and adjacent parking structures. *Id.* at 551-52. The OAC instituted a policy limiting the areas

12  in which public speech could occur to three areas approximately 10 x 10 feet in size. *Id.* at

13  553. It developed these policies "independent of the City of Portland or any other public entity

14  . . . [and] did not solicit any governmental comment or approval." *Id.* It enforced its policies

15  with private, in-house and contracted security personnel. *Id.*

16    The court examined plaintiff's claim that the OAC is a state actor for § 1983 purposes

17  under the "public function test," noting that "when private individuals or groups are endowed

18  by the State with powers or functions governmental in nature, they become agencies or

19  instrumentalities of the State and subject to its constitutional limitations." *Id.* at 554 – 55

20  (citation omitted). The court found that the OAC's regulation of speech on the Commons was

21  a public function, noting that "[where] facilities are built and operated primarily to benefit the

22  public . . . their operation is essentially a public function . . . subject to state regulation." *Id.* at

23  555 (citing *Marsh v. Alabama*, 326 U.S. 501, 506, 66 S.Ct. 276, 90 L.Ed.2d 265 (1946)).[30]

24

---

25  [30] The court also relied upon *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). In *Evans*, the issue was whether the transfer of a park from public control to nominally private control shielded a "whites-only" policy from constitutional scrutiny because the private trustees were not performing a public function. The court

PLAINTIFFS' CONSOLIDATED RESPONSE TO    CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -23-

LAW OFFICES
DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700    FAX. (206) 623-8717

1  Qwest Field and the Event Center were built and operated – using public funds –

2  primarily to benefit the public.  Indeed, the expenditure of public funds requires the existence

3  of a public purpose.  In *Clean v. Washington*, 130 Wn.2d 782, 792-3 (1996), the court

4  considered whether taxes levied for the purpose of constructing the professional baseball

5  stadium in Seattle were constitutional.  The court observed that "[p]ublic expenditures must . . .

6  further public purposes" and indicated that "[w]here it is debatable as to whether or not

7  expenditure is for a public purpose, we will defer to the judgment of the legislature." *Id.* at

8  792-3.  "An expenditure is for a public purpose when it confers a benefit of reasonably general

9  character to a significant part of the public." *Id.* at 793 (citation and quotation marks omitted).

10  After looking at the circumstances and noting the "overwhelming majority" position on the

11  issue, concluded that the stadium construction did confer a public benefit and upheld the tax.

12  Here, there is little question regarding the public purpose of the stadium – the

13  legislature made that public purpose amply clear.  The Stadium Act is replete with examples of

14  the numerous public benefits that were required as a condition to the stadium funding.  PSA

15  was formed for the sole purpose of constructing, operating and maintaining the stadium and

16  related facilities.  It is a single function public entity, and that function is the stadium.  By

17  delegating its authority over Qwest Field and Event Center PSA cloaked FGI with its authority

18  and conferred upon it the "governmental" responsibility of managing a publicly-owned facility

19  developed for the purpose of providing public benefits.

## IV. CONCLUSION

21  For the foregoing reasons, Defendants' motions for summary judgment must be denied.

22  ///

23  ///

examined the history and use of the park and concluded that it was "a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law." *Id.* at 486.

PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT -24-    CV 06-1719 JLR    LAW OFFICES DANIELSON HARRIGAN LEYH & TOLLEFSON LLP 999 THIRD AVENUE, SUITE 4400 SEATTLE, WASHINGTON 98104 TEL. (206) 623-1700  FAX. (206) 623-8717

1

2     Dated this ____ day of May, 2007.

3                  DANIELSON HARRIGAN LEYH & TOLLEFSON LLP

4

5             By _____

6                   Christopher T. Wion, WSBA #33207

                   Garth Wojtanowicz, WSBA #30822

7            Attorneys for Plaintiffs, Fred and Kathleen Stark

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' CONSOLIDATED RESPONSE TO     CV 06-1719 JLR
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -25-

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717

1

2

3

| I declare under penalty of perjury of the laws of the State of Washington that on May 8, 2007, I caused to be served a copy of this document upon the following: | |
|---|---|
| Tim J. Filer / Jeffrey Miller<br>Foster Pepper LLC<br>1111 Third Ave., Suite 3400<br>Seattle, WA  98101-3299 | [ ] Legal Messenger<br>[ ] By Mail<br>[ ] By Facsimile<br>    (206) 447-9700<br>[X] By E-Mail<br>FileT@Foster.com<br>MILJE@Foster.com<br>howej@foster.com |
| Stephen T. Janik / John Dunbar<br>Ball Janik LLP<br>One Main Place<br>101 SW Main St, Suite 1100<br>Portland, OR  97204 | [ ] Legal Messenger<br>[ ] By Mail<br>[ ] By Facsimile<br>    (503) 295-1058<br>[X] By E-Mail<br>sjanik@balljanik.com<br>jdunbar@bjllp.com<br>ismith@bjllp.com<br>lpjordan@balljanik.com |
| Paul A. Ainsworth<br>Gregg H. Levy<br>Covington & Burling LLP<br>1201 Pennsylvania Ave., NW<br>Washington, DC  20004-2401 | [ ] Legal Messenger<br>[ ] By Mail<br>[ ] By Facsimile<br>    (202) 662-6291<br>[X] By E-Mail<br>painsworth@cov.com<br>glevy@cov.com |

D. Yvette Chambers

PLAINTIFFS' CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT -26-

CV 06-1719 JLR

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700   FAX. (206) 623-8717