# EXHIBIT 1

Dockets.Justia.com

Page 1

1                  IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF WASHINGTON

3                            AT SEATTLE

4      _____

5    FRED and KATHLEEN STARK, a          )
     married couple,                     )
6                                        )
                    Plaintiffs,          )
7                                        )
                    vs.                  )   No. CV 06-1719JLR
8                                        )
     THE SEATTLE SEAHAWKS, FOOTBALL      )
9    NORTHWEST, LLC, a Washington        )
     limited liability company,         )
10   FIRST & GOAL, INC., a Washington )
     corporation, THE WASHINGTON         )
11   STATE PUBLIC STADIUM AUTHORITY,     )
     a Washington municipal             )
12   corporation, and LORRAINE HINE,     )
     in her capacity as chair of the    )
13   Washington State Public             )
     Stadium Authority board of          )
14   directors,                          )
                                         )
15                  Defendants.          )

16   _____

               Deposition Upon Oral Examination
17
                             Of
18
                   ANN KAWASAKI ROMERO
19   _____
20
              Taken at 999 Third Avenue, Suite 4400
21
                    Seattle, Washington
22

23

24   DATE:  Wednesday, April 25, 2007

25   REPORTED BY:  Mindy L. Suurs, CSR

Page 2

```
 1                    A P P E A R A N C E S
 2

     For the Plaintiffs:
 3

        CHRISTOPHER T. WION
 4      Danielson Harrigan Leyh & Tollefson
        999 Third Avenue
 5      Suite 4400
        Seattle, Washington 98104
 6
 7

     For PSA and Lorraine Hine:
 8

        JOHN J. DUNBAR
 9      Ball Janik
        One Main Place
10      101 SW Main Street
        Suite 1100
11      Portland, Oregon 97204-3219
12
13   For Football Northwest and First & Goal:
14      PAUL A. AINSWORTH
        Covington & Burling
15      1201 Pennsylvania Avenue NW
        Washington, DC 20004-2401
16
17
18
19
20
21
22
23
24                    --oOo--
25
```

Page 3

```
 1                      I N D E X

 2    EXAMINATION BY                                   PAGE

 3    By Mr. Wojtanowicz                                  4

 4    By Mr. Dunbar                                      60

 5    By Mr. Ainsworth                                   60

 6

 7                    EXHIBIT INDEX

 8    NO.    DESCRIPTION                               PAGE

 9    29     PSA Website                                23

10    30     PSA Website                                31

11    31     PSA Website                                34

12    32     Declaration of Ann Kawasaki Romero         37

13    33     Real Madrid vs. DC United document         44

14    34     September 23, 2004, Board Meeting Minutes  45

15    35     May 23, 2002, Board Meeting Minutes        46

16    36     Mr. Murphy's letter and Ms. Hine's response  47

17    37     September 21, 2005, letter from Sam Hunt to  50
             First & Goal
18
      38     Complaint from Mr. Mapes                   53
19
      39     E-mail string                              55
20

21

22

23

24

25
```

```
 1              Seattle, Washington; Wednesday, April 25, 2007

 2                           11:35 a.m.

 3

 4                           --o0o--

 5

 6    ANN KAWASAKI ROMERO,              deponent herein, having been

 7                                      first duly sworn on oath,

 8                                      was examined and testified

 9                                      as follows:

10

11                     E X A M I N A T I O N

12    BY MR. WOJTANOWICZ:

13         Q.     Okay, Ms. Kawasaki.  We are continuing with

14    your deposition.  We just completed the 30(b)6 deposition,

15    and so now at this point I assume you're comfortable with

16    kind of the ground rules we set out in the previous

17    deposition, and in this instance you are here in response

18    to an individual subpoena and not in your 30(b)6 capacity.

19              Do you understand that?

20         A.     Yes.

21         Q.     And I didn't do this before, and I want to just

22    briefly touch on your work history and your position and

23    what you do at the PSA.

24              So you're the Executive Director of the PSA; is

25    that correct?
```

```
 1   master tenants are required to produce and provide to the

 2   Public Stadium Authority, so I ensure those are received,

 3   and then we review them and we either review them for

 4   comment or we -- for certain plans they require board

 5   approval, so I ensure that the board reviews and approves

 6   those plans where approval is required.

 7        Q.   I believe in the 30(b)6 portion of your

 8   deposition, you described what those plans were, and you

 9   asked if you could see Section 8 of the Master Lease

10   because that would tell you what the plans were; is that

11   correct?

12        A.   Yes.

13        Q.   -- that require board approval.

14        A.   Right, the affordable price report.  I don't

15   think I mentioned that.

16        Q.   Is it your understanding that the Master Lease

17   Agreement between the PSA and FGI requires FGI to provide

18   certain public benefits as part of its lease obligations?

19        A.   Yes.

20        Q.   And the reports that you were referring to that

21   require approval by the PSA board -- do those reports

22   relate to the public benefits -- do some of those reports

23   relate to the public benefits that FGI is required to

24   provide?

25                MR. DUNBAR:  Objection, vague.
```

1          Go ahead.

2               THE WITNESS:  Yes.

3    BY MR. WOJTANOWICZ:

4       Q.   So let's go through -- and those are -- looking

5    at Section 8 of the Master Lease Agreement, you mentioned

6    affordable price seats.  Section 8.12 deals with affordable

7    price seats.  Can you describe for me what the reports

8    entail that relate to affordable price seats from FGI?

9       A.   Oh, it's just a single-page document that

10   reflects tickets that were sold during the applicable

11   period and demonstrates that it meets the criteria that's

12   established in the Master Lease, the language of which

13   parallels the requirement in the statute to provide at

14   least 10 percent of spectator seats in the stadium for sale

15   at an affordable price.  And there's a definition of

16   "affordable" in here.

17      Q.   And as part of your job, you review those reports

18   and determine whether FGI is in compliance with their

19   obligation to provide affordable price seats?

20      A.   Yes.

21      Q.   Has FGI met its obligations?

22              MR. DUNBAR:  Objection, legal conclusion.

23   If you're asking questions about the Master Lease, I'd ask

24   for the same courtesy as with respect to the 30(b)6

25   deposition -- that any questions calling for a legal

1    conclusion, we'll phrase them as understanding, and if you

2    don't, that's what you're asking for, whether you say it or

3    not.  Agreed?

4                    MR. WOJTANOWICZ:  Sure.  That's agreed.  And

5    let me rephrase that question.

6         Q.   Based on your reviews, have you ever found or

7    recommended to the PSA board that FGI was not meeting its

8    obligation to provide affordable price seats?

9         A.   FGI has complied with this term and condition in

10   the Master Lease.

11        Q.   And turning to Section 8.1.3 of the Master Lease,

12   that refers to a suite lottery.  Does FGI also provide

13   reports on whether it's providing a suite lottery?

14        A.   No, we just verify verbally.

15        Q.   And can you describe for me your understanding of

16   what the suite lottery obligation is?

17        A.   It's a ticket upgrade for people who purchase

18   tickets, whether they be season tickets or individual

19   tickets, to a game, and it gives them the opportunity to

20   receive tickets to the suite, and they are able to see the

21   Seahawks game from the suite, and I believe they're

22   provided with refreshments when they're in the suite as

23   well as, I believe, a parking pass.

24        Q.   Do you have an understanding of what the purpose

25   of this provision is?

1      A.    I don't have an understanding what the purpose of

2      the provision is.  It's a provision that's included in the

3      statute.

4      Q.    And you monitor compliance with this provision as

5      well?

6      A.    Yes.

7      Q.    Have you ever found that the Seahawks were not

8      providing this benefit?

9      A.    No.

10     Q.    In Section 8.4, it refers to a lottery

11     promotion.  Do you also monitor compliance with the lottery

12     promotion portion of this contract?

13     A.    We monitor compliance to the extent that we

14     verify or confirm that, in fact, the lottery is receiving

15     in kind advertising or whatever's required.  We do not --

16     the lottery has a contract with the Seattle Seahawks, so we

17     don't monitor that contract; we just verify that, in fact,

18     they have such a contract and the value appears to be

19     appropriate relative to the requirements of this lease.

20     Q.    What types of advertising does FGI provide to the

21     Washington State Lottery?

22     A.    I don't know.

23     Q.    Do you know whether these are advertisements

24     within the facilities or are they external advertisements?

25     A.    I believe at least some of them are internal to

1    the facility, but I can't -- I don't know what the full

2    package includes.

3        Q.    And Section 8.6 refers to women and minority

4    business enterprise goals.  Can you describe for me what

5    your understanding is of the women and minority business

6    enterprise requirements in the Master Lease?

7        A.    That FGI is supposed to or will comply with

8    applicable MBE and WBE goals established by King County in

9    connection with their operation of the premises.

10        Q.    And by "MBE" you mean minority enterprise or

11    business --

12        A.    Minority business enterprise and women business

13    enterprise.

14        Q.    Okay, thank you.  And does FGI issue reports to

15    the PSA on its level of usage of women and minority

16    business enterprises?

17        A.    Yes.

18        Q.    And other than those reports, do you do anything

19    else to verify the compliance with the women and minority

20    business enterprise goals?

21        A.    No.

22        Q.    Have you ever found or recommended to the PSA

23    that FGI was not meeting its goals for using women and

24    minority businesses?

25        A.    Well, you'll see in Line 25 that they show "Use

Page 15

1    reasonable efforts to cause MBEs and WBEs to be utilized in

2    the operation of the project."  It doesn't require that

3    they achieve the goals.

4         Q.    What, if anything, do you do to determine if

5    they're using reasonable efforts?

6         A.    Inquire.  If I have a question about what they're

7    doing, then I will ask them what they have done to -- what

8    reasonable efforts they have used to try to secure MBE and

9    WBE participation.

10        Q.    And Section 8.7 refers to hiring local

11   residents.  Do you monitor compliance with the -- or do you

12   monitor the extent of FGI's use of or hiring of local

13   residents?

14        A.    This -- they report on this as part of the public

15   benefits report.

16        Q.    And what's your understanding of the

17   requirements, if any, on FGI to hire local residents?

18        A.    I believe they're just -- it's best efforts.

19        Q.    Best efforts to hire as many local residents as

20   feasible?

21        A.    Well, it says:  "To the extent feasible."

22        Q.    Now --

23        A.    "Should give preference in hiring."

24        Q.    You referred to a public benefits reporting

25   plan.  Can you describe what that is for me?

1      A.   It's a report that essentially reports on the

2   majority of the items reflected in Section 8 of the Master

3   Lease.  It provides a report -- it's -- there's two parts

4   to it:  The report section of the document discusses what

5   they have done over the course of the previous year or the

6   current year, and then the plan portion of the document

7   talks about what they will do in the upcoming year.  It

8   doesn't include all of these areas, however, because, as I

9   mentioned, the affordable price seats report is a separate

10  document.  It will reference the fact that they have

11  submitted this document.

12      Q.   And this reporting plan -- is this a policy of

13  PSA, or is this a policy of FGI's?

14              MR. DUNBAR:  Objection, vague.

15              THE WITNESS:  The approach of providing a

16  report and a plan, I believe -- I'm just trying to remember

17  how this -- it satisfies, I believe, a requirement that

18  they are supposed to -- I think -- let me think about

19  this.  Okay.  Section 8.882, 8.8.2:  "Within 30 days prior

20  to each lease year FGI shall submit to PSA for its review

21  and comments a proposed stadium mitigation report and

22  plan."  That's what the public benefits report and plan is.

23      Q.   To be clear, 8.8.2 relates to mitigation of

24  impacts from stadium operations; is that correct?

25      A.   It includes mitigation of impact from stadium

1    operations as well as reporting on specific requirements in

2    the Public Benefits section of this Master Lease Agreement.

3         Q.    And the purpose of those reports is to allow you

4    to determine whether FGI's providing the public benefits

5    that are required of it in the Master Lease; right?

6                   MR. DUNBAR:   Objection, foundation, calls

7    for a legal conclusion.

8                   THE WITNESS:   The purpose of the report is

9    to -- is to allow us to -- or is to help us evaluate

10   whether they are complying with the terms and conditions of

11   the Master Lease or public benefits to be derived from the

12   project.

13   BY MR. WOJTANOWICZ:

14        Q.    And how is this report delivered to the PSA or to

15   you?

16        A.    Hand delivered.

17        Q.    And it's a written report?

18        A.    Yes.

19        Q.    And you review that report as part of your

20   general review of contract compliance; is that correct?

21        A.    Yes.

22        Q.    Do you use that report in determining whether

23   they're complying with the provisions of Section 8 of the

24   Master Lease Agreement?

25        A.    Yes.

1        Q.    And in using that report and reviewing Section 8,

2    you're attempting to determine whether they're providing

3    the public benefits required from them under the statute in

4    the contract; right?

5        A.    We're attempting to do that, yes.

6                        (Luncheon recess taken.)

7

8    BY MR. WOJTANOWICZ:

9        Q.    Before we took the break for lunch, we were

10   talking about Section 8 of the Master Lease, and we were

11   going through the various benefits that are -- that FGI --

12   that the contract indicates FGI is to provide to the public

13   as part of the contract, and so I believe we left off after

14   8.7, and I want to talk to you about Section 8.8.

15            Is it your understanding that FGI is required

16   under the contract to attempt to minimize the impacts from

17   the operations of Qwest Field on the surrounding

18   neighborhoods and on traffic?

19       A.    I understand that they're supposed to work to try

20   to mitigate the impacts.

21       Q.    I think you indicated that they issue a report on

22   their mitigation efforts to the PSA; is that correct?

23       A.    Yes.

24       Q.    And does the PSA have input on the mitigation

25   efforts that FGI makes in order to attempt to mitigate the

1    impacts of the stadium operations?

2        A.    The PSA approved the mitigation plan for

3    construction only.

4        Q.    What about mitigation efforts that relate to

5    ongoing events at Qwest Field?

6        A.    That's the operator's responsibility.

7        Q.    So does the PSA review FGI's continuing efforts

8    to mitigate impacts from stadium operations?

9        A.    The PSA, I don't believe, is aware of everything

10   that FGI might be doing to mitigate any adverse impacts on

11   the affected areas.

12       Q.    So have you reviewed the mitigation reports that

13   FGI has provided?

14       A.    Yes, I reviewed them.

15       Q.    What's contained in those reports?

16       A.    Well, besides the reports or references -- the

17   reports we discussed previously, they do discuss mitigation

18   measures that are required under the master use permit,

19   they talk about or they include information about community

20   forums that they hold, community partnership forum, other

21   things that they may be doing in the community.

22       Q.    And moving on to Section 8.11, is it your

23   understanding that the Master Lease requires FGI to provide

24   office space for PSA?

25       A.    Yes.

1      Q.    It's also your understanding, isn't it, that the

2   reasonable operating expenses of the PSA are to be paid by

3   FGI if they exceed the $850,000 annual rent?

4      A.    Yes.

5      Q.    So is it true that all of the expenses of PSA are

6   covered by rent payments and by these -- by the provision

7   of office space from FGI?

8      A.    All of the PSA's operating expenses?  Is that

9   your question?

10      Q.    Yes.

11      A.    All of the PSA's operating expenses are paid for

12   through rent, interest income we receive on our account.

13   Those are the primary sources of revenue for us.

14      Q.    And in Section 8.13, which relates to the

15   protection of tax exempt bonds, do you have an

16   understanding of what this provision relates to?

17      A.    I believe that's a provision that just requires

18   them or asks them to preserve the tax except nature of the

19   bonds, not to do anything that would compromise that.  I

20   don't know what that would be.

21      Q.    Another one of the benefits listed in

22   Section 8.15 -- in Section 8 is in Section 8.15, which

23   indicates:  "Compliance With Laws:  No Discrimination."

24           Is it your understanding that one of the benefits

25   FGI is supposed to provide is that it shall comply with

1    laws, including laws with respect to discrimination?

2                    MR. AINSWORTH:  Objection, mischaracterizes

3    the document.

4                    MR. DUNBAR:  Object to the form of the

5    question.

6                    THE WITNESS:  Can you repeat the question?

7    BY MR. WOJTANOWICZ:

8        Q.    Is it your understanding that FGI is required

9    under the Master Lease to comply with all applicable laws,

10   including laws against discrimination?

11       A.    Yes.

12       Q.    And it's also your understanding that FGI is to

13   include that covenant that that agreement to comply with

14   all applicable laws, including laws with respect to

15   discrimination -- FGI is required to include those in its

16   subcontracts; correct?

17       A.    Yes.

18       Q.    And all of these items listed in Section 8.13

19   are -- actually, let me back up a second.  You've been with

20   the PSA since its inception, I believe you testified;

21   right?

22       A.    Yes.

23       Q.    And you are also involved --

24       A.    Well, I shouldn't say yes.  Since almost their

25   inception.  They actually existed for a while without

Page 22

1    staff.

2        Q.    And your position prior to when you began working

3    for the PSA, you were involved in the organization that led

4    to the creation of the stadium and the PSA; is that

5    correct?

6        A.    I was with the organization that led to the

7    creation of the stadium?  No.

8                MR. DUNBAR:  Object to the form of the

9    question.

10   BY MR. WOJTANOWICZ:

11       Q.    The Public Facilities District.  Did you work

12   with the Public Facilities District -- did that relate

13   to --

14       A.    Baseball.

15       Q.    Oh, that related to baseball, the baseball

16   stadium.  Okay, I apologize.  Were you involved at all in

17   the negotiation or creation of the Master Lease Agreement?

18       A.    I was involved in the development of the Master

19   Lease Agreement, but I did not negotiate the Master Lease

20   Agreement.

21       Q.    What was your involvement in the creation of the

22   Master Lease?

23       A.    I would advise or review and advise the Executive

24   Director, who was part of the negotiating team.

25       Q.    Now, the Section 8 of the Master Lease Agreement

1    requires FGI to provide a number of benefits to the public;

2    is that correct?

3              MR. DUNBAR:  Objection.

4              MR. AINSWORTH:  Objection, mischaracterizes

5    the document.

6              MR. DUNBAR:  Object to the form of the

7    question.

8              THE WITNESS:  Yes.

9    BY MR. WOJTANOWICZ:

10       Q.    And is it your understanding that part of the

11    mission of the PSA is to ensure that the stadium and the

12    operation of the stadium provides benefits to the public?

13       A.    It's my belief that the PSA is -- yes, part of

14    their responsibility is to ensure that public benefits are

15    derived from the stadium pursuant to the Stadium Act.

16       Q.    And as Executive Director of the PSA, do you have

17    any responsibility over the content of web pages of the

18    PSA's website?

19       A.    Well, I'm ultimately -- I have ultimate

20    responsibility.

21       Q.    And have you reviewed the PSA's website, or did

22    you review it prior to the time it was posted?

23       A.    I reviewed it many years ago.

24                        (Exhibit No. 29 marked for

25                         identification.)

Page 24

1   BY MR. WOJTANOWICZ:

2        Q.   I'm showing you what's been marked as Exhibit

3   No. 29, and I'll represent to you that this is -- these are

4   screen shots of web pages found at the PSA's website.  Do

5   you recognize this as part of the PSA's website?

6        A.   Yes.

7        Q.   On the front of Exhibit 29 under the heading

8   "Public Benefits," it says that:  "Qwest Field and Event

9   Center offers more to Washington citizens than just a

10  state-of-the-art venue.  Read our public benefits section

11  to learn more about how public and private interests to

12  worked together to make our facility a sound investment in

13  Washington's future."

14            And it's your understanding that the PSA and --

15  or is it your understanding that the PSA and FGI worked

16  together to provide benefits to the public?

17                 MR. DUNBAR:  Object to the form of the

18  question.

19                 THE WITNESS:  Well, I believe that the

20  private parties are responsible for providing these public

21  benefits and we're responsible for ensuring that that

22  happens, so I guess we are working together in that regard.

23  BY MR. WOJTANOWICZ:

24       Q.   And I believe this document appears to list

25  public benefits that are not described in the Master Lease

1    Agreement.  You look like you wanted to add something.

2        A.    I just want to be clear that we're not

3    responsible for implementing these programs.

4        Q.    But you are responsible for overseeing them;

5    correct?

6        A.    We're responsible for monitoring to ensure that

7    they, in fact, are carried out.  We don't implement them.

8        Q.    And it's part of the PSA's mission, is it not, to

9    ensure that these public benefits are actually realized;

10   correct?

11       A.    I'm not sure if it's part of our mission

12   statement or not.  Is that what your question is?  I don't

13   recall what our mission statement says.

14       Q.    Not necessarily part of the mission statement,

15   but is it part of the PSA's function to ensure that these

16   public benefits are realized?

17       A.    Yes.

18       Q.    Another benefit that this document lists -- and

19   unfortunately, these pages are not numbered, but after the

20   section showing various pieces of artwork, there's a page

21   with the heading "Youth Athletic Facilities."  Can you

22   describe for me the benefits provided to the public through

23   the provision of youth athletic facilities?

24       A.    Well, under the statute, Mr. Allen was required

25   to contribute 10,000,000 to that state account, which he

1    did.  So that requirement was fulfilled.

2        Q.   And then on the next page, it says, under the

3    heading "Diversity Program," it said:  "Referendum 48

4    required the stadium and Exhibition Center project to adopt

5    King County's goals for minority and women business

6    enterprise participation."

7            Earlier we were discussing the minority and women

8    business enterprise goals, and so is it your understanding

9    that FGI was required to adopt King County's goals for

10   minority and women business enterprise by the Master Lease?

11            MR. DUNBAR:  Object to the form of the

12   question.

13            THE WITNESS:  It's my understanding that

14   First & Goal is required to agree to King County's goal for

15   minority and women business enterprise participation.

16   BY MR. WOJTANOWICZ:

17       Q.   And turning to the last page of this exhibit,

18   under the heading "Permanent Common School Fund Profit

19   Sharing," it indicates that:  "20 percent of any annual net

20   profits from the Exhibition Center are to be given to --

21   for funding public schools."  Is that your understanding?

22       A.   Yes.

23       Q.   And the document lists an amount of money for

24   each year that were contributed to the Common School Fund.

25   To the best of your knowledge, are these accurate figures?

1      A.    Yes.

2      Q.    Can you describe for me what types of events are

3   held at the Exhibition Center from which the PSA derives

4   income through this profit sharing arrangement?

5      A.    Consumer shows, trade shows, concerts, community

6   events.  Think those are the general categories.

7      Q.    Do you know whether FGI performs pat-down

8   searches of any patrons entering any of those events in the

9   Exhibition Center?

10     A.    I don't know.

11     Q.    Do you know if there's anything or is it your

12  understanding that there's anything in the Master Lease

13  that would prevent FGI from searching individuals entering

14  the Exhibition Center for those events?

15             MR. DUNBAR:  Objection, legal conclusion.

16             THE WITNESS:  Not aware of anything.

17  BY MR. WOJTANOWICZ:

18     Q.    Have you ever taken the position or told FGI that

19  they could not search individuals entering the Exhibition

20  Center?

21     A.    No.

22     Q.    Has anyone, to your knowledge, at the PSA told

23  FGI that they couldn't search patrons entering the

24  Exhibition Center for events?

25     A.    Not to my knowledge.

1   provisions?

2         A.    Right.

3                          (Exhibit No. 30 marked for

4                          identification.)

5   BY MR. WOJTANOWICZ:

6         Q.    You've just been shown what's been marked as

7   Exhibit 30, and again, do you recognize this as part of the

8   PSA website?

9         A.    Yes.

10        Q.    And in this document under the heading "About the

11  PSA," it states that:  "The PSA's mission is to represent

12  the public's interest in owning Qwest Field and Event

13  Center and overseeing First & Goal's operation of the

14  facility for the benefit of all Washington state citizens."

15              Do you agree with that statement?

16        A.    Yes.  I would define operations of the facility

17  as operations as they're defined -- or as we have the

18  authorities in the Master Lease.

19        Q.    And so when it says that the PSA's mission is, in

20  part, overseeing First & Goal's operation of the facility

21  for the benefit of all Washington state citizens, what does

22  the PSA do to meet that mission?

23        A.    Well, again, we monitor compliance with the

24  relevant terms and conditions of the Master Lease,

25  specifically Section 8, Section 11.

1        Q.    Section 8 being the section --

2        A.    Public Benefits.

3        Q.    Public Benefits.  Thank you.  And underneath that

4   paragraph that I just read to you, it says:  "In pursuit of

5   this mission, the PSA will work to ensure that Qwest Field

6   and Event Center," and then there are some bullet points,

7   and one of those is:  "Provides economic and entertainment

8   benefits to residents across the state of Washington."

9             So is it your understanding that one of the

10  purposes of the PSA is to ensure that Qwest Field provides

11  economic benefits to the public?

12       A.    This mission statement was developed by the board

13  in 1997/1998.  At the time it was developed, provides

14  economic and entertainment benefits to the residents across

15  the state of Washington referred to developing or

16  constructing a state-of-the-art facility that would provide

17  those opportunities.

18       Q.    And it also indicates -- one of the bullet points

19  there is that -- it states:  "Serves as a national model

20  for public/private partnerships."

21            Do you agree that one of the goals of the PSA is

22  to ensure that its work with FGI serves as a national model

23  for public/private partnerships?

24                 MR. AINSWORTH:  Objection, mischaracterizes

25  the document, calls for a legal conclusion.

1              MR. DUNBAR:  We've got that agreement what

2      that we adopt; correct?

3              MR. AINSWORTH:  We don't need to separately

4      state our objections?

5              MR. WOJTANOWICZ:  No.

6              MR. DUNBAR:  Go ahead.

7              THE WITNESS:  Again, the mission statement

8      was developed when the PSA was first established.  It

9      serves as a national model for public/private partnerships

10     as it applies here pertaining to the development of or the

11     construction of Qwest Field.

12     BY MR. WOJTANOWICZ:

13         Q.   Did you draft this mission statement?

14         A.   No, I did not.

15         Q.   So you don't actually know what that means?

16         A.   I was there.  I didn't draft it.

17         Q.   So do you disagree with that statement that -- as

18     indicated underneath or next to the last bullet point?

19         A.   I believe that it is accurate as it reflects --

20     as it relates to the public/private partnership for

21     development of the project.  It was called a public/private

22     partnership because the public contributed financially

23     towards the development of the facility, as did the private

24     party.  So that's what government calls those types of

25     deals:  Public/private partnerships.

Page 34

1        Q.    So is it your testimony that that mission --

2        A.    It was achieved.

3        Q.    That's achieved.  You're no longer --

4        A.    That was achieved during the construction.

5        Q.    So the PSA is no longer working to ensure that

6    Qwest Field and Event Center serves as a national model for

7    public/private partnership; is that correct?

8        A.    We're no longer working towards that.  I don't

9    think we're doing anything related to that.

10        Q.    So has this mission statement been amended?

11        A.    No, it hasn't been updated.

12        Q.    Why not?

13        A.    Can't --

14                MR. AINSWORTH:  Objection, argumentative.

15                THE WITNESS:  I don't know.

16                        (Exhibit No. 31 marked for

17                         identification.)

18    BY MR. WOJTANOWICZ:

19        Q.    So you're now being shown Exhibit 31, which is

20    another portion of the PSA's website, and I draw your

21    attention to the second full paragraph under the heading

22    "What is the Washington State Public Stadium Authority and

23    What Does It Do?"  It indicates that:  "With construction

24    complete, the chief role of the PSA is to ensure the

25    public's interests are represented and protected in the

1    facility's operation."

2              Do you agree with that statement?

3         A.   Yes, I do because that statement speaks to the

4    fact that we're responsible for ensuring that the public's

5    asset is maintained.

6         Q.   Other than ensuring that the public's asset is

7    maintained, is it your understanding that the PSA has any

8    other role in obtaining public benefits?

9         A.   We have responsibility to ensure that public

10   benefits required under the statute are derived from the

11   project.

12        Q.   And you said that you referred to the fact that

13   part of the PSA's role is to ensure that the public's asset

14   is protected; correct?

15        A.   Correct.

16        Q.   And by that, you mean that after the term of the

17   agreement, the stadium will revert back to the ownership of

18   the PSA; correct?

19        A.   After the term -- yes, after the term of the

20   agreement or the Master Lease, yes, it reverts.

21        Q.   And during that time, who pays for the

22   maintenance and upkeep of the facility?

23        A.   Annual and routine maintenance is paid for by

24   First & Goal.  Major maintenance and modernization is paid

25   for by naming rights proceeds, which are paid for by public

1    funds.

2         Q.    And can you describe for me how the PSA derives

3    revenue from naming rights for the facilities?

4         A.    Naming rights were sold -- naming rights --

5    proceeds off the sale of the naming rights are provided to

6    us by First & Goal when they receive the payment from Qwest

7    Communications.

8         Q.    And it's true, isn't it, that the value of those

9    naming rights is derived at least in part, because of the

10   Seahawk's use of the facilities for their games; correct?

11        A.    The value of the naming rights is influenced, I'm

12   sure, by the fact that there is a NFL team playing in that

13   venue.

14        Q.    So you'd agree, wouldn't you, that if the

15   Seahawks weren't using the stadium for their games, the

16   naming rights wouldn't be worth as much; right?

17        A.    I believe that's true.

18        Q.    And the proceeds from those naming rights -- PSA

19   uses the proceeds from those naming rights to improve and

20   conduct major improvements to Qwest Field and Exhibition

21   Center; right?

22        A.    PSA uses those proceeds to fund major maintenance

23   and modernization improvements at the facility.  We do not

24   undertake major maintenance and modernization.

25        Q.    Who undertakes that?

1      A.    First & Goal.

2      Q.    So the PSA provides money that it derived from

3  naming rights to First & Goal to conduct those and First &

4  Goal oversees those improvements?

5                MR. DUNBAR:    Object to the form.

6                Go ahead.

7                THE WITNESS:    First & Goal undertakes the

8  improvements, and yes, we fund the improvements.

9                          (Exhibit No. 32 marked for

10                          identification.)

11  BY MR. WOJTANOWICZ:

12      Q.    You're being shown what's been marked as

13  Exhibit 32, and is this the Declaration that you provided

14  in connection with this case?

15      A.    Yes.

16      Q.    Now, I'd like to direct your attention to

17  Paragraph No. 9, and in the middle of that paragraph, it

18  says:  "As a general rule, the rent derived from Qwest

19  Field is entirely unrelated to and does not vary depending

20  on the amount of FGI's revenues or costs from Qwest Field,"

21  and then it goes on to discuss exceptions, and I'd like to

22  discuss those exceptions with you.

23                First it states that:  "Additional rent can be

24  derived from Olympic Games events or World Cup soccer games

25  at the PSA project, which includes Qwest Field."

1    BY MR. WOJTANOWICZ:

2        Q.    But the PSA derives revenue from each and every

3    ticket sold to each and every event?

4        A.    We derive revenue from each ticket sold at the

5    stadium to be used under an agreement to pay back deferred

6    sales tax on the project.

7        Q.    So in order for these events to be held that

8    generate revenue for the PSA, it's fair to say, isn't it,

9    that there have to be security measures at those events;

10   right?

11                MR. AINSWORTH:   Objection.   Calls for

12   speculation, lack of foundation.

13                THE WITNESS:   I suppose it's reasonable to

14   assume that there have to be some security measures if you

15   hold an event, unless it's in your backyard or something.

16   BY MR. WOJTANOWICZ:

17       Q.    And is it your understanding that the NFL

18   requires its teams to conduct upper body pat-down searches

19   of patrons that enter the NFL games?

20       A.    Is it my understanding that the NFL requires

21   their teams to conduct upper body pat-down searches at

22   their games?   Is that your question?

23       Q.    Correct.

24       A.    Yes.

25       Q.    Do you know whether the Seahawks would be

Page 42

1    permitted to decline or permitted to refuse to conduct

2    these pat-down searches and still hold their games?

3                    MR. DUNBAR:  Object to the form.

4                    THE WITNESS:  I do not know.

5    BY MR. WOJTANOWICZ:

6         Q.    As it's stated here:  "The PSA has not profited

7    directly or indirectly from the pat-down inspections or

8    from any other stadium security procedures."  As you sit

9    here right now, do you still believe that statement to be

10   completely accurate?

11                   MR. DUNBAR:  Objection, argumentative.

12                   THE WITNESS:  The admissions surcharge is

13   not collected for our benefit; it's collected to pay the

14   deferred sales tax on the project, so that's the basis upon

15   which this was -- this statement -- that's what this

16   statement reflects.

17   BY MR. WOJTANOWICZ:

18        Q.    Now, the sales tax on the project -- that's an

19   obligation of the PSA; correct?

20                   MR. DUNBAR:  Object to the form of the

21   question.

22                   THE WITNESS:  I'm not sure.  It's a

23   requirement of the project to pay deferred sales tax.  I

24   don't know if it's specifically called for -- the PSA is

25   obligated to pay the deferred sales tax up to a certain

Page 43

1    amount of money and then beyond that, it becomes a First &

2    Goal obligation, so --

3    BY MR. WOJTANOWICZ:

4        Q.    So by collecting this surcharge on every ticket

5    sold for events at the facilities, the PSA is obtaining

6    revenue that allows it to satisfy its obligation to pay

7    deferred sales tax; correct?

8        A.    Yes.

9        Q.    We previously marked Exhibit 27.  I'd like you to

10   turn back to that, please, and I'd just like to briefly go

11   through these numbers and find out for sure what they

12   represent.

13            Next to "Common School Fund," it lists $426,000,

14   to round off.  What do those payments to the Common School

15   Fund  -- from where are those revenues derived?

16       A.    Net profits from the Event Center.

17       Q.    And the admission surcharge which we just

18   discussed produced a little over $2 million in revenue to

19   the PSA from FGI; correct?

20       A.    Yes.

21       Q.    And the naming rights produced approximately $5

22   million in revenue?

23       A.    Approximately.

24       Q.    4.7, to be fair.  I guess it's not as close to

25   five as I was thinking.

Page 47

1    documents.

2        Q.    So was this provided simply in paper form, or was

3    there also some oral presentation or discussion?

4        A.    He reviewed -- he reviewed the outline that he

5    provided.

6        Q.    And the last sentence of that paragraph says

7    that:  "All game day staff will have completed 16 hours of

8    training and background checks prior to the first event."

9            Do you recall any specific discussion with

10   respect to that particular item?

11       A.    I don't recall.

12                           (Exhibit No. 36 marked for

13                            identification.)

14   BY MR. WOJTANOWICZ:

15       Q.    Showing you Exhibit 36.  This is actually a

16   couple of documents put together, and looking at the last

17   page of that exhibit, is that the letter from Mr. Murphy

18   that you referenced earlier?

19       A.    Yes.

20       Q.    And the document in front of that, pages 0489 to

21   90 -- is that the First & Goal response to Mr. Murphy's

22   letter?

23       A.    Yes.

24       Q.    And I believe you indicated that you drafted the

25   letter that is on the first page of this exhibit with

## <u>CERTIFICATE</u>

THE STATE OF WASHINGTON        )
                               )
COUNTY OF KING                 )


I, the undersigned officer of the Court under my commission as a

Notary Public in and for the State of Washington, hereby certify that

the foregoing deposition upon oral examination of the witness named

herein was taken stenographically before me and thereafter

processed under my direction;

That the witness before examination was first duly sworn by me to

testify truthfully; that the transcript of the deposition is a full, true and

correct transcript of the testimony; That I am neither attorney for nor a

relative or employee of any of the parties to this action; further, that I

am not a relative or employee of any attorney or counsel employed by

the parties hereto, nor financially interested in its outcome.


IN WITNESS WHEREOF, I have hereunto set my hand and

seal this _2nd_ day of _May_ _____ 2007



MINDY L. SUURS
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
OCTOBER 3, 2010

_Mindy L. Suurs_

NOTARY PUBLIC in and for the
State of Washington residing at

_Bellevue_