# EXHIBIT 5

Dockets.Justia.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FRED and KATHLEEN STARK, a      )
married couple,                 )
                                )
            Plaintiffs,         )
                                )
      vs.                       )  No. CV 06-1719 JLR
                                )
THE SEATTLE SEAHAWKS, FOOTBALL  )
NORTHWEST LLC., a Washington    )
limited liability company; FIRST )
& GOAL, INC., a Washington      )
corporation; THE WASHINGTON STATE)
PUBLIC STADIUM AUTHORITY, a     )
municipal corporation; and      )
LORRAINE HINE, in her capacity as)
chair of the WASHINGTON STATE   )
PUBLIC STADIUM AUTHORITY        )
Board of Directors.             )
                                )
            Defendants.         )

DEPOSITION UPON ORAL EXAMINATION

OF

MARTHA FULLER

Taken at 999 Third Avenue, Suite 4400

Seattle, Washington

DATE TAKEN:  April 30, 2007

REPORTED BY:  CINDY K. YOUNG  CCR

Page 7

1    the sale, management and/or control of seat licenses in

2    Quest Field.  So I take it you are familiar now with the

3    charter seat license at Quest Field?

4        A.   Yes, I am.

5        Q.   What is a charter seat license?

6        A.   A charter seat license is basically the right to

7    purchase a particular seat at the stadium.  Most seats are

8    either available on a single game or a season ticket basis

9    but a certain section of those seats, charter seats require

10   the special license to hold them.

11       Q.   So it's a right to buy tickets for the specific

12   seat year after year?

13       A.   Correct.

14       Q.   And are you familiar with the charter seat license

15   agreements?

16       A.   Yes, I am.

17       Q.   What is the relationship between the Public

18   Stadium Authority and FGI with respect to those seat license

19   agreements?

20            MR. FILER:  Object to the question to the

21   extent that it calls for a legal conclusion.  You can

22   testify to what you know.

23       A.   First & Goal acts as sales agent for the PSA with

24   respect to selling those charter seat licenses.

25       Q.   And so then does FGI collect the money that the

1    fan pays for these license agreements?

2         A.    FGI bills the customer and when the funds are

3    received they are deposited directly into the PSA account.

4         Q.    And that's the full amount that gets deposited

5    with the PSA?

6         A.    I believe so.

7         Q.    And just to back up briefly, you are the CFO of

8    FGI; is that correct?

9         A.    I am.

10        Q.    And how long have you been in that position?

11        A.    Since July of 2004.

12        Q.    And prior to that where were you?

13        A.    I was director of planning and economic

14   development for the City of St. Paul, Minnesota.

15        Q.    Okay.  I'd like to hand you a document that's

16   previously been marked as Exhibit 43.  It is a Seattle

17   Seahawks Charter Seat License Agreement between FGI as agent

18   for PSA and Kathleen Stark, one of the plaintiffs.

19             MR. WION:  And Paul and John this is if I

20   didn't mention it Exhibit 43.  I think you have that

21   already.

22        Q.    So there is a figure here about halfway down,

23   $3,400.  So if I understand correctly $3,400 that was paid

24   by the Starks would have been remitted directly to the PSA;

25   is that correct?

1      A.    Correct.

2      Q.    Okay.  And you'll see at the bottom that this is

3   signed by Kathleen Stark.  Do you have any facts indicating

4   that the Starks received anything other than this page?

5      A.    No.

6      Q.    Another topic that you have been asked to speak

7   about today on FGI's behalf is, quote, "FGI's participation

8   in the meetings of the board of directors of PSA, including

9   but not limited to reports given to the board of directors

10   of the PSA regarding the operation or management of the

11   facility."

12            So FGI provides reports to the PSA regarding

13   its operations at the stadium?

14      A.    FGI provides certain reports to the PSA that are

15   set forth in the master lease.  They primarily relate to

16   public benefits and to maintenance and modernization

17   activities.

18      Q.    And is this so that the PSA has what it needs to

19   oversee the operations at the facility?

20            MR. FILER:  Object to the form of the

21   question, also to the extent that it calls for a legal

22   conclusion.

23            As long as I'm talking I'm also going to

24   point out the fact that we objected to your designation on

25   this topic and limited the designation of this witness to

1    testimony regarding security at Quest Field.  I don't mind

2    you getting a little bit of background on this which is

3    where I've seen we've been so far but we do want to restrict

4    her testimony to what she is prepared to testify to which is

5    the security part.

6                    MR. WION:  Understood.  The security part

7    falls under the general rubric of the reports given so

8    that's the background that I am interested in.

9                    MR. FILER:  I understand.

10                   MR. WION:  Did we have a response to that

11   last question?

12                              (The previous testimony

13                              was read as requested.)

14                   MR. FILER:  And I will restate my objections

15   to the question.

16       A.   Could you --

17       Q.   Sure.  So the purpose of providing these reports

18   is to assist the PSA with its oversight function?

19       A.   Well, the primary purpose for providing those

20   reports is because the master lease requires us to do so.  I

21   wouldn't disagree with your statement but, you know, at the

22   end of the day we provide them because we are required to.

23       Q.   Have there been specific reports relating to

24   security?

25       A.   The master lease does not call for any reports

Page 15

1                        (Exhibit No. 58 was marked

2                           for identification.)

3                MR. WION:  We can go back on the record.

4        Q.    You've just been handed a document that's been

5   marked as Exhibit 58.  This is the Washington State Public

6   Stadium Authority Board Meeting Minutes from May 23, 2002.

7   And if I can direct your attention to the second page,

8   paragraph C, it says Stadium Operations Update, quote, "Jeff

9   Klein, facilities manager at First & Goal, Inc. provided the

10  operations plan for Seahawks Stadium.  The plan includes

11  policies and procedures, recruitment and hiring, security

12  and event day operations."

13                Have you reviewed the operations plan?

14       A.    I can't say that I have reviewed that particular

15  operations plan.  That predated me by a couple of years.

16       Q.    Okay.  And is an operations plan developed

17  annually or updated annually?

18       A.    No.

19       Q.    Have you seen the most recent operations plan?

20       A.    Yes.

21       Q.    And does that include a section regarding

22  security?

23       A.    Yes.

24       Q.    At this meeting on May 23rd, 2002, did FGI

25  elaborate on the security issue referenced here in any way?

1      A.    I was not at that meeting so I'm not -- I can't

2  say from personal knowledge that they did.  It does not

3  appear that they did from the minutes.

4      Q.    In anticipation of your deposition today can you

5  tell me how you prepared?

6      A.    I reviewed minutes of the PSA board meeting,

7  looked at -- reviewed the master lease, and I looked at most

8  recent copies of reports that we have provided to the PSA

9  again in the public benefits, maintenance, modernization

10  area.

11     Q.    So you didn't speak with anybody at FGI to learn

12  the substance of a report that was given to the PSA?

13     A.    Can I ask you a question?  Are you referencing

14  this particular plan?

15     Q.    At the moment.

16     A.    No, I did not.

17     Q.    So you don't know what was said at that meeting

18  regarding security operations at Quest Field?

19     A.    That's correct, I do not.

20                          (Exhibit No. 59 was marked

21                           for identification.)

22     Q.    Ms. Fuller, you've just been handed what's been

23  marked as Exhibit 59 and these are the board meeting minutes

24  from September 23rd, 2004.  And I apologize was this before

25  or after you joined FGI?

1       A.    After.

2       Q.    Have you reviewed these board meeting minutes?

3       A.    I have.

4       Q.    I'll direct your attention to page 2 and there is

5    a heading in bold Facility Operations Oversight.  Paragraph

6    one relates to the Seattle Monorail Project Update.  The

7    second sentence is, "At the July meeting, the board

8    expressed their preference to maintain a 100 foot clearance

9    from the building for security reasons."

10             Did FGI provide the board with information

11   regarding the need for 100 foot clearance from the building

12   for security reasons?

13      A.    I believe we discussed that with the PSA board,

14   yes.

15      Q.    When would that have been?

16      A.    Sometime prior to this meeting.  Sometime in the

17   summer of 2004 I would assume.

18      Q.    And would that discussion have been noted in the

19   meeting minutes?

20      A.    No.  And I'd like to clarify one thing.  The

21   discussion that we had regarding the monorail and its

22   configuration and the distance that it was proposed to be

23   from our facility, that discussion was primarily with PSA

24   staff Ann Kawasaki and Steve Woo outside of the board

25   meeting.

1      Q.   And I'm sorry, at FGI who would have been involved

2  in those discussions on behalf of FGI?

3      A.   Jeff Klein, myself probably -- I'm sorry, Jeff

4  Klein and myself.  There may have been others but the two of

5  us for sure.

6      Q.   And how frequently were those non board meeting

7  discussions, how often did they take place?

8      A.   I'm not sure the total number of such discussions.

9  My recollection is there were probably two or three such

10  discussions over a period of several weeks.

11      Q.   And other than this 100 foot clearance issue what

12  other security issues were discussed at those meetings?

13      A.   Our focus was exclusively on the monorail

14  configuration and the distance that the track was proposed

15  to come from the building, so no other security aspects.

16      Q.   I think you referenced earlier discussions at the

17  board meetings regarding tailgating policies?

18      A.   I did.

19      Q.   Can you describe what the issue was with the

20  tailgating policies?

21      A.   Yes.  The board had received comment, a question I

22  guess from a member of the public regarding our tailgating

23  -- regarding tailgating in the North Lot.

24            And we also -- independently First & Goal had

25  been engaged in some discussions with representatives from

1    neighbors in the residential development across Occidental

2    Avenue from the North Lot.

3        Q.    And specifically a complaint?

4        A.    A complaint regarding cleanup after the game, you

5    know, debris, refuse left out in the street, left in the

6    lot.

7        Q.    Do you recall a report to the board of the PSA

8    regarding FGI's issuance of an RFP for a new security

9    contract in May of 2006?

10       A.    I don't recall a report to the board regarding

11   that.  I recall issuing an RFP but not reporting on that to

12   the board.

13                          (Exhibit No. 60 was marked

14                           for identification.)

15       Q.    You've just been handed what's been marked as

16   Exhibit 60.  These are the board meeting minutes of the PSA

17   from May 25th, 2006.  Have you reviewed this document prior

18   to today?

19       A.    No, actually I have not.

20       Q.    On the fourth page at the very top there is a

21   reference to the general manager's report and there are a

22   number of bullet points.  And the sixth bullet point states,

23   quote, "FGI will be issuing an RFP for a security contract.

24   The current contract with CSC expires in June."

25                          Does this refresh your recollection of what

1   was discussed at this meeting regarding the RFP for a

2   security contract?

3        A.   It does.  Thank you.

4        Q.   And can you tell me what was discussed at this

5   meeting regarding this issue?

6        A.   I believe we simply included this in the general

7   manager's report to let them know that we would be issuing

8   an RFP for a security contract.  I don't recall any further

9   discussion or questions about that.

10       Q.   So you don't know if there was a discussion

11   regarding the quality of security provided by CSC?

12       A.   I don't recall any such discussion.

13       Q.   So other than the words that appear, and that I

14   just quoted, you don't have any information about what was

15   reported to the board at this meeting on that issue?

16              MR. FILER:  Mischaracterizes her testimony.

17       A.   I don't recall any subsequent discussion or that

18   any additional information was provided to the board on this

19   particular topic.

20       Q.   Were you at this particular meeting?

21       A.   I was.

22       Q.   Did you speak with anybody -- specifically did you

23   speak with Ms. Susan Darrington in preparation for today's

24   deposition?

25       A.   I did not.

Page 23

1      Q.    Did you speak with anybody else at FGI?

2      A.    I spoke with two members of the finance staff, and

3   technically they are actually Seahawks employees not First &

4   Goal employees.

5      Q.    Do you recall their names?

6      A.    I do.  Karen Harrison, our director of finance,

7   and Patrick McClusky, business manager.

8      Q.    They didn't have any information regarding

9   security reports to the PSA?

10     A.    They did not.  They are finance staff.  That

11  wouldn't be their area.

12     Q.    Another topic that you have been asked to speak

13  about on behalf of FGI today is the imposition of any

14  surcharges on admission tickets by the PSA and the payments

15  of revenues from any such surcharges to the PSA.

16            There is a ticket surcharge in the amount of

17  1.2 percent for all ticket sales at Quest Field; is that

18  correct?

19     A.    That's correct.

20     Q.    And that's Seahawks games, Sounders games,

21  concerts, motocross events, across the board, correct?

22     A.    That's correct.

23     Q.    And is there also a surcharge for events held at

24  the Exhibition Center?  Let me restate that.

25            When tickets are sold for events at the

1    Exhibition Center is there a surcharge on those tickets?

2         A.    I don't know.  That's a good question.  I don't

3    know.

4         Q.    And this surcharge is remitted to the PSA,

5    correct?

6         A.    That is correct.  It's -- it's remitted to the --

7    basically it's a joint remittance to the state treasurer and

8    the PSA.

9         Q.    And is that done on a game-by-game basis?

10        A.    I believe it's done -- I don't believe it's done

11   event-by-event.  I believe it's done monthly, periodically.

12        Q.    Okay.  And surcharges are to pay off the deferred

13   sales tax; is that correct?

14        A.    That's correct.

15        Q.    Is the deferred sales tax paid off solely with

16   these surcharges?

17             MR. DUNBAR:  I'm sorry, Chris.  I couldn't

18   hear that question.  This is John Dunbar.

19             MR. WION:  Do you want to read back the

20   question?

21                  (The question was read as

22                   requested.)

23             MR. DUNBAR:  I'm going to object to the form

24   of the question.

25        Q.    You can answer.

1        A.    I believe so.

2        Q.    Do you know when the deferred sales tax is due?

3        A.    I do not.

4        Q.    Do you know what the deferred sales tax funds are?

5        A.    Could you --

6        Q.    Deferred sales tax funds.

7                  MR. FILER:  Just for clarification is that a

8        defined term from someplace?

9                  MR. WION:  It is, yes.

10                 MR. FILER:  What's the source?

11                 MR. WION:  I believe there are two sources,

12       the master lease and a development agreement, that might not

13       be the full name.

14                 MR. AINSWORTH:  You know, since these are

15       lengthy complex documents I will make the same request as I

16       did last week that if you are going to be asking the witness

17       questions about these topics I think it would be helpful to

18       show the document to the witness.

19                 MR. WION:  One of those documents I don't

20       believe has been produced in this litigation.  And right now

21       I'm just trying to determine whether or not the witness has

22       an understanding of what deferred sales tax funds means.

23       A.    I do generally.  I believe -- it's my

24       understanding that the deferred sales tax funds were sales

25       tax -- sales taxes that were not applied, deferred, as part

```
 1    of the original construction --
 2                  I'm sorry.  Let me restate that.  The
 3    deferred sales tax funds relate to sales taxes that would
 4    otherwise have been imposed on construction materials as
 5    part of the original construction of the stadium and the
 6    event center.  Those were not applied and instead the
 7    surcharge then over time essentially makes the state whole
 8    for what it otherwise would have collected if those sales
 9    taxes had been imposed when the building was built.
10                              (Exhibit No. 61 was marked
11                                for identification.)
12        Q.   You've just now been handed what's been marked as
13    Exhibit 61.  And this is the second amendment to master
14    lease dated November 24th, 1998 between the PSA and FGI.
15    Have you seen this document before?
16        A.   Yes.
17        Q.   Did you review this document in preparation for
18    your deposition today?
19        A.   I did not.
20        Q.   When did you see this the last time?
21        A.   Probably back in 2004 when I started.
22        Q.   Why would you have seen this at that time?
23        A.   I thought it would be a good idea to see if I
24    reviewed the master lease and the amendments so I was
25    familiar with them.
```

1      Q.    I'd like to direct your attention to page 4, and

2    there is a paragraph there identified as 18.2.4.  Would you

3    mind reading that to yourself quietly and I'll ask you some

4    questions.

5      A.    (Witness complies).  Okay.

6      Q.    Do you know if the amount of deferred sales tax

7    whether it was greater or lesser than $37 million?

8      A.    I believe it is the 37 million.

9      Q.    About five lines down it says, quote, "The maximum

10    aggregate amount of the ticket surcharge, and interest and

11    earnings thereon, shall be equal to the amount by which (x)

12    the lesser of the actual deferred sales tax or $37 million;

13    exceeds (y) the amount of deferred sales tax funds (other

14    than ticket surcharge proceeds) deposited pursuant to

15    Section 13.2.3.1 of the Development Agreement and the MOU,

16    and the interest earned on such funds."

17              So if I understand correctly you've indicated

18    that your understanding is that X would be $37 million?

19      A.    That's my understanding, correct.

20      Q.    And Y, which refers to the amount of deferred

21    sales tax funds with some qualifications, do you have a

22    sense of what the deferred sales tax funds are?

23      A.    I believe -- I know that they are less than 37

24    million.

25      Q.    Okay.  And this was an amount that was deposited

1    by FGI?

2        A.    I believe the --

3        Q.    It says here that for Y, the amount of deferred

4    sales tax funds deposited pursuant to, and then it recites a

5    section of the agreement.  So my understanding is that the

6    deferred sales tax funds were actually deposited at some

7    point; is that correct?

8        A.    I don't know.  That I don't know.

9        Q.    So is it fair to say that you don't know whether

10   the surcharges are the sole source of funds for repayment of

11   the deferred sales tax?

12                    MR. FILER:  Asked and answered.

13       A.    It is my understanding that the surcharge is the

14   source, the sole source of the repayment of the deferred

15   sales tax.

16       Q.    So the repayment of the $37 million would come

17   solely from the surcharges; is that correct?

18       A.    That is my understanding.

19                    MR. AINSWORTH:  Chris, I'm going to object to

20   further questions on this.  You didn't ask us in a topic

21   about deferred sales tax.  I let this go for a little ways

22   to get a context of the surcharge that is imposed but we

23   have not prepared Ms. Fuller to testify to all the details

24   of what goes on with the deferred sales tax.  I think the

25   document and the statute speak pretty clearly for

Page 34

1    which we collect and remit the money with my staff, the two

2    individuals that I named before.

3         Q.   Okay.  And other than that nothing else?

4         A.   No.

5         Q.   Okay.  Who keeps track of how much has been paid

6    to the PSA in the context of these surcharges?

7         A.   My staff.

8         Q.   Do you have oversight over what the staff does to

9    make sure that the appropriate amount is remitted?

10        A.   Yes.

11        Q.   Did you review any documents related to this

12    issue?

13        A.   E-mail.  I reviewed -- I asked the questions that

14    I mentioned a moment ago of my staff, to my staff -- I asked

15    the questions regarding rate and the collection methodology.

16    I asked that of my staff in an e-mail and I read their

17    response, so technically I guess that would be a document.

18        Q.   Did you bring any documents here today?

19        A.   Yes.

20        Q.   What are they?

21        A.   I have a chart that shows certain dollars that we

22    have collected and remitted to the PSA.  And then this, I'm

23    not sure what the name of this is, but --

24                   THE WITNESS:  What is this (indicating)?

25                   MR. FILER:  The record will reflect she's

1    referring to defendant First & Goal's responses and

2    objections to plaintiff's notice of the 30(b)6 deposition.

3                   THE WITNESS:   Thank you.

4        Q.   I think we have that but we don't have the chart

5    that you were referring to.   Is that something we can make a

6    copy of?

7        A.   Absolutely.   (Handing document to counsel).

8                   MR. WION:   Why don't we make a copy of this.

9    I'll be right back.

10                            (Off the record.)

11                            (Exhibit No. 62 was marked

12                             for identification.)

13        Q.   We have now just marked as Exhibit 62 the spread

14    sheet that you just brought with you today and handed me.

15    And it's entitled First & Goal, Inc. FGI to PSA for the

16    years 1997 to 2006.   The first column says facility rental.

17    That's the rental payment from FGI to PSA?

18        A.   That's correct.

19        Q.   On an annual basis?

20        A.   That's correct.

21        Q.   The Common School Fund, does that refer to the

22    surcharges that we have been discussing?

23        A.   No.   That refers to the 20 percent of the event

24    center annual operating profit.

25        Q.   I'm sorry.   Thank you.

Page 36

1      A.    Sure.

2      Q.    And the PSL interest earnings, to what does that

3  refer?

4      A.    That relates to interest earned on the account

5  where the charter seat license dollars are deposited.

6      Q.    But that's a PSA account?

7      A.    It is, yes, it is a PSA account.

8      Q.    So FGI is maintaining this account for PSA?

9      A.    The seat license revenues are deposited into that

10  PSA account, as I had said, and from time to time those

11  funds are remitted back to First & Goal.  So to the extent

12  that those funds include interest the PSA does keep that

13  interest.

14      Q.    So at the end of the day PSA gets the interest,

15  but FGI keeps the principal amount of the seat payments?

16      A.    That's correct.

17      Q.    And the next column or the next row, surcharge

18  taxes, is this the 1.2 percent surcharge on ticket sales?

19      A.    It is, that's correct.

20      Q.    And the payments for the naming rights, can you

21  describe what that is?

22      A.    Yes.  Under the master lease the PSA receives

23  naming rights, is entitled to the naming rights revenue on

24  Quest Field and the event center.  Those dollars are

25  collected from or are received from Quest and deposited into

1    the PSA account.  The PSA can only use those dollars to

2    reimburse First & Goal for approved major maintenance and

3    modernization expenditures.

4         Q.    And the next row is naming rights reimbursements,

5    can you describe that, please.

6         A.    Yes.  To the extent that First & Goal has made

7    major maintenance and modernizations to the buildings, to

8    Quest Field and event center, that reflect projects, major

9    maintenance and modernization projects that were previously

10   approved by the PSA, again we are entitled to reimbursement

11   for those projects with naming rights dollars.  The extent

12   to which First & Goal has made such investments to date

13   significantly outstrips the actual dollars in the account so

14   that's what that large negative number is.  We are entitled

15   to more money than has actually been received under the

16   naming rights.

17        Q.    So if that figure is larger than the negative as

18   it is now, does that indicate that all the amounts, all the

19   payments made for the naming rights that the PSA receives

20   will then ultimately get paid back to FGI?

21        A.    That's correct.

22        Q.    And the sale of FF&E?

23        A.    Yes.  FF&E stands for furniture, fixtures and

24   equipment.  To the extent that assets that were originally

25   acquired with the public dollars invested into Quest Field

1    and event center, if those assets are disposed of the

2    proceeds then go to the PSA.

3        Q.    Okay.    Now back to the surcharge taxes for a

4    moment.    Who determines how long the principal remains in

5    that account before it is taken and given back to FGI?

6        A.    First & Goal.

7        Q.    Are there any guidelines for how long the

8    principal remains in that account?

9        A.    Not that I am aware of.    Let me -- let me restate

10   that.    I don't know.

11       Q.    So as far as you know the money could be put into

12   the account and then immediately taken out?

13       A.    It could be.    I believe it typically sits for a

14   period of weeks.

15       Q.    And the interest that accrues in that couple of

16   weeks is then paid to PSA; is that correct?

17                    MR. FILER:    Object to the form.

18                    MR. AINSWORTH:    Object to the form.

19       Q.    You can answer.

20       A.    To the extent that -- I'm not -- I'm not aware

21   that there is interest that accrues on that account.    We

22   know there is -- I know there is -- I know there is interest

23   that accrues on the seat license account.    I don't know that

24   there is interest that accrues on the surcharge account.

25                    MR. WION:    Can you go back and read the last

1                    E X A M I N A T I O N

2    BY MR. FILER:

3        Q.    I have just one question to clarify something, Ms.

4    Fuller.

5        A.    Yes.

6        Q.    Mr. Wion asked you about the admission surcharge

7    and you indicated that those funds are deposited into an

8    account that's used to pay off the deferred sales tax; is

9    that right?

10       A.    That's correct.

11       Q.    And none of the funds collected from the admission

12   surcharge taxes are ever paid to FGI; is that correct?

13       A.    That's correct, that's correct.

14             MR. FILER:  I have no other questions.

15             MR. DUNBAR:  No questions.  This is John

16   Dunbar.

17                        (The deposition concluded at

18                         11:05 a.m.)

19                        (By agreement between counsel

20                         and the witness, signature

21                         was reserved.)

22

23

24

25

## <u>CERTIFICATE</u>

THE STATE OF WASHINGTON    )
                                                      )
COUNTY OF KING                     )


I, the undersigned officer of the Court under my commission as a

Notary Public in and for the State of Washington, hereby certify that

the foregoing deposition upon oral examination of the witness named

herein was taken stenographically before me and thereafter

processed under my direction;

That the witness before examination was first duly sworn by me to

testify truthfully; that the transcript of the deposition is a full, true and

correct transcript of the testimony; That I am neither attorney for nor a

relative or employee of any of the parties to this action; further, that I

am not a relative or employee of any attorney or counsel employed by

the parties hereto, nor financially interested in its outcome.


IN WITNESS WHEREOF, I have hereunto set my hand and

seal this _____2nd_____ day of _____May_____ 2007.



_____Cindy K. Young_____
NOTARY PUBLIC in and for the
State of Washington residing at

_____Burien_____

**Rough & Associates, Inc.**

**3515 SW Alaska St., Seattle, WA  98126**

**206.682.1427**

## WASHINGTON STATE PUBLIC STADIUM AUTHORITY

### May 23, 2002
### BOARD MEETING

Port of Seattle
Commission Chambers
2711 Alaskan Way
Seattle, WA 98121

EXHIBIT _58_ DATE _4-30-07_
WITNESS _Fuller_
CINDY YOUNG                    682-1427

### MINUTES

#### I.    Call to Order

Chair Hine called the meeting to order at 12:45 p.m. Other Board members present were Vice-Chair Mendoza, Sue Frost, Lucy DeYoung, Benson Wong, Bob Dilger, and Jake Jundt.

Staff members in attendance included Executive Director Ann Kawasaki, Project Manager Bruce Rooney, Finance & Administration Director Dick Saunders, Assistant Project Manager Steve Woo and Office Manager Jodi Todd.

#### II.    Approval of Minutes

Minutes
Minutes of the March 28, 2002 regular Board meeting.

A motion was made by Vice-Chair Mendoza, second by Member Jundt to approve the minutes of the March 28, 2002 regular Board meeting.

Motion carried unanimously 7-0.

#### III.    Public Participation

Vince Koskela
Mr. Koskela, Taxpayers on Strike, commented on Seahawks marketing, soccer events in Seattle and street trees.

#### IV.    Administrative Briefings

A.    Facility Planning, Construction and Operations Update

Construction Update
Bruce Rooney, Project Manager, briefed the Board on current stadium construction by providing a slide show of construction activities.

Monthly Project Report
Steve Woo, Asst. Project Manager, provided the April 2002 construction report. April construction highlights around the stadium included north plaza

PSA 000319

construction, art installation, south video board testing and field preparation for FieldTurf installation.

The requested billing for April 2002 totaled $7.6 million. The cumulative total at the end of April was $400.4 million or 93.1% of the budget.

B.    Project Art Update
Pablo Schugurensky, Art Manager at First & Goal Inc., reviewed the art selection process including criteria for selected artwork, artwork previously installed on site and artwork to be installed in July.

C.    Stadium Operations Update
Jeff Klein, Facilities Manager at First & Goal Inc., provided the Operations Plan for Seahawks Stadium. The plan includes policies & procedures, recruitment and hiring, security, and event day operations. All game-day staff will have completed 16 hours of training and background checks prior to the first event.

The Plan also includes maintenance of the facility, public education, community outreach and marketing of the facility. Staff is currently finalizing logistics for Grand Opening in July.

D.    Stadium Commissioning Update
Tom Chiado, Asst. Project Manager at First & Goal Inc., provided an update to the Commissioning Plan. The Plan includes the following to be commissioned: mechanical, electrical, elevators, food service, voice/data and audio/visual. To date, the mechanical and electrical plans have been completed and the others are under final review.

Functional performance testing and start-up of most systems is underway and equipment training started in March. All remaining commissioning plans and complete start-up and commissioning activities for all systems should be completed by mid-June. Delivery of the final O&M manuals, closeout documentation and the final commissioning report will be part of Final Completion.

E.    First Quarter 2002 Diversity Program Report
Ruby Jones, Turner Diversity Program Manager, summarized the first quarter 2002 Diversity Program Report. She was pleased to report that as of March 31st apprenticeship participation was at 18%.

To date, M/WBE participation totals over $68 million in construction work for minority and women-owned firms, and approximately $11.6 million in architectural and engineering, and service and tangible property for minority and women-owned firms.

First & Goal Inc., and Turner Construction are currently working on their final report for the Diversity Program. The report will be a comprehensive summary of the program design, implementation and methods of success, and will be presented at the September meeting.

PSA 000320

2

## V.  Chair and Director's Reports

A.      Chair's Report
        Chair Hine announced that Sue Frost retired from her position as Kennewick Port
        Commissioner and congratulated her on behalf of the Board.

B.      Director's Report
        Ms. Kawasaki reported the following:
        - PSA & FGI staff will brief Mayor Nickels on May 30th and give him a site
          tour
        - Staff is currently involved with Grand Opening planning activities
        - Staff will present the Certificate of Substantial completion to the Board in
          June

## VI.  Unfinished Business

There are no items for review under this section.

## VII.  New Business

A.      Voucher Approval of Expenses
        Vouchers included in blanket Vouchers 128-134 and payroll for the periods
        ended March 15, March 31, April 15 and April 30, 2002 in a total amount of
        $204,088.90.

        Motion by Vice-Chair Mendoza, second by Member Frost to approve Vouchers
        128-134 and payroll for the periods ended March 15, March 31, April 15 and April
        30, 2002 in a total amount of $204,088.90.

        Motion carried unanimously 7-0.

B.      FGI Final Draw Request(s)
        Final Draw Request 43 and FGI Special Costs for a total amount of $9,443,113.

        A motion was made by Vice-Chair Mendoza, second by Member Jundt to
        approve Final Draw Request 43 and FGI Special Costs for a total amount of
        $9,443,113.

        Motion carried unanimously 7-0.


        Final Draw Request 44 and FGI Special Costs for a total amount of $7,555,206.

        A motion was made by Vice-Chair Mendoza, second by Member Jundt to
        approve Final Draw Request 44 and FGI Special Costs for a total amount of
        $7,555,206.

        Motion carried unanimously 7-0.

PSA 000321

C.    Resolutions

Resolution No. 133
*A Resolution of the Board of the Washington State Public Stadium Authority approving the Maintenance Standards for the Stadium Exhibition Center and Parking Garage.*

Motion by Vice-Chair Mendoza, second by Member Wong to approve Resolution No. 133.

Under discussion, Ms. Kawasaki explained that staff has worked with First & Goal on development of the standards and she recommended adoption of the Resolution.

Motion carried unanimously 7-0.


## VIII.   Executive Session

With no further business to come before the Board, Chair Hine announced that the next regular meeting is planned for Thursday, June 27 at 12:30 p.m. at the Port of Seatlle Commission Chambers.

She also announced that there would be a five-minute recess followed by an executive session of the Board to meet with legal counsel to discuss potential litigation involving legal risks from a proposed action or current practice where public discussion of the legal risks would likely result in adverse legal or financial consequences to the PSA. No action by the Board was anticipated as a result of the executive session.

The meeting recessed at 2:14 p.m.

Following the five-minute break, the meeting reconvened in the Commission Chambers, and the Board went into executive session.


## IX.      Adjournment

The meeting reconvened at 3:00 p.m. and was immediately adjourned.


Approved this 27th day of June 2002


Lorraine Hine, Chair                    Jodi Todd, Clerk of the Board

**WASHINGTON STATE PUBLIC STADIUM AUTHORITY**

September 23, 2004
**BOARD MEETING**

Public Stadium Authority Conference Room
800 Occidental Ave. S. #700
Seattle, WA 98134

**MINUTES**

### I.    Call to Order

Board Chair Lorraine Hine called the meeting to order at 12:32 p.m.  Other Board members present were, Vice Chair Fred Mendoza, Jake Jundt, Sue Frost and Bob Dilger.

Staff members in attendance included Executive Director Ann Kawasaki Romero, Project Manager Steve Woo, Accountant Tom Anderson and Office Manager Jodi Todd.

### II.    Approval of Minutes

Minutes
Minutes of the July 22, 2004 regular Board meeting.

Motion by Vice Chair Mendoza, seconded by Member Dilger to approve the minutes of the July 22, 2004 regular Board meeting.

Motion carried unanimously 5-0.

Member Wong arrived at 12:40.

### III.    Public Participation

Vince Koskela
Mr. Koskela, representing Taxpayers on Strike, commented on earthquakes, the naming rights agreement, SR519 and maintenance of the building.  He also stated that Taxpayers on Strike would be going to court to nullify the naming rights agreement.

Member DeYoung arrived at 12:45 p.m.

### IV.    Administrative Briefings

EXHIBIT _59_ DATE _4-30-07_
WITNESS _Fuller_
CINDY YOUNG                    682-1427

A.  **Facility Construction Oversight**

1.  Signage Update
Steve Woo, Project Manager, updated the Board on the new signage for Qwest Field.

PSA 000329

He also provided an update on the status of final completion. First & Goal is scheduled to request a Certificate of Final Completion at the November Board meeting. However, it will depend upon the final payment between First & Goal and Turner Construction, and whether the final repairs made earlier in 2004 have withstood the rain.

Member Jundt asked how the new caulk has withstood pressure washing. Mr. Woo stated that the new caulking has done very well. However, a few new minor leaks appeared after a heavy rain on the upper bowl which FGI is addressing. At this point, this is considered part of the normal maintenance of the building rather than a warranty item.

## B. Facility Operations Oversight

### 1. Seattle Monorail Project Update

Kevin Raymond, Government Relations Manager for the Seattle Monorail Project, provided an update to the Board. At the July meeting, the Board expressed their preference to maintain a 100' clearance from the building for security reasons. Mr. Raymond stated that Monorail staff developed an approach that would satisfy the Board's requirement.

Brian Garrett, Lead Architect, showed the Board several draft alignment drawings that they felt addressed the Board's concerns regarding visual impacts and security. Under the revised alignment, the structure will be much deeper than the "near stadium" alternative due to the need for a relatively long segment to cross the railroad tracks while maintaining the buffer space from the stadium.

Members DeYoung and Frost thanked the Monorail staff for incorporating the Board's comments and suggestions into the new alternative.

### 2. 2003 Annual Maintenance Report and Audit

Steve Woo, Project Manager, reviewed the findings of the staff facility assessment from March 2004. Items noted in auditing the Event Center were all considered aesthetic and included: cracked concrete, loose ceiling tiles, signage repairs and minor water damage in an elevator lobby. Staff has requested that these items be repaired prior to the winter consumer show season.

The first facility assessment for the Stadium was also conducted. Mr. Woo stated that the facility generally looked good. There were a few minor items that he noted which have been forwarded to First & Goal.

Mr. Woo also discussed FGI's Annual Maintenance Report received earlier this year. The report mainly focused on the Event Center, as 2003 was the first full year of stadium operations. Staff proposed some report format changes to better link the Annual Maintenance Report and the Annual Maintenance Plan which will be discussed with First & Goal prior to the next submission date.

Staff issued a Request for Qualifications (RFQ) for Maintenance & Operations consulting. Four proposals were received and reviewed. Mr. Woo said a tentative firm has been selected and a more detailed report will be provided at the November Board meeting.

PSA 000330

2

3. General Managers Report

Jeff Klein, FGI General Manager, reported on the following:

- Sounders completed their season and are confirmed to play again at the Stadium in 2005;
- The Stadium hosted the Emerald City Kick-off Classic high school football tournament;
- The Seahawks home opener on Sunday is a sellout and will be televised locally;
- Seahawks season ticket renewals are at 91%;
- The facility is gearing up for the consumer shows that begin in October;
- Staff received Mr. Woo's facility assessment and items will be completed before the next assessment in November;
- The new stadium policies are in effect, including no re-entry after kick-off and tailgating policies; and
- The high school helmet wall in the West Field Plaza will be unveiled on Friday.

## V. Chair and Director's Reports

A. Chair's Report

There was no Chair's report.

B. Director's Report

Ann Kawasaki Romero reported the following:

- Staff continues to work with FGI staff on the monorail alignment;
- A maintenance audit was conducted by staff in August;
- An RFQ was issued for Maintenance & Operations consulting services. Staff received 4 proposals which are being reviewed by a panel, and staff hopes to award the contract shortly; and
- The State Auditor is currently conducting their annual audit of the PSA.

## VI. Unfinished Business

1. Resolution No. 163

*A Resolution of the Board of the Washington State Public Stadium Authority approving certain Major Maintenance and Modernization Improvements to Qwest Field and Event Center.*

Motion by Vice Chair Mendoza, second by Member Jundt to approve Resolution No. 163.

Under discussion, Ms. Kawasaki Romero stated that the Board tabled consideration of Resolution No. 163 at the September meeting. Following the meeting, FGI notified the PSA that they would like to withdraw from Board consideration, their request to fund the proposed modifications outlined in Exhibit A to the resolution as modernization improvements eligible for naming rights reimbursement. Staff recommends that the Board deny the resolution. A new resolution on the same subject will be considered by the Board under New Business.

Resolution failed unanimously 0-7.

## VII. New Business

A.    Voucher Approval of Expenses

Vouchers included in blanket Vouchers 202-206 and payroll for the periods ended July 15 & 31, 2004 and August 15 & 31, 2004 in a total amount of $211,968.69.

Motion by Vice Chair Mendoza, second by Member Frost to approve Vouchers 202-206 and payroll for the periods ended July 15 & 31, 2004 and August 15 & 31, 2004 in a total amount of $211,968.69.

Motion carried unanimously 7-0.

B.    FGI Final Draw Request(s)

*There were no items for review under this section.*

C.    Resolutions

1.    Resolution No. 165

*A Resolution of the Board of the Washington State Public Stadium Authority Ratifying Certain Privately Funded Alterations to the Football/Soccer Stadium and Exhibition Center Project.*

Motion by Vice Chair Mendoza, second by Member Jundt to adopt Resolution No. 165.

Under discussion, Ms. Kawasaki Romero stated that Resolution 165 would ratify privately funded alterations to the Project as outlined in Exhibit A to the resolution. The proposed approach to this is similar to previous modifications to the Project that have been privately funded. Staff recommends adoption.

Motion carried unanimously 7-0.

## VIII. Executive Session

With no further business to come before the Board, Chair Hine announced that there would be a five minute recess followed by an Executive Session of the Board to meet with legal counsel to discuss potential litigation involving legal risks from a proposed action or current practice where public discussion of the legal risks would likely result in adverse legal or financial consequences to the PSA. The meeting is expected to last one hour. No action by the Board was anticipated as a result of the Executive Session.

She reminded the Board that the next meeting is November 18, 2004.

The meeting recessed to Executive Session at 1:26 p.m.

The meeting reconvened at 1:30 p.m. and immediately went into Executive Session.

PSA 000332

4

## IX.    Adjournment

The Executive Session began at 1:30 p.m. and ended at 3:00 p.m.  The regular meeting of the Public Stadium Authority Board adjourned at 3:00 p.m.


Approved this 18th day of November 2004.


_Lorraine Hine_
Lorraine Hine, Chair

_Jodi Todd_
Jodi Todd, Clerk of the Board

PSA 000333

## WASHINGTON STATE PUBLIC STADIUM AUTHORITY

### May 25, 2006
### BOARD MEETING

Public Stadium Authority Conference Room
800 Occidental Ave. S. #700
Seattle, WA 98134

### MINUTES

#### I.        Call to Order

Board Chair Lorraine Hine called the meeting to order at 12:34 p.m. Other Board members present were: Vice Chair Mendoza, Benson Wong, Bill Lotto, Bob Dilger, Sue Frost and Jake Jundt. Staff members in attendance included Executive Director Ann Kawasaki Romero, Project Manager Steve Woo, Accountant Tom Anderson and Office Manager Jodi Todd.

#### II.        Approval of Minutes

Minutes
Minutes of the March 23, 2006 regular Board meeting.

Motion by Vice Chair Mendoza, second by Member Jundt to approve the minutes of the March 23, 2006 regular Board meeting.

Motion carried unanimously 7-0.

#### III.        Public Participation

Vince Koskela
Mr. Koskela, representing Taxpayers on Strike, commented on earthquakes, surrounding area development, height limits and Qwest Field events.

Steve Ohlenkamp
Mr. Ohlenkamp spoke on behalf of the Consumer Show Coalition Group (CSC) and read a letter for the record recently sent by the CSC to King County Executive Ron Sims. The CSC is very concerned with the proposed sale and development of the north half of the north parking lot. Staging is critical for the consumer shows and development on the north half lot would decrease the available staging in the area. Mr. Ohlenkamp thanked the Board for their continued participation with regard to staging and consumer show needs.

#### IV.        Administrative Briefings

A. Facility Operations Oversight

1. Construction Update
    A. Club & Suite Level Improvement Project
        Martha Fuller, First & Goal CFO, updated the Board on the status of the project. There were several additional improvements to the project and

EXHIBIT ___106___ DATE _4-30-07_
WITNESS ____Fuller____
CINDY YOUNG                    682-1427

PSA 000351

Ms. Fuller stated that some of the upgrades include, air conditioning in the pantries and an electronically controlled shade system for the exterior club lounge windows.  Ms. Fuller introduced Ms. Darrington to further explain the additional improvements specific to the club restaurant and the concessions.

Susan Darrington, First & Goal Vice President, reviewed the modifications to the club restaurant area.  Ms Darrington showed the design boards and pictures that provided detailed information regarding the new layout of the restaurant and the added fan amenities.  She also reviewed the concession stand concepts that will be featured in the club lounges which will also increase the food variety for the patrons.

Ms. Fuller stated that budget hard costs have increased by one million dollars due to the additional improvements being made and will be paid for by First & Goal.  The Naming Rights contributions to the project remain capped as approved for the last Modernization Plan.  She also mentioned that due to the club restaurant remodel, some art pieces currently in the restaurant will likely be moved to other spaces within the facility.

The restaurant is scheduled to be completed by August 6th.  Construction is currently on schedule.

B.  Qwest Event Center Alterations

Ms. Fuller announced First & Goal's plans to create an intimate theatre inside the Exhibition Center.  The theatre would be 6000 portable seats and could be used for smaller concerts, company wide meetings, corporate gatherings and events.  First & Goal will be paying for the facility enhancement.  With the additional booking opportunities, the common school fund will hopefully realize increased benefits as a result of the new Event Center activity.

According to Mike McFaul, Director of Facility Operations, the only permanent addition to the Event Center will be some structural reinforcements  to accommodate a larger rigging package for the concerts.  New steel will be added in the ceiling to help stiffen the structure, and it will be painted to match the existing components. A removable trussing system will also be added to accommodate lighting, an audio package and drapery.  Construction is scheduled to be completed by September 1, 2006.

2.  Annual Maintenance Plan

Steve Woo, PSA Project Manager, provided a comparison overview of preventive vs. corrective maintenance hours planned by FGI for 2006.  The 2006 Plan is for a 15 month period due to FGI changing their fiscal year and as a result, the hours planned show a fair increase over the prior year's average.  The 2006 Plan priorities are generally consistent with long range planning goals established by the PSA's Long Range Plan.

PSA 000352

One of the illustrations was a comparison of preventive, corrective and housekeeping trends. It is anticipated that in 2006, preventative maintenance hours will decrease relative to 2005 hours as staff becomes more efficient, and gain familiarity with the building and its systems.

In summary, the overall increase in maintenance hours and total budget is still a positive trend. The emphasis remains on preventative maintenance work (including the housekeeping component), but also recognizes that corrective maintenance will be needed as the systems age. Impacts from the club and suite level improvement project are not known at this time and will be reported next year. As in prior years, a physical assessment of the facility will be conducted in the fall to gauge Plan implementation.

3.  2005 TMP Results and 2006 TMP
    Jodi Todd, Office Manager, stated that the Transportation Management Plan (TMP) is relatively the same as in prior years. The Plan has been updated to incorporate many changes that the Seahawks and First & Goal implemented over the last few years. The draft Plan will be reviewed by PARC and all comments will be incorporated into the final draft.

    Staff is pleased with the 2005 results. All goals were achieved except for one statistically calculated goal which is becoming outdated. Ms. Todd will be working with FGI to propose a new calculation to be approved by the City of Seattle.

    David Young, FGI Event Services Director, summarized the 2006 Transportation Management Plan. The primary objective is to reduce traffic impacts in the adjacent neighborhoods. There are three areas specifically emphasized in the Plan:
    - Traffic flow on game days: Good ingress and egress routes for patrons have been identified.
    - Strategies to reduce traffic and parking demand: Mass transit, carpooling and charter buses seem to be effective strategies.
    - Dissemination of public information: FGI is always looking for new ways to communicate information to fans.

    A special TMP will be submitted to PARC for the weeknight games this season.

    Mr. Young reviewed the 2005 Plan results and accomplishments. FGI is pleased that they continue to effectively reduce and manage impacts in the immediate vicinity of Qwest Field. The passes-only program implemented in 2004 for season ticket holders in the north lot and adjacent parking garages continues to be very successful and has significantly decreased the number of cars in the area.

4.  2007 PSA Operating Budget
    Ms. Kawasaki Romero reviewed the proposed 2007 operating budget. She explained the revenue and expenditure projections, and highlighted some work program items planned for 2007.

PSA 000353

3

5.  Underline General Managers Report

Susan Darrington, First & Goal Vice President, reported the following:

- SuperCross attendance was over 30,000 and they will return again next year;
- The Seattle Sounders season started and they are drawing more attendees due to their championship season last year;
- Levy Restaurants is currently hiring for the upcoming season and working on menus for upcoming events;
- Event staff hiring ended and currently there are 640 event staff members for the upcoming season;
- Training and fan behavior is a big initiative for the upcoming season;
- FGI will be issuing an RFP for a security contract. The current contract with CSC expires in June; and
- Staff is working with the Health Department regarding the No Smoking Policy.

## V.    Chair and Director's Reports

A.    Chair's Report

There was no report given.

B.    Director's Report

Ann Kawasaki Romero reported the following:

- EnviroIssues has been hired as the new Public Affairs firm for the PSA;
- Staff has begun pre-audit work in anticipation of the state audit;
- Staff is working with FGI on the disposal of surplus property from the club/suite improvement project; and
- Staff continues to be involved in the Livable South Downtown project.

## VI.    Unfinished Business

*There were no items for review under this section.*

## VII. New Business

A.    Voucher Approval of Expenses

Vouchers included in blanket Vouchers 247-249 and payroll for the periods ended March 15, 2006, March 31, 2006, April 15, 2006 and April 30, 2006 in a total amount of $96,245.20.

Motion by Vice Chair Mendoza, second by Member Wong to approve Vouchers 247-249 and payroll for the periods ended March 15, 2006, March 31, 2006, April 15, 2006 and April 30, 2006 in a total amount of $96,245.20.

Motion carried unanimously 7-0.

B.    Naming Rights Reimbursement

Reimbursement of Major Maintenance and Modernization costs in a total amount of $ 404,619 pursuant to the Master Lease Agreement.

PSA 000354

Motion by Vice Chair Mendoza, second by Member Jundt to approve reimbursement of Major Maintenance and Modernization costs in a total amount of $404,619 pursuant to the Master Lease Agreement.

Motion carried unanimously 7-0.

C.    Resolutions

1.    Resolution No. 178

*A Resolution of the Board of the Washington State Public Stadium Authority Adopting the Operating Budget for Fiscal Year 2007 and Related Administrative Actions.*

Motion by Vice Chair Mendoza, second by Member Frost to adopt Resolution No. 178.

Under discussion, Ms. Kawasaki Romero stated that Resolution 178 would approve the fiscal year 2007 and related administrative actions. Staff recommends adoption.

Motion carried unanimously 7-0.

2.    Resolution No. 179

*A Resolution of the Board of the Washington State Public Stadium Authority Approving Certain Alterations to the Qwest Field Event Center.*

Motion by Vice Chair Mendoza, second by Member Jundt to adopt Resolution No. 179.

Under discussion, Ms. Kawasaki Romero stated that Resolution 179 would conditionally approve certain alterations to the Qwest Field Event Center. The modifications would allow the facility to host additional entertainment activities and all modifications are privately funded. Staff recommends adoption.

Motion carried unanimously 7-0.

3.    Resolution No. 180

*A Resolution of the Board of the Washington State Public Stadium Authority Approving the 2006 Annual Maintenance Plan for Qwest Field, Qwest Field Event Center and Parking Facility.*

Motion by Vice Chair Mendoza, second by Member Wong to adopt Resolution No. 180.

Under discussion, Ms. Kawasaki Romero stated that Resolution 180 would approve routine maintenance for the facility. This Plan is for a 15 month period which reflects FGI's fiscal year change from January 1 to April 1. Staff recommends adoption.

PSA 000355

Member Wong noted that line 21 should read March 31, 2007.

Motion carried unanimously 7-0.

4.  Resolution No. 181
    *A Resolution of the Board of the Washington State Public Stadium Authority Updating the Scope and Total Budget for the Club/Suite Improvements Project.*

    Motion by Vice Chair Mendoza, second by Member Jundt to adopt Resolution No. 181.

    Under discussion, Ms. Kawasaki Romero stated that Resolution 181 would approve the revised scope and budget for the club/suite improvements project. The proposed budget increase is privately funded and no additional naming rights proceeds are involved in the transaction. Staff recommends adoption.

    Motion carried unanimously 7-0.

### VIII. Executive Session

With no further business to come before the Board, Chair Hine announced that there would be a five minute recess followed by an Executive Session of the Board to meet with legal counsel to discuss potential litigation involving legal risks from a proposed action or current practice where public discussion of the legal risks would likely result in adverse legal or financial consequences to the PSA. The meeting is expected to last one hour. No action by the Board was anticipated as a result of the Executive Session.

The meeting recessed to Executive Session at 2:13 p.m.

The meeting reconvened at 2:45 p.m. and immediately went into Executive Session.

### IX.　Adjournment

The Executive Session began at 2:45 p.m. and ended at 3:30 p.m. The regular meeting of the Public Stadium Authority Board adjourned at 3:30 p.m.

Approved this 27th day of July 2006.


Lorraine Hine, Chair                    Jodi Todd, Clerk of the Board


PSA 000356

6

First & Goal Inc.
FGI to PSA
For the Years 1997 - 2006

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility Rental | - | - | 176,016.44 | 529,424.36 | 544,718.91 | 753,580.36 | 860,297.32 | 875,409.69 | 1,035,834.75 | 965,841.22 |
| Common School Fund | - | - | | | 116,360.60 | 137,580.43 | 126,808.03 | 146,792.05 | 225,838.00 | 55,946.00 |
| PSL Interest Earnings | - | - | 6,852.59 | 52,995.44 | 85,696.78 | 1,894.73 | 2,601.92 | (338.97) | 1,210.73 | 16,348.44 |
| Surcharge Taxes | - | - | | | | 93,602.56 | 166,879.70 | 100,644.80 | 135,110.62 | 228,525.13 |
| Naming Rights - Payments | - | - | | | | | | 1,979,122.00 | 1,031,578.00 | 1,784,300.00 |
| Naming Rights - Reimbursements | - | - | | | | | | (1,979,122.00) | (404,619.00) | (9,075,371.00) |
| Sale of FF&E | - | - | | | | | | | | 30,471.59 |
| **Total** | - | - | 182,869.03 | 582,419.80 | 746,776.29 | 986,658.08 | 1,156,586.97 | 1,122,507.57 | 2,024,953.10 | (5,993,938.62) |

EXHIBIT _[handwritten]_ DATE 4-30-07 _[signature]_
WITNESS _[signature]_
CINDY YOUNG              682-1427