# EXHIBIT 6

Dockets.Justia.com

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF WASHINGTON
                           AT SEATTLE
_____
FRED and KATHLEEN STARK, a        )
married couple,                   )
                                  )
              Plaintiffs,         )
                                  )
         vs.                      )   No. CV 06-1719JLR
                                  )
THE SEATTLE SEAHAWKS, FOOTBALL    )
NORTHWEST, LLC, a Washington      )
limited liability company,        )
FIRST & GOAL, INC., a Washington  )
corporation, THE WASHINGTON       )
STATE PUBLIC STADIUM AUTHORITY,   )
a Washington municipal            )
corporation, and LORRAINE HINE,   )
in her capacity as chair of the   )
Washington State Public           )
Stadium Authority board of        )
directors,                        )
                                  )
              Defendants.         )
_____

              Deposition Upon Oral Examination

                              Of

                        LORRAINE HINE
_____


           Taken at 999 Third Avenue, Suite 4400

                      Seattle, Washington



DATE:  Friday, April 27, 2007
REPORTED BY:  Mindy L. Suurs, CSR
```

1  football stadium and exhibition center in Seattle.
2      Q.   Did you have any responsibility to oversee the
3  operations of the stadium?
4           MR. DUNBAR:  Objection, legal conclusion.
5  BY MR. WION:
6      Q.   Did you understand that the PSA had a
7  responsibility to oversee the operations of the stadium?
8      A.   We were charged with entering into a Master Lease
9  Agreement with a private party to do the operations.  The
10 oversight is spelled out specifically in the lease
11 agreement what the relationship would be and in which areas
12 we should have what kind of authority.
13     Q.   My question is a little bit different.  Did you
14 understand that there was a responsibility that the PSA
15 provide oversight of the operations at the stadium?
16     A.   Yes.
17          MR. DUNBAR:  Objection, argumentative.
18          MR. AINSWORTH:  Excuse me, Chris, do you
19 mind if I adopt his objections?
20          MR. WION:  That's fine.
21 BY MR. WION:
22     Q.   Can you describe that oversight role?
23          MR. DUNBAR:  Objection, asked and answered.
24 BY MR. WION:
25     Q.   You may answer.  I'll make a general point.  Your

1  counsel may, from time to time, make objections.  We'll
2  deal with those at a later date.  Unless he instructs you
3  not to answer a specific question, as he may have already
4  advised you, you would be required to answer my questions.
5       A.   Would you ask it again, then, please, or have it
6  read back.
7            (Record read.)
8            THE WITNESS:  The oversight role is
9  described in the lease agreement.
10 BY MR. WION:
11      Q.   Do you have an understanding of what that role
12 is?
13      A.   Yes.
14      Q.   What is your understanding of that role?
15      A.   As specifically spelled out in the lease
16 agreement, First & Goal, the private party, is a sole
17 tenant, has responsibility for the operation of the
18 facility.  And there are certain specific areas that -- for
19 instance, the exhibition center.  We monitor their budget
20 because some of that money goes to the Public School Fund.
21 So there's specific areas where our role -- oversight role
22 is spelled out and the difference of responsibilities is
23 spelled out in the lease.
24      Q.   As a part of the operations that the FGI conducts
25 at the stadium, do you understand that they have

1    Q.   Did you talk to anybody else about that letter?
2    A.   No, I don't think so.
3    Q.   Did you speak with anybody else at the PSA
4  regarding that letter?
5    A.   I don't think I did.
6    Q.   In your discussion with Ms. Kawasaki-Romero, do
7  you recall ever talking about whether the pat-downs
8  constituted state action?
9              MR. AINSWORTH:  Objection, calls for legal
10 conclusion.
11             MR. DUNBAR:  And I assume you'll give me the
12 adopt also?
13             MR. WION:  Sure, I'm just asking what she
14 recalls --
15             THE WITNESS:  I'm not sure what you're
16 asking.
17   Q.   In the conversation with Ms. Kawasaki-Romero, do
18 you recall talking about whether the pat-downs constituted
19 state action?
20             MR. DUNBAR:  Objection, foundation.
21             Go ahead.
22             THE WITNESS:  No, did not.
23 BY MR. WION:
24   Q.   Did you subsequently learn that pat-downs had
25 been conducted before that WSU game?

```
 1      A.    I believe so.
 2      Q.    From whom did you learn that?
 3      A.    Probably from FGI in response to our query.
 4      Q.    In a letter response?
 5      A.    There was the letter that was sent to me from
 6   Susan Darrington that did discuss the issue, yes.
 7      Q.    Did you have any discussions with Ms. Darrington?
 8      A.    I did not.
 9      Q.    Did you have any discussions with anyone else at
10   FGI regarding the pat-down procedures?
11      A.    I don't recall talking to anyone except for Ann.
12      Q.    This is a document that has been designated an
13   exhibit previously, but this document actually is from the
14   PSA rather than FGI.  The FGI version has been made an
15   exhibit.  I'd like to make this an exhibit as well.
16                       (Discussion held off the record.)
17                       (Exhibit No. 55 marked for
18                        identification.)
19   BY MR. WION:
20      Q.    So you've now been handed what's been marked as
21   Exhibit 55.  Do you recognize that document?
22      A.    Yes, I do.
23      Q.    And this is a letter from the Washington State
24   Treasurer, Michael Murphy, to you, dated October 27, 2005.
25   Is this the letter you were just referring to?
```

1    A.    Yes.

2    Q.    So when this was received by the PSA, that was
3 your first indication that there were pat-downs at the
4 stadium?

5    A.    That's right.

6    Q.    The second paragraph states, quote: Qwest Field
7 is a state owned facility.

8          Do you agree with that?

9    A.    Yes.

10         MR. DUNBAR: Objection, legal conclusion.
11 BY MR. WION:

12   Q.    And it continues: How is it that the NFL can
13 dictate security policy for a football game of one of our
14 state's public universities?, end quote.

15         Do you have a reaction to receiving this letter?

16   A.    I -- what kind of a reaction? I don't know what
17 you're asking for.

18   Q.    What was your reaction when you read this?

19   A.    That I'd have to answer Mr. Murphy and find out
20 what was going on.

21   Q.    Were you concerned that the pat-downs might be
22 unlawful?

23   A.    No.

24   Q.    The last paragraph states: "I understand the
25 need for heightened security at all public events and

1   documents in any detail that you show the witness the
2   document, please.
3            MR. WION:  I don't think we're going to get
4   into sufficient detail to warrant review of the Master
5   Lease here.
6            MR. DUNBAR:  It's up to you.  I've made my
7   objection.
8            And Lorraine, if you feel that your answer
9   would be aided by reviewing the document, you're free to
10  make that request as well, so go ahead.
11           (Record read as follows:
12           Q.    And under the Master Lease, the PSA
13  is entitled to receive a ticket surcharge from ticket sales
14  at the stadium?")
15           MR. DUNBAR:  And I'm going to interpose a
16  quick objection, legal conclusion.  Go ahead.
17  BY MR. WION:
18      Q.   Do you know whether, in fact, the PSA has
19  received admissions surcharges from FGI?
20      A.   I believe so.
21      Q.   And do you understand that, basically, the more
22  people who buy tickets, the more money FGI is required to
23  remit to PSA?
24      A.   They must for every ticket do the surcharge, for
25  everybody.

```
 1       Q.   So the more tickets, the more revenue for PSA?
 2       A.   That revenue is for a specific purpose -- to pay
 3  for the deferred sales tax.  It's not for PSA for any
 4  operating purposes.
 5       Q.   Okay.  But the amount that FGI pays to the PSA
 6  goes up when attendance goes up.  Is that fair?
 7       A.   Not exactly because the amount is going to go to
 8  pay the deferred sales tax.  It does not go to PSA for PSA
 9  purposes.  If the amount is not sufficient to pay the total
10  bill for deferred sales tax, FGI will have to supplement
11  that.
12       Q.   How would it supplement that?
13       A.   They'd have to just pay whatever additional
14  deferred sales tax bill there would be.  This was an
15  estimate as to how much it would be.
16       Q.   Okay.  This, I believe, has been previously
17  marked as Exhibit 27.  At least I will make that
18  representation to you here today.  And this appears to be a
19  spreadsheet that was produced in this litigation by the
20  PSA.  The title says "Washington State Stadium Authority
21  Revenue Received from FGI, January 1st, 2004, to Present";
22  is that correct?
23       A.   Yes.
24       Q.   Have you seen this document before?
25       A.   Just two days ago.
```

```
 1   to pay for the deferred sales tax.  It does not go to the
 2   PSA for PSA purposes.  The amount at any given time is
 3   immaterial insofar as the total bill will be paid.  If it
 4   doesn't come in in the surcharge, it will come from FGI.
 5   BY MR. WION:
 6        Q.   But the actual amount paid at any given time is a
 7   function of attendance at Seahawks Stadium?
 8                MR. DUNBAR:  Object to the form of the
 9   question.
10                Go ahead.
11   BY MR. WION:
12        Q.   Correct?
13        A.   Yes.
14        Q.   Thank you.
15                     (Discussion held off the record.)
16   BY MR. WION:
17        Q.   I'm going to hand around a document that was
18   previously marked as Exhibit 37.  This is a letter from Sam
19   Hunt, Majority Floor Leader from the State of Washington
20   House of Representatives, dated September 21st, 2005,
21   addressed to First & Goal, Inc.
22        Have you ever seen this letter?
23        A.   Yes.
24        Q.   Do you recall who you received it from?
25        A.   It probably came from Ann, that First & Goal
```

1  probably shared it with her, gave it to her.
2       Q.   Did you have any discussions with
3  Ms. Kawasaki-Romero?
4       A.   Probably did.
5       Q.   Do you recall the substance of those discussions?
6       A.   No, because this came after the Murphy letter, so
7  it was not a surprise about the issue.
8       Q.   So there was no specific follow-up with respect
9  to this letter; it was just cumulative to what had
10 previously been received.  Is that fair?
11      A.   Yes.
12      Q.   Do you know Mr. Hunt?
13      A.   Yes.
14      Q.   Did you ever have a conversation with him about
15 this concern?
16      A.   No, I didn't.
17      Q.   If the Starks had approached you prior to filing
18 this lawsuit and expressed a concern that they have that
19 these pat-downs are unreasonable and unconstitutional,
20 sitting here today, do you have any sense of what reaction
21 you would have had?
22      A.   I would have told them the same as we've
23 discussed throughout -- that they needed to talk to First &
24 Goal, who had total authority over the operation of the
25 facility, including any security measures.

# CERTIFICATE

THE STATE OF WASHINGTON )
)
COUNTY OF KING )

I, the undersigned officer of the Court under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter processed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony; That I am neither attorney for nor a relative or employee of any of the parties to this action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this __30th__ day of __April__ 2007

MINDY L. SUURS
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
OCTOBER 3, 2010

_Mindy L. Suurs_
NOTARY PUBLIC in and for the State of Washington residing at
_Bellevue_



Exhibit 55  Date 4-27-07
Witness Hine
Mindy Suurs

MICHAEL J. MURPHY
State Treasurer

State of Washington
Office of the Treasurer

Sept. 27, 2005

Lorraine Hine, Chair
Washington State Public Stadium Authority
Qwest Field & Event Center
800 Occidental Ave. S. #700
Seattle, WA 98134

RECEIVED
SEP 28 2005
WA State Public
Stadium Authority

Dear Ms. Hine:

I'm writing today with a concern that came to light Sept. 17 at the Washington State University football game at Qwest Field. As my party entered the suite area before the game as guests of WSU President Lane Rawlins, we were patted down by security personnel. I was surprised at this. When I asked about it I was told by Susan Darrington, vice president for facility operations, that the National Football League had suggested the pat-downs for this event.

Qwest Field is a state-owned facility. How is it that the NFL can dictate security policy for a football game of one of our state's public universities? Also, as a point of consistency, I was at a college football game two weeks previously at Qwest Field at which I was not patted down.

I understand the need for heightened security at all public events and venues, but I believe it is inappropriate to pat down attendees at college football games at this state-owned facility. I look forward to a conversation on this subject.

Sincerely,

MICHAEL J. MURPHY
Washington State Treasurer

PSA 000376

Legislative Building, P.O. Box 40200 • Olympia, Washington 98504-0200 • (360) 902-9000 • TDD (360) 902-8963
FAX (360) 902-9044 • Home Page http://tre.wa.gov