# EXHIBIT 8

Dockets.Justia.com

Case 2:06-cv-01719-JLR    Document 32-10    Filed 05/08/2007    Page 2 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.
FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 2   ------------------------------------------------
 3   FRED and KATHLEEN STARK, a married couple,
 4   Plaintiffs,
 5
     v.
 6
     THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a
 7   Washington limited liability company, FIRST & GOAL,
     INC., a Washington corporation, THE WASHINGTON
 8   STATE PUBLIC STADIUM AUTHORITY, a Washington
     municipal corporation, and LORRAINE HINE, in her
 9   capacity as chair of the Washington State Public
     Stadium Authority Board of Directors,
10
     Defendants.
11
12   Case No. CV 06-1719 JLR
     ------------------------------------------------
13
     DEPOSITION OF - CONFIDENTIAL
14   Milton Ahlerich
     May 2, 2007
15   New York, New York
     Lead: Garth Wojtanowicz, Esquire
16   Firm: Danielson Harrigan
17
18
19
20
21
22   FINAL COPY - CONTAINS CONFIDENTIAL SECTION
23
24   JANE ROSE REPORTING           1-800-825-3341
```

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 3 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 32

1    A.    Yes.
2    Q.    You were in charge of the -- actually,
3    let me rephrase that.
4          Were you involved with the development
5    of the NFL policy to conduct limited pat-downs at
6    all NFL games?
7    A.    Yes.
8    Q.    Can you just sort of outline for me what
9    the nature of your involvement was?
10   A.    Immediately after the events of
11   9/11/2001, Commissioner Tagliabue assembled a task
12   force of security experts, some of whom I
13   recommended, some were recommended by others, to
14   participate in a development of appropriate
15   security matters, measures that should be taken to
16   maximize reasonable security at all NFL stadiums
17   going forward.  I chaired that task force.
18   Q.    How many people were on that task force?
19   A.    I believe eight.
20   Q.    Who were those people?
21   A.    Louis Morletti, former director of the
22   U.S. Secret Service; Weldon Kennedy, former deputy
23   director of the FBI; Khalil Johnson, the director
24   of the Georgia World Congress and Convention

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 4 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 38

1  to me that the task force, now at least, meets at
2  least one time per year in person.  So, can you
3  describe for me generally how the task force met
4  initially and whether those procedures changed over
5  time?
6      A.   During 2001-2002, the task force met
7  more than a few times personally, several times
8  personally in, physically in one place at one time,
9  particularly when we were writing the best
10 practices and devising the best practices, inviting
11 in other experts to talk with us.
12           After that, going into 2002, we had some
13 conference calls during 2001, as well.  And then
14 2002, we had more conference calls.  Now we do it
15 mostly by conference call or, and the one meeting
16 that we have a year.
17     Q.   Is it correct to say that the task force
18 was formed in response to the attacks on the World
19 Trade Center on September 11, 2001?
20     A.   I believe that's the case, but you'd
21 have to ask the commissioner.  I did not form that.
22 That's a question more properly directed to him.
23     Q.   Did you have an understanding of what
24 the purpose of the task force was?

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 5 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 39

1    A.    Yes.
2    Q.    What was your understanding?
3    A.    To devise security procedures that we
4  could put in place that would maximize the
5  protection of our stadiums and do that in a
6  reasonable way that would not only provide real
7  security, it would inform the public and our
8  guests, our fans that they were, in fact, safe.
9    Q.    Where did that -- where did your
10 understanding of the purpose of the committee come
11 from?
12   A.    Commissioner Tagliabue.
13   Q.    From conversations with Mr. Tagliabue?
14   A.    His direction, yes, sir.
15   Q.    Now, you said that you -- one of the
16 purposes of the task force was to develop
17 procedures that would inform the public and the
18 fans that they were secure; is that correct?
19   A.    To make -- not exactly.  Not exactly.
20 Let me amplify on that.
21         An important part of security is the
22 perception of security, so that when fans come into
23 a stadium, that they feel comfortable.  They know
24 that measures are in place that are keeping them

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 6 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 40

1   safe, not only from being told that, but from
2   measures that they can see in place.  And I've got
3   numerous examples how that's played out over the
4   years.
5           People want to feel secure, and
6   especially after 9/11, we were intent on A, making
7   them secure and B, giving them the knowledge that
8   they were secure, so that they would perceive that
9   they were secure, so that they could then come in
10  and enjoy the game and not be frightened.
11      Q.   And the importance of that, in part --
12  would you agree that the importance of that is that
13  if fans didn't feel secure, they might not, at NFL
14  games, they might not come in as great of numbers
15  to NFL games, correct?
16      A.   Not exactly.  That's part of the answer.
17  It's part that certainly if they stayed away, that
18  would be a very bad thing for what we're trying to
19  do.
20           But secondly, we want them to enjoy
21  themselves.  We're in the entertainment business.
22  We want our fans to come in and enjoy the games and
23  be able to focus on the games and enjoy the games
24  and support their team.

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 7 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 47

```
 1    not an attorney, and in terms of the relationship
 2    that the teams and the league have, we fall
 3    underneath that.  So broadly, as to how much
 4    authority the league has over teams is something
 5    that I would not be prepared to answer in a
 6    qualified answer.
 7         Q.    Do you have an understanding of what the
 8    extent of your authority is?
 9         A.    Very broadly.
10         Q.    Do you believe -- is it your
11    understanding that you, as the director of
12    security, can require teams to implement specific
13    security procedures?
14         A.    As the individual or as my position, no,
15    I could not.
16         Q.    Is it your understanding that the NFL,
17    upon a vote of the owners, can require all teams to
18    implement specific security procedures?
19         A.    Yes.
20         Q.    Do you have an understanding of what the
21    consequence would be if a team either refused or
22    failed to comply with mandated security procedures?
23         A.    That's not something that I would be the
24    one person taking the authority to take that
```

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 8 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 88

```
 1   or do you do that?  Who makes those changes?
 2        A.    I do that.  They are an advisory
 3   committee.  That's their capacity.  And ultimately,
 4   I am only recommending to the commissioner.
 5              These matters flow to me.  I will draft
 6   any changes that should be considered into the best
 7   practices for a recommendation to the general
 8   counsel and to the commissioner.
 9        Q.    So, the best practices are
10   recommendations to the constituent football teams;
11   is that correct?
12        A.    That's correct.
13        Q.    Is that different from the NFL pat-down
14   policy?
15        A.    It is.
16        Q.    How is that different?
17        A.    Well, the NFL pat-down policy was
18   mandated by the league as a result of the owners
19   endorsing it and the commissioner going forward
20   with that and instructing that they be put in
21   place.
22        Q.    Are there other security procedures that
23   were adopted and made mandatory by a vote of the
24   constituent teams?
```

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 9 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 185

1    Q.    The question is, regardless of what an
2    NFL team, a specific NFL team knew about the
3    reasons for adopting this policy, once you made the
4    decision to make it mandatory, they had to follow
5    it regardless, correct?
6    A.    That's correct.
7    Q.    I'd like you to turn to the fifth page
8    of this exhibit, NFL 1102. And it says, Status of
9    pat-downs. Thirteen clubs used in 2004.
10         And those clubs were doing that
11   voluntarily of their own accord; is that correct?
12   A.    Yes.
13   Q.    Then it says, Every club would be
14   well-advised to consider implementing, genuine
15   deterrent and not just a terrorist issue.
16         What did you mean by not just a
17   terrorist issue?
18   A.    Active shooter, someone who is a
19   deranged person, an imbalanced person and not a
20   terrorist in the classical sense, but if someone is
21   deranged to the point where they want to strap on a
22   large amount of, you know, ten guns on themselves
23   or other explosives on themselves, someone who's a
24   deranged poor soul, but nonetheless deadly, we

Case 2:06-cv-01719-JLR   Document 32-10   Filed 05/08/2007   Page 10 of 10

US District Court - Seattle, Washington
Stark v. Seattle Seahawks, et al.

FINAL - Contains Confidential Section
Milton Ahlerich - May 2, 2007

Page 212

1   or some -- I mean, I would try.
2         Q.    Well, I guess, in reading this document,
3   it indicates on the second page some guidelines to
4   keep in mind.
5         A.    Uh-huh.
6         Q.    And to be frank, I can't tell which
7   parts of these are mandatory and which parts of
8   them are not.  So, do you have any understanding
9   how a member club is going to figure out or might
10  figure out which parts of the instructions given to
11  them are mandatory and which ones are not?
12        A.    Pat-downs are mandatory.  How you do
13  them, here's some guidelines.  We're trying to help
14  you here in giving you some ideas as to guidelines
15  for doing them.
16              Many clubs go further.  Many clubs go
17  much further than what's here.  That's their
18  business.  This is a start point for them.  They've
19  got to do the pat-downs.  They can't let them in.
20  This is material for them to work with in
21  developing how they train their people.
22              We have a video that we have deployed to
23  help people understand what our policies and
24  guidelines are.  They want to go further, they go