

**THE HONORABLE JAMES L. ROBART**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| FRED and KATHLEEN STARK, a married couple,<br><br>Plaintiffs,<br><br>v.<br><br>THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a Washington limited liability company, FIRST & GOAL, INC., a Washington corporation, THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington municipal corporation, and LORRAINE HINE, in her capacity as chair of the Washington State Public Stadium Authority board of directors,<br><br>Defendants. | Case No. CV06 1719 JLR<br><br>**DECLARATION OF JOHN J. DUNBAR IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

I, John J. Dunbar, declare and states under penalty of perjury:

1. I am over the age of 21 years and otherwise competent to make this declaration. I make this declaration on personal knowledge of the facts set forth in this declaration, unless expressly indicated otherwise.

2. Attached as Exhibit A is an accurate copy of the Approval of Naming Rights Agreement between PSA and FGI dated June 24, 2004.



BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

Dockets.Justia.com

3. Attached as Exhibit B are accurate copies of excerpts of the deposition of Ann Kawasaki-Romero, Executive Director of the Public Stadium Authority.

4. Attached as Exhibit C is an accurate copy of an exhibit used in Ms. Kawasaki-Romero's deposition, along with accurate copies of pages of her deposition testimony that authenticate and explain the line item showing interest earned on a lock box account.

5. Attached as Exhibit D are accurate copies of excerpts of the deposition of Lorraine Hine, Chair of the Public Stadium Authority's Board of Directors.

6. Attached as Exhibit E are accurate copies of excerpts of the deposition of Martha Fuller, Chief Financial Officer of First and Goal, Inc.

7. Attached as Exhibit F are accurate copies of excerpts of the deposition of Paul Schieck, who directs security for First and Goal, Inc.

I declare under penalty of perjury under the laws of the State of Washington and the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of May, 2007 in Portland, Oregon.

/s/ John J. Dunbar
John J. Dunbar



BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

LL 014-003
F 1542
D 136090

# APPROVAL OF NAMING RIGHTS AGREEMENT

DATED: June 24, 2004

BETWEEN: WASHINGTON STATE PUBLIC STADIUM AUTHORITY,
a Washington State public corporation
800 Occidental Avenue South, #700
Seattle, WA 98134 ("PSA")

AND: FIRST & GOAL INC.,
a Washington corporation
800 Occidental Avenue South, #200
Seattle, WA 98134 ("FGI")

PSA and FGI entered into that Master Lease dated November 24, 1998 (the "Lease"), pursuant to which PSA leases the Project Improvements, as defined in the Lease, to FGI. Pursuant to Section 17.4.3 of the Lease, PSA's prior reasonable approval is required before FGI may enter into a Special Naming Rights Agreement, as defined in the Lease.

Qwest Communications International, Inc. ("Qwest") entered into a Naming Rights Sponsorship Agreement (the "Sponsorship Agreement") with FGI and Football Northwest LLC ("FNLLC") on June 1, 2004. The Sponsorship Agreement contains provisions that pertain to Special Naming Rights as defined in the Lease and provisions that pertain to Qwest's sponsorship relationship with FGI and FNLLC. Those provisions of the Sponsorship Agreement that pertain to Special Naming Rights shall constitute, and are referred to herein as, the "Naming Rights Agreement."

The Naming Rights Agreement is subject to PSA approval. Other provisions of the Sponsorship Agreement pertaining to exterior signage are subject to approval of the City of Seattle Department of Planning and Development.

Pursuant to Section 17.4.5 of the Lease, consideration payable for Special Naming Rights is to be reasonably allocated between Special Naming Rights and consideration for sponsorship arrangements.

NOW, THEREFORE, in consideration of the agreements set forth in this Approval of Naming Rights Agreement (the "Agreement"), FGI and PSA agree as follows:

1. Approval of Naming Rights Agreement

PSA hereby approves the Naming Rights Agreement, pursuant to Section 17.4.3 of the Lease.

2. Naming Rights Consideration

2.1 FGI and PSA agree that the consideration reasonably allocable to Special Naming Rights is as set forth in attached Exhibit A.

2.2 In the event that FGI receives any payment under the Sponsorship Agreement which is less than the full payment required, the actual payment received shall be allocated between consideration for Special Naming Rights and consideration for sponsorship rights in proportion to the ratio between the applicable consideration for Special Naming Rights set forth on attached Exhibit A and the applicable total payment required under the Sponsorship Agreement, and FGI shall use commercially reasonable efforts to enforce the Sponsorship Agreement and collect the balance of the payment owed. The allocation of payments set forth in this Section 2.2 shall not apply in the event of a breach of the Sponsorship Agreement by FGI or FNLLC, in which event the provisions of Section 3 shall apply.

2.3 Pursuant to Section 17.4.5 of the Lease, FGI is authorized to deduct from the consideration received for the Special Naming Rights certain costs. The parties agree to reasonably allocate such costs between the Special Naming Rights and sponsorship rights. FGI

agrees to provide reasonable documentation supporting the amount of the actual costs incurred by FGI in connection with the Special Naming Rights. The "Net Naming Rights Payment" is the applicable amount allocable to the Special Naming Rights set forth on Exhibit A, less the mutually agreed-upon costs allocable to the Special Naming Rights.

2.4 FGI agrees to pay the Net Naming Rights Payment to PSA within ten (10) days of the receipt by FGI of any payment under the Sponsorship Agreement and the determination of the amount of the Net Naming Rights Payment.

2.5 Any dispute between FGI and PSA with respect to determining the amount of a Net Naming Rights Payment shall be resolved through Dispute Resolution pursuant to Section 24 of the Lease.

3. FGI's Performance of Its Obligations Under the Naming Rights Agreement

FGI agrees to perform its obligations under the Sponsorship Agreement and to cause FNLLC to perform its obligations under the Sponsorship Agreement. FGI agrees to enforce the Naming Rights Agreement. PSA is a third-party beneficiary of the Naming Rights Agreement. Any breach of the Sponsorship Agreement by FGI or FNLLC shall not diminish the amount of the Net Naming Rights Payment that would otherwise be payable to PSA if a breach had not occurred. Any sums received by FGI under the Sponsorship Agreement that are reduced by Qwest because of a purported breach or failure to perform by FGI or FNLLC shall cause a reallocation of the payment structure set forth in Exhibit A such that the reduced payment shall be allocated first to Special Naming Rights with the intent that PSA will receive the Net Naming Rights Payment, or any portion thereof, prior to any allocation of such sums to payments for sponsorship rights. Notwithstanding the foregoing, this Section 3 is not intended to make FGI or FNLLC personally liable to PSA for the Net Naming Rights Payments but only to obligate FGI and FNLLC to fully perform their obligations under the Sponsorship Agreement and, in the

event that a dispute over such performance results in a payment reduction by Qwest to reallocate sums received by FGI under the Sponsorship Agreement.

4. Modification to Naming Rights Agreement

4.1 FGI shall not grant a material waiver of any provision of the Naming Rights Agreement nor enter into any material modification of or amendment to the Naming Rights Agreement without giving PSA prior notice of such waiver, modification or amendment and without PSA's prior approval pursuant to the standards in Section 17.4.3 of the Lease.

4.2 The Naming Rights Agreement allows for a change in the Stadium Name, as defined in the Naming Rights Agreement under certain circumstances. FGI agrees that any such change in the Stadium Name shall be subject to PSA's prior approval pursuant to the standard set forth in Section 17.4.3 of the Lease.

5. Complete Agreement

This Agreement is the complete agreement of PSA and FGI with respect to the subject matter of this Agreement, and this Agreement supersedes any prior written or oral agreements on the same subject matter.

6. Master Lease

The Lease remains in full force and effect according to its terms.

IN WITNESS WHEREOF, FGI and PSA have executed and delivered this Agreement to be effective on the date first set forth above.

PSA: WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington State public corporation

By: Lorraine Hine
Lorraine Hine, Chair of the Board

FGI: FIRST & GOAL INC., a Washington corporation

By: ______________________
Tod Leiweke, President

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I certify that I know or have satisfactory evidence that **LORRAINE HINE** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the Chair of the Board of the **WASHINGTON STATE PUBLIC STADIUM AUTHORITY**, a public corporation of the State of Washington, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this 24th day of June, 2004.




J. E. Todd
(Signature of Notary)
J. E. Todd
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington, residing at Bothell, WA
My appointment expires 6-9-05

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I certify that I know or have satisfactory evidence that **TOD LEIWEKE** is the person who appeared before me, and said person acknowledged that said person signed this instrument, on oath stated that said person was authorized to execute the instrument and acknowledged it as the President of **FIRST & GOAL INC.**, a Washington corporation, to be the free and voluntary act of such corporation for the uses and purposes mentioned in the instrument.

Dated this 24th day of June, 2004.

Kristina M. Howell
(Signature of Notary)
Kristina M. Howell
(Legibly Print or Stamp Name of Notary)
Notary public in and for the State of Washington, residing at Bellevue, WA
My appointment expires 3/19/06



# Approval of Naming Rights Agreement – Exhibit A

**Payment Schedule:**

| Term | Escalation Rate | Year | Annual Payment Total | Annual Payment Naming Rights |
|---|---|---|---|---|
| 1 | | 2004 | $4,000,000 | $1,700,000 |
| 2 | 2.8% | 2005 | $4,112,000 | $1,747,600 |
| 3 | 2.8% | 2006 | $4,227,136 | $1,796,533 |
| 4 | 2.8% | 2007 | $4,345,496 | $1,846,836 |
| 5 | 2.8% | 2008 | $4,467,170 | $1,898,547 |
| 6 | 2.8% | 2009 | $4,592,250 | $1,951,706 |
| 7 | 2.8% | 2010 | $4,720,833 | $2,006,354 |
| 8 | 2.8% | 2011 | $4,853,017 | $2,062,532 |
| 9 | 2.8% | 2012 | $4,988,901 | $2,120,283 |
| 10 | 2.8% | 2013 | $5,128,590 | $2,179,651 |
| 11 | 10.0% | 2014 | $5,641,450 | $2,397,616 |
| 12 | 2.8% | 2015 | $5,799,410 | $2,464,749 |
| 13 | 2.8% | 2016 | $5,961,794 | $2,533,762 |
| 14 | 2.8% | 2017 | $6,128,724 | $2,604,708 |
| 15 | 2.8% | 2018 | $6,300,328 | $2,677,639 |
| | | **Total** | **$75,267,099** | **$31,988,517** |
| | | *Average Payment* | *$5,017,807* | *$2,132,568* |

EXHIBIT A
PAGE 7 OF 7

PSA 000225

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

FRED and KATHLEEN STARK, a married couple,

Plaintiffs,

vs.

No. CV 06-1719JLR

THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a Washington limited liability company, FIRST & GOAL, INC., a Washington corporation, THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington municipal corporation, and LORRAINE HINE, in her capacity as chair of the Washington State Public Stadium Authority board of directors,

Defendants.

---

Deposition Upon Oral Examination

Of

ANN KAWASAKI ROMERO

---

Taken at 999 Third Avenue, Suite 4400

Seattle, Washington

DATE: Wednesday, April 25, 2007

REPORTED BY: Mindy L. Suurs, CSR

EXHIBIT B

PAGE 1 OF 6

APPEARANCES

For the Plaintiffs:

CHRISTOPHER T. WION
Danielson Harrigan Leyh & Tollefson
999 Third Avenue
Suite 4400
Seattle, Washington 98104

For PSA and Lorraine Hine:

JOHN J. DUNBAR
Ball Janik
One Main Place
101 SW Main Street
Suite 1100
Portland, Oregon 97204-3219

For Football Northwest and First & Goal:

PAUL A. AINSWORTH
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

--oOo--

Q. Is the Exhibition Center used in connection with Seahawks games?

A. Yes.

Q. How is it used?

A. I believe they put interactive activities in there for patrons to use prior to the start of the game.

Q. Are there any concessions or other facilities located in the Exhibition Center during these pregame activities?

A. I believe there are some concessions, but I'm not certain.

Q. Do you know whether the PSA receives any profits -- let me rephrase the question.

Do you know whether there's any income generated from FGI's use of the Exhibition Center prior to or in connection with Seahawks games?

A. The Master Lease describes how -- what revenues are included in the calculation of profit sharing. I believe that if an event is ancillary to the primary event, which is, in this case, the Seahawks game, that that activity is attributable to the stadium and therefore not included in the calculation. I'm not 100 percent certain.

Q. Is there an entrance into Qwest Field through the Exhibition Center that is used during Seahawks games?

A. Is there an entrance through Qwest Field to the

Exhibition Center that's used during Seahawks games?

Q. Let me rephrase that. I think that's backwards from what I intended to say. Is it possible for patrons to enter Qwest Field through the Exhibition Center to go to a Seahawks game?

A. I believe so, but I don't know for sure.

Q. So I believe your testimony was that -- or is it your testimony that the PSA does not receive any revenue from use of the Exhibition Center prior to or in connection with Seahawks games?

A. Well, again, I'm not certain.

Q. How would you find out the answer to that question if you were going to look for it?

A. I would have to go back and verify that with our accountant.

Q. Does the PSA keep records that allow it to determine from what event a certain revenue is derived? In other words, if there's a particular event in the Exhibition Center and there's a certain amount of income, does the PSA have records that allow it to determine how much revenue was generated from that event and how much income it should get?

A. We don't have records like that. I think the relevant section in the -- or the Master Lease talks to which events are included in the calculation of profit

EXHIBIT B

sharing, so the answer is in the Master Lease, the relevant section of the Master Lease, if you have that.

Q. I do, and I guess I'm just trying to confirm whether the practice of -- my understanding of the Master Lease is what actually happens.

MR. DUNBAR: You can take a look at section 6.1.1.4, if you'd like.

THE WITNESS: Okay. So the events in the Exhibition Center would be ancillary to the events in the stadium, so it should not be included in the calculation because the primary use is the stadium.

MR. DUNBAR: And Counsel, I'd ask if there are particular provisions that you would like to ask Ms. Kawasaki about, I think it would be fair to direct her attention to those provisions. It's a big lease, as you know. It's pretty long, and I don't think this needs to be a memory quiz.

MR. WOJTANOWICZ: I wasn't attempting that. I was simply trying to determine whether they considered it an ancillary event. It wasn't necessarily a question about that provision. But that's fair enough. I'm not trying to tax her memory in an unreasonable way.

Q. To the best of your knowledge, the PSA does not consider the use of the Exhibition Center in connection with Seahawks games to be subject to its revenue sharing

# CERTIFICATE

THE STATE OF WASHINGTON )
)
COUNTY OF KING )

I, the undersigned officer of the Court under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter processed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony; That I am neither attorney for nor a relative or employee of any of the parties to this action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

**IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2nd day of May 2007**

MINDY L. SUURS
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
OCTOBER 3, 2010

Mindy L. Suurs

**NOTARY PUBLIC in and for the State of Washington residing at** Bellevue

EXHIBIT B
PAGE 6 OF 6

Washington State Stadium Authority
Revenue Received From FGI
1/1/2004 to Present

| Item | Amount |
|---|---|
| Rent | 2,824,644.00 |
| Common School Fund | 426,492.00 |
| Admission Surcharge | 2,012,636.00 |
| Naming Rights | 4,795,000.00 |
| Sale of FF & E | 64,627.00 |
| Interest Earnings on Lock Box | 17,474.00 |
| Total | 10,140,873.00 |

Exhibit 27 Date 4-25-07
Witness Kawasaki
Mindy Suurs

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

FRED and KATHLEEN STARK, a married couple,

Plaintiffs,

vs.

No. CV 06-1719JLR

THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a Washington limited liability company, FIRST & GOAL, INC., a Washington corporation, THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington municipal corporation, and LORRAINE HINE, in her capacity as chair of the Washington State Public Stadium Authority board of directors,

Defendants.

---

Deposition Upon Oral Examination

Of

ANN KAWASAKI ROMERO

---

Taken at 999 Third Avenue, Suite 4400

Seattle, Washington

DATE: Wednesday, April 25, 2007

REPORTED BY: Mindy L. Suurs, CSR

EXHIBIT C

PAGE 2 OF 6

A P P E A R A N C E S

For the Plaintiffs:

CHRISTOPHER T. WION
Danielson Harrigan Leyh & Tollefson
999 Third Avenue
Suite 4400
Seattle, Washington 98104

For PSA and Lorraine Hine:

JOHN J. DUNBAR
Ball Janik
One Main Place
101 SW Main Street
Suite 1100
Portland, Oregon 97204-3219

For Football Northwest and First & Goal:

PAUL A. AINSWORTH
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

--oOo--

amount of money and then beyond that, it becomes a First & Goal obligation, so --

BY MR. WOJTANOWICZ:

Q. So by collecting this surcharge on every ticket sold for events at the facilities, the PSA is obtaining revenue that allows it to satisfy its obligation to pay deferred sales tax; correct?

A. Yes.

Q. We previously marked Exhibit 27. I'd like you to turn back to that, please, and I'd just like to briefly go through these numbers and find out for sure what they represent.

Next to "Common School Fund," it lists $426,000, to round off. What do those payments to the Common School Fund -- from where are those revenues derived?

A. Net profits from the Event Center.

Q. And the admission surcharge which we just discussed produced a little over $2 million in revenue to the PSA from FGI; correct?

A. Yes.

Q. And the naming rights produced approximately $5 million in revenue?

A. Approximately.

Q. 4.7, to be fair. I guess it's not as close to five as I was thinking.

How much of that money has been spent on improvements to Qwest Field or major maintenance?

A. All of it.

Q. All of it. And what is sale of FF & E?

A. Sale of surplus furniture, fixtures, and equipment.

Q. And interest earnings on lock box. I think you touched on that earlier. Would you explain that for me?

A. That's interest on the lock box where PSL proceeds are deposited initially.

Q. PSL?

A. Personal seat licenses.

(Recess taken.)

(Exhibit No. 33 marked for identification.)

BY MR. WOJTANOWICZ:

Q. You're now being shown Exhibit 33. Do you recall that there was a soccer match between Real Madrid and DC United at Qwest Field?

A. Yes.

Q. Do you know whether the PSA derived any revenue directly from that event, leaving aside for the moment the ticket surcharge?

A. We didn't derive any revenue from this event.

Q. I just have a question. One of the items on this

EXHIBIT C
PAGE 5 OF 6

# CERTIFICATE

THE STATE OF WASHINGTON )
)
COUNTY OF KING )

I, the undersigned officer of the Court under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter processed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony; That I am neither attorney for nor a relative or employee of any of the parties to this action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2nd day of May 2007

MINDY L. SUURS
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
OCTOBER 3, 2010

Mindy L. Suurs
NOTARY PUBLIC in and for the State of Washington residing at Bellevue

EXHIBIT C
PAGE 6 OF 6

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

FRED and KATHLEEN STARK, a married couple,

Plaintiffs,

vs.

THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a Washington limited liability company, FIRST & GOAL, INC., a Washington corporation, THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington municipal corporation, and LORRAINE HINE, in her capacity as chair of the Washington State Public Stadium Authority board of directors,

Defendants.

No. CV 06-1719JLR

---

Deposition Upon Oral Examination

Of

LORRAINE HINE

---

Taken at 999 Third Avenue, Suite 4400

Seattle, Washington

DATE: Friday, April 27, 2007

REPORTED BY: Mindy L. Suurs, CSR

EXHIBIT D

PAGE 1 OF 5

A P P E A R A N C E S

For the Plaintiffs:

CHRISTOPHER T. WION
Danielson Harrigan Leyh & Tollefson
999 Third Avenue
Suite 4400
Seattle, Washington 98104

For PSA and Lorraine Hine:

JOHN J. DUNBAR
Ball Janik
One Main Place
101 SW Main Street
Suite 1100
Portland, Oregon 97204-3219

For Football Northwest and First & Goal:

PAUL A. AINSWORTH
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

--oOo--

EXHIBIT D
PAGE 2 OF 5

documents in any detail that you show the witness the document, please.

MR. WION: I don't think we're going to get into sufficient detail to warrant review of the Master Lease here.

MR. DUNBAR: It's up to you. I've made my objection.

And Lorraine, if you feel that your answer would be aided by reviewing the document, you're free to make that request as well, so go ahead.

(Record read as follows:

Q. And under the Master Lease, the PSA is entitled to receive a ticket surcharge from ticket sales at the stadium?")

MR. DUNBAR: And I'm going to interpose a quick objection, legal conclusion. Go ahead.

BY MR. WION:

Q. Do you know whether, in fact, the PSA has received admissions surcharges from FGI?

A. I believe so.

Q. And do you understand that, basically, the more people who buy tickets, the more money FGI is required to remit to PSA?

A. They must for every ticket do the surcharge, for everybody.

Q. So the more tickets, the more revenue for PSA?

A. That revenue is for a specific purpose -- to pay for the deferred sales tax. It's not for PSA for any operating purposes.

Q. Okay. But the amount that FGI pays to the PSA goes up when attendance goes up. Is that fair?

A. Not exactly because the amount is going to go to pay the deferred sales tax. It does not go to PSA for PSA purposes. If the amount is not sufficient to pay the total bill for deferred sales tax, FGI will have to supplement that.

Q. How would it supplement that?

A. They'd have to just pay whatever additional deferred sales tax bill there would be. This was an estimate as to how much it would be.

Q. Okay. This, I believe, has been previously marked as Exhibit 27. At least I will make that representation to you here today. And this appears to be a spreadsheet that was produced in this litigation by the PSA. The title says "Washington State Stadium Authority Revenue Received from FGI, January 1st, 2004, to Present"; is that correct?

A. Yes.

Q. Have you seen this document before?

A. Just two days ago.

EXHIBIT D
PAGE 4 OF 5

# CERTIFICATE

THE STATE OF WASHINGTON )
)
COUNTY OF KING )

I, the undersigned officer of the Court under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter processed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony; That I am neither attorney for nor a relative or employee of any of the parties to this action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

**IN WITNESS WHEREOF, I have hereunto set my hand and seal this 30th day of April 2007**

MINDY L. SUURS
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
OCTOBER 3, 2010

Mindy L. Suurs

**NOTARY PUBLIC in and for the State of Washington residing at** Bellevue

EXHIBIT D
PAGE 5 OF 5

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

FRED and KATHLEEN STARK, a married couple,

Plaintiffs,

vs.

THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST LLC., a Washington limited liability company; FIRST & GOAL, INC., a Washington corporation; THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a municipal corporation; and LORRAINE HINE, in her capacity as chair of the WASHINGTON STATE PUBLIC STADIUM AUTHORITY Board of Directors.

Defendants.

No. CV 06-1719 JLR

DEPOSITION UPON ORAL EXAMINATION

OF

MARTHA FULLER

Taken at 999 Third Avenue, Suite 4400

Seattle, Washington

DATE TAKEN: April 30, 2007

REPORTED BY: CINDY K. YOUNG CCR

EXHIBIT E

PAGE 1 OF 7

A P P E A R A N C E S

FOR THE PLAINTIFFS:

CHRISTOPHER T. WION
Danielson Harrigan Leyh & Tollefson
999 Third Avenue
Suite 4400
Seattle, Washington 98101

FOR THE DEFENDANT PSA & MS. HINE:

JOHN J. DUNBAR
Ball Janik
101 Southwest Main Street
Suite 1100
Portland, Oregon 97204

FOR THE DEFENDANT FOOTBALL NORTHWEST:

PAUL A. AINSWORTH
Covington & Burling
1201 Pennsylvania Avenue NW
Washington DC 20004

-and-

TIM J. FILER
Foster Pepper
1111 Third Avenue
Suite 3400
Seattle, Washington 98101

* * * * *

EXHIBIT E
PAGE 2 OF 7

of the original construction --

I'm sorry. Let me restate that. The deferred sales tax funds relate to sales taxes that would otherwise have been imposed on construction materials as part of the original construction of the stadium and the event center. Those were not applied and instead the surcharge then over time essentially makes the state whole for what it otherwise would have collected if those sales taxes had been imposed when the building was built.

(Exhibit No. 61 was marked for identification.)

Q. You've just now been handed what's been marked as Exhibit 61. And this is the second amendment to master lease dated November 24th, 1998 between the PSA and FGI. Have you seen this document before?

A. Yes.

Q. Did you review this document in preparation for your deposition today?

A. I did not.

Q. When did you see this the last time?

A. Probably back in 2004 when I started.

Q. Why would you have seen this at that time?

A. I thought it would be a good idea to see if I reviewed the master lease and the amendments so I was familiar with them.

EXHIBIT E
PAGE 3 OF 7

Q. I'd like to direct your attention to page 4, and there is a paragraph there identified as 18.2.4. Would you mind reading that to yourself quietly and I'll ask you some questions.

A. (Witness complies). Okay.

Q. Do you know if the amount of deferred sales tax whether it was greater or lesser than $37 million?

A. I believe it is the 37 million.

Q. About five lines down it says, quote, "The maximum aggregate amount of the ticket surcharge, and interest and earnings thereon, shall be equal to the amount by which (x) the lesser of the actual deferred sales tax or $37 million; exceeds (y) the amount of deferred sales tax funds (other than ticket surcharge proceeds) deposited pursuant to Section 13.2.3.1 of the Development Agreement and the MOU, and the interest earned on such funds."

So if I understand correctly you've indicated that your understanding is that X would be $37 million?

A. That's my understanding, correct.

Q. And Y, which refers to the amount of deferred sales tax funds with some qualifications, do you have a sense of what the deferred sales tax funds are?

A. I believe -- I know that they are less than 37 million.

Q. Okay. And this was an amount that was deposited

EXHIBIT E
PAGE 4 OF 7

by FGI?

A. I believe the --

Q. It says here that for Y, the amount of deferred sales tax funds deposited pursuant to, and then it recites a section of the agreement. So my understanding is that the deferred sales tax funds were actually deposited at some point; is that correct?

A. I don't know. That I don't know.

Q. So is it fair to say that you don't know whether the surcharges are the sole source of funds for repayment of the deferred sales tax?

MR. FILER: Asked and answered.

A. It is my understanding that the surcharge is the source, the sole source of the repayment of the deferred sales tax.

Q. So the repayment of the $37 million would come solely from the surcharges; is that correct?

A. That is my understanding.

MR. AINSWORTH: Chris, I'm going to object to further questions on this. You didn't ask us in a topic about deferred sales tax. I let this go for a little ways to get a context of the surcharge that is imposed but we have not prepared Ms. Fuller to testify to all the details of what goes on with the deferred sales tax. I think the document and the statute speak pretty clearly for

EXHIBIT E
PAGE 5 OF 7

the PSA account. The PSA can only use those dollars to reimburse First & Goal for approved major maintenance and modernization expenditures.

Q. And the next row is naming rights reimbursements, can you describe that, please.

A. Yes. To the extent that First & Goal has made major maintenance and modernizations to the buildings, to Quest Field and event center, that reflect projects, major maintenance and modernization projects that were previously approved by the PSA, again we are entitled to reimbursement for those projects with naming rights dollars. The extent to which First & Goal has made such investments to date significantly outstrips the actual dollars in the account so that's what that large negative number is. We are entitled to more money than has actually been received under the naming rights.

Q. So if that figure is larger than the negative as it is now, does that indicate that all the amounts, all the payments made for the naming rights that the PSA receives will then ultimately get paid back to FGI?

A. That's correct.

Q. And the sale of FF&E?

A. Yes. FF&E stands for furniture, fixtures and equipment. To the extent that assets that were originally acquired with the public dollars invested into Quest Field

**CERTIFICATE**

THE STATE OF WASHINGTON )
)
COUNTY OF KING )

I, the undersigned officer of the Court under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter processed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony; That I am neither attorney for nor a relative or employee of any of the parties to this action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2nd day of May 2007.

Cindy K. Young
NOTARY PUBLIC in and for the State of Washington residing at Burien

Rough & Associates, Inc.
3515 SW Alaska St., Seattle, WA 98126
206.682.1427

EXHIBIT E
PAGE 7 OF 7

UNITED STATES DISTRICT MUNICIPAL COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

FRED and KATHLEEN STARK, a married couple,

Plaintiffs,

vs.

THE SEATTLE SEAHAWKS, FOOTBALL NORTHWEST, LLC, a Washington limited liability company, FIRST & GOAL, INC., a Washington corporation, THE WASHINGTON STATE PUBLIC STADIUM AUTHORITY, a Washington municipal corporation, and LORRAINE HINE, in her capacity as chair of the Washington State Public Stadium Authority board of directors,

Defendants.

No. CV 06-1719JLR

---

Deposition and 30(b)6 Deposition Upon Oral Examination of

PAUL DENNIS SCHIECK

---

Taken at 999 Third Avenue, Suite 4400

Seattle, Washington

DATE: Tuesday, April 24, 2007

REPORTED BY: Mindy L. Suurs, CSR

EXHIBIT F

PAGE 1 OF 4

A P P E A R A N C E S

For the Plaintiffs:

Christopher T. Wion
Danielson Harrington Leyh & Tollefson
999 Third Avenue
Suite 4400
Seattle, Washington 98104

For PSA and Lorraine Hine:

JOHN J. DUNBAR
Ball Janik
One Main Place
101 SW Main Street
Suite 1100
Portland, Oregon 97204-3219

For Football Northwest and First & Goal:

PAUL A. AINSWORTH
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

EXHIBIT F
PAGE 2 OF 4

Q. I'm sorry, the football ticket --

A. You can go in without a ticket, but as you're leaving there to go into the stadium, you're screened. I'm sorry. It's --

Q. So between the exhibition hall and the stadium, there is the same type of screening process as at other gates outside the stadium?

A. You mean on the outside of the Exhibition Center? I guess -- I'm sorry. I'm unclear.

Q. If I understand correctly, you can go into the Exhibition Center and, from there, access the stadium; is that correct?

A. That is correct.

Q. At what point along that route would a fan be screened?

A. Before going into the stadium itself, so if you're in the Exhibition Center, you're not screened until you go into the stadium.

Q. And that screening process is the same as the screening process at other gates?

A. Yes, sir.

Q. Has that always been the case?

A. As far as I'm aware, it has been the case.

Q. Have there ever been pat-downs at Seattle Sounders games?

EXHIBIT F

## CERTIFICATE

THE STATE OF WASHINGTON )
)
COUNTY OF KING )

I, the undersigned officer of the Court under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter processed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony; That I am neither attorney for nor a relative or employee of any of the parties to this action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

**IN WITNESS WHEREOF, I have hereunto set my hand and seal this** 2nd **day of** May **200**

MINDY L. SUURS
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
OCTOBER 3, 2010

Mindy L. Suurs

**NOTARY PUBLIC in and for the State of Washington residing at** Bellevue

EXHIBIT F
PAGE 4 OF 4

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 18th day of May, 2007, I served a true and correct copy of the foregoing **DECLARATION OF JOHN J. DUNBAR IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT,** by the method shown below, addressed to the following named persons at their last-known addresses on the date shown above:

Timothy G. Leyh, Esq.
Christopher T. Wion, Esq,
Danielson Harrigan Leyh & Tollefon LLP
999 Third Avenue, Suite 4400
Seattle, Washington 98104
Counsel for Plaintiffs

BY EMAIL AND FEDERAL EXPRESS

Gregg H. Levy, Esq.
Paul A. Ainsworth, Esq.
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004

BY EMAIL AND FEDERAL EXPRESS

Jeffrey Miller, Esq,
Timothy Filer, Esq.
Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101
Attorneys for Defendants The Seattle Seahawks, Football Northwest LLC and First & Goal, Inc.

BY EMAIL AND FEDERAL EXPRESS

/s/ John J. Dunbar
John J. Dunbar, WSBA No. 15509
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, OR 97204
Phone: (503) 228-2525
Fax: (503) 226-3910
Email: jdunbar@bjllp.com

Attorneys for Defendants The Washington State Public Stadium Authority and Lorraine Hine