UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FRED STARK, et al.,

                Plaintiffs,

     v.

THE SEATTLE SEAHAWKS, et al.,

                Defendants.

CASE NO. C06-1719JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on Defendants' motions for summary judgment (Dkt. ## 21, 22). Defendants The Seattle Seahawks ("Seahawks"), Football Northwest, LLC ("Football Northwest"), and First & Goal, Inc. ("First & Goal") (collectively, the "private entities") filed one combined motion for summary judgment (Dkt. # 21), and Defendant Washington State Public Stadium Authority ("Stadium Authority"), together with Defendant Lorraine Hine, filed a second motion for summary judgment (Dkt. # 22). The court has considered the papers filed in connection with the motions and has heard oral argument. For the reasons stated below, the court GRANTS Defendants' motion.

## II. BACKGROUND

Plaintiffs Fred and Kathleen Stark challenge the pat-down searches that are a condition of a ticket-holder's entry to National Football League ("NFL") games held at

ORDER – 1

Qwest Field & Event Center ("Qwest Field"). The Starks, who are season ticket-holders, contend that the pat-downs constitute unreasonable searches in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983 ("Section 1983"), and Art. I, § 7 of the Washington State Constitution. For purposes of these motions, Defendants' sole contention is that the pat-down searches, which are authorized by private entities and conducted by private security personnel, do not constitute "state action," as required to state a claim for a constitutional violation. The facts pertinent to these motions are not in dispute.

In their Complaint, the Starks name the private entities responsible for conducting the pat-down searches: the Seahawks team (a member of the NFL), its owner, Football Northwest, and First & Goal (a Washington corporation that leases Qwest Field for the benefit of the Seahawks). They also name the public entity that owns Qwest Field, the Stadium Authority, and its Board of Director's Chair, Lorraine Hine. The Starks contend that the private entities and the Stadium Authority are so closely entwined in the operation of Qwest Field that the searches conducted by the private entities constitute state action.

**A.    Relationship Between the Stadium Authority and the Seahawks**

In 1997, the Washington Legislature enacted the Stadium and Exhibition Centers Financing Act ("Stadium Act") setting forth a comprehensive financing plan for a new stadium and exhibition hall. The legislature passed the Stadium Act in response to concerns that the then owner of the Seahawks, Ken Behring, planned to move the Seahawks to California. Wojtanowicz Decl., Ex. 4 at 3. In an attempt to keep the team in the greater Seattle area, Football Northwest negotiated and eventually acquired an option to purchase the Seahawks from Mr. Behring. Id. Football Northwest announced that it would not exercise its option to purchase the team unless there was a public

ORDER – 2

commitment "to enable and partially fund construction of a new football stadium for the Seahawks." Id. The passage of the Stadium Act followed.

The Stadium Act created the Stadium Authority entity, granting it authority to "construct, own, remodel and operate" an event center. See RCW § 36.102.050. Shortly after the Stadium Act went into effect, the Stadium Authority, in consultation with First & Goal, began construction on what is now called Qwest Field.[1] The parties do not dispute that Qwest Field, which cost approximately $430 million to build, is a public facility owned by the Stadium Authority. Kawasaki Romero Decl. ¶ 5. The majority of funding, approximately $300 million, for the development and construction of Qwest Field came from public funds, with First & Goal financing the remaining $130 million. Id.

In November 1998, upon completion of construction of Qwest Field, the Stadium Authority and First & Goal entered into a Master Lease agreement making First & Goal "the sole master tenant."[2] Ainsworth Decl., Ex. 4 (Master Lease) § 2.1. The Master Lease vests First & Goal with "exclusive power and authority to possess, operate, use, sublease, and enter into . . . agreements" involving Qwest Field. Id. In return, First & Goal pays an annual rent to the Stadium Authority of $850,000, plus any reasonable operating expenses that exceed the annual rent. Id. at § 5.1. With some exceptions set

---

[1]Qwest Field did not became known as such until July 2004. Dunbar Decl., Ex. A. For ease of reference, however, the court refers to the stadium as Qwest Field for all events, including those occurring prior to July 2004.

[2]The Stadium Act authorized the Stadium Authority "to enter into a long-term lease agreement with a team affiliate whereby, in consideration of the payment of fair rent and assumption of operating and maintenance responsibilities, risk, legal liability, and costs associated with the stadium and exhibition center, the team affiliate becomes the sole master tenant . . . ." RCW § 36.102.060(8).

ORDER – 3

forth below, First & Goal retains all revenues derived from its operation of Qwest Field. Master Lease § 2.1.

Both the Stadium Act and the Master Lease require First & Goal to pay the Stadium Authority 20% of the net profits from the Exhibition Hall (a building next to the stadium) into a common schools fund. Master Lease § 6.1.2; Dunbar Decl., Ex. C at 1. First & Goal also collects and remits to the Stadium Authority a 1.2% ticket surcharge that the Stadium Authority uses to pay down its tax obligation – $37 million in deferred sales tax on construction costs. Ainsworth Decl, Ex. 4 (Sec. Am. to Master Lease) § 18.2.3; see also RCW § 36.102.070. The Stadium Authority also receives fixed payments from the sale of the naming rights for Qwest Field, which go toward major maintenance and modernization improvements of Qwest Field. Id.; Master Lease § 11.6. Finally, if the Seahawks are sold within 25 years of the issuance of the bonds used to finance construction, the state will receive 10% of the gross selling price. RCW § 43.99N.020(2)(b)(vi).

**B.    NFL Pat-Down Policy**

In August 2005, the NFL adopted a policy mandating "limited pat-down inspections" of everyone entering NFL stadiums on the day of an NFL event. Ahlerich Decl. ¶ 13, Ex. B. First & Goal, at the Seahawks' behest, implemented the pat-downs at the start of the 2005 season, and in accordance with NFL guidelines. Shieck Decl. ¶ 13. First & Goal hired a third-party security vendor, Staff Pro, which provides about 180 licensed private security guards to visually inspect bags and conduct the pat-downs of ticket-holders on a same-gender basis. Id. at ¶ 10-11. The Starks do not offer any evidence to suggest that the Stadium Authority had any role in planning or implementing the pat-down searches, or that it approved, encouraged, or was even consulted about these procedures. Defendants, on the other hand, provide evidence that the Stadium Authority

ORDER – 4

1  had no role in the implementation or execution of the pat-down searches.  Kawasaki
2  Decl. ¶ 10.

## III.  DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no material factual dispute and he or she is entitled to prevail as a matter of law.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by producing evidence that negates an essential element of the non-moving party's case, or (2) after suitable discovery, by showing that the non-moving party does not have enough evidence of an essential element to carry its burden of persuasion at trial.  Id. at 322-23; see also Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden, the opposing party must present evidence to support its claim or defense.  Cline v. Indust. Maint. Eng'g. & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000).  For purely legal questions, summary judgment is appropriate without deference to the non-moving party.

**B.     State Action**

To prevail on their federal and state constitutional claims, the Starks must show that the pat-down searches at Qwest Field are fairly attributable to state action.  The Fourth Amendment prohibits only unreasonable searches conducted by the government or its agents.  United States v. Jacobsen, 466 U.S. 109, 113 (1984).  Private conduct may be considered government action if the deprivation of a federal right is fairly attributable to the state.  Lugar v. Edmonson Oil Co. Inc., 457 U.S. 922, 937 (1982) (noting that the

ORDER – 5

Fourteenth Amendment sets forth an "essential dichotomy" between government action subject to scrutiny and private conduct, "however discriminatory or wrongful," for which it offers no shield). Conduct that constitutes state action also satisfies Section 1983's "under color of law" requirement.[3] Id. at 935; Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001). Similarly, Washington's constitutional protections against unreasonable searches cannot be invoked absent state action. State v. Carter, 85 P.3d 887, 890 (Wash. 2004).

The Starks do not contend that the Stadium Authority conducted or authorized the pat-down searches. Instead, they argue that the Stadium Authority and First & Goal are so closely entwined that First & Goal's actions can fairly be attributed to the Stadium Authority. In furtherance of their theory, the Starks argue that there is a symbiotic relationship between the Stadium Authority and First & Goal, or alternatively, that First & Goal is performing an act that is "governmental in nature." Opp'n at 14, 23. The courts recognize the former theory as the "joint activity" test for state action, and the latter as the "public function" test. Although the Ninth Circuit recognizes at least four different criteria, or tests, to identify state action, see Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003), the court limits its analysis to these two test, as there is no evidence or argument in support of the application of the remaining two tests for state action. Notwithstanding, the court conducts its analysis mindful of the Supreme Court's direction in Brentwood:

> What [constitutes state action] is a matter of normative judgment, and the criteria lack rigid simplicity . . . . No one fact can function as a necessary condition across the board . . . nor is any set of circumstances absolutely

---

[3]Section 1983 provides, in relevant part: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983.

ORDER – 6

sufficient, for there may be some countervailing reason against attributing activity to the government.

531 U.S. at 295.

### 1. Joint Activity

Courts have found joint activity sufficient to impute state action in two general patterns: concerted or conspiratorial activity between state and private actors and the existence of a symbiotic relationship. The Starks argue the latter, that the Stadium Authority is in a symbiotic relationship with First & Goal. A symbiotic relationship occurs when the government has "so far insinuated itself into a position of interdependence with [a private entity] that it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Auth., 365 U.S. 715, 862 (1961). As evidence of the alleged symbiotic relationship between the Stadium Authority and First & Goal, the Starks point to the following: (1) First & Goal leases Qwest Field, a publicly-owned facility, from the Stadium Authority; (2) the Stadium Authority shares revenue with First & Goal in the form of a ticket surcharge, naming rights payments, and profits from the Exhibition Hall; and (3) Washington state owns an equity stake in the Seahawks if the team is sold within 25 years from the issuance of the construction bonds. Opp'n at 18. The Starks also point to various provisions in the Master Lease requiring First & Goal to provide benefits to the public not normally associated with commercial leases. For example, the Master Lease requires that the Seahawks offer a certain number of affordable tickets, that First & Goal comply with minority and woman-owned hiring goals, and that First & Goal make payments into a fund for the development of youth athletic facilities. Id. While these facts establish an on-going relationship between the public and private entities, they do not, without more, show that the Stadium Authority "has so far insinuated itself into a position of interdependence" with First & Goal, or the

ORDER – 7

other Seahawks Defendants, such that there is a symbiotic relationship between the two. See Burton, 365 U.S. at 725.

The Starks rely on Burton and Halet v. Wend Inv. Co., 672 F.2d 1305 (9th Cir. 1982), to argue that state action is satisfied by showing the integration and alignment of financial interests between the public and private entities. In Burton, the Supreme Court considered whether a restaurant's refusal to serve plaintiff because of his race could fairly be attributed to the public entity that owned the building that housed the restaurant. 365 U.S. at 723. In finding state action, the Court stressed that the restaurant was located on public property and that the rent from the restaurant contributed to the support of the qpublic building. Id. The Court was further convinced of state action by the argument that the restaurant's profits, and hence the state's financial position, would suffer if it did not discriminate based on race. Id. Similarly, in Halet, the Ninth Circuit found sufficient evidence of state action where the county leased land to a private entity who owned and operated an apartment complex on the land. 672 F.2d at 1310. The Ninth Circuit found a symbiotic relationship between the county and the owner based on the fact that the county owned the land and had developed it using public funds, the county leased the land to the owner for the benefit of providing housing to the public, and the county controlled the use and purpose of the apartment, as well as the rent the owner could charge, a percentage of which was paid to the county. Id.

In Burton and Halet, the Supreme Court and Ninth Circuit found symbiotic relationships between the public and private entities based primarily on the presence of a mutually beneficial relationship. Subsequent courts that have considered the definition of a symbiotic relationship, however, have narrowed the scope and application of Burton. In Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982), for example, decided shortly after the Ninth Circuit decision in Halet, the Supreme Court rejected a symbiotic relationship

ORDER – 8

argument because, although the state and private school were in a mutually beneficial relationship, there was no showing that the state derived any benefit from the challenged activity – i.e., the termination of school personnel. 457 U.S. at 842-43. In distinguishing Burton, the Court emphasized that there was evidence that the state in Burton actually "profited from the restaurant's discriminatory conduct." Id. at 843. The Rendell-Baker Court found no such connection between the benefit conferred to the state by the school and the challenged activity, and thus no symbiotic relationship. Id. In Morse v. N. Coast Opportunities, Inc., the Ninth Circuit later expounded on the Supreme Court's decision in Rendell-Baker, finding "that governmental funding and extensive regulation without more will not suffice to establish governmental involvement in the actions of a private entity." 188 F.3d 1338, 1341 (9th Cir. 1997) (citing Rendell-Baker in overruling Ginn v. Mathews, 533 F.2d 477 (9th Cir. 1976), a decision relying on Burton). The Morse court noted that Burton's symbiotic relationship test requires additional evidence of interdependence, such as "the physical location of the private entity in a building owned and operated by the State, and a showing that the State profited from the private entity's discriminatory conduct." Morse, 188 F.3d at 1341.[4] Thus, the Starks must tie the Stadium Authority's profits to the pat-down searches conducted by the private entities.

---

[4]The Tenth Circuit likewise recognized the limitations of Burton. In Gallagher v. Neil Young Freedom Concert, it found no symbiotic relationship where a private lessee of a state university event center contracted with a third-party to conduct pat-downs of all concertgoers. 49 F.3d 1442, 1453 (10th Cir. 1995). The Tenth Circuit noted that subsequent Supreme Court decisions "have read Burton narrowly" and distinguished it on its facts "as part of [the Court's] justification for not finding state action." Id. at 1451. The Starks argue that Gallagher was not a case involving a symbiotic relationship because the private-state interests were much less entwined than in the present case. Opp'n at 20-21. The Gallagher court, however, found the lease and other economic and non-economic benefits between the university and the private lessee insufficient under *both* the nexus and symbiotic relationship tests because the allegedly unconstitutional pat-downs could not be tied to university policies or profits indispensable to the university's financial success. 49 F.3d at 1453 (noting also that joint activity did not exist simply because the university shared the private defendants' goal of ensuring a profitable concert).

ORDER – 9

In light of <u>Rendell-Baker</u> and <u>Morse</u>, the court therefore considers additional factors for determining whether a symbiotic relationship exists in this case. While the Starks point to several ways in which the Stadium Authority and First & Goal benefit from their relationship, they do not offer sufficient evidence that the Stadium Authority operates Qwest Field, or that it profits from the allegedly unconstitutional pat-down searches. There is no dispute regarding the Stadium Authority's grant to First & Goal of the exclusive right to operate Qwest Field. <u>See</u> Master Lease § 2.1 ("[First & Goal] has the exclusive power and authority to . . . operate . . . [Qwest Field]"). The parties do dispute, however, whether the evidence supports a finding that the Stadium Authority profits from the pat-down searches.

The Starks contend that the Stadium Authority indirectly benefits from the searches because the Seahawks want to make fans feel more secure, and more likely to purchase tickets. Opp'n at 21. These hypothetical increased ticket sales, according to the Starks, correlate to greater profit for the Stadium Authority based on the 1.2% ticket surcharge it receives from First & Goal. As explained by the Stadium Authority, and not refuted by the Starks, however, the ticket surcharge paid to the Stadium Authority is not profit, but is used to pay a tax obligation the Stadium Authority owes on the construction of the stadium. Dunbar Decl, Ex. E (Fuller Dep.) at 4. The tax obligation is a set amount, $37 million, that First & Goal owes to the Stadium Authority. Sec. Am. to Master Lease § 18.2.4. If the surcharge is not sufficient to retire the debt at the time specified in the Master Lease, First & Goal must make up the difference. <u>Id.</u> First & Goal's obligation to collect the surcharge and pay it to the Stadium Authority ceases once it reaches the set amount. <u>Id.</u> Thus, the only effect the supposed increased ticket sales has on the surcharge is potentially to retire the debt sooner; an increase in ticket sales does not therefore directly profit the Stadium Authority.

ORDER – 10

The Starks' remaining arguments regarding the Stadium Authority's ability to profit from the pat-down searches are unavailing. The Starks point to rental and naming rights payments that the Stadium Authority receives from First & Goal, yet there is no dispute that these are fixed amounts that do not depend on ticket sales. Dunbar Decl., Ex. A at 7; Kawasaki Decl. ¶ 9. The Starks also contend that the Stadium Authority profits from the revenues received from the Exhibition Hall, a separate building next to the stadium. Again, the uncontroverted evidence before the court is that there is no pat-down search prior to entering this building and, on days when the Seahawks are playing at Qwest Field, the revenue from the Exhibition Hall does not go to the Stadium Authority. Kawasaki Decl., ¶ 9, Ex. A at 24-25; Master Lease § 6; Kawasaki Dep. at 3-5, Ex. F at 3. Finally, the Starks point to the State's 10% interest in the Seahawks if they are sold within 25 years after issuance of the construction bonds. The court fails to see how this interest, which is pure speculation at this time, supports a finding that the Stadium Authority profits from the current pat-down search policy at Qwest Field.

Although the court acknowledges the existence of a beneficial relationship between the private entities and the Stadium Authority in this case, and that they may even publicly proclaim themselves a "model for public-private partnerships," this does not rise to the level of a symbiotic relationship. The Stadium Authority did not participate in the original decision to conduct pat-down searches of ticket-holders, nor did it control, profit, or directly benefit from the pat-down searches conducted by the private entities at Qwest Field. Accordingly, the court concludes that the Starks have failed to come forth with sufficient evidence to meet the symbiotic relationship test for demonstrating state action.

ORDER – 11

2.  Public Function

In the alternative, the Starks contend that the pat-downs constitute state action because the Stadium Authority "delegated nearly its <u>entire</u> public function to First & Goal" and conferred the "governmental" responsibility of managing a publicly owned stadium required to yield numerous public benefits. Opp'n at 23-24. One way to find state action is by showing that the private entity exercises powers "traditionally exclusively reserved to the State." <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. 345, 352 (1974). In support of this theory, the Starks offer testimony by the Executive Director of the Stadium Authority, that the Master Lease requires First & Goal to provide certain public benefits to the community, that are not typical to a commercial lease. Wojtanowicz Decl., Ex. 1 (Kawasaki Romero Dep.) at 10. Similarly, the Starks offer evidence that the Stadium Authority's mission is to provide "economic and entertainment benefits to residence across the State of Washington." <u>Id.</u> at 32. Essentially, the Starks contend that because the Stadium Authority was created to provide a public benefit, i.e., an event center, its delegation of this duty to First & Goal does not relieve it of liability for First & Goal's actions. Opp'n at 24.

The Starks' reliance on the public function test is misplaced. The public function test is not satisfied simply because a private entity performs a public function; rather, it requires that the public function be one that is traditionally reserved to the government. While providing an event center may be considered a public function in light of the directives in the Stadium Act, the court is not persuaded that operating an event center is a function that has traditionally and exclusively been reserved to the state. Indeed, there are very few functions considered "exclusively reserved to the state" when determining state action. See <u>Flagg Bros. v. Brooks</u>, 436 U.S. 149, 158 (1978) ("While many functions have been traditionally performed by governments, very few have been

ORDER – 12

'exclusively reserved to the State.'"). The context in which courts have recognized traditional state functions include administering elections, Terry v. Adams, 345 U.S. 461 (1953); and running a company-owned town, Marsh v. Alabama, 326 U.S. 501 (1946). The court concludes that operating an event center, on the other hand, does not rise to the level of a traditional state function. See, e.g. Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974) (holding that utility services, though marked with a strong public interest, were not the exclusive prerogative of the state, but associated with both the public and private spheres); see also Lee v. Katz, 276 F.3d 550, 555 (9th Cir. 2002) (noting that to satisfy public function test, the task must be "both traditionally and exclusively governmental"). Indeed, the Ninth Circuit's Lee decision, which the Starks rely on, "turn[ed] on what is quintessentially an exclusive and traditional public function – the regulation of free speech within a public forum." 276 F.3d at 556-57 (holding that regulating speech within the Rose Quarter Commons was state action, but emphasizing "we do not hold that everyone who leases . . . a state-owned public forum will necessarily become a State actor") (citing Lansing v. City of Memphis, 202 F.3d 821, 828-29 (6th Cir. 2000)).

      The expenditure of public funds for the construction of Qwest Field does not alter the court's analysis. In Rendell-Baker, the Supreme Court held that a privately owned school that received up to 99% of its funding from public sources and was subject to significant public regulation did not perform a traditionally exclusive public function. 457 U.S. at 842; see also Blum v. Yaretsky, 457 U.S. 991, 1011-12 (1982) (finding no public function where state subsidized operating and capital costs of nursing homes and paid 90% of patients' medical expenses). The relevant question is not whether a private group served a public function, or served one funded by the public, but rather whether the

ORDER – 13

function was one "traditionally the *exclusive* prerogative of the State." Rendell-Baker, 457 U.S. at 842 (emphasis in original) (citations omitted).

Finally, to the extent the Starks argue that providing security is a public function, for the same reasons as stated above, the court concludes that it is not. In so concluding, the court finds the Tenth Circuit's decision in Gallagher persuasive. 49 F.3d at 1457. Under analogous facts to those before the court in this case, the Tenth Circuit held that providing security for a company that leased a government-owned facility did not constitute a public function. Id. (concluding that where two private firms planned and conducted pat-down searches independently of university officials, the public function test was not satisfied). Because neither operating a stadium nor providing security is a function traditionally and exclusively reserved to the state, the court concludes that the pat-down searches conducted by private actors at Qwest Field do not constitute state action.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motions for summary judgment (Dkt. ## 21, 22). The court directs the clerk to enter judgment consistent with this order.

Dated this 22nd day of June, 2007.

JAMES L. ROBART
United States District Judge

ORDER – 14